**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AU NEW HAVEN, LLC, and TRELLEBORG COATED SYSTEMS US, INC., <br><br> Plaintiffs, <br><br> v. <br><br> YKK CORPORATION et al., <br><br> Defendants. | Civil Action No. 1:15-CV-03411 (GHW) <br><br><br> **DEFENDANTS' BRIEF IN SUPPORT OF THEIR ASSERTION OF PRIVILEGE RELATIVE TO DOCUMENTS WITHHELD FROM PRODUCTION TO PLAINTIFFS IN DISCOVERY** |

**TABLE OF CONTENTS**

INTRODUCTION AND STATEMENT OF FACTS
    RELEVANT TO THIS MOTION ..........................................................................1

    I.     Structure of YKK's Legal Department and Related Privilege Law ......................1

ARGUMENT ...................................................................................................................3

        A.     The Attorney Client Privilege is Preserved in Communications Among
             Commonly Owned Entities, Such as the Defendants in this Case .............3

        B.     Privilege is Preserved When Communications To or From a Lawyer are
             Communicated Through a Member of the Legal Department, Which YKK
             Frequently Does Due to the Multilingual Nature of YKK's Legal Affairs .5

    II.    Specific Documents at Issue......................................................................9

        A.     Document 2.....................................................................................9

        B.     Document 3...................................................................................10

        C.     Documents 6 and 8.........................................................................10

        D.     Document 9...................................................................................11

        E.     Document 15.................................................................................11

        F.     Document 50.................................................................................12

        G.     Document 118...............................................................................13

        H.     Document 119...............................................................................13

        I.     Document 129...............................................................................14

    III.    Conclusion...........................................................................................14

i

# TABLE OF AUTHORITIES

**Cases**

*Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*,
No. 99 Civ. 1725, 2000 WL 1800750 (S.D.N.Y. Dec. 7, 2000)............................................3, 4

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)...........................................................................................................4

*Erie R.R. Co. v. Tompkins*,
304 U.S. 64 (1938)............................................................................................................3

*Golden Trade, S.r.L. v. Lee Apparel Co.*,
143 F.R.D. 514 (S.D.N.Y. 1992) ........................................................................................6

*In re Grand Jury Subpoenas Dated March 24, 2003*,
265 F. Supp. 2d 321 (S.D.N.Y. 2003)..................................................................................6

*In re Pioneer Hi-Bred Intern., Inc.*,
238 F.3d 1370 (Fed. Cir. 2001) .........................................................................................3

*In re Regents*,
101 F.3d at 1390 ..............................................................................................................3

*Music Sales Corp. v. Morris*,
No. 98 Civ. 9002, 1999 WL 974025 (S.D.N.Y. Oct. 26, 1999) ............................................3, 4

*U.S. v. Kovel*,
296 F.2d 918 (2d Cir. 1961) ...........................................................................................6, 7

**INTRODUCTION AND STATEMENT OF FACTS**
**RELEVANT TO THIS MOTION**

**I.        Structure of YKK's Legal Department and Related Privilege Law**

Defendant YKK Corporation ("YKK") is the parent company to the members of the YKK Group, which includes YKK and all of the other Defendants in this action (the "Affiliate Defendants"). As the Declaration of James Reed[1] filed simultaneously herewith supports, the legal departments at each affiliate member of the YKK Group work collaboratively and without regard to the precise corporate structure of each individual entity or the immediate responsibilities of individual attorneys to their direct employer.  In other words, the legal departments of *all* YKK affiliates in the YKK Group, including, without limitation, the Affiliate Defendants, work together to advance the interests of the YKK Group as a whole in coordinated harmony with the overall direction of the corporate parent. YKK Corporation of America's ("YCA") Legal Department, for instance, houses U.S. barred attorneys.  Attorneys from this legal department dispense legal advice to all YKK Group members when dealing with issues of U.S. law.  Communications from the YCA legal department to employees at other affiliates are consequently and routinely made with the expectation that all such communications 1) are confidential, 2) are subject to the attorney-client privilege, and 3) are made to further the interests and legal concerns of the YKK Group as a single entity, under common ownership and control. Prevailing law supports this expectation and immunizes such communications from disclosure to entities *outside* the YKK family of enterprises.

