```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/22/2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
AU NEW HAVEN, LLC and TRELLEBORG        :
COATED SYSTEMS US, INC.,                :
                                        :
                        Plaintiffs,     :   1:15-cv-3411-GHW
                                        :
        -against-                       :   OPINION AND ORDER
                                        :
                                        :
YKK CORPORATION, YKK HONG KONG          :
LTD., YKK FASTENING PRODUCTS SALES      :
INC., SHANGHAI YKK ZIPPER CO., LTD.,    :
SHANGHAI YKK TRADING CO., LTD.,         :
YKK CANADA INC., YKK TAIWAN CO.,        :
LTD., P.T. YKK ZIPPER INDONESIA, YKK    :
BANGLADESH PTE. LTD., YKK KOREA         :
CO., LTD., YKK FRANCE SARL, DALIAN      :
YKK ZIPPER CO., LTD., YKK VIETNAM       :
CO., LTD., YKK DEUTSCHLAND GMBH,        :
YKK (THAILAND) CO., LTD., YKK (U.K.)    :
LTD., YKK ZIPPER (SHENZHEN) CO., LTD.,  :
YKK AUSTRIA GMBH, YKK ITALIA S.P.A.,    :
OOO YKK a/k/a YKK RUSSIA, YKK METAL     :
VE PLASTIK URUNLERI SANAYI VE           :
TICARET A.S., and YKK (U.S.A.) INC.     :
                                        :
                        Defendants.:
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

I.    INTRODUCTION

    Au New Haven, LLC ("Au New Haven") and Trelleborg Coated Systems US, Inc. ("Trelleborg" and, collectively, "Plaintiffs"), filed this action against YKK Corporation ("YKK") and several of its foreign affiliates (collectively, "Defendants"), alleging patent infringement, breach of a licensing agreement, and violations of the Lanham Act, 15 U.S.C § 1125(a), and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq*. The patent at issue claims an invention that improves the water resistance of zippers. In connection with their

infringement and invalidity claims, the parties have asked the Court to construe one disputed term of the patent at issue pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The Court's construction of that term is set forth below.

## II.   BACKGROUND

### A.   Factual Background[1]

On September 25, 1998, Stuart Press filed a patent application with the United States Patent and Trademark Office ("PTO"). Pls.' CC Br., Ex. A at 1. Mr. Press had noticed that many common articles such as outerwear, backpacks, and tents are frequently made of water proof materials that require zipper closures, and that the zippers are often a source of leakage. *Id.* col. 1, lns. 5-15. His invention attempted to solve that problem by improving the water resistance of zippers. The PTO granted Mr. Press's application and, on August 22, 2000, issued Mr. Press U.S. Patent No. 6,105,214, aptly titled, "Water Resistant Slide Fastener and Process for Preparing Same" (the "'214 Patent"). *Id.* at 1.[2]

The '214 Patent claims what it calls a water resistant slide fastener—which, with apologies to Mr. Press and the PTO, the Court will call a zipper—and a process for improving the water resistance of zippers. Among other elements, the claimed zipper includes two stringer tapes to which gripper elements—the zipper "teeth"—are attached. When zipper teeth are engaged—

---

[1] This opinion will refer to the parties' submissions using the following defined terms: Pls.' Claim Construction Br., Dkt. No. 127 ("Pls.' CC Br."); Defs.' Opp'n Br. Respecting Claim Construction, Dkt. No. 140 ("Defs.' CC Opp'n"); Decl. of Amanda N. Brouillette in Supp. of Defs.' Opp'n Br. Respecting Claim Construction, Dkt. No.140-1 ("Brouillette Opp'n Decl."); Pls.' Reply Claim Construction Br., Dkt. No. 144 ("Pls. CC Reply"); Defs.' Opening Claim Construction Br., Dkt. No. 132 ("Defs. CC Br."); Decl. of Amanda N. Brouillette in Supp. of Defs.' Opening Claim Construction Br., Dkt. No. 132-1 ("Brouillette Opening Decl."); Pls.' Opp'n Claim Construction Br., Dkt. No. 139 ("Pls.' Opp'n CC Br."); Defs.' Reply Br. in Further Supp. of their Proposed Claim Construction, Dkt. No. 143 (Defs.' CC Reply"); and Decl. of Amanda N. Brouillette in Supp. of Defs.' Reply Br. in Further Support of their Proposed Claim Construction, Dkt. No. 143-1 ("Brouillette Reply Decl.").

