**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| AU NEW HAVEN, LLC, and TRELLEBORG COATED SYSTEMS US, INC., | Civil Action No. 15-CV-03411 (GHW) (SN) |
| Plaintiffs, | |
| v. | **DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS** |
| YKK CORPORATION, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................II

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ..............................................................................................4

ARGUMENT ..................................................................................................................4

I.  MR. COCKRELL'S TESTIMONY SHOULD BE EXCLUDED..........................6

    A.  Mr. Cockrell's First Three Opinions Rest On An Unreliable Definition Of "High End Outerwear".................................................................................................6

    B.  Mr. Cockrell Is Not Qualified To Render His Fourth Opinion On Plaintiffs' Patent, Which In Any Event Rests On Faulty Assumptions.................11

    C.  Mr. Cockrell Is Not Qualified To Render His Fifth Opinion On Consumer Confusion, Which In Any Event Lacks A Factual Basis ......................................14

II.  MS. BAGLEY'S TESTIMONY SHOULD BE EXCLUDED ...........................16

    A.  Ms. Bagley Offers An Impermissible Legal Opinion ...........................................16

    B.  Ms. Bagley's Opinions Lack A Necessary Factual Foundation, And Are Admittedly Contradicted By The Facts ...............................................................17

III.  MR. DONOHUE'S TESTIMONY SHOULD BE EXCLUDED .....................18

    A.  Mr. Donohue's Opinions Depend On Mr. Cockrell's Improper Opinions ...........19

    B.  Mr. Donohue Fails To Conduct An Analysis Demonstrating Entitlement To Lost Profits ..................................................................................................20

    C.  Mr. Donohue's Lost Profits Calculation Relies Upon Sampling And Extrapolation With No Statistical Basis ..............................................................24

CONCLUSION..............................................................................................................25

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Amorgianos v. Amtrak*,
    303 F.3d 256 (2d Cir. 2002)........................................................................ 5, 10

*Arista Records LLC v. Usenet.com, Inc.*,
    608 F. Supp. 2d 409 (S.D.N.Y. 2009) ............................................................ 5

*Barban v. Rheem Textile Sys., Inc.*,
    2005 WL 387660 (E.D.N.Y. Feb. 11, 2005)................................................. 12

*Bethea v. Equinox Fitness Club*,
    544 F. Supp. 2d 398 (S.D.N.Y. 2008) .......................................................... 16

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996)............................................................................... 5

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
    650 F. Supp. 2d 314 (S.D.N.Y. 2009)................................................ 20, 24, 25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).............................................................................. 1, 5, 8

*Davis v. Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013)............................................................ 9

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006)............................................................... 20, 21

*ECD Inv'r Grp. v. Credit Suisse Int'l*,
    2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017)................................................ 22

*Ericsson, Inc. v. Harris Corp.*,
    352 F.3d 1369 (Fed. Cir. 2003)................................................................... 21

*Gonzalez Prod. Sys., Inc. v. Martinrea Int'l Inc.*,
    2015 WL 4771096 (E.D. Mich. Aug. 13, 2015) ........................................... 24

*Great Earth Int'l Franchising Corp. v. Milks Dev.*,
    311 F. Supp. 2d 419 (S.D.N.Y. 2004).......................................................... 21

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996)..................................................................... 18

*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005).......................................................... 16

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
  103 F. Supp. 2d 268 (S.D.N.Y. 2000) .................................................................... 19, 24

*Kenford Co. v. Ctv. of Erie*,
  67 N.Y.2d 257 (1986) ............................................................................................ 21

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................................................ 5

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
  209 F. Supp. 3d 612 (S.D.N.Y. 2016) .............................................................. 11, 15

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) ........................................................................ 14, 15, 17

*Marx & Co. v. Diner's Club Inc.*,
  550 F.2d 505 (2d Cir. 1977) ................................................................................... 16

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
  429 F.3d 1344 (Fed. Cir. 2005) .............................................................................. 14

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ..................................................................................... 4

*Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*,
  2014 WL 1468118 (S.D.N.Y. Apr. 15, 2014) .......................................................... 9

*Oscar Gruss & Son, Inc. v. Hollander*,
  337 F.3d 186 (2d Cir. 2003) ................................................................................... 20

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
  575 F.2d 1152 (6th Cir. 1978) ................................................................................ 21

*PSN Ill., LLC v. Abbott Labs.*,
  2012 WL 5381278 (N.D. Ill. Oct. 31, 2012) .......................................................... 24

*Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*,
  426 F.3d 580 (2d Cir. 2005) ................................................................................... 17

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
  550 F.3d 1356 (Fed. Cir. 2008) ........................................................................ 12, 18

*United States v. Cruz*,
  363 F.3d 187 (2d Cir. 2004) ..................................................................................... 6

*United States v. Tin Yat Chin*,
  371 F.3d 31 (2d Cir. 2004) ....................................................................................... 5

*Wald v. Costco Wholesale Corp.*,
  2005 WL 425864 (S.D.N.Y. Feb. 22, 2005) ........................................................... 15

**<u>Statutes</u>**

Fed. R. Civ. P. 44.1 ................................................................................................................ 16

Fed. R. Evid. 702 ............................................................................................................ 1, 4, 5

Fed. R. Evid. 702(a) ........................................................................................................ 6, 13

## PRELIMINARY STATEMENT

Plaintiffs proffer three experts, Mr. David W. Cockrell, Ms. Margo A. Bagley, and Mr. James J. Donohue, in support of their claims that YKK engaged in patent infringement, breach of contract, and unfair trade practices.[1] Each of these experts fails to meet the standards required by Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

*First*, Mr. Cockrell's opinions should be excluded in their entirety. Mr. Cockrell, a clothing designer, purports to define and then apply the term "High End Outerwear," a key term in the ELA[2]—the contract at the heart of this case. But Mr. Cockrell's definition of "High End Outerwear" is flawed and unreliable. Not only is his definition subjective *ipse dixit*—Mr. Cockrell himself concedes that it includes a "you [only] know it when you see it" element—but it is incomplete, as Mr. Cockrell testified it includes "a hundred" factors not disclosed in his report. Moreover, Mr. Cockrell *himself incorrectly applied* his definition *50% of the time* in deposition, conclusively showing it is so unreliable that neither he nor other industry experts, much less the parties to this case, could consistently apply it.

