**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------
AU NEW HAVEN, LLC and                        :
TRELLEBORG COATED SYSTEMS US, INC.,          :
                                             :      Civil Action No.
                        Plaintiffs,          :      15-CV-03411-GHW
                                             :
            v.                               :
                                             :
YKK CORPORATION et al.,                      :      July 2, 2018
                                             :
                        Defendants.          :
-------------------------------------------------------------
```

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF**
**PLAINTIFFS' EXPERTS [Dkt. No. 367]**

# TABLE OF CONTENTS

**Page**

Table of Authorities..................................................................... i

I.    Introduction ............................................................................ 1

II.   A Lower Burden of Proof Applies to Plaintiffs' Claims..................................... 1

III.  Cockrell's Opinion as to the Industry Meaning of the Phrase "High End Outerwear" and Donohue's Damages Calculations Based Thereon Are Admissible............................................................... 4

      A.    Cockrell's opinion is supported by industry usage and practice.................. 6

      B.    Cockrell properly identified the most important factors underlying his HEO determinations.......................................... 8

      C.    Cockrell's definition of HEO can be reliably applied................................ 11

IV.   Cockrell's Opinion on the Commercial Success of the Zippers Is Admissible ... 12

V.    Cockrell's Opinion Concerning YKK Customer Confusion Is Admissible......... 14

VI.   Bagley's Testimony Concerning Foreign Patent Law Is Admissible ................. 16

VII.  Donohue's HEO Excluded Market Damages Opinions which Depend on Cockrell's Opinions Are Admissible ................................................... 17

VIII. Donohue's Damages Opinions Are Admissible Because Sufficient Evidence of Causation Exists............................................................ 20

IX.   Donohue's Luggage Excluded Market Damages Opinions Are Admissible ....... 22

X.    Donohue's HEO Excluded Market Damages Opinions Have Sufficient Statistical Bases and Are Admissible................................................ 23

XI.   Conclusion................................................................................ 25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                                     **Page(s)**

*Acticon Techs. v. Heisei Elecs. Co., Ltd.*, 2008 WL 356872 (S.D.N.Y. 2008)..............    3

*Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796 (S.D.N.Y. 2011) .............    9

*Babyage.com Inc. v. Toys "R" Us, Inc.*, 558 F.Supp.2d 575 (E.D.Pa. 2008)...............    7

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 2000 WL 1694321
    (S.D.N.Y. 2000) ...................................................................................................    17

*Beastie Boys v. Monster Energy Co.*, 983 F.Supp.2d 354 (S.D.N.Y. 2014).................    8, 9

*Bellis v. Tokio Marine & Fire Ins. Co., Ltd.*, 2006 WL 64801 (S.D.N.Y. 2006) .........    22

*Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376 (2d Cir. 2006) ............................    1

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283
    (Fed. Cir. 2015)...................................................................................................    17

*Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918 (2d Cir. 1977)....    2

*Content Guard Holdings, Inc. v. Amazon.com, Inc.*, 2015 WL 11089749
    (E.D. Tex. 2015) .................................................................................................    18, 25

*Davis v. Carroll*, 937 F.Supp.2d 390 (S.D.N.Y. 2013) .................................................    9

*Deflecto, LLC v. Dundas *Jafine Inc.*, 2015 WL 6755318 (W.D. Mo. 2015).............    18

*Dorman Prods., Inc. v. Paccar, Inc.*, 201 F.Supp.3d 663 (E.D.Pa. 2016)...................    18

*ECD Investor Grp. v. Credit Suisse Int'l*, 2017 WL 3841872 (S.D.N.Y. 2017) ..........    *passim*

*Emig v. Electrolux Home Prods. Inc.*, 2008 WL 4200988 (S.D.N.Y. 2008)................    9

*In re Initial Public Offering Sec. Litig.*, 174 F.Supp.2d 61 (S.D.N.Y. 2001)...............    16

*Keystone Global LLC v. Auto Essentials, Inc.*, 2015 WL 224359 (S.D.N.Y. 2015) ....    2, 3

*Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056 (Fed. Cir. 1983) ...........................    2

*Lexington Prods. Ltd. v. B. D. Commc'ns, Inc.*, 677 F.2d 251 (2d Cir. 1982) .............    2

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F.Supp.3d 485
    (S.D.N.Y. 2015) .................................................................................... 5, 25

*Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) ......................... 16

*Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017)................ 20

*Merck Eprova AG v. Gnosis S.p.A*, 760 F.3d 247 (2d Cir. 2014)................................ 16

*Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, 2014 WL 1468118
    (S.D.N.Y. 2014).................................................................................... 9

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    691 F.Supp.2d 448 (S.D.N.Y. 2010)....................................................... 8, 9

*Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125 (2d Cir. 2016) ................ 1

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F.Supp.2d 395
    (S.D.N.Y. 2013).................................................................................... 8

*Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2017 WL 1319553
    (E.D. Tex. 2017) .................................................................................. 22

*Rowe v. DPI Specialty Food, Inc.*, 2015 WL 4949097 (D. Utah 2015) ...................... 22

*Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 739580
    (S.D.N.Y. 2018).................................................................................... *passim*

*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33 (S.D.N.Y. 2016)....................... *passim*

*Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566 (Fed. Cir. 1996) ........................... 2

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
    637 F.3d 1269 (Fed. Cir. 2011)............................................................. 7

*SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*,
    467 F.3d 107 (2d Cir. 2006)................................................................. 7

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89
    (2d Cir. 2007)...................................................................................... 2

*TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F.Supp.2d 1120 (C.D.Ca. 2009)....... 7

*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004)................................................... 8

*Winn v. Schafer*, 499 F.Supp.2d 390 (S.D.N.Y. 2007) .............................................. 16

**Other Authorities**                                                                   **Page(s)**

Fed. R. Evid. 702 ................................................................................................. 1, 4

Fed. R. Evid. 1006 .................................................................................................. 5

1 *McCormick on Evidence* § 12 (7th ed. 2016) ............................................................. 16

## I.    <u>Introduction.</u>

Defendants (collectively, "YKK") have moved to exclude the testimony of David W. Cockrell ("Cockrell"), James J. Donohue ("Donohue") and Margo A. Bagley ("Bagley") -- Plaintiffs' outerwear industry, damages and foreign law expert witnesses, respectively.  Dkt. No. 367.  YKK's Motion, however, rests on (1) mischaracterizations of the expert opinions, (2) arguments related to cross-examination, not admissibility, and (3) representations that factual assumptions by the experts are without basis despite evidence in the record establishing such facts.[1]  Accordingly, YKK's Motion must be denied in its entirety.

## II.    <u>A Lower Burden of Proof Applies to Plaintiffs' Claims.</u>

Although the opinions of Plaintiffs' experts are admissible under Rule 702 of the Federal Rules of Evidence ("Rule 702") regardless of the applicable burden of proof, a lower burden of proof, in fact, applies to Plaintiffs' claims in this case for two reasons.

<u>First</u>, where the defendant wrongdoer caused the breach of contract, the plaintiff need only show "a stable foundation for a reasonable estimate" of the damages suffered.  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016); *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 392 (2d Cir. 2006).  Under New York law,

> when the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied a recovery of substantial damages.  Moreover, the burden of uncertainty as to the amount of damage is upon the wrongdoer, and the test for admissibility of evidence concerning prospective damages is whether the evidence has *any tendency* to show their probable amount.  The plaintiff need only show a stable foundation for a reasonable estimate of [damages].  Such an estimate necessarily requires some improvisation, and the party who has caused the loss may

---

[1] As this Court repeatedly has noted, if any factual support exists in the record for the offered opinion, contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.  *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 739580, *3 (S.D.N.Y. 2018); *ECD Investor Grp. v. Credit Suisse Int'l*, 2017 WL 3841872, *16 (S.D.N.Y. 2017); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 52 (S.D.N.Y. 2016).

