UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

AU NEW HAVEN, LLC, and TRELLEBORG
COATED SYSTEMS US, INC.,

                                    Plaintiffs,                    15-CV-3411 (GHW)(SN)

                                                                   OPINION AND ORDER

                     -against-

YKK CORPORATION, et al.,

                                    Defendants.

------------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __03/19/2019__

**TABLE OF CONTENTS**

BACKGROUND ............................................................................................................. 1

APPLICABLE LAW .................................................................................................... 2

DISCUSSION OF PLAINTIFFS' DAUBERT MOTIONS .......................................... 5

  I. Plaintiffs' Motion to Exclude Arntson ............................................................... 5

  II. Plaintiffs' Motion to Exclude Dr. Meirowitz's Testimony ................................. 7

      A. Dr. Meirowitz's Invalidity Report ............................................................ 9

          1. Enablement and Definiteness ............................................................ 9

          2. On-Sale Bar ....................................................................................... 12

          3. Derivation .......................................................................................... 14

          4. Foreign Law ...................................................................................... 16

      B. Dr. Meirowitz's Non-Infringement Report .............................................. 17

          1. Comparison of Accused Products with Drawings ............................. 18

          2. Reliance on Marketing Materials ...................................................... 21

          3. Intent to Induce Infringement ........................................................... 22

          4. Meaning of Water-Resistance ........................................................... 25

          5. Water-Resistance Testing Methodology ........................................... 26

          6. Testing Conducted by YKK Employees ........................................... 27

          7. YKK's Manufacturing Process .......................................................... 28

          8. Non-infringing Alternative ................................................................ 29

  III. Plaintiffs' Motion to Exclude Kindler ............................................................... 29

      A. Lost Profits Legal Instruction ................................................................... 30

      B. Relevance of Opinions Regarding a Non-Exclusive Royalty .................... 31

      C. Reliability of Non-Exclusive Royalty Opinion ......................................... 32

      D. Reliability of Kindler's Rebuttal of Donohue's Damages Estimate ............ 33

      E. Relevance of Hypothetical Royalty to Contract Damages ......................... 34

      F. Relevance of Alternative Measure of Lost Profits for High End Outerwear ................. 35

      G. Relevance of Failure to Mitigate Opinion ................................................ 35

      H. Reliability of Disgorgement Offset Opinion ............................................. 36

  IV. Plaintiffs' Motion to Exclude All Opinions Relating to Non-Infringing Alternatives ....... 37

DISCUSSION OF DEFENDANTS' DAUBERT MOTIONS ...................................... 38

  I. Defendants' Motion to Exclude Bagley .............................................................. 39

II. Defendants' Motion to Exclude Cockrell .............................................................. 41

    A. Cockrell's First Three Opinions Regarding High End Outerwear ................................ 42

    B. Non-Infringing Alternatives ..................................................................... 44

    C. Consumer Confusion ............................................................................ 45

III. Defendants' Motion to Exclude Donohue ............................................................. 46

    A. Reliance on Cockrell ............................................................................ 47

    B. Donohue's Causation Opinions ................................................................ 47

    C. Donohue's Statistical Sampling and Extrapolation ......................................... 48

    D. Donohue's Lost Profits Estimates for Luggage ............................................. 50

CONCLUSION ..................................................................................................... 51

This case is about patents for water-resistant zippers—the '214 Patent and related foreign patents—owned by Plaintiffs. Plaintiffs allege that Defendants have infringed on the patent by exceeding the scope of an exclusive license granted by Plaintiffs. Both parties move to exclude expert witnesses before trial. Plaintiffs move to exclude testimony from three of Defendants' experts: (1) Dr. Randy Emil Meirowitz, a technical expert who supports Defendants' non-infringement and invalidity defenses; (2) Paul Krak Arntson, who speaks to industry definitions and the outerwear industry's use of the zippers; and (3) Lauren R. Kindler, Defendants' damages expert.[1] Defendants have cross-moved to exclude testimony from three of Plaintiffs' experts: (1) David W. Cockrell, a clothing designer who speaks to industry definitions and use of the zippers; (2) Margo A. Bagley, a law professor and Plaintiffs' foreign patent law expert; and (3) James J. Donohue, Plaintiffs' damages expert.[2]

For the reasons discussed below, both parties raise some valid arguments, but none of the motions is justified in its entirety. These motions are granted in part and denied in part.

## BACKGROUND

The '214 Patent originates from conversations between Mike Blenkarn of Arc'teryx and Stuart Press of Uretek, Inc. in the 1990s. At that time, Blenkarn was looking for someone who could make a water-resistant zipper. He found Press, who made the water-resistant zipper claimed in the '214 Patent.

---

[1] Plaintiffs' first motion is exclusively dedicated towards excluding Dr. Meirowitz's testimony. See Pls.' Meirowitz Memo. (ECF No. 360); Defs.' Meirowitz Opp. (ECF No. 383); Pls.' Meirowitz Reply (ECF No. 391). Their second motion moves to exclude portions of Meirowitz's, Arntson's, and Kindler's reports. See Pls.' Daubert Memo. (ECF No. 365); Defs.' Daubert Opp. (ECF No. 385); Pls.' Daubert Reply (ECF No. 393).

[2] See Defs.' Daubert Memo. (ECF No. 367); Pls.' Daubert Opp. (ECF No. 378); Defs.' Daubert Reply (ECF No. 394).

After Press came up with his invention, Uretek began to water-proof zippers for YKK Corporation's American affiliate. Originally, YKK simply paid Uretek for the lamination service, but YKK later wanted to manufacture and sell the water-resistant zipper globally at a lower cost. To facilitate that goal, YKK and Uretek entered into an exclusive licensing agreement that granted YKK the use of the '214 Patent and related patents with one exception: Uretek did not grant YKK the right to use the patent for sales of zippers into the "high end outerwear," "marine," "luggage (excluding sports and cosmetic bags)," or "military" markets.

After several years of cooperation, Uretek came to believe that YKK was selling the patented zippers into those excluded markets. They were ultimately unable to resolve this dispute, giving rise to this litigation. Plaintiffs—who are comprised of the company that later purchased Uretek as well as the rebranded corporate iteration of Uretek, Au New Haven, LLC—have sued for infringement of the '214 Patent, breach of the licensing agreement, deceptive marketing under the Lanham Act, and deceptive practices under the Connecticut Unfair Trade Practices Act. Defendants—who are comprised of YKK's parent company and its local affiliates—assert a variety of defenses, including that: (1) the '214 Patent and its foreign analogues are invalid; (2) some of YKK's water-resistant zippers do not infringe on the patents; and (3) the licensing agreement does not prohibit sales into excluded markets. In the alternative, Defendants also allege that Plaintiffs' claim for damages—which assumes that Uretek would have laminated all of the allegedly infringing zippers—are inflated and unfounded.

Both parties move to exclude experts who support these claims and defenses.

## APPLICABLE LAW

Under Federal Rule of Evidence 702, an expert who is "qualified . . . by knowledge, skill, experience, training, or education" may testify if the testimony would be helpful to the trier of

fact, is "based on sufficient facts or data," is "the product of reliable principles and methods," and the expert has reliably applied the facts of the case.[3] The "proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."[4]

Rule 702 imposes "a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"[5] The court must determine whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[6]

The first step in evaluating a motion to exclude is determining "whether the expert has sufficient qualifications to testify."[7] If so, the second "question is 'whether the proffered testimony has a sufficiently reliable foundation.'"[8] It is "critical that an expert's analysis be reliable at every step," for "any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible."[9] To determine the reliability of the testimony, the Court may consider factors including:

> (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or

---

[3] Fed. R. Evid. 702.

[4] United States v. Williams, 506 F.3d 151. 160 (2d Cir. 2007).

[5] Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993)); see also Davis v. Carroll, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (the court serves an initial gatekeeping function of weeding out "junk science").

[6] Kumho Tire, 526 U.S. at 152.

[7] Davis, 937 F. Supp. 2d at 412 (internal quotation marks omitted).

[8] Id. (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks omitted)).

[9] Amorgianos, 303 F.3d at 267 (internal quotation omitted) (emphasis in original).

theory has gained general acceptance in the relevant scientific community.[10]

Any contentions that the expert's "assumptions are unfounded go to the weight, not the admissibility, of the testimony."[11] The Court need not exclude testimony because of a "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method."[12] But "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[13]

Because "the gatekeeping inquiry must be tied to the facts of a particular case,"[14] the "Daubert inquiry is fluid and will necessarily vary from case to case."[15] The "formality of a separate hearing" is not always required for a district court to "effectively fulfill[] its gatekeeping function under Daubert."[16] Furthermore, the analysis is not limited to Rule 702. Expert testimony "must also adhere to the other Federal Rules of Evidence, including Rule 403, which provides that relevant evidence may still be excluded 'if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'"[17]

---

[10] Amorgianos, 303 F.3d at 266 (quoting Daubert, 509 U.S. at 593-94 (internal citations and quotation marks omitted)).

[11] Id. (internal citation omitted).

[12] Amorgianos, 303 F.3d at 267 (internal citation omitted).

[13] Gen Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

[14] Kumho Tire, 526 U.S. at 150 (internal quotation marks omitted).

[15] Amorgianos, 303 F.3d at 266.

[16] Williams, 506 F.3d at 161.

[17] A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC, 2019 U.S. Dist. LEXIS 14890, at *68-69 (S.D.N.Y. Jan. 30, 2019) (quoting Fed. R. Evid. 403).

### DISCUSSION OF PLAINTIFFS' DAUBERT MOTIONS

In two separate motions, Plaintiffs move to exclude testimony from three of Defendants' experts: (1) Dr. Randy Emil Meirowitz, a technical expert who has written two reports, one in support of Defendants' non-infringement defense, the other in support of Defendants' invalidity defense; (2) Paul Krak Arntson, who speaks to industry definitions and the outerwear industry's use of the accused zippers; and (3) Lauren R. Kindler, Defendants' damages expert.[18]

Because Arntson's report is not irrelevant or unreliable, the motion to exclude his testimony is denied. As for the other experts, Plaintiffs' motions are granted in part and denied in part. Some portions of Dr. Meirowitz's report are inadmissible because they are irrelevant, are beyond his expertise, constitute hearsay, or provide legal instruction reserved for the Court. The bulk of his two reports are, however, admissible. Likewise, portions of Kindler's report are excluded because they constitute improper legal instruction or are insufficiently reliable. But contrary to Plaintiffs' arguments, the vast majority of her report is admissible.

### I.     Plaintiffs' Motion to Exclude Arntson

Paul Krak Arntson is a branding consultant with experience in merchandise management, research design and development, and brand market positioning in the apparel industry, with a particular focus in the outerwear market.[19] In his report, Arntson provides testimony from someone with experience in the industry on a variety of subjects, including the industry definitions of two of the license agreement's excluded markets: "high end outerwear" and

---

[18] Plaintiffs' first motion is exclusively dedicated towards excluding Dr. Meirowitz's testimony. See Pls.' Meirowitz Memo. (ECF No. 360); Defs.' Meirowitz Opp. (ECF No. 383); Pls.' Meirowitz Reply (ECF No. 391). Their second motion moves to exclude portions of Meirowitz's, Arntson's, and Kindler's reports. See Pls.' Daubert Memo. (ECF No. 365); Defs.' Daubert Opp. (ECF No. 385); Pls.' Daubert Reply (ECF No. 393).

[19] Arntson Rep. ¶ 5 (ECF No. 386-3).

"luggage." He defines "high end outerwear" as outerwear with a minimum manufacturer's suggested retail price ("MSRP") of $500 in 2009 dollars,[20] and he defines luggage as "generally comprised of suitcases or wheeled bags that one might check onto an airplane."[21] Plaintiffs argue this testimony is either unreliable due to insufficient corroboration or irrelevant to contract interpretation under New York law. Neither argument is correct.

Arntson's testimony regarding "high end outerwear" is not irrelevant. Plaintiffs observe, correctly, that under New York law the contract must be interpreted according to the parties' intent.[22] They then argue that Arntson's definition must be irrelevant because the signatories, Stuart Press and Masayuki Sarumaru, both have offered different definitions during their depositions.[23] This argument misses an important point. If the Court finds that the term "high end outerwear" is ambiguous, then extrinsic evidence such as industry usage will become relevant.[24] Arntson, who has decades of experience in the outerwear apparel industry,[25] is qualified to testify on the subject,[26] and his opinion will likely be helpful to a lay jury

---

[20] Arntson Rep. ¶ 29 (ECF No. 386-3).

