USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/31/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

AU NEW HAVEN, LLC, and TRELLEBORG
COATED SYSTEMS US, INC.,

                                   Plaintiffs,                          1:15-cv-3411-GHW-SN

                    -against-                                           MEMORANDUM OPINION
                                                                        AND ORDER

YKK CORPORATION et al.,

                                   Defendants.

---------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................................. 1

DISCUSSION .............................................................................................................................. 6

I. Validity of the '214 Patent .......................................................................................... 6

   A. Enablement ........................................................................................................... 7

   B. Inventorship ......................................................................................................... 10

   C. Written Description ............................................................................................ 12

   D. Definiteness ......................................................................................................... 13

   E. On-Sale Bar ......................................................................................................... 15

   F. Obviousness ........................................................................................................ 16

II. Breach of Contract ...................................................................................................... 17

   A. Law Governing the Exclusive Licensing Agreement .................................. 18

   B. The ELA Is Unambigous: It Is a License; Not A Covenant Not to Compete .... 20

   C. Breach of the Implied Covenant of Good Faith and Fair Dealing ............ 23

   D. Breach of Contract Claim against YKK Corp.'s Affiliates ........................ 28

III. Validity of Foreign Patents ......................................................................................... 28

IV. Fraudulent Inducement .............................................................................................. 29

V. Infringement ................................................................................................................. 30

VI. Equitable Estoppel ...................................................................................................... 31

VII. Exhaustion .................................................................................................................... 32

VIII. Lost Profits Remedy for Patent Infringement ........................................................ 32

IX. Lost Profits Remedy for Breach of Contract .......................................................... 33

X. Lanham Act ................................................................................................................... 34

XI. Connecticut Unfair Trade Practices Act ................................................................. 36

CONCLUSION ........................................................................................................................... 38

Those zippers on your jackets represent a multi-billion dollar industry. This case is about one particular zipper that has a tight grip on the waterproof zipper market. Plaintiffs hold the patent to a water-resistant zipper, and the Defendants have an exclusive "field of use" license. This litigation challenges, among other things, the patent's validity, the scope of Defendants' use of the patent, and whether Defendants owe Plaintiffs lost profits.

## BACKGROUND

The parties have submitted a thorough statement of undisputed material facts ("SUMF") pursuant to local rule 56.[1] Rather than review the entire statement, the Court has adopted the parties' admissions and will address any disputes of material fact as they are relevant to each motion for summary judgment. The relevant background to the case is detailed below.

The path to this case began in 1995, when Mike Blenkarn met Stuart Press at a trade show.[2] Blenkarn, who was an employee of Arc'teryx Equipment at the time,[3] was trying to make a water-resistant zipper by laminating the zipper with polyurethane.[4] He had already laminated some reverse coil zippers—*i.e.*, a zipper facing the inside of the garment—using a hot pad.[5] But the polyurethane either flaked off or made the zippers too stiff,[6] so Blenkarn went looking for someone at the trade show who could satisfactorily laminate a zipper.[7] That is when Blenkarn found Press.[8]

---

[1] See ECF No. 406.

[2] SUMF ¶ 35 (citing Blenkarn Dep. 25:15-26:15 (ECF No. 406-17)).

[3] SUMF ¶ 28 (citing Blenkarn Dep. 7:15-10:4 (ECF No. 406-17)).

[4] See Blenkarn Dep. 16:1-12, 18:19-19:9, 21:16-22 (ECF No. 406-17).

[5] SUMF ¶ 29 (citing Blenkarn Dep. 26:19-28, 50:16-24 (ECF No. 406-17)).

[6] SUMF ¶ 34 (quoting Blenkarn Dep. 27:6-12 (ECF No. 406-17)). Defendants dispute whether Blenkarn testified that his results were not "successful," but they do not dispute that he had these problems with the zippers he laminated. See id.

[7] Blenkarn Dep. 29:6-15 (ECF No. 406-17)).

[8] SUMF ¶ 36 (citing Blenkarn Dep. 29:6-30:24 (ECF No. 406-17)).

At that time, Press operated Uretek, Inc. along with Harold Hoder. He had never attempted to laminate a zipper before he met Blenkarn.[9] But he did have expertise in the lamination of fabrics,[10] and he told Blenkarn that he could laminate the zipper with polyurethane.[11] True to his word, Press was able to laminate the zipper to Blenkarn's satisfaction,[12] and Arc'teryx began sending zippers to Uretek for lamination.[13]

The zippers that Arc'teryx sent to Uretek for lamination were purchased from YKK Canada, Inc., a subsidiary of the Japanese zipper manufacturer YKK Corp.[14] In November 1998, Arc'teryx requested a meeting with Uretek and YKK to encourage YKK to work directly with Uretek to manufacture a water-resistant zipper.[15] Approximately six representatives from YKK attended that meeting along with Blenkarn and Tom Herbst on behalf of Arc'teryx and Press on behalf of Uretek.[16] During that meeting, Press told the attendees that he had applied for the patent that would eventually become the approved '214 Patent, and YKK expressed strong interest in his water-proofing process.[17]

That meeting began a relationship between Uretek and YKK that culminated in an exclusive output contract between Uretek and YKK USA.[18] Under the agreement, which was executed on

---

[9] SUMF ¶ 358 (citing Press 8/3/16 Dep. 71:23-72:7 (ECF No. 406-299)).

[10] For instance, in 1995 Press applied for—and ultimately received—a patent for a process for preparing a polyurethane coated fabric. See '766 Patent (ECF No. 406-34).

[11] SUMF ¶ 36 (citing Blenkarn Dep. 29:6-30:24 (ECF No. 406-17)).

[12] See SUMF ¶ 41 (citing Blenkarn Dep. 52:16-23 (ECF No. 406-17)).

[13] See SUMF ¶ 53 (citing Ex. 21 at YKK0295648 (ECF No. 406-21)).

[14] See SUMF ¶ 53 (citing Ex. 21 at YKK0295648 (ECF No. 406-21)). YKK Corp. and its affiliates are hereafter referred to collectively as YKK.

[15] See SUMF ¶ 46 (citing Ex. 21 at YKK0295648 (ECF No. 406-21)).

[16] Id.

[17] See SUMF ¶¶ 48-50 (ECF No. 406); see also '214 Patent (ECF No. 406-35) (indicating Stuart Press filed the patent application on September 25, 1998).

[18] SUMF ¶ 1 (citing Exclusive Output Contract (ECF No. 406-2)).

August 11, 1999, Uretek agreed to laminate zippers exclusively for YKK USA in exchange for an upfront payment as well as a guaranteed minimum annual order.[19] The agreement expired on July 31, 2004.[20] Although the agreement was never renewed, YKK USA continued to pay Uretek to laminate its T4 and T5 zippers for many more years.[21]

Before the output contract expired in 2004, YKK became concerned that the Uretek-laminated T4 and T5 zippers were not competitive in the Asian market due to higher prices and longer lead times.[22] In response to that concern, YKK Corp. entered into an exclusive licensing agreement (the "ELA") with Press and Hoder, the owners of the recently issued '214 Patent.[23] In exchange for a $0.03 per meter royalty, the ELA gives YKK the exclusive right to manufacture and sell zippers covered by the '214 and related foreign patents with one exception: the ELA does not convey a license to use the patents "for zippers placed in finished goods in the high end outerwear, marine, military and luggage (excluding sports bags and cosmetic bags) markets."[24]

Following the ELA's execution, sales of YKK's water-resistant zippers increased substantially.[25] During that time, YKK paid the $0.03 per meter royalty for all of the YKK-laminated T8, T9, and T10 AquaGuard zippers.[26] But in 2006, Press came to believe that YKK was selling

---

[19] Exclusive Output Contract § IV. (ECF No. 406-2).

[20] SUMF ¶ 302 (ECF No. 406).

[21] See SUMF ¶¶ 330-1 (ECF No. 46).

[22] See SUMF ¶¶ 303-5 (ECF No. 46). Plaintiffs dispute whether the T4 and T5 zippers were in fact not competitive, but they do not dispute that the price and lead time was a concern of YKK's. See id.

[23] See SUMF ¶ 2 (citing ELA (ECF No. 406-3)). The '214 Patent was originally issued to Press alone. See '214 Patent at YKK0000003 (ECF No. 406-35). Press later assigned the '214 Patent to both himself and Harold Hoder. See id. ¶ 24. Later, in June 2006, they assigned the '214 Patent to Uretek. See id. ¶¶ 25-6.

[24] ELA § 1 (ECF No. 406-3).

[25] Combined sales of the T4, T5, T7, T8, T9, and T10 zippers increased from 2,559,000 in 2002 to 10,100,000 in 2006. See SUMF ¶ 319 (ECF No. 406). Although Plaintiffs dispute that their expert calculated these numbers, they do not dispute that the numbers are accurate. See id.

[26] See SUMF ¶ 320 (ECF No. 406).

these zippers into the unlicensed markets.[27] Nevertheless, Uretek and YKK attempted to negotiate a resolution while they continued business as usual,[28] with YKK paying the royalty for the zippers it laminated as well as paying Uretek to laminate the T4 and T5 zippers.[29]

Ultimately, they were unable to resolve the dispute amicably. In July 2014, Uretek was purchased by Trelleborg Coated Systems US, Inc.[30] Trellborg and Uretek—which changed its name to Au New Haven, LLC—then initiated this suit in May 2014.[31] In the operative complaint, Plaintiffs have sued for infringement of the '214 Patent, breach of the ELA, deceptive marketing under the Lanham Act, and deceptive practices under the Connecticut Unfair Trade Practices Act.[32] In response, Defendants—who are comprised of YKK Corp. and several of its local subsidiaries— assert a variety of defenses, including that: (1) Plaintiffs' patents are invalid; (2) many of the YKK-laminated zippers do not infringe on Plaintiffs' patents; (3) the ELA does not prohibit sales of patented zippers into the unlicensed markets; and (4) in the alternative, Plaintiffs cannot prove that they are entitled to their claimed damages.[33] Both parties have cross-moved for summary judgment on an assortment of these claims and defenses.[34]

---

[27] See SUMF ¶ 321 (citing Press 8/3/16 Dep. 240:14-18 (ECF No. 406-1)).

