```
UNITED STATES DISTRICT COURT                          USDC SDNY
SOUTHERN DISTRICT OF NEW YORK                         DOCUMENT
-----------------------------------------------------------------X  ELECTRONICALLY FILED
AU NEW HAVEN, LLC and TRELLEBORG      :               DOC #: _____
COATED SYSTEMS US, INC.,              :               DATE FILED: 07/08/19
                                      :
                      Plaintiffs,     :               1:15-cv-3411-GHW
                                      :
         -v -                         :               MEMORANDUM OPINION
                                      :                  AND ORDER
YKK CORPORATION, YKK HONG KONG        :
LTD., YKK FASTENING PRODUCTS SALES    :
INC., SHANGHAI YKK ZIPPER CO., LTD.,  :
SHANGHAI YKK TRADING CO., LTD., YKK   :
CANADA INC., YKK TAIWAN CO., LTD., P.T.:
YKK ZIPPER INDONESIA, YKK             :
BANGLADESH PTE. LTD., YKK KOREA CO.,  :
LTD., YKK FRANCE SARL, DALIAN YKK     :
ZIPPER CO., LTD., YKK VIETNAM CO.,    :
LTD., YKK DEUTSCHLAND GMBH, YKK       :
(THAILAND) CO., LTD., YKK (U.K.) LTD.,  :
YKK ZIPPER (SHENZHEN) CO., LTD., YKK  :
AUSTRIA GMBH, YKK ITALIA S.P.A., OOO  :
YKK a/k/a YKK RUSSIA, YKK METAL VE    :
PLASTIK URUNLERI SANAYI VE TICARET    :
A.S., and YKK (U.S.A.) INC.,          :
                                      :
                      Defendants.     :
-----------------------------------------------------------------X
```

GREGORY H. WOODS, United States District Judge:

On March 31, 2019, the Court entered a Memorandum Opinion and Order (the "Summary Judgment Opinion") resolving the parties' motions for summary judgment. Dkt. No. 425. In that opinion, the Court held that the unambiguous text of the Exclusive License Agreement (the "ELA")—the agreement which underlies Plaintiffs' breach of contract claim—did not prohibit Defendants from selling infringing zippers into the markets which were expressly excluded from the scope of the license. *Id.* at 17-22. However, Plaintiffs argued in the alternative that even if Defendants' conduct did not breach the ELA on its face, the implied covenant of good faith and fair dealing gives rise to a covenant not to sell the patented goods in the fields that are not covered by

the license. Plaintiffs' argument, if accepted, would allow the implied covenant of good faith and fair dealing to thus effectively fill the gap left in the express written agreement. In its Summary Judgment Opinion, the Court deferred judgment on Plaintiffs' implied covenant of good faith and fair dealing claim pending oral argument. The Court held oral argument on this reserved issue on April 29, 2019. Because Plaintiffs' claim for breach of the implied duty of good faith and fair dealing requires that the Court read into the ELA a covenant that is not expressed in the written agreement, the Court now grants Defendants' motion for summary judgment on Plaintiffs' breach of contract claim in its entirely.

On April 15, 2019, both Plaintiffs and Defendants filed motions for reconsideration of certain aspects of the Court's Summary Judgment Opinion. Dkt. Nos. 431, 433. Defendants' motion seeks reconsideration of the Court's decision to grant summary judgment to Plaintiffs on the issue of inventorship. Dkt. Nos. 431, 432. Because Defendants have not demonstrated that there is sufficient evidence in the record for a reasonable trier of fact to find that the patent is invalid for failure to properly name the alleged co-inventor Michael Blenkarn, Defendants' motion for reconsideration is denied. Plaintiffs' motion for reconsideration or clarification asks that the Court expressly address Plaintiffs' motion for summary judgment on Defendants' seventeenth affirmative defense alleging that Plaintiffs' Lanham Act claims are barred by a statute of limitations—an issue which was inadvertently not addressed in the Summary Judgment Opinion. Dkt. No. 433. Because Defendants agree that summary judgment on this affirmative defense is appropriate, that motion is granted.[1]

---

[1] The relevant factual background for purposes of this order is described at length in the Summary Judgment Opinion. The Court assumes the reader's familiarity with the facts of this case as set forth in that opinion and refers to the facts relevant to this opinion only as needed.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party bears the initial burden of establishing that there are no material facts in dispute and must provide "affirmative evidence" from which a factfinder could return a verdict in its favor. *Id.* at 257. Then "the burden shifts to the non-movant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). The "trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., LP*, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). Summary judgment is improper if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party . . . ." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). To create a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). Instead, the response "must set forth specific facts demonstrating that there is a genuine

issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).

Motions for reconsideration are governed by Local Rule 6.3, which provides that the moving party shall set forth "the matters or controlling decisions which counsel believes the Court has overlooked." "Motions for reconsideration are . . . committed to the sound discretion of the district court." *Immigrant Def. Project v. U.S. Immigration and Customs Enforcement*, No. 14-cv-6117 (JPO), 2017 WL 2126839, at *1 (S.D.N.Y. May 16, 2017) (citing cases). "Reconsideration of a previous order by the Court is an extraordinary remedy to be employed sparingly." *Ortega v. Mutt*, No. 14-cv-9703 (JGK), 2017 WL 1968296, at *1 (S.D.N.Y. May 11, 2017) (quoting *Anwar v. Fairfield Greenwich Ltd.*, 800 F. Supp. 2d 571, 572 (S.D.N.Y. 2011)). As such, reconsideration should be granted only when the moving party "identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 185 (S.D.N.Y. 2016) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013)) (internal quotation marks omitted).

## II. DISCUSSION

### A. Defendants' Motion for Summary Judgment on Plaintiffs' Claim for Breach of the Covenant of Good Faith and Fair Dealing

The Court has already described in detail the factual matters at issue with respect to this motion, and the legal principles that govern Plaintiffs' claim for a breach of the covenant of good faith and fair dealing. *See* Summary Judgment Opinion at 23-28. The Court incorporates that discussion by reference here. The Court reserved decision on this issue pending oral argument.

Oral argument allowed Plaintiffs to present focused argument on this point. But Plaintiffs' understanding of the implied covenant as applied here, as illustrated throughout their arguments, is incorrect. Plaintiffs argued at length that they should be permitted to present to the jury evidence of their reasonable expectations regarding the Defendants' obligations under the ELA, so long as those

4

expectations are not inconsistent with the terms of the ELA. As a result, Plaintiffs argue that the two-page ELA—a document entitled "Exclusive License Agreement"—is not merely an agreement not to sue, but that it creates a relationship that is "far more joint venture, far more partnership." April 29, 2019 Transcript at 36. They argue that the ELA creates a "strategic alliance." *Id.* Indeed, Plaintiffs argued that entering into a contract "changes the relationship between two people. It's like dating and getting married." *Id.* at 48.[2]

But fundamentally, under New York law, entering into a contract is not like getting married. It is clearly established that the implied covenant "does not 'add [ ] to the contract a substantive provision not included by the parties.'" *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (internal citations omitted); *see also Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08 CIV. 4341 (RJS), 2009 WL 1054830, at *5-6 (S.D.N.Y. Apr. 17, 2009) ("Significantly, although this implied covenant bars actions not 'expressly forbidden' by the contract but undertaken in bad faith, it does not 'operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits.'" (internal citations omitted)). But this is exactly what Plaintiffs propose—that any party's reasonable expectations regarding the conduct of its

---

[2] The adoption of Plaintiffs' position would have a profoundly destabilizing effect on New York contract law. It would also put a lot of transactional lawyers out of business. Why bother writing a detailed contract with express covenants if each party's reasonable expectations can later be incorporated into the contract so long as they do not conflict with the written terms of the contract, as Plaintiffs argue? For example, under Plaintiffs' view, if a lender extended a loan to a borrower, but asked for no covenants, the lender could nonetheless bring a suit to a jury trial by arguing that it reasonably expected that the borrower would run its business properly and that, in order to do so, the borrower would maintain a 3:1 quarterly Debt to EBITDA ratio—or any of the dozens of other covenants that are typically negotiated in a loan in minute detail. And, more concretely, as Plaintiffs argue here, any two-page contract of sale or settlement agreement could be argued to have given rise to a global strategic alliance or joint venture. Under Plaintiffs' understanding of the implied duty, the work of carefully drafting contracts would be diminished, replaced instead by extensive and prolonged litigation. Parties would be able to go to a jury with an implied covenant claim unrooted in the writing of the agreement, so long as their reasonable expectations were not inconsistent with the written agreement. Plaintiffs may benefit from their expansive proposed construction of the implied covenant, but not so for the rest of the world's users of New York contract law—people and institutions who seek clarity and certainty that the covenants to which they have agreed are those written on the page, as well as the implied covenant to act in good faith with respect to the parties' expressions in the writing, not unexpressed expectations held in the minds of their counterparties.

5

contracting partner can be read into a contract as an implied covenant so long as the party's expectations do not conflict with the express provisions of the contract.

The ELA's language does not include promises by Defendants from which a reasonable jury could extrapolate the existence of an expansive promise not to compete with Plaintiffs, much less give rise to a global strategic alliance, as Plaintiffs have argued. Section 1 of the ELA does not contain a promise by Defendants at all—it is a promise by the licensor not to sue. It suggests no additional promise by (or obligation of) the licensee. *Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, 881 F.3d 1323, 1329 (Fed. Cir. 2018). Section 2 of the ELA does contain an express promise by the licensee—namely, that it will pay the license fee. But like the license grant itself, the payment obligation under Section 2 of the ELA does not suggest a broader obligation by the licensee not to compete with licensor.

As a result, Plaintiffs' argument—to the extent that it relies at all on the text of the ELA—must rely heavily on the text of Section 7 of the ELA. Section 7 provides:

> The Company [licensee] agrees to promptly inform HP [licensor] of any suspected infringement of The Patents *by a third party*. HP shall, at its sole discretion, have the first right to take action against *such* infringing party. Should HP decline to take action, the Company shall have the right to take action at its sole discretion. If either party takes action against such infringer, that party shall bear its own costs and have full benefit, if any, obtained by such action, unless agreed to the contrary by the parties in writing. The Company and HP agree to cooperate with each other, their attorneys, and other authorized representatives in any *such* action.

ELA § 7 (emphasis added). This provision requires the licensee to inform the licensor of infringements of the license by *third parties*, and establishes the agreement of the parties to cooperate in enforcement proceedings against those third parties. The express language of the provision only gives rise to an obligation to notify the licensor of infringement by third parties: the licensee does not agree to act in any way with respect to its use of the patented goods, or to notify the licensor about its own conduct. Plaintiffs ask the Court to permit them to use the implied covenant of good

6

faith to create a new contractual obligation on the part of Defendants that is not found in the text of the agreement, and, as a result, stretches the implied covenant of good faith beyond its proper bounds.

"In general, courts enforce the implied covenant where an implied promise was 'so interwoven *in the whole writing*' of a contract as to be necessary for effectuation of the purposes of the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136-37 (2d Cir. 1990) (quoting *Havel v. Kelsey-Hayes Co.*, 83 A.D.2d 380, 384 (N.Y. App. Div. 4th Dep't 1981)) (emphasis added). Having considered the language of each of the ELA's covenants individually, and the two-page agreement as a whole, the Court finds no basis in the writing—that is, the text of the agreement—to conclude that it imposes an implied covenant on the Defendants not to compete with the Plaintiffs. The absence of a covenant not to compete in the ELA—implied or otherwise—is readily understood given the protections afforded to a licensor under the patent law. That is the backdrop against which this agreement was drafted. It is not necessary to create a covenant unrooted in the text of the ELA in order to provide the licensor a remedy for the use of the patented product beyond the scope of the license—patent law provides that remedy. As a result, Defendants' motion for summary judgment with respect to Plaintiffs' claim for a breach of the implied covenant of good faith and fair dealing is granted.

### B. Defendants' Motion for Reconsideration Regarding Inventorship

Defendants have moved for reconsideration of that part of the Court's Summary Judgment Opinion which granted Plaintiffs' motion for summary judgment on the issue of inventorship. In support of their motion, Defendants first argue that the Court's March 31, 2019 order overlooked their claim that Blenkarn contributed all of the structural elements present in the '214 patent. Defendants' Memorandum of Law in Support of their Motion for Reconsideration, Dkt. No. 432 ("Def. Recon. Mem."), at 4-6. Defendants' factual theory underlying their argument that Blenkarn

conceived of the structural elements of the '214 patent proceeds essentially as follows: Blenkarn began working on water-resistant zippers in the late 1980s. As a result of that work, Blenkarn developed a "prototype" zipper, which he gave to Press at the 1995 trade show where Blenkarn and Press met. That prototype had all the claimed structural limitations of the '214 patent. Therefore, Blenkarn must have been the inventor of the structural elements of the '214 patent. Def. Recon. Mem. at 5-6. This factual argument is unsupported by the record and—even at face value—is insufficient to allow a trier of fact to infer that Blenkarn was a co-inventor of the '214 patent.

First, the logic of Defendants' argument requires that the structure of the zipper claimed in the '214 patent be identical to the structure of the zipper that Blenkarn allegedly gave Press during the 1995 trade show. But the record contains no details whatsoever regarding the structure of that "prototype" zipper. Defendants' support for this point relies wholly on testimony from Press which Defendants quoted at length in both their opening brief and their motion for reconsideration:

> Press further admits that in applying for the '214 patent he did not change the structure of the prototype that Blenkarn gave to him in 1995:
>
>> Q. And how did the [patented] zipper differ from the zipper that Mr. Blenkarn showed you, if at all, at the show?
>>
>> **A. Well, it had, it had higher adhesion and the coating was more uniform.**
>>
>> Q. Anything else?
>>
>> **A. It's thicker.**
>>
>> Q. Anything else?
>>
>> **A. Not that I recall.**
>
> LR56 ¶ 361.

Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, Dkt. No. 382, at 24-25 (emphasis in original). However, an examination of the evidence provided to the Court casts serious doubt on the accuracy of Defendants' characterization that Mr. Press' testimony

8

related to differences between the zipper allegedly provided to him by Blenkarn and the "patented" zipper. Indeed, Press' testimony appears to refer not to the patented zipper, but to sample zippers he sent to Blenkarn that represented his "first go" at attempting to laminate a zipper. Press 8/3/16 Dep. at 117. To the extent that Defendants have evidence suggesting that there were no structural differences between Press' "first go" zipper and the zipper described in the '214 patent, that evidence was not presented to the Court.

However, the more fundamental issue with Defendants' argument is that their factual theory of inventorship—even if accepted as true—does not support the conclusion that *Blenkarn* conceived of the specific structure described in the '214 patent. The primary evidence on which Defendants rely to support their allegations about Blenkarn's work on waterproof zippers before he met Press is the deposition testimony of Thomas Herbst, a man who worked with Blenkarn at MEC and Arc'teryx, and of Blenkarn himself. But that testimony relates almost exclusively to Blenkarn's attempts to *laminate* zippers. It says essentially nothing about Blenkarn's attempt to develop or modify the structure of the zipper which ultimately appeared in the '214 patent. Blenkarn testified that "there came a time in which [he] wanted to laminate a reverse coil zipper with polyurethane," Blenkarn Dep. at 13:17-18; that he "experimented in trying to laminate reverse coil zippers with polyurethane," *id.* at 18:19-22; that at some point he worked with and considered modifying a waterproof zipper created by Jean Norvell, an employee of W.L. Gore,[3] *id.* at 18:24-19:9; and that at the time he met Press in 1995 he had created "prototypes" of laminated zippers, *id.* at 26:19-24.[4]

---

[3] At his deposition, Blenkarn provided certain testimony which could be read to suggest that he conceived of an idea for modifying the structure of the Norvell zipper. Blenkarn Dep. at 18:24-19:9. However, Blenkarn's statement is muddled at best, and neither party has attempted to explain the import—if any—of this testimony. To the extent that Blenkarn's testimony could be read as claiming that he conceived of certain modifications to the structure of the Norvell zipper which were ultimately reflected in the structure of the zipper described in the '214 patent, that testimony is uncorroborated by any other evidence in the record and is thus insufficient to prove co-inventorship. *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998) ("[A]n inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof." (citing *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993))).
[4] Blenkarn's only testimony that pertains directly to decisions about the structure of the zipper he allegedly provided to

Herbst similarly testified regarding Blenkarn's attempts to laminate zippers. *See, e.g.*, Herbst Dep. at 23:19-25:6. None of this evidence supports the conclusion that Blenkarn "conceived" of any specific aspect of the structure of the zipper described in the '214 patent.[5]

What Defendants essentially argue is that because Blenkarn was laminating zippers with a specific structure and because he gave Press a prototype of a laminated zipper with that same specific structure, Blenkarn must have conceived of that structure. This vague, circumstantial evidence is insufficient to rise to the level of "clear and convincing" proof sufficient to defeat the presumption that the inventors named in a patent are the true inventors. *See, e.g.*, *Finkelstein v. Mardkha*, 495 F. Supp. 2d 329, 337 (S.D.N.Y. 2007) ("Because of this presumption . . . the claimed inventor must meet a heavy burden of proving his case by clear and convincing evidence.").[6]

Defendants further argue that the Court's March 31, 2019 Order misapprehended Blenkarn's testimony regarding his contributions to the claimed invention. Def. Recon. Mem. at 7-8. The Court agrees with Defendants that whether or not Blenkarn specifically disavowed any claim that he is a co-inventor is a matter of disputed fact. But Defendants' focus on a single statement in the Court's order misses the overarching point: In the absence of any testimony from Blenkarn himself claiming that he is a co-inventor or pointing to any specific elements of the '214 patent that he believes he conceived, Defendants bear a particularly onerous burden in attempting to prove

---

Press was his testimony about adapting tent pulls to make a slider. Blenkarn Dep. at 34:13-35:4; 47:19-48:9. That testimony has no bearing on the issues presented in this motion because claims for specific zipper pulls or sliders were not included in the '214 patent.

[5] To the extent that this evidence supports the proposition that Blenkarn conceived of the "structure" of the zipper in the broadest sense—in other words, that it was Blenkarn's idea to apply a water resistant layer to a reverse coil zipper—that argument was addressed in the Court's March 31, 2019 order. The Court found that Defendants had provided no reason to believe that this general conception of the "structure" of the zipper described in the '214 patent was anything more than the current state of the art. Defendants have not disputed that finding in their Motion for Reconsideration and, indeed, at oral argument pointed to more specific aspects of the structure of the '214 patent that they believe were invented by Blenkarn.

[6] Because the Court finds that Defendants have not put forth sufficient evidence that Blenkarn did in fact conceive of any specific element of the structure of the zipper described in the '214 patent, it need not consider Defendants' argument that the March 31, 2019 order overlooked evidence regarding the significance of Blenkarn's alleged contribution. Def. Recon. Mem. at 6-7.

inventorship. Even if the Court disregards the evidence suggesting that Blenkarn himself claimed *not* to be a co-inventor, Defendants' evidence is still insufficient for a reasonable trier of fact to find by clear and convincing evidence that Blenkarn was a co-inventor.

### C. Plaintiffs' Motion for Reconsideration or Clarification Regarding Defendants' Seventeenth Affirmative Defense

Plaintiffs have moved for reconsideration or clarification of the Court's Summary Judgment Opinion on the ground that the Court did not expressly address Plaintiffs' motion for summary judgment on Defendants' seventeenth affirmative defense alleging that Plaintiffs' Lanham Act claims are barred by a statute of limitations. Dkt. No. 433. Defendants have expressly acknowledged that they do not oppose this motion. Dkt. No. 440. Accordingly, Plaintiffs' motion for summary judgment on Defendants' seventeenth affirmative defense is granted.

## III. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment on Plaintiffs' breach of contract claims is GRANTED; Defendants' motion for reconsideration is DENIED; and Plaintiff's motion for reconsideration is GRANTED. The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 431 and 433.

SO ORDERED.

Dated: July 8, 2019.
New York, New York

GREGORY H. WOODS
United States District Judge