UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/30/2020
```

---------------------------------------------------------------- X

AU NEW HAVEN, LLC, and TRELLEBORG　　:
COATED SYSTEMS US, INC.,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiffs,　　　:　　　　1:15-cv-3411-GHW
　　　　　　　　　　　　　　　　　　　　　:
　　　　　-against-　　　　　　　　　　　　:　　　MEMORANDUM OPINION
　　　　　　　　　　　　　　　　　　　　　:　　　　　　AND ORDER
YKK CORPORATION et al.,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendants.　　　:
---------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

This is the parties' second stab at summary judgment. YKK Corporation *et al.* (collectively,

"YKK") asks the Court to determine whether Plaintiffs' Lanham Act, Connecticut Unfair Trade

Practices Act ("CUTPA"), and contract claims can proceed to trial, along with Plaintiffs' outstanding

underlying patent claims. For the reasons that follow, YKK's motion is GRANTED as to Plaintiffs'

CUTPA and breach of contract claims, and GRANTED IN PART and DENIED IN PART as to

Plaintiffs' Lanham Act claim.

## I.　　BACKGROUND[1]

On March 31, 2019, the Court issued a summary judgment opinion, comprehensively

zipping together the facts in this case. *See* Summ. J. Op., Dkt. No. 425, at 1–4. For the purposes of

this opinion, the Court assumes the reader's general familiarity with the facts as set forth in that

summary judgment decision, and will update the reader or call attention to specific facts only as

needed to decide the limited, nuanced issues currently before the Court. Still, a brief reminder of the

---

[1] The Court views the facts "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). Unless otherwise noted, the following facts are undisputed.

issues at the heart of this dispute might be helpful.

As the Court previously described in much greater depth, in early 2002, YKK entered into an exclusive licensing agreement (the "ELA") with Stuart Press and Harold Hoder, the owners of the recently issued U.S. Patent No. 6,105,214 (the "'214 patent") and the operators of Uretek, Inc. *See* Summ. J. Op. at 2, 17–18; ELA, Dkt. No. 406-3, at 1.  Among other things, this agreement provided YKK an exclusive (but limited) field of use license—namely:

> an exclusive, worldwide right to manufacture, use, sell, offer for sale and otherwise use and practice the invention contained in U.S. Patent No. 6,105,214, corresponding applications in Taiwan, Canada, Japan, and the European Patent Office . . . except for zippers placed in finished goods in the high end outerwear, marine, military and luggage (excluding sports and cosmetic bags) markets

in exchange for "a royalty of US$.03 per meter" for all patented zippers sold by YKK.  ELA ¶ 2. Plaintiffs have sued YKK because, among other things, they believe that, for years, YKK has been selling its laminated zippers all around the world into the unlicensed, high-end outerwear market.

After the Court published its opinion—and after a flurry of motions for reconsideration and clarification—the parties began the slow march to take what remained of Plaintiffs' claims to trial. The Court originally scheduled the trial for January 13, 2020.  *See* Dkt. No. 455.  But as the motions *in limine* trickled in, it became abundantly clear that there were structural issues lurking in these motions that would more properly be raised in the context of summary judgment.  The Court extended the deadline for motions for summary judgment to adjudicate those issues before—rather than doing so during or after—trial.  *See generally* Dkt. No. 562 (discussing the reasons for the Court's decision to extend the deadline).

The briefs broadly addressed the following questions:  first, whether the patent publication privilege bars Plaintiffs' Lanham Act false advertising claim; second, whether Plaintiffs can use CUTPA—a Connecticut statute that protects against unfair business practices that occur in that state—to sue YKK for selling its patented, water resistant zippers to customers all around the world;

and third, whether Plaintiffs' remaining contract claim presents triable issues, given YKK's offer of

judgment for the amount Plaintiffs sought to recoup by litigation.

The relevant facts necessary to adjudicate these questions are outlined below.

### A.    The Exclusive License Agreement

Plaintiffs' false advertising claim rests on four different categories of statements that YKK

made that they allege inaccurately described the limits of YKK's field of use license under the ELA:

(1) "YKK is the Exclusive Licensee of the water repellent zipper technology owned by Uretek in the

United States as embodied in U.S. Patent No. 6,105,214 and its corresponding foreign patents," Rule

56.1 Stmt., Dkt. No. 591, ¶ 828; (2) "The owners of Uretek, an American company are the owners

of patents deriving from EP1150586B1 & EP1629740B1 which relate to waterproof slide fasteners.

YKK Corporation is licensed to manufacture and sell across the world, products protected by these

patents," Rule 56.1 Stmt. ¶ 828; (3) "YKK Corporation is a licensee to manufacture and sell

products protected by [the '214 and related foreign patents]," Rule 56.1 Stmt. ¶ 712; and (4) "YKK

is the exclusive licensee of the water repellant slide fastener technology embodied in U.S. Patent No.

6,105,214 and its corresponding foreign patent.  YKK has the exclusive right to manufacture, use,

sell and import zippers incorporating this water repellant technology," Rule 56.1 Stmt. ¶ 816; *see also,*

*e.g.*, Ex. 621–28, Dkt. No. 567-22–567-29.[2]

### B.  Connecticut Connections

To ground their CUTPA claim, Plaintiffs assert that YKK's "grand scheme" to steal Uretek's

"rightful share" of the worldwide water-resistant zipper market, involve some commercial activity

that took place in Connecticut.  Pls.' Opp'n to Defs.' Mot. for Summ. J., Dkt. No. 589 ("Opp'n"), at

2.  To be clear, Plaintiffs do not allege that YKK sold any zippers to Connecticut customers, or

---

[2] YKK disputes when, where, and to whom many of these statements were made.  *See* Rule 56.1 Stmt. ¶¶ 828, 838, 816.  These disputes are irrelevant for the purpose of resolving this motion.

advertised to any customers in Connecticut; instead, they claim that YKK engaged in sufficient commercial conduct in Connecticut to subject them to Connecticut law for selling zippers to customers all over the world in the excluded markets.  Plaintiffs link YKK's commercial conduct to Connecticut by reciting the following litany of facts:

1. YKK Group is a global conglomerate consisting of approximately 108 affiliates located in 72 countries.  The members of YKK Group act, in essence, as a single enterprise.

2. Uretek was a family-owned business which operated a manufacturing plant located at 30 Lenox Street, New Haven, Connecticut (the "CT Plant").  Uretek employs approximately 100 people at its Connecticut manufacturing plant.

3. Press was a resident of New Haven, Connecticut when he invented and applied for a patent on the [water-resistant zipper] described in the '214 Patent.

4. YKK representatives traveled to New Haven, Connecticut on numerous occasions over many years to tour Uretek's CT Plant, to discuss Uretek's patents, to negotiate the terms of an output contact and of a license agreement, and to inspect Uretek's quality control systems.

5. YKK representatives engaged in continuous communication with Uretek and its attorneys in Connecticut concerning the business arrangements between YKK and Uretek.

6. YKK drafted and sent to New Haven, Connecticut, non-disclosure agreements governed by the laws of the State of Connecticut.

7. YKK agreed to a five-year Exclusive Output Contract with Uretek, executed by Uretek in Connecticut, whereby YKK would ship non-laminated zipper tape to Uretek's Connecticut manufacturing plant for lamination by Uretek.

8. During negotiations of the ELA with YKK, Uretek communicated to YKK that Uretek would continue to laminate "zippers for high end outerwear, US military, luggage trade, and other high end applications as in boats or tents" in New Haven, Connecticut.

9. YKK entered the ELA with Uretek, which was executed by Press and Hoder in Connecticut.  Pursuant to the ELA, Uretek granted YKK a limited license to use the [']214 Patent worldwide, including in the United States and in Connecticut. YKK agreed to give any notice required under the ELA to Uretek at its New Haven, Connecticut address.

10. From 2003 through 2019, YKK made 34 discrete semi-annual royalty payments to Uretek pursuant to the ELA by wire transfer to Uretek's accounts in New

Haven, Connecticut, in an amount totaling $7,472,966. YKK, however, intentionally did not pay Uretek royalties on sales of six (6) lines of water resistant zippers, several of which YKK itself contemporaneously believed were covered by the ELA.

11. From 2002 to 2019, YKK shipped over 43 million meters of non-laminated zipper tape to Uretek in Connecticut for lamination by Uretek at Uretek's CT Plant, which laminated zippers Uretek shipped out of Connecticut to YKK. YKK paid Uretek in Connecticut approximately $40 million to laminate these zippers in Connecticut.

12. From 2003 to 2013, YKK sent over seventy (70) samples of third party polyurethane laminated reverse coil zippers to Uretek in New Haven, Connecticut for inspection and testing in Uretek's CT Plant to determine if those zippers infringed the [']214 Patent.

13. Despite the fact that Uretek did not grant YKK a license to sell YKK-laminated zippers into the Excluded Markets, YKK adopted an internal sales policy that instructed YKK employees to divert sales of the T4 zippers laminated by Uretek in Connecticut to the T8 zippers laminated by YKK in Japan, including zippers intended for use in the high end outerwear and luggage Excluded Markets.

14. To effectuate YKK's aforesaid sales policy, YKK falsely advertised (globally, including on its website which was accessible from the United States, including from Connecticut) that YKK was licensed to sell YKK-laminated zippers for use in finished goods in the Excluded Markets. Conversely, YKK never advised its customers that they were exposed to patent infringement claims by Uretek if the customer used a YKK-laminated zipper in finished goods in the Excluded Markets. Drafts of certain language contained in certain of these statements were sent to Uretek in Connecticut for review and approval, all without YKK ever advising Uretek that such language would be used by YKK to sell YKK-laminated zippers to Excluded Market customers.

15. From 2009 to 2019, YKK sold over 102 million meters of unlicensed YKK-laminated zippers into the Excluded Markets.

16. But for YKK's unfair and deceptive acts or practices, Uretek would have laminated in Connecticut at the CT Plant the 102 million meters of unlicensed zippers YKK sold into the Excluded Markets.

17. As a result of YKK's unfair and deceptive acts or practices, Uretek suffered over $61 million in lost profits, the economic impact of which was suffered by Uretek in Connecticut.

Opp'n at 22–24 (citations omitted).

In addition, Plaintiffs describe YKK's grand scheme to corner Uretek's fair share of the excluded marketplace as including the following alleged misdeeds:

1. Deceptively engaging in "rhetoric" related to the scope of the markets expressly excluded from the ELA (the "Excluded Markets") in order to induce Stuart Press ("Press") and Harold Hoder ("Hoder") to enter the ELA;

2. Beginning immediately after the ELA was executed, ignoring the high end outerwear and luggage Excluded Markets limitations on the ELA, including omitting such restrictions from YKK's [water-resistant zipper] sales policy in order to shift Excluded Market sales of Uretek-laminated [water-resistant zippers] (generally T4 and T5 [water-resistant zippers]) to sales of YKK-laminated [water-resistant zippers] (generally T8, T9, T10, and RCPU [water-resistant zippers]);

3. Misleading Uretek as to the state of the [water-resistant zipper] market, as to YKK's [water-resistant zippers] sales activities and as to the nature of the Uretek-YKK relationship;

4. Tricking, by false and misleading statements and/or material omissions, YKK's own customers into believing that YKK had an unrestricted right and/or license to sell the YKK-laminated [water-resistant zippers], including for use in the Excluded Markets, and thereby also deceptively exposing those customers to patent infringement claims by Uretek in the United States and abroad;

5. Deceiving Uretek into approving certain advertising language that Uretek justifiably expected would be used by YKK to market Uretek-laminated [water-resistant zippers], when instead YKK intended to, and did, use same to market the YKK-laminated [water-resistant zippers] for use in the Excluded Markets;

6. Tricking Uretek into believing that YKK respected its self-described partnership with Uretek by sending to Uretek samples of potentially infringing third-party zippers and asking Uretek to pursue YKK's competitors while concealing the fact that YKK itself was the world's largest source of infringement;

7. Unilaterally and deceptively manipulating the manner in which YKK paid, or did not pay, royalties under the ELA, including paying royalties on [water-resistant zipper] sales made in the Excluded Markets and repeatedly failing to pay hundreds of thousands of dollars of royalties on permitted market sales due under the ELA with respect to six different [water-resistant zipper] lines (RCPU, DT, AquaCheat, DD, DG, and DS), only now offering to make such payments on the eve of trial to avoid the jury's scorn;

8. Delaying resolution (private or judicial) of this dispute for nine (9) years while YKK maximized its sales of, and profits from, [water-resistant zippers] on the belief that Uretek was receiving enough financial benefits to be satisfied and/or was afraid to litigate against YKK in any event; and

9. Expressly confirming in-house in 2014 the decades long existence of YKK's Grand Scheme and nevertheless instructing all YKK representatives in 2015 to "maintain your ordinary course of business and communication with customers" even after this action had commenced.

Opp'n at 2–3 (citations omitted).  Not all of these allegations are entirely undisputed.  Still, these are Plaintiffs' view of the facts.  And for the purposes of this motion, the Court accepts them as true.

### C.  Offer of Judgment

The parties agree that on January 8, 2020, YKK offered Plaintiffs $740,572.00 to satisfy the unpaid royalties breach of contract claim, including prejudgment interest, through January 8, 2020. Ex. 630, Dkt. No. 567-31.  The parties disagree, however, whether this offer constitutes complete relief pursuant to Fed. R. Civ. P. 68 for Plaintiffs' breach of contract claim based on YKK's failure to pay royalties due under the ELA.

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.

2008) (citing *Celotex*, 477 U.S. at 323–24). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In evaluating whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

## III.   DISCUSSION

### A.  Lanham Act

#### 1.  The patent publication privilege

The Federal Circuit has long recognized a tension between a patentee's privileged right to "notify the public of its patent rights" and Section 43(a) of the Lanham Act, which prohibits "false

8

or misleading description[s] of fact, or false or misleading representation[s] of fact, which in commercial advertising or promotion, misrepresent[] the nature, characteristics, qualities, or geographic origin of [the speaker's] or another person's goods, services, or commercial activities." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1352–53 (Fed. Cir. 1999). To reconcile this potential conflict, "before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith." *Id.* at 1353. Put differently, if a patentee notifies customers of a potential infringer that the infringer's products may infringe the patentee's patent, those statements are actionable under the Lanham Act false advertising provision only if they are made in bad faith.

YKK argues that its allegedly false statements referring to its status as the "exclusive licensee" of the '214 patent are covered by the publication privilege, and thus cannot form the basis of a Lanham Act false advertising claim unless Plaintiffs prove that those statements were made in bad faith. The Court agrees. YKK's statements fall squarely within the scope of the patent publication privilege: They inform the marketplace of the existence of the '214 patent and YKK's rights under that patent.

Plaintiffs' attempts to distinguish the statements at issue here from statements that have been found to be covered by the privilege don't hold water. First, Plaintiffs argue that the application of the publication privilege to Lanham Act claims depends on "what body of law one uses to determine if the statement is false." Opp'n at 6. Because the Court need not look to patent law to determine whether YKK's statement that it is the exclusive licensee of the '214 patent is false, so the argument goes, there is no conflict between patent law and the Lanham Act in this context and no need to apply the privilege. This makes little sense. The "privileged right of a patentee to notify the public of its patent rights is statutorily rooted in the patent laws at 35 U.S.C. § 287, which

authorizes patentholders to 'give notice to the public' of a patent by marking [their] patented articles and makes marking or specific notice to the accused infringer a prerequisite to the recovery of damages." *Zenith*, 182 F.3d at 1353.  The conflict described by the Federal Circuit in *Zenith*, therefore, is not a conflict between the Lanham Act false advertising provision and patent law generally, but a specific conflict between a patentee's right to publicize its patent in good faith— even if its statements are ultimately untrue—and the Lanham Act's prohibition against making false representations of fact.  Plaintiffs may be correct that in most cases involving the application of the publication privilege, the court was required to apply patent law to determine whether the challenged statement was true or false.  *See* Opp'n at 8.  But Plaintiffs' observation regarding the context in which the issue is often raised does not imply that the privilege is necessarily limited to *only* that context.

Next, Plaintiffs argue that because the core right conveyed by a patent is the right to exclude others from using the claimed invention, that fundamental right must necessarily define the scope of the patentee's privilege to notify the public of its patent rights.  Thus, according to Plaintiffs, because a licensee does not obtain the right to exclude by virtue of its license—it merely obtains a covenant from the patentee not to sue for infringement[3]—a licensee's statements about its own license rights cannot fall within the scope of the publication privilege.  This theory fails for at least three reasons.  First, not only do none of the cases Plaintiffs cite compel that narrow a reading of the patent publication privilege, but one of the Federal Circuit's seminal cases involving the privilege explicitly treated exclusive licensees and patentholders identically for the purposes of analyzing the privilege's applicability.  *See Zenith*, 182 F.3d at 1343 n.1.  Second, the statute from which the publication privilege is derived, 35 U.S.C. § 287, specifically permits not just patentees, but "persons

---

[3] The Court agrees with this description of a license as a covenant not to sue.  *See* Reconsideration Op., Dkt. No. 454 at 6.

making, offering for sale, or selling within the United States any patent article for or under them or importing any patented article into the United States" to "give notice to the public" that an article is patented. Limiting the privilege to the patentholder alone is therefore inconsistent with section 287's text, which explicitly broadens the suite of entities permitted to publicize the patented status of their products.

Third: Even if Plaintiffs' articulation of the law were correct, the carveout they have constructed simply would not apply to the facts of this case, because YKK obtained a right to sue infringers by virtue of the Exclusive License Agreement. *See* ELA ¶ 7 ("Should HP decline to take action [against an infringing party], [YKK] shall have the right to take action at its sole discretion."); *see also Alfred E. Mann Found. For Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010) ("[W]here an exclusive license transfers less than 'all substantial rights' in the patents to the exclusive licensee, the exclusive licensee may still be permitted to bring suit against infringers, but the patent owner is an indispensable party who must be joined."). YKK also obtained certain rights to enforce the '214 patent by virtue of the Exclusive License Agreement. So when YKK publicized its status as an exclusive licensee, it can be understood to have been notifying the public of *its* rights under the patent.

Finally, Plaintiffs argue that the publication privilege applies only to statements claiming potential infringement. That's also wrong. "[T]he patent laws permit a patentee to inform a potential infringer of the existence of its patent." *GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1374 (Fed. Cir. 2007); *see also Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998) ("In general, a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of *information about the existence or pendency of patent rights*." (emphasis added)); *Zenith*, 182 F.3d at 1353 (referencing the "privileged right of a patentee to notify the public of its patent rights" and finding that the bad faith requirement applies before a

11

patentee can be held liable for "marketplace activity in support of its patent"). 35 U.S.C. § 287 describes a method by which a patentee may do so: marking the product itself so that all members of the public are aware that the article is patented.[4] That marking is not a statement that infringement has already occurred; it is a warning to potential infringers. Plaintiffs have provided no persuasive reason to exclude from the scope of the publication privilege a patentee or licensee's pre-infringement statements that both warn potential infringers that a product is covered by a patent and inform the public that the speaker has a right to enforce that patent.

Accordingly, the Court finds that the publication privilege applies to the statements on which Plaintiffs' Lanham Act claim is based. For liability to attach under the Lanham Act, Plaintiffs must therefore demonstrate that YKK made these statements in bad faith.

"Bad faith includes separate objective and subjective components." *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008). To satisfy the objective bad faith requirement, a plaintiff asserting a Lanham Act claim must show that the statements made by the patentee were "objectively baseless." *Id.* (quoting *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1375 (Fed. Cir. 2004)).

What does it mean for a statement to be "objectively baseless"? Classically, this standard means that "the infringement allegations [are] such that no reasonable litigant could reasonably expect success on the merits." *Dominant*, 524 F.3d at 1260. Applying a similar test in the context of awarding litigation fees under 35 U.S.C. § 285, the Federal Circuit has also characterized "objectively

---

[4] Plaintiffs' argument seems to assume that the publication privilege is rooted only in the portion of 35 U.S.C. § 287 which governs the actual notice that a patentee must give an infringer if the patentee did not previously mark its products as patented. Opp'n at 10 ("Any right under the Patent Act to give notice to the public, or publish one's patent rights, therefore is informed by the language of 35 U.S.C. § 287, which requires that notice must be of 'the infringement,' not merely notice of the patent's existence or ownership."). But that is at odds with the language of *Zenith* specifically referencing the portion of § 287 relating to pre-infringement marking. *Zenith*, 182 F.3d at 1353.

baseless" as something with "no objective foundation." *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d

907, 916 (Fed. Cir. 2012) (quoting *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1377 (Fed. Cir. 2011)).

Plaintiffs propose that the Court adopt a different standard, and hold that a statement is

objectively baseless if no "reasonable" person would believe the statement was "accurate," and that

a statement is not objectively accurate if it is "incorrect or false." Opp'n at 12. Plaintiffs have

provided no legal support for this unnatural reading of the phrase; indeed, a closer look at Plaintiffs'

brief reveals that Plaintiffs have manufactured this standard by stringing together cherry-picked

words from three Federal Circuit opinions:

> "Objectively baseless" means that no "reasonable" person would believe that YKK's
> Statements were "accurate." *Dominant Semiconductors Sdn. Bhd*, 524 F.3d at 1260 ("To
> be objectively baseless, the infringement allegations must be such that no reasonable
> litigant could reasonably expect success on the merits.") (internal quotation marks
> omitted); *Globetrotter Software, Inc.*, 362 F.3d at 1377 ("[B]ad faith is not supported
> when the information is objectively accurate.") (internal quotation marks omitted).
> A statement is not objectively accurate if it is "incorrect or false." *Mikohn Gaming
> Corp.*, 165 F.3d at 897 ("In general, a threshold showing of incorrectness or falsity, or
> disregard for either, is required in order to find bad faith . . . ."). Here, a reasonable
> juror could find that YKK's Statements are "incorrect or false," either literally or
> impliedly false.

Opp'n at 12–13 (footnotes omitted). The Court does not understand how any of the parentheticals

discussing *Dominant Semiconductors*, *Globetrotter Software*, or *Mikohn Gaming* support the proposition that

the "'objectively baseless' standard means that no 'reasonable' person would believe that the

statements at issue were 'accurate.'" Opp'n at 12. Certainly, the cases themselves say no such thing.

Both *Globetrotter Software* and *Dominant Semiconductors* specifically define the "objectively baseless"

standard as meaning that "no reasonable litigant could realistically expect success on the merits."

*Globetrotter Software*, 362 F.3d at 1376, *Dominant Semiconductors Sdn. Bhd.*, 524 F.3d at 1260. And

*Mikohn Gaming* does not refer to the phrase "objectively baseless" at all—instead, it generally

describes the meaning of "bad faith." Frankly, the Court is surprised that it needs to remind

Plaintiffs that a party cannot cobble together a legal standard by plucking random words from a few

opinions, scrambling them together, and then citing those opinions as an authoritative source.[5]

Courts do not play Scrabble with case law.

---

[5] But perhaps the Court should not be so surprised.  During its December 19, 2019 conference with the parties—when this motion for summary judgment was still a nascent bud buried in a motion *in limine*—the Court engaged in a colloquy with counsel for Plaintiffs about this very problem.  In their opposition to YKK's motion, counsel for Plaintiffs had cited a few words from *Golan v. Pingel Entertainment*, 310 F.3d 1360, 1371 (Fed. Cir. 2002), in support of its theory that a statement which is "false and misleading" under the Lanham Act would also be "objectively baseless" for the purposes of patent law's publication privilege:

> The Federal Circuit itself suggested that the objectively baseless inquiry encompasses each of the three ways to prove falsity under the Lanham Act when it framed the issues as whether [sic] "statement was *false or misleading*," which of course is the standard for violating the Lanham Act.  *Golan*, 310 F.3d at 1371 (emphasis added).

Dkt No. 537 at 18.  While certainly a quote from *Golan*, those words are taken from a section of the opinion unrelated to patent law, much less the "objectively baseless" standard.  During the conversation, the Court commented that, in future, counsel should not simply pluck words out of context from caselaw:

> THE COURT:  Thank you.  So, counsel, I'm looking at the *Golan* case with the cited language regarding "false or misleading."  I see that appearing in a wholly separate section of the opinion than the discussion of the patent privilege that we've been discussing.  As we're talking about false and misleading language here, counsel, can you point me to why it is that the language cited from the circuit in your brief supports the contention that that is the standard that they apply when evaluating the objective baselessness of language.  I see the language that you cited in the section of the opinion headed "Pingle's communication with Rivera regarding Golan's fuel filter," which is a paragraph or two above the circuit's discussion of "patent infringement allegations."  So I'm curious why it is that you would have me read that quote into their jurisprudence regarding the objectively baseless determination.
> MR. FISHER:  I thought, your Honor -- Sean Fisher again -- that was part of the Court's discussion applying the standard.
> THE COURT:  Thank you.  Please take a look at it.  Let me know if that's true.
> MR. FISHER:  Your Honor, I read the statement – it's followed immediately by the sentence saying:  Consequently, patentees do not violate the rules of fair competition by making inaccurate representations; and are allowed to make representations that turn out to be inaccurate, provided they make them in good faith.  And the court language appears right after that.  I apologize, your Honor.  I thought that this was part of the circuit court's discussion of the overall issue.
> THE COURT:  Thank you.
> MR. FISHER:  Then later it applied that standard in the subsequent paragraphs.
> THE COURT:  Thank you.  Where is the pincite for the quote regarding false or misleading?
> MR. FISHER:  Sean Fisher.  1371, your Honor.
> THE COURT:  Thank you.  Can you read me the sentence that surrounds it?
> (Pause)
> MR. FISHER: Your Honor, I apologize -- this is Sean Fisher -- I can't find that language.
> THE COURT:  Thank you.
> MR. FISHER:  It's missing here.

And while Plaintiffs are correct that the classic definition of objective baselessness—namely, whether "the infringement allegations [are] such that no reasonable litigant could reasonably expect success on the merits," *Dominant Semiconductors*, 524 F.3d at 1260—does not obviously apply in the context of statements that do not allege a specific instance of infringement or threaten suit, the Federal Circuit has made clear "the 'objectively baseless' standard applies to publicizing a patent in the marketplace as well as to pre-litigation communications,"[6] *id.* at 1260 n.5.  Again, Plaintiffs have failed to cite any authority suggesting that the words "objectively baseless" should mean anything but what they say—a statement which lacks any reasonable, objective basis in fact.[7]

Turning to the statements at issue here:  YKK argues that it is entitled to summary judgment on Plaintiffs' Lanham Act claim because each of the statements is objectively true on its face, and

---

THE COURT:  Thank you.  That's fine.  Good.  So to the extent that there is discussion that you find regarding the use of that word after doing a control F through the opinion, if you find that that appears someplace in a portion of the opinion that describes the parameters of the patent privilege that we've been discussing, I'd invite you to write me a supplemental letter to show me where that is.  If I don't see such a letter, I'll understand that the quotation is from the earlier portion of the opinion which does not appear to describe the parameters of the privilege.  I would ask you, counsel, to please be conscientious with respect to this going forward.

Dec. 19, 2019 Tr. 22–24.  No such letter was ever filed.

[6] Seizing upon the disconnect between the historical definition of the "objectively baseless" standard and the facts of this case, Plaintiffs have argued that this proves that the privilege does not apply to statements which do not specifically allege infringement.  As discussed above, however, 35 U.S.C. § 287—the statute in which the privilege is rooted—relates both to pre-infringement publication of a patent and notifications to specific entities accused of infringement.  The Court is unpersuaded by the argument that, just because the objectively baseless standard—something that undeniably developed in the context of pre-litigation communications—is often defined in terms of the merits of potential litigation, the patent publication privilege itself should apply only to statements threatening litigation.

[7] Plaintiffs also attempt to argue that the standard for objective baselessness is satisfied if a reasonable juror could find that the challenged statements are either "literally" or "impliedly false" under the Lanham Act.  *See* Opp'n at 13.  But this argument would render the privilege's objective bad faith requirement entirely meaningless in Lanham Act cases.  The conflict between the publication privilege and the Lanham Act arises from the reality that there are some false statements which may be actionable under the Lanham Act false advertising provisions, but are nonetheless covered by the patent publication privilege because they are not objectively baseless.  *See Zenith*, 182 F.3d at 1352–53.  That conflict suggests that the "objectively baseless" standard and "falsity" under the Lanham Act are terms whose meanings are not coterminous.

accordingly does not lack a reasonable, objective basis.  For the most part, the Court agrees—but only with respect to three of the four challenged statements.

Again, four distinct statements form the basis of Plaintiffs' Lanham Act claim:  (1) "YKK is the Exclusive Licensee of the water repellent zipper technology owned by Uretek in the United States as embodied in U.S. Patent No. 6,105,214 and its corresponding foreign patents," Rule 56.1 Stmt. ¶ 828; (2) "The owners of Uretek, an American company are the owners of patents deriving from EP1150586B1 & EP1629740B1 which relate to waterproof slide fasteners.  YKK Corporation is licensed to manufacture and sell across the world, products protected by these patents," Rule 56.1 Stmt. ¶ 828; (3) "YKK Corporation is a licensee to manufacture and sell products protected by [the '214 and related foreign patents]," Rule 56.1 Stmt. ¶ 712; and (4) "YKK is the exclusive licensee of the water repellant slide fastener technology embodied in U.S. Patent No. 6,105,214 and its corresponding foreign patent.  YKK has the exclusive right to manufacture, use, sell and import zippers incorporating this water repellant technology," Rule 56.1 Stmt. ¶ 816.

The first, second, and third statements are not objectively baseless as a matter of law; the ELA did grant YKK an exclusive license to manufacture and sell products covered by the '214 and related foreign patents all over the world.  The mere fact that the exclusive license was not an unlimited exclusive license does not render these statements objectively baseless.  The same is not true, however, for the second sentence in the fourth statement.  A reasonable jury could conclude that YKK's claim that it held the exclusive right to manufacture and sell products covered by the '214 patent was objectively baseless.  After all, YKK undeniably did not have such an exclusive right—it shared that right with Uretek.

Accordingly, Plaintiffs cannot base their Lanham Act false advertising claim on the first, second, or third type of statements.  But the fourth category of statements survives the patent publication privilege.

16

### 2.  Causation

YKK also moved for summary judgment on Plaintiffs' request for lost profits damages under the Lanham Act.  Because only YKK's fourth category of statements—namely, that it is the "exclusive licensee of the water repellant slide fastener technology embodied in U.S. Patent No. 6,105,214 and its corresponding foreign patent"—survives the patent publication privilege, only one question remains:  Have Plaintiffs presented enough evidence sufficient for a reasonable jury to find that YKK's fourth category of statements caused Plaintiffs' alleged injury?  *See Anderson*, 477 U.S. at 248.  In brief:  yes.

The parties seem to agree with the foundational principle "that a plaintiff who establishes false advertising in violation of § 43(a) of the Lanham Act will be entitled only to such damages as were caused by the violation."  *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771 (2d Cir. 1984); *see also Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, No. 14-cv-585 (AJN), 2018 WL 4253181, at *3 (S.D.N.Y. Sept. 5, 2018); *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 659 (S.D.N.Y. 2018).  And while a court may engage in "some degree of speculation" in determining the amount of actual damages appropriate to award, "causation must first be established."  *Burndy Corp.*, 748 F.2d at 771; *see also Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 303 (S.D.N.Y. 2018) ("When seeking money damages [pursuant to a violation of the Lanham Act], a plaintiff must prove both actual damages and a causal link between defendant's violation and those damages."  (internal quotation marks and citations omitted)).

The parties disagree, however, whether Uretek can marshal sufficient evidence to demonstrate the necessary causal link between YKK's fourth statement and sales in the excluded marketplace.  Initially, Plaintiffs had expected to rely on expert testimony from David W. Cockrell, a clothier, creative director, and brand manager who was set to testify "that companies would not

have purchased the accused zippers from YKK if they had known that YKK was infringing upon Uretek's patents." Daubert Op., Dkt. No. 419, at 41. But the Court excluded that testimony, finding this opinion rooted in hypothetical speculation, "abstract belief[s]," and attorney argument. *See* Daubert Op. at 45–46; *see also* Dkt. No. 453 (affirming Magistrate Judge Netburn's exclusion of Mr. Cockrell's testimony). Clutching at straws to keep their claim alive, Plaintiffs insist that a chain of inferences drawn in their favor from the undisputed facts in the parties' Rule 56.1 Statements demonstrates that a path to victory remains open.

The most generous reading[8] of Plaintiffs' theory of causation is as follows: Customers in excluded markets, having decided that they wanted to purchase a patented water-resistant zipper, believed they had only one choice after reading YKK's false advertisement—YKK-laminated zippers. *See* Opp'n at 18–19. Had YKK's advertisements made clear that only Uretek could sell in the excluded market, YKK's customers would have had to buy from them instead. *See* Opp'n at 18–19. Thus, every sale of a YKK zipper in the excluded market was a sale stolen from Uretek. *See* Opp'n at 19–21.[9]

---

[8] This theory, to be clear, was not well-articulated by Plaintiffs. *See* Opp'n at 9. But the Court's job on summary judgment is to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

[9] The Court has scrutinized the record for evidence supporting the notion that customers in the excluded market were, in Plaintiffs' works, "sensitive to the intellectual property rights of their component suppliers" and would not have purchased infringing products. Opp'n at 20. Only three emails appear to support this statement: Exhibits 809, 812, and 813. The strongest of these three, Exhibit 809, is an email between YKK employees discussing a conversation that Dave Johnson from global marketing at YKK had with someone at Jansport to discuss lowering the prices of their water resistant zippers: "Jansport is recosting all bags with these costs to see if they can work. They will not by [sic] non-YKK because of the patent issue. If the costs do not work, they will simply drop the program." Ex. 809 at YKK0650928. Dave Johnson also forwarded an email from another YKK employee referencing a comment by the president of Eagle Creek: "he is not interested in buying non-YKK or violating our patent." Ex. 809 at YKK0650929.

Exhibit 812 is another discussion between YKK employees; a customer at Spyder reached out to Dave Johnson to discuss "the YKK warning we received for using other vendors that are presumably infringing on the YKK water resistant patent." Ex. 812 at YKK0681405. Mr. Johnson forwarded the email to YKK employee Terry Tsukumo, who expressed his desire that Spyder "use YKK water repellant products instead of other supplier's that infringes YKK/Uretek patent." Ex. 812 at YKK0681404.

Tricky as this link might be to prove at trial, the evidence presented here is sufficient to survive summary judgment.  It presents a cogent reason why YKK's profits on sales in the excluded market might have been at Uretek's expense:  every sale of a YKK zipper was a diverted sale.  *See Church & Dwight Co.*, 2018 WL 4253181, at *13 ("[P]laintiff must prove a diversion of some sales from plaintiff to defendant, essentially establishing a nexus between a competitor's false advertising and a diversion of sales . . . .").

Because Plaintiffs appear to have "evidence on which the jury could reasonably find" that YKK's advertisements that it had the exclusive right to manufacture, use, sell and import zippers incorporating the water repellant technology caused Uretek to lose sales, *Anderson*, 477 U.S. at 252, Defendants' motion with respect to this statement is denied.

### B.  Connecticut Unfair Trade Practices Act

Although part of Plaintiffs' Lanham Act claim will survive summary judgment, Plaintiffs' CUTPA claim does not.  Plaintiffs have pointed to no evidence that YKK engaged in any unfair or deceptive practices "in the conduct of any trade or commerce" in Connecticut.

As is axiomatic, we start with the text.  Section 42-110b of the Connecticut General Statutes reads as follows:  "No person shall engage in unfair methods of competition and unfair or deceptive

---

Finally, exhibit 813 features an email conversation between Dave Johnson and Terry Tsukumo, wherein Mr. Tsukumo tells Mr. Johnson that "YKK needs to educate and inform Brand Holders (LandsEnd) that YKK is an exclusive licensee and Uretek is a patent owner of these products.  They know what this means and what they need to do and you know that."  Ex. 813 at YKK0655007.

Accepting the underlying facts in these emails as true—namely, that certain customers would not purchase infringing products, and that they would "kn[o]w what they need[ed] to do" if told about their use of infringing products—and drawing all inferences in favor of Plaintiffs, this evidence is sufficient to support Plaintiffs' causation theory.  Ex. 813 at YKK0655007.  The Court's acceptance of the underlying facts in these emails as true, however, does not mean the emails will be admissible at trial.  These are, at least arguably, hearsay:  statements by third parties admitted for the truth of the matter asserted.  Still, because the parties did not address whether the documents proffered in support of Plaintiffs' theory are admissible, the Court's analysis stops here.

acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. Ann. § 42-110b(a).

"Trade or commerce" is defined in section 42-110a as:

> the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state*.

Conn. Gen. Stat. Ann. § 42-110a(4) (emphasis added).

Plaintiffs assert that CUTPA covers YKK's "extensive commercial activities in and into Connecticut" so long as YKK's "underlying business is associated with Connecticut."  Opp'n at 22–24, 26.  This misstates the law.  CUPTA covers only unfair or deceptive practices that occur in the course of *trade or commerce in Connecticut*.

For decades, courts have acknowledged that a strict reading of CUTPA suggests that the tortious conduct which forms the basis of a CUTPA claim must occur within the state of Connecticut.  *See, e.g.*, *CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 373 (D. Conn. 2018) ("A strict reading of the statute supports the conclusion that CUTPA requires that the violative conduct complained of occur in Connecticut.").[10]  Strangely, while lower Connecticut state courts and Connecticut federal courts acknowledge the statute's geographic limitations, they have simultaneously claimed "that CUTPA does not require that a violation actually occur in Connecticut, if the violation 'is tied to a form of trade or commerce intimately associated with Connecticut,' or if, where Connecticut choice of law principles are applicable, those principals dictate application of Connecticut law."  *Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 406 F. Supp. 2d

---

[10] *See also Metro. Enter. Corp. v. United Techs. Int'l, Corp., Pratt & Whitney Large Commercial Engines Div.*, No. 3:03-cv-1685 (JBA), 2004 WL 1497545, at *7 & 7 n.5 (D. Conn. June 28, 2004) (engaging in a lengthy discussion of CUTPA caselaw that used choice of law principles to expand CUTPA's reach, and noting that "the plain language of the statute, legislative history, and judicial interpretation of parallel federal and state statutes suggests that conduct wholly outside or originating outside of Connecticut does not fall within the scope of CUTPA"); *Uniroyal Chem. Co. v. Drexel Chem. Co.*, 931 F. Supp. 132, 140 (D. Conn. 1996) ("Reading the statute strictly, it appears that [the plaintiff's] allegations of tortious conduct under CUTPA must have occurred in Connecticut.").

175, 200 (D. Conn. 2005), *opinion adhered to as modified on reconsideration*, 409 F. Supp. 2d 112 (D. Conn.

2006).

Neither the Connecticut Supreme Court, nor the Connecticut appellate courts have

endorsed this approach[11]—one entirely unmoored from the statutory language.[12]  In 2011, the

---

[11] The closest the Connecticut Supreme Court has ever come to weighing in on this conflict is a 1998 decision in a case in which a defendant's alleged CUTPA violation was based on his predicate violation of a Connecticut criminal ticket scalping statute.  *State v. Cardwell*, 246 Conn. 721 (1998).  The state sued the defendant for selling tickets from his Massachusetts office to purchasers in Connecticut for prices in excess of three dollars over their face values.  *Id.* at 730–32.  The Connecticut Supreme Court reasoned that according to the state's Uniform Commercial Code, the defendant actually sold the tickets in Massachusetts, where the defendant based his operations, rather than in Connecticut, where the buyers lived.  *Id.* Accordingly, the defendant did not violate the criminal ticket scalping statute, which applied only to conduct occurring in Connecticut.  But the Supreme Court upheld the trial court's decision to award restitution and civil penalties against the defendant under CUTPA for misleading specific customers in Connecticut, telling them that they were buying prime seats for an event, when the defendant was actually selling fairly mediocre seats "far distant from the stage."  *Id.* at 742–43.  At no point did the Connecticut Supreme Court explicitly discuss the extraterritorial application of CUTPA; instead, its analysis merely endorsed the trial court's exercise of discretion to award penalties and restitution once a CUTPA violation had been established.  *Id.*

[12] The "intimately associated" test appears to originate in *H & D Wireless Ltd. Partnership v. Sunspot*, where a federal district court stated that:

> Defendants' interpretation of the meaning of "trade" and "commerce" as it is used in the statute is overly narrow.  Section 42-110a does not necessarily require that the CUTPA violation occur in this state.  It merely requires that the violation be tied to a form of trade or commerce intimately associated with Connecticut.  *See Southern Marine Research v. Jetronic Indust.*, 590 F. Supp. 1192 (D. Conn. 1984) (holding that, while jurisdiction could be asserted in Connecticut over Delaware's corporation/plaintiff's CUTPA claim against Pennsylvania/corporation/defendant, venue lay in Pennsylvania for other reasons); *Couchon v. LeBron, Inc.,* 33 Conn. Sup. 628, 365 A.2d 409 (Super. Ct. 1976) (jurisdiction asserted over non-resident defendant pursuant to § 52-59b where plaintiff alleged a deceptive trade practice violation).

1987 U.S. Dist. LEXIS 16951, *4 (D. Conn. Feb. 24, 1987).  The two cases that *H&D* cites in support of its assertion that a violation need only "be tied to a form of trade or commerce intimately associated with Connecticut" do not support that proposition.  *Southern Marine Research* is a case entirely concerned with venue; the court there expressly described the question before it as whether a magistrate judge had "erred in finding that venue is properly laid in" Connecticut.  590 F. Supp. at 1193.  And *Couchon* has nothing to do with CUTPA.  Still, this decision—directly contradicting the statute's clear text without any support from any legal authority—launched a thousand ships.  Combined with a line of cases conflating applying Connecticut's choice of law principles to the viability of a CUTPA claim, *see Metro. Enter. Corp.*, 2004 WL 1497545, at *5 (detailing the lineage of these cases and describing numerous concerns with their reasoning, including their troubling use of general choice of law provisions to broaden the range of a statute's intended scope), this reinterpretation of the CUTPA's clear statutory text has wormed its way into almost every federal court decision involving CUTPA's geographic reach, and many lower state court decisions too.

Appellate Court of Connecticut decided *Cohen v. Roll-a-Cover, LLC.*, 131 Conn. App. 443 (2011),

wherein it held that a defendant's tortious conduct committed in Connecticut need not cause an

economic injury inside of Connecticut for a plaintiff to maintain a valid cause of action under

CUTPA. *Id.* at 465.  But this case provides little insight into the question of CUTPA's geographic

reach.  In *dicta*, the Appellate Court referenced, but declined to explicitly endorse, the statements by

the federal and lower Connecticut courts that conduct outside of the state could form the basis of a

CUTPA claim:

> While the plain language of CUTPA is directed at unfair competition taking place in
> this state . . . [federal authority in Connecticut has] held that CUTPA does not
> require that a violation actually occur in Connecticut, if the violation is tied to a form
> of trade or commerce intimately associated with Connecticut, or if, where
> Connecticut choice of law principles are applicable, those principles dictate
> application of Connecticut law.

*Id.* at 464 (alteration in original).

This changed in 2013, when the Appellate Court issued its decision in *Western Dermatology v.*

*VitalWorks, Inc.,* 146 Conn. App. 169 (2013), squarely confronting the question of CUTPA's

geographic reach.  There, VitalWorks, a corporate defendant headquartered in Connecticut, sold

faulty software to the New Mexico-based plaintiffs.  Because VitalWorks conducted all of its

product demonstrations in either California or New Mexico, and because all of the installation

services for the software and hardware purchased under the contract were performed in New

Mexico, the Appellate Court found no CUTPA violation.  *Id.* at 200–01.  The Court could not have

been more clear:  "The meaning of § 42–110b(a) is plain and unambiguous; it proscribes only unfair

trade practices occurring within the state of Connecticut."  *Id.* at 200.  Even though VitalWorks had

corporate headquarters in Connecticut, this did not mean that all of its activities in California and

New Mexico fell within CUTPA's ambit, because "the complained about activities did not involve

the advertising, sale, rent, lease, offering for sale, rent or lease or distribution of any services and any

property, tangible or intangible, real, personal or mixed, and other article, commodity or thing of

value in Connecticut." *Id.*[13]

Even if the Court found the statute itself ambiguous as to CUTPA's geographic reach, the

legislative history certainly is not. A leading CUTPA treatise describes the legislature's absolute

rejection of language that would have rendered the statute to apply to all unfair trade practices

affecting Connecticut residents, regardless of where the conduct took place:

> The contemporaneous legislative history indicates that the Connecticut legislature
> did not intend CUTPA to reach conduct merely "affecting" trade or commerce in
> this state. The legislature, in fact, rejected statutory language which would have
> made CUTPA applicable to conduct which merely affected people in this state. As
> originally proposed in 1973, Committee Rule No. 1965 defined "trade" and
> "commerce" as follows:
>
> > "trade" and "commerce" mean the advertising offering for sale, sale
> > or distribution of any services and any property, tangible, or
> > intangible, real, personal or mixed, and any other article, commodity,
> > or thing of value *wherever situate, and shall include any trade or commerce
> > directly or indirectly affecting the people of this state.*
>
> This language traced exactly the definition of "trade" and "commerce" found in
> § 1(2) of the Model Unfair Trade Practices and Consumer Protection Act suggested
> by the Council of State Governments. However, as CUTPA was enacted, this
> section was amended to define the terms "trade" and "commerce" to include only
> conduct "in this state." The broad scope of the original bill was opposed by the
> Connecticut Merchant's Association, which suggested revised language, noting: "the
> bill should be limited to activities within the state. Connecticut should not purport
> to act with respect to things outside the state. The provision which would reach
> activities indirectly affecting residents of Connecticut is far too broad."

---

[13] The Connecticut Supreme Court affirmed the Appellate Court's decision in *Western Dermatology*, though it
stated that the Appellate Court should have resolved the question of choice of law first and that, upon
determining that New Mexico law applied, the Appellate Court should not have reached the issue regarding
the scope of CUTPA. *See Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 322 Conn. 541, 563 (2016).
The Supreme Court did not, however, offer any substantive critique of the Appellate Court's reasoning
regarding CUTPA's scope. The Court agrees with YKK that, in the absence of any persuasive evidence that
the Supreme Court of Connecticut would reach a different decision, the Court should apply the law as stated
by the Connecticut Appellate Court. *See Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 521 (2d Cir.
2016) (stating that the Circuit is bound to apply New York law as interpreted by New York's intermediate
appellate courts unless the Circuit finds "persuasive evidence that the New York Court of Appeals, which has
not ruled on the issue, would reach a different conclusion" (quotations and alterations omitted)).

12 Conn. Prac., Unfair Trade Practices § 3.7.  Essentially, nothing about the statute's text, legislative

history, or recent Connecticut appellate court decisions casts any doubt on the conclusion that

CUTPA does not apply extraterritorially.

Although Plaintiffs provide a laundry list of supposed YKK-Connecticut connections, *see*

*supra* Part I.B, none of them describe "unfair or deceptive acts or practices in the conduct of trade or

commerce" in Connecticut.  Conn. Gen. Stat. Ann. § 42-110b(a).  Many of the connections on

Plaintiffs' list do not involve any alleged unfair or deceptive conduct, such as YKK's registering to

do business in Connecticut, traveling to Connecticut to negotiate a license, entering into a contract,

making royalty payments, or shipping zippers in and out of state.  And even Plaintiffs' list of

misdeeds associated with YKK's "grand scheme" do not involve "the advertising, the sale or rent or

lease, the offering for sale or rent or lease, or the distribution of any services and any property,

tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in

[Connecticut]."  Conn. Gen. Stat. Ann. § 42-110a.  For example, "deceptively engaging in 'rhetoric'

related to the scope of the markets excluded from the ELA . . . in order to induce Stuart Press . . .

and Harold Hoder . . . to enter the ELA," *see* Opp'n at 2, is not an act "in the conduct" of selling or

offering to sell anything in Connecticut; true, the exclusive license Uretek ultimately awarded YKK

permitted YKK to sell Uretek's patented water-resistant zippers, but Plaintiffs have never alleged

that YKK made any sales into the excluded markets *in Connecticut*.[14]  And there remains the serious

question of whether the act of negotiating the terms of a contract to secure such a license—an act at

least two steps removed from any eventual sale of a zipper (first: acquire the license, next:

---

[14] The closest Plaintiffs get is an allegation in their Rule 56.1 Statement that "YKK knew that the companies
to which it sold the T8, T9 and T10 [water-resistant zippers] sold outerwear using those zippers into the
United States (including Connecticut)."  Rule 56.1 Stmt. ¶ 796.  Even if this tenuous link to Connecticut were
sufficient to implicate CUTPA, the exhibit Plaintiffs cite says nothing about Connecticut, or what YKK
"knew" about its customers.  The exhibit doesn't even discuss zippers in any depth—instead it presents an
overview of the United States jacket industry.

manufacture zippers, finally: sell them to customers)—qualifies as "trade or commerce" within the meaning of CUTPA.

Similarly, YKK's decision to pay royalties, not pay royalties, delay the resolution of this case, and instruct global YKK representatives in 2015 to "maintain your ordinary course of business and communication with customers," *see* Opp'n at 2–3, have nothing to do with Connecticut.  Nor does YKK's allegedly misleading statements to its global base of customers, or its sale of zippers to those customers.  *See* Opp'n at 3.  And just because an allegedly false advertisement was displayed on a website "accessible from the United States, including from Connecticut," does not mean that the website was directed at Connecticut customers, or accessed by a customer in Connecticut.  Opp'n at 3.  Fundamentally, none of Plaintiffs' laundry list of alleged misdeeds happened in Connecticut, or were directed at Connecticut.  And, again, most of those allegedly unfair and deceptive practices are so far attenuated from the conduct of advertising, selling, renting, leasing, offering for sale, rent or lease, or distributing goods or services, that a serious question remains as to whether they are covered by the statutory meaning of "trade or commerce" at all.[15]

While YKK's allegedly deceptive conduct took place in the course of its selling, advertising, and distributing goods to customers all over the world, none of it involves the conduct of trade or commerce *in Connecticut*, as that term is defined in section 42-110a(4).  Plaintiffs' invocation of CUTPA to punish conduct that, it asserts, occurred in connection with YKK's worldwide sale of zippers is flatly inconsistent with the express geographical limitation in the text itself, and the intent

---

[15] This Court takes no position on this question.  It is not before the Court; the issue can be resolved by the Court's decision that CUTPA does not apply extraterritorially.  After all, the Court recognizes that courts—including the Connecticut Supreme Court—have construed CUTPA to apply to "a broad spectrum of commercial activity," even in the absence of a clear textual hook.  *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 132, 142 (D. Conn. 2014) (citing *Kim v. Magnotta*, 249 Conn. 94, 108 (1999) and *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492 (1995)).  Still, it is a salient point worth raising.

of its drafters.  Thus, Defendants' motion for summary judgment on Plaintiffs' CUTPA claim is granted.

### C. Breach of Contract

#### 1. Failure to pay royalties

YKK has moved for summary judgment on Plaintiffs' claim for breach of contract based on YKK's failure to pay royalties due under the ELA.  YKK's motion is based on its offer to tender complete relief on this claim.  Plaintiffs' only rebuttal to YKK's motion is their argument that YKK has not tendered complete relief because YKK's offer did not include the "costs then accrued." Opp'n at 39.

YKK's offer of judgment is not defective for failure to explicitly reference costs.  "[I]f [an offer of judgment] is silent as to fees and costs or states that they are not included, the court is required by [Fed. R. Civ. P. 68] to calculate an additional amount which, in its discretion, it determines to be sufficient to cover costs and fees."  *Rivera v. Corp. Receivables, Inc.*, 540 F. Supp. 2d 329, 334 (D. Conn. 2008).

YKK's motion is therefore granted.  The Court will enter judgment for Plaintiffs on this claim once the offer has been paid.  To that end, by no later than one week following the date of this opinion, the parties are directed to confer and write the Court regarding their proposal for how best to effectuate the offer—whether the Court should order the issuance of a bond, order YKK to deposit the amount with the Clerk of Court to the credit of Plaintiffs, or employ some other method of ensuring payment of the judgment.  The parties must also include each party's proposal for the rate of post-award interest.[16]

---

[16] To the extent that this decision influences the relevance and admissibility of any evidence at trial, the parties will have an opportunity to file supplemental motions *in limine* before then.

### 2.   Subassignment

YKK has moved for summary judgment on Plaintiffs' claim for breach of contract based on YKK's alleged breach of the sublicensing provision of the ELA.  Plaintiffs have expressly acknowledged that they do not oppose this portion of YKK's motion, based on the Court's previous summary judgment ruling.  *See* Opp'n at 40.  Accordingly, YKK's motion for summary judgment on Plaintiffs' sublicensing breach of contract claim is granted.

## IV.   CONCLUSION

For the reasons discussed above, YKK's motion for summary judgment is GRANTED as to Plaintiffs' CUTPA and breach of contract claims and GRANTED IN PART and DENIED IN PART as to their Lanham Act claim.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 564.

SO ORDERED.

Dated: July 30, 2020

GREGORY H. WOODS
United States District Judge