```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
AU NEW HAVEN, LLC and TRELLEBORG            :
COATED SYSTEMS US, INC.,                    :
                                            :
                              Plaintiffs,   :      1:15-cv-3411-GHW
                                            :
            -v -                            :      MEMORANDUM OPINION
                                            :          AND ORDER
YKK CORPORATION, YKK HONG KONG              :
LTD., YKK FASTENING PRODUCTS SALES          :
INC., SHANGHAI YKK ZIPPER CO., LTD.,        :
SHANGHAI YKK TRADING CO., LTD., YKK         :
CANADA INC., YKK TAIWAN CO., LTD., P.T.     :
YKK ZIPPER INDONESIA, YKK                   :
BANGLADESH PTE. LTD., YKK KOREA CO.,        :
LTD., YKK FRANCE SARL, DALIAN YKK           :
ZIPPER CO., LTD., YKK VIETNAM CO.,          :
LTD., YKK DEUTSCHLAND GMBH, YKK             :
(THAILAND) CO., LTD., YKK (U.K.) LTD.,      :
YKK ZIPPER (SHENZHEN) CO., LTD., YKK        :
AUSTRIA GMBH, YKK ITALIA S.P.A., OOO        :
YKK a/k/a YKK RUSSIA, YKK METAL VE          :
PLASTIK URUNLERI SANAYI VE TICARET          :
A.S., and YKK (U.S.A.) INC.                 :
                                            :
                              Defendants.   :
-----------------------------------------------------------------X
```

GREGORY H. WOODS, District Judge:

## I. INTRODUCTION

Au New Haven, LLC and Trelleborg Coated Systems US, Inc. (collectively, "Plaintiffs"), filed this action against YKK Corporation ("YKK") and several of its affiliates (collectively, "Defendants"), alleging patent infringement and breach of a licensing agreement. This opinion resolves one narrow question among the many presented to the Court in this case: is the term "high end outerwear" as used in the parties' contract ambiguous? Because the term suggests various meanings, it is ambiguous and its meaning must be determined by the finder of fact from the extrinsic evidence presented by the parties.

**II.     BACKGROUND**

The parties entered into the Exclusive License Agreement that is at the heart of this dispute on February 13, 2002, just over 20 years ago.  Dkt. No. 406-3 (the "ELA").  The ELA granted YKK a license to manufacture and sell waterproof zippers.  Paragraph 1 of the ELA describes the scope of the license as follows:

> [Harold Hoder and Stuart Press] hereby grants to the Company an exclusive, worldwide right to manufacture, use, sell, offer for sale and otherwise use and practice the invention contained in U.S. Patent No. 6,105,214, corresponding applications in Taiwan, Canada, Japan and the European Patent Office, along with any re-issue, other foreign filing, continuation or improvement of same (hereafter "The Patents"), *except for* zippers placed in finished goods in the *high end outerwear*, marine, military and luggage (excluding sports and cosmetic bags) markets (collectively hereafter "Zippers").

ELA ¶ 1 (emphasis added).

The Court has already examined Paragraph 1 of the ELA in its entirety and concluded that the paragraph as a whole unambiguously embodies a license to use the patented technology and that it is not a covenant not to compete.  *See* Dkt. Nos. 425; 454.  The only question presented here is whether the term "high end outerwear," is ambiguous as used in the agreement.

In their briefing, Defendants describe Plaintiffs' shifting positions regarding whether or not the term is ambiguous.  In the initial conference with the Court, Plaintiffs' counsel took the position that the term was ambiguous and that extrinsic evidence would be required to construe the meaning of the term.[1]  In his deposition, Stuart Press, who entered into the ELA with YKK, testified that "high end outerwear" "is a term of art in the industry that would include but not be limited to, the type of material used, he design of the jacket, the fit of the jacket, the look of the jacket and the

---

[1] Transcript of July 2, 2015 Conference, Dkt. No. 36, 5:11-22 (MR. SCHAEFER [Plaintiffs' Counsel]: Your Honor, we do not believe that there is any need for extrinsic evidence with respect to marine, military and luggage.  We do believe there would be a basis for extrinsic evidence on the meaning of high end outerwear. . . .  MR. WHITMER [Defendants' Counsel]:  Could I interrupt you, your Honor?  I did not hear the first part of counsel's statement.  THE COURT:  You heard the most important part, which is that he agrees with you that extrinsic evidence is necessary to construe the meaning of high end outerwear.").

performance of the jacket and the features of the jacket, and it is the sort of thing that when you see it and wear it, you know it." Declaration of Steven Cherny ("Cherny Decl."), Ex. B, Dkt. No. 661, at 207:21-208:7.

Over the course of his dealings with YKK, Mr. Press presented more concrete, but varying, definitions of the term. At one point, according to YKK, Mr. Press described high end outerwear solely by focusing on products sold by particular companies (North Face, Marmot, Arc'teryx). DX-506. When asked to present a formal definition of the term, Mr. Press, through counsel, proposed an understanding of the meaning of the term that included not only products made by specified manufacturers, but also jackets made of certain types of fabric, jackets costing more than $150 at retail, outerwear used in identified sports, and even "[o]uterwear jackets having more than two zippers" as well as "[o]uterwear pants having any zippers."[2] DX-553. "High end outerwear," thus, could be defined alternatively by reference to style, price, quality of material, use, and even zipper count.

The representative of YKK who signed the ELA, Masayuki Sarumaru, provided a somewhat different understanding of the meaning of the term "high end outerwear" in his deposition. He testified that the he understood the phrase "high end outerwear market" as follows: "My understanding was that it was this was outerwear that was quite expensive, it was a luxury item and that these this outerwear would be made in North America and a sort of representative one would be those made by Arc'teryx." Cherny Decl., Ex. C, Dkt. No. 660, at 118:15-22. He also testified that "what I can say is that when I signed this agreement my understanding was that the high end

---

[2] DX-553 ("you had requested from us that our definition of high-end outerwear for consideration of the meters made in Japan. While this may not be a definition, it should provide you our understanding of industry standards as well as our view of high-end: Outerwear jackets having more than two zippers; Outerwear pants having any zippers; Product, including Gore-Tex. . . . Product including Torray fabric. . . . Outwear jackets sold at retail for more than $150 . . . . Specialty outerwear for outdoor sports, including but not limited to hiking, skiing, snowboarding, cycling, running and extreme sports. Outwear sold at retail by, but not limited to: Patagonia, North Face, Hammut, Seattle Sports, Mountain Equipment coop, Helly Hansen, Moons Mountain Hardware, Adidas, Solomon, Eastern Mountain Sports, REI.")

market was one wherein the product was a high performance product, priced high and something that was made in North America." *Id.* at 133:17-22. Like the definitions proffered by Mr. Press, Mr. Sarumaru testified that "high end" could refer to the price of the product, the manufacturer, the quality and the use of the product. Mr. Sarumaru's testimony calls out an additional potential limitation on the meaning of the term—namely that "high end outerwear" refers only to products manufactured in a particular geographic area: North America.

While Plaintiffs are now taking the position that the term "high end outerwear" is entirely unambiguous, their volte face regarding the ambiguity of the term seems principally motivated by a concern that the trier of fact might decide that the term high end outerwear indeed embraces the geographic limitation advanced by Mr. Sarumaru in his deposition testimony. Memorandum of Law in Opposition, Dkt. No. 674 (the "Opposition"), at 1 ("the only dispute, therefore, is whether 'high end' also means 'made in North America,' as YKK contends."). If all products manufactured outside of North America are not "high end outerwear," Plaintiffs' claim for damages against Defendants will be significantly reduced.

The issue of whether the phrase "high end outerwear" is ambiguous has been percolating since the very first conference in this case. Defendants filed a motion asking that the Court determine whether the phrase is ambiguous years after that first conference, together with a supporting memorandum of law. Dkt. No. 656; 659. Plaintiffs filed their Opposition in response to the motion; and the motion was fully briefed with Defendants' reply. Dkt. No. 685.

### III.   LEGAL STANDARD

The ELA is governed by New York law. ELA ¶ 13. Under New York law, "[w]hen interpreting a contract, our 'primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement.'" *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 113–114 (2d Cir. 2014) (quoting *Compagnie Financiere de CIC et de L'Union*

*Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 114 (brackets omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

As a "threshold question," courts must consider if "the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)); *see also Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement . . . .").

Courts consider a contract unambiguous when it has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp.*, 704 F.3d at 99 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). "The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted) (quotation omitted).

Courts analyze ambiguity using the "normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed as to give full meaning and effect to all of its provisions." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295);

*see also Brad H.*, 17 N.Y.3d at 185 ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole."). "A contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill Master Fund Ltd.*, 830 F.3d at 156–57 (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114).

Where terms used in a contract are asserted to have specialized meaning in a particular trade or business, parties must present evidence of the custom and usage of the terms to the court.

> Evidence as to such custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized. When the parties have used contract terms which are "in common use in a business or art" and have "a definite meaning understood by those who use them," but which "convey no meaning to [t]hose who are not initiated into the mysteries of the craft," the parties, in order to have the court construe their contracts, "must furnish [the court] with the dictionaries they have used." In such circumstances, the court "must be informed of the meaning of the language as generally understood in that business, in the light of the customs and practices of the business." Proof of custom and usage does not mean proof of the parties' subjective intent, for "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous," . . . . Rather, proof of custom and usage consists of proof that the language in question "is 'fixed and invariable' in the industry in question." The trade usage must be "so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto."

*L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465–68 (2d Cir. 2010) (internal citations omitted).

## IV.   ANALYSIS

The phrase "high end outerwear" is ambiguous. At the outset, neither party argues that the term has a specialized industry definition. All parties point to contemporary dictionary definitions

of the term "high-end."[3]  The Webster's New World College Dictionary(4th ed.) defined the term as " expensive and of very high quality."  Cherny Decl., Ex. D.  The 2000 American Heritage Dictionary (4th ed.) defined the term as "[a]ppealing to sophisticated and discerning customers . . . ."  *Id.*  The 2001 New Oxford American Dictionary defined the term as "denoting the most expensive of a range of products."  *Id.*  And the 2001 Random House Webster's College dictionary defined the term as "being the most expensive and technically sophisticated."  *Id.*

The very array of potential meanings of "high-end" revealed in these definitions make the term "high end outerwear" ambiguous.  Depending on the dictionary definition used, a product might be high end only because it is expensive, regardless of its style or technical sophistication (New Oxford definition).  It might be expensive, but not high end unless also technically sophisticated (Random House Webster's definition).  It might appeal to discerning customers as a result of its features regardless of price or technical sophistication (American Heritage definition).  Each of these definitions are feasible, but they vary in meaning.  Because the term "high end outerwear" suggests more than one meaning, it is ambiguous.

Having found that the term is ambiguous, it is for the trier of fact to discern the parties' intentions at the time of formation of the contract.  The Court cannot conclude as a matter of law that the phrase does not include a geographical limitation, as Plaintiffs request.  Plaintiffs argue that "[b]ecause *none* of the dictionary definitions of 'high end' delineate between items only made in North America and items made elsewhere, high end outerwear cannot reasonably be interpreted to mean *only* outerwear made in North America.  Overall, YKK is attempting to add an additional, unexpressed term to the License Agreement."  Opposition at 11.

There are two principal issues with Plaintiffs' argument.  First, one contemporary dictionary definition of the term defines "high-end" as "[a]ppealing to sophisticated and discerning customers .

---

[3] Neither party asserts that the word "outerwear" standing on its own is ambiguous.

7

. . ." This definition might encompass a geographical limitation. The Court cannot conclude as a matter of law that the "sophisticated and discerning" customer of 2002 did not only find appealing outerwear made in certain geographic regions, whether because of the perceived quality of clothing made in Asia at the time or otherwise.

Second, the outcome of a determination regarding the ambiguity of a contractual term is directed by a simple toggle switch: If the contractual term is unambiguous, the Court can state its meaning. If, however, the term is ambiguous and the parties present extrinsic evidence of its meaning, it is for the finder of fact to determine its meaning. After much searching, the Court has not found a single case in which a New York court has determined that a term is ambiguous, and at the same time put guardrails around what the finder of fact can conclude the term means. The Court cannot determine that the term high end outerwear is ambiguous in part—in that it may encompass varying understandings of the term based on price, technology, design, and "appeal"— and at the same time rule that the term unambiguously does not encompass a limitation based on geography. Once the Court determines that the term is ambiguous, it is for the finder of fact to discern its meaning from the extrinsic evidence presented by the parties.[4]

To determine the meaning of an ambiguous term, the finder of fact may consider "extrinsic evidence as to the parties' intent . . . " in the formulation of the contract. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). The testimony of Plaintiffs' expert, Mr. Cockrell, cannot be introduced as extrinsic evidence of the parties' intent. Plaintiffs acknowledge that he has nothing to

---

[4] A court "may resolve the ambiguity in the contractual language as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so-one sided that no reasonable factfinder could decide contrary to one party's interpretation." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir. 2000). Here, there is extrinsic evidence of the meaning of the term. In this motion, the Court is asked only to make a threshold determination regarding whether the words of the contract are ambiguous, not to decide the meaning of the term based on an assessment of the extrinsic evidence. Of course, the Court might ultimately determine as a matter of law that no reasonable fact finder could support a party's view of the meaning of the term in response to a motion under Federal Rule of Civil Procedure 50 or otherwise.

offer regarding the intentions of the parties at the time. Opposition at 17 ("Cockrell does not purport to opine as to the *meaning* of the License Agreement . . . ."). Instead, Plaintiffs offer Mr. Cockrell's testimony as to the "qualitative factors recognized in the industry, and the application of those factors to thousands of items of outerwear . . . ." *Id.*[5]

## V.    CONCLUSION

For the reasons stated above, the Court concludes that the term "high end outerwear" as used in the ELA is ambiguous. The meaning of the term is to be determined by a finder of fact looking to extrinsic evidence of the parties' intentions at the time of contract formation. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 656.

SO ORDERED.

Dated: February 26, 2022
New York, New York

GREGORY H. WOODS
United States District Judge

---

[5] An issue to be determined is to what extent Mr. Cockrell's definition deviates from the meaning ascribed to the term by the finder of fact and whether, to the extent Mr. Cockrell's definition deviates from the meaning of the term as determined by the finder of fact, his testimony will indeed be helpful. Since the Court has determined that the term is ambiguous, the Court invites the parties' views regarding how best to stage the determination of that issue. The Court previously asked if the parties were willing to put that evidentiary issue before the Court, or the assigned magistrate judge, as the finder of fact in advance of trial. Other alternative proposals will be appreciated.