USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/17/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                     :

AU NEW HAVEN, LLC, *and* TRELLEBORG   :
COATED SYSTEMS US, INC.,                 :
                                                     :       1:15-cv-3411-GHW
                                  Plaintiffs,   :
                                                    :     MEMORANDUM OPINION
                          -against-             :          AND ORDER
                                                     :
YKK CORPORATION, *et al.*,               :
                                                    :
                                     Defendants.   :
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Au New Haven, LLC and Trelleborg Coated Systems US, Inc. (collectively, "Plaintiffs"), filed this action against YKK Corporation and several of its affiliates (collectively, "Defendants"), alleging patent infringement and breach of a licensing agreement. Earlier this year, the Court issued an order holding that a key phrase in the licensing agreement—"high end outerwear"—was ambiguous, and invited the parties to consider how to most effectively stage the upcoming trial given that conclusion. *See Au New Haven, LLC v. YKK Corp.*, No. 15-cv-3411, 2022 WL 595951, at *4–5 & n.5 (S.D.N.Y. Feb. 26, 2022). Defendants have suggested that either additional summary-judgment briefing or a bifurcated trial are appropriate to resolve the phrase's meaning before trial; Plaintiffs oppose both requests and instead prefer to proceed to a single trial. Because there is no good cause for adding another round of briefing to the case schedule, Defendants' request to file an additional motion for summary judgment is denied. But because determining the meaning of "high end outerwear" before proceeding to the remainder of trial will avoid the potential for prejudice and substantially reduce juror confusion, Defendants' bifurcation motion is granted.

## II. PROCEDURAL BACKGROUND[1]

On February 26, 2022, this Court issued an opinion holding that the phrase "high end outerwear," as used in the parties' Exclusive License Agreement at the heart of this dispute, is ambiguous. *Au New Haven*, 2022 WL 595951, at *4. Given that conclusion, the Court "invite[d] the parties' views regarding how best to stage the determination" of whether certain testimony, which appeared to hinge on a given definition of the phrase "high end outerwear," could be considered in the course of trial. *Id.* at *5 n.5.

Three months later, Defendants sent the Court a letter detailing their discussions with Plaintiffs in response to the Court's request. Dkt. No. 808. On June 9, 2022, the Court held a conference on the matter. Dkt. No. 818. At the close of that conference, the Court granted Defendants permission to engage in two sets of briefing. Defendants were first permitted to send an "application for leave to file" an additional summary judgment motion on the meaning of "high end outerwear." *Id.* at 32. The Court also requested "substantive briefing" concerning Defendants' "application to sever the trial of the issue regarding the definition of [high end outerwear]." *Id.* For both sets of briefing, the Court set schedules for Plaintiffs to oppose Defendants' requests and for Defendants to file replies. *See id.* at 32–33. Both matters are now fully briefed. *See* Dkt. No. 819 (Defendants' request for leave to file an additional summary judgment motion); Dkt. No. 822 (Plaintiffs' opposition); Dkt. No. 824 (Defendants' reply); Dkt. No. 820 (Defendants' motion to bifurcate the trial); Dkt. No 821 (Defendants' memorandum of law in support of that motion); Dkt. No. 823 (Plaintiffs' opposition); Dkt. No. 825 (Defendants' reply).

---

[1] The Court presumes the reader's familiarity with the basic facts of the case. Accordingly, this section discusses only the procedural background most relevant to this order.

### III. LEGAL STANDARDS

#### A. Rule 16(b)(4) and Rule 1

Rule 16 provides that a scheduling order established by the Court "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). A district court has discretion to amend a Rule 16 scheduling order when "the interests of justice make such a course desirable." *Madison Consultants v. Fed. Deposit Ins. Corp.*, 710 F.2d 57, 62 n.3 (2d Cir. 1983).

Several factors are relevant to that inquiry. "Whether good cause exists" often "turns on the diligence of the moving party." *Samad Bros, Inc. v. Bokara Rug Co. Inc.*, No. 09-cv-5843, 2010 WL 4457196, at *2 (S.D.N.Y. Oct. 18, 2010) (internal quotation marks omitted). Courts also "consider whether previous extensions [to the schedule] already have been granted." 6A Charles A. Wright & Arthur Miller, Federal Practice & Procedure § 1522.2 (3d ed. 2022). Whether a modification will delay or expedite proceedings also matters because "Rule 16(b) serves an important function in ensuring fairness, certainty, and expedition of litigation." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, No. 05-cv-3749, 2009 WL 3467756, at *6 (S.D.N.Y. Oct. 28, 2009). And the Federal Rules of Civil Procedure are all "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

#### B. Rule 42(b)

Under Rule 42(b), a court "may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims" "[f]or convenience, to avoid prejudice, or to expedite and economize" the proceedings. Fed. R. Civ. P. 42(b). "The Second Circuit accords district courts broad discretion in determining whether to grant separate trials." *Lewis v. Triborough Bridge & Tunnel Auth.*, No. 97-cv-0607, 2000 WL 423517, at *2 (S.D.N.Y. Apr. 19, 2000); *see also Chevron Corp. v. Donziger*, 800 F. Supp. 2d 484, 491 (S.D.N.Y. 2011) ("Rule 42(b) is sweeping in its terms and allows the district court, in its discretion, to grant a separate trial of any kind of issue in

3

any kind of case." (quoting 9A Wright & Miller, Federal Practice and Procedure § 2398)). It is appropriate to consider, in determining whether bifurcation is appropriate under Rule 42(b), whether—in accordance with the rule's text—"such an order will further convenience, avoid prejudice, or promote efficiency." *Aquino v. City of New York*, No. 1:16-cv-1577, 2017 WL 2223921, at *1 (S.D.N.Y. May 19, 2017) (Woods, J.) (quoting *Amato v. City of Saratoga Springs*, 170 F. 3d 311, 316 (2d Cir. 1999)). "In cases analyzing motions brought under Rule 42(b), courts have held that only one of the three conditions specified in the rule—convenience, to avoid prejudice, or to expedite and economize—[is] needed to justify ordering separate trials." *Jem Accessories, Inc. v. JVCKENWOOD USA Corp.*, 120-cv-4984, 2021 WL 706646, at *4 n.2 (S.D.N.Y. Feb. 22, 2021) (Woods, J.) (citing *Ricciuti v. New York City Transit*, 796 F. Supp. 84, 86 (S.D.N.Y. 1992) and *Ismail v. Cohen*, 706 F. Supp. 243, 251 (S.D.N.Y. 1989), *aff'd*, 899 F.2d 183 (2d Cir. 1990)). Courts also consider "whether bifurcation will lessen or eliminate the likelihood of juror confusion." *Farghaly v. Potamkin Cadillac-Buick-Chevrolet-Geo, Ltd.*, No. 18-cv-11106, 2021 WL 4267656, at *1 (S.D.N.Y. Sept. 20, 2021) (Nathan, J.) (internal quotation omitted).

The party seeking bifurcation bears the burden of establishing that bifurcation is warranted. *See id.* "[B]ifurcated trials are generally disfavored and 'remain the exception rather than the rule.'" *Id.* (quoting *Bowers v. Navistar Int'l Transp. Corp.*, No. 88-cv-8857, 1993 WL 159965, at *1 (Sotomayor, J.) (S.D.N.Y. May 10, 1993)). If the Court does bifurcate issues for trial, it "must preserve any federal right to a jury trial." Fed. R. Civ. P. 42(b).

### C. Seventh Amendment Jury Trial Right

The Seventh Amendment reads:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII. "At bottom," the Seventh Amendment's re-examination clause means that while "issues may be divided and tried separately," "a given issue may not be tried by different, successive juries." *Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999); *see also In re Amla Litig.*, 282 F. Supp. 3d 751, 765 (S.D.N.Y. 2017) (a court may "not divide issues between separate trials in such a way that the same issue is reexamined by different juries in violation of the Seventh Amendment" (internal quotation omitted)). "The existence of common factual issues is to be distinguished from the existence of overlapping evidence. For purposes of the Seventh Amendment, the question is whether factual issues overlap, thus requiring one trier-of-fact to decide a disputed issue that must be decided by a subsequent jury, not whether the two fact-finders will merely have to consider similar evidence in deciding distinct issues." *Rickett v. Orsino*, No. 10-cv-5152, 2013 WL 1176059, at *23 (S.D.N.Y. Feb. 20, 2013) (quoting *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 170 n.14 (2d Cir. 2001), *overruled in part on other grounds by Wal–Mart v. Dukes*, 564 U.S. 338 (2011)). So "[d]ifferent juries may examine overlapping evidence as long as they do not decide factual issues that are common to both trials and essential to the outcome." *Chevron Corp.*, 800 F. Supp. 2d at 495 n.56 (internal quotations omitted).

In a related context, the Supreme Court has held that a partial new trial "may not be properly resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931); *see also Simon v. Philip Morris Incorp.*, 200 F.R.D. 21, 36 (E.D.N.Y. 2001) ("While *Gasoline Products* does not expressly mention bifurcation because the procedural posture of that case involved a potential partial new trial after appeal, the decision supports the constitutionality of the bifurcation procedure."). The question is whether the separated factual issues are "so interwoven" that, if they were submitted to the jury separately, it would cause "confusion and uncertainty, which would amount to a denial of a fair trial." *Id.* As the Second Circuit has noted,

5

"[t]he [Supreme] Court's concern" in *Gasoline Products* "was thus with the ability of the second jury to function" without confusion in conducting the second trial. *Crane v. Consol. Rail Corp.*, 731 F.2d 1042, 1049 (2d Cir. 1984).

### D. Judicial Estoppel

"The doctrine of judicial estoppel provides that '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *Quinn v. City of New York*, No. 20-cv-2666, 2022 WL 874852, at *3 (S.D.N.Y. Mar. 24, 2022) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). But judicial estoppel applies "only in situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005). Those requirements mean that "[i]n the Second Circuit, the doctrine of judicial estoppel applies only 'to situations where the risk of inconsistent results with its impact on judicial integrity is certain.'" *In re Aurora Com. Corp.*, 20-cv-8282, 2021 WL 3595716, at *7 (S.D.N.Y. Aug. 13, 2021) (quoting *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005)).

### IV. DISCUSSION

#### A. Leave to File an Additional Motion for Summary Judgment

The Court declines to grant Defendants leave to file an additional summary judgment motion. The Court may only add additional summary-judgment briefing and modify that schedule if Defendants have demonstrated good cause to do so. *See* Fed. R. Civ. P. 16(b)(4). The Court finds the good-cause standard not met here.

Most important to that determination is that the Court has already permitted many deadline extensions in this case, including granting Defendants leave to file a second round of summary-judgment briefing. In determining whether to modify a Rule 16 schedule, courts often consider whether previous extensions to that schedule have already been granted. *See* 6A Wright & Miller, Federal Practice & Procedure § 1522.2 & n.16. The original scheduling order in this case set a deadline for filing motions for summary judgment for September 14, 2016, Dkt. No. 30 at 3, and that deadline that was pushed back numerous times, Dkt. Nos. 80, 99, 183, 218, 283, 310, 355. Plaintiffs filed their motion for summary judgment on June 4, 2018. Dkt. Nos. 362-363. After one more extension, Dkt. No. 376, Defendants filed their summary-judgment motion on July 16, 2018, Dkt. No. 382-383. Then, a year and a half later—long after the initial motions for summary judgment were resolved—the Court granted Defendants leave to file an additional summary-judgment motion. Dkt. No. 562. In that instance, the Court found the good-cause standard to modify its schedule met because Defendants had good reasons to have not considered certain issues in their initial summary-judgment briefing, and because it would be more efficient to resolve those issues through pre-trial briefing than through post-trial motions. *Id.* at 2–3.

To allow yet another round of summary-judgment briefing, given these prior extensions and modifications, would be remarkable. As Plaintiffs note, Defendants seek leave to engage in that briefing over four years after the applicable pretrial deadline in 2018 and only months before the trial in this case is currently set to begin. Dkt. No. 822 at 1. That posture, combined with the fact that the Court previously granted Defendants' motion for a second round of summary-judgment briefing, is enough to show that there is no good cause to grant Defendants leave again here.[2]

---

[2] Even if anything more *were* needed to conclude that there is no good cause here, moreover, the Court notes that granting Defendants' request for additional summary-judgment briefing appears to conflict with one of Rule 16's purposes: expediting litigation. *See Sokol Holdings*, 2009 WL 3467756, at *6 ("Rule 16(b) serves an important function in ensuring fairness, certainty, and expedition of litigation."); *see also* Fed. R. Civ. P. 1 (noting that the federal rules should

Accordingly, Defendants' request for permission to file a motion for summary judgment on the meaning of "high end outerwear" is denied.

### B. Motion for Bifurcation

The Court will grant Defendants' request to bifurcate trial to first determine the meaning of "high end outerwear" as used in the license agreement. The factors considered in the Rule 42(b) analysis support bifurcation, which is likely to reduce prejudice and juror confusion. And upon careful consideration, the Court finds that a bifurcated trial structure will not imperil Plaintiffs' Seventh Amendment jury-trial right. Finally, Defendants are not judicially estopped from presenting evidence to support their preferred definition of "high end outerwear" at the first trial.

#### 1. Bifurcation is Appropriate Under Rule 42(b)

"In cases analyzing motions brought under Rule 42(b), courts have held that only one of the three conditions specified in the rule—convenience, to avoid prejudice, or to expedite and economize—[is] needed to justify ordering separate trials." *Jem Accessories*, 2021 WL 706646, at *4 n.2 (citing *Ricciuti*, 796 F. Supp. at 86 and *Ismail*, 706 F. Supp. at 251). Here, bifurcation of trial to first determine the meaning of "high end outerwear" will avoid subjecting Defendants to potential unfair prejudice and prevent juror confusion. Accordingly, the standard set by Rule 42(b) for ordering separate trials is satisfied, and the Court finds bifurcation appropriate.

To understand why bifurcation will prevent potential prejudice, a brief outline of this case's structure is necessary. Plaintiffs have brought claims under the Patent and Lanham Acts based on Defendants' alleged violations of the "Exclusive License Agreement that is at the heart of this

---

be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding"). Here, without wading into the merits of the parties' dispute concerning the meaning of "high end outerwear," the Court is skeptical that it can resolve that dispute as a matter of law. *See Au New Haven*, 2022 WL 595951, at *4 (indicating the Court's view that because "the term [high end outerwear] is ambiguous, it is for the trier of fact to discern the parties' intentions at the time of formation of the contract"); *see also* Dkt. No. 818 at 29 (the Court noting its skepticism "of the prospect that a motion for summary judgment will be able to resolve . . . the full meaning of the term [high end outerwear]"). Given that instinct, an additional round of summary-judgment briefing would likely only prolong proceedings—which is additional reason to avoid it.

dispute." *Au New Haven*, 2022 WL 595951, at *1. That licensing agreement, in turn, expressly precluded Defendants from using or selling Plaintiffs' technology in finished goods in the "high end outerwear" market. *See id.*; Dkt. No. 406-3. But the parties disagree on the meaning of "high end outerwear"; this Court has ruled that a jury must resolve the phrase's meaning. *See Au New Haven*, 2022 WL 595951, at *4–5. And to do so, the jury will look at evidence concerning what the parties intended the phrase to mean, in order "to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). That will involve examining the statements made or actions taken by representatives of the parties that speak to what they understood the "high end outerwear" exception to mean at the time that the license was signed. *See Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, No. 02-cv-6005, 2007 WL 2197830, at *9 (S.D.N.Y. July 31, 2007) ("[D]etermination of the intent of the parties at the time they entered into the contract is governed by . . . what they wrote, their acts, conduct and all surrounding circumstances." (internal quotation omitted)).

To evaluate Plaintiffs' claims in full, however, will require examination of much more than what the parties intended as to the scope of the license agreement and the "high end outerwear" exception to it. Those issues, to be sure, will matter—but so too will a host of other facts that speak not to the agreement's scope but to other questions in the case. As examples, the jury may have to consider whether Defendants induced third parties to make sales in the high-end outerwear market, and whether Defendants can be held responsible for those sales on that basis. Or it might have to examine the demand for zippers in that market, to the extent that lost-profit patent damages are available as a remedy. Or it could be asked to look at whether Defendants willfully (as opposed to accidentally) infringed on Plaintiffs' patent by selling zippers in the high-end outerwear market,

9

which may also matter in the damages calculation. The list could go on. *See* Dkt. No. 821 at 4–6, 11 (listing other evidence that may or may not be considered depending upon the meaning of "high end outerwear," and arguing that much of Plaintiffs' proposed evidence is not relevant to determining the meaning of the phrase). For these and other questions, a variety of evidence related to what decisionmakers for Defendants did and said, wholly unrelated to the meaning of "high end outerwear," would be relevant. And, depending on the specifics of the decisionmakers' statements and actions, that evidence could paint Defendants in a negative light.

Much or all of that evidence, moreover, may be subject to exclusion depending on the meaning of "high end outerwear"—making its introduction before knowing the phrase's meaning potentially prejudicial. If "high end outerwear" has a broad scope, it would likely mean that Defendants placed a large number of zippers in the proscribed market—and further evidence speaking to, for example, whether Defendants induced third parties to sell zippers in the market and the damages that Plaintiffs are accordingly entitled to would be relevant and probative. But if the phrase's scope is narrow, it could be that Defendants did not place any or many zippers in that market—and much of that same evidence would be irrelevant or otherwise inadmissible. If the Court allows the introduction of that evidence before knowing the scope of the term "high end outerwear," it thus may be permitting the use of inadmissible evidence that could prejudice defendants.

The most substantial risk of prejudice concerns the introduction of the testimony of Plaintiffs' expert David Cockrell. Mr. Cockrell, in his expert report, explains his understanding of the industry version of "high end outerwear" and then—using that definition—apportions the market into low-end, middle-end, and high-end categories based on his definition. Dkt. No. 368-1 at 2, 5–7; *id.* Exs. 3–14. But the Court has already ruled that Mr. Cockrell's testimony is not relevant to determining the parties' intent concerning the scope of the licensing agreement at the time of

10

signing. *Au New Haven*, 2022 WL 595951, at *5. And while Mr. Cockrell's definition of high-end outerwear may align (or nearly align) with what the jury determines the parties meant when they used the term in the license agreement—in which case his analysis of what goods fall into that market would have probative value—the jury may instead adopt a completely different definition, making his testimony irrelevant or nonprobative. Allowing the introduction of or testimony concerning Mr. Cockrell's report before determining the meaning of high-end outerwear thus risks confusing and misleading the jury through the introduction of irrelevant evidence, which could, in turn, prejudice Defendants. *See also Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 511 (2d Cir. 1977) (noting that allowing a party to cross-examine a witness who the court has improperly allowed to testify does not cure the improper testimony).

Bifurcation avoids this potential prejudice. In determining the meaning of "high end outerwear," the first jury will consider only the evidence relevant to that term's meaning.[3] Anything not relevant to that trial will be excluded. So there is no risk of admitting evidence that, depending on the meaning of "high end outerwear" as determined by the jury, could later turn out to be prejudicial to Defendants (or, for that matter, to Plaintiffs). Then, at trial two, the second jury will be presented with whatever evidence is admissible given the first jury's definition of "high end outerwear"—again, eliminating the risk of prejudice from the introduction of inadmissible evidence.

In avoiding that prejudice, moreover, bifurcation will also lessen the risk of jury confusion. *See Farghaly*, 2021 WL 4267656, at *1 (noting that bifurcation may be warranted where it "will lessen or eliminate the likelihood of juror confusion"). In particular, if Mr. Cockrell were to testify at a single trial, the jury would have to be asked to set aside his testimony for the purpose of defining

---

[3] Through this order, the Court takes no position on Defendants' contention that much of Plaintiffs' proffered evidence is not relevant to the meaning of "high end outerwear." *See* Dkt. Nos. 819 at 7–14, 821 at 11. Whether or not individual pieces of evidence are or are not relevant to that phrase's meaning will be determined through future decisions resolving evidentiary disputes in advance of or during the first trial.

11

"high end outerwear" while simultaneously evaluating his testimony as relevant to other issues in the case—even though the testimony is based on Mr. Cockrell's definition of the relevant phrase. A reasonable juror, faced with that task, would likely experience substantial confusion. *See Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 837 (S.D.N.Y. 1998) (noting that in cases containing "difficult concepts," bifurcating proceedings to allow the jury to decide "one complex set of issues at a time is likely to reduce the possibility of jury frustration and confusion"). And avoiding that confusion, in addition to eliminating prejudice, reduces the likelihood of errors and the inefficiencies associated with them.[4]

Plaintiffs, in response, suggest that limiting instructions could cure any prejudice to Defendants. Dkt. No. 823 at 21–23; *see, e.g., United States v. Jasper*, No. 00-cr-825, 2003 WL 740878, at *3 (S.D.N.Y. Mar. 3, 2003) (finding in that case that "any prejudice that does arise from the [improper] introduction of evidence . . . can be cured with a limiting instruction"). But in this case, there is no effective limiting instruction the Court could issue that would mitigate the problems identified above. Until the meaning of "high end outerwear" is established, a large amount of evidence may be completely irrelevant, extremely probative, or anywhere in between. If the jury establishes the meaning of "high end outerwear" at the same time as it determines liability and damages—as would happen in a single trial—the Court will not know in advance what the above-listed evidence (and other evidence like it) may properly be considered for. So the Court could not

---

[4] Plaintiffs cite several cases that, in their view, suggest that where there is an overlap of witnesses and evidence between the two proposed trials, or where there will be a need for two trials regardless of the outcome of the first, bifurcation cannot improve judicial economy. *See Monaghan v. SZS 33 Assocs., L.P.*, 827 F. Supp. 233, 246 (S.D.N.Y. 1993) (suggesting that witness and evidence overlap "alone" precludes claims that bifurcation will advance judicial economy); *Ramsay-Nobles v. Keyser*, No. 16-cv-5778, 2018 WL 6985228, at *10 (S.D.N.Y. Dec. 18, 2018) (same); *Amato*, 170 F.3d at 316 (noting that trials are often bifurcated where "the litigation of the first issue might eliminate the need to litigate the second issue"). But Plaintiffs overstate the holdings of those cases. What they stand for is that, *in individual cases*, an overlap in witnesses and evidence, or the impossibility of eliminating a second trial, can lead a court to determine that bifurcation is not warranted. But what matters is whether, in a given proceeding, bifurcation will meet one or more of the objectives of Rule 42(b) by improving convenience, avoiding prejudice, or expediting and economizing the proceedings. Fed. R. Civ. P. 42(b). For the reasons provided in this section of this opinion, bifurcation here satisfies that standard.

limit the prejudice that Defendants potentially face through a limiting instruction. And even if such a limiting instruction were possible, the Court finds it unlikely that any instruction could meaningfully reduce the confusion that jurors would experience absent bifurcation. *See United States v. Levin*, No. 15-cr-101, 2016 WL 299031, at *12 (S.D.N.Y. Jan. 25, 2016) (finding that "under the particular circumstances," "a cautionary or limiting instruction" would not be able to reduce juror confusion created by certain testimony, and thus excluding it because it "would confuse or mislead the jury").

Bifurcating trial will both eliminate the risk of prejudice to Defendants and reduce the likelihood of juror confusion that could occur in a single trial. Accordingly, Rule 42(b)'s standard for bifurcation is satisfied.

### 2. A Bifurcated Trial Will Not Violate Plaintiffs' Seventh Amendment Rights

Bifurcating the trial between the meaning of "high end outerwear" and the examination of Plaintiffs' substantive claims will not violate the Seventh Amendment. That Amendment precludes any "fact tried by a jury" from being "otherwise re-examined in any Court of the United States." U.S. Const. amend. VII. For the purpose of bifurcation, that means that while "issues may be divided and tried separately" between trials, courts must not allow "a given issue" to "be tried by different, successive juries." *Blyden*, 186 F.3d at 268. Here, Defendants have proposed to have the first jury determine the meaning of "high end outerwear." *See* Dkt. No. 821 at 13. The Court will instruct the second jury that it may not re-examine the meaning of "high end outerwear"; instead, they will be instructed to apply the definition from the first trial in their deliberations. That instruction eliminates the prospect that the second jury will reconsider the meaning of "high end outerwear" because "in all cases, juries are presumed to follow the court's instructions." *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009).

Plaintiffs, however, submit that bifurcation would nonetheless violate the Seventh Amendment. They argue that the "scienter with which [Defendants'] decisionmakers acted" in (a) deceiving Plaintiffs into signing the licensing agreement, (b) ignoring the high-end outerwear restriction in that agreement, and (c) implementing policies in violation of the agreement is relevant to the scienter that those decisionmakers acted with when testifying about the meaning of high-end outerwear. Dkt. No. 823 at 12–13. And they argue that, absent the ability to present all the evidence concerning Defendants' alleged misrepresentations at once, the two juries may each be deceived into giving Defendants' testimony more credence that is deserved. *Id.* at 13.

These arguments, however, erroneously conflate the Seventh Amendment jury-trial right with discretionary bifurcation under Rule 42(b). Bifurcated trials are the exception rather than the rule, under Rule 42, in part because "[o]rdinarily, a jury is entitled to hear all of the evidence and deliberate over all of the issues in the case at one time." *Lewis v. City of New York*, 689 F. Supp. 2d 417, 428 (E.D.N.Y. 2010). But "[f]or purposes of the Seventh Amendment," "[t]he existence of common factual *issues* is to be distinguished from the existence of overlapping *evidence*." *Rickett*, 2013 WL 1176059, at *23 (quoting *Robinson*, 267 F.3d at 170 n.14). The relevant "question is whether factual issues overlap, thus requiring one trier-of-fact to decide a disputed issue that must be decided by a subsequent jury, not whether the two fact-finders will merely have to consider similar evidence in deciding distinct issues." *Id.* In other words, the general preference that jurors hear evidence in a single proceeding, and the fact that certain evidence (here, concerning Defendants' scienter) may need to be introduced at two trials, are relevant efficiency considerations in a Rule 42(b) bifurcation analysis.[5] But here, as discussed in Part IV(B)(1), Rule 42(b) is satisfied due to the prejudice and

---

[5] It is therefore no surprise that the cases cited by Plaintiffs in support of their position considered the problem of overlapping evidence in deciding Rule 42(b) bifurcation issues rather than in the Seventh Amendment context. *See Mattsson v. Pat McGrath Cosmetics LLC*, No. 21-cv-5187, 2022 WL 1658516, at *3-4 (S.D.N.Y. May 26, 2022); *Farghaly*, 2021 WL 4267656, at *2.

14

confusion that could result from not bifurcating the trials. And Plaintiffs' arguments concerning Defendants' scienter do not allege, let alone prove, that any fact tried by the first jury would have to be retried by the second jury such that bifurcation would violate their Seventh Amendment rights. Accordingly, the Court is convinced that bifurcation does not threaten Plaintiffs' Seventh Amendment jury-trial right.[6]

### 3. Judicial Estoppel

Plaintiffs submit that at trial (bifurcated or not), Defendants should be judicially estopped from arguing that "high end outerwear" means anything other than outerwear made in North America. Dkt. No. 823 at 1–5. The Court disagrees.

Judicial estoppel does not apply here because the Court has not accepted Defendants' (or any party's) submission as to the meaning of "high end outerwear." Judicial estoppel applies "only in situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, *and has had that earlier position adopted by the tribunal to which it was advanced*." *Stichting Ter Behartiging*, 407 F.3d at 45 (emphasis added). Setting aside the question of whether Defendants have taken a position in conflict with one taken in a prior proceeding, the Court's treatment of the phrase "high end outerwear" makes plain that it has not accepted any position as to its meaning. As the Court's prior order on this issue noted, based on the evidence that has been presented so far, "[t]he phrase 'high end outerwear' is ambiguous." *Au New Haven*, 2022 WL 595951, at *4. The Court has

---

[6] The Court has also considered an issue that Plaintiffs do not raise: Whether the second jury, to determine Defendants' liability for willful damages, would need to reexamine a potential finding from the first jury about what Defendants' decisionmakers believed the phrase "high end outerwear" meant when the license agreement was signed. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016) (noting the possibility of enhanced damages for willful patent infringement under the Patent Act). Upon examination, however, that scenario does not present a Seventh Amendment problem. The Court will not ask the first jury to make any finding concerning what Defendants believed "high end outerwear" meant; rather, they will determine phrase's meaning at the time of signing. Nor will the second jury be asked to determine Defendants' belief about the meaning of the phrase. And if the second jury is called upon to reach a conclusion as to Defendants' willfulness, it could do so based on any number of facts, including many entirely separate from Defendants' belief about the meaning of "high end outerwear" when the license agreement was signed. As a result, the Court understands why Plaintiffs decided not to raise this issue.

therefore not adopted any position advocated by Defendants, including one incorporating a North American geographical limitation.

Plaintiffs' argument that the Court "adopted" Defendants' earlier definition of "high end outerwear" by articulating what their position was at the time—one that included a geographic limitation—misses the mark. Plaintiffs lead case amply demonstrates that to "adopt" a proffered position, a Court must accept it as true and base its ruling on its acceptance of that position. *See Quinn*, 2022 WL 874852. In *Quinn v. City of New York*, the court detailed how, in an earlier case, a magistrate judge had ordered ConEd to pay nearly $2.5 million in damages based on an assertion from a plaintiff that he had tripped over a ConEd gas cap. *Id.* at *5. Then, in *Quinn*, that same plaintiff made the mutually exclusive claim—when describing the same incident—that he had in fact tripped in a crosswalk pothole. *Id.* at *2. The court noted that the settlement ordered by the magistrate judge in the earlier case necessarily meant that court had accepted the plaintiff's earlier position, because if it hadn't, "ConEd would not be liable at all, let alone for nearly $2.5 million in damages." *Id.* at *5. So the *Quinn* court found that the plaintiff there could not pursue a new theory of liability—that he had tripped in a crosswalk pothole—that conflicted with the previously adopted position that he had stumbled over a ConEd gas cap. *Id.* at *7.

Not so here. In holding that the term "high end outerwear" is ambiguous, this Court expressly declined to adopt any position regarding the meaning of the phrase. As a result, when the jury in the first trial *does* adopt a position regarding the phrase's meaning, it will pose no "risk of inconsistent results with its impact on judicial integrity"—let alone a "certain[ty]" that such an inconsistent result could arise—because there is no prior result that the new result could conflict with. *Uzdavines*, 418 F.3d at 148; *see also In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-cv-740, 2022 WL 976266, at *28 (S.D.N.Y. Mar. 31, 2022) (finding that a party's reversal on a position, "in the absence of a judicial decision adopting its prior position, 'introduces no risk of inconsistent court

16

determinations'—much less a certain risk, as required in the Second Circuit—'and thus poses little threat to judicial integrity'" (quoting *New Hampshire*, 532 U.S. at 751)).  Plaintiffs' reliance on the doctrine of judicial estoppel is accordingly misplaced, and the Court will not rely on it to limit the positions that may be advanced at the planned first trial on the meaning of "high end outerwear."[7]

## V. CONCLUSION

For the reasons set forth above, Defendants' application for leave to file an additional summary judgment motion is DENIED.  Defendants' motion to bifurcate trial to first determine the meaning of "high end outerwear" as used in the license agreement is GRANTED.  Through a separate order to be entered on the docket, the Court will begin the process of scheduling trials.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 819 and 820.

SO ORDERED.

Dated:  October 17, 2022

GREGORY H. WOODS
United States District Judge

---

[7] Defendants argue, as an additional grounds for denying judicial estoppel, that their preferred definition of "high end outerwear" has not changed during this litigation.  Dkt. No. 825 at 3–4.  The Court takes no position on this argument and does not rely on it in rejecting the doctrine's application here.