USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/9/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**MEMORANDUM ENDORSED**

---
AU NEW HAVEN, LLC, and : 
TRELLEBORG COATED SYSTEMS US, INC., :
: CIVIL ACTION NO.
Plaintiffs, : 15-CV-03411-GHW-SN
:
v. :
:
YKK CORPORATION et al., : January 9, 2023
:
Defendants. :
---

Honorable Gregory H. Woods, United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re: **YKK's legally impermissible definition of "high end outerwear" (ECF 884)**

Dear Judge Woods:

    Plaintiffs request that the Court add to the agenda for the scheduled January 13, 2023, pretrial conference the following important, and potentially dispositive, issue: how, or even whether, the January 23, 2023, trial should proceed in light of YKK's newly minted, **fourth** definition of "high end outerwear" ("HEO") which objectively and impermissibly (1) renders the HEO exclusion in the Exclusive License Agreement (the "ELA") entirely meaningless and (2) falls outside all feasible definitions of HEO. Under New York law, even where a contract term may, on its face, have several "feasible" definitions that "vary in meaning," *see* ECF 794 at 7, a court should not find a triable dispute of fact if one party urges "an interpretation that effectively renders [the contract term] meaningless," *Republic of Rwanda v. Ferone*, 307 F. App'x 600, 602 (2d Cir. 2009) (summary order), or "strain[s] the contract language beyond its reasonable and ordinary meaning." *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotations omitted). YKK's new definition does both.

    Rule 16(c)(2)(A) of the Federal Rules of Civil Procedure empowers the Court, at any pretrial conference, to "consider and take appropriate action on … formulating and simplifying the issues, and eliminating frivolous claims or defenses." And Federal Rules of Evidence ("FRE") 401 and 403 empower the Court to exclude irrelevant and unduly prejudicial evidence. For the reasons that follow, this Court should preclude YKK's new, last minute definition of HEO from being presented to the jury.

1

**I.      YKK's new definition impermissibly renders the HEO exclusion meaningless.**

The fundamental issue in this patent dispute is the scope of the substantive limitations expressly placed on the patent rights that Plaintiffs licensed to YKK in the ELA. YKK now at the 11th hour has proposed a definition that results in no HEO exclusion at all, namely: "Outerwear sold in a luxury market by garment manufacturers willing to pay higher prices for zippers laminated by Uretek in New Haven and accept the delivery times associated with such zippers."[1] ECF 884. In effect, YKK now contends that any outerwear using YKK-laminated zippers (T8, T9, and T10), including outerwear sold in the so-called "luxury market," is not HEO **by definition** solely because YKK (not Uretek) put the laminate film on the cloth stringer tapes before YKK finished the manufacture of the final zipper product, a fact that no outerwear consumer in 2002 or at any other time could ever know. *See* PX-11A & B (zipper components); *compare* PX-14 (T4) & PX-18B (T8); *see also* Sarumaru Depo. Tr. 324:12-24 (explaining the manufacturing process). Under this definition, YKK illogically could sell YKK-laminated zippers to any outerwear manufacturer for use in any outerwear finished goods without ever exceeding the scope of its limited patent rights because such outerwear, by YKK's definition, could not be HEO. The outerwear's quality or where it was made suddenly no longer matters.[2]

YKK's definition impermissibly would "have the effect of rendering" the ELA HEO exclusion "superfluous and meaningless." *See Nashua Corp. v. Norton Co.*, 1994 WL 144251, *7 (N.D.N.Y. 1994). "[I]t would be unreasonable to conclude that the parties ... would have written an entire, separate contractual provision … expressly" excluding HEO from YKK's licensed patent rights "and then define [that exclusion] out of existence." *Id*. (internal quotation marks omitted).  No reasonable patent owner would expressly exclude a field of use from a patent license only to then define that exclusion such that it never could encompass any sales of otherwise unauthorized, infringing products by the licensee. As a matter of law, no triable dispute of fact exists when one party, like YKK here, urges "an interpretation that effectively renders [the contract term] meaningless." *Republic of Rwanda*, 307 F. App'x at 602.

YKK's new definition also disregards the fundamental nature of patents underlying this case. The main benefit of a patent is the ability to exclude others from practicing the invention. The express purpose of the ELA was to permit YKK to sell YKK-laminated zippers in all markets **except** the four excluded markets. An outerwear manufacturer's decision not to use Plaintiff-laminated zippers in their HEO (for whatever reason) could not expand the scope of

---

[1] Nowhere does YKK provide a definition of "luxury market," nor has YKK disclosed an industry expert opining on what constituted the "luxury market" from 2002 through 2019. In any event, YKK's Fed. R. Civ. P. 30(b)(6) corporate designee, Akinobu Shibata ("Shibata"), testified that, while "luxury" as he used the term means "something that has special value," luxury was not defined by price. Shibata Depo. Tr. 26:25-27:5. Shibata then testified that YKK would determine whether outerwear is in the luxury category by "[w]hether it is made in North America." *Id*. 27:6-9. When asked whether any luxury finished goods were made outside of North America, Shibata testified that he did not know. *Id*. 27:9-12. Masayuki Sarumaru ("Sarumaru"), in turn, testified that, when he signed the ELA, he understood HEO to mean a "luxury item" that "would be made in North America." Sarumaru Depo. Tr. 118:14-22. But YKK has since disavowed any definition of HEO that includes an express or implied "made in North America" geographic limitation (ECF 819 at 2-3), so even YKK's current HEO definition is impermissibly vague.

[2] For example, under YKK's proposed definition, outerwear manufactured by Arc'teryx would be HEO when YKK sold Arc'teryx Plaintiff-laminated T4 or T5 zippers, but those exact same styles of Arc'teryx outerwear allegedly would not be HEO if YKK sold Arc'teryx YKK's indistinguishable YKK-laminated T8 or T10 zippers.

rights granted to YKK or otherwise unilaterally amend the ELA to give YKK the right to sell YKK-laminated zippers for HEO use, even if that meant YKK and/or Uretek might lose revenues. Uretek retained the HEO patent rights for itself. If YKK refused to insist that manufacturers purchase only Plaintiff-laminated zippers (T4 and T5) for use in HEO, Uretek was free to find another zipper manufacturer with whom Uretek could pursue those HEO sales.

This undisputed fact has tormented YKK from the beginning. YKK's conspicuous reluctance to articulate any definition of HEO as trial approached evidenced YKK's struggle to come up with a definition (1) to which Sarumaru and Shibata would be willing to testify under oath, subject to the penalties of perjury in a United States federal court, (2) that has even the slightest appearance of alleged factual support in the record, and (3) that also would absolve YKK of all liability to Plaintiffs. *See* 12/21/22 Tr. 90:9-90:17 (YKK's counsel: "Well, I'm reluctant to pin it down."). Now that YKK has been forced to pin down its definition of HEO, this Court should evaluate that definition **as if that were the definition contended by YKK before the Court entered its HEO ambiguity order**. And because YKK's new, fourth definition would render the HEO exclusion effectively meaningless, the Court should now conclude as a matter of law that YKK's definition cannot be presented to, much less than be allowed to be adopted by, the jury.[3]

Nor is waiting for the jury to return a verdict before deciding this issue an option. The jury will consist of six to eight (likely non-attorney) people who must reach a unanimous verdict. Allowing YKK to submit evidence or argument in support of this impermissible definition would be extremely prejudicial to Plaintiffs because even if only one juror unreasonably adheres to YKK's impermissible definition, that may lead to improper jury compromises when otherwise the jury would have unanimously accepted Plaintiffs' definition as its verdict.

## II. YKK's new contention undisputedly falls outside any feasible definition of HEO.

A court also should not submit extrinsic evidence of the parties' intentions to the jury unless the parties urge two conflicting, **plausible** interpretations that are each consistent with a feasible definition of the language used, but that nevertheless substantively vary in meaning vis-à-vis the case *sub judice*. YKK recognized this rule of law in its HEO briefing: "for the Court to accept [Plaintiffs'] proffered definition as the unambiguous meaning of 'high end' as used in the ELA, the Court must find YKK's interpretation to be unreasonable." ECF 685 at 9.

---

[3] YKK did not serve its fourth definition of HEO on Plaintiffs until 6:17 pm on January 6, 2023, apparently needing every last minute to formulate a new litigation strategy. YKK, of course, only needed to ask Sarumaru what he meant by HEO when he signed the ELA, just as Plaintiffs did in Sarumaru's deposition. *See* Sarumaru Depo. Tr. 119:18-119:23 & 164:02-169:25 (HEO was determined by the characteristics of the outerwear and whether it was made in North America); *see also* ECF 794 at 4. Plaintiffs note that as soon as YKK successfully obtained the HEO ambiguity order from this Court (ECF 794) based on YKK's qualitative and made in North America definition, YKK proposed a second definition of HEO, namely, "that the parties intended HEO to reflect the market where a manufacturer was willing to pay more and wait longer for delivery of a laminated zipper." ECF 819 at 2, 4 & 5. After the Court denied YKK's request to move for summary judgment on that second definition, YKK pivoted to a third definition of HEO, one that focused on the outerwear manufacturer's relative proximity to Uretek's New Haven, Connecticut factory, namely, "a participant in the HEO market had to be in reasonable proximity to the manufacturing facilities (so as to minimize wait times) and had to sell items that could bear the additional cost of an American-made laminated zipper when compared to the Asian competition." ECF 854 at 2. With each iteration, YKK's proffered definition strayed farther from any reasonable and ordinary meaning of HEO and from the truth.

YKK's new definition of HEO abandons all pretense of reasonableness.[4] This is problematic for YKK because the "normal rules of contract interpretation" mandate that "words and phrases ... should be given their plain meaning." *Orlander v. Staples, Inc.*, 802 F.3d 289, 295 (2d Cir. 2015) (quoting *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)). Indeed, when interpreting a contract, a court is "not free to alter the plain terms of an agreement or to strain language beyond its reasonable and ordinary meaning." *Shaw Grp. Inc.*, 322 F.3d at 124. "[A]s in **all** cases involving contract interpretation," the "words and phrases used by the parties must … be given their plain meaning." *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014) (emphasis added) (quoting *Brooke Grp. Ltd. v. JCH Syndicate 488*, 87 N.Y.2d 530, 534 (1996)). This rule is especially applicable here, where "neither party argues that the term has a specialized industry definition." ECF 794 at 6.

Although courts consider a contract unambiguous when it has "a definite and precise meaning," a contract "is not made ambiguous simply because the parties urge different interpretations." ECF 794 at 5 (citations omitted). Even where, in a vacuum, several "definitions are feasible, but they vary in meaning," *id.* at 7, a "court should not find the contract ambiguous where the interpretation urged by one party would 'strain the contract language beyond its reasonable and ordinary meaning.'" *Law Debenture Tr. Co. of New York*, 595 F.3d at 467 (quoting *Bethlehem Steel Co.,* 2 N.Y.2d at 459). "Nor is ambiguity created because one party attaches a particular, subjective meaning to a term that differs from the term's plain meaning." *Thompson v. Mun. Credit Union*, 2022 WL 2717303, *4 (S.D.N.Y. 2022).

Because "[t]he admission of extrinsic evidence to cure ambiguities … is an act of contract **interpretation**, not contract **reformation**," a court should never resort to extrinsic evidence to "distort the meaning of those [terms] used and thereby make a new contract for the parties under the guise of interpreting the writing." *Acranom Masonry, Inc. v. Wenger Constr. Co.*, 2017 WL 4358751, *12 (E.D.N.Y. 2017) (emphasis added) (citing *Collins v. Harrison-Bode*, 303 F.3d 429, 433-35 (2d Cir. 2002)). Rather, extrinsic evidence may be used solely "for the limited purpose of resolving a specific ambiguity in the written agreement." *Id*.

Whether a jury is needed to resolve a specific ambiguity depends on whether each party has stated a facially reasonable interpretation. For example, in *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1275 (2d Cir. 1989), the defendant agreed to pay the plaintiff, a personnel placement firm, 2% of the monthly "booking" of any sales representative placed with the defendant. The defendant contended that the undefined term "booking" "could reasonably be read as comprising only business obtained from new customers," and not business from existing customers. *Id*. at 1276. The Second Circuit held that the district court correctly did not consider extrinsic evidence because the term "booking" had "no connotation of limitation based on whose reservations are accepted or for whom arrangements are made." *Id*. at 1278. Similarly, in *CBS Broad. Inc. v. Jones*, 460 F.Supp.2d 500, 505 (S.D.N.Y. 2006), the district court found that the undefined contract term "pro rata" was "not wholly without ambiguity." Still, it concluded that

---

[4] YKK may have presumed that it could proceed without fear of an adverse court ruling given the proximity to trial, as also evidenced by YKK's previously expressed preferences of never offering a definition to the jury (12/21/22 Tr. 84:11-87:15) or of not disclosing YKK's definition to the jury until YKK's closing statement (*id.* 90:9-90:22). Regardless of YKK's strategies, this Court should rule on the issues that Plaintiffs' raise in this letter before opening statements.

"**as between the two competing interpretations before the Court,**" "a reasonably intelligent and objective person could give the Agreement only one interpretation." *Id*. (emphasis added); *see also Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.*, 2017 WL 2835250, *11 & *13 (W.D.N.Y. 2017) (defendant's interpretation of the contract "is the only reasonable one" because plaintiff's interpretation "would require the Court to suspend the rules of common English usage and add words into the Agreement").[5]

In all events, "[e]xtrinsic evidence is admissible only to resolve conflicting, plausible interpretations that straddle the ambiguity of a word, not interpretations that change the word's meaning." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 36 (2d Cir. 1995). A finding that a phrase has more than one feasible meaning does not permit the finder-of-fact to attribute **any** meaning to the phrase. *Id.; see also Pierson v. Willets Point Contracting Corp.*, 899 F. Supp. 1033, 1043-44 (E.D.N.Y. 1995) (because "[e]xtrinsic evidence is available only to resolve conflicting, plausible interpretations of a word, not to change the word's meaning," the ambiguous term "'legal services' cannot be interpreted to include … 'non-legal services'"). Thus, the determination that a contract is ambiguous depends not only on whether the term has more than one feasible definition, but also on whether the parties to the dispute have urged two "conflicting, plausible interpretations" that are each consistent with a feasible definition, but nevertheless substantively vary in meaning.

Comparing YKK's new, fourth definition to the plain meaning definitions that the Court considered in its HEO ambiguity order (ECF 794 at 7) allows only one reasonable conclusion: YKK's new definition is not a plausible interpretation of what constitutes HEO. YKK illogically rests its definition on whether a manufacturer was willing to pay higher prices and accept certain undefined delivery times. In other words, YKK's definition effectively is based on whether the outerwear manufacturer preferred to purchase YKK's T8, T9 or T10 zippers because YKK offered these indistinguishable, infringing zippers at a lower cost with a shorter delivery time. This definition of HEO is unreasonable because the ELA phrase HEO contains no such "connotation of limitation" based on these amorphous manufacturer preferences. *Hunt Ltd.*, 889 F.2d at 1278.

YKK's new manufacturer-centric definition also starkly contrasts with the consumer-centric definition on which YKK previously obtained the HEO ambiguity and trial bifurcation orders. This Court allowed YKK to proceed to trial on YKK's then qualitative and made in North America definition (1) because outerwear **consumers** would know where the outerwear was made (presumably from the garment's tag) and (2) because the Court could "not conclude as a matter of law that the 'sophisticated and discerning' **customer** of 2002 did not only find appealing outerwear made in certain geographic regions …." ECF 794 at 8 (emphasis added);

---

[5] *See also White Plains Aviation Partners, LLC v. Cnty. of Westchester*, 2022 WL 743434, *4 (S.D.N.Y. 2022) (rejecting proposed interpretation of undefined term "required" changes to include "desired" or "any" changes); *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F.Supp.2d 379, 393 (S.D.N.Y. 2014), *aff'd sub nom. APEX Emp. Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc.*, 725 F. App'x 4 (2d Cir. 2018) (rejecting "the suggestion that 'projection' is intended as a synonym for 'appointments'"); *Hollis Park Manor Nursing Home v. Landmark Am. Ins. Co.*, 803 F.Supp.2d 205, 209 (E.D.N.Y. 2011) (contract was not ambiguous because the "broad definition of 'derivative claim' urged by [plaintiff] is not reasonable"); *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F.Supp.2d 191, 201-202 (S.D.N.Y. 2006) (unreasonable to interpret contract term "become defective" to "include a loss due to misdelivery" of film tape).

*see also* ECF 664 at 5 (YKK noting "customer viewpoints"); Sarumaru Depo. Tr. 133:14-133:22 (noting "fashion trends and consumer trends"). If YKK had urged then the definition YKK urges now, the Court likely would have reached a different conclusion.

      That different conclusion would have been called for because outerwear consumers (end-users) would never be exposed to information about the garment manufacturer's choice between YKK-laminated zippers and the indistinguishable Plaintiff-laminated zippers. Nor would consumers ever know the identity of the specific supplier that laminated the cloth stringer tapes before YKK assembled and sold the completed zipper to outerwear manufacturers or how long any of those manufacturers would have waited or how much they would have paid for zippers from worldwide suppliers. Because "sophisticated and discerning" consumers in 2002 would not have this information (unlike where the outerwear was made), no reasonable consumer could have only found appealing outerwear with a zipper that had cloth stringer tapes laminated by Uretek rather than by YKK.

### III.    This Court should conclude as a matter of law that YKK's new definition of HEO should not be submitted to the jury.

      In sum, in the HEO ambiguity order, this Court could not "conclude as a matter of law that [HEO] does not include a geographical limitation." ECF 794 at 7. But the Court noted that it "might ultimately determine as a matter of law that no reasonable fact finder could support a party's view of the meaning of the term in response to a motion under Federal Rule of Civil Procedure 50 **or otherwise**." *Id*. at 8 n. 4 (emphasis added). This Court now can—and should— (1) conclude that no reasonable fact finder could support YKK's new, fourth definition; (2) enter an order that the phrase "high end outerwear" was intended by the parties to have the reasonable meaning submitted by Plaintiffs in their proposed verdict form (ECF 841-2); (3) cancel the bifurcated January 23, 2023, HEO trial; and (4) schedule those pretrial conferences necessary for the Court and the parties to be prepared to proceed with a full trial on the merits beginning March 6, 2023.

************

Respectfully submitted,

By: /s/ *Brian P. Daniels*
Brian P. Daniels (pro hac vice)
David R. Schaefer (pro hac vice)
Michael T. Cretella (pro hac vice)
BRENNER, SALTZMAN & WALLMAN LLP
271 Whitney Avenue
New Haven, Connecticut 06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: bpdaniels@bswlaw.com
Email: dschaefer@bswlaw.com
Email: mcretella@bswlaw.com

Norman H. Zivin (NZ-6053)
nzivin@wolfgreenfield.com
Tonia A. Sayour
tsayour@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
605 Third Avenue
New York, NY 10158
212.849.3341 Phone
617.646.8646 Fax

Michael A. Albert
malbert@wolfgreenfield.com
Emma L. Frank
efrank@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
617.646.8000 Phone
617.646.8646 Fax

*Attorneys for Plaintiffs AU New Haven,*
*LLC and Trelleborg Coated Systems US, Inc.*

## CERTIFICATE OF SERVICE

      I hereby certify that on January 9, 2023, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.

                                                */s/Brian P. Daniels*
                                                Brian P. Daniels (pro hac vice)

11o57547.doc

Application granted in part. The Court will take up this issue at the conference scheduled for January 13, 2023.

SO ORDERED.

Dated: January 9, 2023
New York, New York

                                                GREGORY H. WOODS
                                                United States District Judge