UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

AU NEW HAVEN, LLC, and TRELLEBORG : 
COATED SYSTEMS US, INC., :
 :
                      Plaintiffs, :
 :
        -against- :
 :
YKK CORPORATION *et al.,* :
 :
                     Defendants. :

---------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 3/23/2023 |

1:15-cv-3411-GHW

MEMORANDUM OPINION
AND ORDER

## I.    INTRODUCTION

Over the course of the long history of this case, Plaintiffs maintained that they held patents issued in both Japan and Taiwan.  Their ownership of those foreign patents was an important issue in the case:  Defendants asserted that unless Plaintiffs owned the patents, they did not have standing to pursue certain of their claims.  Long after the close of fact discovery, Defendants were provoked to conduct an independent examination of the public filings in the patent offices in Japan and Taiwan.  Defendants discovered that during the discovery period, Plaintiffs had created, but failed to produce, a substantial number of documents that were responsive to Defendants' discovery requests (the "Withheld Documents").  Those documents showed that rights to the Japanese patents were not properly assigned to Plaintiffs until years after the date on which Plaintiffs had previously represented, and that rights to the patents in Taiwan were never formally transferred to Plaintiffs.  Because Plaintiffs had a continuing obligation to produce the Withheld Documents to Defendants under Federal Rule of Civil Procedure 26(e), and were grossly negligent in their failure to do so, Defendants' motion for sanctions is granted in part.

## II.     BACKGROUND

The Court assumes the parties' familiarity with the facts and procedural history in this matter.  Nonetheless, the Court recapitulates the aspects of the case relevant to this motion.

### A.   Plaintiffs' Claims Regarding Ownership of Foreign Patents

This long-running litigation began in May of 2015.  Dkt. No. 1.  In their original complaint, Plaintiffs Au New Haven, LLC ("Uretek") and Trelleborg Coated Systems US, Inc. ("Trelleborg"), asserted claims against a single defendant, YKK Corporation ("YKK").  The claims arose under the "Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq.*, and the laws of the State of New York."  *Id.* ¶ 1.  The claims focused on a single U.S.-issued patent, U.S. Patent No. 6,105,214 (the "'214 Patent").  According to the complaint, the '214 Patent was issued to Mr. Press.  *Id.* ¶ 7.  Mr. Press, in turn, was alleged to have assigned the patent to himself and Harold Hoder.  *Id.* ¶ 8.

The original complaint asserted that YKK infringed on the '214 Patent, in violation of the U.S. patent laws.  It also claimed that the company had breached an agreement—the Exclusive License Agreement (the "ELA") that it had entered into with Messrs. Press and Hoder.  The ELA provided YKK a license to manufacture and sell products using the '214 Patent, except in a number of excluded market.  *Id.* ¶ 9.

On February 23, 2016, Plaintiffs filed an amended complaint (the "Amended Complaint"). Dkt. No. 90.  The Amended Complaint dramatically expanded the claims in the case.  Plaintiffs named as defendants a number of YKK's subsidiaries.  And the Amended Complaint added allegations regarding foreign patents covering the invention claimed in the '214 Patent—including patents in Japan and Taiwan.  Amended Complaint ¶¶ 31, 39, 40.  Mr. Hoder passed away in January 2006, "with Hoder's interests in the '214 Patent, the Foreign Patents and the License Agreement thereby becoming assets of the Estate of Harold E. Hoder (the 'Hoder Estate')."  *Id.* ¶ 41.  The Amended Complaint alleged that in or about June 2006, "the Hoder Estate and Press assigned the

'214 Patent and the Foreign Patents [defined to include the patents in Japan and Taiwan] . . . to Uretek." *Id.* ¶ 42.  And, in turn, "[i]n or about October 2014, Uretek assigned the "214 Patent and the Foreign Patents to Trelleborg." *Id.* ¶ 43.[1]

The Amended Complaint raised claims under the Lanham Act.  Those claims were based in part on the alleged effect of statements by Defendants asserting that they were the "sole parties authorized to manufacture zippers containing the invention claimed in the Zipper Patents to be used in the Excluded Markets . . . ." *Id.* ¶ 82.  Because, the Amended Complaint alleged, "Plaintiffs are the sole parties authorized to manufacture zippers containing the invention claimed in the Zipper Patents [defined to include the foreign patents]" . . . "Defendants' false and/or deceptive advertising thereby interferes with Plaintiffs' business expectancies in that customers purchasing zippers containing the invention claimed in the Zipper Patents to be used in the Excluded Markets are diverted from such zippers manufactured by Plaintiffs and to such zippers manufactured by parties other than Plaintiffs . . . ." *Id.* ¶¶ 82, 83.

### B.  The Relevant Discovery Requests and Plaintiffs' Responses

The Court held an initial pretrial conference for this case on July 2, 2015, and entered a case management plan and scheduling order the next day.  Dkt. No. 30.  With that, the parties were off and running with discovery.  Discovery lasted for a long time—more than two years.  Most fact discovery was to be completed by July 2017, Dkt. No. 218, but the Court granted a number of targeted extensions of fact discovery after that date.

YKK served its first set of requests for the production of documents on July 31, 2015 (the "RFPs").  Cherny Decl. Ex. R.  The RFPs contained a number of requests related to Plaintiffs' ownership of the patents issued in Japan and Taiwan, and, in particular, the manner in which they

---

[1] The Court has been provided with the assignment agreements that correspond to these allegations.  *See* Declaration of Steven Cherny, Dkt. No. 765 ("Cherny Decl."), Ex. O (2006 Assignment), Ex. P (YKK Consent to 2006 Assignment), Ex. Q (2014 Assignment).

were transferred to Trelleborg.[2]  The RFPs directed that Plaintiffs supplement their responses with documents that they later received that would be responsive to any request.  *Id.* at 4 ("These document requests are to be regarded as continuing and you are requested to provide promptly, by way of supplementary production of documents, such additional documents as may hereafter be obtained by you or any person acting on your behalf which fall within the scope of these document requests.").

Plaintiffs responded to the RFPs on September 3, 2015 (the "RFP Responses").  Cherny Decl. Ex. S.  Plaintiffs responded to each of the three RFPs at issue here.  They stated that they would produce responsive documents in response to RFPs 39 and 46.  RFP Responses at 12-13.  They objected to RFP 45 on the basis that it was "overly broad and unduly burdensome to the extent it seeks information unrelated to the assignment of the '214 Patent from Uretek to Trelleborg and also to the extent it seeks information in addition to the executed closing documents."  *Id.* at 13.  But the RFP Responses did not state that any documents were being withheld as a result of those objections.  The RFP Responses objected to a number of the general instructions contained in the RFPs.  However, Plaintiffs did not object to the RFPs' general instruction directing Plaintiffs' to update their responses as additional information became available.  *See* RFP Responses at 1-2.

During discovery, Plaintiffs produced "over 30 documents which existed as of 2015 related to Japan and Taiwan patent filings (the 'Discovery Documents'), including over two dozen created prior to the filing of this action."  Dkt. No. 780 ("Opposition") at 4.[3]  The Court understands that

---

[2] The RFPs included the following requests: "39.  All documents concerning the ownership of the '214 Patent and any patent claiming priority to or otherwise related to the '214 Patent, and any transfers or licenses of rights, either wholly or partially. . . .  45.  All documents concerning the acquisition or purported acquisition of any assets, rights, or obligations of Uretek by Trelleborg, including any negotiation regarding that acquisition.  46.  All documents concerning the transfer or purported transfer of the '214 Patent, or rights in the '214 Patent, from Uretek to Trelleborg."  Cherny Decl. Ex. R at 9.

[3] Plaintiffs' Opposition contains a number of factual assertions, such as the one quoted here.  A number of documents are attached to the Opposition.  The Opposition is deficient, however, because it is not accompanied by an affidavit attesting to the truth of the facts stated in the Opposition or to the verisimilitude of the documents attached to it.  Plaintiffs' failure to present an affidavit in support of the Opposition violates the Court's Local Rules.  *See* Local Rules of

Plaintiffs are asserting that those documents were produced in response to the RFPs at issue here. Several of those 30 documents are duplicates. Many of the documents were unexecuted; none of the executed documents were signed after 2011. Some of the unexecuted documents seem to relate to the potential transfer of the Japanese patents to Uretek and Trelleborg, respectively. *See, e.g.,* Opposition Exs. 4, 10-14, 30-34. While undated, some bear signature dates with pre-prepared signature dates in 2014 and 2015. *Id.* None, however, show that the transfer of the patents registered in Japan and Taiwan to Uretek or Trelleborg was implemented under the local laws of those countries.[4]

---

the United States District Courts for the Southern and Eastern Districts of New York 7.1(a)(3) ("all motions shall include the following motion papers: (3) Supporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion.").

[4] Opposition Ex. 4 (undated, unsigned "Deed of Assignment" of Japanese patent to Uretek, with 2015 signature block); Ex. 5 (April 15, 2011 declaration by Randal Holder referring to Japanese patent and stating that he is the heir to Harold Hoder); Ex. 6 (declaration with same content as Ex. 5); Ex. 7 (declaration with same content as Ex. 5); Ex. 8 (May 27, 2014 declaration by Randal Hoder referring to Japanese patent, stating that he is heir to Harold Hoder, and appointing Japanese attorneys with respect to the Japanese patent); Ex. 9 (declaration with same content as Ex. 8); Ex. 10 (undated, unexecuted "Deed of Assignment" of Japanese patent to Uretek, with 2014 signature block); Ex. 11 (undated, unexecuted "Deed of Assignment" of Japanese patent to Uretek, with 2015 signature block); Ex. 12 (undated, unexecuted "General Power of Attorney" from Trelleborg to Japanese attorneys with respect to Japanese patent with 2015 signature block); Ex. 13 (undated, unexecuted "General Power of Attorney" from Uretek to Japanese attorneys with respect to Japanese patents with 2014 signature block); Ex. 14 (undated, unexecuted "General Power of Attorney" from Uretek to Japanese attorneys with respect to Japanese patent with 2015 signature block); Ex. 15 (March 10, 2008 "Power of Attorney" from Stuart Press, representative of Uretek, to attorneys in Taiwan with respect to patents); Ex. 16 (July 2008 "Power of Attorney" from Stuart Press to Japanese attorney with respect to Japanese patent application); Ex. 17 ("Power of Attorney" with same content as Ex. 16); Ex. 18 (July 2008 "Power of Attorney" from Randal Hoder to Japanese attorney with respect to Japanese patent application); Ex. 19 (April 15, 2011 "Power of Attorney" from Randal Hoder, as legal heir to Harold Hoder, to Japanese attorneys with respect to Japanese patent applications); Ex. 20 ("Power of Attorney" with same content as Ex. 19); Ex. 21 (April 24, 2011 "General Power of Attorney" from Stuart Press to Japanese attorneys with respect to Japanese patent applications); Ex. 22 ("General Power of Attorney" with same content as Ex. 21); Ex. 23 (filing of April 15, 2011 "Power of Attorney" and April 15, 2011 "Declaration" by Randal Hoder); Ex. 24 (filing of April 24, 2011 "General Power of Attorney" by Stuart Press); Ex. 25 (untranslated Japanese document, stamped received on April 25, 2011); Ex. 26 ("Power of Attorney" with same content as Ex. 19); Ex. 27 ("General Power of Attorney" with same content as Ex. 21); Ex. 28 (April 24, 2011 "Power of Attorney" from Stuart Press to Japanese attorney with respect to Japanese patent application); Ex. 29 (untranslated Japanese document, stamped received on My 31, 2011); Ex. 30 (undated, unexecuted "Power of Attorney" from Uretek to Japanese attorneys with respect to Japanese patent applications with 2014 signature block); Ex. 31 (incomplete, undated, unexecuted "Declaration" by Randal Hoder, as heir to Harold Hoder, granting power of attorney with respect to Japanese patent applications with 2014 signature block); Ex. 32 ("Declaration" with same content as Ex. 31); Ex. 33 (undated, unexecuted "Power of Attorney" from Uretek to Japanese attorneys with respect to Japanese patent applications with 2015 signature block); Ex. 34 (undated, unexecuted "Power of Attorney" from Trelleborg to Japanese attorneys with respect to Japanese patent applications with 2015 signature block); Ex. 35 (undated, unexecuted "Power of Attorney" by Stuart Press, on behalf of himself, appointing Taiwanese attorneys as power of attorney with respect to patents).

### C.  Hints on the Record Regarding the Transfer of the Foreign Patents

While litigation in this case was ongoing, "YKK had filed two coordinated Japan patent invalidation actions against Press and Randal Hoder . . . as record title owners of those Japan patents." Opposition at 3.  On December 7 and December 8, 2016, the Japan Patent Office (the "JPO") wrote counsel for YKK that the "rights of the Appellee have been transferred in the present appeal case . . . ," and that, therefore, the cases would proceed against the holder of the patent rights—Trelleborg.  Opposition Ex. 1 and 2.  Neither notice stated when the transfer to Trelleborg had been completed.

In April 2017, the parties received an "Advance Notice of Trial Decision" with respect to the requests to invalidate the two Japanese patents at issue in the litigation.  At the Court's request, those notices were filed in this case under cover of a letter from the parties.  Dkt. No. 227.  Pages 2 and 3 of an eighty-three page long trial decision contained a list of events relevant to the patent's history.  Dkt. No. 227-1.  One entry in the list reads:  "November 14, 2016  Request for Registration of Transfer."  After laying out that brief review of the history of the patent, the remainder of the opinion focuses on the substance of the dispute regarding the patent's validity.

### D.  The Court Accepts Plaintiffs' Representations Regarding Ownership of Foreign Patents

In January 2018, Plaintiffs sought an anti-suit injunction to prevent YKK from litigating issues related to the infringement and validity of the Japanese patent in Japanese courts.  *See* Dkt. No. 320.  In their motion, in order to establish the necessary similarity in the parties to the two cases, Plaintiffs asserted that "Trelleborg also was assigned the JP '523 Patent by Uretek, the other plaintiff in this action."  Dkt. No. 320-1 at 4.  Judge Netburn ultimately granted Plaintiffs' request for the entry of an anti-suit injunction.  Dkt. No. 356.  In her decision, Judge Netburn accepted Plaintiffs' statements regarding the ownership of the Japanese patent.  *Id.* at 2 ("A Japanese patent was subsequently issued to Uretek for a water-resistant slide fastener and the process for preparing it

6

. . . .  In October 2014, AU New Haven sold substantially all of the operating assets of the Uretek business to Plaintiff Trelleborg . . . and assigned the U.S. Patent, the Japanese Patent, and several other patents to Trelleborg.").

The Court issued a decision granting summary judgment to Defendants in part in July of 2020 (the "SJ Opinion").  Dkt. No. 611.  That opinion focused on Plaintiffs' Lanham Act claims—in particular the four statements that Plaintiffs identified as the basis for those claims.  The Court concluded that "YKK's statements fall squarely within the scope of the patent publication privilege . . . ."  SJ Opinion at 9.  Therefore, the Court concluded, "[f]or liability to attach under the Lanham Act, Plaintiffs must . . . demonstrate that YKK made these statements in bad faith."  *Id.* at 12.  Evaluating the statements in that light, the Court granted Defendants summary judgment as to all but one statement.  As to that one, the Court wrote that a "reasonable jury could conclude that YKK's claim that it held the exclusive right to manufacture and sell products covered by the '214 patent was objectively baseless.  After all, YKK undeniably did not have such an exclusive right—*it shared that right with Uretek.*"  *Id.* at 16 (emphasis added).  Thus, at the core of the Court's decision was its acceptance that Uretek held the right to sell the patented products—including those covered by the Japanese and Taiwanese patents.

The scope of Plaintiffs' ownership interests in the foreign patents at issue here has an impact on Plaintiffs' Lanham Act claims.  On August 24, 2020, after the Court's ruling on the summary judgment motion, the Court held a conference to discuss the issues remaining to be tried in the case, and, in particular, "briefing and jury instructions regarding issues of foreign law."  Dkt. No. 621 at 6:9-10.  During that hearing, Plaintiffs' counsel informed the Court that "the only foreign laws that are applicable would be Taiwan and Japan . . . ."  *Id.* at 17:8-9.  Plaintiffs explained that the scope of Plaintiffs' rights in the patents registered in those countries would be relevant to their Lanham Act claims.  In Plaintiffs' counsel's words, "the scope of the patents in foreign countries is relevant to

the issue of whether the defendants['] claim they had the right to sell products made in accordance with those patents.  And our position is that they knew that they did not have the right.  And that goes to the intent aspect of the Lanham Act claim." *Id.* at 17:25-18:5.

### E.  Defendants Become Suspicious of Plaintiffs' Representations Regarding Ownership of Foreign Patents

It appears that Defendants were provoked to conduct the investigation that revealed the documents at issue in this motion by Plaintiffs' comments about, and conduct regarding, their ownership of the patents.  The issue of Plaintiffs' ownership of the patents at issue in this case came up during a September 8, 2020 conference which was scheduled to discuss pending motions *in limine* in advance of trial.  One of Plaintiffs' motions asked the Court to exclude "any evidence or testimony that the assignment from Uretek to Trelleborg is invalid." Dkt. No. 468 at 14.  During the conference, the Court asked "whether there is, in fact, a live issue related to standing; and if so whether and why this is an issue that would be put to the jury, as opposed to [being] tested through a 12(b)(1) motion." Dkt. No. 626 at 22:4-5.  Defendants' counsel responded that they did not expect to move on the issue, but that they expected to require that Plaintiffs prove their ownership of the patents in suit at trial:  "our point was simply that proof of ownership and title . . . is an issue that plaintiffs bear the burden on.  And we don't think we should be precluded from putting them to that burden." *Id.* at 22:12-16.

On December 9, 2020, Plaintiffs filed a motion to dismiss Defendants' affirmative defense challenging their title to the patents at issue.  Dkt. No. 718.  The motion was short—just longer than three pages, including the caption.  And the substantive basis for the motion was thin—Plaintiffs' presented no evidence in support of the motion.  Instead, they presented as the sole support for the motion the assertion that "YKK's counsel effectively has conceded that this affirmative defense is factually frivolous." *Id.* at 2.  The Court denied the motion without prejudice because it had not been not preceded by a pre-motion letter, Dkt. No. 719, and conducted a conference regarding the

proposed motion eight days later.  During that conference, Defendants refuted Plaintiffs' contention

that they had conceded Plaintiffs' ownership of the patents at issue in this case.  Dkt. No. 727 at

9:13-18 ("And so, I will reiterate:  It is plaintiff's burden . . . to prove standing here.  They've got a

number of different transactions over the years of this patent and various and sundry other rights.

We are telling them that they need to prove that.").

The Court granted Plaintiffs leave to file a motion for the Court to evaluate their contention

that their ownership of the patents at issue could not be disputed, such that they need not prove up

that issue at trial.  However, given that Defendants had not conceded the point, the Court made

clear that any motion would need to be supported by more than just a conclusory statement of the

type included in the earlier motion.  *Id.* at 21:13-22:6.  Plaintiffs never filed the motion.

### F.  Defendants Uncover the Withheld Documents

Prompted by Plaintiffs' decision not to file the motion, "counsel for YKK independently

investigated the information available from the two foreign patent authorities still relevant to this

dispute, the JPO and TIPO [Taiwan Intellectual Property Office]."  Dkt. No. 74 ("Def. Mem.") at

13.  In the JPO, Defendants found ten documents related to the Japanese patent at issue in this case

that had not been previously produced to them.  Cherny Decl. Exs. A-J.  Those show that on

September 15, 2016, Mr. Press executed a "Deed of Assignment" assigning the Japanese patent to

Uretek, LLC.  *Id.* Ex. D.  Randal Hoder and Mr. Press executed another "Deed of Assignment" to

Uretek, LLC on the same day.  *Id.* Ex. G.  Also on September 15, 2016, Milton Berlinski signed a

"Deed of Assignment" on behalf of Uretek, transferring the Japanese patent to Trelleborg.  *Id.* Ex.

H.  On October 10, 2016, Randal Hoder, acting as the heir to Harold Holder, signed a pair of

"Declarations" first affirming that he was authorized to execute a power of attorney on behalf of

Harold Hoder, and then granting that power to Japanese attorneys.  *Id.* Ex. F.  It appears that all of

the documents were filed with the JPO in November of 2016.

Defendants' investigation in Taiwan uncovered other documents that had not been produced during discovery.  Defendants tasked Taiwanese counsel to investigate the ownership of the Taiwanese patent at issue here.  Declaration of Kaya Kuo, Dkt. No. 767 ("Kuo Decl."), ¶ 1. Counsel called the TIPO to inquire about the ownership of the patent "and was told by a representative of TIPO that an application for succession of patent rights had been filed in 2017 . . . ." *Id.* ¶ 3.  But because of the ongoing COVID-19 pandemic, counsel could not access the records.  In late July 2021, Defendants' counsel raised with Plaintiffs' counsel the concern that unproduced documents, like those uncovered in Japan, might also exist in Taiwan.  In an email response to Defendants' assertion, counsel for Plaintiffs responded that "we are not aware of any 2017 filing.  In light of your representation that you received some kind of oral confirmation of such a filing by the Taiwan Patent Office, we are in the process of contacting Plaintiffs' Taiwan counsel to make further inquiry."  Cherny Decl. Ex. T.

Defendants' counsel reported on what they had heard from their Taiwanese counsel in an August 6, 2021 conference with the Court.  Dkt. No. 754 at 14:12-14 ("we're still trying to figure out why the Taiwanese Patent Office is telling us that the request to change the ownership or update it happened in 2017.").  Plaintiffs' counsel responded that "[a]s to Taiwan, your Honor, we have gone up and down our files.  We contacted Taiwan counsel.  I'm telling you, there's no assignment that we're aware of that has been filed in Taiwan.  There just isn't." *Id.* at 27:13-16.

Plaintiffs did not produce any documents related to the ownership of the patents in Taiwan to Defendants; instead, Defendants' counsel worked independently to find them in the TIPO.  In August 2021, Defendants' Taiwanese counsel filed an application for the records and was allowed to access the files.  Kuo Decl. ¶ 4.  The records that he uncovered showed the following:  "an application for recording the change of the second patent applicant . . . was filed on Nov. 11, 2016 citing the demise of the second applicant, Harold Hoder, and relevant documents of one of his

alleged successors, Randal Hoder, were submitted . . . ." *Id.* ¶ 6.  The documents included a "Power of Attorney" signed by Mr. Press on October 18, 2016, and another signed by Randal Hoder on October 31, 2016, both granting authority to Taiwanese counsel to take action with respect to patents and patent applications owned by them.  Cherny Decl. Ex. K.

The documents also revealed that "an application for inheritance of Harold Hoder's patent right . . . along with a letter of consent in support of the application for inheritance of a patent right executed by Gloria Holder was submitted on January 11, 2017."  Kuo Decl. ¶ 7.  Ms. Hoder signed the letter of support on January 3, 2017.  The "TIPO subsequently issued an office action instructing the applicant to provide additional evidence in support of the application for inheritance, including a document certifying inheritance issued by a court . . . ."  *Id.* ¶ 8.  Confronted with that request for documentation to support the requested transfer, "the applicant filed a response stating that the application for inheritance of patent right was canceled."  *Id.* ¶ 9.

### G.  The Withheld Documents Are Significant

The facts revealed by the Withheld Documents uncovered by Defendants are significant. Under Japanese law, "no transfer of patent rights or rights to obtain a patent through assignment agreements is valid or has any effect unless the transfer is notified and registered at the JPO." Declaration of Toshiko Takenaga, Dkt. No. 766 ("Takenaga Decl."), ¶ 17.  For both "rights to obtain patents" and issued patents, a purported transfer does not have any effect unless the transfer is registered at the JPO, except for certain transfers resulting from inheritance.  *Id.* ¶¶ 18, 19.

> In short, no transfer of patent rights or rights to obtain a patent through assignment agreements is valid or has any effect unless the transfer is notified and registered at the JPO.  Even if assignment agreements are valid and result in claims and obligations to the assignors and assignees, they do not have any impact on the ownership of the rights without a public notice of the assignment via a notification to the JPO commissioner or a registration at the JPO patent registry.

> Because assignees have not received any right prior to the registration, they cannot bring a suit against third parties for infringement of the patent in Japanese court.

*Id.* ¶¶ 20, 21 (internal numbering omitted).

Therefore, under Japanese law, the documents found by Defendants in the JPO show that "Uretek did not obtain rights to the '523 Patent in 2006 and that Trelleborg did not obtain rights to the '523 Patent in 2014 because the 2006 Assignment and the 2014 Assignment are not included in or even referenced in any of the documents registered with the JPO. Instead, the documents attached as Exhibits B-H and registered with the JPO include entirely different assignments to Uretek and Trelleborg dated in 2016, and show there was no transfer of the rights in the '523 Patent to Uretek or Trelleborg until the purported 2016 assignment was registered with the JPO." *Id.* ¶ 24.

The records uncovered in Taiwan show no change in ownership of the Taiwanese patents from Mr. Press and Harold Hoder. Importantly, there is no indication in the records that a transfer was ever implemented to either Uretek or Trelleborg. When confronted with a request to document Randal Hoder's status as heir to Mr. Hoder and to implement the requested transfer, the TIPO records show, Plaintiffs stopped trying.

As Defendants argue, the facts revealed by these documents call into question the accuracy of a number of Plaintiffs' representations to the Court regarding the ownership of the relevant foreign patents.[5]

They also undermine the foundation of the Court's ruling with respect to Plaintiffs' remaining Lanham Act claim. As described above, the Court found that one statement attributed to Defendants might support a viable Lanham Act claim: Defendants claim that had an exclusive right to manufacture the patented zippers might be false because "YKK undeniably did not have such an exclusive right—*it shared that right with Uretek*." SJ Opinion at 16 (emphasis added). The Withheld

---

[5] They may also call into question representations made by Uretek to Trelleborg in its 2014 assignment agreement. *See* Cherny Decl. Ex. Q ("WHEREAS, Assignor is the *registered owner* of those . . . foreign patents listed in <u>Schedule A</u> attached hereto . . . .") (emphasis added).

Documents are probative of the proposition that the Court's conclusion was based on a false premise: because Uretek and Trelleborg had not been assigned the Japanese patent rights until 2016, and have never registered their ownership of the Taiwanese patent, YKK would argue that it shared that right, not with Uretek or Trelleborg, but, rather with Messrs. Press and Hoder—neither of whom is a plaintiff in this lawsuit.

### H.  Trelleborg's Counsel Knew About the Withheld Documents

Trelleborg's counsel commissioned the creation of the Withheld Documents.  Thomas D. Yaczik, Vice President Legal Americas at Trelleborg Group, submitted an affidavit in support of Plaintiffs' opposition.  Opposition Ex. 62 ("Yaczik Decl.").  In it he affirmed that he was the corporate counsel for Trelleborg in 2014.  *Id.* ¶ 3.  In or about January 2015, he learned that "record title to the Patents varied among Uretek, Uretek, Inc., or Stuart Press and Harold Hoder."  *Id.* ¶ 6. "Shortly thereafter, in or about February 2015, I authorized Trelleborg's patent counsel to begin the process of updating record title to the Patents."  *Id.* ¶ 7.  According to Mr. Yaczik, Mr. Press, Randal Hoder, and Mr. Berlinski cooperated with Trelleborg in implementing the transfers.  *Id.* ¶ 8.

Mr. Yaczik affirmed that updating record title to Trelleborg's patents is not, in his view, a "time-sensitive task."  *Id.* ¶ 9.  So "Trelleborg ordinarily updates record title to Trelleborg's patents only when it is reasonably practical to do so."  *Id.* ¶ 10.  "Trelleborg undertook the Japan and Taiwan filings at issue as part of its general business practices independent of this litigation against YKK (including independent of Plaintiffs' claim against YKK under the United States Lanham Act), and the filings would have occurred even if this litigation was not pending."  *Id.* ¶ 11.

Accepted as true, Mr. Yaczik's affirmation establishes that Trelleborg did not create and file the transfer documents discovered by Defendants in order to advance its litigation position in this case.  But it also establishes that Trelleborg knew of the issues with its record ownership of the patents at issue here since 2015—in other words, that Messrs. Hoder and Press, rather than it or

Uretek, held record title to them.  And it reveals that Trelleborg's counsel directed that the documentation uncovered by Defendants be created at a time when Trelleborg was actively involved in the discovery process in this case.

## III.   DISCUSSION

As the Second Circuit has explained,

> [t]he extremely broad discovery permitted by the Federal Rules depends on the parties' voluntary participation.  The system functions because, in the vast majority of cases, we can rely on each side to . . . disclose relevant information when asked (and sometimes even before then) without being forced to proceed at the point of a court order.

*Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 631 (2d Cir. 2018) (citing *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979)).  Defendants contend that Plaintiffs failed to disclose the Withheld Documents during discovery despite the fact that they were responsive to their discovery requests.  For their discovery abuses, Defendants argue that Plaintiffs should be sanctioned under Fed. R. Civ. P. 37(c) for failure to comply with their discovery obligations, *see* Def. Mem. at 21-25.  For the reasons that follow, the Court agrees.

### A.  Legal Standard

The Federal Rules of Civil Procedure set forth liberal limits on the scope of discovery.  Rule 26 provides:

> Unless otherwise limited by court order, the scope of discovery is as follows:  Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).  "In federal actions, discovery should be broad, and all relevant materials which are reasonably calculated to lead to the discovery of admissible evidence should be [discoverable]."  *Nat'l Cong. for Puerto Rican Rights ex rel. Perez v. City of New York*, 194 F.R.D. 88, 92

(S.D.N.Y. 2000) (quotation omitted); *Johnson v. Doty*, No. 15-cv-7823 (KMK)(JCM), 2020 WL

1244236, at *1 (S.D.N.Y. Mar. 16, 2020) (stating that information is "relevant if it has any tendency

to make a fact more or less probable and the fact is of consequence in determining the action.")

(internal quotations and citations omitted).

 Under Rule 26(e), a party who has responded to a request for production is required to

supplement or correct its response "if [it] learns that in some material respect the . . . response is

incomplete or incorrect, and if the additional or corrective information has not otherwise been made

known to the other parties during the discovery process or in writing[.]" Fed. R. Civ. P. 26(e)(1)(A).

As the text of the rule makes clear, a party's obligation to supplement its disclosures under Rule

26(e) is a continuing one: if following an initial response a party learns that the response is

incomplete or incorrect, and the caveat specified in the rule does not apply, the party must update its

disclosures. As early as 1975, the Second Circuit ruled that Rule 26(e) should be read to impose on

litigants a continuing obligation to update their disclosures. *See Weiss v. Chrysler Motors Corp.*, 515

F.2d 449, 457 (2d Cir. 1975) ("Even if appellant is wrong in contending, to the contrary, that the

crucial tests were actually completed before trial, Chrysler's obligation to supplement its response to

interrogatories on the 'subject matter' and 'substance' of expert testimony was a continuing

obligation. Nothing in either Rule 26(e) or the trial judge's direction to the parties indicates that that

obligation contained any limitation of time. . . ."); *see also Grand River Enters. Six Nations, Ltd. v. King*,

No. 02 CIV. 5068 (JFK), 2009 WL 1360686, at *2 (S.D.N.Y. May 15, 2009) (quoting *Weiss* to

conclude that "Rule 26(e) is a 'continuing obligation' and is not subject to 'any limitation of time.'").

 In *Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63 (W.D.N.Y. 2011), Judge Leslie G.

Foschio engaged in thoughtful analysis of Rule 26(e) and its requirements, responding to an

argument that the rule imposed no duty to supplement a party's response with documents created

after the response. Unsurprisingly, given the clear text of the rule itself and the committee notes,

Judge Foschio concluded that the argument had no merit.  In reaching that conclusion, Judge Foschio analyzed the effect of the 2007 amendments to the rule.  Judge Foschio pointed to minutes of the advisory committee working on the rule's revision to illustrate that the 2007 revision was intended to reflect an already broadly-understood practice—that the rule required the production of later acquired information:

> As the May 23, 2006 minutes of the Civil Rules Advisory Committee in considering the change effected in the 2007 amendment to Rule 26(e) stated
>
> > All reference to "thereafter acquired" was deleted from the Style [proposed] Rule because <u>this limit</u> was thought to have disappeared from actual practice.  All lawyers understand that there is an obligation to supplement or correct a disclosure or response <u>no matter whether the omitted information was known at the time of the initial disclosure or response or whether in some sense the party "learned" of the information "later acquired."</u>

*Robbins & Myers*, 274 F.R.D. at 75–76 (quoting Civil Rules Advisory Committee of the Judicial Conference, 2006 WL 2940679, *10 (J.C.U.S)) (emphasis in original).

As a leading treatise states, "[t]he Committee Note to the 1993 revision made it clear that the duty exists if the new information is acquired by the attorney or the party.  Although it is important to avoid traps for the unwary or innocently ignorant, courts look with disfavor on claims that counsel did not recognize that important new items of information should be disclosed."  8A Fed. Prac. & Proc. Civ. § 2049.1 (3d ed.).

"Sanctions may be authorized by any of a number of rules or statutory provisions, or may be permissible on the basis of the court's inherent powers."  *Sakon v. Andreo*, 119 F.3d 109, 113 (2d Cir. 1997).

> Rules 26(g) and 37 "represent the principal enforcement power to punish discovery abuse."  Inherent power sanctions are thus not a primary mechanism by which a party can obtain relief for a discovery abuse:  They should serve only as a useful backstop against discovery abuses that do not clearly violate Rules 26(g) and 37.

*Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 236–37 (2d Cir. 2020) (quoting Gregory P. Joseph,

*Sanctions: The Federal Law of Litigation Abuse* 535 (6th ed. 2020)).  After a court determines that

sanctions are warranted, it may tailor the sanctions it imposes using a case-by-case approach because

"the failure[s] to produce relevant evidence . . . occur along a continuum of fault—ranging from

innocence through the degrees of negligence to intentionality."  *Reilly v. Natwest Mkts. Grp. Inc.*, 181

F.3d 253, 267 (2d Cir. 1999) (internal quotation marks and citation omitted).

> As relevant here, Federal Rule of Civil Procedure 37(c)(1) provides that

> > [i]f a party fails to provide information or identify a witness as required by Rule 26(a)
> > or (e) . . . the court, on motion and after giving an opportunity to be heard . . . may
> > order payment of the reasonable expenses, including attorney's fees, caused by the
> > failure . . . [or] impose other appropriate sanctions, including any of the orders listed
> > in Rule 37(b)(2)(A)(i)–(vi).

Fed. R. Civ. P. 37(c)(1).  "[Rule 37(c)] permits a court to impose a variety of sanctions for discovery-

related abuses, including the payment of the reasonable expenses, including attorney's fees."  *Borsanyi*

*v. Huggins*, No. 19-cv-177266 (CBA)(AKT), 2019 WL 4911188, at *6 (E.D.N.Y. Sept. 30, 2019)

(quoting *JMC Rest. Holding, LLC v. Pevida*, No. 14 Civ. 6157 (WFK)(VMS), 2016 WL 3351007, at *6

(E.D.N.Y. June 14, 2016)).  Where "the alleged misconduct is the non-production of relevant

documents, district courts have broad discretion in fashioning an appropriate sanction."  *Pevida*,

2016 WL 3351007, at *6 (E.D.N.Y. June 14, 2016) (quoting *Fossil Indus., Inc. v. Onyx Specialty Papers,

Inc.*, 302 F.R.D. 288, 293 (E.D.N.Y. 2014)).

> To determine whether to grant sanctions under Rule 37 when a party withholds evidence,

the Court employs a three-factor test and evaluates:

> > (1) whether the party with control of the evidence "had an obligation to timely
> > produce it," (2) whether that party had a "culpable state of mind," and (3) whether
> > the withheld documents are "relevant to the party's claim or defense such that a
> > reasonable trier of fact could find that it would support that claim or defense."

*In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (quoting *Residential*

*Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

To satisfy the first element of this test, the moving party must show that the respondent breached its obligations, either as set forth in Rule 26, Fed. R. Civ. P., or as provided in court orders regulating discovery.  The "culpable state of mind" element is satisfied by a showing that "a party has breached a discovery obligation . . . through bad faith or gross negligence [or] ordinary negligence."  With respect to the third element, a finding that a party breached its discovery obligations in bad faith is sufficient to establish the relevance of untimely produced or destroyed evidence as a matter of law; a finding that a party breached its obligations through gross negligence is "frequently" sufficient.

*Id.* (internal citations omitted).

### B.  Application

#### i.  Plaintiffs Failed to Meet Their Obligation to Produce the Withheld Documents

Plaintiffs were obligated to provide the Withheld Documents to Defendants.  The first element of the test asks whether "the party having control of the evidence had an obligation to timely produce it . . . either as set forth in Rule 26, Fed. R. Civ. P., or as provided in court orders regulating discovery."  *In re Sept. 11th*, 243 F.R.D. at 125 (quotation omitted).  Under Rule 26(e), a party is required to supplement or correct its discovery responses "if [it] learns that in some material respect the . . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"  Fed. R. Civ. P. 26(e)(1)(A).  It is clear that Plaintiffs were required to update their production to include the Withheld Documents.

As described above, Defendants' RFPs requested documents related to the assignment or transfer of the foreign patents at issue in this suit.  *See, e.g.*, RFP 39 (described in footnote 3 above).  That documents of the type discovered by Defendants were responsive to the requests is made plain by the fact that Plaintiffs presented similar documents to Defendants, and even, as Plaintiffs point out, what appear to be undated, unsigned drafts of some of the Withheld Documents.

Plaintiffs' arguments that they were excused from the obligation to provide these documents to Defendants have no merit.  First, they contend that their failure was justified because that they

provided other documents related to the ownership of the patents to Defendants, and that some of those were drafts of executed documents found amidst the Withheld Documents. *See, e.g.,* Opposition at 15 ("Further, over 30 documents which existed as of December 2015 related to various Japan and Taiwan patent filings were produced in discovery (the Discovery Documents), including at least two dozen created prior to this action.  The Discovery Documents included then existing drafts and multiple executed versions of the documents at issue.").

This should not need to be said:  producing some relevant, responsive documents does not excuse a party from producing all relevant, responsive documents; producing drafts of documents does not excuse a party from producing the final, executed versions of the documents.  That Plaintiffs produced other related documents and drafts of some of the Withheld Documents does not excuse their failure to produce the Withheld Documents.  Adopting Plaintiffs' proposed interpretation of a party's discovery obligations as a categorical rule would eviscerate the discovery process.

Moreover, Plaintiffs ignore the significance of the information that the Withheld Documents revealed.  They provide strong evidence that the Japanese and Taiwanese patents were not legally owned by Trelleborg and Uretek, as they had asserted.  There are draft unexecuted transfer documents for the Japanese patent rights with dates in 2014 and 2015 among the documents that were produced by Plaintiffs.  *See* fn. 4 above.  But because they are unexecuted, they do not plainly show that the transfers had not been completed in 2006 and 2014, as Plaintiffs had represented. The executed Withheld Documents contradict those representations.

So Plaintiffs' argument—that the production of some related documents, and the production of documents in draft form excuses them from producing other responsive documents, including the finalized executed versions of the documents of which drafts had been provided—is untenable.  Adopting it as a rule would make Swiss cheese of the discovery process.  And their

position ignores the significance of the information revealed by the documents that they failed to produce in this case.

Plaintiffs' second argument is similarly flawed, both conceptually and as applied to the facts of this case.  They argue that, because Defendants were able to find the documents in public filing systems in Japan and Taiwan, the documents were "equally accessible" to Defendants.  Opposition at 15.  As a result, Plaintiffs contend, they had no obligation to provide them in discovery in this case.  As an initial matter, a party is required to produce responsive documents within its "possession, custody, or control."  Fed. R. Civ. P. 34(a)(1).  There is no carve out from the discovery rules that permits a party to fail to produce responsive information merely because the information has been filed publicly.  *See, e.g., Shatsky v. Syrian Arab Rep.*, 312 F.R.D. 219, 223-24 (D.D.C. 2015) ("The Federal Rules do not shield publicly available documents from discovery merely because of their accessibility.  A limitation of this nature would lead to patently absurd consequences.").[6]

Second, the records at issue here cannot reasonably be described as equally accessible to Defendants.  They were created at the behest, and by the hands, of Plaintiffs.  Mr. Yaczik, "Vice President Legal Americas" of Trelleborg, requested that documentation related to the transfers be prepared.  Yaczik Decl. ¶¶ 6-8.  In order to implement the transactions, Mr. Berlinski, the principal

---

[6] One can easily imagine the parade of patently absurd consequences that would follow from the adoption of Plaintiffs' proposed interpretation of the discovery rules.  For example, if a party was engaged in litigation and a document was filed on the public docket of that litigation, Plaintiffs would contend that the document would need not be produced in response to a discovery request:  it was, after all, publicly available, and therefore accessible to the requester.  Any request for a corporation's charter documents could be ignored because its charter was filed in its jurisdiction of organization.  Under Plaintiffs' errant interpretation of the discovery rules, a party acting in bad faith could readily manipulate the discovery process and avoid producing adverse information by placing responsive documents that they did not wish to produce in the files of the most obscure public agency, and take the position that they were excused from producing the documents because they were accessible to the public.  Plaintiffs' proposal goes further because not only public filings in some jurisdiction within the United States would excuse a party from its discovery obligations, even filing the materials in a remote jurisdiction on another continent would excuse a party from producing responsive materials:  After all, here Plaintiffs argue that records stored in Taiwan's Intellectual Property Office information was accessible to Defendants and, therefore, need not be produced, notwithstanding the fact that they were stored on another continent, in another language, in a format that could not be accessed remotely, and notwithstanding the fact Defendants had to retain local counsel to conduct the searches.  Plaintiffs' argument finds no support in the law or reason.

owner of Uretek, and Mr. Press, its most senior operating executive, "cooperated with Trelleborg in this process . . . by executing documents in the form required by the various patent offices."  *See* Yaczik Decl. ¶ 20.  So on Plaintiffs' side of the equation, the preparation of the documents at issue here was instigated by a senior lawyer for Trelleborg, one of the Plaintiffs in this case.  Many of the documents were signed by the most senior officers of Uretek, the other Plaintiff.

On Defendants' side of the equation, it is fair to say that substantial work was required to access the records.  Defendants hired a Taiwanese lawyer to search for the documents in Taiwan. Kuo Decl. ¶ 2.  The records "were not available online."  *Id.* ¶ 3.  So counsel had to file an application to access the physical files; after the TIPO granted the application, he was able to access the records.  *Id.* ¶ 5.  Given all of this, it is not fair to claim that the Withheld Documents were equally accessible to Defendants as they were to Plaintiff Trelleborg, which commissioned their creation and organized their execution, or to Plaintiff Uretek, whose senior executives signed a number of the documents.[7]

Plaintiffs' argument that the records in the JPO were equally accessible to Defendants and that they were thus excused from producing them is also meritless.  Plaintiffs argue that there were enough hints on the record to suggest to YKK that there were assignment records on file at the JPO that had not been produced to them.  Opposition at 15 ("The JPO issued to YKK two written notices in December 2016 expressly advising YKK that '***the rights of [Press and Hoder] have been transferred*** . . . and therefore, the procedure of the present [patent invalidation] appeal case will continue henceforth with [Trelleborg] as the Appellee.'  YKK likely (or easily could have) reviewed and downloaded the associated JPO public record index and linked documents.") (emphasis in original).  Plaintiffs also support their argument by pointing to the single reference to

---

[7] Defendants have not presented evidence regarding the burden associated with the acquisition of records from the JPO. Since YKK is a Japanese corporation, it may have been less of a burden on it than to obtain the records in Taiwan.

the reference to a "November 14, 2016 Request for Registration of Transfer" in the Advance Notice of Trial Decision.

Plaintiffs' arguments are fundamentally flawed because it does not matter whether or not Defendants had enough information to prompt them to hunt independently for the documents that Plaintiffs failed to produce.[8]  Plaintiffs are responsible for the creation of the Withheld Documents. They were responsive to outstanding discovery requests.  Plaintiffs had a duty to produce them. Plaintiffs cannot take refuge from their failure to produce such documents by arguing that Defendants should have caught Plaintiffs sooner.  Plaintiffs are blaming the victim for their misconduct.  The discovery rules simply do not contain a carve-out of the type Plaintiffs advocate for here:  that a party should not be held responsible for its failure to provide responsive discovery materials if its adversary has enough information to figure out that it needs to search for the information on its own.  Again, the rule that Plaintiffs ask the Court to apply to their conduct would, if applied broadly, undermine the goals of the discovery process.

### ii.   Plaintiffs Had a Culpable State of Mind

Plaintiffs' failure to produce the responsive documents was at least the result of gross negligence.  The second element of the test for sanctions under Rule 37 asks whether Plaintiffs, in breaching their discovery obligations, had a culpable state of mind.  *In re Sept. 11th*, 243 F.R.D. at 125 (S.D.N.Y. 2007) (citation omitted).  The "culpable state of mind" element is satisfied by a showing that "a party has breached a discovery obligation . . . through bad faith or gross negligence [or] ordinary negligence."  *Id.*

---

[8] While the Court need not reach this question, the hints on the record regarding a transfer to which Plaintiffs point would not necessarily prompt a party to conduct the kind of secondary investigation that Plaintiffs argue Defendants were required to undertake.  The statement by the JPO that the patents were assigned to Trelleborg was consistent with Plaintiffs' representations regarding their ownership—it is the date of the transfer revealed by the Withheld Documents that is particularly significant, not the fact of Trelleborg's ownership of the patents.  And the single recitation in the 83 page long Advance Notice of Trial Decision to a 2016 assignment request was fleeting.  It was not the focus of the opinion or the issues raised by it:  it commands any attention only in retrospect.

Plaintiffs created the Withheld Documents: they were commissioned by a senior lawyer at Trelleborg and many were executed by senior officers at Uretek. Plaintiffs contend that the fact that they produced earlier drafts of some of the documents to Defendants illustrates that they did not have a culpable state of mind. Opposition at 19 ("Plaintiffs also produced in discovery dozens of executed and unexecuted related documents."). The Court believes that the opposite is true: the fact that Plaintiffs produced related documents supports the conclusion that they acted with at least gross negligence. It demonstrates that Plaintiffs knew that the category of documents represented by the Withheld Documents was responsive. Their failure to produce the documents of a type that they knew to be responsive to the RFPs was at least grossly negligent.

Plaintiffs also argue that they did not act with a culpable state of mind because "the subject filings were unrelated to the present action . . . and were part of Trelleborg's ordinary practice of updating record title to acquired patents . . ." *Id.* But this argument about the reasons for the documents' creation says little about the justification for Plaintiffs' failure to produce them. Plaintiffs' production of related documents proves that they were aware that this category of documents was responsive to Defendants' discovery requests.

Counsel for Plaintiffs' principal argument against a finding that they acted with a sufficiently culpable state of mind is the following: "the fact that several decisions issued in the district courts of New York have held that a party is under no duty to produce later-created documents—including Kingsway Fin. Servs., Inc., In re Schick, and Pharmacy, Inc.—negates a finding that Plaintiffs acted with a culpable state of mind." Opposition at 19-20. There are several reason why this argument has little traction.

First, as described above, it has been clearly established for a long time that Rule 26(e) imposes a continuing obligation to produce later-created documents. The Second Circuit held as much in *Weiss*, 515 F.2d 449, 457 (2d Cir. 1975). And the obligation is widely understood by

competent counsel.  "As the May 23, 2006 minutes of the Civil Rules Advisory Committee in considering the change effected in the 2007 amendment to Rule 26(e) stated . . . 'All lawyers understand that there is an obligation to supplement or correct a disclosure or response <u>no matter whether the omitted information was known at the time of the initial disclosure or response or whether in some sense the party 'learned' of the information 'later acquired.'</u>'"  *Robbins & Myers, Inc.*, 274 F.R.D. at 75–76 (quoting Civil Rules Advisory Committee of the Judicial Conference, 2006 WL 2940679, *10 (J.C.U.S)); 8A Fed. Prac. & Proc. Civ. § 2049.1 (3d ed.) ("courts look with disfavor on claims that counsel did not recognize that important new items of information should be disclosed.").

Second, the record indicates that Plaintiffs' counsel were aware of the continuing nature of their obligations under Rule 26(e).  As described above, the RFPs contained a number of general instructions, including one requiring continuing updates of Plaintiffs' disclosures.  Plaintiffs objected to several of the other general instructions, but found this one to be unobjectionable.  In addition, Plaintiffs' counsel cited *Robbins & Myers* favorably in a brief submitted in this case in September, 2017.  Dkt. No. 265 at 11-12 ("Rule 26(e) applies broadly to all discovery devices and is 'triggered based on the responding party's awareness that providing new information *even if later acquired by the party* to its adversary was necessary to support the adversary's continuing reliance on the accuracy of an earlier response when new information of which the party gains knowledge renders the prior response materially incorrect or incomplete.'") (quoting *Robbins & Myers*, 274 F.R.D. at 76) (emphasis added).  So in 2017, Plaintiffs' counsel were aware of the continuing nature of the obligations imposed by Rule 26(e) and of the analysis of the rule laid out in *Robbins & Myers*.  Their failure to follow the rule that they presented in their own advocacy was grossly negligent.

Third, while counsel for Plaintiffs argue that they should be excused because of the existence of two opinions by New York courts that do not hold that Rule 26(e) imposes a continuing

obligation, they have not presented an affidavit saying that counsel were *in fact* unaware of the continuing nature of their discovery obligations under Rule 26(e).[9]  Given that Plaintiffs' counsel previously wrote in briefing about the broad scope of the obligation, and did not object to the RFP's request for continuing updates, their choice not present a sworn statement to support the argument that did not act culpably because they were ignorant of the requirements of the rule is damning.

### iii.   The Withheld Documents Are Relevant to This Action

The third element of the test for sanctions under Rule 37 asks whether withheld evidence is relevant to the party's claim or defense.  *In re Sept. 11th*, 243 F.R.D. at 125 (S.D.N.Y. 2007) (citation omitted).  Plaintiffs do not argue that the evidence is not relevant for any purpose in connection with the case:  they present a much more targeted argument regarding the documents' relevance to Plaintiffs' Lanham Act claim.  Plaintiffs assert that the Withheld Documents "do not contradict any of Plaintiffs' above-quoted Lanham Act allegations."  Opposition at 20.  And they argue that Defendants have not presented an affirmative defense with respect to Plaintiffs' standing to bring their Lanham Act claim.  *Id.*  These arguments are unpersuasive for a number of reasons.

The Withheld Documents are clearly relevant.  In the context of discovery, relevance is an extremely broad concept.  *See Convolve*, 223 F.R.D. at 167; *Melendez v. Greiner*, No. 01 Civ. 7888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003); *Zanowic v. Reno*, No. 97 Civ. 5292, 2000 WL 1376251,

---

[9] All of the cases that Plaintiffs cite as a justification for their failure are unreasoned and pre-date the careful examination of the issue presented in *Robbins & Myers*.  The reasoning of two of the decisions has been expressly discredited by other courts.  *See, e.g.*, *Switch Commc'ns Grp. v. Ballard*, No. 2:11-CV-00285-KJD, 2012 WL 2342929, at *7 (D. Nev. June 19, 2012) (faulting the holding of *Kingsway Financial Services, Inc. v. Price WaterhouseCoopers LLP*, 2006 WL 1295409 (S.D.N.Y. 2006) because it does "not analyze the language of the rule, the Advisory Committee Notes, or other legal authority.")*; see also Robbins & Myers*, 274 F.R.D. 79 (critiquing the holding of *Kingsway* because it is unsupported by the text of the rule and the associated advisory committee notes); *id.* (critiquing the holding of *In re Schick*, No. 96 B 42902 (SMB), 1997 WL 465217 (Bankr. S.D.N.Y. Aug. 12, 1997), for the same reasons).  The third case cited by Plaintiffs, *Pharmacy, Inc. v. Am. Pharm. Partners, Inc.*, No. CV 05-776 DRH AKT, 2008 WL 4415263 (E.D.N.Y. Sept. 24, 2008), does not stand for the proposition that a party has no obligation to update its productions with after-acquired evidence.  The holding of that decision applies to a more limited situation, which does not apply here:  "a party is under no duty to produce documents which did not exist prior to the close of discovery."  *Id.* at *3.  The Withheld Documents were created prior to the close of discovery.  So of the three cases cited by Plaintiffs, one is not on point, and the holdings of the other two were repudiated by *Robbins & Myers*—a case with which Plaintiffs' counsel was well-familiar.

at *2 (S.D.N.Y. Sept. 25, 2000).  In short, "to be discoverable, information must be 'relevant to a[ny] party's claim or defense.'"  *Lifeguard Licensing Corp. v. Kozak*, 15 Civ. 8459 (LGS)(JCF), 2016 WL 3144049, at *3 (S.D.N.Y. May 23, 2016) (quoting Fed. R. Civ. P. 26(b)(1)).

> Information is relevant if:  "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Relevance is a matter of degree, and the standard is applied more liberally in discovery than it is at trial.

*Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088 (RMB)(HBP), 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016) (quoting Fed. R. Evid. 401) (internal citations omitted).  "Parties to litigation have the right to challenge the relevance of documents through discovery motion practice, rather than unilateral determinations by individuals in whose interest it is to seek to withhold the production of documents that may lead to the discovery of admissible evidence."  *Umbach v. Carrington Inv. Partners* (US), LP, No. 3:08-cv-484 (EBB), 2009 WL 3287537, at *10 (D. Conn. Oct. 9, 2009); *see also Rozell v. Ross-Holst*, No. 05 Civ. 2936 (JGK)(JCF), 2006 WL 163143, at *2 (S.D.N.Y. Jan. 20, 2006).

First, Plaintiffs' ownership of the foreign patents was clearly relevant to the issues being litigated in this case during the discovery period.  Plaintiffs' attempt to focus the analysis on their Lanham Act claim alone is a red herring.  As Plaintiffs acknowledge in their Opposition, "YKK . . . asserted Plaintiffs' alleged lack of title to the foreign patents as a well-pleaded defense . . . to Plaintiffs' breach of contract claim."  Opposition at 20.  At the time that the Withheld Documents were created—and for an extended period thereafter—Plaintiffs' contract claim was very much alive.  It was alive throughout the discovery period.  Therefore, it cannot reasonably be disputed that the Withheld Documents were relevant to the claims and defenses in the case during the discovery period when they should have been produced.  Again, the fact that Plaintiffs produced related documents and drafts of some of the Withheld Documents proves that before they were confronted with this sanctions motion, Plaintiffs were aware that the documents related to the ownership of the foreign patents was relevant to the issues involved in the case.

Second, even when focused only on Plaintiffs' Lanham Act claim, the Withheld Documents are relevant. As discussed above, the Court found that Plaintiffs' Lanham Act claim was viable only because YKK shared its right to manufacture the patented zippers with one of the Plaintiffs. If, as the documents reveal, Plaintiffs did not have the right to manufacture the zippers in Japan or Taiwan—and that right was instead held by Messrs. Press and Hoder—a principal plank of the Court's ruling regarding Plaintiffs' Lanham Act claim would be profoundly undermined as it pertained to sales in Japan and Taiwan.

### iv. Sanctions Are Warranted for Plaintiff's Failure to Meet Its Obligations Under Rule 26(e)

Because Plaintiffs failed to disclose the Withheld Documents, and did so with a sufficiently culpable state of mind, the Court grants Defendants' motion for sanctions under Rule 37(c). The Court must, therefore, determine the appropriate sanction to impose.

> When deciding a proper sanction, a court generally must consider, in light of the full record of the case, (a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party has been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party.

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)). These factors are not exclusive. *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010). For example, a court may also consider the "need to deter discovery abuse and efficiently control dockets." *In re Sumitomo Copper Litig.*, 204 F.R.D. 58, 60 (S.D.N.Y. 2001). Indeed, discovery sanctions are designed to serve several purposes: (1) to ensure that a party will not benefit from its failure to comply; (2) to obtain compliance with the court's orders; and (3) to deter noncompliance, both in the particular case and in litigation in general. *See Allied Artists Pictures*, 602 F.2d at 1066.

The guiding principle underlying the imposition of sanctions is that "any sanction must be narrowly tailored to remedy[] the specific prejudice that the party seeking discovery would otherwise

suffer." *Rivera v. New York City Hous. Auth.*, No. 94 Civ. 436, 1998 WL 108032, at *1 (S.D.N.Y. Mar. 11, 1998). The sanction of dismissal is available "only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prod., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)).

Defendants' only proposed sanction—that the Court strike Plaintiffs' Lanham Act claim in its entirety—is excessive. The Withheld Documents relate solely to Plaintiffs' ownership interest in the foreign patents. The information that the Withheld Documents disclose does not undermine Plaintiffs' Lanham Act claim to the extent that it relates to U.S. domestic conduct.

The Withheld Documents may, however, shed light on a significant defense to Plaintiffs' Lanham Act claim to the extent that it relates to conduct in Japan and Taiwan. Defendants would argue that Plaintiffs did not have the legal right to exclude sales in those jurisdictions. Defendants make a strong argument that because the Withheld Documents were not produced during the discovery period, they were unable to develop the facts related to that argument. Therefore, barring Plaintiffs from pursuing their Lanham Act claims with respect to foreign conduct may be an appropriate and proportionate sanction.

The Court hesitates to decide that question at this time because the Supreme Court currently has under consideration the case of *Abitron Austria GmbH, et al. v. Hetronic International, Inc.* (21-1043). The Supreme Court's decision in that case may substantially affect the viability of Plaintiffs' claims based on foreign sales. As a result, this Court cannot calibrate the effect of an order barring Plaintiffs' Lanham Act claims to the extent that they rely on foreign conduct at this time. The Court holds the prospect of an award of sanctions of this type in abeyance pending the Court's resolution of *Abitron*, which is expected this term.

In any event, Defendants are entitled to reasonable attorney's fees and costs attributable to (1) the investigation that led to the discovery of the Withheld Documents, (2) the briefing of this motion for sanctions, and (3) any supplemental briefing approved by the Court with respect to the proper scope of the sanctions and any argument with respect to that issue. Defendants are directed to submit an application for fees and costs of the type described in categories (1) and (2) above to the Court no later than April 11, 2023; any opposition to that application is due no later than two weeks following the date of the submission.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for sanctions is granted in part. The Court will likely solicit additional briefing regarding the scope of appropriate sanctions as a result of Plaintiffs' violations of their discovery obligations following the Supreme Court's decision in *Abitron Austria GmbH, et al. v. Hetronic International, Inc.*

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 763.

SO ORDERED.

Dated: March 23, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge