**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AU NEW HAVEN, LLC, and TRELLEBORG
COATED SYSTEMS US, INC.,

                         Plaintiffs,

          v.

YKK CORPORATION, et al.,

                         Defendants.

---

Civil Action No. 15-CV-03411 (GHW)

**MEMORANDUM OF LAW IN SUPPORT
OF YKK'S MOTION TO EXCLUDE
PLAINTIFFS' EXPERT OPINIONS**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ......................................................................................................4

     A.    Mr. Cockrell's Opinions ...........................................................................................4

     B.    Mr. Donohue's Opinions ...........................................................................................7

LEGAL STANDARD..................................................................................................................10

ARGUMENT ..............................................................................................................................11

I.     PLAINTIFFS' EXPERTS FAIL TO APPLY THE JURY'S DEFINITION OF 'HIGH END OUTERWEAR,' RENDERING THEIR OPINIONS ON THIS TOPIC IRRELEVANT .....................................................................................................11

     A.    Mr. Cockrell's 'High End Outerwear' Opinions Contradict The Jury's Definition By Giving No Effect To The "Maximizing Profits" Clause ................11

     B.    Plaintiffs' Attempt To Turn "Maximizing Profits For All Parties" Into A Mere After The Fact Profit Redistribution Exercise Fails As A Matter of Law .........................................................................................................................14

     C.    Neither Mr. Cockrell Nor Mr. Donohue Has Any Admissible Opinion Related To 'High End Outerwear' .........................................................................16

II.    MR. DONOHUE'S LUGGAGE DAMAGES OPINIONS ARE ALSO INADMISSIBLE .................................................................................................................18

III.   MR. DONOHUE'S "DOMESTIC CONDUCT" OPINION IS INADMISSIBLE ..........20

     A.    Mr. Donohue Has No Expertise On Any Liability Issue And Cannot Take The Stand To Recount Plaintiffs' Desired Fact Narrative .....................................20

     B.    Mr. Donohue's Purported Analysis Of Trade Shows Is Based On Conjecture ...............................................................................................................22

     C.    Mr. Donohue's New Domestic Conduct Opinions Are Untimely .........................24

CONCLUSION ...........................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

### <u>Cases</u>

*AAMP of Fla., Inc v. Auto. Data Sols., Inc.*,
    2015 WL 12843845 (M.D. Fla. Oct. 8, 2015) .................................................. 14

*Abitron Austria GmbH v. Hectronic Int'l, Inc.*,
    No. 21-1043 .......................................................................... 3, 4, 24, 25

*Alto v. Sun Pharm. Indus., Inc.*,
    2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021) .................................................. 10

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ...................................................................... 11

*Arista Recs. LLC v. Lime Grp. LLC*,
    2011 WL 1674796 (S.D.N.Y. May 2, 2011) .................................................. 21

*Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
    910 F. Supp. 2d 629 (S.D.N.Y. 2012) .......................................................... 3

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996) ........................................................................ 23

*Brooks v. Outboard Marine Corp.*,
    234 F.3d 89 (2d. Cir. 2000) ...................................................................... 16

*Capri Sun GmbH v. Am. Beverage Corp.*,
    595 F. Supp. 3d 83 (S.D.N.Y. 2022) ........................................................ 1, 12

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2001) .......................................................... 23

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
    650 F. Supp. 2d 314 (S.D.N.Y. 2009) ...................................................... 2, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................ 10

*Davis v. Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013) .......................................................... 20

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
    311 F. Supp. 3d 653 (S.D.N.Y. 2018) .......................................................... 16

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006) .................................................................. 19

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) .................................................................... 21

*EMC Corp. v. Pure Storage, Inc.*,
    154 F. Supp. 3d 81 (D. Del. 2016)..................................................................13

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
    185 F.3d 1341 (Fed. Cir. 1999)....................................................................19

*In re M/V MSC FLAMINIA*,
    2017 WL 3208598 (S.D.N.Y. July 28, 2017) ..............................................17

*In re Novatel Wireless Sec. Litig.*,
    846 F. Supp. 2d 1104 (S.D. Cal. 2012)........................................................12

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999)..........................................................................18

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
    2021 WL 4810266 (S.D.N.Y. Sept. 30, 2021)..............................................24

*Kentucky Speedway, LLC v. NASCAR Ass'n of Stock Car Auto Racing, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ........................................................................17

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
    2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ..............................................24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)......................................................................................19

*Lightfoot v. Union Carbide Corp.*,
    175 F.3d 1008 (2d Cir. 1999)..................................................................1, 12

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)....................................................20, 21

*Mink Mart, Inc. v. Reliance Ins. Co.*,
    65 F. Supp. 2d 176 (S.D.N.Y. 1999)............................................................16

*Morrison Knudsen Corp. v. Ground Improvement Techs., Inc.*,
    2006 WL 753207 (D. Colo. Mar. 20, 2006) ................................................13

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
    67 F.3d 435 (2d Cir. 1995)............................................................................20

*Mountain Valley Pipeline, LLC v. 1.40 Acres of Land, Owned by Rives*,
    2021 WL 1235024 (W.D. Va. Mar. 31, 2021)..............................................21

*Munro v. USC*,
    2022 WL 16955481 (C.D. Cal. Nov. 1, 2022)..............................................12

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)..........................................................................11

*Noskowiak v. Bobst SA*,
    2005 WL 2146073 (E.D. Wis. Sept. 2, 2005)..............................................13

*Plew v. Limited Brands, Inc.*,
    2012 WL 379933 (S.D.N.Y. Feb. 6, 2012).................................................................. 13

*Portus Sing. PTE LTD v. Kenyon & Kenyon LLP*,
    449 F. Supp. 3d 402 (S.D.N.Y. 2020)...................................................................... 21

*Prisua Eng'g Corp. v. Samsung Elecs. Co.*,
    2018 U.S. Dist. LEXIS 221548 (S.D. Fla. Feb. 13, 2018).............................................. 13

*S.E.C. v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013).................................................................. 3, 24

*Scentsational Techs., LLC v. Pepsi, Inc.*,
    2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018)............................................................. 23

*Scentsational Techs., LLC v. PepsiCo, Inc.*,
    773 F. App'x 607 (Fed. Cir. 2019)........................................................................ 23

*Trez Cap. (Fla.) Corp. v. Noroton Heights & Co.*,
    2022 WL 4547412 (S.D.N.Y. Sept. 29, 2022)............................................................. 3

*U.S. Gypsum Co. v. Lafarge N. Am. Inc.*,
    670 F. Supp. 2d 737 (N.D. Ill. 2009)..................................................................... 13

*United States v. Roldan-Zapata*,
    916 F.2d 795 (2d Cir. 1990)............................................................................... 20

## PRELIMINARY STATEMENT

YKK respectfully moves to exclude Mr. Cockrell and Mr. Donohue's opinions regarding 'high end outerwear,' luggage, and YKK's alleged 'domestic conduct.'  These opinions reflect legal error, are based on conjecture, and/or fall wholly outside the witnesses' expertise.  They do not meet the requirements of the Federal Rules of Evidence and should not be presented to the jury.

*First*, Mr. Cockrell's opinions about 'high end outerwear,' and Mr. Donohue's opinions relying on them, apply the wrong definition of the term.  Years ago, Mr. Cockrell applied a "know it when you see it" definition that looked solely to the functionality, features, and price of items in a vacuum.  But it is now law of the case that the term means "outerwear of high quality based on factors such as fabric, weight, water resistance, breathability, seam tolerance, function and price, *as they relate to maximizing profits for all parties in the global market*."  Mr. Cockrell's opinions did not consider this conjunctive component of the definition.  *See* Ex. C (Cockrell 2023 Dep.) at 188:4-10.  Yet his supplemental report (Ex. A) anomalously reaches the same conclusions, because those conclusions are driven by Plaintiffs' desired outcome, not fidelity to the jury's definition.

Mr. Cockrell's opinions are inadmissible because they ignore—indeed, undermine—the jury's definition requiring a threshold assessment of factors as they relate to maximizing the parties' profits.  If maximizing the parties' profits is not part of the *ex ante* determination, the jury's definition has not been followed.  Opinions fail to meet the *Daubert* standard where "the expert 'has failed to consider the necessary factors.'"  *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 120 (S.D.N.Y. 2022) (quoting *Lightfoot v. Union Carbide Corp.*, 175 F.3d 1008 (table), *2 (2d Cir. 1999)).  Mr. Cockrell failed to consider the threshold relationship the jury adopted, and Mr. Donohue relied on Mr. Cockrell, so both of their opinions are inadmissible.

Rather than identify garments as high end outerwear by considering how their features relate to maximizing profits, Plaintiffs' experts calculate what profits would result if Mr.

1

Cockrell's features-only opinion were adopted. This does not comport with the jury's verdict. Looking at profitability *after* Mr. Cockrell's definition is applied cannot retroactively incorporate a relationship "to maximizing profits for all parties in the global market" into the determination of what is 'high end outerwear.' Plaintiffs seek to present opinions that do not apply the jury's profitability requirement, and then argue that calculating the ***resulting*** profitability meets that requirement. That approach improperly assumes away the maximizing profitability factor the jury ruled must be addressed in determining what is 'high end outerwear' in the first place.

*Second*, Mr. Donohue's opinions on luggage are likewise inadmissible. Mr. Donohue has no expertise to opine on what would have happened if YKK had refused to sell YKK-laminated zippers to the luggage manufacturers he identifies, but in calculating damages he assumes without explanation or support that every such sale would have been replaced by a Uretek-laminated zipper. Mr. Donohue, an accountant, has no basis or expertise for this key assumption, nor any justification in the record. *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319-21 (S.D.N.Y. 2009) (excluding lost profits opinions based on "a series of assumptions that have no basis in fact or reality" that plaintiff would have made sales but for defendant's actions).

*Third*, Mr. Donohue's supplemental opinion (Ex. B) on "YKK's United States Domestic Conduct" is a transparent attempt to minimize the consequences of having Plaintiffs' claim for extraterritorial damages struck by turning a claim for $11.5 million of lost sales into the U.S. into a $75.6 million claim for "U.S.-based" damages. It should be excluded for at least three reasons.

Most obviously, Mr. Donohue admittedly has no experience or expertise in outerwear or luggage sales and thus no basis to provide the narrative about Lanham Act liability that Plaintiffs seek to place in his mouth. "[A]n expert's opinion must be based upon his own application of

principles within his expertise to the facts of the case.  An expert cannot simply parrot the findings

of another arrived at in another context." *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS

CBO II, Ltd.*, 910 F. Supp. 2d 629, 640 (S.D.N.Y. 2012).  "It is also inappropriate for experts to

become a vehicle for factual narrative." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y.

2013).  Yet narration of facts beyond his expertise is precisely what Mr. Donohue does.

Moreover, the theory Mr. Donohue parrots is so speculative that it could not go to the jury

even if it were within his expertise.  Because he opines that a flyer bearing the single sentence still

at issue in the Lanham Act claim was available at a trade show in 2008 (outside the relevant time

period),[1] Mr. Donohue assumes that every customer whose affiliate attended a trade show from

2009-19 that purchased a T8, T9 or T10 zipper did so as a direct consequence of that sentence.

The sheer number of unsupportable assumptions in this 'analysis'—that YKK used the same flyer

at every show for more than a decade; that every customer attending a show reviewed it; that every

customer read the sentence in the intellectual property notice; that the reader made purchasing

decisions or showed the sentence to those who did; that every customer who then bought a T8, T9

or T10 zipper did so solely due to the sentence—reveal it to be "rife with speculation and

conjecture," and thus inadmissible.  *Trez Cap. (Fla.) Corp. v. Noroton Heights & Co.*, 2022 WL

4547412, *4 (S.D.N.Y. Sept. 29, 2022).

Finally, the opinion is untimely.  Expert discovery closed long ago, without Mr. Donohue

opining on "domestic conduct" or liability.  The Court asked the parties to "account for the full

range of possible legal standards that could emerge from a decision in" *Abitron Austria GmbH v.*

---

[1]  Mr. Donohue cites two documents that reference the Summer 2009 Outdoor Retail Show.  Ex.
B ¶ 45.  Both images are too blurry to determine whether the challenged sentence is on these flyers.
Mr. Donohue admitted that he "can't read [the flyer in the photograph] verbatim," that "it gets
pretty blurry," and that "I just see the red language, but I can't read it."  Ex. D at 602:10-603:22.

*Hectronic Int'l, Inc.* Rather than do so, he argues for liability, which exceeds the Court's order.

## FACTUAL BACKGROUND

### A.    Mr. Cockrell's Opinions

David Cockrell works in the outerwear industry. Dkt. 368-1 (Cockrell 2017 Rpt.) ¶ 3. In 2017, he disclosed opinions on (1) the meaning of 'high end outerwear'; (2) an application of his definition to particular products; (3) companies selling 'high end outerwear'; (4) the commercial success of water-resistant zippers; and (5) customer behavior and confusion. *Id.* ¶¶ 6-74.[2]

Mr. Cockrell's definition of 'high end outerwear' depended solely on the "relatively expensive" price, "quality of craftmanship," and "features/functionality," *id.* ¶¶ 16-17, including "a hundred features" that he decided not to list. Dkt. 368-7 (Cockrell 2017 Dep.) at 87:21-89:7. It further included a "know it when you see it" test. *Id.* at 96:2-16. He applied his definition on a product-by-product review, looking at what he deemed "the relevant features of each product" above a "floor MSRP" for each brand. Dkt. 368-1 ¶¶ 36-37 (describing his "methodology"). This analysis did not consider maximizing profits or any other customer dynamic. *See, e.g.*, Ex. C at 189:20-190:2 (agreeing that his 2017 report "didn't include any discussion of profits or maximizing profits in connection with [his] opinion on the meaning of high-end outerwear"); *id.* at 190:22-191:3 (agreeing that before 2023, he "didn't opine on the relationship between the factors [he] applied to determine whether garments were high-end outerwear and profitability or maximizing profits").

During the first phase of the bifurcated trial, the jury was charged with defining what "the

---

[2]    Judge Netburn barred Mr. Cockrell from "testify[ing] that other zippers are not infringing or water resistant," but allowed "personal knowledge" about whether "people in the industry have not recognized another zipper to be both a legal and functioning alternative." Dkt. 419 at 44-45. The order precluded his opinion on industry purchasing decisions entirely, finding it relied on "hypothetical speculation [that] is not proper for any expert." *Id.* at 45.

parties intended the term 'high end outerwear' as that term was used in the Exclusive License Agreement to mean" when they executed the agreement in 2002. Dkt. 918.  Plaintiffs advocated for a purely features-based definition, similar to Mr. Cockrell's, without analysis as to whether manufacturers would buy Uretek-laminated zippers: "Outerwear of high quality, based on factors such as fabrics, weight, water resistance, breathability, seam tolerances, function, and price." HEO Trial Court Ex. C.  YKK's proposed definition, in contrast, incorporated the market conditions that drove adoption of the ELA: "Outerwear sold in a luxury market by garment manufacturers willing to pay higher prices for zippers laminated by Uretek in New Haven and accept the delivery times associated with such zippers."  HEO Trial Court Ex. D.  Trial confirmed that the garment manufacturing industry had shifted to Asia; that there were many Asian-based competitors who could deliver water-resistant zippers to those Asian manufacturers much cheaper and faster than the Uretek-laminated zippers from New Haven; and that both parties knew that if garment manufacturers were unwilling to pay more and wait longer for the Uretek-laminated T4s and T5s, then they would turn to the competition.  In that situation, selling those manufacturers a YKK-laminated, royalty-bearing T8, T9 or T10 zipper, rather than losing the sale to competitors, maximized profits for both parties.  *See, e.g.*, HEO Trial Court Ex. A, Press Desig. at 230:4-23; *id.* at 231:17-232:9; HEO Trial Tr. (Jan. 25, 2023), Dkt. 935 at 441:5-14; *id.* at 448:24-449:10; *id.* at 468:20-469:5; *id.* at 474:25-475:10; *id.* at 480:2-16; HEO Trial Tr. (Jan. 27, 2023), Dkt. 939 at 774:24-775:1; DX-56; DX-84; DX-92; DX-96.

The jury adopted the following definition: "outerwear of high quality based on factors such as fabric, weight, water resistance, breathability, seam tolerance, function and price, as they relate to maximizing profits for all parties in the global market." Dkt. 918.  Accordingly, identifying items as 'high end outerwear' must include *ex ante* consideration of how the features that one

considers in designating a garment 'high end outerwear' relate to maximizing profits for all parties.

Following the verdict, the Court noted that "one of the reasons that drove [its] decision to bifurcate the trial was indeed the testimony of Mr. Cockrell, and the question is really going to be to what extent any of the testimony of the experts maps onto properly the definition that's used here, and, as a result, whether or not evidence that may not map onto this definition should be permitted at trial." HEO Trial Tr. (Jan. 30, 2023), Dkt. 941 at 916:8-14. It thus invited the parties to explain how "this definition will impact particularly the testimony of the experts that was anticipated." *Id.* at 916:4-8. Plaintiffs argued that "the HEO testimony of Plaintiffs' outerwear industry expert, [Mr. Cockrell] … is admissible," without any modification. Dkt. 928. But after the Court confirmed that it would "subject any (modified or unmodified) expert report to *Daubert* scrutiny based on the jury's definition of 'high end outerwear' as determined at the high-end outerwear trial, which was information that was not available in the Court's previous consideration of expert reports," Dkt. 945 at 1 n.3, Plaintiffs supplemented Mr. Cockrell's and Mr. Donohue's opinions.

On March 28, 2023, Plaintiffs disclosed a short Supplemental Expert Report of David W. Cockrell, which re-adopted his "opinions regarding High End Outerwear set forth in [his] 2017 Report." Ex. A ¶ 4; *accord*, *id.* at ¶ 10. Mr. Cockrell admitted that, in reaching those opinions, he "did not expressly reference or fully examine how the factors [he] applied to the individual items of outerwear related to maximizing profits for all parties in the global market." *Id.* ¶ 6.[3] But he claimed to have now considered two exhibits prepared by Mr. Donohue (the "Exhibits") that took the laminated zippers sold from February 2009 to September 2019 and redistributed some of them

---

[3] *See also, e.g.*, Ex. C at 190:22-191:3 ("Q. Now, in your earlier reports you didn't opine on the relationship between the factors you applied to determine whether garments were high-end outerwear and profitability or maximizing profitability, correct? A. Correct.").

to Plaintiff-laminated zippers based on his 2017 definition of 'high end outerwear.' *See id.* Exs. 1 & 2. This, Mr. Cockrell admitted, was the "only reference to any analysis of profitability in [his] supplemental report." Ex. C at 199:4-20.

Although Mr. Donohue testified that he relied on Mr. Cockrell for determining what is and is not high end outerwear, Ex. D (Donohue 2023 Dep.) at 488:11-17; *id.* at 530:22-531:3, Mr. Cockrell testified that the line item for 'high end outerwear' in these Exhibits was "generated by Donohue." Ex. C at 194:11-196:16. So, Plaintiffs created a circle in which Mr. Cockrell determined what garments were 'high end outerwear' in 2017 without considering profitability, Mr. Donohue accepted that determination and assessed profits assuming that Plaintiffs had laminated every zipper in garments Mr. Cockrell defined as 'high end outerwear,' and then both experts declared that this analysis showed that Mr. Cockrell's original views had presciently applied the jury's later definition. But a reallocation of profits ***after*** the universe of 'high end outerwear' already has been identified cannot retroactively add a "maximizing profits" factor to the determination of what garments are 'high end outwear' in the first place. Nonetheless, Mr. Cockrell now concludes "that the manner in which [he] applied the outerwear-based factors referenced in the First Verdict did relate to maximizing profits for all parties in the global outerwear market." Ex. A ¶ 9.

### B.     Mr. Donohue's Opinions

James J. Donohue is a Certified Public Accountant and Certified Valuation Analyst. Dkt. 368-3 (Donohue 2017 Rpt.) ¶ 2. He is, by his own account, "not an industry expert in outerwear." Dkt. 368-9 (Donohue 2017 Dep.) at 62:19-20; *see also* Ex. D at 284:4-8 ("Q. You're not someone who is familiar with the garment industry, correct? A. I am not a, like a high end outerwear expert, no, a garment expert."). Nor is he an expert in waterproof zippers. Ex. D at 284:9-11. He has never worked for or with an outerwear or zipper company, made purchasing decisions for a

clothing manufacturer, or otherwise gained personal experience in the industries that YKK and Plaintiffs operate within. *See, e.g.*, *id.* at 310:12-17 ("Q. You're not an expert on garment manufacturer's decision-making on which water-resistant laminated zippers to purchase and which ones not to purchase, correct? A. Correct, I am not an industry expert."); *id.* at 467:2-7.

In 2017, Mr. Donohue provided a report setting forth the following opinions: (1) a measure of Plaintiffs' alleged lost profits; (2) a measure of Plaintiffs' alleged lost profits: United States only (which then totaled $11.0 million); (3) a measure of YKK's revenues, costs, and profits; and (4) a measure of alleged unpaid royalties. Dkt. 368-3 ¶¶ 9-17. Mr. Donohue made clear that his only role was "as an expert witness in this matter to estimate Plaintiffs' damages" and that in order to perform his calculations he had "assumed liability as alleged by the Plaintiffs." *Id.* at ¶ 4 & n.5.

Mr. Donohue "relied on Mr. Cockrell," and "didn't perform any independent analysis of what [he] believed to be high-end outerwear or not high-end outerwear." Dkt. 368-9 at 149:12-150:4; *id.* at 62:3-6 ("the high-end product identification process … is Mr. Cockrell's domain"). Mr. Donohue accepted Mr. Cockrell's application of the term to calculate what percentage of 13 discovery customers'[4] purchases were for 'high end outerwear.' Dkt. 368-3 at ¶¶ 110-111. He then applied that percentage to hundreds of non-discovery customers.[5] *Id.* at ¶¶ 112-116.

After the first trial, Mr. Donohue provided extensive supplemental opinions. Ex. B. Those

---

[4]   Plaintiffs' experts rely on summary data produced by 13 "discovery customers" who they subpoenaed in connection with this matter. *See, e.g.*, Ex B at ¶ 24; p. 13 (Fig. 4). However, as Mr. Donohue recently admitted (Ex. D at 508:17-519:2) these customers did not produce the underlying books and records that supported these summaries. As this data has not been made available for examination, the summaries are improper under Fed. R. Evid. 1006, and Plaintiffs' experts' reliance on this data independently warrants exclusion. *See* Dkt. 648, 649, 703 (YKK's Mot. *in limine* No. 15); Dkt. 693 & 695 (YKK's Objections to Certain Exs. Proposed by Pltfs.).

[5]   Mr. Cockrell's recent inability to name a *single* piece of high end outerwear produced by any of six different non-discovery customers (*see* Ex. C at 251:5-262:3) further undermines Mr. Donohue's continued assumption that all of the hundreds of non-discovery customers placed 57% of the laminated zippers they purchased into high end outerwear. *See* Ex. B, ¶ 19; p. 10, n. 25.

opinions acknowledge that his 'high end outerwear' damages opinions "relied on Mr. Cockrell's analysis of sample Functional outerwear products and customers to determine the portion of YKK's Functional outerwear sales that were high end outerwear."  *Id.* ¶¶ 7, 17-18; *see also* Ex. D at 284:4-11; *id.* at 295:13-25; *id.* at 310:12-17; *id.* at 327:9-18; *id.* at 467:2-7; *id.* at 488:11-17; *id.* at 530:22-531:3.  Building on Mr. Cockrell's failure to account for the jury's verdict,  Mr. Donohue uses the 2017 application of 'high end outerwear' to re-slice "*the same demonstrated global outerwear market size*."  Ex. B ¶¶ 8; 31 (emphasis added).  This assumes that no customer who was offered only T4 or T5 zippers would have gone to a competitor or elected not to use water-resistant zippers, and thus uses the exact same number of zipper-meters in both the "actual" and "adjusted" results, an assumption that zipper customers would buy exactly 151,685,260 meters of zippers for use in outerwear regardless of whether they had access to both Uretek-laminated T4 and T5 zippers and YKK-laminated T8, T9, and T10 zippers, or only had access to T4s and T5s. *Id.* Figs. 5 & 7.  These "adjusted" hypothetical figures further assume that the total revenues for all parties would go up relative to reality, while the total profits for all parties would go down.  *Id.*

At his deposition, Mr. Donohue admitted that he did not "lay out in [his] report any of the factors that garment manufacturers took into account during the relevant time period in connection with their water-resistant laminated zipper purchasing decisions." Ex. D at 308:2-309:21. Although he acknowledged that YKK never had 100% market share, and instead faced competition, *see id.* at 438:23-439:25, he admitted that his report does not discuss or analyze sales data or competitors' prices, *id.* at 277:9-21, 322:19-323:23, or differences in lead-times from competitors, *id.* at 291:7-16, in lead-times or shipping logistics for Uretek-laminated zippers, *see id.* at 293:9-18; 300:7-17; *id*. at 303:20-304:2; *id*. at 306:8-15, or in quality and customer satisfaction for Uretek-laminated zippers, *see id.* at 402:16-22.

Mr. Donohue's supplemental opinion then veers wholly out of his expertise and turns to a Part III, titled "YKK's United States Domestic Conduct."  Subpart A lists companies "who maintain a United States-based headquarters or are affiliated with a customer that has a United States-based headquarters."  *Id.* ¶ 42.  Subpart B discusses "YKK customers who attended the Outdoor Retailer trade shows in the United States and were therefore likely exposed to YKK's false advertisements."  *Id.* ¶ 48.  If, for example a U.S.-based employee of an affiliate of the Norway-based brand Helly Hansen went to a trade show with a thousand exhibitors between 2009 and 2019, Mr. Donohue assumes that she visited the YKK booth; that YKK's booth broadly disseminated a flyer containing the challenged statement (despite Plaintiffs' never identifying an example after 2008); that YKK presented her with such a flyer (and did not only do so at her request); that she read the statement; that she then communicated the statement to Helly Hansen employees in Norway making the purchasing decisions for which zippers to use in outerwear manufactured and sold abroad; and that these Norwegian employees would have purchased T4 or T5 zippers for Helly Hansen's worldwide garment production, but instead decided to buy T8, T9, or T10 zippers specifically because of the challenged statement in the intellectual property warning on the flyer.  *See, e.g.*, Ex. D at 622:14-623:12.  On that attenuated basis, Mr. Donohue shifts ***all*** Helly Hansen sales in luggage and 'high end outerwear,' along with millions of similarly situated foreign sales to other customers, to "U.S.-based."  *See* Ex. B ¶¶ 41-42 & Exhs. 37A & 42.

## LEGAL STANDARD

Federal Rule of Evidence 702 "requires district courts to act as gatekeepers—ensuring that expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, *1 (S.D.N.Y. Oct. 13, 2021) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  The proponent must establish that the "testimony has a sufficiently reliable foundation" at "every step" of the analysis, as "*any* step that

renders the analysis unreliable … renders the expert's testimony inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265, 267 (2d Cir. 2002)).  Whether an opinion is sufficiently reliable and relevant to be presented must "focus on the principles and methodology employed by the expert." *Id.* at 266.  "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and a district court may "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).  "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

## ARGUMENT

I.  **PLAINTIFFS' EXPERTS FAIL TO APPLY THE JURY'S DEFINITION OF 'HIGH END OUTERWEAR,' RENDERING THEIR OPINIONS ON THIS TOPIC IRRELEVANT**

A.  **Mr. Cockrell's 'High End Outerwear' Opinions Contradict The Jury's Definition By Giving No Effect To The "Maximizing Profits" Clause**

In 2017, Mr. Cockrell defined 'high end outerwear' solely in terms of a garment's features, craftmanship, and price, and then in 2023 he stuck with that definition even after the jury determined that the parties intended 'high end outerwear' to refer to "outerwear of high quality based on factors such as fabric, weight, water resistance, breathability, seam tolerance, function and price, ***as they relate to maximizing profits for all parties in the global market***."  Dkt. 918 (emphasis added).  Those basic facts are not in dispute.  In Mr. Cockrell's words, in his "previously stated opinions, [he] did not expressly reference or fully examine how the factors [he] applied to the individual items of outerwear related to maximizing profits for all parties in the global market."  Ex. A ¶ 6.  Plainly, adding that requirement changed nothing about his analysis, because he did

not change his conclusions at all.  *Id.* at ¶ 10; *see also* Ex. C at 188:4-10.

To the contrary, at his deposition, Mr. Cockrell admitted the absence of any consideration of the factors that might bear on "maximizing profits for all parties in the global market."  Although he acknowledges that garment manufacturers account for relative price, delivery time, quality, availability, and capacity of the zippers in making their purchasing decisions, he admittedly did not account for any of those factors in his determination of what is and is not 'high end outerwear.' Ex. C at 230:5-231:15; 232:7-21.  He lacks any knowledge about how zippers laminated by Uretek were delivered to customers and disclaimed any knowledge of where companies manufacture their outerwear, despite agreeing that the garment manufacturing industry had likely shifted to Asia during the time period at issue in this case.  *Id.* at 204:13-205:8, 226:17-227:13.  He also admittedly failed to consider customers' actual willingness to buy T4 or T5 zippers, *id.* at 225:14-23, and thus necessarily failed to consider how limiting customers to those zippers they might not be willing to buy could impact, let alone "maximiz[e] profits for all parties in the global market."

An expert who "has failed to consider the necessary factors" cannot provide relevant testimony.  *Capri Sun*, 595 F. Supp. 3d at 120 (quoting *Lightfoot*, 175 F.3d 1008 (table)).  Because Mr. Cockrell concludes that 'high end outerwear' covers the same products whether that term is defined only by a garment's features or by its features "as they relate to maximizing profits for all parties in the global market," he gives that clause no effect.  Mr. Cockrell failed to consider the "maximizing profits for all parties" clause in reaching his conclusions, and thus cannot assist the jury.  Expert analysis that is "premised on an incorrect legal standard" is "neither reliable nor relevant."  *Munro v. USC*, 2022 WL 16955481, *4–5 (C.D. Cal. Nov. 1, 2022); *see also, e.g.*, *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108 (S.D. Cal. 2012) (excluding expert analysis "based on a loss causation standard that is incompatible with that set forth by the Ninth

12

Circuit"); *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 745 (N.D. Ill. 2009) ("Having applied the incorrect legal standard in formulating damages under the CFAA, Davis will not be permitted to testify on that topic.").

The ban on opinions that ignore or misapply a principle of law (like the meaning of a contract term) extends also to prior rulings in the case. For example, "[e]xpert testimony that conflicts with a court's claim construction should be excluded under *Daubert* as unreliable and unhelpful to the finder of fact." *Prisua Eng'g Corp. v. Samsung Elecs. Co.*, 2018 U.S. Dist. LEXIS 221548, *20 (S.D. Fla. Feb. 13, 2018) (citing *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 109 (D. Del. 2016)); *see also Plew v. Limited Brands, Inc.*, 2012 WL 379933, *3 (S.D.N.Y. Feb. 6, 2012) ("Due to the risk of jury confusion, expert witnesses are not permitted to offer testimony that conflicts with the Court's construction of the claim."). Courts also properly bar expert testimony that "is contrary to the prior jury verdict and the law of the case." *Morrison Knudsen Corp. v. Ground Improvement Techs., Inc.*, 2006 WL 753207, *4 (D. Colo. Mar. 20, 2006).

Nor should the Court credit any "contention that cross-examination is the proper remedy for curing [an] expert's purported application of the wrong legal standard when conducting his analysis." *Noskowiak v. Bobst SA*, 2005 WL 2146073, *5 (E.D. Wis. Sept. 2, 2005). Mr. Cockrell's decision to ignore an entire clause of the jury's definition, rather than taking seriously the Court's invitation to revisit his analysis, renders his opinions not just worthy of little weight, but fundamentally inadmissible. "Testimony based on an incorrect legal standard may confuse the jury, and may be proscribed by the Court pursuant to Rule 403 of the Federal Rules of Evidence. Part of the Court's gatekeeping function is to exclude largely irrelevant evidence." *Id.*

Mr. Cockrell's opinions are the result of looking only at product features; the "maximizing

13

profits for all parties" clause of the jury's definition does not affect his classification of a single item, because he failed to take that clause into account. That flaw violates New York contract law, and his testimony thus violates Rules 403 and 702. "Having applied the wrong test, those opinions are irrelevant, unreliable, and would mislead the jury." *AAMP of Fla., Inc v. Auto. Data Sols., Inc.*, 2015 WL 12843845, *9 (M.D. Fla. Oct. 8, 2015). They should be excluded.

### B.    Plaintiffs' Attempt To Turn "Maximizing Profits For All Parties" Into A Mere After The Fact Profit Redistribution Exercise Fails As A Matter of Law

Nor can Mr. Cockrell rehabilitate his decision to ignore the jury's definition by pointing to two Exhibits from Mr. Donohue. *See* Ex. A ¶¶ 8-9.

*First,* Plaintiffs' experts have a fatal chicken-and-egg problem. The quantity of 'high end outerwear' in these Exhibits stems from Mr. Cockrell's 2017 application of that term, which did not consider maximizing profits. *See*, *e.g.*, Ex. A ¶¶ 6 & 7; Ex. C at 189:20-191:3. The Exhibits cannot retroactively add a "maximizing profits for all parties" factor that Mr. Cockrell did not consider. The conclusions remain based on an incorrect definition of a contract term.

*Second*, Mr. Cockrell's discussion of these *ex post* Exhibits references only the parties' profitability on *all* outerwear sales, including zippers Plaintiffs agree were outside of 'high end outerwear' and properly licensed by the ELA. Ex. A ¶ 9. The Court has already recognized this flaw in Plaintiffs' position, warning against "taking the position that the import of the jury's definition was not that the profit limitation applied to the definition of the relevant outerwear, but rather that so long as the overall deal is profitable for all parties, things that meet your conditions, proposed conditions, are necessarily high-end outerwear." *See*, Feb. 10, 2023 Hr'g Tr., Dkt. 950 at 5:17-6:13; *id.* at 7:8-20. That is exactly what Mr. Cockrell's analysis does by claiming that, as long as applying his 2017 opinion of 'high end outerwear' would generate profits for both sides, it "did relate to maximizing profits for all parties in the global outerwear market." Ex. A ¶ 10.

14

This contradicts the Court's ruling granting YKK motion *in limine* 4 because "the other parts of defendants' business, including the sales of zippers that were sold in undisputedly permitted markets are not at issue here." Sept. 8, 2020 Hr'g. Tr., Dkt. 626 at 62:23-63:3. And it fails to apply the jury's verdict. Simply put, whether the parties profited from YKK's undisputedly licensed sales for non-high-end outerwear is irrelevant to whether a particular garment is high end outerwear, and thus cannot salvage Mr. Cockrell's opinion on that question.

*Third*, Mr. Donohue's Exhibits assume without analysis that every customer that bought T8, T9, or T10 zippers would have made the same purchasing choice if it had only been able to buy T4 or T5 zippers from YKK. *See* Ex. A at Exhs. 1 & 2 (same exact meters sold, both for high end outerwear and for total, in both scenarios).[6] This assumption contradicts the basic point of the jury's definition of 'high end outerwear,' which recognized that this label must be applied with an eye to "maximizing profits for all parties in the global market." If the global market of purchasers was just as likely to buy a T4/T5 zipper as a T8/T9/T10 zipper in every instance, as Mr. Donohue and Mr. Cockrell assume, then the "maximizing profits" clause (indeed the entire ELA) would be unnecessary: YKK and Plaintiffs could have simply dictated what zipper every customer bought, rather than entering into the ELA and adjusting to market realities.[7] By adopting a definition that requires accounting for market reaction, the first jury recognized that realities of the global market and the zipper customers' preferences, to which YKK and Plaintiffs were subject.

The sole support that Mr. Donohue obliquely offers for his assumption that the number of

---

[6] Exhibits 1 & 2 to Mr. Cockrell's supplemental report are also Exhibits 34 & 34A to Mr. Donohue's supplemental report. The two Exhibits show the same analysis as one another, just differing based on whether Aquacheat DD, DS, and DG chain codes are included.

[7] Under those circumstances, Hoder and Press would never have entered into the ELA permitting YKK to laminate zippers in any field because no sales would have been lost had Uretek continued to laminate every zipper sold. The existence of the ELA disproves this assumption.

zippers sold is fixed, rather than a reflection of customer choice, is the fact that he is "not aware of any non-infringing alternatives during the relevant period to meet this demonstrated outerwear market demand."  Ex. B ¶ 23.  But this Court has already precluded "testimony from Mr. Donohue, Mr. Cockrell, and Dr. Reinholtz on non-infringing alternatives."  Ex. E (9/21/2020 Hrg. Tr.) at 55; *see also* Dkt. 419 at 44-45 (precluding Mr. Cockrell from testifying that no non-infringing alternatives exist).  Lack of awareness (particularly an accountant's lack of awareness) does not establish absence of alternatives.  And even an established absence of non-infringing alternatives cannot provide a basis for damages under the Lanham Act, which must reflect a causation theory tied to the challenged statement.  *See Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d. Cir. 2000) ("The failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony."); *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 660-62 (S.D.N.Y. 2018) (excluding expert report that "failed to demonstrate that 100% of sales made through TrueCar were caused by advertisements that falsely promised a 'no-haggle' experience" because "a plaintiff seeking damages for false advertising must establish causation"); *Mink Mart, Inc. v. Reliance Ins. Co.*, 65 F. Supp. 2d 176, 181 (S.D.N.Y. 1999) (expert's testimony as to causation not reasonably reliable without a basis on which a rational jury could determine causation without speculating).

### C.  Neither Mr. Cockrell Nor Mr. Donohue Has Any Admissible Opinion Related To 'High End Outerwear'

All of Mr. Cockrell's opinions regarding 'high end outerwear' are irrelevant to the upcoming trial, which must implement the jury's definition.  It is too late for Mr. Cockrell to come up with another supplemental opinion, and his "know it when you see it" analysis cannot be repurposed for some other use—his opinion of the features of a garment, ignoring the need to maximize overall profits, is irrelevant to the jury's task of determining whether YKK sold zippers

in a field defined by profit concerns. At a minimum, such opinions' "probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

All of Mr. Donohue's conclusions about 'high end outerwear' derive from Mr. Cockrell's opinion of what is 'high end outerwear.' *See, e.g.*, Dkt. 368-3 ¶¶ 108-121. Without Mr. Cockrell's sorting, Mr. Donohue has no basis to conclude which sales should have been limited to T4 or T5 zippers, and thus no basis to reach any conclusions about lost profits for 'high end outerwear.' *See, e.g.*, Ex. B ¶ 17 ("I relied on Mr. Cockrell's analysis of sample Functional outerwear products and customers to determine the portion of YKK's T8/T9/T10 Functional outerwear sales that were high end outerwear."); Ex. A ¶ 6(b) ("James Donohue used the results of my analyses of functional outerwear customers of YKK who produced High End Outerwear in calculating Uretek's lost profits."); Dkt. 368-9 at 149:12-150:4 (Donohue is "not an industry expert," so he "relied on Mr. Cockrell" to "estimate the percentage of high-end outerwear," and "didn't perform any independent analysis of what [he] believed to be high-end outerwear or not high-end outerwear").

Mr. Donohue's conclusions are thus based on inadmissible opinions from Mr. Cockrell, and are, on this basis, inadmissible themselves. *See, e.g.*, *In re M/V MSC FLAMINIA*, 2017 WL 3208598, *5 (S.D.N.Y. July 28, 2017) ("If one expert's opinions are built upon a foundation laid by another, reliability of the latter requires reliability of the former."); *Kentucky Speedway, LLC v. NASCAR Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 919 (6th Cir. 2009) (affirming district court's exclusion of an expert witness whose analysis was based on an excluded expert's analysis). Where, as here, one expert "relied on the opinions of plaintiffs' other … experts and assumed the correctness of each expert's proposition," this "failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts'

opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results." *In re TMI Litig.*, 193 F.3d 613, 714-16 (3d Cir. 1999).  Mr. Donohue's opinions regarding 'high end outerwear' damages are "analogous to the last domino in the line that begins to fall when the first domino is toppled." *Id.* at 715.  They should be excluded as well.

## II.    MR. DONOHUE'S LUGGAGE DAMAGES OPINIONS ARE ALSO INADMISSIBLE

The Court should also exclude Mr. Donohue's opinions on purported damages related to zipper sales in the luggage field, which he updated in his supplemental report to recharacterize as extensively "U.S.-based." *See* Ex. B ¶¶ 41-42 & Exhs. 37A & 42.  These opinions simply assume that every customer that purchased a T8, T9, T10, or RCPU zipper for use in "luggage" would have instead purchased a T4 or T5 zipper absent YKK's allegedly infringing sales.  Ex. B at Exh. 28-R3.  However, Mr. Donohue lacks any basis to make such an assumption or to opine as to what would have happened in the luggage market if T8, T9, T10 or RCPU zippers were unavailable.  Mr. Donohue is admittedly not an expert in the luggage market.  *See* Ex. D at 536:4-538:19; *id.* at 550:9-25; Dkt. 368-9 at 163:18-164:6; *id.* at 177:10-16.  He provides no evidence or analysis regarding sensitivities in the luggage market, including, for example, price sensitivities, lead time constraints, competition, or acceptable alternatives, whether or not they are laminated or water-resistant.  *See, e.g.*, Ex. D at 559:25-560:21; *see also, generally,* Ex. B.  And unlike his opinions with respect to high end outerwear, which accept and rely on Mr. Cockrell's flawed opinions, no other purported expert supplies him with any market-based luggage opinions, leaving him unqualified to categorize products as "luggage" or to opine about purchasing decisions.

The failure to support his assumptions about sales in the 'but for' world render Mr. Donohue's luggage damages opinions inadmissible.  "The 'but for' inquiry ... requires a

reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee 'would … have made.'" *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999). Mr. Donohue's lack of expertise and support for his opinions concerning the luggage market render the entirety of his lost profits analysis for "luggage" unreliable, including his attempt to tie these sales to alleged "United States Domestic Conduct." Ex. B ¶¶ 41-48.[8] Mr. Donohue has no information at all regarding any relationship between companies' headquarters (or their affiliates' headquarters) and the luggage market, nor any evidence that any luggage manufacturer saw any YKK flyers or that their purchasing decisions relating to zippers in the luggage market would have been influenced by such a flyer. *See id.* Indeed, although the bulk of the allegedly unlicensed luggage sales were for RCPU zippers, (*see* Ex. B, Exh. 28-R3) the flyer that Mr. Donohue cites does not even mention the RCPU zipper. *See, e.g.*, Ex. B at p. 24 (Fig. 8). Regardless, he simply assumes that but for the challenged statement on the flyer, every sale would have been made by YKK as a T4 or T5 sale, rather than by a third-party competitor, or non-PU laminated zipper sale—an assumption unsupported by any facts or analysis, and which Mr. Donohue is unqualified to make. *See, e.g., DSU Med. Corp. v. JMS Co*., 471 F.3d 1293, 1308-09 (Fed. Cir. 2006) (affirming exclusion of damages opinion where expert's conclusion that patentee would have made sales but for infringement was based on hypothetical construction of market that lacked foundation in fact or economic principle); *Compania Embotelladora*, 650 F. Supp. 2d at 319-21; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (discussing causation requirements under Lanham Act).

---

[8] *See, also e.g.*, Ex. D at 550:14-25, 553:20-24 (Mr. Donohue lumped together YKK's coding of "bags" with luggage and assumed all backpacks are luggage, even though he did not look at any of the actual items he assumed were "luggage" within the meaning of the ELA).

### III.    MR. DONOHUE'S "DOMESTIC CONDUCT" OPINION IS INADMISSIBLE

#### A.    Mr. Donohue Has No Expertise On Any Liability Issue And Cannot Take The Stand To Recount Plaintiffs' Desired Fact Narrative

Under the guise of detailing "additional calculations concerning YKK's United States domestic conduct," Part III of Mr. Donohue's report purports to locate the headquarters of manufacturers and identify customers who, in Mr. Donohue's speculation, "have likely been exposed to YKK's allegedly false advertising flyer in the United States based on trade show attendance records…" Ex. B ¶¶ 39-40.  None of these opinions can go to the jury through a CPA who is "not an industry expert in outerwear, " who has no basis for opining on zipper purchase decision-making, and whose opinions rely on nothing but speculation.  Dkt. 368-9 at 62:19-20.

"A witness may be qualified as an expert on certain matters and not others."  *United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990).  Courts strike extraneous testimony "where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of his expertise, ... as the admission of an expert does not provide that individual with carte blanche to opine on every issue in the case."  *Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013).  "An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007).

The opinions in Part III are beyond the scope of Mr. Donohue's expertise, and thus should be precluded.  *See, e.g.*, Ex. D at 284:4-8 (not a high-end outerwear expert or a garment expert); *id.* at 284:9-11 (not a waterproof zipper expert); *id.* at 310:12-18 ("not an expert on garment manufacturer's decision-making on which water-resistant laminated zippers to purchase" and "not an industry expert").  Accounting experience does not qualify a witness to testify about other industries.  *See, e.g.*, *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 444 (2d Cir. 1995)

(affirming order "precluding Trinity's witness, an accountant, from rendering opinions on subjects outside his field of expertise," including "qualitative testimony" about industry behavior); *Portus Sing. PTE LTD v. Kenyon & Kenyon LLP*, 449 F. Supp. 3d 402, 420 (S.D.N.Y. 2020) (precluding accountant who was unqualified "to opine on a fundamental premise in his damages report"); *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, *9-10 (S.D.N.Y. May 2, 2011) (precluding damages expert from opining about behavior in an industry).

Nor can Mr. Donohue take the stand to opine on industry questions on the grounds that he spoke with Mr. Cockrell. "[T]he expert witness must in the end be giving his <u>own</u> opinion. He cannot simply be a conduit for the opinion of an unproduced expert." *Malletier*, 525 F. Supp. 2d at 664; *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."); *Mountain Valley Pipeline, LLC v. 1.40 Acres of Land, Owned by Rives*, 2021 WL 1235024, *4 (W.D. Va. Mar. 31, 2021) ("Rule 703 does not extend so far as to allow an expert to testify about the conclusions of other experts."). Reliance on Mr. Cockrell's views about how customers would have made purchasing decisions is particularly inappropriate, as Mr. Cockrell was already precluded from testifying on this topic. *See* Dkt. 419 at 45-46 ("Cockrell may have extensive experience in the industry, but this kind of hypothetical speculation is not proper for any expert; to say to the jury that the purchasers of YKK's zippers would have acted differently requires some kind of methodology other than conjecture.").

An accountant, and Mr. Donohue in particular, has no specialized expertise to offer the jury about YKK's customers' "United States Domestic Conduct." The Court should bar Mr. Donohue from offering such opinions.

**B.      Mr. Donohue's Purported Analysis Of Trade Shows Is Based On Conjecture**

Part III of Mr. Donohue's supplemental report should also be precluded because it constitutes a speculative argument that would be inappropriate for even a qualified industry expert.

Mr. Donohue purports to identify a set of "YKK customers who attended the Outdoor Retailer trade shows in the United States and were therefore likely exposed to YKK's false advertisements," and then estimates the zipper purchases such customers made to quantify Plaintiffs' alleged lost sales. Ex. B ¶ 48. This purported "analysis" relies on at least the following conjectures:

1.     That YKK distributed Aquaguard flyers at every Outdoor Retailer trade show from 2009 to 2019, and did so to such an extent that they became advertising, not simply commercial speech.

2.     That every such flyer contained the one purportedly false sentence left in this case, just because a prior version of an AquaGuard flyer contained the sentence.

3.     That a representative from every customer who visited any Outdoor Retailer trade show visited YKK's booth.

4.     That every customer-representative who visited YKK's booth received a flyer bearing the challenged sentence.

5.     That every customer-representative who received such a flyer read it in its entirety, including the intellectual property notice at the bottom that contained the accused sentence.

6.     That every customer-representative who attended a trade show and read a flyer either made all worldwide zipper-purchasing decisions for that customer or shared the flyer with the person or people who did—who may have worked for a separate corporate entity located on another continent—who in turn read the entirety of the flyer.

7.     That every such employee making purchasing decisions would have purchased a T4 or T5 zipper had she not read the challenged sentence on the bottom of flyer that listed T4, T5, T8, T9, and T10 zippers, which caused her to instead purchase T8, T9, or T10 zippers.

Every one of these propositions is necessary to support Mr. Donohue's uncited claim that he has identified customers who were "likely exposed to YKK's false advertisements" and his

22

calculations of lost profits that flow from such customers.  The report supports none of them.[9]

Any conclusion that follows from this reasoning is insufficiently supported to go to the jury.  "[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith."  *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (holding that it is an abuse of discretion to admit expert testimony based on an "unrealistic and speculative assumption"); *see also Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, *6 (S.D.N.Y. Apr. 18, 2018) (excluding expert testimony as "*ipse dixit*, pure speculation, or both" where the proffered expert "present[ed] no methodology underlying her related assertions" and "the analytical gap between known facts and [the expert]'s assertion [was] enormous"), *aff'd sub nom*. 773 F. App'x 607 (Fed. Cir. 2019).

Nor can Mr. Donohue take the stand to read through evidence and encourage the jury to draw the inferences regarding falsity and causation that Plaintiffs need to support their contention that customers at trade shows in 2009-19 were all deceived by a sentence Mr. Donohue quotes from one 2008 flyer.  "Experts are not percipient witnesses. They are witnesses who, by virtue of specialized expertise, are able to provide opinions or information beyond the ken of the layperson. It is therefore inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one

---

[9]  Nor does Mr. Donohue address the admitted fact that Mr. Press attended the same shows. *See* DX-509 ("Press attends the fall outdoor show every year."); *see also* Ex. D at 462:20-24.  If anyone at those shows was likely to read and react to the one challenged sentence Plaintiffs claim is false, it was Mr. Press, but Mr. Donohue nowhere accounts for his silence when listing customers Mr. Donohue thinks were "likely exposed to YKK's false advertisements". *See Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 287 (S.D.N.Y. 2001) (an expert "should address evidence that contradicts his conclusions").  Indeed, such knowing silence would establish a laches defense.  Plaintiffs cannot present an expert to opine that every visitor to a trade show **other than Mr. Press** received, read, and acted on the one challenged sentence.

party's story." *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2021 WL 4810266, *16 (S.D.N.Y. Sept. 30, 2021); *see also Tourre*, 950 F. Supp. 2d at 675 ("It is also inappropriate for experts to become a vehicle for factual narrative. Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such narration traceable to a reliable methodology. Mere narration thus fails to fulfill *Daubert*'s most basic requirements.").

## C.    Mr. Donohue's New Domestic Conduct Opinions Are Untimely

Part III is also untimely and beyond the scope of supplementation. *See Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 WL 4684238, *8 (S.D.N.Y. Apr. 11, 2005) ("[U]ntimely produced evidentiary materials, including expert submissions, are subject to near automatic exclusion.").

The Supreme Court granted certiorari in *Abitron* to answer a question about the extraterritorial reach of the Lanham Act. Because this case also involves an attempt to apply the Act extraterritorially, the Court requested that modified expert opinions "account for the full range of possible legal standards that could emerge from a decision in that case." Dkt. 957 at 1.

Those "possible legal standards" include the petitioner's perspective,[10] the respondent's perspective,[11] and the United States' perspective,[12] among others. The standard the Court announces will define the scope of available damages for Plaintiffs' Lanham Act claim, which seeks lost profits for, among other things, sales that foreign YKK affiliates made to foreign

---

[10]    Brief for Petitioner at 16-32, 37-39, 45-47, *Abitron Austria GmbH v. Hectronic Int'l, Inc.*, No. 21-1043 ("The Lanham Act Is Not Extraterritorial," "The Act Does Not Apply 'Domestically' to Foreign Sales," "The 'Diversion of Foreign Sales' Theory Must Be Rejected").

[11]    Brief for Respondent at 19-33, *Abitron Austria GmbH v. Hectronic Int'l, Inc.*, No. 21-1043 ("The Lanham Act Applies Extraterritorially And Encompasses Petitioners' Willful Infringement").

[12]    Brief for United States as *Amicus Curie* Supporting Neither Party at 10-14, *Abitron Austria GmbH v. Hectronic Int'l, Inc.*, No. 21-1043 ("Sections 32(1)(a) and 43(a)(1)(A) of the Lanham Act provide a remedy for use of a plaintiff's U.S. trademark abroad only if that use is likely to cause consumer confusion in the United States").

corporations in foreign countries.

Rather than explain what damages would be available under "the full range of possible legal standards that could emerge," Mr. Donohue purports to analyze what manufacturers have U.S.-based affiliates and what companies were "likely exposed to YKK's false advertisements." Ex. B ¶ 48.  Whether motivated by an anticipated unfavorable ruling in *Abitron* or to circumvent the relief the Court may award as part of its sanctions decision, *see* Dkt. 958, this is a transparent attempt to increase U.S.-based damages by conflating foreign brands with domestic affiliates. *Compare* PX-263-C (2019 Donohue Supp. Exh. 28C-R3) (claiming $11.5 million sales imported into the United States), *with* Ex. B at Exh. 39 (claiming $75.6 million "U.S.-based" damages).

Mr. Donohue does not discuss the legal standards that could emerge from *Abitron*; there is no opinion explaining the damages he would calculate under a particular view of the Lanham Act. Because this analysis does not comport with the Court's order it should not go to the jury.

## **CONCLUSION**

For all these reasons, the Court should preclude the aforementioned opinions at trial.

Dated:  June 2, 2023

Respectfully submitted,

By:___/s/ Steven Cherny_____
Steven Cherny
Harvey J. Wolkoff
Deborah K. Brown
Owen Roberts
QUINN EMANUEL URQUHART
  & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849-8700
stevencherny@quinnemanuel.com
harveywolkoff@quinnemanuel.com
deborahbrown@quinnemanuel.com
owenroberts@quinnemanuel.com

Immanuel R. Foster
Elizabeth M. Kelly
QUINN EMANUEL URQUHART
& SULLIVAN LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
Tel.: (617) 712-7142
immanuelfoster@quinnemanuel.com
elizabethkelly@quinnemanuel.com

Russell A. Korn
Michael A. Bertelson
Amanda N. Brouillette
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE Suite 2800
Atlanta, Georgia 30309-4528
Tel.: (404) 815-6500
rkorn@kilpatricktownsend.com
mbertelson@kilpatricktownsend.com
abrouillette@kilpatricktownsend.com

Kate Cassidy
LTL ATTORNEYS LLP
152 West 57th Street, 19th Floor
New York, New York 10019
Telephone: (332) 244-7015
kate.cassidy@ltlattorneys.com

*Attorneys for Defendants*

26