As the Reed Declaration also makes plain, non-lawyer employees within the YKK Group constitute an integral, important, and inseparable element of the consideration and delivery of

---

[1] That Declaration is referenced herein as "Reed Dec. at ____."  All the factual assertions in this Brief are supported by the paragraphs of the Reed Declaration, which is based on the personal knowledge of Mr. Reed and his knowledge of relevant books and records of YKK or its affiliate entities.

legal advice within and to the YKK Group.  Because of the far-flung, world-wide operations and many languages and time differences YKK confronts in its global activities, YKK routinely communicates through non-lawyers to and from the lawyers working for the YKK Group's interests. The reason is two-fold: First, the attorney managing a particular issue frequently requires help and assistance of non-lawyers throughout the YKK Group's legal department to supervise and implement the direction of the legal advice, especially when dealing with different languages. The sheer volume of communications across the extensive network of YKK companies[2] that implements an attorney's advice often means that not every communication copies an attorney, including even the source of the legal advice when that advice is further communicated to relevant YKK Group personnel; that fact, however, in no way diminishes the privileged nature of the substance of the communication within the YKK family, as Defendants demonstrate within. Second, the YKK Group attorney responsible for managing the relationship with Plaintiff AU New Haven, LLC (f/k/a Uretek) ("Uretek") was at all times an exclusively English-speaking attorney, duly admitted to practice law in his or her jurisdiction, and physically located in the United States.  Conversely, the majority of YKK Group employees (regardless of their physical location or their YKK family affiliation) were natively Japanese-speaking. Even if they had acquired some level of English language comprehension, the legal departments recognized the need for non-lawyers to assist the attorney in communicating the nuanced needs of the client and the equally nuanced advice of the attorney.

This undoubted fact creates a practical necessity for YKK: communications with other parts of the world-wide legal structure of YKK as well as with other, non-legal YKK employees for purposes of dealing with legal issues concerning the Uretek relationship frequently, if not

---

[2] During the relevant period of the instant controversy, the YKK Group consisted of more than 100 separately incorporated or organized legal entities.

2

universally, included a bilingual member of YKK's legal team. That legal department employee would then be able to translate the request for legal advice to the supervising attorney for response, and then consequently translate the attorney's advice to the requesting party.

This brief now demonstrates that this described factual arrangement is consistent with, and in no way compromises or eviscerates the protection of privilege afforded legal advice— even when communicated through the non-attorney legal department employee. The challenged documents that YKK withheld from production were properly withheld and adequately described.

## ARGUMENT

A.   The Attorney Client Privilege is Preserved in Communications Among Commonly Owned Entities, Such as the Defendants in this Case.

In New York[3], entities that are under common ownership, which is the case in this action relative to YKK and the YKK Affiliates, are considered a *single* entity for purposes of evaluating and enforcing protections afforded by the attorney-client privilege. *See, e.g., Music Sales Corp. v. Morris*, No. 98 Civ. 9002, 1999 WL 974025, at *7 (S.D.N.Y. Oct. 26, 1999); *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, No. 99 Civ. 1725, 2000 WL 1800750, at *6 (S.D.N.Y. Dec. 7, 2000). This rule has a clear consequence: sharing attorney-client privileged information between and among affiliated entities under common ownership neither waives nor compromises that privilege. Indeed, this court has explicitly distinguished between the requirements to preserve privilege between *related* rather than *unrelated* entities:

---

[3] YKK believes that New York law, as the substantive law of the forum state, where the parties agreed to have controversies litigated would apply here for two reasons: 1) traditional choice of law rules would indicate that New York was the relevant substantive law, and 2) to the extent that any aspect of this Court's subject matter jurisdiction would rest on federal question jurisdiction, the Federal Circuit has likewise made plain that the substantive law of the District Court's venue would be the appropriate body of substantive law to apply. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *In re Pioneer Hi-Bred Intern., Inc.*, 238 F.3d 1370, 1374 (Fed. Cir. 2001) ("With respect to the privilege questions, we apply the law of the [regional circuit]. See *In re Regents*, 101 F.3d at 1390, n. 2 ("For procedural matters that are not unique to patent issues, we apply the perceived law of the regional circuit.").).

> *[U]nrelated* corporations cannot claim the attorney-client privilege for communications from counsel which they have shared with each other unless they have a substantial identity of legal interest. Corporations which are related through common ownership or control, however, need not meet this strict standard. Rather, such inter-related corporate communications are treated in the same manner as intra-corporate communications. Corporations consequently can demonstrate sufficient interrelatedness to be treated as one entity for attorney-client privilege purposes if they *either* are closely affiliated *or* share an identity of legal interest.

*Music Sales*, 1999 WL 974025, at *7 (internal quotation marks and citations omitted) (emphasis in original). *See also Cary Oil*, 2000 WL 1800750, at *6 ("The plaintiffs cite no New York case holding that a subsidiary waives its privilege by making disclosures to its parent corporation. There is no such waiver in federal-question cases."). These authorities are illustrative of a long-established, clear rule, a rule on which YKK is entitled to rely in order to protect its privilege: sharing privileged information within the framework of related entities acting, in essence, as a single enterprise has no effect on the vitality of the underlying privilege.[4]

All members of the YKK Group, including without exception the Affiliate Defendants, are under the common ownership of YKK, the parent corporation of each of them. Reed Decl. at ¶ 2. The legal departments of YKK Group members work collaboratively across affiliates for the common interest of the YKK Group, functioning in essence as a single unified legal department which provides advice to all members of the YKK Group. *Id.* at ¶ 4. This way, professional expertise within one jurisdiction within the global enterprise can be leveraged across the YKK group as the need arises. YKK's privilege persists intact and undiminished where, as happens frequently in the coordination of YKK's world-wide activities, a member of one affiliate's legal department conveys attorney advice to employees of another affiliate, or where an employee of

---

[4] This is consistent with the 'single entity' rule that now prevails in the enforcement of §1 of the Sherman Act. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (holding that agreements between corporate subsidiaries under common ownership, though distinct legal entities, were not within the ambit of §1 of the Sherman Act because of the common enterprise of which they were a part).

4

one affiliate solicits legal advice through a member of another affiliate's legal department, or where an employee of one affiliate communicates an attorney's previous advice to an employee of another affiliate. Preservation of the privileges, maintained here by withholding them from production, supports the underlying purpose of immunizing such communications among YKK personnel: encouraging frank exchanges between clients, attorneys and among each other to ensure the confidentiality of such exchanges against the prospect that an adversary—as the Plaintiffs here—could reach through intrusive and comprehensive discovery, as plaintiffs here have propounded, those communications.

Such cross-affiliate interactions are common in documents relevant to this litigation because the attorney in charge of managing the Uretek-related legal issues was at all times a member of the legal department at YCA and was often called upon as a part of his or her duties to his or her immediate employer, YCA, and the ultimate parent, YKK, to provide legal advice to employees at other YKK affiliates regarding the scope and implementation of the License Agreement between YKK and Uretek. *Id.* at ¶¶ 5, 7. The attorney-client privilege inherent in such communications is not waived simply because it has been conveyed to a YKK employee at *another* affiliate in the YKK family. To hold otherwise would render the privilege only a theoretical protection, but a practical nullity.

B.   Privilege is Preserved When Communications To or From a Lawyer are Communicated Through a Member of the Legal Department, Which YKK Frequently Does Due to the Multilingual Nature of YKK's Legal Affairs.

It is bedrock law that the attorney-client privilege is not limited to communications between an attorney and his or her client. "Rather, if the purpose of the communication is to facilitate the rendering of legal services by the attorney, the privilege may also cover communications between the client and his attorney's representative, between the client's representative and the attorney, and between the attorney and his representative." *Golden Trade,*

5

*S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 518 (S.D.N.Y. 1992). It is likewise inarguable that the privilege extends to communications involving persons, as this Court has observed:

> "assisting the lawyer in the rendition of legal services. This principle has been applied universally to cover office personnel, such as secretaries and law clerks, who assist lawyers in performing their tasks. But it has been applied more broadly as well. For example, in *United States v. Kovel*, the Second Circuit held that a client's communications with an accountant employed by his attorney were privileged where made for the purpose of enabling the attorney to understand the client's situation in order to provide legal advice."

*In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321, 325 (S.D.N.Y. 2003).

Further, the Second Circuit has acknowledged the necessity for this rule:

> [T]he complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others; few lawyers could now practice without the assistance of secretaries, file clerks, telephone operators, messengers, clerks not yet admitted to the bar, and aides of other sorts. The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents.

*U.S. v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (internal quotation marks and citation omitted).

Recognition and enforcement of this privilege is *not*, however, confined merely to ministerial employees. As the Second Circuit further held,

> [W]e can see no significant difference between a case where the attorney sends a client speaking a foreign language to an interpreter to make a literal translation of the client's story; a second where the attorney, himself having some little knowledge of the foreign tongue, has a more knowledgeable non-lawyer employee in the room to help out; a third where someone to perform that same function has been brought along by the client; and a fourth where the attorney, ignorant of the foreign language, sends the client to a non-lawyer proficient in it, with instructions to interview the client on the attorney's behalf and then render his own summary of the situation, perhaps drawing on his own knowledge in the process, so that the attorney can give the client proper legal advice. All four cases meet every element of [attorney-client privilege].

*Id.*

6

YKK Group's legal departments hire non-attorney employees for the express purpose of assisting the managing or supervising attorneys in their duties and responsibilities to provide clear, understandable legal advice, which can be comprehended in the native language of those acting pursuant to that advice. That is the sole reason such personnel are hired as members of the legal department rather than by the company at-large. Reed Decl. at ¶ 8. Indeed, non-attorney legal department employees are neither expected to, nor are they authorized to, provide their *own* legal advice.  They assist in the development or communication of the *attorney's* legal advice; they are conduits or transmitters of legal advice, not its authors. *Id.* at ¶ 10. For example, as in the examples provided in *Kovel*, YKK's non-attorney employees in YKK's legal departments may be asked to interview other employees or to attend meetings in order to report back the information to the attorney so *the attorney* can develop legal advice based on that information. *Id.* at ¶¶ 8-10.

With specific reference to the circumstances here, YKK's relationship with Plaintiff Uretek was supervised at all times by any of John Castellano, Key Wynn, or James Reed, each one of whom are admitted to the bar in the United States, but *none* of whom is fluent in Japanese. *Id.* at ¶ 9. Communications between these attorneys and YKK Group employees, the majority of whom are native, if not exclusively Japanese speakers, necessarily must be translated in both directions to encourage and protect the intelligibility of both the request and the response. As a practical matter, the YKK Group instead staffs its legal department with bilingual employees that assist the attorneys in the provision and implementation of their legal advice. *Id.* at ¶ 9.

Because of the global nature of the YKK Group's business, and the often thirteen or fourteen hour time difference between the United States and Japan, meetings that would more

traditionally take place in person or by telephone instead occur via email. That logistical and practical impediment accounts for the large distribution list on some email communications and the high volume of such traffic. *Id.* at ¶ 11. For initial emails, the "to" field generally includes the writer's immediate supervisor(s), which may be thought of as the person whose office everyone would be standing in were all of the participants in the same country and able to meet in person.[5] *Id.* at ¶¶ 11-12. The other "attendees" are copied because they need to know the information contained in the email and would have been invited into the "office" in a normal face-to-face meeting. *Id.* at ¶ 14. A "cc" within the YKK Group is not just a gratuitous addition to a communication. Recipients of such emails represent the team for that particular issue. *Id.* at ¶ 14-15.

When a member of the legal department is the recipient of or is copied on a communication, it is because the information contained therein has been requested by the legal department or because the sender is specifically intending for the legal department to weigh in if they see a problem with the information or course of action described. *Id.* at ¶ 15-16. It is a fact of life within the YKK family that the legal departments within the YKK Group provide a constant stream of legal advice to YKK employees as issues, relationships, and negotiations develop, rather than providing after the fact legal corrections to already-made decisions. *Id.* The legal department is not included in communications where legal advice is not sought or required. *Id.* Non-attorney members of the legal departments are often included, rather than being direct recipients, because their inclusion in the communication is intended to be a "go-between," informing the supervising attorney of the contents of the communication and soliciting his or her input on the matters at hand. *Id.*

---

[5] The individuals in the "to" vs. "cc" field may change as emails are replied to, but this concept holds true for initial emails as well as intentional changes to the distribution list.

Communications with non-attorney members of the legal department may therefore be protected by the attorney-client privilege where they are intended to assist the attorney in the provision of his or her legal advice, either as a figurative extra set of hands or as an intermediary translator.[6] Against this legal context and framework, YKK proceeds to discuss the documents Plaintiffs have chosen to challenge.

## II.    Specific Documents at Issue

### A.    Document 2

This email from Jack Sasaki copies Katsu Yumoto who was, at the time of this email, the "Legal Coordinator" at YCA reporting directly to John Castellano. The Legal Coordinator acts to "bridge the gap" between Japanese colleagues and the supervising U.S. attorneys, and to serve as the attorney's proxy in electronic "meetings" conducted in Japanese. *Id.* at ¶¶ 17-18. This email reflects the legal department's previous legal directions on the merits of Uretek's proposals under blue section heading (1). Under blue section heading (2), Mr. Sasaki explicitly states the need for a formal legal opinion on a certain issue. The statement of a need for this opinion is a reflection of prior legal advice and, given Mr. Yumoto's inclusion on the email, is intended to solicit that formal legal opinion from YKK's legal department in the person of John Castellano.

---

[6] Defendants long ago informed Plaintiffs, in response to their questions regarding the identity of the person providing legal advice for whom privilege was claimed, that any Uretek-related legal advice provided between September 20, 1993 and April 21, 2008 was from John Castellano, between April 22, 2008 and January 25, 2009 was from Key Wynn, and from January 26, 2009 to present was from James Reed. Defendants took this course of action after Plaintiffs used this same tactic to inform Defendants of the origin of the legal advice claimed in its own privilege log. Despite the fact that Defendants' privilege log is vastly more detailed and informative than Plaintiffs' privilege log, Plaintiffs continue to maintain that this information is not sufficient. *See* Def. Priv. Log and Pl. Priv. Log, attached as Exs. 1 and 2 to the Reed Declaration. To the extent Plaintiffs successfully claim Defendants' log is deficient in this respect, Defendants request that Plaintiffs be required to take the same corrective action required of Defendants.

9

This communication therefore both reflects the prior legal advice of in-house counsel, Mr. Castellano, and solicits a formal legal opinion from that in-house counsel. It is accordingly properly excluded from production under the attorney-client privilege.

B.      Document 3

This document, at section (6), explicitly reflects the prior legal opinion of John Castellano regarding the ability to use a certain product in light of a certain patent. All of the parties to the email are employees of Defendants YKK and YKK (U.S.A.) Inc. ("YKK USA"). YKK USA is a wholly owned subsidiary of YKK This email therefore contains and constitutes the distribution of legal advice between commonly held entities which, as discussed above, neither waives nor diminishes the attorney-client privilege which otherwise protects that advice. This document therefore is properly excluded from production.

C.      Documents 6 and 8

Document 6 is an email, and Document 8 is one of its attachments. Document 6 includes emails from Yuki Abe, who was at the time a member of YKK's legal department, to various recipients, including Mamoru Usuda, another member of YKK's legal department. Reed Decl. at ¶ 19. This document attaches reports, including Document 8, all of which were generated by the legal department for use in advising Mr. Sarumaru, the President of YKK, regarding current legal issues surrounding the Uretek relationship that were facing YKK at the time. Document 8 (one of those attachments) contains an analysis of the status of Uretek's foreign patent applications as well as the scope and coverage of those foreign patents. Both Mr. Abe and Mr. Usuda were working to implement John Castellano's legal strategies on this matter. *Id.* Again, the parties to this email are all employees of either YKK USA or YKK. This email and its

attachments therefore provide or request legal analysis and advice to commonly owned entities. Accordingly, this document is properly excluded from production.[7]

### D.   Document 9

This email from Jack Sasaki copies Yancy Harada who, at the time, was the Legal Coordinator for YCA reporting directly to John Castellano. Reed Decl. at ¶¶ 17-18. As with Mr. Yumoto, whom Mr. Harada replaced, his position was to act as a liaison between the U.S. attorney and the Japanese-speaking YKK Group employees, as well as to serve as the attorney's proxy in electronic "meetings." This communication discusses the YKK Group's legal strategy regarding warning letters. This therefore discloses a YKK legal strategy, developed by the legal department and communicated as legal advice. All parties to this email are employed by YKK or one of its wholly-owned subsidiaries, namely YKK USA or YCA. Therefore the privilege which attached to the legal strategy being discussed is not waived and the document was properly excluded from production.

### E.   Document 15

This document is a confidential, internal, redlined draft of proposed amendments to an agreement with Uretek. These redlines were made by a member of the legal department before being provided to the document custodian, Yoshimine Kobayashi. Reed Decl. at ¶ 20. This proposed agreement format was wholly replaced by the Plaintiff-drafted License Agreement, and there is no indication this version was ever distributed outside of the YKK Group. *Id.* This document thus reflects the thoughts and strategies of counsel and constitutes attorney work product which is protected and properly excluded from disclosure to Plaintiffs.

---

[7] Plaintiffs have, in the past, claimed to Defendants that Plaintiffs believe Defendants have waived any privilege claim relating to these documents. However, Plaintiffs did not raise that issue in the pre-motion letter or call with the Court, nor with Defendants in their meet and confer prior to that joint letter, so Defendants do not substantively address it here. However, if Plaintiffs attempt to make such an argument in their Opposition, Defendants explicitly reserve the right to object and/or respond in their Reply, as is appropriate.

F.      Document 50

Document 50 is a timeline prepared by James Reed, the Chief Legal Counsel at YCA, and its attachments. Reed Decl. at ¶ 21. Mr. Reed created this timeline to track the parties' actions and communications regarding the subject matter of the timeline, and all of the documents attached thereto were collected at Mr. Reed's instruction to assist him in its creation. *Id.* Mr. Reed created this timeline and its collection of documents in order to provide legal advice to YKK in the course of its negotiations with Uretek leading up to this action. *Id.*

Although this collection of documents as whole constitutes work product, Defendants also note that every underlying document has either already been produced or is independently protected by the attorney client or work product privileges. The first three pages are the timeline drafted by Mr. Reed. Pages 4-6 and 28-30 have been produced without the attorney emphasis/marginalia. Pages 21-26, 33-34, 45, 48-49, and 51-53 have already been produced as-is. Pages 7-20 and 27 are notes made by or communications with Kari Moeller, an attorney at YCA, that constitute attorney client privileged communications and attorney work product. Pages 31-32 are notes made by John Castellano, the Chief Legal Counsel of YCA at the time, regarding a meeting with Uretek, which reflect his internal thinking regarding the dispute and therefore constitute attorney work product. Pages 35-41 were already produced, except for the communications with attorneys James Reed and Katsuya Yumoto at the top of page 35. Pages 42-43 contains an email which is labeled "Attorney Client Privilege" and copies Mr. Reed to provide him with updates on the Uretek negotiations for purposes of providing continued legal advice regarding those negotiations. Pages 44, 46-47, and 50 are emails directly from Mr. Reed to YKK employees regarding the dispute with Uretek and ongoing negotiations. Any of these independently-protected documents that were retained in YKK's files in the ordinary course of business, outside of this work-product-protected timeline, were properly logged.

The timeline and its attachments therefore reflect the thoughts and strategies of counsel and constitute protected attorney work product which was properly withheld from disclosure to Plaintiffs.

G.    Document 118

Several emails in this chain copy James Reed, the Chief Legal Counsel at YCA. These emails explicitly communicate Mr. Reed's previously-stated legal opinion and the previously-stated legal opinion of Taiwanese counsel. All emails in this chain, including those on which Mr. Reed is not copied, simply repeat and further transmit Mr. Reed's legal advice or information provided to Mr. Reed in the course of soliciting his legal advice. Furthermore, the last email in this chain by date (from Akinobu Shibata to Michael Blunt, copying Mr. Reed, at 7:38 a.m. on May 27, 2010) explicitly asks Mr. Reed to confirm his previous legal advice. This document thus reflects in numerous places and ways attorney advice and confidential attorney-client communications.  It was accordingly properly excluded from production.

H.    Document 119

The subject line of this email, which copies James Reed, the Chief Legal Counsel at YCA, explicitly states that it is subject to attorney client privilege. This email replies to another email, also copying Mr. Reed, which conveys the legal department's advice regarding certain foreign regulations and the YKK Group's attorney's previously-communicated advice regarding their ability to make certain arguments regarding royalty payments. The document also sets forth an intention to meet with Mr. Reed to discuss both strategies relating to these issues and the advice of foreign counsel. Copying Mr. Reed on the email alerts him to the need to meet in the future regarding these issues and is therefore soliciting future legal advice. This document thus reflects both attorney advice and the solicitation of attorney advice, and was properly excluded from production.

13

I.      Document 129

The table in this document was prepared by Mr. Reed to track the status of the actions which are the subject of the table, in order to provide legal advice to YKK in the course of its negotiations with Uretek leading up to this lawsuit. Reed Decl. at ¶ 22. This document thus reflects the thoughts and strategies of legal counsel and was properly excluded from production. It should remain so.

III.    **Conclusion**

For the foregoing reasons, this Court should sustain the privileges Defendants have asserted here and deny Plaintiffs' requests to invade YKK's legitimate exercise of the attorney client and work product privileges here properly asserted. Defendants have already produced over 600,000 pages of documents to Plaintiffs and have not withheld any documents cavalierly.

September 9, 2016
New York, New York

              Respectfully submitted,

              /s/ Frederick L. Whitmer
              Frederick L. Whitmer
              KILPATRICK TOWNSEND & STOCKTON LLP
              1114 Avenue of the Americas
              New York, New York 10036
              Telephone: (212) 775-8700
              Facsimile: (212) 775-8800
              fwhitmer@kilpatricktownsend.com

              Michael A. Bertelson
              David A. Reed
              Amanda N. Brouillette
              1100 Peachtree Street, Suite 2800
              Atlanta, Georgia  30309
              Telephone: (404) 815-6500
              Facsimile: (404) 815-6555
              mbertelson@kilpatricktownsend.com
              dreed@kilpatricktownsend.com
              abrouillette@kilpatricktownsend.com

              *Attorneys for Defendants YKK Corporation, et al.*

14

**CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on September 9, 2016, per Local Rule Civil Rule 5.2.

/s/ Frederick L. Whitmer
Frederick L. Whitmer