[2] Mr. Press subsequently assigned the '214 Patent to Plaintiffs. The '214 Patent's assignment history is described in the Court's September 28, 2016 Memorandum Opinion and Order. *See Au New Haven, LLC v. YKK Corp.*, No. 1:15-CV-3411-GHW, 2016 WL 5477775 (S.D.N.Y. Sept. 28, 2016).

that is, when the zipper is zipped—the edges of the stringer tapes come into contact with one another, leaving a gap in between the two tapes. That gap is a source of water leakage and water penetration in many zippers.

To minimize the passage of water through that gap, the '214 Patent describes a process in which a water resistant layer is placed on the outer surfaces of the stringer tapes opposite the zipper teeth, overlying the edges of the tapes as well as the teeth. That layer is subsequently cut at the center along where the zipper teeth engage. As described in the '214 Patent, this arrangement and the layer improve the water resistance of the zipper and obviate the need for flaps along the zipper when it is incorporated into finished products.

### B. Procedural History & Claim Construction Proceedings

Plaintiffs commenced this action on May 1, 2015. Dkt. No. 1. Plaintiffs filed an amended complaint on February 23, 2016, which, among other things, named additional YKK affiliates as defendants. Dkt. No. 90. On March 11, 2016, Defendants moved to dismiss certain claims in the amended complaint, Dkt. No. 95, and on May 11, 2016 Defendants answered the remaining claims and asserted certain counterclaims against Plaintiffs, Dkt. No. 119.

On May 17, 2016, the Court held a technology tutorial hearing during which the parties presented an overview of the technology at issue, the patented invention, and the accused products.[3] The parties filed competing claim construction briefs on June 1 and June 2, 2016. *See* Dkt. Nos. 127, 132. Simultaneous oppositions were filed on July 11, 2016, and simultaneous replies were filed on July 18, 2016. *See* Dkt. Nos. 139, 140, 143, and 144. In support of their respective proposed claim constructions, the parties submitted various exhibits for the Court's

---

[3] Other than aiding the Court in understanding the technology at issue, the information presented during the overview hearing played no role in the Court's construction of the disputed term.

consideration, including the '214 Patent's prosecution history, an expert declaration and deposition testimony, dictionary excerpts, and other patents not subject to any claims in this case. *See, e.g.*, Dkt. Nos. 132-1, 140-1, 143-1.  The Court held a claim construction hearing on August 4, 2016, during which the parties presented their arguments and proposed constructions. Neither party called an expert to testify at the hearing.

### C. The Disputed Claim Term

The parties dispute the meaning of the term "a water resistant layer on said second surfaces."  Defs.' CC Br. at 1; *see also* Joint Disputed Claim Term Chart, Dkt. No. 118.  That term appears in two independent claims of the '214 Patent that Plaintiffs assert against Defendants—Claims 1 and 23.[4]  *See* Pls.' Amend. & Supp. Disclosure of Asserted Claims and Infringement Contentions, Dkt. No. 132-28.  Claim 1 is representative of how the disputed term appears in the claims:

> 1. A water resistant slide fastener, comprising:
>
> a pair of stringer tapes each having first and second opposed surfaces and each having a series of gripper elements positioned along edges of said first surface; and
>
> *a water resistant layer on said second surfaces*, wherein said water resistant layer has an adhesion to said stringer tapes of at least about 6 lb/in, wherein said stringer tapes are arranged substantially parallel having inner edges substantially adjacent to said series of grippers elements, and wherein said water resistant layer is positioned on said second surfaces and overlying said inner edges and said series of gripper elements.

'214 Patent, col. 9, lns. 26-39 (emphases added).

---

[4] The disputed term also appears in two independent claims not asserted by Plaintiffs (Claims 14 and 24).

Plaintiffs maintain that this term "is an ordinary English term and should be given its ordinary meaning." Pls.' CC Br. at 11. In the alternative, Plaintiffs propose the following construction:

> *A layer, generally a film or laminate, which is water resistant and/or hydrophobic, that is, the ability to resist water penetration and/or wetting to some significant degree, but not necessarily entirely.* The layer lies on the surfaces of the stringer tapes such that it overlies the square edges of the stringer tapes and gripper elements. When the layer is cut, the squared edges are substantially parallel to and contact each other with no substantial gap in between. When the gripper elements are engaged, the square edges remain parallel to each other and have substantial gap in between. The layer flatly overlies the square edges of the stringer tapes and the gripper elements without a flap or overlap.

*Id.* (emphasis in original). Defendants ask the Court to construe this term to mean:

> A layer on the second surfaces of the stringer tapes of the slide fastener, *the layer prevents passage of no more than 1 gram of water through the tape and gripper elements when tested in accordance with the Water Resistance AATCC Test Method 35 for 2 minutes at 600 mm of pressure.*

*Id.* (emphasis in original).[5] Defendants agree with last four sentences in Plaintiffs' alternative construction. Defs.' CC Br. at 1.

The difference between the parties' proposed constructions is highlighted in the italicized language from Defendant's proposed construction quoted in the preceding paragraph. Defendants urge the Court to read a specific restriction into the claim: a particular measurement of water resistance—AATCC Test Method 35, one of many possible tests of water resistance, at a level selected by Defendants' retained expert. By contrast, Plaintiffs contend that the term "water resistant" should be understood to have its ordinary meaning, which is not constrained by the patent to require that it meet a particular testing standard.

---

[5] The Court will refer to the standard referenced in Defendants' proposed construction as the "AATCC 35 Test."

### III. APPLICABLE LAW

Claim construction is a question of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ("[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim."). Only after the court construes any disputed terms can the factfinder determine whether an accused product infringes the patent at issue. *Metabolite Labs., Inc. v. Lab. Corp. of Amer. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004); *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1077 (Fed. Cir. 2003) ("An infringement analysis requires that the court determine the scope and meaning of the claims asserted, and compare the construed claims to the allegedly infringing device.") (citations omitted)

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Subject to two exceptions discussed below, the general rule is that "[c]laim terms are generally given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir.), *cert. denied*, 135 S. Ct. 719 (2014) (citing *Phillips*, 415 F.3d at 1313); *see also Massachusetts Inst. of Tech. v. Shire Pharm., Inc.*, --F.3d--, No. 2015-1881, 2016 WL 5939429, at *6 (Fed. Cir. Oct. 13, 2016) (quoting *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning."). In the claim construction context, the ordinary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."

*Phillips*, 415 F.3d at 1313; *see also Innova/Pure Water*, 381 F.3d at 1116 ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).

To determine the ordinary meaning, courts look beyond the claim language and consult the entire "intrinsic record, which includes the specification and prosecution history." *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) (citing *Phillips*, 415 F.3d at 1315-17). This is because, patent claims "do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 978-79)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Indeed, the specification is "'the primary basis for construing the claims.'" *Phillips*, 415 F.3d at 1315 (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)); *see also Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1378 (Fed. Cir. 2006).

Nevertheless, because the claims, not the specification, define the scope of the invention, the Federal Circuit has repeatedly "emphasized that it is important to 'avoid importing limitations from the specification into the claims.'" *Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 805 F.3d

1102, 1109 (Fed. Cir. 2015) (quoting *Phillips*, 415 F.3d at 1323)  "The court must . . . use the written description for enlightenment and not to read a limitation from the specification." *Playtex Prod., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005) (citing *Comark Communications v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998)).[6]

"[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014), *reh'g denied* (June 17, 2014); *see also Hill-Rom Servs.*, 755 F.3d at 1371 (recognizing two exceptions to the general rule that claim terms are construed to have their plain ordinary meaning: "'(1) when a patentee sets out a definition [in the specification] and acts as his own lexicographer, or (2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution'" before the PTO) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). "The standards for finding lexicography and disavowal are 'exacting.'" *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (quoting *GE Lighting Sols.*, 750 F.3d at 1309).

"To act as a lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' and 'clearly express an intent to define the term.'" *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024 (Fed. Cir. 2015) (quoting *Thorner*, 669 F.3d at 1365). To disavow a

---

[6] As the Federal Circuit has acknowledged,

> [T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification. As we have explained, an inherent tension exists as to whether a statement is a clear lexicographic definition or a description of a preferred embodiment. The problem is to interpret claims in view of the specification without unnecessarily importing limitations from the specification into the claims.

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904-05 (Fed. Cir. 2004) (internal quotation marks and citations omitted).

particular construction, the specification or prosecution history must "'make [ ] clear that the invention does not include a particular feature.'" *Id.* (quoting *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (emphasis in original). "Absent implied or explicit lexicography or disavowal, [the Federal Circuit] ha[s] recognized that the specification plays a more limited role where claim language has so 'plain a meaning on an issue' that it "leav[es] no genuine uncertainties on interpretive questions relevant to the case." *Symantec Corp.*, 811 F.3d 1359, 1364 n.2 (quoting *Straight Path IP Group, Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015)).

In addition to the intrinsic record, courts may also consult extrinsic evidence consisting of all materials "external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (internal quotation marks and citations omitted). The Federal Circuit has cautioned, however, that such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal quotation marks and citations omitted). Critically, while "extrinsic evidence may be used . . . to assist in the proper *understanding* of the disputed limitation[,] it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1269 (Fed. Cir. 2001) (citations omitted) (emphasis added); *see also Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("A court may look to extrinsic evidence so long as the extrinsic evidence does not contradict the meaning otherwise apparent from the intrinsic record.") (citations omitted); *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014).

## IV. CONSTRUCTION OF THE DISPUTED CLAIM TERM

### A. Degree of Water Resistance

The principal disagreement between the parties concerns whether a person having ordinary skill in the art would understand "water resistant" to connote a *specific* degree of water resistance. Defendants propose that the claim's use of the term "water resistant" must be read to incorporate a specific test for water resistance selected by their expert witness. Defendants' contention relies heavily on limitations that they extrapolate from elements of the specification. Defendants note that the specification teaches that the invention relates to a zipper with "excellent resistance to the passage of water," namely that the '214 Patent "repeatedly represents that its zipper is 'effective' and is 'excellent' for resisting water penetration . . . ." However, they also observe that "the '214 Patent does not reference any test method or standard for distinguishing between a water resistant layer and a non-water resistant layer." Defs.' CC Br. at 16-17 (citations omitted).

Defendants maintain that, "because the '214 Patent never unambiguously resolves" what "effective" or "excellent" water resistance means, "it is entirely appropriate, and indeed required by the applicable case law" for the Court "to resort to extrinsic evidence to understand how a person of ordinary skill in the relevant technology would interpret the claim language." Defs.' Opp'n CC Br. at 10. Relying on their expert's opinion, Defendants proffer the "AATCC Method 35 at the 1 gram/600mm/2 minutes standard as the minimum standard a person of ordinary skill in the art *would use to qualify something as water resistant*." *Id.* at 11 (emphasis added). Defendants' expert selected that testing standard from a broad variety of test methods available for testing water resistance. *See* Brouillette Opening Decl., Ex. C (Decl. of Randy Emil Meirowitz, Ph.D. ("Meirowitz Decl.")) ¶ 35.

In response, Plaintiffs maintain that the Court should construe the disputed term to have its ordinary meaning; they argue that Defendants' proposed construction has no support either in the '214 Patent's intrinsic record or the extrinsic evidence. Pls.' Opp'n CC Br. at 2.

Plaintiffs are correct. Defendants' proposed construction—that the claim should be restricted by incorporating a particular testing standard that appears nowhere in the intrinsic record—runs afoul of several well-established claim construction principles. And, as described below, their arguments fall short of meeting either exception to the general rule that the ordinary meaning of a claim term governs.

### 1. In Construing Disputed Claim Language, the Court May Not Read Limitations from the Specification into the Claims

As a threshold matter, Defendants' proposed construction ignores the well-settled principle that limitations from the specification may not be read into the claims. The Federal Circuit has repeatedly held that, while the written description and other parts of the specification "may shed contextual light on the plain and ordinary meaning . . . they cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citations omitted).

Defendants point to language which characterizes the claimed invention as improving upon water resistance of zippers existing in the prior art. For example, the specification describes the invention as providing "excellent" resistance to water penetration through the zipper. '214 Patent, col. 2, lns. 4-6; *see also id.* ("It is therefore the primary object of the present invention to provide a water resistant slide fastener which provides excellent resistance to the passage of water."). The specification also characterizes the invention as "relat[ing] to a . . . slide fastener which is effective in resisting passage of water and the like . . . .". *id.*, col. 3, lns. 6-8; *see also id.*

11

col. 7, lns. 33-36 (stating that the laminate layer is cut in such a way as to provide "provide excellent resistant to the passage of water through the *gripper structure* of water resistant slide fastener") (emphasis added). Although the specification describes the zipper as providing "excellent" and "effective" water resistance, Defendants argue, the '214 Patent does not identify a way in which to evaluate precisely how "excellent" or "effective" the water resistance must be. Therefore, Defendants maintain, the Court should construe the disputed term to incorporate the least restrictive and most widely accepted standard for testing water resistance. Defs.' CC Br. at 17.

The words "effective" and "excellent," however, are conspicuously absent from the text of the '214 Patent's 24 claims. The claims make no reference to a degree of water resistance that the layer must have or a maximum amount of water penetration that the layer will tolerate as water resistant. In addition, Defendants ignore the fact that, to the extent the specification refers to "excellent" or "effective" water resistance, the descriptors are associated with properties of the *zipper* as a whole, not the "water resistant layer on said second surfaces." Accordingly, the Court declines to read that limitation from the specification into these claims, a practice the Federal Circuit has characterized as "one of the cardinal sins of patent law." *SciMed Life Sys.*, 242 F.3d at 1340 (citations omitted).

### 2. Courts May Not Interpret Terms of Degree to Require A Precise Numerical Construction

Courts may not construe terms of degree by importing extrinsic standards that the patentee has not expressly identified in the intrinsic record. *Playtex Prods.*, 400 F.3d at 907. Defendants' proposal that the Court adopt a precise, quantifiable measure of water resistance as the appropriate construction because "without specifying a performance standard for what

qualifies as 'water resistant,' the term is meaningless," Defs.' CC Reply at 8, founders on that principle.

"Claims are often drafted using terminology that is not as precise or specific as it might be . . . . That does not mean, however, that a court, under the rubric of claim construction, may give a claim whatever additional precision or specificity is necessary to facilitate a comparison between the claim and the accused product." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) (citing *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1280 (Fed. Cir. 1988)); *see also Playtex Prods.*, 400 F.3d at 907 (holding that the district court's construction of the term "substantially flattened surfaces" improperly "introduce[d] a numerical tolerance to the flatness"); *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1361 (Fed. Cir. 2003) (declining to impose a precise numeric constraint on a disputed term where the intrinsic evidence did not contain a "clear and unmistakable disclaimer" warranting a numerical limitation); *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1311 (Fed. Cir. 2003) (holding that "the phrase 'generally parallel' envisions some amount of deviation from exactly parallel," and that "words of approximation, such as 'generally' and 'substantially,' are descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter") (internal quotation marks and citations omitted). Absent intrinsic evidence to the contrary, imprecise terms are construed to have their ordinary meaning. *See, e.g.*, *Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1382, 1389 (Fed. Cir. 2014) (affirming the district court's ruling that the term "about," which was "not defined either explicitly or by implication by the specification" to have its ordinary meaning of "approximately"); *see also Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1369-70 (Fed. Cir. 2005).

There is no indication in the intrinsic record to suggest that a departure from the disputed term's ordinary meaning is appropriate here.  Defendants agree that water resistance "is a continuum along the spectrum of impenetrability," and that water resistance is distinguishable from water proof.  Aug. 4, 2016 Claim Construction Hr'g ("CC Hr'g") Tr. 60:5-12.  But they have identified no intrinsic evidence in support of their argument that a person having ordinary skill in the art would understand "water resistant" to mean a specific degree of water resistance, let alone the "numerical tolerance" of the AATCC 35 Test.  The Court finds no basis for reaching that conclusion and, therefore, declines to construe the disputed term to require the precise degree of water resistance called for under the AATCC 35 Test.

### 3. The Extrinsic Evidence Does Not Address How a Person Having Ordinary Skill in the Art Would Construe the Disputed Claim Term

Defendants maintain that the Court may rely on extrinsic evidence because the disputed term is "ambiguous, and the intrinsic evidence does not resolve the ambiguity."  Defs. CC Opp'n at 7.  Relying on their expert's opinion—and a collection of different tests for measuring water resistance—Defendants argue that the claim language "require[s], *at a minimum*, that the layer allow passage of no more water" than the quantity permitted under the AATCC 35 Test.  Defs.' CC Opp'n at 7 (emphasis in original).  Unlike Mr. Press's zipper, this argument does not hold water.

Defendants' proposed construction describes a way in which to *measure* water resistance, not to *define* the term.  Defendants claim that generally, "persons of ordinary skill in the art use objective standards to determine whether something satisfies the characterization 'water resistant.'"  Defs.' CC Reply at 9.  Because the '214 Patent is silent on that issue, Defendants rely on their expert's approach of "look[ing] for the most widely accepted test [he] knows that has the lowest requirement to be called water resistant[t]."  *Id.* (quoting Deposition of Dr. Randy

Meirowitz ("Meirowitz Dep.") 27:2-5 (June 23, 2016), Dkt. No. 143-2). They acknowledge that there are "various water resistance tests" that "use different test methodologies with different standards." Defs.' CC Br. at 9; *see also* Meirowitz Decl. ¶¶ 28-29, 33, 35. And the wide selection of standards leads Defendants to conclude that water resistance "*can and should* be objectively assessed and tested for a particular product and industry need, and those skilled in the art would rely upon these tests to determine whether something can be called water resistant or not." *Id.* (emphasis added). "[W]ithout specifying a performance standard for what qualifies as 'water resistant,'" they argue, "the term is meaningless." Defs.' CC Reply at 8 (citations omitted).

That water resistance can be objectively assessed does not mean that the term is meaningless standing alone. As Defendants and their expert acknowledge, water resistance "is a term which is ubiquitously used" and means either resistance to wetting or resistance to water penetration. *See, e.g.*, Meirowitz Decl. ¶¶ 28-29. Instead of defining what water resistance means, Defendants rely on extrinsic evidence to assign a numerical value to the patented technology's ability to resist water. In other words, the extrinsic evidence describes a method to assess *how* water resistant the layer is, not *what* water resistant means in the context of the '214 Patent. Therefore, the extrinsic evidence does not "assist in the proper understanding of the disputed limitation" and improperly "limit[s] the claim language from how it is defined, even by implication, in the specification." *Bell Atl. Network Servs.*, 262 F.3d at 1269. Accordingly, Court affords Defendants' proffered extrinsic evidence little weight.[7]

---

[7] The Court finds the extrinsic evidence presented by Defendants to be particularly unpersuasive for a number of reasons, some of which are worth mentioning here. First, Defendant's expert states that "there is not one commonly accepted definition for water resistant." Meirowitz Decl. ¶ 10. He further acknowledges that "[t]here are different standards for water resistance required for different products." *Id.* Because there is no commonly accepted threshold for what would qualify an article as water resistant, Defendants' expert "*chose* the test with the least strict standard." Defs.' CC Reply at 9 (emphasis added). These statements, and the need for Defendants' expert to *select* a particular standard from those available, substantially undermines his opinion that the term water resistant must be

### B. Resistance to Passage of Water and Resistance to "Wetting"

The parties also dispute whether the term "water resistant" should be construed to encompass a resistance to "wetting."[8] Plaintiffs' maintain that the term "water resistant" is commonly understood to mean resistance to the "passage of water and/or wetting by water to some significant degree, but not necessarily entirely." Pls.' CC Br. at 12. Defendants assert that

---

understood to incorporate the AATCC 35 Test with the particular test results that he prescribes, especially where the intrinsic record is silent on the issue.

Second, Defendants' expert acknowledges that many possible tests of water resistance exist. His justification for asserting that the term "water resistant" would be understood by a person of ordinary skill in the art to connote the AATCC 35 Test is thin. The test that the expert asserts is connoted by the term "water resistant" is just one of "many different test methods for water resistance of textiles . . . ," —eleven "representative" exemplars of which are identified in his declaration. Meirowitz Decl. ¶ 35. The expert selected one of the multitude of possible tests because "it is the "test the most widely used in this country by those of skill in the art to evaluate the water resistance of . . . items for which the zippers of the '214 Patent is intended . . . ." *Id.* at ¶ 58. In selecting that test, however, he acknowledges that "the patent does not give any explicit guidance on this issue . . . ." *Id.* at ¶ 58. At the outset, the Court observes that the expert does not describe whether the AATCC 35 Test was used at the time of invention; even if the test is the predominant test today, as he states, he provides no information regarding how the term would have been understood by a person of ordinary skill at the time of invention. Moreover, even if the test was the dominant test at the time of the patent's filing, the Court does not afford significant weight to the inference drawn from that asserted fact by the expert—that one test of measurement is used most frequently does not *ipso facto* mean that it is the defining test.

Third, the expert's justification for the selecting the minimum test results that he proposes is not compelling. The compliance level under the AATCC 35 Test proposed by Defendants' expert is based on a U.S. government tariff schedule. Defendants' expert explains that the AATCC 35 Test "is the minimum standard set by the US government for water resistance for calculating import duties," and "is also the minimum standard adopted by many clothing brands in the United States and importers into the United States . . . .". *Id.* ¶ 40. Specifically, according to Defendants' expert, "the US Harmonized Tariff code Section 62 . . . specifies that the minimum requirement a fabric must achieve to be defined as water resistant" meets the AATCC 35 Test and, while "[m]any [clothing] brands will adopt more rigorous standards for water resistance . . . . Chapter 62 of the US Harmonized Tariff code is a commonly accepted minimum standard for apparel and similar items to be considered water resistant by those of skill in the art." *Id.* Yet, while the AATCC 35 Test might serve as the baseline water resistance level under the U.S. harmonized tariff code, Defendants' expert has offered no evidence that a person having ordinary skill in the art at the time of the invention would understand "a water resistant layer on said second surfaces" to be synonymous with the government's tariff standard. Even the Defendants' expert is unwilling to say as much—he avers only that it is a "commonly accepted minimum standard." This is far from an assertion that it is a synonym for the term water resistant. The extrinsic evidence presented by Defendants to demonstrate a link between the AATCC 35 Test at the level specified by Defendants' expert and the term "water resistant layer on said second surfaces" can be most generously be described as tenuous. As an aside, the Court observes that a variety of non-U.S. patents with language similar to the term "water resistant" in the '214 Patent are the subject of the contract claims in this case. At argument, the Court inquired whether the AATCC 35 Test used in the United States at the U.S. tariff schedule test levels should be read into the term "water resistant" as used in any foreign cognates of the '214 Patent, but did not receive a substantive response.

[8] The parties agree that wetting refers to the effect of water beading up against the surface of the material rather than penetrating through it. CC Hr'g Tr. 5:3-8, 19:2-11.

16

the '214 Patent "never mentions resistance to 'wetting' as a desired characteristic of the patented water resistant zippers;" therefore, they argue, construing the term to encompass that property "transgresses basic rules of claim construction to be bounded by the intrinsic language of the patent." Defs.' CC Opp'n at 5 n.6; *see also id.* at 11-12.

Defendants contend that the claim should be narrowed to exclude from its coverage water resistant layers that are water resistant as a result of their resistance to wetting, as opposed to their resistance to penetration of water (to the extent that is a technically meaningful distinction). As discussed above, departure from a claim term's ordinary meaning is appropriate only where the patentee acts as his own lexicographer or clearly disavows the full scope of the claim term. *GE Lighting Sols.*, 750 F.3d at 1309. Critically here, only where the "'specification . . . reveal[s] an intentional disclaimer, or disavowal, of claim scope by the inventor,'" must a court construe the disputed the disputed term "more narrowly than it otherwise would to give effect to the inventor's intent to disavow a broader claim scope." *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1336 (Fed. Cir. 2009) (citing *Phillips* 415 F.3d at 1316; *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319-20 (Fed. Cir. 2006); *SciMed Life Sys.*, 242 F.3d at 1342-44).

The Court has not identified an intentional disavowal of resistance to "wetting," and Defendants have pointed to none. Here, too, Defendants' argument is based on a misreading of the language in the specification. Defendants are correct that the "'214 Patent . . . emphasizes that its water resistant zippers are resistant to the 'passage' or 'penetration' of water." Defs.' CC Br. at 22 (citations omitted). But, again, the ability to resist the passage and penetration of water is described in the specifications as an attribute of the zipper as a whole, not exclusively of the "water resistant layer on said second surfaces." Moreover, the specification is silent as to whether the layer's water resistance can be achieved through resistance to wetting, which

17

Defendants agree is a form of water resistance. *See* Defs. CC Br. at 22. Finding no disavowal of resistance to wetting, or other support for Defendant's position, in the intrinsic record, the Court declines to read that limitation into the claims as well.

V.     **CONCLUSION**

In sum, the Court finds no basis to depart from the general rule that claim terms are to be given their ordinary and customary meaning. The patentee did not act as his own lexicographer to support a construction that equates water resistance with the AATCC 35 Test. Nor did the patentee disavow resistance to wetting as way of achieving the water resistance of the layer on said second surfaces. Here, the meaning of "water resistant" as it appears in the disputed term is "readily apparent even to lay judges," and is readily apparent to this Court. *Phillips*, 415 F.3d at 1314. Therefore, "claim construction in [this] case[ ] involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* Accordingly, the Court construes "a water resistant layer on said second surfaces" to mean just that: a water resistant layer on said second surfaces.

The parties are reminded that fact discovery must be completed no later than 45 days from date of this opinion and are directed to review the Court's March 15, 2016, order, Dkt. No. 99, for the subsequent expert discovery and motion practice deadlines.

SO ORDERED.

Dated: November 22, 2016  
New York, New York

GREGORY H. WOODS  
United States District Judge