Mr. Cockrell also purports to opine on (i) whether the patent alleged to cover the Accused Zippers[3] describes and claims advantages over alternative methods used to prevent water from penetrating outerwear through a zipper, and (ii) whether any acceptable alternative, non-infringing, water-resistant zippers exist. Yet Mr. Cockrell admitted that he (i) *does not know or*

---

[1]  Plaintiffs also proffer a fourth expert, Dr. Charles Reinholtz, whom Defendants do not challenge in this motion.

[2]  "ELA" refers to the Exclusive License Agreement entered into between YKK Corporation on the one hand, and Stuart Press and Hal Hoder on the other hand, on February 13, 2002.

[3]  "Accused Zippers" refers to zippers that YKK sold where (1) Plaintiffs allege the zippers are covered by U.S. Patent No. 6,105,214 (the "U.S. Patent") or any of Plaintiffs' foreign patents at issue in this case, and (2) Plaintiffs allege those sales breach the ELA.

*understand* the scope of the U.S. Patent, and (ii) was instructed to assume that it covers *all* comparable water-resistant zippers, and thus *no alternative, non-infringing, water-resistant zippers* could possibly exist. These admissions and assumptions render Mr. Cockrell's opinions on the presence of acceptable alternative non-infringing products fundamentally unreliable.

Mr. Cockrell also lacks the qualifications and factual basis necessary to support his opinions as to whether certain statements made by YKK regarding its contractual rights to sell water-resistant zippers "confused" YKK's customers. Mr. Cockrell is not a marketing expert, and he did not conduct any surveys regarding such alleged confusion.

*Second*, Ms. Bagley's opinions likewise should be excluded in their entirety. Ms. Bagley, a law professor at Emory University, provides a treatise-like report on comparative patent law in order to argue that if the Accused Zipper sales infringed the U.S. Patent, then they also necessarily infringed Plaintiffs' series of foreign patents, because the applicable foreign laws and foreign patents purportedly have the same scope as U.S. law and the U.S. Patent. Ms. Bagley's opinions should be excluded because she impermissibly provides legal conclusions dressed up as expert opinion. Her opinions also lack foundation because she failed to consider the specific claim terms of any of the relevant patents. Her conclusions instead rely upon her baseless opinion that the U.S. and foreign patents demonstrate "striking similarity," and her oft-contradicted opinion that all applicable laws would treat them the same. Plaintiffs should not be allowed to offer legal argument dressed up as unreliable expert opinion in an effort to convince the jury to assume infringement of foreign patents based on the U.S. Patent alone. This Court will instruct the jury regarding what Plaintiffs must show to meet their burden of proving YKK has infringed any foreign patents, and there is no place for a legal "expert" on this topic.

*Third*, all opinions from Plaintiffs' damages expert, Mr. Donohue, should be excluded from trial as well. Mr. Donohue's calculation of lost profits depends upon both Mr. Cockrell's unreliable opinion that there are no acceptable non-infringing alternatives for the Accused Zippers, and Mr. Cockrell's unreliable definition of High End Outerwear. To the extent the Court excludes Mr. Cockrell's opinions on these topics, it should exclude Mr. Donohue's opinions as well.

Mr. Donohue's lost profits opinion should be excluded for the independent reason that he does not perform the analysis needed to develop the "but for" scenario required under either New York contract law or federal patent law. Lost profits damages for both breach of contract and patent infringement are measured by the profits plaintiff would have made "but for" defendant's alleged breach or infringement, respectively. That assessment requires an analysis of what sales Plaintiffs allege were lost as a result of the asserted breach or infringement. But Mr. Donohue does not perform that analysis, and instead simply assumes—because Plaintiffs' counsel instructed him to do so—that, but for the alleged breach or infringement, Plaintiffs would have laminated every Accused Zipper sold by YKK. Plaintiffs offer no other expert to fill that gap, leaving Mr. Donohue's opinion without any sound economic foundation. Additionally, even if the Court were not to exclude Mr. Donohue's lost profits opinion in its entirety, the Court should at least exclude his opinion as to lost profits for breach of contract after October 31, 2014, because that is the date on which AU New Haven—the sole Plaintiff that is a party to the ELA— became a non-practicing entity incapable of generating (and thus losing) profits.

Mr. Donohue's calculation of lost profits for High End Outerwear also should be excluded for the independent reason that it relies upon an analysis of only 12 YKK customers that he extrapolates to sales from *more than 3,000 YKK customers* without *any* statistical basis

and without demonstrating those 12 customers are representative of the remaining thousands. Mr. Donohue's failure to provide a reliable basis for that statistical sample and extrapolation is a further reason his lost profits analysis should not be put to the jury.

## STATEMENT OF FACTS

In February 2002, YKK Corporation entered into the ELA with Stuart Press (the named inventor of the U.S. Patent) and Hal Hoder.  That agreement gave YKK "an exclusive, worldwide right to manufacture, use, sell, offer for sale and otherwise use and practice the invention contained in" the U.S. Patent and certain foreign counterparts, *i.e.*, water-resistant zippers.  ELA  ¶ 1.  This exclusive license, however, did not include "zippers placed in finished goods in the high end outerwear, marine, military and luggage (excluding sports and cosmetic bags) markets" (collectively, "the Unlicensed Markets").  *Id.*

Plaintiff AU New Haven, LLC ("AU New Haven") is the current assignee of Press and Hoder's rights in the ELA, and Plaintiff Trelleborg Coated Systems US, Inc. ("Trelleborg") is the current assignee of the U.S. Patent and its foreign counterparts.  Berlinski Dep. Tr. 112-116. In May 2015, Plaintiffs brought this action alleging that YKK had committed patent infringement and breach of contract by selling YKK-laminated zippers that YKK's customers ultimately used in products sold into the Unlicensed Markets (*i.e.*, the Accused Zippers).  Dkt. 90.  Plaintiffs also assert violations of Section 43 of the Lanham Act, and violations of Connecticut unfair trade practices law.  *Id.*

## ARGUMENT

All proffered expert testimony presents the "threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting FED. R. EVID. 702).  Courts consider "the totality of a witness's background when evaluating the

witness's qualifications to testify as an expert." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009). Courts must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony" to ensure that the expert testifies within his or her area of expertise. *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

Even where an expert is qualified to opine on a particular topic, it is the district court's duty to ensure that unreliable or unhelpful expert testimony does not reach the jury. *See Daubert*, 509 U.S. at 597. "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999).

Expert testimony should not be presented to the jury unless the proponent of that testimony demonstrates by a preponderance of the evidence that the proposed testimony is (1) based on sufficient facts and data, (2) the product of reliable principles and methods, and (3) based on a reliable application of those principles and methods to the facts of the case. FED. R. EVID. 702; *Daubert*, 509 U.S. at 592-93. Thus, an expert's testimony must be excluded if it is "speculative or conjectural." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted). Similarly, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

These principles require exclusion of the opinions and testimony of Mr. Cockrell, Ms. Bagley, and Mr. Donohue.

## I.    MR. COCKRELL'S TESTIMONY SHOULD BE EXCLUDED

### A.    Mr. Cockrell's First Three Opinions Rest On An Unreliable Definition Of "High End Outerwear"

Mr. Cockrell's first three opinions[4] should be excluded because they are based on his unreliable definition of the term "High End Outerwear," which appears in the ELA.  Cockrell Rpt. ¶ 2 (A, B, and C).[5]  Mr. Cockrell's proposed definition is pure *ipse dixit*, is admittedly incomplete, provides no objective standard to ensure consistent application, and is so malleable that Mr. Cockrell himself incorrectly applied it 50% of the time at his deposition.  Mr. Cockrell's proposed definition is thus unhelpful and unreliable, and should be excluded from trial.  *See* Fed. R. Evid. 702(a) (expert testimony is admissible where "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue").

*First*, Mr. Cockrell's opinion should be excluded because he fails to show that his proposed definition of "High End Outerwear" has any basis in industry usage or practice.  *See, e.g.*, *United States v. Cruz,* 363 F.3d 187, 195-96 (2d Cir. 2004) (reversing failure to exclude expert testimony regarding the meaning of the phrase "to watch someone's back" where there

---

[4]    Mr. Cockrell's first three opinions address:  (1) the meaning of the term "High End Outerwear"; (2) whether certain finished goods using Accused Zippers are High End Outerwear; and (3) whether certain YKK customers sell High End Outerwear.  Cockrell Rpt. at 2.

[5]    According to Mr. Cockrell, the definition of "high end outerwear" and the assessment of whether outerwear is "high end" (or "low end," or "mid-range") is determined by identifying and evaluating a garment's features (Cockrell Dep. Tr. 79:4-9, 80:4-12, 82:14-18), including but not limited to:  (1) price; (2) number of AquaGuard zippers; (3) whether it uses three, two-and-a-half or two-layer fabric; (4) whether it has taped seams; (5) whether it has an articulated fit; (6) whether it has a fitted hood with cinch system; (7) whether it is down filled; (8) the weight; (9) the ventilation; (10) whether it has heat-welded seams or pockets and detail/protective films; and (11) the number of pockets (Cockrell Rpt. Ex. 3-14; Cockrell Dep. Tr. 80:13-82:13).

was no record evidence that this phrase carried a particular meaning within the narcotics trade).

Mr. Cockrell claims that the term "High End Outerwear" is "a term of art in the worldwide

outerwear industry, with [a] commonly understood meaning" (Cockrell Rpt. ¶ 6), yet he spends

almost seven full pages of his report purporting to define its meaning without reference to any

scientific, academic, or third-party industry support (*id.* ¶¶ 6-34).[6]  Furthermore, at deposition,

Mr. Cockrell confirmed that his definition of "High End Outerwear" includes a "you know it

when you see it" component:

> Q.  [Is] a test to determine whether something is high end
>      outerwear or not, you know it when you see it? […]
>
> A.  Most of the time.
>
> Q.  So your expert opinion is that "you know it when you see it" is
>      the test for high end outerwear? […]
>
> A.  It's one of the tests.
>
> Q.  Did you list that test in your expert report?
>
> A.  No.

Cockrell Dep. Tr. 96:2-16.  Neither the parties to the ELA, nor the jury, could possibly reliably

assess whether something is "High End Outerwear" based on Mr. Cockrell's purported definition

and his alleged ability to "know it when [he] see[s] it."[7]

*Second*, the unreliability of Mr. Cockrell's opinion is compounded by his admission that

his report does not identify all of the features relevant to the meaning of "High End Outerwear,"

---

[6]    *See also* Cockrell Dep. Tr. 78:22-79:3 ("Q: Now, in your paragraph 6, or frankly anywhere with respect to your opinion of what's commonly understood [regarding the meaning of 'high end outerwear'], you don't cite to any evidence or document that supports your opinion; correct?  A: Correct.").

[7]    Mr. Cockrell, for example, testified that a $2,695 cashmere Burberry trench coat that did not meet any of his listed "features" was High End Outerwear, while a $1,500 Gucci wool trench coat was not High End Outerwear.  Cockrell Dep. Tr. 132:3-133:11, 41:5-42:16.

and that he relied on "a hundred" *undisclosed* features in determining whether a garment was, in fact, "High End Outerwear":

> Q.   What are the other features [used to determine whether a garment is "High End Outerwear," but not listed in the Cockrell Report]?
>
> A.   There are many – there are many additional features.
>
> Q.   Which ones?
>
> A.    I mean, this feature list we could have made, you know, a hundred – a hundred features long.
>
> Q.   …This set of features that you listed in your charts, those are features that were specific to this litigation.  Is that true?
>
> A.   No.
>
> Q.   So why didn't you list the features that were a hundred features long, as you have said?
>
> A.   Too laborious for consideration in the garments that we reviewed.
>
> Q.   Why is it too laborious?
>
> A.   It wouldn't have made sense.
>
> Q.   Why not?
>
> A.   Because we focused on the important ones […]
>
> Q.   You understand that plaintiff is asking for multiple tens of millions of dollars in this litigation?
>
> A.   Yes.
>
> Q.   And is it your testimony that it was too laborious to address all of the factors that you thought might make a product high end outerwear or not?
>
> A.   Yes.

Cockrell Dep. Tr. 87:21-89:7.[8]  Such a concededly incomplete definition cannot be tested, and

thus is inadmissible.  *See, e.g., Daubert*, 509 U.S. at 593 (holding that "a key question to be

---

[8]   According to Mr. Cockrell, several of the features omitted from his report were "of course" important to his determination of whether a garment met the definition of "High End Outerwear," including craftsmanship, manufacturing process, the type of pocket a garment has, and how the pocket was sewn in. *See* Cockrell Dep. Tr. 106:8-22; 121:5-14; 122:11-19.  Mr. Cockrell also admitted that other unidentified features needed to be considered, depending on the type of outerwear at issue.  For example, although

answered in determining whether a theory or technique … will assist the trier of fact will be whether it can be (and has been) tested"); *Davis v. Carroll*, 937 F. Supp. 2d 390, 417 (S.D.N.Y. 2013) (excluding expert's methodology as unreliable because, *inter alia*, he did not "clarify the full set of factors that play a role in this analysis").

*Third*, these methodological flaws are further magnified by Mr. Cockrell's failure—indeed, inability—to explain how each purportedly relevant feature should be weighed in determining whether a garment is "High End Outerwear." For example, Mr. Cockrell initially testified at his deposition that no single feature was more important than any other. *See* Cockrell Dep. Tr. 98:9-13. But Mr. Cockrell later testified that the manufacturing process could be "a determining factor," that price is "highly considered," and that the presence or absence of YKK AquaGuard zippers in a particular jacket could—by itself[9]—change whether a garment was "high end." Cockrell Dep. Tr. 121:5-14, 126:3-18, 114:6-13. This kind of "I know it when I see it" definition—apparently comprised of dozens of features beyond those Mr. Cockrell identified in his report, and each with unknown priority or weighting—is inherently unreliable, and should not be allowed to proceed to the jury. *See, e.g.*, *Davis*, 937 F. Supp. 2d at 417 (excluding expert's methodology as unreliable because, *inter alia*, he did not "explain how these factors interact or how much weight each factor is assigned in his calculus"); *Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, 2014 WL 1468118, *1, *8 (S.D.N.Y. Apr. 15, 2014) (excluding expert testimony where "the expert fail[ed] to explain how her opinion follows logically from the

---

gloves are outerwear (*id.* at 155:2-5), Mr. Cockrell testified that he would need to create a different definition with a different set of features to determine whether gloves were "high end" (*id.* at 156:9-12).

[9] The suggestion that a garment could become "High End Outerwear" solely because it featured YKK AquaGuard zippers shows the absurdity of Mr. Cockrell's definition because, among other things, it would render the ELA meaningless. If AquaGuard zippers alone can make outerwear "high end" under the ELA, YKK would not be allowed to sell them for use in *any* outerwear.

application of the methodology to the specific facts of the case," including "what factors were considered in selecting the comparable works and how those factors were weighed").

*Finally*, Mr. Cockrell's proposed definition should be excluded for the independent reason that it cannot be reliably applied, *even by Mr. Cockrell himself.  See, e.g.*, *Amorgianos*, 303 F.3d at 268 (affirming district court's exclusion of expert testimony where the expert "failed to apply his own methodology reliably").  When asked to apply his definition during deposition to ten garments that he had *already identified* in his report as "High End Outerwear" ("HEO"), Mr. Cockrell reached the opposite result *50% of the time*—notwithstanding that he was provided with the same information he claimed to have relied upon in his report:

| Outerwear Garment | Cockrell Report | Cockrell Deposition | Consistent? |
|---|---|---|---|
| Berghaus Ruction Shell Jkt AM | Not HEO (Ex. 3B, Row 138) | Not HEO (105:12-15) | Yes |
| Berghaus Arran Shell Jkt AM | HEO (Ex. 3A, Row 94) | Not HEO (109:5-9) | **NO** |
| Berghaus Light Trek HS Shell Jkt | Not HEO (Ex. 3B, Row 140) | Not HEO (110:2-6) | Yes |
| Berghaus Bowfell Shell Jacket AF | HEO (Ex. 3A, Row 68) | HEO (111:17-21) | Yes |
| Helly Hansen Arctic | Not HEO (Ex. 6B, Row 122) | HEO (115:3-15) | **NO** |
| Helly Hansen Lysefjord Set | HEO (Ex. 6A, Row 44) | Not HEO (115:25-116:5) | **NO** |
| Columbia Hot Thought | Not HEO (Ex. 4B, Row 446) | Not HEO (118:19-119:3) | Yes |
| Columbia Trophy Shot | HEO (Ex. 4A, Row 41) | Not HEO (119:16-23) | **NO** |
| Montbell Versalite | Not HEO (Ex. 8B, Row 251) | HEO (122:22-123:9) | **NO** |
| Montbell US Torrent Flier | HEO (Ex. 8A, Row 183) | HEO (124:12-17) | Yes |

Mr. Cockrell's definition of "High End Outerwear" thus possesses a known error rate of 50% when *Mr. Cockrell himself* attempts to apply it.  And Mr. Cockrell has admitted that people who are "highly knowledgeable in the [garment] industry" would not reliably get the same result as he does when applying his definition to the same piece of outerwear:

> Q. So in your opinion, applying the tests that you have come up with, the decision will come up the same every time about what is and what isn't high end outerwear?
>
> A. Not every time. [. . .]
>
> Q. For any particular jacket, if you had two people that were highly knowledgeable in the industry applying your feature-based test, would they always come out with the same decision about what is and what isn't high end outerwear?
>
> A. Not always.

Cockrell Dep. Tr. 116:19-24, 117:11-17.

This degree of error—which is unsurprising given the methodological flaws discussed above—shows that Mr. Cockrell's definition of High End Outerwear is completely unreliable and requires exclusion of his first, second, and third opinions (Cockrell Rpt. ¶ 2 (A, B, and C)).

**B.    Mr. Cockrell Is Not Qualified To Render His Fourth Opinion On Plaintiffs' Patent, Which In Any Event Rests On Faulty Assumptions**

For his fourth opinion, Mr. Cockrell purports to opine on Plaintiffs' patent for water-resistant zippers, and specifically whether (1) zippers covered by the U.S. Patent had advantages over "other methods used to prevent water from penetrating outerwear through the zipper" (*Id.* ¶ 2 (D)), and (2) there were acceptable non-infringing alternatives to zippers covered by the U.S. Patent (*see id.* ¶¶ 2(D), ¶¶ 45, 51). These opinions should be excluded for at least three reasons.

*First*, Mr. Cockrell is unqualified to opine on what advantages zippers covered by the U.S. Patent claims might have over other water-resistant zippers. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016) ("Whether a witness is qualified as an expert is a threshold question that precedes the court's relevance and reliability inquiries." (internal quotation marks omitted)); *id.* at 638 ("It is well established that even if a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." (internal

quotation marks omitted)).  For example, even though the U.S. Patent is for a "water resistant [zipper]," Mr. Cockrell admitted he does not know "how to test whether a zipper is water resistant" (Cockrell Dep. Tr. 136:10-16.).  Thus, Mr. Cockrell has no basis to identify and opine on the advantages or disadvantages of various water-resistant zippers.  *See, e.g.*, *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008) (holding that "it is an abuse of discretion to permit a witness to testify as an expert on [infringement] unless that witness is qualified as an expert in the pertinent art"); *Barban v. Rheem Textile Sys., Inc.,* 2005 WL 387660, *3-4 (E.D.N.Y. Feb. 11, 2005) (ruling that expert was not qualified to testify regarding design of laundry press machine because he "has never designed a machine of any kind, and has never worked with laundry machines in any capacity that bears on the conclusions he reaches in this case"), *aff'd,* 147 F. App'x 222 (2d Cir. 2005).

Moreover, even if Mr. Cockrell had the technical qualifications to opine on the alleged advantages of the patented inventions, he cannot provide a reliable opinion when—by his own admission—he does not understand the scope of the U.S. Patent.  Mr. Cockrell admitted at deposition that he had not reviewed it, nor been told what it covers in more than general terms:

> Q.  You, yourself, haven't reviewed the patent.  Correct?
>
> A.  Correct.
>
> Q.  So you, yourself, don't know what the patent covers or doesn't cover.  Isn't that true?
>
> A.  No.  I would know the basics of the patent from the information I received.
>
> Q.  And do you know what each individual claim in the patent covers?
>
> A.  No, I do not.
>
> Q.  Has counsel informed you about what each individual claim of the patent covers?

A.  No.

Q.  Has he just told you about the patent in general?

A.  Correct.

Q.  So you don't know with any specificity what the patent does
and doesn't cover.  Isn't that true? […]

A.  Correct.

Cockrell Dep. Tr. 70:25-71:25.    Without having reviewed the U.S. Patent or knowing specifically what it covers, Mr. Cockrell is not qualified to provide "scientific, technical, or other specialized knowledge [that] will help the trier of fact" regarding any advantages that patent supposedly offers over other zippers that it does not cover.  FED. R. EVID. 702(a).

*Second*, Mr. Cockrell's opinion that there are no acceptable non-infringing alternatives to the zippers covered by the U.S. Patent should be excluded because it merely parrots Plaintiffs' litigation position and does not reflect any independent analysis.  Indeed, Plaintiffs asked Mr. Cockrell to assume the very thing on which he offers an opinion:  that "[a]ll polyurethane-laminated reverse coil zippers of comparable quality [to the zipper claimed in the patents] … made or sold by any third party in or into the United States, Canada, Europe, Japan Taiwan, and Hong Kong *are covered by [Plaintiffs'] Patents."*  Cockrell Rpt. ¶ 1(C) (emphasis added).  In other words, Mr. Cockrell opines there are no acceptable non-infringing alternatives to the Accused Zippers because he *assumes* any "comparable" third-party polyurethane-laminated zippers infringed Plaintiffs' patents—which of course means they could not be *non-infringing* alternatives.  Mere recitation of a party's allegations is not an objective expert opinion.  Because Mr. Cockrell's opinion on non-infringing alternatives is nothing more than a re-packaging of Plaintiffs' legal arguments, it should not be allowed to go to the jury.

*Third*, the record shows that acceptable non-infringing alternatives, in fact, do exist.  *See,*

*e.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (affirming rejection of "[a]n expert's opinions that are without factual basis" in granting summary judgment); *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1355-56 (Fed. Cir. 2005) ("[T]he district court has the responsibility to exclude an expert opinion that overlooks factors that render the testimony unreliable and/or speculative."). For example, none of Plaintiffs' experts dispute that Light Rail water resistant zippers produced by IDEAL are non-infringing,[10] and Mr. Cockrell acknowledged at deposition that YKK's customers found them to be acceptable alternatives (Cockrell Dep. Tr. 147:6-11). Mr. Cockrell cannot, given these admitted facts regarding acceptable alternatives, reliably opine that no non-infringing alternatives exist.

### C.  Mr. Cockrell Is Not Qualified To Render His Fifth Opinion On Consumer Confusion, Which In Any Event Lacks A Factual Basis

Mr. Cockrell's fifth opinion, which concerns whether customers were confused by YKK's sale of Accused Zippers without disclosing the scope of YKK's license, and what those customers would have done had they received such a disclosure, should be excluded on at least two grounds. Cockrell Rpt. ¶ 2(E).

*First*, Mr. Cockrell is not qualified to opine on customers' hypothetical reactions or what they would have done if they were "confused" about YKK's rights under the ELA. Mr. Cockrell is a clothing designer. He is neither a marketing expert nor an expert in consumer behavior, psychology, or consumer perception surveys. Cockrell Rpt. Ex. 1 (resume); Cockrell Dep. Tr. 46:21-47:6 (admitting to having limited marketing experience, none of which is relevant); *id.* at

---

[10]  YKK's technical expert, Dr. Meirowitz, has opined that the Ideal Light Rail zippers do not infringe the U.S. Patent. Meirowitz Rebuttal Non-Infringement Rpt., ¶¶ 178, 187-90. Plaintiffs have offered no expert testimony on this issue, and no evidence was produced during fact discovery regarding potential infringement by these zippers.

57:17-21 (admitting to be retained only for his experience with outerwear).  He is thus not qualified to opine on potential consumer confusion or customer reactions regarding YKK's statements about the ELA.  *See, e.g.*, *LVL XIII Brands,* 209 F. Supp. 3d at 640 (excluding expert testimony where the expert did "not appear to have any [relevant] training or experience").

Moreover, although Mr. Cockrell identified certain YKK statements that he alleges were confusing (Cockrell Rpt. ¶¶ 56-58), he did not perform any analysis of whether these statements did, in fact, cause consumer confusion, or provide any explanation of how such alleged confusion arose.  Because Mr. Cockrell is not qualified to opine on consumer confusion, and does not credibly attempt to do so in his report, he cannot be proffered to the jury as an expert on "whether YKK's … customers were confused," or what they purportedly would have done if not confused.  *See, e.g.*, *Wald v. Costco Wholesale Corp*., 2005 WL 425864, *6 (S.D.N.Y. Feb. 22, 2005) (excluding consumer understanding opinions because the expert's "application of those theories to this case seems more impressionistic, subjective and conclusory than scientific").

*Second*, even if Mr. Cockrell were qualified to testify as to consumer confusion and reactions, his opinions regarding what customers would have done if not confused are inadmissible because they rest on his unreliable opinion that there are no acceptable non-infringing alternatives.  Mr. Cockrell assumes YKK's customers, if not confused by YKK's statements regarding the scope of its rights under the ELA, would have had no option but to buy zippers from YKK that were laminated by Plaintiffs.  Cockrell Rpt. ¶ 60.  Because this opinion rests on the unsupported assumption that no other alternative was available to YKK's customers, it too should be excluded.  *See, e.g.*, *Major League Baseball Props.*, 542 F.3d at 311.

## II.    MS. BAGLEY'S TESTIMONY SHOULD BE EXCLUDED

### A.    Ms. Bagley Offers An Impermissible Legal Opinion

Ms. Bagley's opinions should be excluded in their entirety because they constitute inadmissible legal opinions.  *See, e.g.*, *Bethea v. Equinox Fitness Club*, 544 F. Supp. 2d 398, 399 (S.D.N.Y. 2008) (excluding expert testimony because "much of [his] report is simply his view of the appropriate legal standards, which is the Court's province"); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (expert's discussion of governing law "is inadmissible because 'it is not for witnesses to instruct the jury as to applicable principles of law'" (quoting *Marx & Co. v. Diner's Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977))).  Ms. Bagley is a law professor whom Plaintiffs asked to opine on "the origins and contours of the international patent system, as well as the comparative approaches to claim construction and claim coverage in countries relevant to the present action as they relate to the patents at issue in this action."  Bagley Rpt. ¶ 10.  Her report is essentially a 40-page legal treatise on comparative law offered to support Plaintiffs' position that a finding that YKK infringed the U.S. Patent is tantamount to a finding that it infringed the foreign patents as well.  Indeed, Ms. Bagley's conclusion is that:

> I would expect the court in Canada, Japan, Taiwan, Hong Kong, and the relevant Europe court to construe the phrase 'water resistant' in the same way as in the U.S. …  I would also expect courts in these same countries … to reach the same conclusion concerning YKK's product being within the scope of the relevant claims of the patents specified in the license agreement at issue in this case.

Bagley Rpt. ¶ 126.  This legal opinion is clearly irrelevant and improper.

Presenting Ms. Bagley's legal opinion on foreign law to the jury, moreover, would run afoul of Rule 44.1, which provides that the meaning and application of foreign law is an issue of law for the Court.  *See* FED. R. CIV. P. 44.1 ("In determining foreign law … [t]he court's

determination must be treated as a ruling on a question of law."); *Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 585-86 (2d Cir. 2005) (stating that Rule 44.1 was promulgated, in part, "to put to rest the notion that foreign law is a question of fact" and that "[u]ltimately, the responsibility for correctly identifying and applying foreign law rests with the court"). As such, her opinions regarding how foreign courts would interpret or apply the foreign patents at issue should be excluded.

**B.    Ms. Bagley's Opinions Lack A Necessary Factual Foundation, And Are Admittedly Contradicted By The Facts**

Even if an expert could properly opine on how foreign courts would apply foreign law to interpret foreign patents, Ms. Bagley's opinion should be excluded because it lacks any factual basis. *See, e.g.*, *Major League Baseball Props.,* 542 F.3d at 311. Ms. Bagley opines that foreign courts would "reach the same conclusion concerning YKK's products being within the scope of the relevant claims of the patents specified in the license agreement at issue in this case." Bagley Rpt. ¶ 126. Ms. Bagley's report, however, does not provide any analysis of the relevant foreign patents. *See generally* Bagley Rpt. ¶ 61 & App'x D (reproducing, without analyzing, "representative claims" at issue). Ms. Bagley also admitted in deposition that she did not attempt to analyze whether any of the foreign patents covered any of the relevant YKK zippers:

> Q.    My question is whether or not you took any YKK product and compared it to the claims of any patent relevant to this action and made an independent determination that, yes, the product comes within the claims of that patent.
>
> A.    I did not, in preparing this report, take any YKK products and make an independent assessment, no.

Bagley Dep. Tr. 34:6-14. With no technical expertise in the relevant subject matter, and having made no attempt to compare any YKK zipper to any relevant foreign patent, Ms. Bagley cannot reliably opine on what conclusion a court might reach regarding "YKK's products being within

the scope of the relevant claims of the patents specified in the license agreement at issue in this case"—let alone opine that applying *all* relevant foreign patents would result in the same conclusion on that issue. *Sundance*, 550 F.3d at 1362 ("Unless a patent lawyer is also a qualified technical expert, his testimony on … technical issues [going to validity and infringement] is improper and thus inadmissible.").

Moreover, Ms. Bagley repeatedly admitted the patents have different claim limitations and thus different scopes, contradicting her opinion that they would be treated identically under all foreign laws. Bagley Dep. Tr. 89:4-20, 92:22-93:20 (admitting the patents had different scopes and thus would not necessarily be infringed by the same circumstances). Because Ms. Bagley's opinion has no factual basis, and reaches legal conclusions that she admits will not necessarily hold given the undisputed facts, it should be excluded. *See, e.g.*, *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts, not only unproven science, but markedly incorrect law. Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories.") (citation omitted).

## III.    MR. DONOHUE'S TESTIMONY SHOULD BE EXCLUDED

Mr. Donohue's calculations of lost profits should be excluded because they rest on Mr. Cockrell's unreliable and inadmissible opinions and, separately, because they lack any foundation in economic theory or the factual record. Mr. Donohue provides no analysis of what the market would look like "but for" YKK's alleged wrongful acts. Instead, he simply assumes Plaintiffs lost profits on *every one* of YKK's allegedly breaching or infringing sales, without relying on any economic analysis or theory to support his assumptions. Much like with Mr. Cockrell, Plaintiffs instructed their "expert" to adopt their litigation position in lieu of conducting an objective analysis. Further, Mr. Donohue's lost profits opinions rely upon his extrapolation of

his purported estimate of damages for a sample of 12 YKK customers to *more than 3,000 YKK customers*—without any reliable statistical basis for his selection of this small sample or his extrapolation from the same.  Mr. Donohue's opinions are thus unreliable several times over.

### A.    Mr. Donohue's Opinions Depend On Mr. Cockrell's Improper Opinions

If the Court excludes Mr. Cockrell's opinion regarding either the definition of "High End Outerwear" (*see supra*, Part I.A) or the existence of non-infringing alternative products (*see supra*, Part I.B), then Mr. Donohue's lost profits opinions are necessarily inadmissible and should be excluded as well.

*First*, exclusion of Mr. Cockrell's testimony regarding the absence of any acceptable non-infringing alternatives to the Accused Zippers requires exclusion of Mr. Donohue's lost profits calculations in full because Mr. Donohue's calculations rely upon Mr. Cockrell's conclusion. Donohue Rpt. ¶ 136 (stating that his lost profits analysis "is based upon … the absence of acceptable, non-infringing alternatives").  Without Mr. Cockrell's opinion, Mr. Donohue has not determined what amount of the Accused Zipper sales would go to Plaintiffs versus to other alternatives, rendering his methodology fundamentally flawed and unhelpful for the jury.  *See, e.g.*, *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 285 (S.D.N.Y. 2000) (excluding expert's opinion on lost profits in part because patentee's expert "did not discuss, and apparently never considered, the commercial acceptability of non-infringing substitutes").

*Second*, exclusion of Mr. Cockrell's definition of "High End Outerwear" as unreliable requires exclusion of Mr. Donohue's calculation of lost profits related to High End Outerwear. To reach that calculation, Mr. Donohue relied upon Mr. Cockrell to determine how many meters of Accused Zippers sold by YKK ended up in High End Outerwear.  Donohue Rpt. ¶ 121. Without Mr. Cockrell's "High End Outerwear" definition, Mr. Donohue has no basis for his

opinion regarding the number of meters of Accused Zippers used in High End Outerwear or the amount of lost profits related to those zippers. Donohue Rpt. ¶ 106. Because Mr. Cockrell's definition is unreliable and should be excluded, Mr. Donohue's calculation of lost profits based on that definition should be excluded as well.

### B. Mr. Donohue Fails To Conduct An Analysis Demonstrating Entitlement To Lost Profits

Even if Mr. Donohue's lost profits calculations are not fatally tainted by reliance on Mr. Cockrell's opinions, Mr. Donohue's opinions still should be excluded because his lost profits calculation rests on improper assumptions and is impermissibly speculative. *See, e.g.*, *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1308-09 (Fed. Cir. 2006) (affirming exclusion of expert opinion on damages where expert's conclusion that patent holder would have made certain sales but for infringement was based on hypothetical construction of market that lacked any foundation in fact or economic principle); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319-21 (S.D.N.Y. 2009) (holding that expert's lost profits opinions were unreliable and inadmissible where based on unsupported assumption that plaintiff would have made additional sales but for defendant's actions).

New York contract law and federal patent law require similar methodologies for calculating lost profits. "Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003).[11] A plaintiff claiming lost profits thus must demonstrate (among other requirements)

---

[11] Plaintiffs' breach of contract theory is premised on the assumption that the ELA contained not only the express, exclusive license, but also an implied negative covenant that prohibits YKK from selling water-resistant zippers into the Unlicensed Markets. As will be explained in its summary judgment motion, YKK strongly disputes that such a covenant exists. If the Court agrees with YKK, then Mr.

those profits "would have been earned *but for* the breach of contract." *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 432 (S.D.N.Y. 2004) (emphasis added). Utilizing the appropriate "but for" scenario is critical in calculating lost profits because it is the means by which a plaintiff can "demonstrate[] with certainty that [its lost profit] damages have been caused by the [alleged] breach." *Kenford Co. v. Cty. of Erie*, 67 N.Y.2d 257, 261 (1986).

Likewise, under federal patent law, for a patent holder to recover lost profits on sales that it purportedly would have made absent infringement, it must prove "a causal relation between the infringement and its loss of profits," and in particular "a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003) (internal quotation marks omitted). This "but for" causation standard requires the patent holder to reconstruct the market to show what it would have looked like absent the alleged infringing sales. *Id.* While any such reconstruction is inherently hypothetical, it must have "some grounding in sound economic and factual predicates." *DSU Med.*, 471 F.3d at 1309 (internal quotation marks omitted). The standard method for proving patent lost profits is to prove: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) [the patent holder's] manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit [the patent holder] would have made." *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

Mr. Donohue's lost profits calculation rests on mere speculation, not any sound economic or factual predicates. Mr. Donohue engages in no analysis of what the world would have looked

Donohue's opinions regarding lost profits damages for breach of contract should be excluded as irrelevant.

like absent YKK's alleged breach or patent infringement.  Rather, Plaintiffs' counsel instructed

him to assume that if YKK had not engaged in any of the alleged improper conduct, then

Plaintiffs would have laminated every single Accused Zipper that YKK sold into the Unlicensed

Markets.  *See* Donohue Dep. Tr. 82:4-7, 95:16-23; *see also* Donohue Rpt. ¶ 136 ("… Plaintiffs

contend that, but for YKK's improper actions, Plaintiffs would have laminated the Excluded

Market Water Resistant Zippers that were laminated by YKK.").  A calculation based solely on

spoon-fed assumptions and speculation lacks the rigorous factual examination necessary to

support admissible expert testimony.  *ECD Inv'r Grp. v. Credit Suisse Int'l*, 2017 WL 3841872,

\*14 (S.D.N.Y. Sept. 1, 2017) (excluding expert's opinion that was "predicated on an assumption

wholly lacking in factual basis").  Plaintiffs have not attempted to fill this gap with another

expert.  Thus, there is no economic analysis, sound or unsound, to support the "but for" scenario

Mr. Donohue has used.

Nor, in any event, is there any factual predicate for that "but for" scenario.  Indeed, Mr.

Donohue failed to address, or even consider, that YKK had difficulty marketing and selling

zippers laminated by Plaintiffs due to severe price competition, as well as freight-cost and lead-

time issues associated with shipping zippers from the United States to Asia, where YKK's

customers were located.  *See* YKK0335335 at 337-339.  YKK's customers demanded a lower

price for water-resistant zippers than could be met with YKK's zippers laminated by Plaintiffs

and those customers considered turning to competing zipper manufacturers to meet their needs.

Shibata/Sarumaru Exs. 29, 32, 67, 71, 72, 88; YKK0050675; YKK0089871-874.    These

competitors in Asia sold their water-resistant zippers for far less than the price of the zippers

laminated by Plaintiffs.  YKK0007979, Tab: "Cost vs List Price."  Indeed, Mr. Donohue

acknowledged that water-resistant zippers laminated by Plaintiffs were "meaningfully more

expensive" than YKK-laminated zippers, Donohue Dep. Tr. 188:16-20; yet, he assumes—at Plaintiffs' counsel's direction—that YKK would have sold equal numbers of the more expensive zippers without accounting for this "meaningful" price discrepancy. Donohue Rpt. ¶ 136.[12] Such a speculative and unsupported "lost profits" theory is inherently unreliable and should not be presented to a jury.

Even if the "but for" scenario Mr. Donohue used was not fatally flawed and woefully speculative, his opinion regarding lost profits related to water-resistant zippers used in "luggage (excluding sports and cosmetic bags)"—one of the Unlicensed Markets—should be excluded as methodologically unsound and speculative. Mr. Donohue estimated the amount of water-resistant zippers sold by YKK and used in luggage, excluding sports and cosmetic bags, by using a luggage-related usage code in YKK's sales data, and excluding a "sports" sub-category. Donohue Rpt. Section V. Although facially appealing, even a cursory review of his results reveals that his method is unreliable and incomplete absent further testing (which Mr. Donohue did not do, Donohue Dep. Tr. 166:13-22), such as collecting data from YKK's customers to determine whether the Accused Zippers in fact were used in an Excluded Market. For example, Mr. Donohue includes zipper sales to Titleist, Nike, Adidas and other sports companies in his calculation of zipper sales used in luggage, excluding sports bags (Donohue Rpt. Ex. 13B), without reviewing any sales materials to confirm whether these sport bags manufacturers actually sell "luggage" other than sports bags. Donohue Dep. Tr. 171:10-172:24. Such an unfounded opinion is not reliable and should be excluded.

---

[12]  Furthermore, there is no factual support for Mr. Donohue's assumption that YKK would have asked Plaintiffs to laminate *66 million meters* of zippers for its customers absent any obligation to do so. And even if YKK had asked, it is questionable whether Plaintiffs would have been able to accommodate such requests given that (according to Donohue) Trelleborg would have had to give up all of its manufacturing capability at its New Haven, CT plant, and convert all machines to zipper laminators to accommodate such requests. Donohue Rpt. ¶¶ 148-52.

In addition, Mr. Donohue's opinion should be excluded with respect to all alleged lost profits for breach of contract after October 31, 2014 because that is the date on which Plaintiff AU New Haven—the only Plaintiff that is a party to the ELA—sold all of its lamination business, including its ability to laminate zippers, to Trelleborg. Donohue Rpt. ¶ 20. Since then, it is undisputed that AU New Haven has not had the ability to provide any products or services, much less lamination services. Berlinski Dep. Tr. 81:6-82:19. Thus, at the very least, Mr. Donohue's opinions for lost profits arising from alleged breach of contract must be excluded for the period after October 31, 2014. *See, e.g. PSN Ill., LLC v. Abbott Labs.,* 2012 WL 5381278, *5 (N.D. Ill. Oct. 31, 2012) (excluding expert's opinion as "fundamentally flawed" and insufficiently tied to case because expert's damages calculations included time periods for which patent holder could not recover damages); *Gonzalez Prod. Sys., Inc. v. Martinrea Int'l Inc.*, 2015 WL 4771096, *14-15 (E.D. Mich. Aug. 13, 2015) (excluding portions of expert's report detailing damages theory not available under applicable law for breach of contract).

### C.   Mr. Donohue's Lost Profits Calculation Relies Upon Sampling And Extrapolation With No Statistical Basis

Finally, even if Mr. Donohue's opinion on lost profits for High End Outerwear could somehow survive despite the methodological and legal flaws just discussed, the Court should still exclude it because Mr. Donohue has no reliable statistical basis to extrapolate from his limited set of empirical data. *See, e.g.*, *Compania Embotelladora*, 650 F. Supp. 2d at 320-21 (excluding lost profits opinion where expert assumed that transshipping occurred in same proportion in all relevant sales territories solely because "there's no reason to assume that [transshipping in all sales territories] wasn't in the same proportion"); *Johnson Elec.*, 103 F. Supp. 2d at 283-84 (while experts are not required to base their opinions on empirical data alone, expert "must have some reliable basis for extrapolating from the available data").

24

To calculate lost profits for High End Outerwear, Mr. Donohue relied on products from only 12 of YKK's customers and Mr. Cockrell's subjective assessment as to whether those products met his definition of "High End Outerwear." Then, Mr. Donohue created a weighted average of 56% based on Mr. Cockrell's subjective assessment (which ranged from 26% to 88% across the 12 YKK customers) and applied that average to every one of YKK's more than 3,000 remaining customers. Donohue Rpt. ¶ 112-13. In so doing, however, Mr. Donohue did not assess whether the 12 customers were statistically representative of YKK's remaining customers. Instead, he simply *assumed* they were. *See* Donohue Dep. Tr. 116:24-117:18, 136:9-137:13, 152:16-153:19, 154:3-16. Because Mr. Donohue had no reliable basis for that assumption, his lost profits opinions should—at a minimum—be excluded to the extent he purports to extrapolate beyond the 12 customers.

***

In sum, Mr. Donohue's use of an unreliable definition, unsupportable factual assumptions, and legally erroneous economic theory, renders his lost profits opinions unreliable and improper for the jury. *See, e.g.*, *Compania*, 650 F. Supp. 2d at 321 (excluding expert opinion on lost profits because amounting to "one baseless, flawed assumption after another").

**CONCLUSION**

For the reasons explained above, the Court should exclude the opinions and testimony of Plaintiffs' experts David W. Cockrell, Margo A. Bagley, and James J. Donohue.

Dated: May 21, 2018

Respectfully submitted,

By:    */s/ Steven Cherny*
Steven Cherny
Deborah K. Brown
Toby E. Futter
QUINN EMANUEL URQUHART
  & SULLIVAN LLP

25

51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849-8700
Fax: (212) 849-7100
Email: stevencherny@quinnemanuel.com
Email: deborahbrown@quinnemanuel.com
Email: tobyfutter@quinnemanuel.com

Michael A. Bertelson
Russell A. Korn
Amanda N. Brouillette
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE Suite 2800
Atlanta, Georgia 30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: mbertelson@kilpatricktownsend.com
Email: rkorn@kilpatricktownsend.com
Email: abrouillette@kilpatricktownsend.com

*Attorneys for Defendants*