not insist on theoretical perfection.  The law will make the best appraisal that it can, summoning to its service whatever aids it can command.

*Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926-927 (2d Cir. 1977) (emphasis added); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110-11 (2d Cir. 2007); *Lexington Prods. Ltd. v. B. D. Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982).

Here, Plaintiffs claim the profits they otherwise would have earned if YKK had Plaintiffs laminate the Zippers which were laminated instead by YKK and which YKK sold for use in the Excluded Markets (the "Accused Zippers").[2]  These lost profits are a direct result of YKK's misconduct, as confirmed by YKK's own documents wherein YKK itself recognized that these lost profits were exactly the type of damages to which Plaintiffs would be entitled.  Exhs. 2-6.

<u>Second</u>, a lower burden of proof applies when the defendants prevent the availability of additional evidence relevant to their patent infringement.  "[A]ny adverse consequences must rest on the infringer when the inability to ascertain lost profits is due to the infringer's own failure to keep accurate or complete records."  *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983).  "[I]f actual damages can not be ascertained with precision because the evidence available from the infringer is inadequate, *damages may be estimated on the best available evidence*, taking cognizance of the reason for the inadequacy of proof and resolving doubt against the infringer."  *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996) (emphasis added); *see also Keystone Global LLC v. Auto Essentials, Inc.*, 2015 WL

---

[2] "Zippers" refer to the water resistant zippers covered by the claims of Plaintiffs' United States Patent No. 6,105,214 (the "'214 Patent") and the related foreign patents (collectively, the "Patents").  "Excluded Markets" refer to the "high end outerwear, marine, military and luggage (excluding sports and cosmetic bags) markets" into which YKK was not permitted to sell Zippers per the express terms of the February 13, 2002 Exclusive License Agreement (the "License Agreement").  Exh. 1 ¶ 1.  YKK sells both (1) YKK Zippers laminated by Plaintiffs, marketed as AquaGuard T4 and T5 Zippers, and also (2) YKK Zippers laminated by YKK or its unauthorized subcontractors or sublicensees, marketed as AquaGuard T8, T9 and T10, AquaCheat, RCPU, DG, DT, DD, and DS Zippers.  Plaintiffs' claims generally arise out of YKK selling into Excluded Markets those Zippers which were not laminated by Plaintiffs.  When appropriate, the attached exhibits are highlighted for the Court's convenience.

224359, *4-*5 (S.D.N.Y. 2015); *Acticon Techs. v. Heisei Elecs. Co., Ltd.*, 2008 WL 356872, *2 (S.D.N.Y. 2008).  "When the calculation of damages is impeded by incomplete records of the infringer, adverse inferences are appropriately drawn."  *Sensonics, Inc.*, 81 F.3d at 1572.

Here, YKK did not track all sales of Accused Zippers for use in Excluded Markets, leaving Plaintiffs to prove their claims with the business records YKK did maintain and with the sales records of YKK's largest Accused Zippers customers.  For example, within months after the License Agreement was executed (reinforced again in 2006), and unbeknownst to Plaintiffs, individuals at the highest levels of the YKK organization, including Masayuki Sarumaru ("Sarumaru") and Akinobu Shibata ("Shibata"), decided that the high end outerwear ("HEO") Excluded Market limitation (the "HEO Excluded Market") was to be completely ignored by YKK.  Exhs. 7-8.  As a result, no YKK sales personnel ever were advised of the HEO Excluded Market restriction, as confirmed in an April 2014 YKK document (Exh. 9) which stated:

> 1. No materials were found that represented internal company announcements in relation to the [HEO License Agreement] scope of exclusion.
> 2. All of the relevant people that were spoken with were not aware of the existence of an [HEO] exclusion clause in the [License Agreement].

YKK described this improperly unrestricted sales practice as a "No Limitation" sales policy.  Exh. 4; *see also* Exh. 10 (10/17/13 YKK "Meeting Memo" stating, emphasis added, "Excluded Field.  It was discussed that it would be difficult for YKK to find the way to avoid all kinds of penalties since we sell [YKK-laminated Zippers] to all kinds of industries and customers *with no limitation*"); Shibata Tr. 37:20-38:2 & 39:19-25 (Shibata unable to identify any such procedures to track HEO Excluded Market sales and unable to identify any YKK representative having knowledge of such a procedure) (Exh. 11).  Related hereto, YKK stated in 2006 that it was not tracking which Zippers were sold for use in HEO (Exh. 12), and in 2013 YKK's Chief

Legal Counsel cautioned, "I think we will also need to consider whether YKK ever actually tried to control or police the sale of the zippers" with respect to the HEO Excluded Market (Exh. 13).

Thus, a lower burden of proof applies to Plaintiffs' claims in this case.[3]

### III.    Cockrell's Opinion as to the Industry Meaning of the Phrase "High End Outerwear" and Donohue's Damages Calculations Based Thereon Are Admissible.

Putting the issue in perspective, YKK's own Chief Legal Counsel stated in October 2013:

> I do not believe YKK can make the argument that the zippers never went into high end outerwear. *I think we have to admit at some point that there is something called high end outerwear and that some YKK zippers went into these garments.*

Exh. 13 (emphasis added).

In this regard, Cockrell first describes the meaning of the term HEO by reference to the different market segments in the outerwear industry (Exh. 14 ¶¶ 6-10), sets forth in detail the quantitative characteristics of HEO based upon his specialized knowledge and experience in the industry (*id.* ¶¶ 11-16) and explains that "[w]hether a particular product constitutes [HEO] depends on" those characteristics (*id.* ¶ 17). Cockrell then explains his methodology for determining which articles are HEO (*id.* ¶¶ 35-40).

To permit this analysis, Plaintiffs subpoenaed from certain of YKK's Accused Zippers customers their pertinent sales data (outerwear styles, catalogs, volumes sold, countries of sale, and manufacturer suggested retail price ("MSRP")). These customers included seven of YKK's nine largest customers and ten of YKK's 23 largest customers, and accounted for over 35 million meters of AquaGuard T8, T9 and T10 Zippers sales from February 2009 (the beginning of the damages period) through September 2017 (the last discovery update by YKK). Cockrell spent

---

[3] Plaintiffs address herein only those Rule 702 criteria challenged by YKK. The other criteria undisputedly are satisfied given the lack of any challenges by YKK thereto.

approximately 170 hours analyzing 3,225 styles of jackets and 856 styles of pants, creating spreadsheets listing the important characteristics of each and noting whether the products were HEO.  *See* Cockrell Tr. 55:25-56:4 (Exh. 15); *see also, e.g.*, Exh. 14 (Exhibit 12 thereto).[4]

Cockrell's opinions will assist the jury in understanding which of these *thousands* of garments, by industry standards, are considered high end (as opposed to low end or mid-range), and, therefore, such opinions are admissible.  *Scott*, 315 F.R.D. at 45 ("Expert testimony is … admissible where it synthesizes or summarizes data in a manner that streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion"); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F.Supp.3d 485, 504 (S.D.N.Y. 2015) (admitting summary where the expert "did more than simply add a few numbers—she combed through at least 100 pages of sales reports, compiled and aggregated the data (which was provided on a transaction-by-transaction basis), and presented it in a more readily understandable format").[5]

The above alone is sufficient to deny YKK's Motion with respect to Cockrell's opinion on the industry meaning of the phrase "high end outerwear," but for completeness, Plaintiffs nevertheless specifically address each of YKK's arguments.

---

[4] The first third-party subpoenae were issued in December 2015, and the last set of customer sales data was obtained in August 2017.  Plaintiffs incurred approximately $160,000 in legal expenses with respect to discovery of YKK's customers, including filing a legal action in Oregon federal court to obtain one customer's sales records.  Despite urging by the Court (11/30/16 Tr. at 27:5-21, Exh. 16), YKK never assisted in the collection of sales data from any of YKK's own customers, including from those customers who refused to cooperate with Plaintiffs.  The statistics discussed herein are inclusive of the customer data recently obtained and included in Cockrell's March 15, 2018 Supplemental Report.  YKK, on the other hand, relies upon an expert, Paul K. Arntson ("Arntson"), whose opinion of high end outerwear is based solely on MSRP (*i.e.*, whose opinion effectively is that "high end" simply means "expensive").  Arntson Report ¶¶ 29 & 45 (Exh. 17).  Arntson testified in deposition that he had spent only 20 to 40 hours working on this case through July 2017, including the time devoted to drafting his 35-page report.  Arntson Tr. 54:4-22 (Exh. 18).

[5] Ignoring this Court's holding in *Scott*, YKK instead would have the members of the jury determine, in the first instance and literally item-by-item, which of the *over 4,000* jackets and pants at issue are high end after Cockrell (1) educates the jury on the important industry considerations and (2) explains the spreadsheets he created summarizing the features of the outerwear products at issue (*see* Fed. R. Evid. 1006).  While the jury is free to accept or reject Cockrell's opinion with respect to any specific outerwear product(s) which YKK challenges at trial, that is a far cry from the members of the jury being tasked with categorizing over 4,000 jackets and pants in the first instance.

### A.    <u>Cockrell's opinion is supported by industry usage and practice</u>.

YKK argues that Cockrell's definition of HEO does not have "*any basis* in industry usage or practice." Motion p. 6 (emphasis added). That statement, however, is objectively inaccurate.

<u>First</u>, the YKK records cited in Cockrell's Report confirm decades of such industry usage. *See* <u>Exh. 14</u> ¶¶ 18-34 & Exhibits 2A-2P thereto; *cf. Scott*, 315 F.R.D. at 45 ("An expert also may offer commentary on documents in evidence if the expert's testimony relates to the context in which documents were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge"). YKK does not discuss *any* of these documents, which (1) range from 2000 to 2015, (2) use the phrase "high end" to describe outerwear manufacturers and outerwear and (3) reference outerwear characteristics in connection therewith.

For example, in 2003 shortly after the License Agreement was executed, YKK's own documents state: (1) that "High End Jacket" was a "Segment" of the "USA Jacket Industry"; (2) that such products generally were "High quality and lots of hand work," were designed and developed in the United States but manufactured in Asia and used a "value added zipper" such as the "PU zipper"; (3) that the Zippers were "High Performance Products" for "High End Outerwear Jacket";  and (4) that YKK was "developing three areas of Jacket industries [including] Jackets for High End" and was "introducing various type of PU Coil Zippers for High End Jackets." *See* <u>Exh. 14</u> (Exhibit 2K at YKK0253888-890, Exhibit 2L at YKK0294538, Exhibit 2M at YKK0308574-575, & Exhibit 2O at YKK0348021-023 thereto).

<u>Second</u>, other YKK documents (marked as, or referenced in, deposition exhibits) ranging from 1999 to 2013 also describe particular outerwear or outerwear manufacturers as "high end." *See, e.g.,* <u>Exhs. 19</u>-<u>33</u>.

6

<u>Third</u>, the person who executed the License Agreement on behalf of YKK in 2002, Sarumaru, similarly understood the phrase "high end outerwear" to mean high performance outerwear as determined by the characteristics of same (*e.g.*, weight, flexibility, wind and water resistance, breathability, and seamless).  *See* <u>Exh. 34</u> and Sarumaru Tr. 164:19-169:25 (<u>Exh. 35</u>).

<u>Fourth</u>, common sense instructs that those products in a particular industry comprising the "high end" will be those of high quality and performance, with industry experts able to identify the characteristics deemed most important to this determination.  *See, e.g., Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287-88 (Fed. Cir. 2011) ("high end PET scanner market" of products offering the "highest performance and high technology"); *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F.Supp.2d 1120, 1129-30 (C.D.Ca. 2009) ("high-end competitive swimwear" market consisting of "performance swimwear"); *Babyage.com Inc. v. Toys "R" Us, Inc.*, 558 F.Supp.2d 575, 580 (E.D.Pa. 2008) ("high-end baby and juvenile strollers," "high-end high chairs," "high-end breast pumps," "high-end baby bedding," "high-end car seats," and "high-end infant carriers" markets).[6]

Cockrell has 25 years of extensive experience in the water resistant outerwear industry as a designer, creative director and brand manager and is more than qualified to opine on this subject.  *See* <u>Exh. 14</u> ¶ 3 & Exhibit 1 thereto.  Contrary to YKK's assertion (Motion pp. 6-7), no requirement exists that an expert reference "scientific, academic, or third-party industry support."  Courts routinely admit expert testimony grounded in the experience of the expert.  *See, e.g., SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 133 (2d Cir. 2006) (admitting expert testimony regarding the insurance industry use of the term "occurrence");

---

[6] As with any industry, generic references to "high end" can be found in print and online, but no one reasonably expects to find a formulaic definition accepted as the exact standard in the industry.  *See, e.g.*, <u>Exhs. 36</u>-<u>37</u>. Similarly, as Cockrell observed for outerwear, any industry expert identifying high end products generally "will know it when you see it" as that is nothing more than a collective assessment of the important individual characteristics of the product.  YKK's criticisms of Cockrell's opinion in this regard must be rejected.  Motion p. 7.

*Royal Park Invs. SA/NV*, 2018 WL 739580, *6 (experts routinely tie observations to conclusions through the use of "general truths derived from … specialized experience"); *ECD Investor Grp.*, 2017 WL 3841872, *17 (admitting expert testimony regarding the financial industry definition of the term "hedging"); *Scott*, 315 F.R.D. at 46 (experts may testify regarding "ordinary practices and usages" in a particular industry); *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 405 (S.D.N.Y. 2013) (admitting expert testimony on custom and practice in entertainment industry); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F.Supp.2d 448, 463 (S.D.N.Y. 2010) (admitting expert testimony based on industry experience rather than on published scholarship or existing data).[7]

### B. Cockrell properly identified the most important factors underlying his HEO determinations.

YKK argues that Cockrell's opinions should be completely excluded, rather than tested before the jury through cross-examination, because Cockrell did not create a spreadsheet identifying every single factor that one could consider in assessing the quality of a product and did not expound a mathematical formula to be rigidly applied to the factors identified.  Motion pp. 7-10.  YKK's arguments must be rejected for at least the following five reasons.

First, expert opinions can be qualitative (as opposed to quantitative), thus inherently incapable of involving an exhaustive list of considerations or a mathematical formula to be applied.  *See, e.g., Scott*, 315 F.R.D. at 50 ("In cases where experts draw a conclusion from a set of observations based on extensive and specialized experience, the method is the application of experience to facts"); *Beastie Boys v. Monster Energy Co.*, 983 F.Supp.2d 354, 365 (S.D.N.Y.

---

[7] *United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004), cited by YKK is inapposite and, if anything, supports *Plaintiffs'* position.  In *Cruz*, the proposed prosecution expert testimony was excluded because the subject phraseology ("to watch someone's back") was not shown to fall solely "within the ambit of drug jargon." *Id.* at 195-196.  Here, both parties' experts, although disagreeing in substance, do agree that the phrase "high end" has an "understood meaning in the apparel industry." *See, e.g.,* Exh. 17 ¶ 25.

2014) (an expert opinion is admissible even if that opinion "does not readily lend itself to a formal or quantitative methodology"); *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1674796, *7 (S.D.N.Y. 2011) (an empirical basis is not necessary for an expert opinion based on experience); *Pension Comm. of Univ. of Montreal Pension Plan*, 691 F.Supp.2d at 464 ("While courts do consider whether an expert has articulated how the specifics of his experience led to his conclusions, every case is fact-specific, and every expert is not required to provide the same degree of detail in linking his experience to his conclusions. … Industry practices are not like scientific hypotheses, which can be tested through trial and error, or logical arguments, which can be analyzed through probing their underlying premises."); *Emig v. Electrolux Home Prods. Inc.*, 2008 WL 4200988, *8 (S.D.N.Y. 2008) (admitting testimony where expert demonstrated a connection between his experience and the process used to reach his conclusions).[8]

Second, Cockrell's opinion is consistent with the parties' intended meaning of "high end outerwear" in the License Agreement (Exh. 34 and Sarumaru Tr. 164:19-169:25 (Exh. 35)), permitting Cockrell to apply that standard to the thousands of outerwear products using the Zippers and to aid the jury in deciding which products are HEO. *ECD Investor Grp.*, 2017 WL 3841872, *17 ("the definition of 'hedging' is not a legal term but rather a contract term to whose interpretation industry trade practice is plainly relevant").

Third, YKK concedes that Cockrell listed "the important ones" in his chart of outerwear characteristics. Motion p. 8. As this Court has explained, professional judgment disputes regarding the variables to employ only affect the probative value of the analysis, not its admissibility. *ECD Investor Grp.*, 2017 WL 3841872, *16; *Scott*, 315 F.R.D. at 50-51 & 53.

---

[8] YKK's reliance on *Davis v. Carroll*, 937 F.Supp.2d 390 (S.D.N.Y. 2013), and *Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, 2014 WL 1468118 (S.D.N.Y. 2014), is misplaced. The challenged opinions in those cases were excluded because the experts abandoned established industry standards for appraising art pieces in favor of their own speculative methods. *Davis*, 937 F.Supp.2d at 415-18; *Oleg Cassini, Inc.*, 2014 WL 1468118, *8-*9.

Thus, that Cockrell did not include columns for overall considerations such as "you know it when you see it" or craftsmanship/manufacturing process does not bear on admissibility as argued by YKK.[9]  Motion pp. 7-8.  In fact, YKK's own documents categorize outerwear manufacturers (and thus outerwear products) based on larger considerations of functionality and performance.  *See, e.g.,* Exh. 14 (Exhibit 2B & Exhibit 2I at YKK0185022 thereto); Exhs. 38-41.

Fourth, YKK's complaint that Cockrell included as a factor the number of AquaGuard Zippers used also misses the mark.  This factor is but one of many considered by Cockrell, any one of which ultimately could warrant a HEO designation.  YKK itself correctly recognized that the use of polyurethane-laminated zippers (having greater functionality and higher cost) is one important indication that a jacket is high end.  Exh. 14 (Exhibits 2K & 2O thereto).  Similarly, YKK's dire prediction that considering such a factor would result in the "absurdity" of all garments using AquaGuard Zippers being deemed HEO (Motion p. 9 n. 9) is belied by the facts (1) that 1,263 jacket and pants styles (over 30%) were not deemed by Cockrell to be HEO despite the use of such Zippers and (2) that only 55% of the AquaGuard T8, T9 and T10 Zippers sold to relevant customers were estimated to have been used in HEO.  Exh. 42 (Exhibit 26F-R).

Finally, YKK's own expert disclosure undercuts YKK's arguments.  Arntson discloses a *facially quantitative* opinion that, for example, all jackets using the water resistant Zippers with a MSRP of at least $500 are the only jackets that constitute HEO regardless of their characteristics and regardless of the characteristics of any jackets with a lower MSRP.  *See* Exh. 17 ¶ 29.  The very selection of $500 as the minimum price point, however, was *entirely qualitative*.  Nowhere in Arntson's report does Arntson purport to disclose every factor considered in determining $500

---

[9] Such considerations were referenced in Cockrell's Report (Exh. 14 ¶ 17), and YKK does not identify a single item of outerwear whose categorization by Cockrell as HEO should be affected by the allegedly poor craftsmanship of any YKK customers.  Further, YKK's criticism of Cockrell for not creating a separate spreadsheet for gloves is nonsensical as only 12 of the 4,380 items reviewed (less than three-tenths of 1%) were gloves.  *See* Motion p. 8 n. 8.

as a minimum MSRP, nor does Arntson disclose the formula which, when applied to every factor Arntson considered, mathematically resulted in a minimum jacket MSRP of $500.[10]

### C. Cockrell's definition of HEO can be reliably applied.

Cockrell's definition of HEO is reliable.  First, YKK mischaracterizes the percentage of times application of Cockrell's definition results in differing opinions.  Motion p. 10.  YKK only marked as deposition exhibits ten jackets carefully selected to include some as to which opinions might differ.  As a result, three of the 2,211 jackets Cockrell identified in his Report as HEO (less than one-seventh of 1%) were categorized at deposition as not HEO.[11]  Such a negligible figure is in stark contrast to the 50% failure rate YKK incorrectly states.  Putting YKK's strategy in perspective, had YKK shown Cockrell only one jacket and had the categorization varied, YKK would have argued that Cockrell's definition *never* works.  Conversely, had YKK shown Cockrell jackets which would be categorized as HEO regardless of who examined the jacket, YKK then would have had to concede that Cockrell's definition *always* works.  Cockrell himself fully recognized that a small percentage of the products reviewed reasonably could be considered the lower tier of HEO or the higher tier of mid-range outwear, and Cockrell did his best to exclude such products from the HEO category.  Exh. 14 ¶ 39.  Cockrell's opinion must be assessed on a larger scale given that *thousands* of outerwear garments were analyzed.

Second, as noted by Cockrell in his Report, a correlation exists between (1) the functionality and quality of the outerwear and (2) the MSRP consumers are willing to pay for

---

[10] Arntson admitted at deposition that he formed his opinion without reviewing any of the available product information with respect to any of the outerwear products at issue.  Arntson Tr. 116:2-5 & 170:21-171:9 (Exh. 18). As noted in Plaintiffs' motion to exclude Arntson's opinions, the only factor likely underlying Arntson's choice of a $500 MSRP for jackets is that that MSRP is exactly the MSRP that YKK determined pre-litigation would result in a total payment to Plaintiffs within YKK's $10 million "Negotiating Budget."  *See* Dkt. No. 365 p. 2.

[11] Two other jackets identified in Cockrell's Report as not HEO were categorized as HEO at deposition.  Even considering all five jackets as to which the categorization differed, those five examples would comprise less than one-fifth of 1% of the 2,642 jackets categorized by Cockrell as high end, or not high end, outerwear.

such products. *See* Exh. 14 ¶¶ 8, 10 & 16. When the number of styles of jackets and pants sold after 2009 are grouped by MSRP ranges, the reliability of Cockrell's item-by-item analysis comes clearly into focus. For example, only 11% of outerwear with an MSRP of $150 or less, 54% with an MSRP between $151 and $200, and 95% with an MSRP greater than $200 is HEO. Conversely, 89% of outerwear with an MSRP of $150 or less, 46% with an MSRP between $151 and $200, and only 5% with an MSRP greater than $200 is not HEO.[12] These statistics closely match the general stratifications in which an analysis of YKK's own documents results, namely: (1) jackets below $100 MSRP are low end; (2) jackets with a MSRP between $100 and $300 are mid-range; (3) jackets with a MSRP between $300 and $500 are high end; and (4) jackets above $500 MSRP are very high end. *See* Exh. 43; Exh. 14 (Exhibit 2N at YKK334664 thereto). Arntson himself agrees that low end jackets generally are no more than $100 MSRP and that mid-range jackets generally have MSRPs beginning at $100. Exh. 17 ¶¶ 31 & 35.

In light of the above, Cockrell's opinions of HEO (and, therefore, Donohue's damages calculations based thereon) are sufficiently detailed and reliable to be admissible.

## IV.    Cockrell's Opinion on the Commercial Success of the Zippers Is Admissible.

YKK's challenge to Cockrell's opinion on the commercial success of the Zippers and the absence of acceptable alternatives (Motion pp. 11-14) must be rejected for three reasons.

First, Cockrell is qualified to opine on the advantages the water resistant Zippers have over other methods to prevent water from penetrating outerwear through the zipper. Cockrell has 25 years of extensive professional experience in the water resistant outerwear industry

---

[12] These figures derive from the 2,711 products as to which YKK's subpoenaed customers produced both MSRP data and also sufficient data for Cockrell to make a high end (or not high end) determination. The MSRP ranges and percentages likely would vary had a different time period (such as 2006-2009) been analyzed due to, *inter alia*, product availability and demand, raw material and labor costs, and inflation. While a general MSRP range for HEO during a particular period of time can be estimated from an item-by-item functionality analysis, a definition of HEO cannot simply consist of a stated MSRP independent of the particular outerwear's features and functionality.

(Exh. 14 ¶ 3 & Exhibit 1 thereto), including familiarity with zippers generally and with YKK's water resistant Zippers specifically.  *See* Exh. 15 (Cockrell Tr. 15:23-18:19); *see also Royal Park Invs. SA/NV*, 2018 WL 739580, *4 (courts within the Second Circuit "have liberally construed expert qualification requirements"); *ECD Investor Grp.*, 2017 WL 3841872, *11-*12 ("educational and experiential qualifications in a general field closely related to the subject matter in question" is sufficient in light of "the liberal thrust of the Federal Rules on this issue").

Cockrell understands that the '214 Patent covers minimum adhesion of the polyurethane layer (how strongly the film is laminated to the stringer tapes), abrasion resistance (how well the film resists wear and tear) and flexibility (how stiff the zipper is when laminated).  Exh. 14 ¶ 1.D.; Exh. 15 (Cockrell Tr. 70:18-71:9).[13]  Cockrell is free to testify, as stated in his Report, that "nothing has come along [since the Zippers were introduced in 1998] which the outerwear industry has recognized as a legal, functioning alternative."  Exh. 14 ¶ 51.  Again, YKK's own documents support this opinion.  Id. ¶¶ 46-50 & Exhibits 17A-17D thereto.

Although YKK criticizes Cockrell for knowing how to test the water resistance of a *fabric* but not a *zipper* (Motion p. 12), YKK disregards the Court's previous claim construction of "water resistant."  The Court already has found that "water resistant" as used in the '214 Patent has its common, ordinary meaning [Dkt. No. 180 at 18], a meaning which Cockrell (and everyone else in the world) fully understands.  *See also* Exh. 15 (Cockrell Tr. 19:2-9) (certain YKK Zippers are in Cockrell's own ski jackets); Exh. 44 (YKK noting that the polyurethane film makes the zipper water resistant).  YKK also ignores the fact that an industry-recognized test exists for fabrics *but not for zippers*.  Exh. 14 ¶ 13; Exh. 15 (Cockrell Tr. 135:19-136:9).

---

[13] Although YKK cites additional lines of Cockrell's deposition transcript (Motion p. 13), YKK omits an objection made on the record which affects the admissibility of the testimony.

Second, YKK improperly attacks Cockrell's opinion that no acceptable, non-infringing alternatives to the Zippers exist because Cockrell (correctly) assumed that all polyurethane-laminated reverse coil zippers of *comparable* adhesion, abrasion resistance and flexibility were infringing zippers.  Motion p. 13.  YKK's own documents, however, advised outerwear and zipper manufacturers worldwide of exactly the same position.  *See, e.g.*, Exh. 14 (Exhibits 18I, 20B & 20E thereto); Exhs. 45-46.

Finally, YKK incorrectly states that the record shows "that non-infringing alternatives, in fact, do exist."  Motion pp. 13-14.  To the contrary, for the reasons set forth in Plaintiffs' Motion to Exclude [Dkt. No. 365, pp. 15-25], none of the zippers identified by YKK's experts are zippers that were (1) non-infringing, (2) acceptable alternatives *and* (3) available in the marketplace during the damages period.  YKK also states that Cockrell admitted that one of these zippers was found by YKK's customers "to be acceptable *alternatives*."  Motion p. 14 (emphasis added).  To the contrary, Cockrell only testified that such zippers likely were "acceptable" to the particular manufacturer as a component for the particular outerwear in which they were used, a substantively different statement than the legally significant phraseology which YKK falsely attributes to Cockrell.[14]  *See also* Exh. 15 (Cockrell Tr. 142:2-14, asking YKK's counsel to clarify what he meant by the word "acceptable" and receiving no clarification).

## V.    Cockrell's Opinion Concerning YKK Customer Confusion Is Admissible.

Plaintiffs' Lanham Act claims generally are based on the facts (1) that YKK never advised its customers that YKK only could sell YKK Zippers laminated *by Plaintiffs* if the customer intended to use the Zippers in Excluded Market finished goods (such as HEO) and (2) that YKK's customers therefore were misled into purchasing Accused Zippers laminated *by YKK*

---

[14] Importantly, YKK knew it was falsely characterizing Cockrell's deposition testimony as this issue previously was fully briefed.  *See* Dkt. No. 272 pp. 2-3 and Dkt. No. 275 pp. 2-3.

for use in Excluded Market finished goods. *See, generally*, Exh. 14 ¶¶ 56-59 & Exhibits 18A-18I thereto; *see also* Exhs. 7-8 (internal instructions for YKK to ignore the HEO Excluded Market limitation). YKK now moves to exclude Cockrell's opinion (1) that brand customers (especially HEO manufacturers) would not *knowingly* violate applicable patent laws *after* the patent owner or licensee advised such customers as to same and, therefore, (2) that such customers would have required YKK to sell them YKK Zippers laminated by Plaintiffs for use in Excluded Market finished goods had YKK disclosed YKK's limited license rights. Motion pp. 14-15. While YKK professes to believe that Cockrell did not "credibly" opine on customer confusion (Motion p. 15), such arguments are for cross-examination or closing argument.

In short, Cockrell's opinion is admissible as based on (1) over two decades of industry experience (*Royal Park Invs. SA/NV*, 2018 WL 739580, *4; *ECD Investor Grp.*, 2017 WL 3841872, *11-*12), (2) YKK's own documents confirming that its customers switched from third-party infringing zippers to YKK Zippers when told of Plaintiffs' Patents and YKK's status as a licensee, (3) the fact that no other non-infringing, acceptable alternative zippers were available to the market, and, of course, (4) common sense.[15] *See* Exh. 14 ¶¶ 54-74 & Exhibits 19A-19C & 20A-20I thereto. Not surprisingly, YKK did not disclose an expert opinion naming any YKK customers who knowingly would have violated the law if YKK had advised them that YKK was not licensed to sell Zippers laminated by YKK for the use in the Excluded Markets. *Royal Park Invs. SA/NV*, 2018 WL 739580, *6 (experts of all kinds routinely tie observations to conclusions through the use of "general truths derived from … specialized experience"); *cf.*

---

[15] YKK describes Cockrell's experience as only a "clothing designer." Motion p. 14. Cockrell, however, also has experience as a brand manager and with branding and consulting. Exh. 14 ¶ 3 & Exhibit 1 thereto; Cockrell Tr. 45:18-46:18 (Exh. 15). In any event, clothing designers, such as Cockrell, who also select the components of the outwear would be equally knowledgeable about whether the brand companies for which they are designing would knowingly use prominent components that violate patent laws, including the United States Patent Act, after being advised by the patent owner or licensee. Cockrell Tr. 15:23-16:12 (Exh. 15).

*Merck Eprova AG v. Gnosis S.p.A*, 760 F.3d 247, 256-257 (2d Cir. 2014) (when an intent to mislead exists, the burden shifts to the defendant to prove the absence of consumer confusion).

**VI.    Bagley's Testimony Concerning Foreign Patent Law Is Admissible.**

YKK asks that Bagley's opinions be excluded in their entirety because they constitute inadmissible legal opinions.  Motion pp. 16-17.  YKK's assertion is misguided.  Bagley is a Professor of Law at both Emory University and the University of Virginia and is an expert in international patent law.  Dkt. No. 368-2 ¶¶ 1-7 & Appendix A thereto.  Bagley described "the origins and contours of the international patent system" in her Report.  Dkt. No. 368-2 ¶ 10.  Her testimony will be of great assistance to the Court in determining the patent laws of Japan, Taiwan, Europe, Hong Kong, and Canada and is not intended to usurp the Court's function.

In *Winn v. Schafer*, 499 F.Supp.2d 390 (S.D.N.Y. 2007), the plaintiffs similarly argued that "a foreign law expert may not opine as to the 'ultimate application of the (foreign) law to the facts of the case.'"  *Id*. at 396 n. 28.  Rejecting that proposition, the Court stated, "A court may thus consider a foreign law expert's opinion even on ultimate legal conclusions."  *Id*.; *see also In re Initial Public Offering Sec. Litig.*, 174 F.Supp.2d 61, 65 (S.D.N.Y. 2001) ("Courts make one exception to this strict rule – when interpreting foreign law, expert legal opinion may be allowed." (citing *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977))); 1 *McCormick on Evidence* § 12 (7th ed. 2016) ("Regardless of the rule concerning opinions on ultimate facts, at common law courts do not allow opinion on a question of law, *unless the issue concerns foreign law*.  Nor do the Federal Rules of Evidence permit opinions on law *except questions of foreign law*." (emphasis added)).  Thus, as an expert on foreign patent law, Bagley may opine on ultimate legal conclusions, and her testimony is admissible.

YKK further argues that Bagley's opinion nevertheless should be excluded because it lacks any factual basis. Motion pp. 17-18. YKK mischaracterizes Bagley's conclusions, which are based on law and on other expert opinions, not on fact. Bagley determined that if the '214 Patent was found to be infringed in the United States by the Accused Zippers, the Accused Zippers also would be found to be covered by the claims of the corresponding foreign Patents due to their similar claim elements and similarities in the respective laws. Dkt. No. 368-2 ¶ 126.

YKK also asserts that Bagley admitted that the patents at issue have different claims. Motion p. 18. Minor differences in claim elements across jurisdictions, however, are inconsequential. For example, in her Report, Bagley discussed the "essential elements" doctrine in Canadian patent law, which considers only the essential elements of a claim in assessing infringement; a product missing "non-essential elements" could still be covered by the patent claims. Dkt. No. 368-2 ¶¶ 93 & 96. Thus, so long as the essential elements are present in YKK's zippers, they would be found to infringe Plaintiffs' Canadian Patent. *Id*. at ¶ 96.

Finally, while Bagley is an engineer and registered patent attorney and has the technical expertise to reach that conclusion, she also relied on the testimony of Plaintiffs' technical expert, Dr. Charles Reinholtz. Dkt. No. 368-2 ¶ 91. One expert's reliance on another is permissible. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303 (Fed. Cir. 2015); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 2000 WL 1694321, *2 (S.D.N.Y. 2000). Thus, Bagley's opinions are proper and admissible in their entirety.

## VII.    Donohue's HEO Excluded Market Damages Opinions which Depend on Cockrell's Opinions Are Admissible.

Cockrell's opinions regarding the definition of HEO and the absence of non-infringing acceptable alternative zippers are admissible. Thus, Donohue's damages opinions related to

HEO Excluded Market sales based on same also are admissible.  Even were Cockrell's opinion regarding alternatives to the Accused Zippers excluded, Donohue's HEO damages opinions still would be admissible for at least three reasons.

First, Donohue considered the issue, thereby rendering his opinion admissible regardless of YKK's disagreement with Donohue's underlying assumption.  *See, e.g.*, *Dorman Prods., Inc. v. Paccar, Inc.*, 201 F.Supp.3d 663, 690 (E.D.Pa. 2016) (damages expert's assumption that no acceptable non-infringing alternatives existed did not render his opinion inadmissible); *Content Guard Holdings, Inc. v. Amazon.com, Inc.*, 2015 WL 11089749, *8 (E.D. Tex. 2015) (expert's acknowledgement that non-infringing alternatives might exist did not render his damages opinion inadmissible); *Deflecto, LLC v. Dundas *Jafine Inc.*, 2015 WL 6755318, *3 (W.D. Mo. 2015) (expert opinion admissible even where it relies upon another witness's inadmissible opinion that acceptable non-infringing alternatives do not exist in the marketplace because that issue is capable of proof by other means).

Second, Donohue's calculations already account for any alleged alternatives that were available in the marketplace because YKK could have maintained the same selling price in any event, thereby not affecting its customers' historic purchasing decisions.  Specifically, YKK's 2009-2016 HEO gross profit margins on the patented water resistant Zippers (approximately 45% of sales price, totaling approximately $61 million) were extremely high given the demand for these products.[16]  Dkt. No. 368-3 ¶¶ 128-135.  Absent the need for YKK to increase its selling prices to absorb additional manufacturing costs, Donohue opined that YKK having

---

[16] The calculation of YKK's gross profit margins is conservative because the margin is calculated at the YKK selling affiliate level due to the manner in which YKK produced its financial data.  In other words, the reported cost to any YKK selling affiliate of a particular Zipper includes the gross profit earned by the YKK manufacturing affiliate from the intermediate sale of the Zipper to the YKK selling affiliate.  If one were to calculate the gross profit margin earned by the YKK Group as a whole on the sale of the Zippers to third party customers, the margin would be higher.  Kindler Tr. 238:22-239:14 (Exh. 47).

Plaintiffs, rather than YKK, laminate the Accused Zippers (in addition to the approximately 40 million meters of Zippers YKK did have Plaintiffs laminate) only would have affected Plaintiffs' and YKK's respective shares of the historically recognized huge gross profits.  In other words, Donohue's HEO analysis showed (1) that paying Plaintiffs to laminate the Accused Zippers would have increased YKK's cost of manufacturing the Accused Zippers by approximately 50%, (2) that YKK could have maintained the same historic selling prices to its customers while still recognizing a very healthy, albeit reduced, gross profit margin (approximately 15% of selling prices, totaling more than $20 million in gross profits) and (3) that Plaintiffs would have recognized additional gross profits from laminating the Accused Zippers (Plaintiffs' lost profits damages).[17]  Dkt. No. 368-3 ¶¶ 136-168; Exh. 42 (Exhibits 25B & 29B).

Contrary to YKK's claim that "no factual support" exists for the assumption that YKK also would have had Plaintiffs laminate the Accused Zippers rather than forgoing all such sales (Motion p. 23 n. 12), the high profit margin, YKK's ability to offer a selection of products to its customers and the fact that no other laminator could be used given Plaintiffs' ownership of the Patents all strongly indicate that YKK would have had Plaintiffs laminate the Accused Zippers (just as YKK had Plaintiffs laminate other YKK Zippers).  Related hereto, from 2002 to 2013, YKK had Plaintiffs laminate over 39 million meters of other Zippers (including over 6 million meters in 2005 alone).  Exh. 49.

From the customers' point of view, therefore, nothing would have differed from what historically transpired.  Thus, no reason would have existed for those customers to consider any

---

[17] The June 5, 2018 Declaration of Shibata states that disclosure of YKK's cost and profit information to its customers "may also increase price reduction pressure from those customers, no matter how reasonable YKK's profit margin."  *See* Dkt. No. 370 ¶ 5, Exh. 48; Kindler Tr. 233:14-23 (YKK did not have a standard minimum gross profit requirement) (Exh. 47); Shibata Tr. 201:12-15 (same) (Exh. 11).  An ability to reduce a selling price substantively is no different than an ability to absorb higher costs as both confirm the willingness of YKK to accept a lower gross profit to maintain YKK's position in the water resistant zipper market.

alternative products not already considered when they decided to purchase YKK-laminated

Accused Zippers, and the effects of such alternative products, if any, already are reflected in

YKK's historic, actual sales volumes.  Any YKK disagreement doesn't affect admissibility.

Third, YKK's own damages expert, Lauren R. Kindler, did not calculate the purported

effect any allegedly acceptable alternative should have had on Donohue's damages calculations.

Kindler Tr. 302:19-303:1 (Exh. 47).  Accordingly, not only can the jury reasonably infer that the

alleged effect would have been monetarily insignificant, but also the jury can conclude that

Donohue's calculation represents a reasonable estimate of Plaintiffs' lost profits in any event.

*Cf. ECD Investor Grp.*, 2017 WL 3841872, *20 (absent contrary evidence in the record, the jury

reasonably could find the facts as asserted by the plaintiffs).

## VIII.    Donohue's Damages Opinions Are Admissible Because Sufficient Evidence of Causation Exists.

YKK's challenge based on causation must be rejected for three reasons.[18]

First, YKK argues that Donohue must reconstruct a hypothetical market as Donohue

believes it would have existed absent YKK's misconduct to determine the amount of Accused

Zippers Plaintiffs would have laminated in addition to the approximately 40 million meters of

Zippers Plaintiffs already laminated for YKK.  Motion pp. 20-21  One method of doing so is for

Dohonue to establish (1) the demand for the Zippers, (2) the absence (or effect of) acceptable,

non-infringing alternative products, (3) Plaintiffs' manufacturing capacity to exploit the demand,

and (4) the gross profits Plaintiffs would have realized.[19]  Motion p. 21.  As evidenced by the

---

[18] Contrary to YKK's argument (Motion p. 24), Donohue does not provide any opinion of lost profits breach of contract damages for the period after October 31, 2014.  The contract monetary damages claimed for that period generally are the unpaid royalties due under the License Agreement.  Donohue's post-October 31, 2014 lost profits damages calculations relate to Plaintiffs' respective patent infringement, unfair competition and Lanham Act claims.

[19] This so-called *Panduit* test is one method, but not the only method, of establishing the patentee's entitlement to lost profits.  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1284 (Fed. Cir. 2017).

face of Donohue's Report and as already discussed above, that is exactly what Donohue has done. *See, e.g.*, Section VII above; Dkt. No. 268-3 ¶¶ 140-144 (market demand), ¶¶ 145-147 (alternative products), ¶¶ 148-152 (capacity), and ¶¶ 136-139 & 153-168 (lost profits). YKK's opposition, at most, goes only to the weight, not the admissibility, of Donohue's opinions. That YKK fully recognizes the reasonableness of Donohue's opinions on the instant record is confirmed by the fact that YKK's own experts did not disclose any opinions calculating (1) the market demand for the Zippers, (2) the claimed mathematical effect of any alleged alternative products, (3) Plaintiffs' manufacturing capacity, or (4) Plaintiffs' lost gross profit margins. *See, e.g.*, Kindler Tr. 155:19-156:5, 260:3-24 & 302:19-303:1 (Exh. 47).

Second, YKK mischaracterizes Donohue's opinion as one to the effect that "YKK would have sold equal numbers *of the more expensive zippers*" without accounting for the alleged price discrepancy between the Plaintiffs-laminated Zippers that should have been sold and the YKK-laminated Accused Zippers that actually were sold. Motion pp. 20-21 (emphasis added). As noted above, Donohue opined that, with the much increased volume associated with Plaintiffs laminating all of the Accused Zippers, the lamination prices that would have been charged by Plaintiffs to YKK would have permitted YKK to maintain *the same Zipper selling price* to its customers that was historically charged, while still making a substantial profit. While YKK is free to cross-examine Donohue with respect to this opinion, the opinion is admissible.[20]

---

[20] For example, YKK selectively cites five lines of Donohue's deposition transcript for the proposition that the Plaintiffs-laminated AquaGuard T4 and T5 Zippers historically were more expensive than the YKK-laminated AquaGuard T8 Zipper. Motion p. 22-23. Donohue, however, simply was acknowledging the historically higher prices *set by YKK* with respect to the relatively low volume AquaGuard T4 and T5 Zippers sold mostly to the United States government. Donohue further confirmed in deposition that his analyses necessarily included consideration of such non-price factors as lead time, as Donohue opined that "Uretek would achieve the sales." Donohue Tr. 188:21-189:20 (Exh. 50). The handful of additional documents YKK cites (Motion p. 22) -- pre-dating the damages period, containing inadmissible hearsay, reflecting customers' unwillingness to violate Plaintiffs' patent rights, stating YKK's then unwillingness to accept less than a 33% profit margin, and devoid of any detailed analysis of whether the allegedly competing products infringed the Patents, were of comparable quality to the Zippers or had significant sales to reputable brand companies -- also are, at most, nothing more than material for cross-examination.

Finally, Plaintiffs also note (1) that a damages expert can assume causation (*i.e.*, liability) where, as here, the jury may find reliable evidence of such causation at trial and, conversely, (2) that a damages expert will be precluded from opining on causation when, as here, that determination, on the facts of the case, falls within the province of the jury. *See, e.g., Bellis v. Tokio Marine & Fire Ins. Co., Ltd.*, 2006 WL 648013, *5 (S.D.N.Y. 2006); *Rowe v. DPI Specialty Food, Inc.*, 2015 WL 4949097, *5 (D. Utah 2015), *aff'd*, 2018 WL 1180654, *9-*10 (10th Cir. 2018) (excluding the proposed causation opinions of a damages expert); *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2017 WL 1319553, *4-*5 (E.D. Tex. 2017) (denying motion to exclude damages expert).

## IX.    Donohue's Luggage Excluded Market Damages Opinions Are Admissible.

YKK tracked Zipper sales into the "luggage" market, broken down into sub-categories that included sports luggage, for sales accounting purposes.  Dkt. No. 368-3 ¶¶ 61-65; Shibata Tr. 206:20-207:5 (Exh. 11).  YKK now incredibly claims that YKK's own sales records are so inaccurate that this Court should exclude Donohue's damages calculations for YKK's sales of Accused Zippers for use in the "luggage (excluding sports and cosmetics bags)" Excluded Market (the "Luggage Excluded Market") expressly set forth in the License Agreement.  Motion p. 23.  The term "luggage," however, was intended by the parties to be extremely broad (hence the need to expressly exclude "cosmetics bags" from the definition of "luggage") (Exh. 1 ¶ 1), and no evidence has been produced that YKK used the term "luggage" in the License Agreement differently than how YKK contemporaneously used that term in its other sales records.

Further, YKK's reliance on the "sports bag" exclusion from the Luggage Excluded Market is particularly troubling.  Motion p. 23.  First, within just a few months of signing the License Agreement, Sarumaru regretted agreeing to the Luggage Excluded Market (finding it

22

"unacceptable") and expressly advised that if the Luggage Excluded Market limitation was not removed from the License Agreement, then YKK would "proceed by stretching the meaning of 'sports bag.'" Exh. 51 at YKK0720634.  Second, the companies noted by YKK as examples (Nike, Titleist and Adidas) all sell luggage.  *See, e.g.*, Exhs. 52-54.

Overall, Donohue's opinion, relying on the contents of YKK's own business records, is admissible.

## X.    Donohue's HEO Excluded Market Damages Opinions Have Sufficient Statistical Bases and Are Admissible.

Plaintiffs' extraordinary world-wide discovery efforts resulted in Plaintiffs obtaining sales data from most of YKK's largest customers, who collectively purchased, from January 2009 to September 2017, 28.5 million meters of the 88.1 million meters (over 32%) of YKK-laminated AquaGuard T8, T9 and T10 Zippers used in functional outerwear.  Exh. 42 (Exhibit 16-R).  In light of many factors apparent in the record (discussed below), Donohue opined that the HEO analysis conducted by Cockrell with respect to these Zippers could be extrapolated to the remaining Zippers sold for use in functional outerwear to calculate a reasonable estimate of Plaintiffs' HEO Excluded Market damages.  YKK undertook no analysis of its own and now seeks to exclude Donohue's calculations by (1) misstating the basis for Donohue's damages opinion and (2) by mischaracterizing the record.

First, YKK states that Donohue had "*no* reliable basis" to assume that the YKK-laminated AquaGuard Zippers sold to customers for use in functional outerwear could be substantively analyzed regardless of whether the sales data of a particular customer was obtained.  Motion p. 25 (emphasis added).  The detailed basis for Donohue's extrapolation, however, is set forth in his Report (Dkt. No. 368-3 ¶¶ 72-126) and generally is as follows:

1.  The empirical data was collected from most of YKK's largest customers;

2.  The HEO analysis was limited to YKK-laminated AquaGuard T8, T9 and T10 Zippers sold to customers by common YKK affiliates during the same time period;

3.  The customers purchased the more expensive water resistant AquaGuard T8, T9 and T10 Zippers, with similar price and Zipper product mixes;

4.  The calculations utilized YKK's own functionality-based customer segmentations ("Hi-Function" or "Functional");

5.  The calculations also utilized YKK's own product usage categories (primarily those associated with outerwear such as jackets);

6.  Cockrell confirmed that recognized functional customers from whom empirical data had not been obtained sold at least some HEO (Exh. 14 ¶ 43);

7.  The analysis conservatively did not include any Zipper sales that lacked both a YKK customer segmentation and an outerwear usage code, potentially omitting approximately 1 million meters of Accused Zipper sales for use in HEO;

8.  The analysis conservatively calculated the percentage of outerwear using the Zippers which was HEO (i) by including in the total customer outerwear style count those styles as to which Cockrell did not have sufficient information to make any HEO determination and (ii) by assuming that none of those products were HEO;

9.  The analysis also applies to the collective of the remaining relevant customers the 57% weighted average of those outerwear styles which were HEO for the subpoenaed customers, rather than the 63% simple average or the 66% median[21]; and

10. The analysis results were compared with prior sales periods.

---

[21] The use of a *weighted* average does *not* apply the same percentage to *each* customer (*i.e.*, does *not* assume that *each* customer sold exactly the same percentage of HEO). This methodology instead assumes, as with the subpoenaed customers, that some YKK customers sold a higher percentage of HEO and that some sold a lower percentage. The weighted average estimates that, *as a collective*, YKK's other relevant customers sold functional outerwear consisting of a mix of high end (57%) and non-high end (43%) outerwear. Exh. 42 (Exhibit 16-R); Kindler Tr. 84:2-25 (Exh. 47).

YKK's contentions that these assumptions are unfounded go to the weight, not the admissibility, of the testimony. *Royal Park Invs. SA/NV*, 2018 WL 739580, *3; *ECD Investor Grp.*, 2017 WL 3841872, *16; *Scott*, 315 F.R.D. at 52; *Content Guard Holdings, Inc.*, 2015 WL 11089749, *6.

Second, YKK describes the results of Plaintiffs' discovery efforts as obtaining data from only 12 (now 13) of approximately 3,000 YKK customers, without reference to the fact that those 13 customers accounted for over 28.5 million meters of AquaGuard T8, T9 and T10 functional outerwear Zipper sales (over 32% of such sales). Motion p. 25. Under the facts of this case, mere head count of customers is not the correct metric for assessing the sufficiency of Donohue's sample pool, and YKK has not cited any bright-line rule regarding the minimum sampling pool which allegedly would be sufficient on the instant record taking into consideration Zipper sales volumes. Thus, no basis exists to declare Donohue's opinions inadmissible on this ground. *See, e.g., Louis Vuitton Malletier S.A.*, 97 F.Supp.3d at 508-510 (admitting expert testimony, noting that criticism of plaintiff's survey utilizing only two of the 400 sunglasses products at issue "is exactly the type of inquiry" that can be explored on cross-examination and holding that the allegedly small sample size of survey participants "goes to the weight, rather than to the reliability (and admissibility) of a study").

## XI.     Conclusion.

For the foregoing reasons, YKK's Motion must be denied in its entirety.

PLAINTIFFS AU NEW HAVEN, LLC, and
TRELLEBORG COATED SYSTEMS US, INC.


By: _____*s/ Brian P. Daniels*_____
 Brian P. Daniels (pro hac vice)
 Sean M. Fisher (SF0251)
 David R. Schaefer (pro hac vice)
 Michael T. Cretella (pro hac vice)
 BRENNER, SALTZMAN & WALLMAN LLP
 271 Whitney Avenue
 New Haven, CT 06511
 Tel.: (203) 772-2600
 Fax: (203) 562-2098
 Email: bpdaniels@bswlaw.com
 Email: dschaefer@bswlaw.com
 Email: sfisher@bswlaw.com
 Email: mcretella@bswlaw.com

  and

 Norman H. Zivin (NZ-6053)
 Tonia A. Sayour (TS-7208)
 COOPER & DUNHAM LLP
 30 Rockefeller Plaza
 New York, New York 10112
 Tel.: (212) 278-0400
 Fax: (212) 391-0525
 Email: nzivin@cooperdunham.com
 Email: tsayour@cooperdunham.com

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 2, 2018, a copy of the foregoing was sent by e-mail to all parties of record.

*s/ Brian P. Daniels*
Brian P. Daniels (pro hac vice)

E70792.doc

27