[21] Id. ¶ 67.

[22] See TCA TV Corp. v. McCollum, 839 F.3d 168, 188 (2d Cir. 2016) ("New York and California law both instruct that contracts must be interpreted according to the mutual intent of the parties at the time the contract was formed.") (citations omitted).

[23] Pls.' Daubert Memo. at 3 (ECF No. 365) (citing Press 8/3/16 Dep. 216:5-21 (ECF No. 365-9), Sarumaru Dep. 164:2-169:25 (ECF No. 365-10)).

[24] See Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 274 (2d Cir. 1992) ("[E]xtrinsic evidence may in appropriate cases include industry custom and practice.") (applying New York law).

[25] Arntson Rep. ¶ 5 (ECF No. 386-3).

[26] See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 132-34 (2d Cir. 2006) (affirming lower court's admission of expert witness' testimony to custom and usage despite because the expert "testified that he had over 30 years of experience in the insurance industry (as both an underwriter and a broker) and he was familiar with practices in the industry").

unexperienced in the field.[27]

Arntson's opinion on the definition of luggage is also admissible. Plaintiffs object that Arntson does not have experience working in the narrowly defined luggage industry, and that he offers no corroboration for his definition.[28] It is true that Arntson's experience is not specifically in the luggage industry; instead, his definition comes from the perspective of an expert in the retail industry.[29] Arntson is qualified to offer that definition, whether or not he has corroborating documents.[30] Plaintiffs may argue that this is not the relevant industry for interpreting the licensing agreement, but that goes to weight, not admissibility.

Thus, Arntson's report is sufficiently relevant and reliable. Plaintiffs' motion to exclude his definitions of "luggage" and "high end outerwear" is denied in its entirety.

## II.  Plaintiffs' Motion to Exclude Dr. Meirowitz's Testimony

Dr. Randy Emil Meirowitz is a surface and advanced materials scientist with over 30 years of experience.[31] He has produced two expert reports in this case: one supports Defendants' claim that the '214 and related foreign patents are invalid,[32] while the other supports Defendants'

---

[27] As for Plaintiffs' objection that Arntson defines the market segmentation according to price points in 2009, this argument is also unavailing. Arntson believes that price points are used in the industry to define high end outerwear. Prices change over time with inflation. There is nothing wrong with Arntson pegging his opinion to 2009 prices. If Plaintiffs believe that the use of 2009 prices underinflates their damages, then they may argue that point at trial.

[28] See Pls.' Daubert Memo. at 4 (citing Arntson Dep. 226:18-22 (ECF No. 365-8)).

[29] Arntson Rep. ¶ 67 (ECF No. 386-3) ("Luggage has a well-understood meaning in the retail industry. Namely, luggage is generally comprised of suitcases or wheeled bags that one might check onto an airplane.").

[30] See Arntson Rep. ¶ 5 (ECF No. 386-3) ("My particular area of expertise is the outdoor apparel industry, though I have a wide range of retail and apparel-based experience.").

[31] Meirowitz Invalidity Rep. ¶ 6 (ECF No. 360-1).

[32] See Meirowitz Invalidity Rep. (ECF No. 360-1).

claim that the accused zippers do not infringe on any of the domestic or foreign patents.[33] Plaintiffs move to exclude all of Dr. Meirowitz's testimony, arguing that he is not an expert in the relevant art.[34] In the alternative, Plaintiffs move to exclude specific portions of each report.

The motion to exclude all of Dr. Meirowitz's testimony is denied. Plaintiffs argue that Dr. Meirowitz is not qualified because the relevant art here is zipper manufacture, not the chemical composition of the materials used to construct the zipper.[35] That argument is misplaced. The relevant art here is coating and laminating fabric—in this case, fabric with zipper teeth attached—for the purpose of obtaining water-resistance. Indeed, the claimed inventor of the '214 Patent, Stuart Press, had not worked with zippers before he applied his expertise in fabrics lamination to the problem of zipper water-resistance.[36] Dr. Meirowitz is more than qualified as an expert in that art. He has dedicated much of his career to studying how fabrics and related materials interact with water and fluids; he has even written textbooks on the subject.[37] He is qualified to testify to issues in this case in a way that will be helpful to the jury, and that testimony will not be excluded in its entirety.

As for the remainder of Plaintiffs' motion, some of their arguments have merit, while others do not. The remainder of the motion is granted in part and denied in part as discussed below.

---

[33] See Meirowitz Non-Infringement Rep. (ECF No. 360-2).

[34] Pls.' Meirowitz Memo. at 18-19 (ECF No. 360).

[35] Id.

[36] See SUMF ¶ 358 (ECF No. 406).

[37] See Meirowitz Non-Infringement Rpt. ¶¶ 9, 10, 16-19 (ECF No. 360-2).

**A.  Dr. Meirowitz's Invalidity Report**

Plaintiffs move to exclude the following portions of Dr. Meirowitz's invalidity report: (1) testimony that the '214 Patent is indefinite and not enabling because the testimony constitutes improper legal instruction; (2) testimony related to the on-sale bar defense on the grounds that it contains legal instruction and is based on an unreliable test method; (3) testimony that Press derived the '214 Patent from Blenkarn on the grounds that it is unhelpful to the trier of fact; and (5) testimony relying on foreign patent law on the grounds that it is based upon undisclosed expert reports.

Because the majority of the invalidity report comes from reliably applied scientific methods that will be helpful to a lay jury, most of this testimony will not be stricken. But the report also offers summations of domestic and foreign patent law beyond Dr. Meirowitz's expertise. Plaintiffs' motion to strike those portions is granted for the reasons discussed below.

**1.  Enablement and Definiteness**

Defendants claim that Plaintiffs' patents are invalid due to a lack of enablement and indefiniteness. To be enabling under the Patent Act "the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation."[38] As for definiteness, a patent is indefinite and invalid if its claims, when read with the context of the specification and prosecution history, do not allow the public to know what does and does not infringe upon the patent.[39]

---

[38] ALZA Corp. v. Andrx Pharms., LLC, 603 F.3d 935, 940 (Fed. Cir. 2010) (internal quotation marks omitted).

[39] See Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 875 F.3d 1369, 1375 (Fed. Cir. 2017) (citing Nautilus, Inc. v. Biosig Instruments, Inc., 134 S.Ct. 2120, 2124 (2014)); Halliburton Energy Svcs., Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Dr. Meirowitz provides support for both claims in his invalidity report. He opines that the '214 Patent is invalid due to a lack of enablement and indefiniteness, two closely related requirements under the Patent Act. He also concludes that the related patents in Europe, Hong Kong, Japan, Taiwan, and Canada are invalid under analogous requirements in each jurisdiction.[40] Plaintiffs move to exclude several paragraphs of this testimony—paragraphs 93, 94, 166, 167, 171, 176, 181, 182, 366, 369, 374, 378, and 379—arguing that those paragraphs contain legal conclusions regarding enablement and indefiniteness.[41] Because portions of the paragraphs contain legal conclusions, the motion is granted in part.

Under Federal Rule of Evidence 704, an "opinion is not objectionable just because it embraces an ultimate issue,"[42] but an expert also "may not testify as to what the law is, because such testimony would impinge on the trial court's function."[43] This is a rather fine, but manageable, distinction. A qualified expert can testify whether a decedent had the mental capacity to fully understand the meaning and consequences of a will.[44] Such testimony would assist the jury in fulfilling its duty of reaching factual conclusions and applying those conclusions to the court's legal instructions. An expert may not, however, testify that a decedent lacked the capacity to make a will.[45] That testimony would draw the connection between the

---

[40] Dr. Meirowitz concludes that all six patents are invalid due to a lack of enablement and or its foreign analogue. See Meirowitz Invalidity Report at 15-50 (ECF No. 360-1). But he only concludes that the patents in the United States, Europe, Hong Kong, and Canada are invalid due to a lack of definiteness. Id. at 103-6.

[41] Pl.'s Memo. Exclude Meirowitz at 17 (ECF No. 360).

[42] Fed. R. Evid. 704(a).

[43] In re Air Disaster at Lockerbie Scot., 37 F.3d 804, 826-27 (2d Cir. 1994) (citation omitted).

[44] Id.

[45] Cargill, Inc. v. Sears Petroleum & Transp. Corp., 334 F. Supp. 2d 197, 249-50 (N.D.N.Y. 2004) (citing Fed. R. Evid. 704 advisory committee's note).

factual conclusion and the legal conclusion, which would "implicitly provide a legal standard to the jury."[46]

    Some, but not all, portions of the paragraphs objected to by Plaintiffs fall into the former category. In most of them, Dr. Meirowitz opines that, based on his experience in materials design, a person of ordinary skill in the relevant areas would not be able to make the patented zippers without undue experimentation.[47] He also testifies that most people in the relevant industry do not know what "water-resistant" means because fabrics exhibit a wide spectrum of water-resistance that is typically defined using objective and quantifiable tests.[48] That testimony would permissibly and helpfully assist a lay jury in answering the ultimate factual questions of enablement and indefiniteness. In those same paragraphs, however, he goes on to conclude that the patent is invalid because it fails to meet the enablement and definiteness requirement of several nation's patent laws.[49] The latter testimony would improperly impede on the Court's function of instructing the jury on the applicable law.[50]

---

[46] In re Air Disaster at Lockerbie Scot., 37 F.3d at 826-27.

[47] See, e.g., Meirowitz Invalidity Report ¶ 166 (ECF No. 360-1) ("[I]t is my opinion that claims 12, 13, 15-19, 21 and 25 of the EP '586 and HK '423 Patents are invalid on the basis of classical insufficiency, as the instructions in the patent specification do not enable the ordinary skilled person to perform the purported invention.").

[48] See, e.g., id. ¶ 369 (ECF No. 360-1) ("'Water resistant' divorced from standard industry tests of water resistance is not a term that one of ordinary skill in the art would understand the boundaries of with reasonable certainty.").

[49] See, e.g., id. ¶ 166 (ECF No. 360-1) ("For the same reasons discussed above for the US '214 Patent, it is my opinion that claims 12, 13, 15-19, 21 and 25 of the EP '586 and HK '423 Patents are invalid on the basis of classical insufficiency. . . ."); id. ¶ 369 ("Therefore, it is my opinion that the scope of claims 1, 2, 4-8, 10, 14-17, and 23 of the US '214 Patent is not reasonably certain, and those claims are invalid as indefinite.").

[50] Accord Bausch & Lomb, Inc. v. Alcon Labs., Inc., 79 F. Supp. 2d 252, 257-58 (W.D.N.Y. 2000) (excluding expert testimony about "what is required for a patent to be valid . . . . including matters relating to prior art, obviousness, enablement, and the 'best mode' requirement" because it was "calculated to invade the province of the court to determine the applicable law and to instruct the jury as to that law") (citation and quotation marks omitted).

Thus, Dr. Meirowitz may offer his opinion that, for example, "the US '214 Patent does not disclose sufficient information to permit a person of ordinary skill in the art to make the claimed water resistant zipper without undue experimentation," but he may not testify that "claim 1 of the US '214 Patent is invalid for failing to satisfy the enablement requirement."[51]

### 2. On-Sale Bar

Plaintiffs move to exclude paragraphs 322-365 of Dr. Meirowitz's invalidity report that relate to Defendants' "on-sale bar" defense.[52] Under that rule, a patent is invalid if "the claimed invention was (1) the subject of a commercial offer for sale; and (2) ready for patenting" more than one year before the patent's effective filing date.[53] Dr. Meirowitz supports this defense, concluding that one of Uretek's 1996 prototype zippers satisfies both elements. Plaintiffs assert two bases for excluding the testimony: (1) Dr. Meirowitz offers improper legal conclusions in these paragraphs; and (2) his opinion is not based on the best testing method for adhesion.[54] The first argument has a little merit, and the second has none.

Regarding the first, Dr. Meirowitz does offer some legal instructions and conclusions that are beyond his expertise and invade the Court's role of instructing the jury. Specifically, paragraph 323, in which he relays his hearsay understanding of the on-sale bar rule, and paragraph 324, in which he states that the '214 Patent is invalid. The Court will instruct the jury on the elements of the on-sale bar defense, and the Court will instruct the jury that if those elements are met, then the patent is invalid. Dr. Meirowitz should not be allowed to preempt

---

[51] Meirowitz Invalidity Rep. ¶ 93 (ECF No. 360-1).

[52] Pl.'s Meirowitz Memo. at 12 (ECF No. 360).

[53] Medicines Co. v. Hospira, Inc., 827 F.3d 1363, 1368 (Fed. Cir. 2016) (en banc) (citing Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 67-68 (1998)).

[54] Pl.'s Meirowitz Memo. at 12-15 (ECF No. 360).

those instructions from the Court. The rest of his testimony in paragraphs 322-365, however, is admissible. In those paragraphs, he relays his testing and observation of the 1996 zipper prototypes and concludes that they match every descriptor of the '214 Patent's claims 1, 2, 4-8, 10, 14-17, and 23. That is admissible testimony.

Regarding the best testing method, Plaintiffs argument is unavailing. To conclude that the zipper fell within the scope of the '214 Patent's claims, Dr. Meirowitz had to test the prototype to conclude if the water-resistant layer had a level of adhesion claimed in the '214 Patent. Plaintiffs complain that Dr. Meirowitz did not use a standardized peel strength test, such as Federal Test Method Std. No. 191A, Method 5970, which Dr. Meirowitz identified as the best way to determine the 1996 samples' level of adhesion.[55] But there is no rule that experts must use the best testing method available; instead, if the testing method used undermines the expert's conclusion, then a party is free to—and should—attack the expert's testimony with cross-examination or rebuttal reports.

The only requirement is that the testing method be reliable,[56] and Dr. Meirowitz's method here meets that standard. Because Plaintiffs did not allow Dr. Meirowitz to use a standard adhesion test that would have destroyed the samples, Dr. Meirowitz came up with a rather ingenious process of deduction.[57] First, he tested other zippers and found that they had

---

[55] Meirowitz Invalidity Report ¶ 330 (ECF No. 360-1).

[56] Fed. R. Evid. 702.

[57] Plaintiffs argue that Defendants have "waived" the argument that Plaintiffs' refusal to allow for destructive testing of the samples justified Dr. Meirowitz's work-around method. See Pls.' Meirowitz Reply at 8 (ECF No. 391). This argument is misplaced. Certainly, it would have been untimely—although not prohibited—for Defendants to ask for a sanction, such as an adverse inference, after failing to file a motion to compel the adverse testing. See, e.g., SEC v. Huff, 2010 U.S. Dist. LEXIS 6916, at *10-11 (S.D. Fla. Jan. 13, 2010) (interpreting a motion to exclude expert testimony as a motion to compel because "[a]lthough this Court is reluctant to find that failure to file a motion to compel waives a party's right to seek to exclude evidence or other severe sanctions, fairness suggests that a party opposing the discovery should have the opportunity to do so without subjecting itself to the death penalty for its

- 13 -

levels of adhesion higher than those specified in the '214 Patent's claims. Second, he attempted, successfully, to peel off the water-resistant layer of the other zippers with his fingers. Third, he attempted, unsuccessfully, to peel off the water-resistant layer of the 1996 sample. Thus, with simple logic, he concludes that the 1996 sample zippers must have an adhesion level greater than the others tested, and therefore must also have a level of adhesion greater than those claimed in the '214 Patent. Certainly, one can quibble with the test—how, for example, can we be sure that Dr. Meirowitz really tried to peel off the layer of the 1996 sample?—but there is no evidence that the method is so inherently unreliable as to render it inadmissible under Rule 702.

Thus, Dr. Meirowitz's opinions in paragraphs 322-365 that relay the law of on-sale bar and opine that the '214 Patent is invalid are barred. Otherwise, the testimony contained in those paragraphs is admissible. It would helpfully walk a lay jury through the elements of the claims, relay observations and test results, and identify the presence of those elements in the 1996 sample. All of this would be helpful to the jury.

### 3. Derivation

Under the Patent Act, a person is "entitled to a patent unless he did not himself invent the subject matter sought to be patented."[58] Defendants claim that Stuart Press derived the invention claimed in the '214 Patent from Mike Blenkarn,[59] thereby rendering the patent invalid. In

---

evidence, if it guesses wrong"); see also Simuro v. Shedd, 2016 U.S. Dist. LEXIS 194582, at *33 (D. Vt. Nov. 9, 2016) (finding that failure to file a motion to compel did not waive a motion to sanction with exclusion and assessing the motion to exclude on the merits). But that is not the situation here. Defendants are not asking for a sanction; instead, they found a workaround test given Plaintiffs' refusal. If anything, it is now improper for *Plaintiffs* to insist that Dr. Meirowitz's report should be excluded because he should have used a test that they forbade.

[58] 35 U.S.C. § 102(f) (2000). That section of the act has since been amended, and the inventorship requirement now resides in 35 U.S.C.A. § 116 (2018).

[59] See, Am. Supp. Answer at 20 (ECF No. 142).

- 14 -

support of that claim, Dr. Meirowitz reviews the deposition testimony of Press and Blenkarn before concluding that Press derived the invention from Blenkarn. Plaintiffs move to exclude that testimony—paragraphs 301-321—arguing that this testimony is a combination of improper legal instruction and opinions regarding ultimate issues that require no expertise.[60]

Plaintiffs are partially correct. The testimony in paragraph 301 does improperly instruct the jury regarding the elements of derivation. It is stricken. Everything else, however, may be admissible in the proper context. To prove derivation, Defendants must show that Blenkarn communicated a prior conception of the invention to Press and that this communication would have enabled an ordinary person skilled in the relevant art to make the '214 Patent's zippers.[61] Whether their communications were enabling is a technical question; a lay jury will not know the state of knowledge of fabric lamination in the mid-90s. Dr. Meirowitz's testimony can help fill their lack of knowledge with his expertise.[62]

That said, a detailed review of Press and Blenkarn's depositions as presented in the report would be inadmissible under Rule 403. Because it is triple hearsay, it has limited probative

---

[60] Pls.' Meirowitz Memo. at 15-17 (ECF No. 360).

[61] See Eaton Corp. v. Rockwell Int'l Corp., 323 F.3d 1332, 1344 (Fed. Cir. 2003) ("The communication must be sufficient to enable one of ordinary skill in the art to make the patented invention.") (citation omitted); Gambro Lundia AB v. Baxter Healthcare Corp., 110 F.3d 1573, 1577 (Fed. Cir. 1997) ("The Supreme Court announced the standard for finding communication of a prior conception over 125 years ago . . . . The Court required a showing that the communication 'enabled an ordinary mechanic, without the exercise of any ingenuity and special skill on his part, to construct and put the improvement in successful operation.'") (quoting Agawam Woolen v. Jordan, 74 U.S. 583, 602-3 (1868)).

[62] See, e.g., Meirowitz Invalidity Rep. ¶ 317 ("From Mr. Press's and Mr. Herbst's testimony, it is clear that Mr. Press entirely derived the idea for the structure of the zipper . . . from Mr. Blenkarn and Mr. Press . . . helped Mr. Blenkarn improve the quality of the manufacturing process used . . . . [I]t was already well known in the art that it was desirable for a water resistant layer on a zipper to have high adhesion and abrasion resistance without detracting from the flexibility of the zipper.").

value. And to the extent that the jury hears the evidence directly from Blenkarn's testimony or Press's deposition, an exegesis from Dr. Meirowitz would be excessively cumulative.

Thus, Dr. Meirowitz will only be allowed to testify that specific communications would have enabled one skilled in the art to produce the invention contained in the '214 Patent. That will be helpful to a jury. Dr. Meirowitz will not, however, be allowed to relay any communications not directly tied to that expert conclusion.

### 4. Foreign Law

In discussing the validity of the foreign patents, Dr. Meirowitz relies on memoranda produced by law firms retained by Defendants. Plaintiffs believe these memoranda are undisclosed expert reports and move to exclude paragraphs 161-182, 286-300, and 370-378 of his invalidity report on the grounds that they rely on undisclosed experts in foreign patent law.[63] The motion is granted in part.

Plaintiffs here have confused two issues. Defendants are not attempting to rely on the legal memoranda to prove foreign law to the Court; if they were, then the memoranda would be undisclosed reports that should be excluded.[64] Instead, it is clear that Dr. Meirowitz was

---

[63] Pls.' Meirowitz Memo. at 15. Plaintiffs have also moved to exclude paragraph 93 of the non-infringement report on the same basis. That motion is denied. That paragraph does not opine on foreign law. Instead, it offers his opinion about how the assertion of Plaintiffs' foreign law expert would affect his conclusion. That is proper rebuttal testimony.

[64] See Narayanan v. Sutherland Glob. Holdings, Inc., 2018 U.S. Dist. LEXIS 82629, at *23 (W.D.N.Y. May 16, 2018) ("[A] party is entitled to discovery regarding its adversary's foreign law expert, just as it is entitled to discovery regarding any other kind of expert.") (citation omitted); Silberman v. Innovation Luggage, Inc., 2002 U.S. Dist. LEXIS 18456, at *4 (S.D.N.Y. Sep. 30, 2002) (collecting cases); In re Bridgestone/Firestone, Inc., 131 F. Supp. 2d 1027, 1031 (S.D. Ind. 2001) (holding that where defendants included affidavits from a number of foreign law experts in connection with a motion to dismiss, discovery on the basis of the experts' conclusions and qualifications was appropriate). One court has reached a contrary conclusion, but that "decision appears contrary to the weight of authority on this question." Silberman, 2002 U.S. Dist. LEXIS 18456, at *5 n.1 (citing BCCI Holdings (Luxembourg) v. Khalil, 184 F.R.D. 3, 9 (D.D.C. 1999)).

informed of the legal framework at issue to guide his assessment of the facts. That is wholly proper.

That said, for the same reasons that Dr. Meirowitz cannot instruct the jury on domestic patent law, he also may not instruct the jury on foreign patent law, both because he is not an expert and because it would improperly infringe on the Court's role of instructing the jury. Thus, any paragraphs that simply describe the requirements of foreign patent law are stricken.[65] Furthermore, his opinion that the foreign patents are "invalid" for failing to comply with foreign patent law is also impermissible.[66] The remainder of these paragraphs are, however, permissible. In those sections, Dr. Meirowitz applies his understanding of the facts and his technical expertise to make factual conclusions regarding the foreign patents. That is wholly proper.

### B.  Dr. Meirowitz's Non-Infringement Report

To prove their non-infringement defense, Defendants must show that the accused zippers do not fall within the definition of claims in each patent. To support that defense, Dr. Meirowitz opines that YKK's water-resistant zippers did not infringe on the patents for several reasons, including that: (1) some of the zippers are not water-resistant; (2) some of the zippers are constructed differently than the patented zippers; and (3) YKK did not intentionally sell the zippers outside of their license.

Plaintiffs move to exclude much of this testimony, including: (1) testimony based on illustrations comparing YKK's zippers with Figure 1 of the '214 Patent on the grounds that it is irrelevant; (2) testimony relying on YKK's marketing materials on the grounds it is irrelevant; (3) testimony that there is no evidence of intent to induce infringement on the grounds it is not

---

[65] See, e.g., Meirowitz Invalidity Rep. ¶¶ 161-2 (ECF No. 360-1).

[66] See, e.g., id. ¶¶ 166-7 (ECF No. 360-1).

helpful to the trier of fact; (4) testimony that some of YKK's zippers are not water resistant on the grounds that it is contrary to the Court's earlier ruling on claim construction; (5) testimony based on results from the AATCC 42 water-resistance test on the grounds that the test was not properly conducted; (6) testimony based on tests conducted by YKK's employees on the grounds that it is both hearsay and the product of unreliable testing; (7) testimony describing YKK's manufacturing processes on the grounds that it is hearsay; and (8) testimony of whether people in the outerwear industry consider YKK's zippers to be water-resistant.

### 1.  Comparison of Accused Products with Drawings

Plaintiffs move to strike paragraphs 50-56 and 59-66 of Dr. Meirowitz's non-infringement report.[67] They argue that these paragraphs compare YKK's zippers with images from Plaintiffs' patents that are not to scale and are, therefore, irrelevant in assessing infringement under U.S. patent law.[68] Defendants argue that Dr. Meirowitz offers no opinions in those paragraphs, and that they are permissible background relevant to assessing infringement of the *foreign* patents.[69] Both parties are half right. I exclude portions of paragraphs 50-56 and 59-66.

In the paragraphs, Meirowitz relies on pictures of several YKK-manufactured zippers to conclude that the zippers have gaps between the stringer tape and water-resistant layer, even when zipped, and that the water-resistant layer partially overhangs the stringer tape.[70] Based on that examination, he then produces two sets of drawings to illustrate the differences between

---

[67] Pls.' Meirowitz Memo. at 2 (ECF No. 360).

[68] Id. at 2-3.

[69] Defs.' Meirowitz Opp. at 5-6 (ECF No. 383).

[70] Meirowitz Non-Infringement Rep. ¶¶ 50-56, 59-65 (ECF No. 360-2). The stringer tape is the fabric attached to the zipper coil.

YKK's Reverse Coil AquaGuard and Reverse Coil Decorative Zippers:[71]



The drawing of the Asserted Patents appears to come from figures contained in the patents, including Figure 1 of the '214 Patent.[72] Dr. Meirowitz produced his own drawings depicting YKK's zippers, adding color to indicate stringer tape with yellow, polyurethane with green, and the zipper coil with red.[73]

In arguing that these paragraphs are irrelevant, Plaintiffs overstate their case. The '214 Patent lays claim to a water-resistant zipper, which is specified to include a minimal gap between the two halves of the water-resistant layer.[74] In his report, Dr. Meirowitz concludes that the gap

---

[71] Meirowitz Non-Infringement Rep. ¶¶ 56, 65 (ECF No. 360-2).

[72] Compare, e.g., '214 Patent at 2 (ECF No. 406-35).

[73] Meirowitz Non-Infringement Rep. ¶¶ 56, 65 (ECF No. 360-2).

[74] See, e.g., '214 Patent at 3:32-37 (ECF No. 406-35).

in YKK's zippers is larger than those specified, which he identifies as one reason that YKK's zippers are not water-resistant.[75] Testimony along those lines is plainly relevant to the question of whether YKK's zippers fall within the claims of the '214 Patent,[76] and pictures of the gaps are a helpful, relevant, and admissible demonstration of the factual basis for his conclusions.

The drawing purporting to compare the YKK zippers to scale with the drawing of the patented zipper, however, has minimal, if any, probative value. The Federal Circuit has made it clear that "patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue."[77] The juxtaposition of Figure 1 of the '214 Patent with Dr. Meirowitz's drawing invites that impermissible inference. Figure 1 of the '214 Patent depicts no gap, even though the '214 Patent explicitly contemplates that there may be some gap.[78] By juxtaposing the stylized YKK zipper

---

[75] See Meirowitz Non-Infringement Rep. ¶¶ 90, 96, 98, 132-33, 136, 138, 140, 163, 165, 167 90 (ECF No. 360-2). Defendants argue that paragraphs 50-56 and 59-66 pertain only to Dr. Meirowitz's opinions on infringement of the foreign patents. See Defs.' Meirowitz Opp. at 5. And it is true that Dr. Meirowitz does not cite these paragraphs in his opinion regarding the '214 Patent, but he *does* rely on his conclusion that there is a gap in YKK's zippers. See Meirowitz Non-Infringement Rep. ¶ 90 (ECF No. 360-2) ("The gaps in the polyurethane and between the stringer tapes provide an easy path for water to penetrate through and wet the zipper.").

[76] See 4 Modern Federal Jury Instructions-Civil P 86.02 (2018) (stating that the first element for direct infringement is "that every requirement in the asserted claim in the patent is included in defendant's product (or method)").

[77] Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l Inc., 222 F.3d 951, 956 (Fed. Cir. 2000); see also Nystrom v. TREX Co., 424 F.3d 1136, 1149 (Fed. Cir. 2005) ("Absent any written description in the specification of quantitative values, arguments based on measurements of a drawing are of little value.") (quoting In re Wright, 569 F.2d 1124, 1127 (C.C.P.A. 1977)); Cacace v. Meyer Mktg. (Macau Commer. Offshore) Co., 812 F. Supp. 2d 547, 563-65 (S.D.N.Y. 2011) ("The law is clear that precise measurements should not be made, and should not be considered by a court, where the drawings and figures from which those measurements are derived are silent as to scale and proportion.") (citation omitted).

[78] See '214 Patent at 3:32-37 (ECF No. 406-35) ("Film 26 and cut line 42 are preferably provided so as to provide sections 50 of film 26 each having end surfaces 52, 54 which are reasonably square in nature so as to provide contact or near contact between end surfaces 52, 54 which serve advantageously to provide excellent resistance to permeation of water."); id. at 6:20-24 ("After substantial use, a small gap

with Figure 1, Dr. Meirowitz would impermissibly invite the conclusion that the YKK zipper has a gap larger than that specified in the '214 Patent because it looks larger than any gap contained in Figure 1.

The prejudicial nature of the comparison outweighs any probative value, and Dr. Meirowitz should not be allowed to compare Figure 1 with his drawing at trial. Testimony and pictures attesting to a gap in YKK's zippers that defeats water-resistance is, however, relevant to infringement of the '214 Patent, and it will be allowed at trial.[79]

## 2. Reliance on Marketing Materials

In paragraphs 57, 58, and 85 of his non-infringement report, Dr. Meirowitz attests that YKK's zippers are not water resistant, citing to some of YKK's marketing materials as evidence.[80] Plaintiffs object that this evidence is irrelevant to the question of infringement, and Defendants reply with citations to cases considering marketing materials. Plaintiffs' motion is granted.

Marketing materials may be relevant in a patent case. Plainly, if YKK tells customers that the zippers are not water resistant, that has a tendency to make the fact of water-resistance "more

---

may eventually develop between surfaces 52, 54 of polyurethane material 26. However, such gap will typically be less than about 0.5 mm, and will not affect the proper operation of polyurethane layer 26 in accordance with the present invention."); id. at 7:58-61 ("Also, the substantial abutting nature of polyurethane coat or film along cut line 42 parallel to parting line 44 of gripper structure 22, provides excellent resistance to water flow through gripper structure 22.").

[79] The parties dispute, without offering any authorities, whether the images and testimony would be relevant to the question of infringement on the foreign patents. The Court will not, therefore, rule at this time on the question of whether the images and testimony are or are not relevant to the foreign patents. Cf. Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 936 (S.D.N.Y. 2013) ("Neither party, however, has identified, let alone addressed, this legal issue here. For the time being, therefore, the Court declines to grant summary judgment to either party as to this claim, and denies both sides' motions as to this claim.").

[80] Meirowitz Non-Infringement Rep. ¶ 57 (ECF No. 360-2).

or less probable than it would without the evidence."[81] Several courts for this reason have deemed marketing statements to be relevant to the question of infringement.[82]

But the marketing statements here are *also* out of court statements offered to prove that the zippers are not water-resistant, making them hearsay.[83] Although experts are free to rely on otherwise inadmissible evidence, parties also cannot use experts as a Trojan Horse of hearsay.[84] Here, Dr. Meirowitz does not rely on the marketing statements to reach his conclusion that, based on his tests, YKK's zippers are not water-resistant. Thus, the Court will not allow Dr. Meirowitz to testify about marketing materials that are both hearsay and not the ultimate basis for his report; such evidence would be unnecessarily cumulative of his expert testimony while adding minimal, if any, probative value.

### 3. Intent to Induce Infringement

Plaintiffs move to exclude paragraphs 69-75 of Dr. Meirowitz's non-infringement report in which he opines that there is no evidence of an intent to induce infringement.[85] Defendants object, pointing to some cases where courts have considered expert testimony when discussing

---

[81] Fed. R. Evid. 401.

[82] See PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1351 (Fed. Cir. 2007) ("There is no prohibition against using the admissions of a party, whether in the form of marketing materials or otherwise, as evidence in an infringement action; such admissions are entitled to weight along with all other evidence of infringement."); see also Allergan, Inc. v. Athena Cosmetics, Inc., 2013 WL 12141346, *6 (C.D. Cal. Mar. 5, 2013), aff'd, 738 F.3d 1350 (Fed. Cir. 2013) (holding that statements in marketing materials directly addressing claim limitations supported finding of infringement).

[83] See Fed. R. Evid. 801(c).

[84] Rotman v. Progressive Ins. Co., 955 F. Supp. 2d 272, 283 (D. Vt. 2013) (noting that it is "appropriate for district courts to recognize the risk that a particular expert might become nothing more than a transmitter of testimonial hearsay and exercise their discretion in a manner to avoid such abuses") (citation omitted).

[85] Pls.' Meirowitz Memo. at 4 (ECF No. 360).

intent to induce.[86] Because this testimony is not based on any technical expertise, I agree with Plaintiffs.

First, it must be noted that only paragraphs 71-75 discuss Defendants' intent; paragraphs 69-70 discuss whether YKK's sales were licensed or otherwise infringed on the '214 Patent.[87] Nevertheless, those paragraphs are just as impermissible.[88] In paragraph 69, Dr. Meirowitz testifies to a factual issue—that YKK paid royalties under a licensing agreement that Plaintiffs accepted—and then offers a legal conclusion—that the zipper sales were therefore licensed and not infringing.[89] None of this is helpful to the jury or appropriate for an expert witness. Whether YKK paid and Plaintiffs accepted royalties is a basic issue well within the capacity of a lay jury, and the legal import of any acceptance of royalties is a legal instruction that must come from the Court.[90] No testimony along these lines should come from Dr. Meirowitz, let alone any other expert.

As for paragraph 70, the testimony there is equally inadmissible. There, Dr. Meirowitz again testifies to basic facts beyond his personal knowledge—that YKK manufactured the accused zippers abroad and did not import them—and then offers a legal instruction—that the zippers were not infringing because they were not imported into or made in the United States.[91]

---

[86] Defs.' Meirowitz Opp. at 14-15 (ECF No. 383).

[87] Meirowitz Non-Infringement Rep. ¶¶ 69-75 (ECF No. 360-2).

[88] Although Plaintiffs did not address these opinions in their motion, the Court may police the opinions of expert witnesses sua sponte. See Brenord v. Catholic Med. Ctr. of Brooklyn & Queens, Inc., 133 F. Supp. 2d 179, 188 n.4 (E.D.N.Y. 2001) (engaging in a sua sponte inquiry into qualifications of an expert under Daubert) (collecting cases).

[89] Meirowitz Non-Infringement Rep. ¶ 69 (ECF No. 360-2).

[90] Island Intellectual Prop. LLC v. Deutsche Bank AG, 2012 U.S. Dist. LEXIS 21742, at *18 (S.D.N.Y. Feb. 14, 2012) ("[E]xperts may not transmit factual narrative to the jury nor may they usurp the Court's role to instruct the jury on the applicable law.").

[91] Meirowitz Non-Infringement Rep. ¶ 70 (ECF No. 360-2).

This testimony offers no expertise helpful to a lay jury while also impermissibly offering instructions on the law of patent infringement. It is excluded.

Moving onto the paragraphs regarding intent to induce infringement, Plaintiffs are correct that this testimony is improper. Because science has not yet invented a way to read minds, "inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."[92] Instead, juries must answer questions of intent with the lay tools that they always have: examination of testimony and documents, and assessment of credibility. Thus, Dr. Meirowitz's testimony that he has seen no evidence of an intent to induce infringement is completely unnecessary, potentially misleading, and therefore inadmissible. The jury will examine the evidence and decide whether they see evidence of intent. Dr. Meirowitz's testimony in paragraphs 71-75 is excluded.[93]

The authorities cited by Defendants do not suggest otherwise. In those cases, the witnesses offered expert insight into intent behind the *design or structure* of products, such as how the user interface of software required users to use software in an infringing manner[94] or how training manuals encouraged others to combine molecules in an infringing fashion.[95] That,

---

[92] In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004).

[93] Accord id. (excluding expert testimony regarding intent to induce infringement because it "merely repeated facts or opinions stated by other potential witnesses" and because "the opinions of these witnesses on the intent, motives, or states of mind of corporations . . . have no basis in any relevant body of knowledge or expertise); Island Intellectual Prop. LLC v. Deutsche Bank AG, 2012 U.S. Dist. LEXIS 21742, at *25 (S.D.N.Y. Feb. 14, 2012) ("Zatkovich may provide opinions within the scope of his banking expertise, which scope does not extend to inferences regarding the specific intent of defendants . . . or ultimate conclusions as to whether defendants induced infringement or not."); BorgWarner, Inc. v. Honeywell Int'l, Inc., 750 F. Supp. 2d 596, 611 (W.D.N.C. 2010) ("Honeywell's intent with respect to the patents-in-suit is a question for the trier of fact to decide and does not require the admission of expert testimony.").

[94] Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1322-23 (Fed. Cir. 2009).

[95] ClearValue, Inc. v. Pearl River Polymers, Inc., 735 F. Supp. 2d 560, 575-76 (E.D. Tex. 2010).

unlike Dr. Meirowitz's testimony, is helpful expertise beyond the understanding of a typical juror.

Thus, I am precluding the testimony described in paragraphs 69-75 because it offers impermissible legal instructions and opines on basic factual evidence within a lay jury's understanding.

### 4. Meaning of Water-Resistance

Plaintiffs move to exclude paragraphs 86-90 of Dr. Meirowitz's non-infringement report.[96] They argue that the paragraphs apply a construction of the '214 Patent's claims at odds with the Court's earlier <u>Markman</u> decision. This motion is denied.

In the earlier decision, the Court construed "'a water resistant layer on second surfaces' to mean just that: a water resistant layer on said second surfaces."[97] This construction rejected Defendants' position that "water resistant" should be construed according to a defined metric or test.

Plaintiffs claim that Dr. Meirowitz's testimony impermissibly argues for a different construction. But they are wrong. In paragraphs 86-90, Dr. Meirowitz does not say that for a zipper to be water resistant, it must satisfy a specific test or metric. Instead, Dr. Meirowitz conducted "every single standard water resistance test [he is] aware of that is appropriate for testing zippers."[98] He relays pictures and data demonstrating that water penetrated the zippers under all of the tests, and based on these results he concludes that the zippers are not water resistant.

---

[96] Pl.'s Meirowitz Memo. at 4 (ECF No. 360).

[97] Markman Decision at 18 (ECF No. 180).

[98] Meirowitz Non-Infringement Rep. ¶ 90 (ECF No. 360-2).

All of this is to say that Dr. Meirowitz does not insist on a specific definition or construction of "water resistant." Instead, he uses specific measurements of water resistance to demonstrate that the zippers do not qualify as resistant to water. Nothing about this is improper. Indeed, it is helpful to a lay jury. The Court will not strike paragraphs 86-90.

### 5.   Water-Resistance Testing Methodology

In the alternative, Plaintiffs move to strike paragraphs 86-90 on the grounds that one of the water resistance tests, the "AATCC 42" test, was performed improperly. This motion is denied.

During this test, water is funneled from a uniform height above a sample that is weighted down on a board angled at 45 degrees. The water resistance is measured by examining how much, if any, water makes its way onto a blotter paper beneath the sample. Plaintiffs argue that at least one of these tests deviated from the test's parameters because the zipper sample was not weighted down on both ends. Plaintiffs believe that water could have reached the blotter paper "by seeping in around the edges," and that the test is therefore unreliable.

This is not a cogent basis for excluding Dr. Meirowitz's opinion. Plaintiffs do not argue that the AATCC 42 test is itself an unreliable methodology, and any deviations or errors in its application go to its weight, not its admissibility.[99] Vigorous "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and

---

[99] Accord Newport Corp. v. Lighthouse Photonics Inc., 2014 WL 1370749, at *3 (C.D. Cal. Apr. 8, 2014) ("Failure to perfectly adhere to methodologies promulgated by a standard-setting organization is not, by itself, grounds for precluding expert testimony . . . ."); Responsive Innovations, LLC v. Hotlzbrinck Publishers, LLC, 2014 WL 1237632, at *5 (N.D. Ohio Mar. 25, 2014) ("Defendants' challenge to the efficacy of Bartone's testing concerns the weight, not the admissibility of Bartone's testimony."); PacTool Int'l, Ltd. v. Kett Tool Co., 2012 WL 3637391, at *3 (W.D. Wash. Aug. 22, 2012) ("[T]hese issues [of data collection and test calibration] are best left to the factfinder to weigh during the battle of the experts instead of the Court to weigh when considering the exclusion of an expert.").

appropriate means of attacking shaky but admissible evidence."[100] If Plaintiffs believe that the deviation from proper protocol for the AATCC 42 test undermined the results, then they should avail themselves of those methods.

### 6.   Testing Conducted by YKK Employees

Plaintiffs move to exclude paragraph 91 and 92 of Dr. Meirowitz's report because it is based on tests conducted by a YKK employee without Dr. Meirowitz's involvement. This argument is frivolous. Under Federal Rule of Evidence 703, an expert may testify to tests that he did not personally conduct or observe so long as the expert "obtained sufficient personal knowledge through review of the records of the tests."[101] Plaintiffs do not argue, nor can they, that Dr. Meirowitz has insufficient knowledge of the tests conducted by YKK; Dr. Meirowitz attached YKK's internal testing protocol and the results to his report, and he personally spoke with the employee who conducted the tests.[102]

Instead, Plaintiffs argue that YKK's testing is unreliable because they think that the result—that a polyurethane layer has little to no impact on water resistance—defies "common sense." They offer some first principles reasoning and other conflicting evidence in support of their position. None of this is a valid basis for excluding the testimony. These are material facts that Plaintiffs can present to the jury. The motion is denied.

---

[100] Daubert, 509 U.S. at 595.

[101] Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1383 (Fed. Cir. 2005); see also Monsanto Co. v. David, 516 F.3d 1009, 1015 (Fed. Cir. 2008) ("[R]eliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703.").

[102] Meirowitz Non-Infringement Rep. ¶ 91 (ECF No. 360-2).

7.   **YKK's Manufacturing Process**

Plaintiffs move to exclude Dr. Meirowitz's testimony in paragraphs 43-49 and 67-68 that explains the manufacturing process used for YKK's zippers.[103] Dr. Meirowitz's understanding of the processes is derived from Mr. Konaka, who purportedly designed the manufacturing process for some, but not all, of YKK's zippers. This motion is denied without prejudice to renewal during trial.

It may be permissible for experts to rely on otherwise inadmissible hearsay, but the information relied upon must be disclosed and reliable.[104] Based on the briefing presented, it is impossible to determine the reliability of Mr. Konaka's out-of-court conversations with Dr. Meirowitz. On the one hand, Plaintiffs have attached several snippets of his deposition where he lacks information regarding the manufacture of some zippers. On the other hand, Defendants assert—without any evidence—that Mr. Konaka designed the manufacturing process for the AquaGuard zippers.

Assuming that Defendants' assertion is true, some of Mr. Konaka's knowledge must have been reliable. But there is also evidence that Mr. Konaka's knowledge regarding some zippers is unreliable. Because Dr. Meirowitz's testimony regarding YKK's manufacturing processes should not affect the summary judgment ruling here, the Court denies this motion without prejudice to renewal.[105] Before or during trial, Defendants should have the opportunity to

---

[103] Pl.'s Meirowitz Memo. at 5 (ECF No. 360).

[104] See Cummins v. Lyle Indus., 93 F.3d 362, 372 (7th Cir. 1996) (Easterbrook, J.) ("The district court was entitled to conclude that there has been an inadequate showing that the hearsay statements relied upon by Dr. Carpenter in formulating his opinion are 'of a type reasonably relied upon by experts in the field.'").

[105] Accord In re Scotts EZ Seed Litig., 2017 U.S. Dist. LEXIS 125621, at *44-45 (S.D.N.Y. Aug. 7, 2017) ("Based on that understanding and because deciding plaintiffs' Daubert motion with respect to

demonstrate the scope and basis of Mr. Konaka's knowledge that was conveyed to Dr. Meirowitz. With more complete information, the Court can assess whether some—or all—of his statements to Dr. Meirowitz were unreliable.

### 8.  Non-infringing Alternative

Plaintiffs move to exclude paragraph 85 of Dr. Meirowitz's non-infringement opinion in which he opines that no "one in the outerwear or related industry would consider the layer that includes the polyurethane to be water resistant."[106] Plaintiffs argue that Dr. Meirowitz is not an expert in the outerwear industry and so is not-qualified to offer this opinion. Contrary to Plaintiffs' assertions, Dr. Meirowitz has advised a number of companies and organizations on outerwear, including Patagonia, Black Mountain Equipment, Marmot, The North Face, and the U.S. Army. Plaintiffs do not explain why this experience is insufficient. This motion is denied.

## III.   Plaintiffs' Motion to Exclude Kindler

Lauren Kindler is an economist that Defendants have retained as their damages expert. In her report, she offers her rebuttal to Plaintiffs' damages expert, James Donohue. She argues that lost profits and disgorgement are inappropriate remedies here but, in any event, that Donohue's calculations contain errors. In response, she provides alternative measurements that she says are more accurate. In conclusion, she also determines a hypothetical royalty rate that she believes is a superior measure of damages.

Plaintiffs move to exclude most of her testimony, arguing: (1) her testimony regarding the appropriateness of lost profits is an improper legal instruction; (2) testimony regarding a hypothetical royalty is irrelevant; (3) the hypothetical royalty she calculates is based on an

---

Dr. Nelson and Foust is not necessary for deciding the parties' cross-motions for summary judgment, plaintiffs' motion to preclude the testimony of Dr. Nelson and Foust is denied without prejudice.").

[106] Pl.'s Memo. Exclude Meirowitz at 12 (ECF No. 360).

unreliable method; (4) her rebuttal to Plaintiffs' damages calculations is based on unreliable data;
(5) her hypothetical royalty is irrelevant to measurement of damages for breach of contract; (6)
the alternative measurement she generates using Plaintiffs' expert's method is irrelevant; (7)
testimony regarding Plaintiffs' failure to mitigate damages is irrelevant; and (8) her rebuttal to
Plaintiffs' calculation of a disgorgement remedy is unreliable.

Part of this motion is granted. Plaintiffs are correct that Kindler's lost profits opinion
contains some inadmissible legal instruction. They are also correct that, because Defendants have
waived any mitigation defense, Kindler may not testify that Plaintiffs' failed to mitigate their
damages. And they are right to point out that Kindler's calculation of disgorgement damages is
based on unreliable data. But the rest of her testimony is neither unreliable nor irrelevant for the
reasons discussed below.

### A. Lost Profits Legal Instruction

Plaintiffs move to exclude paragraphs 57 to 63 of Kindler's report in which she opines
that Plaintiffs have not shown that YKK's actions deprived Uretek of profits from YKK's
purchase of lamination services.[107] They argue that the entirety of that opinion should be
excluded because it amounts to impermissible legal instruction. This motion is granted in part.

In two sentences of the relevant paragraphs, Kindler does testify to what Plaintiffs must
prove in order to obtain lost profits under the patent act.[108] That is an instruction of law reserved

---

[107] Pls.' Daubert Memo. at 4-5 (ECF No. 365).

[108] Kindler Rep. ¶ 59 ("In order to establish a claim for lost profits in a patent infringement
context, the plaintiff needs to be able to show that in the absence of the infringement, it would have made
the infringing sales (i.e., that it competes directly for the sale of the accused product(s). As it pertains to
this case, in order to claim lost profits from laminating YKK's Accused Zippers sold into Excluded
Markets, Uretek needs to be able to show that it would have been in a position to either (a) laminate those
zippers on behalf of other competing zipper manufacturers to whom those sales would have flowed or (b)
manufacture its own laminated zippers to capture YKK's Accused Zipper sales.").

for the Court. It is accordingly excluded. The remainder of her opinion on this matter, however, is free of legal instructions or opinions. In those paragraphs Kindler offers several cogent arguments that Plaintiffs have failed to demonstrate but-for causation; specifically, she notes that Uretek never laminated zippers for other customers, Uretek never tried to obtain business laminating zippers for other customers, and Uretek in fact offered to license the remainder of the patent in return for a straight royalty.[109] All of these observations are supported by citation to the record and, as an economist, Kindler is qualified to offer her opinion regarding causation. Such an opinion would also be helpful to a lay jury.[110] The motion is, therefore, granted in part and denied in part.

### B.  Relevance of Opinions Regarding a Non-Exclusive Royalty

Plaintiffs move to exclude paragraphs 118 to 161 of Kindler's report as irrelevant. In those paragraphs, Kindler offers an opinion on the appropriate amount of royalty damages, which she bases on her conclusion that in a hypothetical negotiation Uretek and YKK would have agreed to a non-exclusive royalty for the excluded markets ranging between $0.05 to $0.09 per meter.[111] Plaintiffs argue that this opinion is irrelevant because no party ever offered a deal involving a non-exclusive license during the actual negotiations.[112] Plaintiffs argument, however, goes to weight, not admissibility. The motion is denied.

---

[109] Kindler Rep. ¶ 58-63 (ECF No. 365-2).

[110] See LaserDynamics, Inc. v. Quanta Comput., Inc., 694 F.3d 51, 67 (Fed. Cir. 2012) ("A damages theory must be based on 'sound economic and factual predicates.'") (quoting Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311 (Fed. Cir. 2002)).

[111] See Kindler Rep. ¶ 157 (ECF No. 365-2).

[112] Kindler acknowledges that the proposals she reviewed did not involve a nonexclusive license. See Kindler Dep. 220:16-20 (ECF No. 365-11).

Under the Patent Act, a party may prove damages for patent infringement by proving a royalty that the parties would have agreed to in a hypothetically successful negotiation.[113] Under this standard, known as the *Georgia-Pacific* framework,[114] over a dozen factors can be relevant to the royalty's amount, including whether the license is exclusive or non-exclusive.[115] Kindler's detailed and thorough analysis culminating in her conclusion that the parties would have agreed to a non-exclusive royalty is, therefore, relevant under the test. To the extent that Plaintiffs think that an exclusive royalty arrangement was the more likely outcome of a hypothetical negotiation, then that is their case to make. But it is not a valid basis for excluding this opinion.

## C.  Reliability of Non-Exclusive Royalty Opinion

Next, Plaintiffs argue that Kindler's hypothetical royalty opinion is unreliable because in assessing a hypothetical royalty, the expert must rely upon data points that are sufficiently comparable and close in time to the hypothetical license. Plaintiffs argue that four of the data points she discusses—a 1999 internal YKK memo, a 2001 internal YKK memo, a 2007 report from the Analytical Finance Group, and a 2015 presentation prepared by Deloitte—are either too temporally distant or are based on licenses that are too dissimilar.[116] They believe that those comparators taint the entirety of her conclusion. This motion is denied.

Plaintiffs are correct that an expert's assessment of a hypothetical license must be based on sufficiently comparable data points.[117] And they offer many valid reasons to question the

---

[113] Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[114] Id. (citing Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

[115] See Ga.-Pacific Corp., 318 F. Supp. at 1120.

[116] Pls.' Daubert Memo. at 7-11 (ECF No. 365).

[117] See Ravo v. Covidien LP, 55 F. Supp.3d 766, 775 (W.D.Pa. 2014) ("[A]ny other licenses relied upon to support a reasonable royalty analysis must be proven to be sufficiently comparable to the

adjacency of those four data points to the hypothetical 2006 royalty agreement. But the fact that Kindler discusses those data points in her report does not make her conclusion so profoundly unreliable that it must be excluded. Indeed, her conclusion appears to derive from much more reliable comparators. In reviewing the actual negotiations, Kindler saw evidence that Uretek offered in 2004 to receive $0.05 per meter for the exclusive use of the patent in the luggage market, and that Uretek later offered in 2007 to receive $0.09 per meter for exclusive use of the patent with the exception of the military market.[118] Those offers—which nicely bookend the hypothetical 2006 agreement—closely align with her conclusion that the parties would have agreed to receive $0.05 per meter for the luggage market and $0.09 per meter for the high end outerwear and military markets if the license were non-exclusive.[119] Her logic there is clear: if Uretek was willing to *offer* those prices for an exclusive license, then it likely would have *accepted* them for a non-exclusive license.

Certainly, Plaintiffs may argue that Uretek ultimately would never have agreed to a non-exclusive license and would have required a higher royalty, but her conclusions follow logically from the evidence reviewed, and the opinion may be presented to the jury.

### D.  Reliability of Kindler's Rebuttal of Donohue's Damages Estimate

Plaintiffs also argue that Kindler's reliance on the four data points discussed above—the 1999 internal YKK memo, 2001 internal YKK memo, 2007 report from the Analytical Finance Group, and 2015 presentation prepared by Deloitte—irreparably taints her rebuttal of Donohue's

---

hypothetical license at issue with respect to technology, economic terms, and time period.") (quoting Apple v. Motorola, Inc., 757 F.3d 1286, 1315 (Fed. Cir. 2014)).

[118] See Kindler Rep. at 96, 97 (ECF No. 365-2).

[119] See Kindler Rep. ¶ 157.

opinion in paragraphs 106-7 of her report.[120] This motion is also denied. In those paragraphs, Kindler merely points out that Donohue does not address these data points that are indicative of value. She also observes that the valuations they contain, which range from $1.6 million to $9.3 million, are so grossly different from his estimate of lost profits that they suggest that his calculations are in error. To the extent that Plaintiffs believe those data points are irrelevant because they are not sufficiently comparable, that is an argument against the weight of her opinion, not its admissibility.[121]

### E.  Relevance of Hypothetical Royalty to Contract Damages

Plaintiffs also argue that Kindler's hypothetical royalty is too speculative to assess contract damages under New York law. But, as discussed above, her ultimate hypothetical royalty is not pure speculation. Instead, she uses royalty numbers that *were offered by Uretek* in negotiations. Thus, this is not a case with no prior licensing or negotiation history that would make a hypothetical royalty impermissibly speculative under New York law.[122] Her opinion is concrete enough to be relevant and considered in assessing damages for breach of contract. This motion is denied.

---

[120] Pls.' Daubert Memo. at 7 (ECF No. 365).

[121] Cf. Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("[Q]uestions regarding which facts are most relevant for calculating a reasonable royalty are properly left to the jury.").

[122] Compare with Jill Stuart (Asia) LLC v. Sanei Int'l Co., 566 F. App'x 29, 32 (2d Cir. 2014) (summary order) (finding that "Jill Stuart [had] failed to show reasonably certain, adequately proven, and sufficiently non-conjectural consequential damages" under New York law because "Jill Stuart failed to show sufficiently similar royalty contracts"); Document Sec. Sys. v. Coupons.com, Inc., 55 F. Supp. 3d 485, 498-99 (W.D.N.Y. 2014) (granting summary judgment on hypothetical royalty theory of damages for breach of contract because evidence suggested that "Plaintiff had no standard licensing arrangement, but rather, it negotiated each licensing agreement separately based on various factors").

### F.  Relevance of Alternative Measure of Lost Profits for High End Outerwear

In paragraphs 100-2 of her report, Kindler calculates an alternative to Donohue's damages by taking his method but assuming that "High End Outerwear" is limited to outerwear sold in North America.[123] Plaintiffs argue that this testimony is irrelevant because there is no evidence that the licensing agreement adopted that definition of "high end outerwear."

Plaintiffs are incorrect. There is a dispute of material fact over the meaning of the phrase "high end outerwear." Defendants maintain that it was meant to be limited to sales in North America, a contention that has some basis in admissible testimony, such as the deposition of Mr. Akinobu Shibata.[124] Her alternative measurement of damages is, therefore, potentially relevant and would be helpful to the jury. Plaintiffs' motion to exclude this testimony is denied.

### G.  Relevance of Failure to Mitigate Opinion

In paragraphs 75-77 of her report, Kindler opines that there is a general duty to mitigate losses from an alleged breach of contract. She goes on to say Uretek could have, but did not, take various steps to mitigate its damages. Plaintiffs believe this testimony should be excluded as irrelevant. They are correct. Failure "to mitigate damages is an affirmative defense and therefore must be pleaded."[125] Defendants did not include any mitigation defense in their response to the operative complaint.[126] They may not, therefore, present such a defense to the jury, thereby

---

[123] Kindler Rep. ¶¶ 100-2 (ECF No. 365-2)

[124] See Kindler Rep. at 18 n. 74 (ECF No. 365-2) (quoting Shibata's testimony that he understood high end outerwear to mean "garments that are made in North America, in Canada and/or United States in a niche market or a luxury market").

[125] Travellers Int'l, A.G. v. Trans World Airlines, 41 F.3d 1570, 1580 (2d Cir. 1994) (citing Fed. R. Civ. P. 8(c)).

[126] See generally Answer at 16-23 (ECF No. 142) (not including mitigation in list of affirmative defenses).

making Kindler's testimony on the subject irrelevant. It must be excluded.[127]

**H.  Reliability of Disgorgement Offset Opinion**

In paragraph 116 of her report, Kindler testifies that Donohue's disgorgement calculation should include an offset for YKK's costs. She believes the appropriate offset is 28% of YKK's revenue, a number she reaches by looking at data from YKK's aggregate financial reports. Plaintiffs argue that those reports are an unreliable basis for the opinion. They are correct.

The basis for the 28% figure is insufficiently reliable to satisfy Rule 702. The 28% figure comes from YKK's combined financial reports, which include business segments other than zippers. Kindler believes that use of the 28% offset is still an appropriate estimate of costs for zipper sales because a YKK executive, Mr. Shibata, told her it was reasonable to assume that the proportion is similar for the lines of business that manufacture zippers. But Mr. Shibata has insufficient personal knowledge to make his statement a reliable foundation. During his deposition, for example, he did not even know if any YKK affiliates record their manufacturing costs for polyurethane laminated coil zippers.[128] Kindler's assumption, therefore, rests on infirm ground, making her opinion inadmissible.[129] This motion is granted.

---

[127] In theory, Defendants could have argued that an amendment to conform to the evidence presented at summary judgment would be appropriate here under Rule 15. See, e.g., United States v. City of N.Y., 847 F. Supp. 2d 395, 428 (E.D.N.Y. 2012) (finding that defendant had waived the defense but granting an amendment to conform to evidence at summary judgment).

[128] See Shibata Dep. 125:13-20 (ECF No. 365-2).

[129] Accord Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., 2001 U.S. Dist. LEXIS 20737, at *14-15 (S.D.N.Y. Dec. 13, 2001) (finding expert testimony to be inadmissible because the expert "based his report on his client's unrealistic assurances rather than available records").

**IV.      Plaintiffs' Motion to Exclude All Opinions Relating to Non-Infringing Alternatives**

Finally, Plaintiffs move to exclude all opinions offered by three of Defendants' experts—Meirowitz, Arntson, and Kindler—that relate to non-infringing alternatives.[130] Defendants offer this testimony because if they can prove there were acceptable non-infringing alternatives, then that undermines the but-for causation embedded within Plaintiffs' requested damages. To exclude the testimony, Plaintiffs argue that these opinions have insufficient factual bases that the identified zippers were either non-infringing, an acceptable alternative, or available in the market. This motion is denied.

Plaintiffs' motion is essentially disagreement with the conclusion that goes to weight rather than admissibility.[131] Indeed, an examination of the paragraphs they have tagged for exclusion reveals that none of the experts goes beyond their expertise. Dr. Meirowitz, after examining the '214 Patent's claims in light of his experience in water-resistant textiles, identifies three zippers that he believes do not fall within the '214 Patent's claims.[132] As discussed above, Dr. Meirowitz is qualified to make these kinds of comparisons under Rule 702. Likewise, Arntson testifies—based on his decades of experience in the outdoor apparel industry—that the three zippers mentioned by Dr. Meirowitz are in fact used by brands as a possible substitute to the allegedly infringing zippers. And Kindler relies on their expert testimony to conclude that, given the existence of these substitutable non-infringing zippers, Donohue's damages'

---

[130] Pls.' Daubert Memo. at 15.

[131] Accord Emerson Electric Co., v. Suzhou Cleva Electric, 2015 WL 8916113, at *10 (E.D. Mo. Dec. 15, 2015) (denying motion to exclude expert testimony because even if the experts "incorrectly assumed that the non-infringing alternatives were available during the relevant time frame when they were not . . . [that] may be easily addressed through cross-examination and contrary testimony").

[132] Meirowitz Non-Infringement Rep. ¶¶ 179-192 (ECF No. 365-3).

calculations are flawed. [133] There is no link in this chain of testimony that violates Rule 702.

Plaintiffs identify several facts that were not considered by these experts that may call the conclusions into question; Arntson, for example, was not able to provide during his deposition several facts about the industry's use of the AquaTight Zipper or the Light Rail Zipper. [134] They also offer some arguments that some of the zippers are used differently than the allegedly infringing zippers. [135] And they argue that one of the zippers, the Talon AquaTight Zipper, is in fact an infringing zipper. [136] All of this goes to weight, not admissibility. Indeed, Plaintiffs have identified many reasons to disagree with the opinions, but they have identified no opinion that is so unreliable that it fails to satisfy Rule 702. The motion is denied. [137]

## DISCUSSION OF DEFENDANTS' DAUBERT MOTIONS

In one motion, Defendants move to exclude much of Bagley's, Cockrell's, and Donohue's reports, arguing: (1) Bagley's report regarding the application of foreign law to this case is inadmissible legal instruction that also exceeds her expertise; (2) Cockrell's testimony regarding industry custom and usage is unreliable and lacks sufficient basis in evidence; and (3) Donohue's damages estimates should be excluded because they are based on Cockrell's opinion, are based on an unscientific methodology, and rely on unfounded assumptions.

---

[133] See Kindler Rep. ¶¶ 51, 70 (ECF No. 365-2).

[134] Arntson Dep. 194:23-196:1, 197:22-199:1 (ECF No. 365-8).

[135] See, e.g., Pls.' Daubert Memo. at 22 ("The Light Rail Zipper lacks the advantages of the patented Zippers and is extremely dissimilar in appearance and function.").

[136] Pls.' Daubert Memo. at 19-22 (ECF No. 365).

[137] With regard to the Talon AquaTight Zipper, Plaintiffs' motion to exclude testimony that this zipper is a non-infringing alternative is denied without prejudice. In order to determine whether this zipper infringes on the '214 Patent, the Court would have to construe the meaning of the word "on" in the claims. Because Defendants have offered testimony regarding other non-infringing alternatives, however, a decision regarding this zipper need not be decided at summary judgment. Accord In re Scotts EZ Seed Litig., 2017 U.S. Dist. LEXIS 125621, at *44-45 (S.D.N.Y. Aug. 7, 2017).

With a few exceptions, these motions are denied. Portions of Cockrell's report summarize evidence beyond his expertise and personal knowledge and are, therefore, excluded. But his opinions stemming directly from his experience in the outerwear industry are not unreliable and are admitted. Likewise, Bagley's report does not stray from her expertise and is admissible. And although Defendants offer many arguments as to why Donohue's calculations are imperfect, none of the alleged defects makes his calculations inadmissible.

## I.     Defendants' Motion to Exclude Bagley

Margo A. Bagley is a law professor who has offered an expert report on the distinctions between various' nations patent laws and whether they differ in any meaningful way for the purposes of this case. Defendants move to exclude the entirety of Bagley's report on the grounds that it: (1) consists of impermissible legal instructions; and (2) is based on unreliable facts. The motion is granted in part.

Defendants argue, correctly, that expert testimony to legal standards is generally inadmissible because such testimony infringes on the Court's obligation to instruct the jury on applicable law.[138] For that reason, Bagley's testimony should not be presented to the jury.[139]

---

[138] See Bethea v. Equinox Fitness Club, 544 F. Supp. 2d 398, 399 (S.D.N.Y. 2008) (excluding expert testimony because "much of [his] report is simply his view of the appropriate legal standards, which is the Court's province"); Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (expert's discussion of governing law "is inadmissible because 'it is not for witnesses to instruct the jury as to applicable principles of law'") (quoting Marx & Co. v. Diner's Club Inc., 550 F.2d 505, 509-10 (2d Cir. 1977)). This rule also applies to foreign law. See Linde v. Arab Bank, PLC, 920 F. Supp. 2d 282, 286 (E.D.N.Y. 2011); see, e.g., Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997) ("Even in the case of foreign law, under modern practice the testimony is generally given to the judge, outside of the presence of the jury, and is meant to assist the judge in determining the appropriate instructions.").

[139] It is entirely unclear, though, if Plaintiffs even intended for Bagley to testify before the jury. See Pls.' Daubert Opp. at 16 (ECF No. 378) ("Her testimony will be of great assistance to the Court in determining the patent laws of Japan, Taiwan, Europe, Hong Kong, and Canada and is not intended to usurp the Court's function.").

Courts, however, "make one exception to this strict rule – when interpreting foreign law, expert legal opinion may be allowed."[140] Defendants do not argue that Bagley lacks the requisite expertise to produce what is, in their own words, a "40-page legal treatise on comparative law."[141] Indeed, her report will be helpful for the Court in determining foreign law, and her testimony at a hearing on jury instructions would, if desired, be appropriate.

Bagley may, however, testify to the Court as set forth in paragraph 126 in which she concludes that: (1) "I would expect the courts in Canada, Japan, Taiwan, Hong Kong, and the relevant European courts to construe the phrase 'water resistant' in the same way as in the U.S."; and (2) "I would also expect courts in these same countries, based on the same evidence of the literal presence of each element of the product claim in the YKK products . . . to reach the same conclusion concerning YKK's products being within the scope of the relevant claims of the patents." Defendants argue that these conclusion are improper because she is not a technical expert and because she never examined the allegedly infringing products to see if they fall within the foreign patents' claims.[142]

This motion is denied. Certainly, if Bagley were testifying that the accused products do fall within the foreign patents' claims, then Defendants would have a point. But she says no such thing. Rather, she is—helpfully—testifying that if a court in one jurisdiction were to find that

---

[140] In re Initial Public Offering Sec. Litig., 174 F. Supp. 2d 61, 65 (S.D.N.Y. 2001) (citing Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 510 (2d Cir. 1977)); see also Winn v. Schafer, 499 F. Supp. 2d 390 (S.D.N.Y. 2007) ("A court may thus consider a foreign law expert's opinion even on ultimate legal conclusions."); 1 McCormick on Evidence § 12 (7th ed. 2016) ("Regardless of the rule concerning opinions on ultimate facts, at common law courts do not allow opinion on a question of law, unless the issue concerns foreign law. Nor do the Federal Rules of Evidence permit opinions on law except questions of foreign law.") (emphasis added).

[141] Defs.' Daubert Memo at 16 (ECF No. 367).

[142] Id. at 17-18.

one of YKK's products infringed on Plaintiffs' patent in that jurisdiction, then she would expect the others to reach the same conclusion if presented with the same evidence. Defendants may have some reasons for why they think this opinion is incorrect, but the Court is perfectly capable of weighing Defendants' arguments against Bagley's testimony.

Thus, Defendants' motion is granted in part. Bagley may not testify before the jury. But her report is not excluded at summary judgment, and her testimony may be appropriate during any hearings relating to the application of foreign patent law in this case.

## II.    Defendants' Motion to Exclude Cockrell

David W. Cockrell is a clothing designer, creative director, and brand manager who has worked in the outerwear industry for 25 years.[143] In his report, he offers a definition for "high end outerwear" as understood in the industry. He then uses that definition to determine whether specific outerwear items incorporating YKK's zippers qualify as "high end outerwear." He also testifies that Uretek's zipper was commercially successful, that there were no recognized alternatives in the industry, and that companies would not have purchased the accused zippers from YKK if they had known that YKK was infringing upon Uretek's patents.

Defendants move to exclude all of this testimony, arguing: (1) his opinions defining "high end outerwear" and applying that definition to specific items are based on an unreliable and undisclosed method; (2) he is not qualified to testify that there were no alternative zippers; and (3) that he is not qualified to testify to what companies would have done and, in the alternative, his opinion lacks a basis in fact.

Defendants' motion is granted in part. Although Defendants have identified flaws in Cockrell's definition of high end outerwear, that goes to weight, not admissibility. Regarding the

---

[143] Cockrell Rep. ¶ 3 (ECF No. 386-6).

alternative zippers, Cockrell may testify to his personal understanding of beliefs shared in the industry, but he also may not review internal YKK documents supporting his testimony. And as for what other companies would have done if they had known YKK's zippers infringed on a patent, this testimony is too hypothetical to be admitted. Each of these issues is discussed below.

### A. Cockrell's First Three Opinions Regarding High End Outerwear

Defendants move to exclude the first three sections Cockrell's report that include: (1) the portion in which he offers definitions for low end, mid range, and high end outerwear, contained in paragraphs 6 – 34; (2) the portion of his report in which he applies his definition to determine which goods incorporating YKK's water-resistant zippers were high end outerwear; and (3) the portion of his report in which he concludes that certain brand companies sell some high end outerwear. Defendants argue that his opinions must be excluded because he has not fully disclosed his methodology and that, in any event, his methodology is unreliable. This motion is denied.

Although Defendants make grist from Cockrell's alleged 50% error rate, the first opinion on the definitions of the various market segments is proper and admissible. During his deposition, Cockrell was unable to look at an item of clothing and reach the same conclusion as his report five out of ten times. Certainly, that error rate is high, and it would be a valid basis to exclude an expert with scientific knowledge under Daubert.[144] But an opinion regarding the definition of an industry term does "not present the kind of 'junk science' problem that Daubert [is] meant to address."[145] For that reason, it would be an error to require the definition to abide

---

[144] See, e.g., Amorgianos v. National R.R. Passenger Corp., 303 F.3d at 268 (7th Cir. 2002) (affirming district court's exclusion of expert testimony regarding injury causation and exposure to the chemical xylene because the expert "failed to apply his own methodology reliably").

[145] Iacobelli Constr. v. Cty. of Monroe, Rochester Pure Waters Dist., 32 F.3d 19, 25 (2d Cir. 1994) (citation omitted).

by the strictures of the scientific method.[146] Instead, when an expert offers an opinion on an industry term, the relevant inquiry is whether that expert has sufficient experience.[147] Cockrell, who has 25 years of experience in the water resistant outerwear industry, has enough experience to make his opinion of industry terms admissible.[148] Defendants' belief that his application of that definition is inconsistent goes "to the weight of the evidence, not to its admissibility."[149] The same is true of his opinion applying the definition to specific items of clothing.[150]

As for Cockrell's third opinion regarding brands that sell some high end outerwear, it is impossible to rule on that motion at this time. Neither Plaintiffs nor Defendants have attached Exhibit 16 of his report that contains Cockrell's actual opinion on the matter.[151] Thus, this motion is denied without prejudice to renewal.[152]

---

[146] Id. (reversing district court's dismissal of the opinions of several experts testifying to industry custom and usage under Daubert because "reliance on Daubert was misplaced").

[147] SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 132-34 (2d Cir. 2006) (affirming lower court's admission of expert witness' testimony to custom and usage despite arguments that he "could not offer a consistent, reliable methodology by which he applied his opinions" because the expert "testified that he had over 30 years of experience in the insurance industry (as both an underwriter and a broker) and he was familiar with practices in the industry").

[148] See, e.g., id.

[149] SR Int'l Bus. Ins. Co., 467 F.3d at 134 (citation omitted); accord Restivo v. Hessemann, 846 F.3d 547, 580 (2d Cir. 2017) ("If, as Volpe claims, those terms have no special law enforcement meaning, then Volpe should have introduced testimony to that effect, expert or otherwise. That does not render Fischer's testimony inadmissible.").

[150] Cockrell's entire opinion recording whether hundreds of items are high end outerwear, however, may potentially be too cumulative to be presented to the jury. See Fed. R. Evid. 403. That determination would more appropriately be made once Plaintiffs have indicated how exactly they intend to present their case.

[151] See Cockrell Rep. (ECF No. 368-1).

[152] Accord In re Scotts EZ Seed Litig., 2017 U.S. Dist. LEXIS 125621, at *44-45 (S.D.N.Y. Aug. 7, 2017).

### B. Non-Infringing Alternatives

Cockrell's fourth opinion is that Arc'teryx's—and later, Uretek's and YKK's—water resistant zippers have been highly successful, and that the industry does not view any of the competitors to be a viable substitute.[153] Defendants move to exclude this opinion, arguing that Cockrell is unqualified to say there are no non-infringing alternatives and that, in any event, his opinions are not based on the consideration of all relevant evidence. This motion is denied in part and granted in part.

Defendants' argument rests on a sleight of hand. They say that Cockrell cannot reliably testify that there are no viable non-infringing alternatives to the '214 Patent because he has not reviewed the patent himself and because he does not know how to test for water resistance.[154] And they have a point; a person could not reliably testify that other zippers are not infringing or water resistant without having that foundation of knowledge. But Cockrell says no such thing. Instead he testifies, based on his lengthy experience in the industry, that the zipper invented by Uretek has been a huge success in the industry, and that there are no zippers "which the outerwear industry *has recognized* as a legal, functioning alternative."[155] He is not testifying that no such zipper exists; that would be beyond his knowledge. He is testifying that people in the industry have not recognized another zipper to be both a legal and functioning alternative. So long as Cockrell's testimony is cabined to his personal knowledge in that way, it is proper and admissible.

---

[153] Cockrell Rep. ¶¶ 44-53 (ECF No. 368-1).

[154] Defs.' Daubert Memo. at 11-2 (ECF No. 367).

[155] Cockrell Rep. ¶ 51 (ECF No. 368-1) (emphasis added).

The remainder of his fourth opinion is, however, excluded. In the remainder, he goes over internal YKK documents and testifies that the documents suggest that YKK agrees with his conclusion.[156] This testimony is nothing more than "a narrative of the case which a juror is equally capable of constructing."[157] Such a narrative, unmoored from the personal experience of the speaker, is reserved for closing argument; any expert testimony to that effect is excluded.[158]

### C.  Consumer Confusion

In his fifth opinion, Cockrell testifies that any companies in the industry would have required that YKK sell them zippers laminated by Uretek if YKK had advised them of YKK's licensing agreement. To support his claim, he refers to his decades of experience as well as several of YKK's internal documents in which YKK or others state that they would prefer not to infringe on any intellectual property.[159]

This testimony is inadmissible. Mr. Cockrell's opinion comes from two sources, neither of which are admissible expert testimony. First, he cites an abstract belief that "most, if not all, of the brand companies purchasing YKK-made Water Resistant Zippers for use in either the High-End Outerwear or Luggage Excluded Markets would have required that YKK instead sell them the Water Resistant Zippers laminated by Uretek if YKK had advised its customers of YKK's limited rights in this regard."[160] Cockrell may have extensive experience in the industry, but this kind of hypothetical speculation is not proper for any expert; to say to the jury that the purchasers of YKK's zippers would have acted differently requires some kind of methodology

---

[156] See Cockrell Rep. ¶¶ 46-50, 52-53 (ECF No. 368-1) (emphasis added).

[157] In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (citation omitted).

[158] See Snyder v. Wells Fargo Bank, N.A., 2012 WL 4876938, at *4 (S.D.N.Y. Oct. 15, 2012) (preventing an expert to give a summation of evidence from the witness stand).

[159] Cockrell Rep. ¶¶ 56-59, 66-74 (ECF No. 368-1).

[160] Cockrell Rep. ¶¶ 56-59, 66-74 (ECF No. 368-1) (emphasis added).

other than conjecture.[161] Perhaps Cockrell could testify that *he* would have only purchased Uretek-laminated zippers from YKK, but he cannot because he in fact has continued to use YKK-laminated zippers in the high end outerwear market.[162]

As for the portions of his opinion that comb through various internal documents, this testimony is also inadmissible. Just like his review of internal YKK documents in his fourth opinion, Cockrell's testimony here is nothing more than disguised argument from Plaintiffs' attorneys. It is excluded.[163]

## III.   Defendants' Motion to Exclude Donohue

James J. Donohue is an accountant who has authored Plaintiffs' damages report. In his report, he determines Plaintiffs' lost profits and disgorgement measure of damages by looking at YKK's actual sales into unlicensed, and therefore infringing, markets. Defendants move to exclude portions of his report, arguing: (1) he relies on Cockrell's unreliable definition of "high end outerwear" and lack of a non-infringing alternative; (2) his damages calculations rely on an unreliable causation assumption; (3) he relies upon a non-representative sample of sales to some companies to reach conclusions regarding all of YKK's customers; and (4) he relies upon unreliable sales data cataloguing YKK's luggage sales. These arguments are unavailing.

---

[161] Accord Tovey v. Nike, Inc., 2014 U.S. Dist. LEXIS 93905, at *24-25 (N.D. Ohio Apr. 2, 2014) (excluding expert testimony to consumer confusion not based on a consumer survey because there was no "reliable support for her conclusion, [and the] . . . opinion amounts to 'only speculation, which is generally inadmissible'").

[162] See Cockrell Dep. 23:10-25:4 (ECF No. 368-7).

[163] Accord In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (citation omitted); see also Snyder v. Wells Fargo Bank, N.A., 2012 WL 4876938, at *4 (S.D.N.Y. Oct. 15, 2012).

### A.  Reliance on Cockrell

Defendants move to exclude Donohue's lost profits analysis because, they argue, it is based on the inadmissible testimony from Cockrell regarding the definition of "high end outerwear" and the existence of non-infringing alternative products.[164] But Cockrell's opinions are not excluded, and so the motion is moot. This motion is denied.[165]

### B.  Donohue's Causation Opinions

Defendants argue that Donohue's lost profit conclusions do not justify his belief that "but for" YKK's actions, Uretek would have laminated millions more meters of zippers for YKK. Defendants' challenge goes to the weight, not the admissibility, of Donohue's opinion. One permissible means of proving lost profits under patent law is to establish: (1) the demand for the zippers; (2) the absence (or effect of) acceptable, non-infringing alternative products; (3) Plaintiffs' manufacturing capacity to exploit the demand; and (4) the gross profits Plaintiffs would have realized.[166] That is exactly the mode of Donohue's analysis. He first accepts the premise that there were no non-infringing alternatives based on Cockrell's testimony, which is admissible for the reasons discussed above. He then comes up with the demand for the zippers, Plaintiffs' manufacturing profits, and the resulting gross profits based on data. Defendants may believe that this could never have happened because Uretek's lamination-costs were too high, but this does not render his opinion inadmissible; given YKK's large profit margin on the zippers, it is not unreasonable for Donohue to conclude that YKK could have maintained sales volume

---

[164] Defs.' Daubert Memo. at 19 (ECF No. 367).

[165] Furthermore, Donohue's analysis would not necessarily be inadmissible even if Cockrell's opinion was excluded. An expert may rely on otherwise inadmissible testimony. See Deflecto, LLC v. Dundas *Jafine Inc., 2015 WL 6755318, *3 (W.D. Mo. 2015).

[166] Mentor Graphics Corp. v. EVE-USA, Inc., 851 F.3d 1275, 1285 (Fed. Cir. 2017) (citing Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978)).

while losing some of its margin to Uretek's higher lamination costs. Thus, Defendants may present this theory to the jury through cross-examination or in rebuttal, but Donohue's opinion is not inadmissible.[167]

### C.  Donohue's Statistical Sampling and Extrapolation

Defendants move to exclude Donohue's estimate of water-resistant zippers sold by YKK into the high end outerwear market, arguing that he used a nonrandom and unreliable sampling method. Because Donohue has a basis for concluding that his data was representative of all customers, this argument goes to weight and not admissibility. The motion is denied.

YKK did not track zipper sales into the "high end outerwear market" as defined in the licensing agreement.[168] Donohue nevertheless constructed an estimate of those sales using two data sets, one from YKK and one from YKK's customers. He first identified a possible universe of high end outerwear sales by looking at YKK's customer segment and zipper use data. He focused on sales to customers identified as "high-function" or "functional," which YKK defined as those who produce goods with a functional purpose, including outdoor and sports apparel.[169] He then identified the subset of sales to those customers that YKK tagged with a usage code associated with outerwear.[170] This process identified 77.7 million meters of zippers sold to

---

[167] The parties offer some slight argument that Donohue's testimony may or may not be relevant for Plaintiffs' theory of lost profits for breach of contract, especially for any damages after October 31, 2014. Given how lightly briefed this question is, a motion limiting Donohue's testimony regarding breach of contract is denied without prejudice at this time. Accord In re Scotts EZ Seed Litig., 2017 U.S. Dist. LEXIS 125621, at *44-45 (S.D.N.Y. Aug. 7, 2017).

[168] See Donohue Rep. ¶ 72 (ECF No. 386-3).

[169] See Donohue Rep. at 36 (ECF No. 386-3). During the relevant period, YKK went from classifying its customers into four market segment to nine market segments. See id. The "Hi-Function" customers were reclassified as "Functional," but the category's definition does not appear to have changed. See id.

[170] See Donohue Rep. ¶¶ 90-1 (ECF No. 386-3).

functional customers for use in outerwear.[171] Donohue then relied on Cockrell's analysis of

product information provided in discovery by YKK's customers. Plaintiffs were able to obtain

that information for twelve customers (the "Discovery Customers") who accounted for roughly

30% of YKK's water-resistant zipper sales.[172] Using Cockrell's determination of which products

constituted high end outerwear, Donohue then concluded that 56% of YKK's sales to the

Discovery Customers went into high end outerwear.[173]

      Aside from Donohue's reliance on Cockrell's opinion, Defendants do not object to

Donohue's conclusions with regard to the Discovery Customers. Instead, Defendants object to

Donohue's extrapolation from that data to conclude that 56% of all functional outerwear sales

went into high end outerwear. They argue that he has no basis for assuming that the Discovery

Customers were representative of YKK's other customers.

      Defendants are correct that an expert cannot extrapolate from a nonrandom sample

without a reason to believe the sample is in fact representative of the whole population.[174] But

Donohue does offer a justifiable reason: all of the customers were identified as "functional," and

they all purchased the same water-resistant zippers for use in outerwear.[175] In addition to that

similarity, he reviewed the overall product mix of both sets in order to be sure that the "zipper

---

[171] See Donohue Rep. at 50 (ECF No. 386-3).

[172] Donohue's report identifies twelve discovery customers: Berghaus, Columbia, Harley Davidson, Helly Hansen, Marmot, Montbell, Mountain Hardwear, Nike, the North Face, Patagonia, Spyder, and Under Armour. Donohue Rep. at 51 (ECF No. 386-3). Since then, Plaintiffs have received product data from Arc'teryx. See Donohue Dep. 114:9-115:3 (ECF No. 368-9). For the purposes of this opinion, I will only discuss the data produced in Donohue's report.

[173] See Donohue Rep. at 52.

[174] See, e.g., Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co., 650 F. Supp. 2d 314, 320 (S.D.N.Y. 2009) (excluding opinion that transshipping occurred in same proportion outside of the studied sales territories because expert offered no basis for assumption that the studied sales territory was representative).

[175] See Donohue Rep. ¶¶ 114, 119 (ECF No. 368-3).

pricing and product mix . . . were also similar."[176] His conclusion, therefore, is not the kind of statistical junk science that courts have excluded under Daubert.[177]

Unless the movant can show a reason that the assumption of representativeness is unsound, courts routinely allow experts to extrapolate from a nonrandom sample.[178]  Because Defendants have not shown that his assumption is unsound or that his sample is in fact unrepresentative, the motion is denied.[179]

### D.  Donohue's Lost Profits Estimates for Luggage

Finally, Defendants argue that Donohue's calculation of lost profits for the luggage market are unreliable. Donohue looked at YKK's internal data, which tagged certain sales as luggage or "sports." He then looked at zipper sales for luggage while excluding sales with the "sports" tag. Defendants argue this was unreliable because he did not engage in any further

---

[176] Donohue Rep. ¶ 114 (ECF No. 368-3); see also id. ¶¶ 119 ("This approximation also considered the many similarities between these two groups of customers.").

[177] See, e.g., Pepsi Cola Co., 650 F. Supp. 2d at 320 (S.D.N.Y. 2009).

[178] Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 968-70 (9th Cir. 2013) (finding it was not error to admit expert who used data from Juneau's rental car market, which constituted 5% of the statewide market, to reach conclusions regarding Alaska's rental car market because the "expert gave reasons for his use of all these comparisons, such as by pointing out the clarity with which the Juneau market could be examined"); In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig, 984 F. Supp. 2d 1021, 1032-1033 (C.D. Ca. 2013) (dismissing argument that sample of loans was nonrandom and unreliable because "the loan sample and the replacement loan sample were tested against the SLG population on eleven variables to ensure that the samples accurately represented the SLG population"); Abrams v. Ciba Specialty Chems. Corp., 2010 U.S. Dist. LEXIS 19157, at *34 (S.D. Ala. Mar. 2, 2010) (rejecting argument that sampling was not random because expert's sampling was consistent with "specific standard US Environmental Protection Agency methods" and because movant offered no reason why the nonrandom sampling was "inconsistent with accepted scientific methodology").

[179] They have not, for example, offered any statistical metrics—such as an estimated confidence interval—to demonstrate that his methodology is statistically unsound and should be excluded. Contra Chavez v. IBP, Inc., 2004 U.S. Dist. LEXIS 28838, at *33-34 (E.D. Wash. Dec. 8, 2004) (finding expert testimony was based on unreliable sampling after rebuttal expert offered credible testimony that "because of the small sample size, the numbers were overly malleable, depending upon what midpoint was chosen").

testing of whether those sales were in fact used for luggage and not sports bags. This argument is unavailing. Defendants offer no reason to believe that that their own internal data tags were inaccurate or were used in a fashion that differed from the definitions used in the licensing agreement. At some point experts, like all people, must make some epistemological assumptions, and it is not *per se* unreliable to use YKK's internal sales data coding. If Defendants have evidence or argument that this sales data is unreliable, then that goes to the weight, not the admissibility.

## CONCLUSION

For the reasons discussed above, both Plaintiffs' and Defendants' <u>Daubert</u> motions are granted in part and denied in part. The Clerk of the Court is respectfully requested to terminate the motions at ECF Nos. 359, 361, 366, and 401.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

Dated: March 19, 2019
       New York, New York