[28] See SUMF ¶¶ 321, 324-25, 329 (ECF No. 406).

[29] See SUMF ¶¶ 331-33 (ECF No. 406).

[30] See SUMF ¶¶ 334-36 (ECF No. 406).

[31] See Compl. (ECF No. 1).

[32] See Am. Compl. ¶¶ 62-95 (ECF No. 90).

[33] See generally Answer (ECF No. 123).

[34] See Pls.' Mot. Summ. J. (ECF No. 362). Defendants have not filed a cross motion on the docket, but have instead indicated that they are cross moving in their memorandum of law. See Defs.' Mem. at 4 (ECF No. 382).

## LAW GOVERNING SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[35] The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict."[36] The moving party bears the initial burden of establishing that there are no material facts in dispute and must provide "affirmative evidence" from which a factfinder could return a verdict in its favor.[37] Then "the burden shifts to the non-movant to point to record evidence creating a genuine issue of material fact."[38] The "trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."[39]

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party.[40] Summary judgment is improper if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party . . . ."[41] To create a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits

---

[35] Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[36] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

[37] Id. at 257.

[38] Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006).

[39] Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224 (2d Cir. 1994).

[40] See Scott v. Harris, 550 U.S. 372, 378 (2007).

[41] Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

supporting the motion are not credible . . . ."[42] Instead, the response "must set forth specific facts

demonstrating that there is a genuine issue for trial."[43]

## DISCUSSION

### I.    Validity of the '214 Patent

Plaintiffs' first cause of action is for patent infringement under 35 U.S.C. § 271.[44] They allege

that YKK either directly infringed or induced others to infringe on the '214 Patent "by importing,

making, using, offering to sell, and/or selling within or into the United States zippers containing the

invention claimed in the '214 Patent."[45] Defendants have counterclaimed that the '214 Patent is

invalid,[46] a claim which they must prove with clear and convincing evidence.[47] The parties have cross

moved for summary judgment on two bases for invalidity: inventorship and enablement.[48] Plaintiffs

have also moved for summary judgment on four other bases: written description, definiteness,

anticipation, and obviousness.[49]

---

[42] Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

[43] Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).

[44] See Am. Compl. ¶¶ 62-67 (ECF No. 90). This claim pertains only to sales within the United States. See id. Plaintiffs' claims regarding sales outside of the United States are based entirely on the theory of breach of the ELA. See id. ¶ 70.

[45] Am. Compl. ¶ 63 (ECF No. 90). Plaintiffs allege that a wide variety of YKK-manufactured zippers infringe on the '214 Patent, including: "all AquaGuard® and AquaGuard® Conceal® zippers (other than AquaGuard® Vislon® zippers) including any of the following zippers; all AquaCheat® zippers (other than 5 VS/VZ PU, 5 SG/SGW PU, 3 CF/CM PU, and 5 CNF/CNM PU) including any of the following zippers; and all zipper types including any of the CNFMR, CFT, CNT, CCT, CND, CFD, RCPU, CFDG, CNDG, and CHT designations." Id.

[46] See Answer at 24 (ECF No. 24). Defendants also allege that the foreign patents are invalid, but that is only a defense to the breach of contract claim. See id.

[47] Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 97 (2011) ("Under the Federal Circuit's reading of § 282, a defendant seeking to overcome this presumption must persuade the factfinder of its invalidity defense by clear and convincing evidence.").

[48] See Pls.' Mem. at 6-13, 17-19 (ECF No. 363); Defs.' Mem. at 14-27 (ECF No. 382).

[49] See Pls.' Mem. at 25-34 (ECF No. 363).

Because Defendants have not offered evidence that Uretek made a commercial offer of sale prior to 1998, Plaintiffs' motion for summary judgment on Defendants' anticipation theory of invalidity is granted. Similarly, because no reasonable jury could find that Blenkarn was a co-inventor of the '214 patent, Plaintiffs' motion with respect to Defendants' claims of invalidity on that basis is granted. As for the other claimed basis of invalidity of the patent, there are disputes of material fact that preclude the entry of summary judgment for any party.

## A. Enablement

The parties have cross moved on Defendants' theory that the '214 Patent is invalid due to a lack of enablement. Because there are genuine disputes of fact material to the question of enablement, both motions are denied.

Enablement is a key "part of the *quid pro quo* of the patent bargain,"[50] which seeks "to put the public in complete possession of the invention . . . [so that] its benefits may be fully enjoyed by the public, after the patent expires."[51] To "be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation."[52] The Federal Circuit has identified eight factors—known collectively as the Wands factors—that are helpful for assessing enablement: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working

---

[50] Sitrick v. Dreamworks, LLC, 516 F.3d 993, 999 (Fed. Cir. 2008).

[51] Evans v. Eaton, 20 U.S. 356, 418 (1822); see also 35 U.S.C. § 112, ¶ 1 ("The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.").

[52] ALZA Corp. v. Andrx Pharms., LLC, 603 F.3d 935, 940 (Fed. Cir. 2010) (emphasis added; internal quotation marks omitted). This assessment is done from the perspective of one skilled in the art at the time the patent application was filed. See In re Brana, 51 F.3d 1560, 1567 n.19 (Fed. Cir. 1995).

examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims.[53]

Defendants' theory is based on the '214 Patent's omission of some manufacturing parameters. The '214 Patent lays claim to a water-resistant zipper that has "excellent adhesion strength and resistance to abrasion while maintaining a flexible, soft, and supple closure . . . [which] cannot practically be done using conventionally applied coatings or films . . . ."[54] The patent specifies two possible methods for manufacturing such a zipper, one lamination and one transfer lamination method.[55] But it also omits some key parameters. It does not specify the temperature, speed, or pressure to be used during lamination,[56] and it does not identify a specific material to be used as stringer-tape.[57] Defendants' expert witness, Dr. Meirowitz, believes that those missing specifications are crucial to enablement.[58] In his report, Dr. Meirowitz testifies that each of these variables—the process, the process parameters, and the fabric—interact in a dynamic way such that one skilled in

---

[53] In re Wands, 858 F.2d 731, 737 (Fed. Cir. 1988).

[54] SUMF ¶ 339 (quoting '214 Patent at 3:37-50 (ECF No. 406-281)).

[55] See '214 Patent at 5:8-6:11 (ECF No. 406-35); see also Meirowitz Invalidity Rep. ¶ 71 (ECF No. 406-291) ("The specification describes in general terms examples of lamination and transfer lamination processes at column 5, line 29 through column 6, line 11 and in Figures 2 and 4.").

[56] See SUMF ¶¶ 343-44 (ECF No. 44).

[57] The patent does specify that a woven fabric is preferable, but it also lists several other suitable alternatives. See '214 Patent at 7:7-11 (ECF No. 406-35) ("Stringer tapes . . . in accordance with the present invention are typically provided from a woven or non-woven fabric, preferably a woven fabric, and may suitably be provided from materials such as polyester yarn, nylon yarn, aramid yarn, and the like.").

[58] See Meirowitz Invalidity Rep. ¶ 69 (ECF No. 406-291) ("[O]ne of ordinary skill in the art would have to know at a minimum (1) the temperature, pressure, and speed parameters to be used to apply the water resistant layer to the stringer tapes for the particular process used, (2) the specific type of stringer tape material, and (3) the specific type of material to be applied to the stringer tapes to form the water resistant layer."); id. ¶ 72 ("For a given process type, there are several process parameters that directly impact adhesion strength for a given stringer tape material and a given water resistant layer material, including, without limitation: oven temperature, roller temperature, line speed (e.g. dwell time), application pressure (e.g. nip roller pressure, knife pressure, knife angle,…), use of bonding agents, type of bonding agents, concentration of bonding agents, etc.").

the relevant art would have to engage in lengthy and costly experimentation to replicate the described zipper.[59]

Plaintiffs do not dispute that the '214 Patent's specification omits some important parameters.[60] Instead, they argue that one of Press's earlier patents—the '766 Patent—discloses the missing parameters.[61] That patent, which is cited in the '214 Patent as relevant prior art,[62] describes a process for coating fabric with polyurethane.[63] It also specifies some of the parameters missing in the '214 Patent, including temperature and timing.[64] Dr. Meirowitz does not dispute that someone skilled in the art would have been familiar with this patent.[65]

It is impossible to resolve this dispute on summary judgment. The evidence shows that one skilled in the art would have had to engage in some experimentation in order to practice the '214

---

[59] See SUMF ¶ 600 (quoting Meirowitz Invalidity Rep. ¶ 84 (ECF No. 406-291)) ("[The materials and parameters] all interact, meaning one cannot optimize them individually and just take the optimized value for each and set the machine to that[.] One will need to determine what balance of the three process parameters gives the desired product performance.").

[60] It is beyond dispute that the '214 Patent omits these parameters. See SUMF ¶ 344 (quoting Press 4/28/17 Dep. 151:11-24 (ECF No. 406-286)). It is also beyond dispute that these parameters affect the water-resistant layer's level of adhesion. See SUMF ¶ 343 (quoting Press 4/28/17 Dep. 145:12-24 (ECF No. 406-285)) ("Q. You identified a number of characteristics, the heat, the pressure, the speed with respect to the lamination process that were all variables with respect to the bonding strength, is that correct? A. That's correct. Q. And you have answered, I think accurately, that those methods and those characteristics are not described in the '214 specification, correct? A. Correct.").

[61] Press, for example, testified that "the methodology to get the adhesion [in the '214 Patent] is explained in [the '766] patent." SUMF ¶ 75 (quoting Press 4/28/17 Dep. 137:24-138:14 (ECF No. 406-36)).

[62] SUMF ¶ 74 (citing '214 Patent at YKK0000003 (ECF No. 406-34)).

[63] See '766 Patent (ECF No. 406-34).

[64] See, e.g., '766 Patent at 5:27-34 (ECF No. 406-34) ("At curing station 78, polyurethane coated fabric . . . is subjected to an increased heat . . . most preferably to a temperature of between about 375° F to about 380° F. The curing step is preferably carried out for a short period of time, preferably about 3 to 6 minutes.").

[65] See SUMF ¶ 76 (quoting Meirowitz Dep. 22:22-23:1 (ECF No 406-37)).

Patent. But the Patent Act allows for some experimentation so long as it is not undue,[66] and there *is* a dispute of fact regarding the amount and reasonableness of necessary experimentation.[67] Resolution of that dispute will require a trial.

## B. Inventorship

Under the Patent Act, a person is "entitled to a patent unless he did not himself invent the subject matter sought to be patented.[68] If a person is not in fact an inventor, or if a joint inventor is not named in the patent application, then the patent is not valid under the Act. Defendants assert several counterclaims and affirmative defenses based on this requirement, arguing that Blenkarn is an undisclosed joint inventor of the '214 Patent. The parties have cross moved for summary judgment on the question of inventorship. Plaintiffs' motion for summary judgment is granted; Defendants' motion is denied.

"Because the issuance of a patent creates a presumption that the named inventors are the true and only inventors . . . the burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence."[69] To prove that Blenkarn was a co-inventor, Defendants must establish that Blenkarn "(1) contribute[d] in some significant manner to

---

[66] Cephalon, Inc. v. Watson Pharm., Inc., 707 F.3d 1330, 1336 (Fed. Cir. 2013) ("[A]lthough experimentation must not be undue, a reasonable amount of routine experimentation required to practice a claimed invention does not violate the enablement requirement.") (citation omitted).

[67] For example, one of YKK's engineers looked at the '766 Patent in 1999 and concluded that he could replicate Uretek's zipper if he had "three to six months and a few thousand dollars." SUMF ¶ 79 (citing Ex. 39 (ECF No. 406-39)). Dr. Meirowitz believes that a few thousand dollars was an underestimate and that, in any event, three to six months and a few thousand dollars was an undue amount of experimentation. See SUMF ¶ 76 (citing Meirowitz Dep. 24:15-17 (ECF No. 406-230)). That amount of experimentation is not, however, so excessive that it is per se undue under the Patent Act. Compare with Cephalon, Inc., 707 F.3d at 1339 ("This court has held that experimentation was unreasonable, for example, where it was found that eighteen months to two years' work was required to practice the patented invention.") (citing White Consol. Indus., Inc. v. Vega Servo–Control, Inc., 713 F.2d 788, 791 (Fed. Cir.1983)).

[68] 35 U.S.C. § 102(f) (2000). That section of the act has since been amended, and the inventorship requirement now resides in 35 U.S.C.A. § 116 (2018).

[69] Gen. Elec. Co. v. Wilkins, 750 F.3d 1324, 1329 (Fed. Cir. 2014).

the conception or reduction to practice of the invention, (2) ma[de] a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) [did] more than merely explain to [Press] well-known concepts and/or the current state of the art."[70]

Defendants' argument for co-inventorship rests entirely on the claim that Blenkarn invented the structure of the zipper described in the '214 patent.[71] But Defendants never specify exactly which aspects of the structure they believes represent Blenkarn's contribution to the invention. Defendants point to the language of Claim 1 and state that every aspect of the claim—other than the specifications of the adhesion level of the water resistant layer—is attributable to Blenkarn. But Defendants fails to note exactly what aspects of that claim they believe represent Blenkarn's novel contributions to the invention. At best, the Court can surmise that Defendants intend to argue that it was Blenkarn's idea to apply a water resistant layer to the zipper which represents his alleged contribution.

Defendants' primary evidence that Blenkarn was a co-inventor is testimony from Press that Blenkarn gave him a "prototype" of a reverse coil, coated zipper during the 1995 trade show.[72] Plaintiffs dispute that this act ever happened, but argues that even if it is true, Blenkarn's contributions merely conveyed the state of the art to press. For instance, Plaintiffs point to several of YKK's earlier patents for putatively water-resistant reverse coil zippers have a structure that is remarkably similar to the '214 Patent.[73] On reply, Defendants fail to address this argument or to

---

[70] In re VerHoef, 888 F.3d 1362, 1366 (Fed. Cir. 2018), as amended (May 7, 2018).

[71] See Defs.' Mem. at 24 (ECF No. 382).

[72] See Defs.' Mem. at 24 (ECF No. 382).

[73] See SUMF ¶ 501 (citing ECF Nos. 406-137, 406-138, 406-139).

point to any evidence suggesting that the general "structure" of the '214 patent represented anything other than the current state of the art.

Furthermore, Blenkarn himself does not claim to be a co-inventor of the '214 Patent. In cases where a putative co-inventor challenges the validity of a patent on the grounds that he was not listed as a co-inventor, courts have consistently held that the alleged co-inventor must offer evidence beyond his testimony to corroborate his claim.[74] Here, Blenkarn has specifically disavowed any claim that he is a co-inventor.[75] Although the Court does not find that it is impossible for Defendants to prove co-invention under these circumstances, a natural corollary from the cases requiring corroboration of an alleged co-inventor's testimony is that in the absence of any assertion of co-invention by Blenkarn, the burden on Defendants in challenging inventorship is particularly high. Defendants' vague "prototype" evidence—which fails to identify specific and substantial elements of the invention allegedly contributed by Blenkarn—simply cannot meet the standard of clear and convincing proof. Plaintiffs' motion for summary judgment on this claim is granted.

## C. Written Description

Under the Patent Act, the written description of a patent must be definite enough "so that the public will know what it is and that he or she has truly made the claimed invention."[76] Whereas the purpose of an enabling specification is to enable the public to practice the invention upon the patent's expiration, the purpose of the written description requirement is to curtail "claims . . . that

---

[74] See, e.g., Ferring B.V. v. Allergan, Inc., 166 F. Supp. 3d 415, 419 (S.D.N.Y. 2016) (citing Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1358 (Fed. Cir. 2004)).

[75] See SUMF ¶ 44-45.

[76] Abbvie Deutschland GmbH & Co. v. Janssen Biotech, Inc., 759 F.3d 1285, 1298 (Fed. Cir. 2014) (citation omitted).

have not been invented, and thus cannot be described."[77] Defendants have alleged that the '214

Patent is invalid because the specification is too indefinite, and Plaintiffs move for summary

judgment with respect to that defense.[78]

There are disputes of material fact that preclude summary judgment. To satisfy the written

description requirement, the specification "must clearly allow persons of ordinary skill in the art to

recognize that the inventor invented what is claimed."[79] Dr. Meirowitz has offered an admissible

opinion that the '214 Patent specifications would not permit a person of ordinary skill in the art to

conclude that Press controlled the claimed subject matter.[80] Dr. Meirowitz's opinion alone is

sufficient to defeat summary judgment on this issue. Plaintiffs cite to evidence that they assert

discredits that opinion testimony, but such credibility determinations are for the finder of fact.[81]

Thus, summary judgment as to this issue is denied.

### D. Definiteness

Under the Patent Act, a patent is invalid if "its claims, read in light of the specification

delineating the patent, and the prosecution history, fail to inform, with reasonable clarity, those

skilled in the art about the scope of the invention."[82] This is necessary so that the public knows what

---

[77] Id. (citation omitted). This distinction between a definite written description and an enabling description is, however, controversial. See, e.g., Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1360-72 (Fed. Cir. 2010) (Rader, J., dissenting).

[78] See Pls.' Mem. at 19-21 (ECF No. 363).

[79] In re Oxycontin Antitrust Litig., 994 F. Supp. 2d 367, 382 (S.D.N.Y. 2014) (quoting Ariad Pharms., 598 F.3d at 1351).

[80] SUMF ¶ 415 (citing Meirowitz Invalidity Rep. ¶¶ 94, 99, 103, 108, 113, 118, 122, 126, 138, 143, 148, 153, 160 (ECF No. 406-291)).

[81] Plaintiffs rely, for example, on the pictures of zippers in the '214 Patent. See SUMF ¶ 85. A reasonable juror could side with Dr. Meirowitz's opinion and conclude that those pictures do not conform to the '214 Patent's claims.

[82] Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 875 F.3d 1369, 1375 (Fed. Cir. 2017) (citing Nautilus, Inc. v. Biosig Instruments, Inc., 134 S.Ct. 2120, 2124 (2014)).

does, and what does not, infringe upon the patent.[83] Defendants argue that the '214 Patent's claims are indefinite because the term "water resistant" does not inform one skilled in the art of the patent's scope with reasonable clarity. Plaintiffs move for summary judgment on that theory.[84]

Genuine disputes of material disputes of fact preclude summary judgment here. In the earlier Markman Order, the Court construed the '214 Patent's use of the term "water resistant" to mean just that: "a water resistant layer on said second surfaces."[85] This construction rejected Defendants' position that "water resistant" should be construed according to a defined metric or test. Dr. Meirowitz believes that this construction is indefinite: he says that the industry would not have any reasonable certainty whether a zipper fell within the '214 Patents' claims because there is no industry-wide standard for claiming "water resistance."[86] Plaintiffs have offered contrary evidence that the degree of water resistance is not what makes the '214 Patent definite. They argue, with evidence, that any zipper that met the '214 Patent's specifications—a zipper with a polyurethane layer matching specific levels of adhesion—falls within the claim. As evidence, they have deposition testimony from Dr. Meirowitz in which he admits that he tested one jacket for water resistance by simply applying water to a jacket and looking for "whether it beaded up on the surface of the zipper."[87] They also have extensive documents and statements from YKK's own employees indicating that, as people in the industry, they had no difficulty assessing the scope of the '214 Patent's claims.[88]

---

[83] See Halliburton Energy Svcs., Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

[84] Pls.' Mem. at 21-24 (ECF No. 363).

[85] Markman Decision at 18 (ECF No. 180).

[86] SUMF ¶ 417 (citing Meirowitz Invalidity Rep. ¶ 369 (ECF No. 406-291)).

[87] SUMF ¶ 90 (quoting Meirowitz Dep. 159:1-12 (ECF No. 406-37))

[88] See SUMF ¶¶ 86-111.

These are genuine disputes of fact that must be resolved by the trier of fact. As a result, summary judgment is denied.

### E. On-Sale Bar

Under the Patent Act, a patent is invalid if "the claimed invention was (1) the subject of a commercial offer for sale; and (2) ready for patenting" more than one year before the patent's effective filing date.[89] Defendants argue that the '214 Patent is invalid because of the on-sale bar. Plaintiffs now move for summary judgment on this defense.

Defendants' case for the application of the on-sale bar defense relies on a zipper prototype from 1996 for which Uretek invoiced Arc'teryx. Defendants do have evidence that this zipper prototype was ready for patenting in Dr. Meirowitz's report.[90] But they have no clear and convincing evidence that the 1996 zippers were offered for a commercial sale. Their only evidence on that front are three invoices from August 1996, September 1997, and November 1997 for a total of $12,539.70.[91] But if "the sale was primarily for experimentation rather than commercial gain, then the sale is not invalidating under § 102(b)."[92] And the undisputed evidence here is that Uretek sent Arc'teryx these zippers and invoices for the primary purpose of experimentation. Press testified that those were invoices for research and development,[93] and both Blenkarn and Herbst of Arc'teryx testified that the product was first offered for sale in 1998 or 1999.[94] Defendants have offered no

---

[89] Medicines Co. v. Hospira, Inc., 827 F.3d 1363, 1368 (Fed. Cir. 2016) (en banc) (citing Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 67-68 (1998)).

[90] See SUMF ¶ 420 (ECF No. 406).

[91] See SUMF ¶ 510 (ECF No. 406).

[92] Electromotive Div. of GMC v. Transp. Sys. Div. of GE, 417 F.3d 1203, 1210 (Fed. Cir. 2005) (citing Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1258 (Fed. Cir. 2001)).

[93] See SUMF ¶ 510 (citing Press 8/3/16 Dep. 143:19-25 (ECF No. 406-131)).

[94] See SUMF ¶ 511 (citing Blenkarn Dep. 63:16-20 (ECF No. 406-127), Herbst Dep. 42:5-17 (ECF No. 406-141)).

contrary evidence, and so they cannot satisfy their burden. Summary judgment is granted in favor of Plaintiffs on Defendants' on-sale bar counterclaim.

## F. Obviousness

Defendants have counterclaimed to Plaintiffs' infringement claims that the '214 Patent is invalid as obvious. Plaintiffs have moved for summary judgment on the counterclaim. Both motions are denied.

To show obviousness, a party must establish by "clear and convincing" evidence that "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious" to a person having ordinary skill in the art at the time of invention.[95] Whether prior art renders a patent claim obvious is a question of law that relies upon consideration of (1) the scope and content of the alleged prior art, (2) differences between the alleged prior art and the asserted claims, (3) the level of ordinary skill in the art, and (4) any relevant objective indicia of nonobviousness.[96] Indicia of nonobviousness include (1) commercial success, (2) industry praise for the patented invention, (3) copying by others, (4) industry skepticism, (5) the existence of a long-felt but unsatisfied need for the invention, and (6) licenses showing industry respect for the invention.[97]

Taken together, this inquiry is factually intensive, and the parties have marshalled competing evidence that reveals disputes of material fact. Plaintiffs primarily rely on extensive evidence of objective indicia.[98] Defendants, by contrast, primarily rely on Dr. Meirowitz's opinion in which he examines prior art and determines that the prior art anticipates the structure and materials of the

---

[95] 35 U.S.C. § 103.

[96] Apple Inc. v. Samsung Elecs. Co., Ltd., 839 F.3d 1034, 1047-48 (Fed. Cir. 2016).

[97] Apple, 839 F.3d at 1052 (citing Graham v. John Deere Co., 383 U.S. 1, 36 (1966)).

[98] See SUMF ¶¶ 125-54 (ECF No. 406).

'214 Patent.[99] He further concludes that it was clear in the prior art that in order to obtain water-resistance high levels of adhesion, abrasion resistance, and flexibility were necessary. Thus, in his view, the '214 Patent essentially took obvious features and simply wrote down specific performance metrics. Plaintiffs argue that his opinions are conclusory and insufficient to make a *prima facie* case, but that is not so; he rather thoroughly goes through the '214 Patent's claims after examining many of the relevant prior process and product patents.[100] Plaintiffs disagree with his conclusion and have their own contrary evidence. The finder of fact will have to weigh the competing evidence.[101]

## II.    Breach of Contract

Like other forms of property, a patent gives its holder a lawful monopoly over the patent's use.[102] Sometimes a patent holder may choose to license the patent rather than use it directly.[103] The license can take many forms. It can, for example, be exclusive or non-exclusive. It can also convey all or just a portion of the patent's field of use.[104]

YKK Corp. and Uretek entered into one such license agreement in August 2002.[105] The agreement—referred to here as the ELA—was an exclusive field of use license giving YKK Corp.

---

[99] See SUMF ¶ 421 (citing Meirowitz Rep. ¶¶ 233-37 (ECF No. 360-1)).

[100] See Meirowitz Rep. ¶¶ 184-285 (ECF No. 360-1)).

[101] Plaintiffs make much of the tension between Meirowitz's enablement opinion and obviousness opinions, but any perceived tension is not a basis to grant summary judgment on either claim. Meirowitz's opinion may thread a fine needle, but it is not self-defeating. His view is, implicitly, that the original contribution of Press was his process that enabled him to achieve high levels of performance metrics. But that process is, in his view, absent from the '214 Patent, while the need to obtain high performance was obvious to everyone skilled in the prior art.

[102] See FTC v. Actavis, Inc., 570 U.S. 136, 146 (2013) (citation omitted).

[103] See, e.g., United States v. GE Co., 272 U.S. 476, 489 (1926) ("The owner of a patent may assign it to another and convey, (1) the exclusive right to make, use and vend the invention throughout the United States, or, (2) an undivided part or share of that exclusive right, or (3) the exclusive right under the patent within and through a specific part of the United States.").

[104] Id.

[105] SUMF ¶ 2; see also Exclusive License Agreement (ECF No. 406-3).

permission to sell Uretek's zippers into all markets "except for zippers placed in finished goods in the high end outerwear, marine, military and luggage (excluding sports and cosmetic bags) markets."[106]

In their first cause of action, Plaintiffs allege that Defendants breached the agreement by selling zippers beyond the conveyed field of use. Defendants move for summary judgment on this claim, arguing that the license only gives *permission* to sell into the *non-excluded* markets and does not contain a corollary *prohibition* of sale into the *excluded* markets. Defendants' construction of the agreement is correct.

### A. Law Governing the Exclusive Licensing Agreement

Construction of a patent "licensing agreement is solely a matter of state law."[107] The ELA is governed by New York law. Under New York law, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."[108] "The best evidence of what parties to a written agreement intend is what they say in their writing."[109] "Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms."[110]

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous."[111] The question of "[w]hether or not a writing is ambiguous is a question of law to be

---

[106] SUMF ¶ 312; <u>see also</u> Exclusive Licensing Agreement ¶ 1 (ECF No. 406-3).

[107] <u>Lear, Inc. v. Adkins</u>, 395 U.S. 653, 661-62 (1969).

[108] <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 569 (2002).

[109] <u>Id.</u> (internal quotation marks omitted).

[110] <u>Id.</u>; <u>see</u> <u>South Rd. Assocs., LLC v. IBM</u>, 4 N.Y.3d 272, 277 (2005) ("In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." (internal quotation marks omitted)).

[111] <u>Lockheed Martin Corp. v. Retail Holdings, N.V.</u>, 639 F.3d 63, 69 (2d Cir. 2011) (quoting <u>Krumme v. West Point Stevens, Inc.</u>, 238 F.3d 133, 138 (2d Cir. 2000)).

resolved by the courts."[112] "It is well settled that a contract is unambiguous if the language it uses

has a definite and precise meaning, as to which there is no reasonable basis for a difference of

opinion. Conversely, . . . the language of a contract is ambiguous if it is capable of more than one

meaning when viewed objectively by a reasonably intelligent person who has examined the context

of the entire integrated agreement."[113] "[A]n omission . . . in a contract does not constitute an

ambiguity."[114]

"Ambiguity is determined by looking within the four corners of the document, not to

outside sources."[115] "It is well settled that extrinsic and parol evidence is not admissible to create an

ambiguity in a written agreement which is complete and clear and unambiguous upon its face."[116]

"An analysis that begins with consideration of extrinsic evidence of what the parties meant, instead

of looking first to what they said and reaching extrinsic evidence only when required to do so

because of some identified ambiguity, unnecessarily denigrates the contract and unsettles the law."[117]

"[B]efore looking to evidence of what was in the parties' minds, a court must give due weight to

what was in their contract."[118]

"Parol evidence—evidence outside the four corners of the document—is admissible only if a

court finds an ambiguity in the contract. As a general rule, extrinsic evidence is inadmissible to alter

---

[112] W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990) (citation omitted).

[113] Lockheed Martin Corp., 639 F.3d at 69 (citations omitted).

[114] Jade Realty LLC v. Citigroup Commercial Mortgage Trust 2005-EMG, 83 A.D.3d 567, 922 N.Y.S.2d 37, 39 (1st Dep't 2011) (citation omitted), aff'd, 20 N.Y.3d 881 (2012).

[115] JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (quoting Kass v. Kass, 91 N.Y.2d 554, 566 (1998)).

[116] W.W.W. Assoc., 77 N.Y.2d at 163 (quoting Intercontinental Planning v Daystrom, Inc., 24 N.Y.2d 372, 379 (1969)).

[117] Id.

[118] Id. at 162.

or add a provision to a written agreement."[119] "Furthermore, where a contract contains a merger clause, a court is obliged 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'"[120]

### B.  The ELA Is Unambigous:  It Is a License; Not A Covenant Not to Compete

The language of the ELA is unambiguous; it provides the licensees the right to use the intellectual property. It does not contain a negative covenant requiring that the licensees not compete in the excluded markets. The clause reads in full as follows:

> [Harold Hoder and Stuart Press] hereby grants to the Company an exclusive, worldwide right to manufacture, use, sell, offer for sale and otherwise use and practice the invention contained in U.S. Patent No. 6,105,214, corresponding applications in Taiwan, Canada, Japan and the European Patent Office, along with any re-issue, other foreign filing, continuation or improvement of same (hereafter "The Patents"), *except for* zippers placed in finished goods in the high end outerwear, marine, military and luggage (excluding sports and cosmetic bags) markets (collectively hereafter "Zippers").[121]

In this provision, the licensors grant the licensee a license to use the intellectual property. The grant defines the scope of the license: the licensee can sell the patented zipper worldwide with the exception of zippers in finished goods in the specified markets. The "except for" clause in this text is part of the definition of the scope of permitted use. That is the clear, natural construction of this language. There is no verb in the sentence other than the "grant," which makes it plain that the "except for" clause is an exclusion from the preceding grant. If the "except for" clause were to be read as a covenant, as Plaintiffs argue, there would need to be an additional verb in this provision.

There would also need to be an additional subject. Because the quoted language from the contract contains a grant by the licensors, but does not require any action by the licensee. As

---

[119] Schron v. Troutman Sanders LLP, 20 N.Y.3d 430, 436 (2013).

[120] Id. (quoting Matter of Primex Int'l Corp. v. Wal-Mart Stores, 89 N.Y.2d 594, 599 (1997)).

[121] SUMF ¶ 312 (quoting Exclusive License Agreement ¶ 1 (ECF No. 406-3)) (emphasis added).

described above, the licensee (the "Company") passively accepts the right. There is no provision of the license that expressly requires "the Company" not to sell in the excluded markets.[122]

Plaintiffs' arguments to the contrary rely heavily on extrinsic evidence. They argue that the Court should, in order to evaluate the meaning of the contract, take a sneak peek into a limited set of extrinsic evidence relevant to "context," which, they argue, would allow the Court to consider among other things "Uretek's commercial relationship with YKK which already existed as of 2002 and the other circumstances under which the ELA was executed."[123] But, as described above, this is something that the Court cannot do when construing an unambiguous contract—particularly one which, like the ELA, contains an integration provision. Plaintiffs also argue that the Court should find ambiguity because the result of applying a strict construction of the contract is not consistent with the parties' intentions. But, again, this is not the approach endorsed by New York law: "The best evidence of what parties to a written agreement intend is what they say in their writing."[124] If Plaintiffs wanted an express covenant not to compete, it would have cost them and their lawyers little effort to draft one.

Moreover, the ELA was fully integrated. The integration provision, or merger clause, of the ELA reads as follows:

> This Agreement contains a complete statement of all arrangements between the parties with respect to its subject matter. No statements or agreements, oral or written, made prior to or at the execution of this

---

[122] Compare Eli Lilly & Co. v. Emisphere Techs., Inc., 408 F. Supp. 2d 668, 686 (S.D. Ind. 2006) (holding under New York law that the following contractual provision could be construed to impose covenant on licensee not to compete in field excluded from license: "Lilly shall not have any rights to use the Emisphere Technology or Emisphere Program Technology other than insofar as they relate directly to the Field and are expressly granted herein."). The Court does not comment on the holding of this case, other than to note that, unlike here, the contract at issue in Eli Lilly imposed an express contractual obligation on the licensee ("Lilly . . . shall not . . . ."). No similar provision exists in the ELA with respect to the scope of use of the technology at issue here.

[123] Pl. Mem. at 36.

[124] Id. (internal quotation marks omitted).

> Agreement shall vary or, modify the written terms hereof and neither party shall claim any amendment, modifications or release from any provision. The Agreement may not be modified or amended in any respect except in writing signed by both parties.

ELA § 12. As noted above, "[t]he purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing. The merger clause accomplishes this purpose by evincing the parties' intent that the agreement 'is to be considered a completely integrated writing' . . . ."[125] This merger language expressly bars the Court from embracing Plaintiffs' request that it consider the parties' negotiations or prior course of dealing in order to construe the express terms of the contract. It also informs the Court's evaluation of whether the implied covenant of good faith and fair dealing gives rise to an obligation on the part of the licensee that the express contractual language does not.

In sum, the language of the ELA is unambiguous: it provides YKK a field of use license. "This language conveys a patent license to [licensee], which is 'in essence nothing more than a promise by the licensor not to sue the licensee.'"[126] The Court's finding that the contract provides a license only, and that it does not give rise to a negative covenant does not mean that Plaintiffs cannot take action against Defendants for selling zippers in a way that exceeded the scope of their license—the absurd result that Plaintiffs claim. Instead, it simply means that they must do so under patent law, rather than through a breach of contract claim.[127]

---

[125] Jarecki v. Shung Moo Louie, 95 N.Y.2d 665, 669 (2001).

[126] Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG, 881 F.3d 1323, 1329 (Fed. Cir. 2018) (quoting Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1081 (Fed. Cir. 1987)).

[127] Id.

**C. Breach of the Implied Covenant of Good Faith and Fair Dealing**

The Court defers ruling on Plaintiffs' alternative claim that Defendants have breached the implied covenant of good faith and fair dealing pending oral argument. Plaintiffs argue that the implied covenant gives rise to a covenant not to sell the patented goods in the fields that are not covered by the license—effectively filling in the gap left in the express written agreement. No court applying New York law that the parties or the Court has identified has reached this conclusion. This is a substantial issue for this case, and because it has not has been directly answered by a court applying New York law, the Court will entertain oral argument with respect to the issue prior to issuing a decision. The following discussion is intended to inform that argument.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance."[128] "The implied covenant of good faith and fair dealing obligates a promisor to fulfill 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included' in the contract."[129] The Second Circuit has explained that under this doctrine

> neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. However, this covenant *only applies where an implied promise is so interwoven into the contract as to be necessary for effectuation of the purposes of the contract.* For this to occur, a party's action must directly violate an obligation that may be presumed to have been intended by the parties. However, the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.[130]

---

[128] Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) (emphasis added).

[129] Id. (quoting Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69 (1978)) (internal quotation marks omitted).

[130] Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407-08 (2d Cir. 2006) (citations and internal quotation marks omitted); see also Fishoff v. Coty Inc., 634 F.3d 647, 653 (2d Cir. 2011) ("'This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the

In addition "[t]he implied covenant 'can only impose an obligation 'consistent with other mutually agreed upon terms in the contract." It does not 'add [ ] to the contract a substantive provision not included by the parties.'"[131] A "party who asserts the existence of an implied-in-fact covenant bears a heavy burden, for it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists. Thus, a party making such a claim must prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole."[132]

The parties have not identified any court applying New York law which has found that the implied covenant of good faith and fair dealing implies a covenant not to compete in a patent license such as the one at issue here.[133] Plaintiffs have directed the Court to the decision of the Vermont

_____

right of the other party to receive the fruits of the contract.'" (quoting <u>511 W. 232nd Owners Corp. v. Jennifer Realty Co.</u>, 98 N.Y.2d 144 (2002))).

[131] <u>Broder v. Cablevision Sys. Corp.</u>, 418 F.3d 187, 198-99 (2d Cir. 2005) (internal citations omitted); <u>see</u> <u>also</u> <u>Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.</u>, No. 08 CIV. 4341 (RJS), 2009 WL 1054830, at *5-6 (S.D.N.Y. Apr. 17, 2009) ("Significantly, although this implied covenant bars actions not 'expressly forbidden' by the contract but undertaken in bad faith, it does not 'operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits.' Accordingly, 'no obligation can be implied that would be inconsistent with other terms of the contractual relationship.'" (internal citations omitted)).

[132] <u>Rowe v. Great Atl. & Pac. Tea Co.</u>, 46 N.Y.2d 62, 69, 385 N.E.2d 566 (1978)

[133] In support of their position, Plaintiffs point to language from Judge Kaplan's decision in <u>E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.</u>, 90 F. Supp. 2d 277 (S.D.N.Y. 2000), <u>aff'd</u>, 4 F. App'x 81 (2d Cir. 2001). In particular, they point to the following language from that decision: "By accepting a sublicense that expressly limited the right to use the EGL name and marks to the Los Angeles area, Tashey implicitly covenanted that he would not use the name and marks elsewhere. When he solicited prospective customers to bring stones for grading to his booth at trade shows held outside Los Angeles and there issued EGL certificates on those stones, he flagrantly breached his obligation under the contract." <u>Id.</u> at 305. However, Plaintiffs miss two important facts about the decision: First, Judge Kaplan was writing about the terms of a contract that was not fully embodied in writing or integrated as the finder of fact following an bench trial. Second, and more significantly, the letter confirming the terms of the contract at issue in <u>E.G.L.</u> contained an express covenant not to use the relevant brand name outside of the scope of the license. <u>Id.</u> at 281 ("The letter confirmed that Tashey had been granted a license to use the EGL marks in the Los Angeles area, that

Supreme Court in <u>Shaw v. E. I. DuPont De Nemours & Co.</u>, in which the court held that such an

obligation was applied under Vermont common law.[134] At the same time, "[t]he Court recognizes

that in other cases courts have not been willing to imply a negative covenant in the patent

context."[135]

Very recently, the Federal Circuit, applying California law, concluded that a field patent

license did not contain an implied covenant by the licensee not to sell in the excluded markets.[136]

The language at issue in that case was very similar in structure to the granting clause in the ELA—it

granted a license to use a patent only in a specified field of use.[137] The Federal Circuit analyzed the

issue as follows:

> This language conveys a patent license to MACOM, which is "in
> essence nothing more than a promise by the licensor not to sue the
> licensee." Aside from this promise not to sue, the quoted contractual
> language suggests no additional promise by (or obligation of)
> MACOM not to exceed the Field of Use on which we may "hinge an
> implied duty," . . . .
>
> Infineon nevertheless argues that this particular license suggests such
> a promise or obligation, because it is limited to the "Field of Use only."
> Infineon asks too much of the word "only." We do not read that word,

---

Tashey would pay Margel a percentage of his gross income earned in connection with those marks, <u>and</u> that Tashey would 'have <u>no</u> authority to do business in the name or on behalf of [EGL Inc.] or any other corporation of which Mr. Margel was or is a principal.'" (first emphasis added)). As a result, the Court does not believe that the holding of the decision is as broad as Plaintiffs argue.

[134] 126 Vt. 206, 209, 226 A.2d 903, 906 (1966), <u>adhered to on reconsideration sub nom. Shaw v. E. I. duPont deNemours & Co.</u>, No. 83, 1967 WL 156525 (Vt. Feb. 7, 1967) (holding "we think there is corollary application in a restricted license of patent rights to the effect that the licensee will not invade the ungranted part of the patent to the detriment of the estate reserved by the licensor.").

[135] <u>JW Pharm. Corp. v. Michael Kahn & Prism Pharma Co.</u>, No. CV1201006JGBRZX, 2013 WL 12125751, at *9 (C.D. Cal. Mar. 11, 2013) (citing <u>Oliver v. Flow Int'l Corp.</u>, 137 Wash. App. 655, 661 (2007); <u>Florida Canada Corp. v. Union Carbide Corp.</u>, 280 F.2d 193 (6th Cir. 1960); <u>Eli Lilly & Co. v. Genentech, Inc.</u>, IP 87-219-C, 1990 WL 305392 (S.D. Ind. July 17, 1990)).

[136] <u>Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG</u>, 881 F.3d 1323 (Fed. Cir. 2018).

[137] The grant clause read as follows: "[Infineon] hereby grants to [MACOM] the following: a) a worldwide, royalty-free, fully paid exclusive license in the Field of Use only . . . ." <u>Id.</u> at 1329.

alone, to supplement Infineon's mere promise not to sue with a contractual obligation of MACOM.

Infineon further argues that, because the Agreement was part of a larger transaction under which the Licensed Patents were purchased from Nitronex (i.e., MACOM's predecessor), it "makes no sense that [Infineon] would have purchased those patent rights and granted Nitronex a license to a subset of those rights, if Nitronex [were] free to operate in violation of the remainder of the rights that [Infineon] had just purchased." But we do not suggest that MACOM is free to operate outside the Field of Use. After all, Infineon's ownership of the Licensed Patents gives it a right to exclude. 35 U.S.C. § 154(a)(1); Prism Techs. LLC v. Sprint Spectrum L.P., 849 F.3d 1360, 1370 (Fed. Cir. 2017) ("A patent gives nothing but the right to exclude, which in our system generally means a right to call on the courts."). Infineon may seek to vindicate that right under the patent laws for activity outside the licensed Field of Use.[138]

The Federal Circuit's analysis of the issue in <u>Macom</u> is persuasive, and its analysis appears to be equally apt under New York law. As <u>Macon</u> highlights, the patent laws exist as a backstop to protect the rights of the patent holder against infringing uses in the absence of an express covenant not to compete. As a result, there appears to be no need for the law to imply an a contractual covenant not to compete in order to effectuate the interests of the parties—patent law does it already. As described above, under New York law, the implied covenant "only applies where an implied promise is so interwoven into the contract as to be <u>necessary</u> for effectuation of the purposes of the contract."[139] The blanket protections afforded by the patent laws also provide a natural response to Plaintiffs' argument that they reasonably expected that the licensee would not compete with them in excluded markets. Those reasonable expectations are not thwarted because of the absence of an implied contractual term in the ELA—rather, they are protected by the patent laws.

---

[138] <u>Id.</u>

[139] <u>Thyroff v. Nationwide Mut. Ins. Co.</u>, 460 F.3d 400, 407-08 (2d Cir. 2006) (emphasis added).

Moreover, the absence of an express obligation by the licensee to Plaintiffs in the ELA

undermines Plaintiffs' argument. "The implied covenant of good faith and fair dealing obligates a

promisor to fulfill 'any promises which a reasonable person in the position of the <u>promisee</u> would be

justified in understanding were included' in the contract."[140] The ELA does not contain any relevant

promise by the licensees; they passively accept the grant. Since the licensees are not promisors,

Plaintiffs do not appear to be "promisees" who should benefit from the implied covenant. Instead,

Plaintiffs appear to be seeking the addition of a covenant to the License Agreement in their favor in

whole cloth, something that New York law does not permit.[141]

It is Plaintiffs' burden to "prove not merely that it would have been better or more sensible

to include such a covenant, but rather that the particular unexpressed promise sought to be enforced

is in fact implicit in the agreement viewed as a whole."[142] Given the absence of an express promise

---

[140] <u>Dalton v. Educ. Testing Serv.</u>, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291-92 (1995) (emphasis added)(quoting <u>Rowe v. Great Atl. & Pac. Tea Co.</u>, 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978)) (internal quotation marks omitted).

[141] Plaintiffs distinguish <u>Macom</u> by arguing that California requires that one identify an express contractual provision to which to tether the implied covenant, while New York does not. The sole citation provided by Plaintiffs in support of that argument is <u>Dorset Indus., Inc. v. Unified Grocers, Inc.</u>, 893 F. Supp. 2d 395, 405-07 (E.D.N.Y. 2012). There, in the context of an excellent summary of New York law on the implied duty of good faith, Judge Spatt stated that "The fact that the Agreements are silent on these issues is not necessarily fatal to the Plaintiff's claim because New York does not require that a breach of the duty of good faith and fair dealing be tied to a <u>specific</u> contractual provision." <u>Id.</u> (emphasis added). But Judge Spatt does not say that the duty need not be tethered to <u>any</u> contractual obligation embodied in the written contract, as Plaintiffs suggest. The case cited by Judge Spatt in support of the observation quoted above makes it clear that the implied covenant must be tethered to a contractual understanding and cannot give rise to a covenant not expressed by the parties. <u>See</u> <u>Havel v. Kelsey–Hayes Co.</u>, 83 A.D.2d 380, 382-84, 445 N.Y.S.2d 333 (4th Dep't 1981) ("It is a primary rule of contract construction that where the terms of a written agreement are clear and unambiguous, the intent of the parties must be drawn from the contract language. This is so because 'it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists'. In achieving that end, due regard must be given the overriding principle that every contract contains an implied covenant of good faith performance and fair dealing. Moreover, that a specific promise has not been expressly stated does not always mean that it was not intended. '[T]he undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included'").

[142] <u>Rowe v. Great Atl. & Pac. Tea Co.</u>, 46 N.Y.2d 62, 69 (1978)

by the licensee, and the protections otherwise afforded to Plaintiffs by patent law in the United States and abroad, the Court harbors serious doubts that Plaintiffs can meet that burden. However, given the significance of the question, the Court will defer ruling on the issue pending oral argument.

### D.  Breach of Contract Claim against YKK Corp.'s Affiliates

Plaintiffs make two ancillary motions for summary judgment in support of their theory that the actions of YKK Corp.'s affiliates breached the licensing agreement. First, Plaintiffs move for a finding that YKK Corp.'s affiliates are all agents of YKK Corp. and, therefore, that their conduct is imputable to YKK Corp.[143] Second, Plaintiffs move for a finding that YKK Corp.'s affiliates were themselves parties to the licensing agreement.[144] YKK does not oppose either motion.[145] By failing to oppose, it has conceded the motions. Both motions are granted.

## III.  Validity of Foreign Patents

Defendants allege in their fourteenth affirmative defense to breach of the licensing agreement that the foreign patents—those in Canadian, Taiwan, Europe, Hong Kong, and Japan—are invalid for reasons similar to those of the '214 Patent.[146] Plaintiffs move for summary judgment on that defense, arguing that the invalidity defenses should fall for the same reasons as the domestic invalidity defenses discussed above and, in the alternative, because Defendants never disclosed a foreign law expert.[147] This motion is granted.

Plaintiffs' second argument is sound. Defendants do not have an expert who can provide evidence at trial regarding the validity of the foreign patents. Instead, in their opposition to

---

[143] Pls.' Mem. at 2-5 (ECF No. 363).

[144] Id. at 5-6.

[145] See Pls.' Reply at 2 (ECF No. 392).

[146] See Am. Supp. Answer at 22 (ECF No. 142).

[147] Pls.' Mem. at 24-25 (ECF No. 363).

Plaintiffs' motion, they point to Plaintiffs' expert report as the basis for their assertion that a material issue of fact remains to be litigated with respect to this issue.[148] But Plaintiffs' expert report addresses issues related to the scope of the foreign patents; it does not provide a basis to contest their validity.[149] Defendants cannot expect a Perry Mason-like trial maneuver to extract from Plaintiffs' expert the evidence that they chose not to develop on their own: any testimony regarding the foreign patents' validity would fall outside of the scope of her disclosed opinion testimony. Defendants did not contest this point following Plaintiffs' rebuttal, highlighting this fundamental deficiency. As a result, Plaintiffs are granted summary judgment with respect to Defendants' assertions that the foreign patents are invalid.

## IV. Fraudulent Inducement

Defendants' fourth counterclaim and eighteenth affirmative defense is for fraudulent inducement, based on the allegation that Uretek misrepresented the validity of the '214 Patent, in particular its inventorship.[150] To prove fraudulent inducement under New York law, a party must prove by clear and convincing evidence: "(1) a material misrepresentation or omission of fact, (2) made by defendant with knowledge of its falsity (3) and an intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."[151] Plaintiffs move for summary judgment on both the affirmative defense and the counterclaim, arguing that Defendants cannot prove their *prima facie* case.[152] This motion is granted.

---

[148] See Defs.' Mem. at 58 (ECF No. 382).

[149] See Pls.' Reply at 12-13 (ECF No. 392).

[150] See Am. Supp. Answer at 23, 37-38 (ECF No. 142).

[151] Hindsight Sols., LLC v. Citigroup Inc., 53 F. Supp. 3d 747, 772 (S.D.N.Y. 2014).

[152] See Pls.' Mem. at 13-15 (ECF No. 363). Plaintiffs also move for summary judgment on the counterclaim, but not the affirmative defense, on the grounds that it is time-barred. Id. at 15-17. Defendants did not oppose that motion, making this an independent basis for granting summary judgment on the counterclaim. See Pls.' Reply at 8 (ECF No. 392).

At "the summary judgment stage, a party must come forward with evidence to support the particularized allegations of fraudulent inducement."[153] Defendants have failed to do so. Defendants have presented no evidence that Plaintiffs made a misrepresentation of fact with knowledge of its falsity. The record does not contain any representation by Plaintiffs to YKK regarding the validity of the '214 patent; the ELA, the most likely vehicle for such a representation, and which, as noted above contains a merger clause, does not contain such a representation. Moreover, Defendants have presented no evidence that Plaintiffs intended to defraud them by hiding the invalidity of the patent. To the contrary, the evidence illustrates that Plaintiffs did (and do) believe in the validity of their patent. Given that it had been issued, it was presumed to be so.[154] Defendants may ultimately be successful in providing that the patent is and has been invalid, but they cannot prove on this record that Plaintiffs knew that the patent was invalid at the time that they entered into the ELA. Since that would be necessary in order to prove fraudulent inducement, Plaintiffs' motion for summary judgment is granted with respect to this issue.

## V.     Infringement

Defendants claim in their fifteenth affirmative defense and first counterclaim that their products do not infringe the '214 Patent, arguing that the accused zippers do not have a "water resistant layer."[155] Plaintiffs move for summary judgment with regard to the specific question of whether the AquaGuard, RCPU and DT Zippers have a water resistant layer.[156] Because Defendants do not offer any argument regarding the AquaGuard zippers, summary judgment is granted on the

---

[153] <u>MM Ariz. Holdings LLC v. Bonanno</u>, 658 F. Supp. 2d 589, 594 (S.D.N.Y. 2009).

[154] <u>See</u> 35 U.S.C. § 282.

[155] <u>See</u> Am. Supp. Answer at 22, 31-33 (ECF No. 142).

[156] <u>See</u> Pls.' Mem. at 34-36 (ECF No. 363). They do not move for summary judgment on Defendants' claim that the AquaCheat, DG, DD, and DS zippers are not water resistant. <u>Id</u>. at 34 n.15.

question of whether those zippers have a water-resistant layer.[157] There are, however, disputes of material fact with regard to the water-resistance of the RCPU and DT zippers. The motion pertaining to those zippers is denied.

The only evidence Plaintiffs cite in support of their motion are the raw results from two AATCC 42 water resistance tests which found that these two zippers both permitted 5 grams of water to pass through the zipper.[158] Dr. Meirowitz looked at those test results, among others, before concluding that the RCPU and DT zippers are not water resistant.[159] This is the very definition of a dispute of material fact. Summary judgment is denied.

## VI.     Equitable Estoppel

In their seventh affirmative defense, Defendants claim that Plaintiffs' patent and contract claims are barred by estoppel.[160] Defendants argue that Plaintiffs' statements and actions led Defendants to believe that Plaintiffs would not assert such claims with respect to Defendants' sale of zippers into the excluded and unlicensed markets. Plaintiffs move for summary judgment on this defense. This motion is denied.

---

[157] It is undisputed that the AquaGuard zippers are water resistant. See SUMF ¶ 164 (ECF No. 406). But Defendants have not dropped their claim that their sales of the AquaGuard zippers were non-infringing. See Defs.' Mem. at 57-58.

[158] See Pls.' Mem. at 35 (ECF No. 363) (citing SUMF ¶¶ 164-65).

[159] See SUMF ¶ 425, 428-29 (ECF No. 406).

[160] To prove equitable estoppel of the patent claims, Defendants must show: (1) that "the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer," (2) that the infringer relied on that misleading conduct and (3) "due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." Meyers v. Asics Corp., 974 F.2d 1304, 1308 (Fed. Cir. 1992). To prove equitable estoppel of the contract claims, Defendants must show (1) an act constituting a concealment of facts or misrepresentation, (2) an intention or expectation that such acts will be relied upon, (3) actual or constructive knowledge of the true facts by the wrongdoers, and (4) reliance causing the innocent party to detrimentally change its position. Gaia House Mezz LLC v. State St. Bank & Tr. Co., 720 F.3d 84, 90 (2d Cir. 2013).

The evidence shows that disputes arose shortly after the ELA was executed.[161] As a result, there were protracted, on and off discussions and negotiations regarding the ELA's definition of excluded markets for more than a decade.[162] To the extent that Uretek accepted royalties without lodging an objection, a reasonable finder of fact could find that the elements of equitable estoppel were met as to some zipper sales.[163] A determination whether specific royalty payments spanning over a decade equitably estop specific contract or patent claims will require extensive factual determinations that are inappropriate for summary judgment.

## VII. Exhaustion

In their answer, Defendants' alleged an affirmative defense of patent exhaustion, against which Plaintiffs have moved for summary judgment.[164] Defendants do not oppose the motion.[165] It is granted.

## VIII. Lost Profits Remedy for Patent Infringement

Plaintiffs claim they are owed lost profits for Defendants' alleged infringement of the '214 Patent. Defendants move for summary judgment, arguing that Plaintiffs' evidence is insufficient to support a lost profits instruction to the jury.[166] This motion is denied.

---

[161] See, e.g., SUMF ¶ 174 (ECF No. 406) ("A February 2003 YKK R&D Report stated . . . [t]he T8 zipper was seen in Nike jackets and Columbia Sportswear garments. . . . Stuart Press questioned whether Nike and Columbia were low end. It was stressed that they were both mass-market manufacturers and did not represent true high-end garments.") (quoting Ex. 95 (ECF No. 406-95)).

[162] See, e.g., SUMF ¶ 435-42 (ECF No. 406).

[163] See Corines v. Am. Physicians Ins. Tr., 769 F. Supp. 2d 584, 592 n.7 (S.D.N.Y. 2011) (noting that the plaintiff may have had an argument that the acceptance of insurance premiums equitably estopped claims that the policy was void, but that the argument had not been raised); Asymmetrx, Inc. v. Biocare Med. LLC, 578 F. Supp. 2d 333, 342-43 (D. Mass. 2008) (finding that plaintiff was equitably estopped from alleging patent infringement after disputes between the parties arose but plaintiff continued to accept royalty payments).

[164] Am. Supp. Answer at 18 (ECF No. 142).

[165] See Defs.' Mem. at 60 n.31 (ECF No. 382).

[166] Defs.' Mem. at 36-39 (ECF No. 382).

Under the Patent Act, a plaintiff may receive "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention."[167] Proof of damages over the reasonable royalty requires proof that "but for" the infringement, the plaintiff would have received the lost profits.[168] Following that principle, one recognized theory of lost profits is the Panduit test of causation, which requires proof of "(1) demand for the patented product, (2) absence of acceptable non-infringing substitutes, (3) [the patent holder's] manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit [the patent holder] would have made."[169]

Defendants argue that Plaintiffs' evidence is insufficient to make a *prima facie* case under the Panduit test, but the admissible portions of Donohue's expert report are sufficient to make the case. In Donohue's expert report, he offers his opinion that there was demand for the product, that there are no acceptable non-infringing alternatives, that Uretek had the capacity to laminate many more zippers, and that Uretek lost significant profits from lost sales of lamination services to YKK.[170] Defendants may point out several perceived flaws in his logic, but a reasonable jury could side with Plaintiffs' expert. The motion is, therefore, denied.

## IX.    Lost Profits Remedy for Breach of Contract

The Court has withheld ruling on Plaintiffs' asserted claim for the breach of the implied covenant of good faith and fair dealing. Were that claim to proceed, however, Plaintiffs have presented sufficient evidence to support sending a claim for general damages to the finder of fact.

---

[167] 35 U.S.C. § 284.

[168] Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1350 (Fed. Cir. 1999).

[169] Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1156 (6th Cir. 1978).

[170] See Donohue Rep. ¶¶ 136-168 (ECF No. 392).

Defendants rest their argument on a contention that Plaintiffs' claim for lost damages necessarily constitute "consequential" damages.[171] However, Plaintiffs are seeking direct, or general damages here. The Second Circuit described the standard of proof required to establish such damages in <u>Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.</u>, as follows:

> It has long been established in New York that a breaching party is liable for all direct and proximate damages which result from the breach. The damages, however, "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach of the contract." "Certainty," as it pertains to general damages, refers to the fact of damage, not the amount. For "when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain." "[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer . . . ." "The plaintiff need only show a 'stable foundation for a reasonable estimate'" of the damage incurred as a result of the breach. "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection."[172]

Defendants' arguments in favor of summary judgment consist largely of attacks on Plaintiffs' expert's calculation of damages.[173] That the expert's conclusions are estimates is clear, but his report provides what a reasonable jury could find to be a stable foundation for a reasonable estimate of damages. Defendants insist on theoretical perfection, but on that basis their motion cannot prevail.

## X. Lanham Act

Defendants move for summary judgment on Plaintiffs' Lanham Act claim, arguing that Plaintiffs cannot make out a *prima facie* case. This motion is denied.

---

[171] <u>See</u> Defs.' Mem. at 28-29 (ECF No. 382).

[172] <u>Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.</u>, 487 F.3d 89, 110-11 (2d Cir. 2007).

[173] <u>See</u> Defs.' Mem. at 27-34 (ECF No. 382).

First, Defendants argue that Plaintiffs' claim is time-barred under the doctrine of laches.

Assuming *arguendo* that Plaintiffs did file this action outside of the applicable six-year limitations

period, there would still be triable issues to resolve. As an equitable defense, laches is "highly fact

intensive and not typically amenable to summary judgment."[174] This is one such typical case. The

degree to which Plaintiffs' delay in filing suit was reasonable depends on how one views the years

long efforts by the parties to amend the license agreement. That determination is for a finder of fact

to make.[175]

Second, Defendants argue that the challenged statements are not commercial advertising

subject to the Lanham Act. It is undisputed that the challenged statements are not pure commercial

speech, meaning that whether they are "commercial speech depends on factors such as whether the

communication is an advertisement, whether the communication makes reference to a specific

product, and whether the speaker has an economic motivation for the communication."[176] These

factors—the motivation in particular—are disputed material facts that preclude summary judgment.

Third, Defendants argue that Plaintiffs have not satisfied the basic elements of false

advertising under the Lanham Act, which are that the challenged statements are "(1) either literally

or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely

injury to the plaintiff."[177] Construing the evidence in the light most favorable to Plaintiffs, they have

made that case. The challenged statements, while not literally false, do falsely imply that YKK had

an unlimited license.[178] As a statement concerning YKK's very right to sell the zippers, the

---

[174] <u>Gucci Am., Inc. v. Guess?, Inc.</u>, 843 F. Supp. 2d 412, 420 (S.D.N.Y. 2012).

[175] <u>See generally</u> SUMF ¶¶ 168-215 (ECF No. 406)

[176] <u>Bad Frog Brewery, Inc. v. New York State Liquor Auth.</u>, 134 F.3d 87, 97 (2d Cir. 1998).

[177] <u>Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH</u>, 843 F.3d 48, 65 (2d Cir. 2016).

[178] Defendants argue that Plaintiffs must have a consumer survey to prove implied falsity. There is, however, an exception. If Plaintiffs can also show that the ambiguous statement was intentionally misleading,

statements involved "an inherent or material quality of the product."[179] The interstate nature of the

commerce is manifest, and Plaintiffs have offered evidence that YKK's sale of goods into the

excluded markets caused them damage. Thus, Plaintiffs have evidence supporting all five elements.

They have made out a *prima facie* case. Summary judgment is denied.

## XI. Connecticut Unfair Trade Practices Act

The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits "unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[180]

Plaintiffs allege that Defendants violated the act in two ways: (1) Defendants deceptively published

information advising customers that YKK had the unrestricted right to sell the patented zippers;[181]

and (2) YKK willfully and wantonly breached the ELA in a fashion that constituted unfair

competition. Defendants move for summary judgment on these claims, arguing that they are time-

barred or, in the alternative, Plaintiffs cannot prove any recoverable loss.[182] The motion is denied.

Defendants argue first that CUTPA has a three-year statute of limitations that "begins to run

from the date of the act or omission complained of, rather than the time at which the plaintiff

---

that creates a rebuttable presumption of consumer confusion. See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH, 843 F.3d 48, 67 n.8 (2d Cir. 2016) ("Implied falsity is often demonstrated through extrinsic evidence of consumer confusion . . . or though evidence of the defendant's deliberate deception, which creates a rebuttable presumption of consumer confusion."); see also Bern Unlimited, Inc. v. Burton Corp., 95 F. Supp. 3d 184, 215 (D. Mass. 2015) (denying summary judgment on false advertising claim involving similarly misleading statements regarding patent ownership).

[179] See C=Holdings B.V., 992 F. Supp. 2d at 243 (false statements that the products offered for sale are licensed relate to the nature and qualities of the product); Blank, 916 F. Supp. at 172 ("the misrepresentation that a product is patented relates to the nature and qualities of the product").

[180] Conn. Gen. Stat. § 42-110b.

[181] Am. Compl. ¶ 88 (ECF No. 90).

[182] Plaintiffs' have also moved for summary judgment on Defendants' second affirmative defense to CUTPA based on laches. Defendants have not opposed that motion, see Pls.' Reply at 27 (ECF No. 392), therefore it is granted.

discovers that injury.”[183] Because the first allegedly misleading statement was made January 13, 2003, Defendants claim that the statute of limitation began to run on that day, barring any claim for subsequent repetitions or amplifications of the allegedly misleading statement, even those which occurred within three years of the filing of this law suit. This position represents a marked departure from Connecticut law, and would “insulate standardized or repeated unfair trade practices from challenge once they had been instituted for three years.”[184] And as Plaintiffs correctly note, the cases on which Defendant relies for its position arose exclusively in the context of trademark violations. Their logic depends explicitly on the CUTPA claims’ parallels to trademark infringement claims.[185] Outside of the trademark context, Connecticut state and federal courts have regularly acknowledged that claims can be brought for conduct which occurred within the three year statute of limitations period, even if the first instance of challenged conduct happened long before.[186] The Court sees no reason to depart from that rule in this case.[187]

---

[183] Argus Research Group, Inc. v. Argus Media, Inc., 562 F. Supp. 2d 260, 279-80 (D. Conn. 2008) (citations and internal quotation marks omitted).

[184] Broadway Theatre Corp. v. Buena Vista Pictures Distribution, No. CIV.A. 3:00CV706 (SR), 2002 WL 32502100, at *6 (D. Conn. Sept. 19, 2002).

[185] See, e.g., CSL Silicones Inc. v. Midsun Grp. Inc., 170 F. Supp. 3d 304, 309-15 (D. Conn. 2016) (barring claims under CUTPA for alleged trademark violations which began before the statute of limitations period, but noting that courts have embraced a separate-accrual rule for other types of CUTPA claims); see also RBC Nice Bearings, Inc. v. Peer Bearing Co., 410 F. App’x 362, 366-67 (2d Cir. 2010) (summary order).

[186] See, e.g., Broadway Theatre Corp., 2002 WL 32502100, at *6 (plaintiff could assert CUTPA violations based on defendant’s longstanding practice of licensing films only to certain movie theaters when certain licenses had been executed in the last three years); Izzarelli v. R.J. Reynolds Tobacco Co., 117 F. Supp. 2d 167, 177 (D. Conn. 2000) (allegations that for over four decades defendant directed a misleading marketing strategy to minors sufficiently alleged a continuing course of conduct to toll the statute of limitations); Soto v. Bushmaster Firearms Int’l, LLC, 331 Conn. 53, 105-06 (2019) (finding CUTPA claims predicated on advertising and marketing were not time barred because some of the advertising took place within the last three years).

[187] Because the Court rejects the underlying premise of Defendants’ argument, it need not decide at this juncture whether Plaintiffs can rely on a “continuing course of conduct theory” to reach conduct which occurred outside of the three years which preceded the filing of this case or whether its claims are limited solely to conduct which occurred in those three years under the theory that each misleading statement was subject to its own statute of limitations.

Defendants' second argument that Plaintiffs cannot prove a recoverable loss is similarly unavailing for the reasons discussed above. That argument is again rejected. Defendants' motion for summary judgment with regard to Plaintiff's CUTPA claims is denied.

## CONCLUSION

In sum, Plaintiffs' and Defendants' cross motions for summary judgment are granted in part and denied in part. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 362 and 414.

SO ORDERED.

Dated: March 31, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge