# EXHIBIT D

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 15-CV-03411-GHW

4    - - - - - - - - - - - - - - - - - - -x

5    AU NEW HAVEN, LLC and TRELLEBORG COATED

     SYSTEMS US, INC.,

6

                        Plaintiffs,

7

          -against-

8

     YKK CORPORATION, et al.,

9

                        Defendants.

10

     - - - - - - - - - - - - - - - - - - -x

11

12

                        May 18, 2023

13                      9:31 a.m.

14

15      CONTINUED VIDEOTAPED DEPOSITION of

16   JAMES J. DONOHUE, an Expert Witness in

17   the above-entitled action, held at Quinn,

18   Emanuel, Urkuhart & Sullivan, 51 Madison

19   Avenue, New York, New York at the above

20   time and place, taken before Dawn Matera,

21   a Certified Shorthand Reporter and Notary

22   Public of the State of New York.

23

24            *      *      *

25

                                    Page 259

1  APPEARANCES:
2
   BRENNER, SALTZMAN & WALLMAN LLP
3      Attorneys for Plaintiff
       271 Whitney Avenue
4      New Haven, Connecticut 06511
5  BY:  BRIAN P. DANIELS, ESQ.
       bpdaniels@bswlaw.com
6
7  QUINN EMANUEL URQUHART & SULLIVAN LLP
       Attorneys for the YKK Defendants
8      111 Huntington Avenue
       Suite 520
9      Boston, Massachusetts 02199
10 BY:  HARVEY J. WOLKOFF, ESQ.
       harveywolkoff@quinnemanuel.com
11
   BY:  IMMANUEL FOSTER, ESQ.
12     Immanuelfoster@quinneman.com
13
14
   Also Present:
15
   Silvio Facchin, Legal Video Specialist
16
            *   *   *
17
18
19
20
21
22
23
24
25
                                    Page 260

1          THE VIDEOGRAPHER:  Good morning.
2   We are now going on the record.  The
3   time is 9:31 a.m.  Please note that
4   the microphones are sensitive and may
5   pick up whispering and private
6   conversations.  Please mute your
7   phones at this time.  Audio and video
8   recording will continue to take place
9   unless all parties agree to go off the
10  record.
11         This is media unit number 1 of
12  the video-recorded deposition of James
13  Donohue, volume II, taken by counsel
14  for the defendants in the matter of AU
15  New Haven, LLC and Trelleborg Coated
16  Systems U.S., Inc. versus YKK
17  Corporation, et al.
18         This is filed in the United
19  States District Court, Southern
20  District of New York.  The case number
21  is 15-CV-03411-GHW.
22         The location of the deposition
23  is Quinn Emanuel Urquhart and
24  Sullivan, LLP located at 51 Madison
25  Avenue, New York, New York.
                                    Page 261

1          My name is Silvio Facchin, I am
2   a certified legal video specialist
3   representing Veritext Texas, and the
4   court reporter is Dawn Matera from the
5   firm of Veritext Texas.
6          I am not authorized to
7   administer an oath.  I am not related
8   to any party in this action nor am I
9   financially interested in the outcome.
10         If there are any objections to
11  proceeding, please state them at this
12  time.  Counsel and all present
13  including remotely will now state
14  their appearances and affiliations for
15  the record.
16         MR. WOLKOFF:  Good morning.  My
17  name is Harvey Wolkoff.  I am here
18  together with my colleague Immanuel
19  Foster.  We are from the law firm of
20  Quinn Emanuel.  We represent the
21  various YKK entities who are
22  defendants in this case.
23         MR. DANIELS:  Brian Daniels,
24  Brenner, Saltzman & Wallman and I
25  represent the plaintiffs.
                                    Page 262

1          THE VIDEOGRAPHER:  Will the
2   court reporter please swear in the
3   witness.
4  J A M E S  J. D O N O H U E,
5  The Witness herein, having first
6  been duly sworn by the Notary Public, was
7  examined and testified as follows:
8          MR. WOLKOFF:  Good morning,
9   Mr. Donohue.  I would like to start by
10  having your supplemental expert report
11  submitted on March 28th, 2023 marked
12  as Donohue Exhibit 12 for
13  identification.
14         (Donohue Exhibit 12,
15  supplemental expert report submitted
16  on March 28th, 2023 was so marked for
17  identification, as of this date.)
18 EXAMINATION
19 BY MR. WOLKOFF:
20     Q.   Placing in front of you what we
21  had marked as Exhibit 12 for
22  identification.
23         MR. DANIELS:  Sorry, do I have a
24  copy?
25     Q.   Placing in front of you what we
                                    Page 263

2 (Pages 260 - 263)

1 marked as Exhibit 12 for identification,
2 do you recognize this as your
3 supplemental expert report in this matter
4 dated March 28th, 2023?
5    A.   I do.
6    Q.   Is there anything you want to
7 change in this report?
8    A.   I believe there was one or two
9 schedules that we sent afterwards with
10 certain edits, but that was it, to my
11 knowledge.
12   Q.   Okay.  Have you been qualified
13 to testify as an expert by any court or
14 in any arbitration or other body since
15 your prior deposition in this case in
16 September of 2017?
17   A.   Yes.
18   Q.   Which matters?
19   A.   Several matters.  More recently
20 there was an arbitration, a private
21 arbitration in April.  There was a trial
22 last year.  There was two other
23 arbitrations that year.  And then after
24 that I need to look at my CV and go.  But
25 there have been several since 2017.

Page 264

1    Q.   Okay.  Since your deposition in
2 this matter on September 20, 2017, has
3 your testimony or opinions been excluded
4 in whole or in part by any court or
5 arbitration, tribunal or any other
6 tribunal?
7    A.   No.  I've had documents and
8 things like that limited in evidence that
9 can't be brought in, but my testimony and
10 opinion has been allowed.
11   Q.   You haven't had any portion of
12 your expert opinion struck by any court
13 or other tribunal?
14   A.   I have had documents removed
15 and things that I can't talk about in
16 cases and things like that.  But my
17 opinions in those cases were presented.
18   Q.   What cases were those?
19   A.   I am specifically referring to
20 a case involving Dali and CommScope.  And
21 I recall certain documents or testimony
22 not being able to be discussed.
23   Q.   But you're saying that none of
24 your opinions in that case were stricken?
25   A.   Well, I couldn't talk about

Page 265

1 that document.  But my royalty opinion,
2 for example, was not stricken.
3    Q.   But you did have some opinions
4 that were stricken in that case?
5    A.   Anything about that document I
6 could not say.
7    Q.   Is your answer yes?
8       MR. DANIELS:  Objection.  Asked
9    and answered.
10   A.   I don't know if it said
11 stricken.  I could not talk about that
12 document in that case.  Anything in my
13 report about that document, I could not
14 talk about.
15   Q.   And did you have opinions,
16 therefore, that you couldn't talk about
17 by court order?
18   A.   I reported what those documents
19 said.  So in that sense, yes.  But again
20 my royalty opinion was provided in that
21 case.
22   Q.   You opined that there were
23 approximately 65 million meters of YKK
24 laminated T8s, 9s and 10s sewn into
25 high-end outerwear garments during the

Page 266

1 time period in issue, correct?
2    A.   Yes.
3    Q.   And the time period in issue is
4 February 2009 through September 2019,
5 correct?
6    A.   Depending on the claim, but
7 yes, that's the wider time period,
8 shorter for the U.S.
9    Q.   For the U.S. the time period is
10 February of 2009 through September 2018,
11 correct?
12   A.   Correct.
13   Q.   If I refer to the relevant
14 period, though, you understand unless I
15 say otherwise, that it's February 2009
16 through September 30, 2019, correct?
17   A.   I understand that's the damage
18 period applicable in this case.
19   Q.   You've calculated damages in
20 connection with a but-for analysis based
21 on the claim that YKK should have sold
22 its customers Uretek laminated T4s and
23 T5s instead of its own laminated T8s, 9s
24 and 10s, correct?
25   A.   That's a summary.  But that's

Page 267

3 (Pages 264 - 267)

1 essentially the claim but-for their sales
2 in the excluded market, "their" being YKK
3 and Uretek would have laminated those
4 sales.
5    Q.    And you've calculated damages
6 based on the claim that YKK should have
7 sold its customers Uretek laminated
8 zippers instead of its own laminated
9 zippers for all 65 million meters of
10 high-end outerwear, correct?
11    A.    Yes, all of them are included
12 for that relevant time period.
13    Q.    Did you attempt to determine
14 whether in the real world that YKK could
15 have sold its customers 65 million meters
16 of Uretek laminated T4s and T5s rather
17 than its own laminated T8s, 9s and 10s?
18    A.    Yes, I did consider that as
19 part of my but-for calculation.
20    Q.    It's true that if YKK couldn't
21 sell a T4 or T5 to a customer or
22 customers, there would be no profit for
23 either YKK or Uretek, correct?
24    A.    Not necessarily, because then
25 Uretek would be free to reach that market

1    A.    In your hypothetical where
2 you're assuming they would not buy T4s
3 and 5s, it's circular.  So if you're
4 assuming they would not buy them, they
5 would sell a T8 --
6    Q.    It's not a hypothetical.  In
7 the real world, if YKK couldn't sell, was
8 unable to sell T4s and T5s to a customer
9 or customers, so instead sold that
10 customer T8s, 9s or 10s, then both YKK
11 and Uretek would make some money,
12 correct?
13        MR. DANIELS:  Objection as to
14    form.  It is a hypothetical.
15    A.    Respectfully, that is a
16 hypothetical, because you're asking me to
17 assume that they can't sell T4s and 5s,
18 and they do sell a T8.  But you are
19 correct, if they do not or refuse to sell
20 a T4 or 5 and sell a T8, they would only
21 get 3 cents.
22    Q.    Did you say anything in your
23 report about determining whether YKK
24 could sell Uretek laminated T4s and T5s
25 to particular customers, sir?

1 in an alternative manner, if in your
2 hypothetical.
3    Q.    Did Uretek ever attempt to do
4 that?
5    A.    To my knowledge, Uretek was
6 always trying to work out this issue.
7    Q.    So is the answer no?
8    A.    They continued to work with YKK
9 --
10    Q.    Is the answer to my question
11 no?
12    A.    Well, they didn't do it because
13 they were doing that.  But they did not
14 do anything else, they continued to work
15 with YKK.
16    Q.    Did YKK ever -- strike that.
17        Did Uretek ever attempt to do
18 that?
19    A.    Not to my knowledge, they
20 continued to work with YKK.
21    Q.    If YKK sold to customers who
22 wouldn't buy Uretek laminated T4s and
23 T5s, YKK laminated T8s, 9s and 10s
24 instead, then both Uretek and YKK would
25 make some money, correct?

1    A.    In my report, are you limiting
2 it to my supplemental report?
3    Q.    Yes.
4    A.    Yes, for example, I talked
5 about the profits they would make if they
6 lowered their margins and sold at the
7 lower prices.
8    Q.    Show me where in your reports,
9 in any of your reports, where you talked
10 about whether YKK could sell T4s or T5s
11 instead of T8s, 9s or 10s to particular
12 customers.
13        MR. DANIELS:  I am sorry, did
14    you say in any of his reports?
15        MR. WOLKOFF:  Yes.
16        MR. DANIELS:  Do you have his
17    original one you can put in front of
18    him?
19        MR. WOLKOFF:  Yes.
20        MR. DANIELS:  And for this
21    question, do you want him to go page
22    by page?
23        MR. WOLKOFF:  No, I would like
24    him to point it out.  Presumably, he's
25    familiar with his reports.

1    A.   So, for example, figure 7, I
2  calculate it by looking back at the
3  permitted global outerwear market, and I
4  show that YKK would sell T4s and 5s.  I
5  look at the profits that they would make
6  on those sales.  And I discuss that
7  profit calculation elsewhere in my
8  report.
9    Q.   But you don't say in that
10  figure 7 whether YKK could have sold T4s
11  and T5s to particular customers instead
12  of T8s, 9 ands and 10s, do you sir,
13  whether in the real world it could have
14  done that?
15    A.   I believe I do.  My opinion in
16  this supplemental report talks about them
17  selling T4s and 5s instead.  It
18  calculates that.
19    Q.   I am asking whether or not you
20  said anywhere in any of your reports that
21  YKK could have sold T4s or T5s in the
22  real world to these customers instead of
23  T8s, 9s and 10s?
24    A.   I do.  I just showed you an
25  example where I am actually calculating,

1  have done that in the real world; do you,
2  sir?
3        MR. DANIELS:  Objection.  Asked
4    and answered.
5    A.   No, I disagree.  I consider the
6  significant demand for this patent.  The
7  lack of alternatives.  The fact that
8  Uretek was a 40-million meter supplier
9  for them.  My analysis in section 9 of my
10  old report walks through that
11  calculation.
12    Q.   In your supplemental expert
13  report submitted on March 28th, 2023 you
14  assume that YKK could have sold Uretek
15  laminated T4s and T5s in lieu of YKK
16  laminated T8s, 9s and 10s, you do no
17  analysis of whether or not YKK could have
18  sold T4s and T5s to customers in the real
19  world; do you, sir?
20        MR. DANIELS:  Objection.  Asked
21    and answered.
22    A.   I disagree.
23    Q.   Where do you do that?  Where do
24  you do that?
25        MR. DANIELS:  Objection.  Asked

1  my but-for calculation is selling a T4 or
2  T5 instead.  In here, I do it at the T8
3  price, for example.
4    Q.   I am not asking you about your
5  calculations.  I am asking you whether or
6  not you discuss anywhere in your report
7  whether YKK could sell T4s or T5s to
8  specific customers instead of T8s, 9s and
9  10s?
10        MR. DANIELS:  Objection.  Asked
11    and answered repeatedly.
12    A.   I showed you the calculation --
13  I could show you the profit calculations
14  that you asked back in my initial report
15  from June 7, 2017.
16        Starting in section 9 of that
17  report I go through my lost profit
18  analysis where I talk about the factors
19  that lead me to conclude that the proper
20  calculation is lost lamination profits on
21  T4s and 5s.
22    Q.   You assume that YKK could have
23  sold Uretek laminated T4s and 5s in lieu
24  of YKK laminated T8s, 9s and 10s.  You do
25  no analysis of whether or not YKK could

1    and answered.
2    A.   I pointed out my figures where
3  I do the calculations.  I pointed out the
4  profit sections where I do the profit
5  calculation.  There are other parts where
6  I analyze the fact that YKK was selling
7  T4 and 5s to their customers throughout
8  this time period.  So there is things in
9  my report where I do talk about their
10  ability to sell those.
11    Q.   Did you say anything in your
12  report about a comparison of prices for
13  T4s and T5s compared to T8s, 9s or 10s or
14  to water-resistant zippers laminated by
15  other manufacturers during the relevant
16  period, sir?
17        MR. DANIELS:  Objection as to
18    form.
19    A.   I talk about what they would
20  sell it at in the but-for world.  I do
21  have the actual prices in my report for
22  what was actually happening.
23    Q.   In the real world did you say
24  anything in your report about a
25  comparison of prices for T4s and T5s to

1  T8s, 9s, and 10s?
2     A.  In my report I analyze that
3  data.  But that is actual T4s and 5
4  sales.  Not the but-for T4s and 5 sales.
5     Q.  I am asking you about the real
6  world, sir.  Did you say anything about
7  comparing the prices in the real world
8  for T4s and T5s as compared to T8s, 9s
9  and 10s?
10    A.  My analysis of the sales data
11 captures that information.  But those are
12 actual sales, not but-for sales.  In the
13 but-for sales, as I show in my
14 supplemental report, I assume would be at
15 the T8 prices.
16    Q.  Did you say anything in your
17 supplemental report about the prices in
18 the real world for T8s, T9s or T10s as
19 compared to laminated zippers
20 manufactured by other third parties?
21    A.  I talk about the T8 prices in
22 my report that were actually sold.  The
23 market demand that they actually
24 achieved.
25    Q.  Did you talk about the prices

Page 276

1  being charged by third parties for their
2  water-resistant laminated zippers other
3  than YKK or Uretek laminated zippers?
4     A.  I talked about the other
5  claimed alternatives and I recognize that
6  they were there, but YKK achieved the T8
7  sales that it did, for example, at those
8  prices.
9     Q.  But please answer my question.
10 Did you lay out anywhere in your reports
11 the prices being charged during the
12 relevant period by third parties for
13 their water-resistant laminated zippers
14 as compared to Uretek laminated zippers
15 or YKK laminated zippers?
16       MR. DANIELS:  Objection as to
17    form.
18    A.  I don't believe I have sales
19 data that I analyze for these other
20 zippers that exist.  So I don't believe
21 that sales data is in my report.
22    Q.  You didn't lay out any
23 comparisons in your report between the
24 prices for Uretek laminated T4s and T5s
25 as compared to water-resistant zippers

Page 277

1  laminated by third parties; did you, sir?
2     A.  Again, that sales data isn't
3  available in this record that there is
4  spot information about it.  But in my
5  report I don't compare those to actual T4
6  prices which were higher than T8s during
7  the time.
8     Q.  Did you do -- strike that.
9        Did you say anything in your
10 report about complaints by YKK customers
11 about the prices for Uretek laminated
12 zippers in the real world?
13    A.  No, because that's the actual
14 prices that were going on.  Not the
15 but-for scenario.
16    Q.  Did you say anything in your
17 report about complaints by customers
18 about long delivery times of Uretek
19 laminated zippers?
20    A.  I don't discuss delivery times.
21 I discuss it with Mr. Press.  But I don't
22 recall specifically talking about
23 delivery times in my report.
24    Q.  Do you say anything in your
25 report about comparing delivery times of

Page 278

1  YKK laminated T8s, 9s and 10s as compared
2  to Uretek laminated T4 and T5s?
3     A.  I don't specifically discuss
4  delivery times, I discuss the but-for
5  transactions that would have occurred.
6     Q.  Do you discuss anything in your
7  report about the delivery times for
8  water-resistant laminated zippers by
9  third parties as compared to Uretek
10 laminated T4s and T5s?
11    A.  My report doesn't discuss
12 delivery times, it analyzes the but-for
13 scenario, which would be Uretek making
14 those sales.
15    Q.  Do you talk anything in your
16 report about customers either switching
17 or threatening to switch to zippers
18 laminated by third parties as opposed to
19 continuing to purchase T4s and T5s?
20    A.  I don't recall that as I sit
21 here.
22       THE WITNESS:  Can you read that
23    back, please?
24       [The requested portion of the
25    record was read back as follows:

Page 279

6 (Pages 276 - 279)

1    "Question:  Do you talk anything
2  in your report about customers either
3  switching or threatening to switch to
4  zippers laminated by third parties as
5  opposed to continuing to purchase T4s
6  and T5s?"]
7    A.   I don't recall that specific
8  fact set being discussed in my report.
9    Q.   Do you recall discussing at all
10  in your report any quality issues that
11  either YKK or YKK customers had or
12  claimed to have with Uretek laminated
13  zippers?
14    A.   I recall looking at capacity
15  which would include the ability to make
16  those sales.  But I don't talk about
17  specific instances of quality issues and
18  things like that.
19    Q.   Listen to my question, please.
20  I am not talking about capacity.  We will
21  get to that later.
22        Do you talk anywhere in your
23  reports about quality issues that either
24  YKK or YKK customers had or claimed to
25  have with Uretek laminated T4s and T5s?

Page 280

1    about that.
2    Q.   Can you answer the question I
3  asked, please?  We can have it read back
4  if you want.
5    A.   Thank you.
6        MR. WOLKOFF:  Can you read it
7  back, please?
8        [The requested portion of the
9  record was read back as follows:
10        "Question:  Listen to my
11  question, please.  I am not talking
12  about capacity.  We will get to that
13  later.
14        "Do you talk anywhere in your
15  reports about quality issues that
16  either YKK or YKK customers had or
17  claimed to have with Uretek laminated
18  T4s and T5s?"]
19    A.   Not specifically in that
20  manner.  Just in general about them being
21  a supplier for many years for millions of
22  meters.
23    Q.   Did you do any review or take
24  into account customer complaints about
25  the quality of T4s and T5s as compared

Page 282

1        MR. DANIELS:  I just want to
2  make a substantive objection.  It
3  sounds -- I am letting it go for a
4  little while, but it sounds like you
5  are rehashing the stuff that was in
6  his original report that is not in his
7  supplemental report.  And that is
8  outside the scope of these permitted
9  depositions and the court orders.
10        And so I am have been letting it
11  go for a little while, but I am just
12  going to give you a standing objection
13  that stuff related to the original
14  report that was already covered in
15  prior depositions and that has not
16  changed, I have a standing objection
17  to those questions.
18        MR. WOLKOFF:  Well, that's the
19  point, isn't it, that despite the
20  jury's verdict, this witness has not
21  changed his opinions and continues to
22  rely on the same types of information,
23  but not taken into account the jury's
24  verdict.  That's our point here.  And
25  I am entitled to question this witness

Page 281

1  with YKK laminated T8s, 9s and 10s or
2  compared to water-resistant zippers
3  laminated by other manufacturers during
4  the relevant time period?
5        MR. DANIELS:  Objection to form.
6  There is also a motion in limine
7  pending on this topic.
8    A.   I did not specifically discuss
9  complaints.  I just discussed their
10  ability to be a supplier and their
11  history of millions of meters and many
12  years of being a supplier.
13    Q.   Did you identify any
14  third-party manufacturer of
15  water-resistant laminated zippers in your
16  reports, sir, during the relevant time
17  period, any competitors?
18    A.   No, I am not aware of an
19  acceptable alternative, so I haven't
20  identified any competitors.
21    Q.   So you haven't, right?
22    A.   I don't recall listing one.
23  There is none to my understanding that
24  would be acceptable in this industry to
25  replace these sales.  So I have not named

Page 283

7 (Pages 280 - 283)

1 another one.

2    Q.  You're an accountant, correct?

3    A.  I am a CPA, yes.

4    Q.  You're not someone who is

5 familiar with the garment industry,

6 correct?

7    A.  I am not a, like a high-end

8 outerwear expert, no, a garment expert.

9    Q.  And you're not an expert on

10 waterproof zippers; are you?

11    A.  I am not.

12    Q.  Do you talk at all in your

13 reports about the price being charged by

14 third-party competitors making

15 water-resistant laminated zippers as

16 compared to Uretek laminated T4s and T5s?

17      MR. DANIELS:  Objection.  Asked

18   and answered.

19    A.  As I mentioned before, I assume

20 the same price, so I am talking about the

21 price that would be charged in the

22 but-for world.

23    Q.  Do you talk anywhere about the

24 price being charged, sir, by third-party

25 competitors for water-resistant laminated

1 zippers as compared to the prices being

2 charged during the relevant time period

3 for T4s and T5s?

4    A.  I don't -- there is no sales

5 data to discuss that.  I cite to some

6 one-off documents that cite prices and

7 comparisons and things of that nature

8 when reaching the conclusion that YKK

9 would sell into that market at the T8

10 price, and I reference those documents.

11 But there is no sales data about these

12 competitive zippers in question.

13    Q.  You mean you have no sales data

14 to review, correct?

15    A.  I don't have sales data about

16 those.  I have some one-off pieces of

17 paper that show some prices and I do cite

18 those.  I think I cite a presentation or

19 two.

20    Q.  Do you know whether or not

21 plaintiffs made any attempt to obtain

22 such sales data from third-party

23 water-resistant zipper manufacturers of

24 laminated zippers?

25    A.  Not to my knowledge.

1    Q.  Did you make any such attempt?

2    A.  Not to my knowledge.

3    Q.  To your knowledge did anybody?

4    A.  Not to my knowledge.

5    Q.  Did you or to your knowledge

6 anyone else communicate with any YKK

7 customers and ask them if they would have

8 purchased T4s and T5s during the relevant

9 time period as opposed to purchasing T8s,

10 9s and 10s or water-resistant zippers

11 laminated by other manufacturers?

12    A.  I did not reach out and talk

13 about YKK customers in this private

14 litigation, no.

15    Q.  Did you talk to any zipper

16 customers about anything in connection

17 with your work?

18    A.  I did not reach out in a

19 private litigation and talk to them.

20 There was a legal channel for getting the

21 data from which we did get and that

22 process went out and I got data from it.

23    Q.  What is the private litigation

24 that you're referring to?  This is a

25 public litigation.

1    A.  Well, it's public to some

2 extent.  But I have not gone out and

3 talked to anyone besides the proper

4 channels of getting subpoenas and getting

5 data from them.

6    Q.  Did you ask the plaintiffs to

7 do that?

8    A.  To do that meaning "sales

9 data"?

10    Q.  Did you ask the plaintiffs to

11 do that?

12    A.  To get sales data?  Yes, I did.

13    Q.  And they didn't do it?

14    A.  I think we are talking past

15 each other.

16      MR. DANIELS:  Objection to form.

17    Q.  Okay.  You understand my

18 question.  Did you --

19      MR. DANIELS:  Objection.

20    Q.  Did you ask the plaintiffs to

21 get sales data from third-party

22 manufacturers of laminated zippers, that

23 is from competitors, in this industry,

24 sir?

25    A.  I answered that question before

1 and I said not to my knowledge, no.
2    Q.   Did you or to your knowledge
3 anyone communicate with any customers to
4 ask them if they were willing to purchase
5 T4s and T5s as opposed to water-resistant
6 zippers laminated by third-parties
7 despite higher prices?
8    A.   I did not talk to YKK's
9 customers.
10    Q.   Did you or to your knowledge
11 anyone communicate with any customers to
12 ask them if they were willing to purchase
13 T4s and T5s as opposed to water-resistant
14 zippers laminated by others, despite
15 longer delivery times?
16        MR. DANIELS:  Objection as to
17    form.
18    A.   As I answered before, I have
19 not spoken to YKK's customers.
20    Q.   Did you have any information
21 that you included in your reports about
22 customers willing to purchase T4s and T5s
23 as opposed to water-resistant zippers
24 laminated by others, despite higher
25 prices?

Page 288

1        MR. DANIELS:  Objection as to
2    form and objection.  Asked and
3    answered.
4    A.   Yes.
5    Q.   Where do you have that, sir?
6    A.   I have the history of these
7 customers buying T4s and T5s at higher
8 prices in the past and also I have sales
9 data from YKK showing that some customers
10 continued to do that.
11    Q.   A very small amount, as you
12 point out, of customers continued to buy
13 T4s and T5s during the relevant period,
14 correct?
15    A.   In the actual world, in the
16 face of T8 being priced lower, yes, T8
17 was available lower at the time.
18    Q.   Do you have any information
19 that you included in your reports about
20 customers willing to purchase T4s and T5s
21 as opposed to zippers laminated by
22 others?
23        MR. DANIELS:  Objection.  Asked
24    and answered --
25        MR. WOLKOFF:  Strike that.

Page 289

1        MR. DANIELS:  -- many times.
2    Q.   Do you have any information
3 that you included in your reports during
4 the relevant period about customers
5 willing to purchase T4s and T5s as
6 opposed to water-resistant zippers
7 laminated by others, despite higher
8 prices?
9        MR. DANIELS:  Objection to form.
10    Objection.  Asked and answered.
11    A.   As I just answered, there is
12 evidence that the T4 and 5 was being
13 purchased and there is evidence that
14 there is a market for it with the T8
15 pricing.  So, yes, I have looked at that
16 and that, of course, is in a market with
17 those competitors.
18    Q.   And that's that small amount of
19 T4s and T5s that you talk about in figure
20 10, I believe, in your supplemental
21 report?
22    A.   In the actual, it is.  But in
23 the actual world, it is also $500 million
24 of zipper demand that was achieved
25 despite those competitors.

Page 290

1    Q.   Your opinions are based on the
2 but-for world; is that correct?
3    A.   Well, they are based on the
4 but-for world.  And they also consider
5 what actually happened as part of that,
6 because you're comparing the two.
7    Q.   You didn't consider anywhere in
8 your report longer delivery times or
9 purported longer delivery times for T4s
10 and T5s than other water-resistant
11 laminated zippers; did you?
12        MR. DANIELS:  Objection to form.
13    A.   I analyzed whether they could
14 make the sale.  I didn't talk
15 specifically about lead times in my
16 report.  I talked to Mr. Press about it.
17 YKK had a demonstrated history of using
18 Uretek as a supplier.
19    Q.   I am talking about in your
20 report, sir, in your report, you didn't
21 say anything about customers willing to
22 purchase T4s and T5s as opposed to
23 water-resistant zippers laminated by
24 others despite higher prices --
25        MR. DANIELS:  Objection as to

Page 291

9 (Pages 288 - 291)

1    form.
2    Q.    -- for the T4s and T5s?
3        MR. DANIELS:  Objection, asked
4    and answered.
5    A.    When you say say anything, I
6    did.  I looked at the market for these
7    zippers.  I saw the demand.  I looked at
8    the actual prices.
9    Q.    Did you anywhere in your
10   reports compare that these are the prices
11   for T4s and T5s being charged during the
12   relevant period, and that these are the
13   prices being charged by third-party
14   water-resistant laminating manufacturers?
15       MR. DANIELS:  Objection, asked
16   and answered.
17   A.    As I said before, I don't have
18   data to compare those things.  I have
19   some one-off documents that I cite in my
20   report.  But I don't have sales data from
21   those competitors to compare.
22   Q.    Do you include in your report
23   any information about these are the
24   delivery times for water-resistant
25   laminated zippers by third parties as

Page 292

1    and answered.
2    A.    I do.  I discuss that the T8s
3    were made in a market that had these
4    competitors.  And I also knew what the T4
5    and T5 prices were.  My data shows that.
6    Q.    Did you say anywhere in your
7    report what the prices were during the
8    relevant time period for T8s, 9s and 10s,
9    the actual prices in the real world?
10   A.    Yes.
11   Q.    Where?
12   A.    In my, for example, in my chart
13   where I look at the $500 million market.
14   I look at the price -- I look at the
15   meters and I look at the revenues for
16   those.
17   Q.    Now, you relied on YKK's usage
18   codes in trying to determine YKK's sales
19   of outerwear, correct?
20   A.    Correct.
21   Q.    And then you segregated the
22   outerwear that was served to "functional
23   customers" according to YKK's customer
24   usage codes, correct?
25   A.    Correct.

Page 294

1    compared to the delivery times for Uretek
2    laminated T4s and T5s?
3    A.    As I had mentioned this
4    morning, I don't specifically discuss
5    delivery times.  I don't recall data on
6    delivery times besides one-off documents.
7    But I don't discuss delivery and lead
8    times in my report.
9    Q.    Do you say anything in your
10   report about these are the delivery times
11   for YKK's T8s, 9s and 10s as compared to
12   the delivery times for Uretek laminated
13   T4s and T5s?
14   A.    As I've mentioned, I don't
15   discuss specifically lead times in my
16   report.  I talked about it with
17   Mr. Press.  But I did not discuss that in
18   my report.
19   Q.    Do you discuss anywhere in your
20   reports these are the prices during the
21   relevant time period being charged for
22   T8s, 9s and 10s, as compared to the
23   prices during the relevant time period
24   being charged for T4s and T5s?
25       MR. DANIELS:  Objection.  Asked

Page 293

1    Q.    And then to determine if the
2    T8, 9 and 10 zippers were used in
3    high-end outerwear you rely completely on
4    David Cockrell's opinions of what is
5    high-end outerwear and what is not,
6    correct?
7    A.    Well, it's one part of the
8    analysis, but it's the parts with the
9    parts that you just went through, which
10   is usage, segmentation, the use of T8s,
11   9s and 10s, higher prices, things like
12   that.  But that is part of the analysis.
13   Q.    Well, after identifying or
14   limiting sales to T8s, 9s and 10
15   functional outerwear based on YKK's
16   available data, you then rely on
17   completely Mr. Cockrell's analysis of
18   sample functional outerwear products and
19   customers to determine the portion of
20   that functional outerwear sales that were
21   high-end outerwear, correct?
22   A.    Yes, I rely on his analysis to
23   do that final step.  I compared customer
24   trends and things like that, but I did
25   rely on his analysis to do that step.

Page 295

1    Q.    You would agree, sir, that by
2  2009 and '10 most of the manufacturers in
3  the garment industry had moved to Asia,
4  correct?
5    A.    I understand that most -- there
6  was a shift to Asia during that time
7  period, yes.
8    Q.    Can you identify any high-end
9  outerwear garment manufacturers that by
10 2010 didn't manufacture, substantially,
11 all of their high-end outerwear outside
12 of North America?
13       MR. DANIELS:  Objection.
14 Outside the scope of the report.
15    A.    I don't know.  I know that
16 there was some -- I have even some
17 evidence of some manufacturing still
18 going on in North America.  But I don't
19 know their names.
20    Q.    Can you identify any high-end
21 outerwear garment manufacturer that by
22 2010 didn't manufacture substantially all
23 of their high-end outerwear outside of
24 North America?
25       MR. DANIELS:  Objection to form.

1    A.    As I said, I don't know their
2  names.  I know that there was high
3  performance manufacturing still going on
4  in North America.  I don't know their
5  names.
6    Q.    Do you say anything in your
7  reports about, by the year 2010,
8  manufacturer of high-end outerwear still
9  going on in North America, sir?
10    A.    I don't recall discussing that
11 in my report.
12    Q.    Can you identify any high-end
13 outerwear garment manufacturer that by
14 2010 didn't manufacture, substantially,
15 all of its high-end outerwear in Asia?
16       MR. DANIELS:  Objection as to
17 form.
18    A.    Again, the same answer.  I know
19 that there was some in North America.  I
20 don't know their names as I sit here.
21    Q.    So the answer is no, you can't
22 identify any high-end outerwear or
23 garment manufacturer that by 2010 didn't
24 manufacture, substantially, all of its
25 high-end outerwear in Asia?

1       MR. DANIELS:  Objection to form.
2    A.    Correct.  I know there is some
3  that do, but I can't identify them for
4  you because I don't know their names.
5    Q.    Did you talk at all in your
6  reports about any high-end outerwear
7  garment manufacturer that by 2010 was
8  still manufacturing high-end outerwear in
9  North America?
10    A.    I don't recall discussing that
11 in my report.
12    Q.    In your figure 4?
13    A.    Figure 4 in my supplemental
14 report?
15    Q.    In your supplemental report.
16       On page 13 you say that there
17 were 65,090,121 YKK laminated zippers
18 that were "Likely high-end outerwear
19 meters," correct, sir?
20    A.    Yes.
21    Q.    Can you identify even one of
22 those 65,090,121 meters that were sewn
23 into high-end outerwear garments, where
24 the high-end outerwear was manufactured
25 outside of Asia?

1    A.    I can't specifically do that
2  for you; no, as I sit here.
3    Q.    Okay.  In terms of delivery
4  time for the T4s and T5s, did you
5  familiarize yourself with the process
6  involved in creating water-resistant
7  Uretek laminated zippers and how long
8  that process took, sir?
9    A.    I recall visiting the plant and
10 talking with Mr. Press and others about
11 it, yes.
12    Q.    Okay.  What was the process?
13    A.    In general, the zipper chain
14 was sent from Georgia, I believe, to
15 Connecticut and then Uretek would
16 laminate it and send it back to Georgia.
17    Q.    Do you know by what means the
18 zipper chain was sent from YKK's plant in
19 Georgia up to Uretek's plant in New
20 Haven?
21    A.    I think it varied, but I don't
22 recall.  I think it varied.  I think
23 Mr. Press noted that it might have varied
24 at times depending on certain things, but
25 I don't recall the details.

1    Q.   You don't recall?
2    A.   I don't recall the details.
3    Q.   Do you recall generally how
4 long?
5    A.   I don't recall how long as I
6 sit here.
7    Q.   Okay.  Do you recall how long
8 on average it took for Uretek to laminate
9 the zippers at its plant in New Haven?
10   A.   I don't recall those details
11 now as I sit here.
12   Q.   Do you recall by what means the
13 zippers after being laminated were sent
14 to YKK's plant in Georgia?
15   A.   I think that varied, as well.
16 But I don't specifically recall as I sit
17 here.
18   Q.   And then for garment
19 manufacturers in Asia, where were the
20 laminated zippers sent from; do you know?
21   A.   I don't know if I understand
22 your question.  I guess it depends on
23 which zipper they were buying.
24   Q.   Well, we are talking about the
25 process of laminating T4s and T5s.  Do

Page 300

1 you know by what means the zippers, after
2 being laminated by Uretek in New Haven
3 and sent back down to YKK in Georgia they
4 were sent to manufacturers in Asia?
5    A.   They would be -- I have seen
6 ship.  I think I have seen reference to
7 air at times.  But I think predominately
8 ship.
9    Q.   Do you know how long that
10 shipping took, on average?
11   A.   I don't have a date for you.
12   Q.   Do you know how long it took to
13 have T4s and T5s laminated by Uretek and
14 then shipped out to Asia on average, sir,
15 during the relevant time period?
16   A.   I have seen estimates of weeks.
17 But again, I have seen people talk about
18 six, eight, 10.  I have seen different
19 numbers.
20   Q.   Do you say anything about that
21 in your reports?
22   A.   I don't talk about the weeks in
23 my report.  No, I don't talk about
24 specific weeks in my report.
25   Q.   Do you know how long it took

Page 301

1 for YKK to laminate T8s, 9s and 10s and
2 then ship them to Asia to manufacture?
3    A.   I recall -- I only know what
4 some presentations said and I recall that
5 being several weeks.
6    Q.   Do you know if the time period
7 -- strike that.
8         What presentation are you
9 referring to?
10   A.   I recall a presentation, for
11 example, from January of 2002.
12   Q.   So my questions are about the
13 relevant time period, sir.  Not January
14 2002.  Was YKK even laminate T8s, 9s
15 and 10s in January of 2002; do you know?
16   A.   Not yet.
17   Q.   Not yet.  So during the
18 relevant time period do you know how long
19 it took YKK to manufacture and then ship
20 out to Asian manufacturers with regard to
21 its T8s, 9s and 10s?
22   A.   Only from some documents that
23 I've seen when the parties were
24 negotiating or settling, there was some
25 talk of this.  But I just recall those

Page 302

1 week ranges being in those documents.
2    Q.   Now you're recalling different
3 documents than before?
4    A.   Yes.
5    Q.   What documents?
6    A.   I recall some documents where
7 the parties, Uretek and YKK, were
8 discussing resolution of this issue with
9 litigation.
10   Q.   Can you specify what the
11 documents are, sir, that you're referring
12 to?
13   A.   There was, the parties talked
14 multiple times.  I don't have one in my
15 head for you.
16   Q.   So you can't?
17   A.   I can't identify a particular
18 document.  I would have to -- I don't
19 know if I cited that document.
20   Q.   Do you say anything in your
21 report about the amount of time it took
22 for YKK to manufacture its own laminated
23 T8s, 9s and 10s and ship them out to
24 Asian manufacturers and they received
25 them?

Page 303

12 (Pages 300 - 303)

1    A.   I don't recall specifically
2  talking about that in my report.
3    Q.   Do you know whether Uretek ever
4  fell behind and created a backlog with
5  regard to its T4s and T5s during the
6  relevant time period?
7    A.   I had conversations with
8  Mr. Press about that.  There was things
9  that went on during the process.  I
10 recall something about that.
11   Q.   What do you recall?
12   A.   I recall them telling me that
13 that happened at times, but with specific
14 volume and things like that, all of those
15 issues were resolved and could be
16 resolved, especially with the added
17 volume.
18   Q.   Do you recall being told that
19 Uretek had fallen behind in its
20 production of T4s and T5s during the
21 relevant time period and had created a
22 backlog for YKK?
23      MR. DANIELS:  Objection as to
24   form.
25   A.   I don't recall that specific

Page 304

1  instance.  I recall Mr. Press talking
2  about the ability to make these sales
3  and, yes, with low volumes it takes
4  longer, with low inventory, things like
5  that, it could take longer.  But I also
6  recall him telling me or testifying that
7  they were a good supplier and they always
8  resolved these issues.
9    Q.   How many times did you speak
10 with Mr. Press in connection with your
11 work in this case?
12   A.   Several times.
13   Q.   Did you ever meet with him?
14   A.   I did.
15   Q.   Where did you meet with him?
16   A.   I met with him in Connecticut.
17   Q.   Where in Connecticut?
18      MR. DANIELS:  I am going to
19   object again.  These are all grounds
20   that were already covered the first
21   time and have nothing to do with the
22   jury verdict and given that Mr. Press
23   passed in 2017, he could not possibly
24   have changed how many times he met
25   with him, since his last deposition.

Page 305

1    A.   I believe it was at the plant.
2    Q.   How long did you spend?
3    A.   I was there for several hours.
4    Q.   Did you ever take any notes of
5  what it is you say that Mr. Press told
6  you?
7    A.   I don't believe I did.
8    Q.   Did you say anything in your
9  reports about the importance of delivery
10 times to Asian garment manufacturers in
11 connection with their water-resistant
12 zipper purchasing decisions?
13   A.   As I've mentioned a few times
14 this morning, I don't specifically talk
15 about delivery times in my report.
16   Q.   Did you say anything in your
17 report about the importance of pricing to
18 Asian garment manufacturers in connection
19 with their water-resistant zipper
20 purchasing decisions?
21   A.   Well, anything, in general as
22 my supplemental report points out, when I
23 do my profit allocation, I use the T8
24 example of the actual world, what
25 actually happened, showing the actual

Page 306

1  demand for water-resistant zippers.
2    Q.   Did you say anything in your
3  reports about the importance of pricing
4  to Asian manufacturers in connection with
5  their water-resistant laminated zipper
6  purchasing decisions?
7       MR. DANIELS:  Objection as to
8    form.
9    A.   Well, again, when you say
10 anything, yes, because I've looked at the
11 market and used the actual price.  So
12 recognizing the actual price, the actual
13 demand that did occur.
14   Q.   Did you say anything in your
15 report about the factors that were
16 important to Asian garment manufacturers
17 in connection with their water-resistant
18 laminated zipper decisions, purchasing
19 decisions?
20      MR. DANIELS:  Objection as to
21   form.
22   A.   I don't know if I understand
23 your question.  My report recognizes the
24 T8 pricing, for example, so that could
25 answer -- could be a yes to your

Page 307

13 (Pages 304 - 307)

1 question, that I do talk about that.
2    Q.   Did you lay out in your report
3 any of the factors that garment
4 manufacturers took into account during
5 the relevant time period in connection
6 with their water-resistant laminated
7 zipper purchasing decisions?
8        MR. DANIELS:  Objection as to
9    form.
10   A.   Not in that specific nature.
11 Again, whatever those were, those were
12 considered -- I am assuming those were
13 considered when the market bought those
14 500 million dollars of meters.  So
15 whatever those issues were, the market
16 considered them.
17   Q.   But you didn't lay out any of
18 those issues, correct, in your report?
19       MR. DANIELS:  Objection to form.
20   A.   I do not go into detail about
21 that, because again I have market data
22 that shows that those manufacturers --
23   Q.   I am not talking about market
24 data.
25       MR. DANIELS:  Let the witness
Page 308

1    A.   Correct.  I talk about the
2 non-infringing alternatives and the lack
3 of an alternative zipper that is in this
4 market, according to Mr. Cockrell.
5    Q.   No, sir.  You just talked in
6 your report about the absence of
7 non-infringing acceptable alternative to
8 zippers in paragraphs 20, 23 and 25 of
9 your supplemental report, correct, sir?
10   A.   In my supplemental report, yes.
11 I talk about non-infringing alternatives.
12   Q.   You're not an expert on garment
13 manufacturer's decision-making on which
14 water-resistant laminated zippers to
15 purchase and which ones not to purchase,
16 correct?
17   A.   Correct, I am not an industry
18 expert.
19   Q.   I want to show you what's been
20 marked in this case as DX 645.
21       (Defendants' Exhibit 645,
22       document Bates stamped YKK0703208 was
23       previously marked for identification.)
24       MR. WOLKOFF:  It's a trial
25    exhibit.  I don't think we need to
Page 310

1    answer the question.
2    A.   -- that shows that those
3 manufacturers achieved those volumes at
4 those prices.
5    Q.   I am not talking about market
6 data.  Do you lay out in any of your
7 reports the factors that garment
8 manufacturers took into account during
9 the relevant time period in connection
10 with their purchasing decisions with
11 respect to water-resistant laminated
12 zippers?
13       MR. DANIELS:  Objection as to
14    form.  Objection, asked and answered.
15   A.   Not in the detail that you are
16 laying out.  I lay out the market demand
17 that we've talked about.  Also, the
18 billion dollar market that this was in
19 general and the lack of alternatives.  So
20 I lay out those things, which would be
21 important to that question.
22   Q.   Actually, you didn't talk about
23 the lack of alternatives.  You talked
24 only about the lack of non-infringing
25 acceptable alternatives, correct, sir?
Page 309

1    mark these again.
2    Q.   You see that this is an e-mail
3 string back in March of 2014, sir?
4    A.   Yes.
5    Q.   You've seen this e-mail string
6 before, correct?
7       (Witness reviews document.)
8       MR. DANIELS:  I am just going to
9    object to this document on lack of
10    authentication.
11   A.   I am not certain.  I know I saw
12 some things from Mr. Reed from this time
13 period.  I am not positive.
14   Q.   Didn't you review all of the
15 exhibits marked as trial exhibits in
16 connection with your work and your
17 supplemental report in this matter, sir?
18   A.   I didn't necessarily review
19 every one of them.  I did searches on
20 them.  I've referenced what I've cited.
21   Q.   Didn't you say in your report
22 that you had considered all of the trial
23 exhibits in connection with preparing
24 your supplemental report, sir?
25   A.   Yes, I had access to them.  I
Page 311

14 (Pages 308 - 311)

1 have done searches on them. I don't know
2 if I stopped and read this one. It looks
3 familiar. I just don't know if I read
4 645.
5    Q.   Directing your attention to
6 page 703216 of Trial Exhibit DX 645, do
7 you see that that's an e-mail written by
8 someone named Scott Jensen at YKK back on
9 March 7, 2014, sir?
10       MR. DANIELS: Objection. Lack
11   of authentication.
12   A.   Yes. You mean the part under
13 "Hi Scott," -- Scott Jensen.
14   Q.   Under the part "Hi Shauna." Do
15 you see it?
16   A.   Yes, I see what it says.
17   Q.   And Mr. Jensen said, "We are
18 once again dealing with an unhappy
19 customer based off our 10CT4 chain lead
20 times."
21       You understand the 10CT4 to be
22 one of the zippers laminated by Uretek,
23 correct?
24   A.   Correct.
25   Q.   Mr. Jensen went on to say,

Page 312

1 "Based off the issues the customer had on
2 his last order of receiving material, he
3 placed a new order this week and received
4 an order confirmation of an ETC of eight
5 weeks out. His order is for 300 meters.
6 He can't believe it will take eight weeks
7 to get that item complete. He is ready
8 to cancel all of his orders and move his
9 business to Lenzip and other competitors,
10 if he doesn't get acknowledgment with an
11 improved lead time."
12       I read that correctly?
13   A.   You did.
14   Q.   Did you consider that in
15 connection with your opinions in this
16 matter?
17   A.   That being this e-mail and
18 things that went on in the actual world.
19 Again, as I talked to Mr. Press, and also
20 recognizing the additional volume that
21 would have been going through the plant
22 at the time and the inventory management,
23 because this is during -- this is coming
24 during a time of very low volume.
25   Q.   Did you consider this

Page 313

1 particular statement with regard to this
2 customer in connection with your opinions
3 in this matter?
4    A.   As I said, I think I did know
5 of instances in the actual world where
6 due to the low volume and lack of
7 inventory, this would happen. But I
8 understand from Mr. Press that with the
9 volume and the inventory control that
10 would be going on if they had been using
11 Uretek.
12   Q.   Did you say anything about this
13 particular issue in your reports, sir?
14       MR. DANIELS: Objection as to
15   form.
16   A.   Nothing with respect to 645.
17 Again, I don't recall citing this e-mail.
18   Q.   Did you say anything with
19 regard to customer complaints about long
20 delivery times for the T4 in your report,
21 sir?
22       MR. DANIELS: Objection as to
23   form.
24   A.   I did not talk about customer
25 complaints, specifically, in my report.

Page 314

1    Q.   Did you say anything about
2 delivery times being reduced with more
3 volume purportedly being reduced with
4 more volume in your report, sir?
5    A.   I did not say, I did not say
6 that. I talked about the volume in my
7 discussions with Mr. Press.
8    Q.   Any discussions you had with
9 anybody at Uretek was prior to the jury
10 verdict in this matter in January of
11 2023, correct?
12   A.   Correct.
13   Q.   You didn't go back and
14 communicate with anybody at Uretek after
15 the jury verdict in this matter about the
16 definition of high-end outerwear,
17 correct?
18   A.   I could not and I did not.
19   Q.   You couldn't talk -- when I say
20 Uretek, did you talk with anybody at the
21 two plaintiffs in this matter after the
22 jury's verdict in January of 2023?
23       MR. DANIELS: And just to be
24   clear, I assume you're not asking
25   about conversations with counsel.

Page 315

15 (Pages 312 - 315)

1    MR. WOLKOFF:  Yes.
2  A.   No.
3  Q.   You see up above on page 214,
4  the response about the complaint from the
5  customer about the long lead time was, "I
6  cannot improve the delivery at this time.
7  As I said before, the standard lead time
8  for Uretek chain is six to eight weeks."
9      Do you see that, sir?
10 A.   I do.
11 Q.   And then up above, "Looks like
12 we will be losing this order from the
13 customer based on our long lead times."
14     Do you see that, sir?
15 A.   I see that.
16 Q.   Did you take -- strike that.
17     Did you say anything in your
18 report about YKK losing sales of T4s and
19 T5s with customers because of the lead
20 times for delivery of the T4s and T5s
21 during the relevant time period?
22 A.   I don't recall discussing that
23 in my report.  Again, I didn't discuss
24 this e-mail in my report.
25 Q.   Do you recall discussing

Page 316

1  anything about YKK losing customers
2  because of the higher prices of T4s and
3  T5s during the relevant time period?
4  A.   No.
5  Q.   Did you consider prices or
6  delivery times in connection with the
7  ability of YKK to sell Uretek laminated
8  T4s and T5s to customers during the
9  relevant time period?
10     MR. DANIELS:  Objection.  Asked
11     and answered.
12 A.   Yes.
13 Q.   Did you say anything in your
14 report, specifically, that, or in sum and
15 substance that YKK would be able to sell
16 T4s and T5s to these customers despite
17 the higher prices and longer lead times
18 for those zippers?
19     MR. DANIELS:  Objection as to
20     form.
21 A.   Yes.  My calculations discuss
22 using T4 and T5, and I have them
23 achieving the sales.
24 Q.   Do you have any sentences in
25 your reports that say despite purported

Page 317

1  higher prices or longer delivery times
2  for T4s and T5s, YKK would still be able
3  to sell T4s and T5s as opposed to T8s, 9s
4  and 10s to its customers?
5      MR. DANIELS:  Objection as to
6      form.
7  A.   I don't have that quoted
8  sentence in my report.
9  Q.   Do you have that in sum and
10 substance in words in your report, in
11 words, sir?
12 A.   For example, I talk about the
13 price.  I do a calculation where I assume
14 the price would be the same.  So yes, I
15 do.
16 Q.   Do you say anywhere in sum or
17 substance, in words, that despite the
18 higher price for T4s and T5s as compared
19 to T8s, 9s and 10s or water-resistant
20 zippers manufactured by third-parties, in
21 my opinion YKK could still sell T4s and
22 T5s to its customers?
23     MR. DANIELS:  Objection as to
24     form.
25 A.   I already pointed you to the

Page 318

1  price sections and things like that,
2  where I am selling them at that T4 and
3  T5s at the T8 prices.
4  Q.   Sir, listen to my question.
5  You know my question is about words.  Do
6  you say anything in words?
7      MR. DANIELS:  Objection.  That's
8      not true.  You said sum or substance.
9      That was the question.  So objection
10     as to form.  And objection to
11     badgering the witness.
12 Q.   In sum or substance in words.
13     MR. DANIELS:  Objection as to
14     form.
15 Q.   Did you say anything in sum or
16 substance, using words, that YKK would
17 still be successful in selling T4s and
18 T5s, despite higher prices for T4s and
19 T5s than for other water-resistant
20 laminated zippers on the market?
21     MR. DANIELS:  Objection as to
22     form.
23 A.   Yes.
24 Q.   Point out where.
25 A.   My supplemental report, the

Page 319

1 opinion, the ultimate opinion in my
2 supplemental report is that they could
3 achieve those sales at a lower margin due
4 to lamination costs from Uretek.
5         So in sum and substance and all
6 of the words that talk about that
7 opinion, is why I am saying that.
8    Q.   You never analyzed the
9 difference in prices during the relevant
10 time period between the T4 and T5 and any
11 competitor manufacturer of
12 water-resistant laminated zippers?  You
13 never did that in your reports; did you,
14 sir?
15    A.   Because I've used the T8 price.
16 And those T8 prices were achieved with
17 whatever competition you're suggesting.
18    Q.   Did you ever analyze the price
19 of T4s and T5s as compared with the
20 prices of water-resistant zippers
21 laminated by third-parties, that is
22 compared the actual prices in the real
23 world in your reports?
24        MR. DANIELS:  Objection.  Asked
25    and answered.

Page 320

1    A.   In my report, I have the T4 and
2 T5 prices which I provide.  I do
3 reference documents that have these
4 competitive prices.  But again, I use the
5 T8 price, for example, and that T8 price
6 was achieved in the actual world with
7 that competition.
8    Q.   Okay.  You're not answering the
9 question.
10        MR. DANIELS:  Objection.  He is
11    answering the question.
12    Q.   Did you ever go through a
13 comparison in your reports of the actual
14 prices being charged for T4s and T5s in
15 the real world as compared with the
16 prices being charged by other
17 manufacturers of water-resistant
18 laminated zippers during the relevant
19 time period?
20        MR. DANIELS:  Objection as to
21    form.  Objection, asked and answered.
22    A.   I can't answer the question
23 differently.  I provide the T4 and T5
24 prices.  I reference competitive pricing
25 and, of course, I use T8 pricing.

Page 321

1    Q.   Show me where you reference
2 competitor's prices for their
3 water-resistant zippers in your
4 supplemental report, please.
5        (Witness reviews document.)
6    A.   So, for example, paragraph 23,
7 I talk about how YKK successfully sold
8 152 million meters, generated 495 million
9 in revenue despite any competition.
10    Q.   That's not what I am asking
11 you, and you know it, sir.
12        MR. DANIELS:  Objection.  You're
13    badgering the witness.  He's answering
14    the question you asked.  You just
15    don't like the answers.  Don't tell
16    the witness that somehow he knows your
17    question and is intentionally ignoring
18    it.
19    Q.   I am asking you, sir, where in
20 your supplemental report do you set out
21 the price being charged for
22 water-resistant laminated zippers by any
23 third-party manufacturer of the actual
24 prices?
25        MR. DANIELS:  Objection as to

Page 322

1    form.  It's not the same question that
2    you previously asked.
3        You can answer that question.
4    A.   And as I said before, I don't,
5 I think I reference a document that has
6 that.  But I don't lay out those prices.
7 I am aware of them in my analysis.  And I
8 don't have sales data about that.  I am
9 aware of some pieces of paper.
10    Q.   You don't say anything about --
11 strike that.
12        You don't recall the actual
13 prices being charged during the relevant
14 time period by any manufacturer of
15 water-resistant laminated zippers; do
16 you, sir?
17        MR. DANIELS:  Objection.  Asked
18    and answered.
19    A.   In a narrow sense, I do not
20 specifically cite the one-off examples
21 that I have seen.  And I don't have sales
22 data.  So that's not in here, that's
23 correct.
24    Q.   Directing you back to
25 Defendants' Exhibit 645.  The reference

Page 323

17 (Pages 320 - 323)

1 on page 703214 to the standard lead time
2 for Uretek chain is six to eight weeks.
3 Is that consistent with your knowledge
4 that the standard delivery time during
5 the relevant time period for Uretek
6 laminated zippers T4s and T5s was six to
7 eight weeks?
8    A.   Generally.  I have seen other
9 ranges in other documents.
10    Q.   Do you have any different time
11 period other than six to eight weeks set
12 forth anywhere in your report recognizing
13 you don't even have six to eight weeks
14 there?
15    A.   I don't have six to eight weeks
16 or any other time period referenced in my
17 report, specifically.
18    Q.   For a delivery time, you don't?
19    A.   As I said before, I don't have
20 that six to eight-week figure,
21 specifically, in my report.
22    Q.   I would like to show you now DX
23 56.
24       (Defendants' 56, document Bates
25    stamped YKK0044515 previously marked

Page 324

1    for identification.)
2    Q.   I am placing in front of you
3 Defendants' Trial Exhibit 56.  You have
4 seen this document before, correct?  It's
5 an internal YKK e-mail chain from
6 September 1999?
7       MR. DANIELS:  Objection.  Lack
8    of foundation.  No authentication.
9    A.   I believe I have or at least
10 part of the chain.  I don't know if I saw
11 the whole chain.
12    Q.   Let me direct your attention to
13 page 44519.  Do you see there there is an
14 e-mail from YKK's Jeff Donnelly to Bryan
15 Shibata, dated September 9th -- actually,
16 September 27, 2009, sir, during the
17 relevant time period?
18       MR. DANIELS:  Hold on a second.
19    The relevant time period objection.
20       MR. WOLKOFF:  Okay.  Let me
21    restate it, because I think I got
22    mixed up on the date.
23    Q.   Do you see on page 44519 there
24 is an e-mail from YKK's Jeff Donnelly
25 back on September 27th, 1999 to Bryan

Page 325

1 Shibata, the subject is North Face?
2    A.   I do see that.
3    Q.   Do you see in the e-mail it
4 says, "North Face contractors have
5 already received black water-resistant
6 zippers from the Taiwanese competitor"?
7    A.   I see that sentence.
8    Q.   Do you know who the Taiwanese
9 competitor is that was being referred to
10 there?
11    A.   I don't.
12    Q.   Did you do anything to try to
13 determine who the competitors were for
14 water-resistant zippers during the
15 relevant time period?
16       MR. DANIELS:  Objection as to
17    form.
18    A.   I think I have seen some
19 documents that lay out some potential
20 competitors.  I talked to Mr. Cockrell
21 about this as well.
22    Q.   Who, to your knowledge, were
23 the competitors for water-resistant
24 zippers during the relevant time period,
25 competitors to the T4 and T5 Uretek

Page 326

1 laminated zippers?  Can you name any?
2    A.   I recall people suggesting that
3 Aqua-Tite was one.  That Talon.  Lenzip.
4 Riri.  Coats.  I have seen people say
5 these names as competitors.  Again, I
6 don't agree that they are competitors,
7 but I have seen them mentioned in
8 documents.
9    Q.   You're not an expert in who are
10 competitors or who weren't competitors
11 during the relevant time period for the
12 T4s and T5s, correct?
13    A.   Well, I am relying on
14 Mr. Cockrell, the industry witness, in
15 part, yes, for that.  But also, I am also
16 looking at the data and seeing that YKK
17 achieved these sales despite those
18 competitors.
19    Q.   What sales?
20    A.   They achieved 500 million in
21 outerwear sales.  They achieved a billion
22 dollars in sales despite these
23 competitors.
24    Q.   Of their own laminated zippers,
25 by far that was the vast majority of the

Page 327

18 (Pages 324 - 327)

1 sales YKK was able to make, correct?
2      MR. DANIELS:  Objection as to
3  form.
4  A.   Yes.
5  Q.   How much -- strike that.
6      The amount in dollars of T4s or
7 T5s that YKK was able to make during this
8 relevant time period paled in comparison
9 to its own sales of T8s, 9s and 10s,
10 correct?
11      MR. DANIELS:  Objection as to
12  form.
13  A.   In the actual market, yes, YKK
14 was selling in the excluded markets and
15 not using Uretek, so yes their sales were
16 dramatically decreased.
17  Q.   On page 44516 of Exhibit 56, do
18 you see there is an e-mail from
19 Mr. Shibata at YKK to Mr. Sarumaru at YKK
20 on September 28th, 1999.
21      And in the fourth paragraph
22 down it says, "The North Face said that
23 the Taiwan manufacturers are offering a
24 price 60 percent cheaper ($1 or lower)
25 than the 5CNT3 price in Asia."

Page 328

1      Q.   Let me place in front of you
2 what we have marked previously as
3 Defendants' Trial Exhibit 86.
4      (Defendants' Exhibit 86,
5      document Bates stamped YKK0679784,
6      previously marked for identification.)
7      Q.   You see this is an e-mail from
8 Michael Blunt to Bryan Shibata on
9 February 2, 2001, sir --
10      MR. DANIELS:  Objection, lack of
11  authentication.
12  Q.   -- at the top?
13  A.   I do see that.
14  Q.   Do you see he forwarded to
15 Mr. Shibata an e-mail from Jeff Donnelly
16 at YKK dated February 2, 2001?
17  A.   I see that.
18  Q.   Now, I asked you before if you
19 knew who the competitor was in Taiwan
20 that North Face was referencing, and
21 actually in this e-mail it says that the
22 competitor is a company in Taiwan going
23 by the name of Perfect Footwear, correct?
24      MR. DANIELS:  Objection as to
25  form.

Page 330

1      Do you see that?
2  A.   I do.
3  Q.   Did you look at whether as
4 early as 1999, if North Face was
5 referencing a different laminating zipper
6 company in Taiwan for at least some of
7 its purchases because of a lower price?
8  A.   As I said, I think I've seen
9 this e-mail before, so I was aware of
10 that.
11  Q.   Did you talk about it in your
12 report, at all?
13  A.   No, I did not, because I
14 understand that YKK was able to achieve
15 these sales despite this competition.
16  Q.   YKK, as we've already been
17 through, was able to achieve only a
18 minimal amount of sales of T4s and T5s
19 during the time period, you set them out
20 in your figure 10, correct?
21      MR. DANIELS:  Objection as to
22  form.
23  A.   Correct, due to the competition
24 from T8s at a lower price during this
25 period, yes.

Page 329

1      Q.   It says, "I believe that this
2 competitor is a company in Taiwan that
3 goes by the name of Perfect Footwear,"
4 correct?
5  A.   I see that in the second
6 paragraph, correct.
7  Q.   You have read this e-mail
8 before, Defendants' Exhibit 86, in
9 connection with your work in this matter,
10 correct?
11  A.   I believe I have seen this
12 before.
13  Q.   And the e-mail goes on to say
14 "North Face is sourcing a T4-type product
15 from them and is paying much less than
16 our price," correct?
17  A.   Yes, that's what it says.
18  Q.   Did you do any investigation of
19 whether or not Perfect Footwear was a
20 competitor during the relevant time
21 period for water-resistant laminated
22 zippers for high-end outerwear?
23  A.   In general, yes, I talked about
24 competitors in general and I also
25 recognized that YKK achieved these sales

Page 331

19 (Pages 328 - 331)

1  despite them.
2    Q.  I am asking specifically about
3  Perfect Footwear.  Did you do any
4  investigation to determine whether or not
5  Perfect Footwear was a competitor for
6  laminated water-resistant zippers during
7  the relevant time period?
8    A.  I don't remember Perfect
9  Footwear coming up in some of the
10  reports, and things like that.
11    Q.  But you read this e-mail before
12  your supplemental report here in which
13  Perfect Footwear did come up as a
14  competitor, correct?
15    A.  Correct.
16    Q.  But you said nothing about it
17  in your report; did you?
18    A.  Because Perfect Footwear
19  existed and YKK achieved those sales
20  despite, apparently, a much lower price,
21  so YKK achieved those sales at a higher
22  price despite Perfect Footwear.
23    Q.  Did you say anything about
24  Perfect Footwear in your report?
25    A.  My report does not mention the

Page 332

1  standard.
2    Q.  Which competitors did you
3  analyze or investigate?
4    A.  I didn't limit my questions to
5  Mr. Cockrell about whether others that
6  were a standard in the industry, for
7  example, or others that were competing
8  for these sales.
9    Q.  Can you identify another
10  potentially competitive or competitor
11  laminated zipper manufacturer for
12  high-end outerwear that you investigated
13  or reviewed to determine if they were
14  competitors during the relevant time
15  period?
16    A.  I mentioned the same earlier.
17  I would have to go back and see if there
18  are any other names, but again, I didn't
19  limit my questions to Mr. Cockrell or my
20  analysis of alternatives.  And also I
21  recognized in my supplemental report that
22  these sales were made, despite infringing
23  or non-infringing competition.
24    Q.  Did you investigate the
25  presence of competitors for

Page 334

1  word Perfect Footwear.
2    Q.  Did you do any investigation to
3  try to locate any competitors in the real
4  world for not, for water-resistant
5  laminated zippers during the relevant
6  time period?
7    A.  Yes, I looked at the absence of
8  alternatives and talked with Mr. Cockrell
9  about that in my first report and I
10  mention it again in my second report.
11    Q.  I am not talking about
12  non-infringing alternatives, just to be
13  clear.
14        Did you do any investigation or
15  review of whether there were competitors
16  in the real world or not for
17  water-resistant laminated zippers during
18  the relevant time period for high-end
19  outerwear?
20        MR. DANIELS:  Objection to form.
21    A.  Yes.  Because again, I talk
22  about the success of this product and how
23  it became a standard in the industry
24  according to Mr. Cockrell, and he was not
25  aware of something else that was a

Page 333

1  water-resistant laminated zippers during
2  the relevant time period by doing
3  anything other than talking to
4  Mr. Cockrell?
5    A.  Well, looking at the sales data
6  and the success; so, yes, I did.
7    Q.  Anything else other than
8  looking at the sales data and talking to
9  Mr. Cockrell, that you did?
10    A.  Talked to Mr. Cockrell.  Looked
11  at the sales date.
12    Q.  Anything else, sir?
13    A.  Looked at the record.
14    Q.  Anything else, sir?
15    A.  The record itself, looking at
16  documents like this.
17    Q.  Anything else?
18    A.  And I should include that I
19  reviewed the opposing experts' reports,
20  as well.
21        MR. DANIELS:  I object.
22  Obviously, his report speaks for
23  itself.
24    Q.  Apart from talking to
25  Mr. Cockrell, did you actually do any

Page 335

20 (Pages 332 - 335)

1 research on your own looking at the names
2 of competitors or potential competitors
3 in the water-resistant laminated zipper
4 space during the relevant time period?
5    A.    I think I recall looking for
6 information about them and using the
7 record to kind and go and ask for them
8 about that.  Yes, I did do some searches
9 and things like that.
10    Q.    What did you do?
11    A.    I tried to search for some of
12 the competitors and just sort of
13 understand if they had any market share
14 or had any size.
15    Q.    And what did you determine?
16    A.    I determined that this, that
17 the water-resistant YKK zipper was a
18 standard, was a success in the industry.
19    Q.    Did you determine what YKK's
20 market share was during the relevant time
21 period for its laminated zippers?
22    A.    I did not get market data that
23 sufficient to kind of analyze that.  I
24 saw references within the record to what
25 YKK thought it was.

Page 336

1    Q.    Did you actually make any
2 attempt to determine what YKK's market
3 share was for water-resistant laminated
4 zippers for high-end outerwear during the
5 period at issue?
6    A.    I did not locate data that
7 would allow me to do that, other than the
8 record that showed what YKK thought it
9 was.
10    Q.    So you didn't?
11    A.    I did not find out another
12 market share.  I used, I looked at YKK's
13 view of their market share.
14    Q.    Do you have any evidence that
15 any of these YKK customers would have
16 purchased T4s and T5s, if YKK had refused
17 to sell them T8s, 9s and 10s for their
18 high-end outerwear during the relevant
19 time period?
20    A.    Yes.
21    Q.    What evidence do you have?
22    A.    The fact that they were buying
23 T4s and 5s.
24    Q.    In what amounts?
25    A.    In the actual world in smaller

Page 337

1 amounts.  But they had been buying them
2 in more significant amounts prior to that
3 period.
4    Q.    Did you have any data to
5 compare the amounts of T4s and T5s that
6 any of the YKK customers were purchasing
7 during the relevant time period as
8 compared to any purchases that they were
9 making of third-party water-resistant
10 laminated zipper manufacturers?
11    A.    No granular data.  But again, I
12 mentioned YKK would sometimes do one-off
13 comparisons of this, where they would
14 look at jackets and see how many were
15 AquaGuard or not.
16    Q.    So you did not have any data to
17 compare the amounts of T4s and T5s that
18 any of the YKK customers were purchasing
19 during the relevant time period as
20 compared to any purchases they were
21 making of third-party water-resistant
22 laminated zippers from other
23 manufacturers?
24    A.    Other than those one-off
25 instances where YKK was comparing how

Page 338

1 many AquaGuards there were, AquaGuards
2 meaning 8s, 9s, 10s, 4s and 5s.
3    Q.    What documents were those, sir?
4    A.    In some of the outdoor reports
5 they would sometimes count which
6 providers were providing using which
7 zippers and they would look at their
8 shares.
9    Q.    Can you be anymore specific
10 than that?
11    A.    Their outdoor research reports
12 that they would do each year.  They would
13 tend to show, and sometimes they would
14 count the zippers and express a market
15 share, a sizable market share.
16    Q.    But you had no data during the
17 relevant time period about purchases by
18 YKK customers of T4s and T5s or for that
19 matter any -- strike that.
20        You have no data during the
21 relevant time period of YKK customers'
22 purchases of T4 or T5 versus purchases
23 they may have been making from
24 third-party manufacturers of laminated
25 water-resistant zippers, correct?

Page 339

21 (Pages 336 - 339)

1      MR. DANIELS: Objection. Asked
2  and answered.
3      A.  Not aside from what I had just
4  mentioned, the one-off. And, of course,
5  I knew the T4 and T5 side of the
6  equation. I just don't have discovery
7  from the jacket manufacturers of what
8  else they were purchasing.
9      Q.  You did have data from 13
10  so-called discovery customers of YKK,
11  correct?
12      A.  Yes.
13      Q.  Did you have data from those 13
14  discovery customers of other laminated
15  water-resistant zippers they were
16  purchasing from other manufacturers, sir?
17      MR. DANIELS: Objection as to
18  form.
19      Q.  Was that asked for?
20      A.  I don't believe that was asked
21  for. Not that I know. I understood that
22  that process was to request their use of
23  AquaGuard zippers.
24      Q.  But you didn't have data, even
25  from the 13 discovery customers, of

Page 340

1  purchases the North Face was making
2  during the relevant time period for
3  high-end outerwear from third-party
4  competitors in the marketplace?
5      A.  I'm sorry, can you read that
6  back?
7      Q.  Did you look at any data of how
8  much, if any, of its laminated zipper
9  meters the North Face was purchasing
10  during the relevant time period for its
11  high-end outerwear from third-party
12  competitors in the marketplace?
13      A.  As I think I just answered, I
14  don't have data from North Face on their
15  other zipper purchases.
16      Q.  Did you look at any data of how
17  much, if any, any of these customers were
18  making -- strike that.
19      Did you look at any data of how
20  much, if any, of its laminated zipper
21  purchases any of these other customers in
22  your figure 4 were making during the
23  relevant time period for high-end
24  outerwear from third-party competitors in
25  the marketplace?

Page 342

1  purchases they were making in the
2  marketplace of third-party competitors
3  for water-resistant zippers for high-end
4  outerwear --
5      MR. DANIELS: Objection as to
6  form.
7      Q.  -- during the relevant time
8  period?
9      A.  I don't have data directly from
10  those customers about their other
11  purchases of zippers.
12      Q.  Was it asked for, to your
13  knowledge?
14      A.  I don't know. I don't recall
15  seeing it in a subpoena.
16      Q.  Did you ask for it?
17      A.  I did not ask for it, no.
18      Q.  You list on your figure 4 on
19  page 13 of your supplemental report,
20  North Face as having purchased the most
21  high-end outerwear zippers of all the 13
22  discovery customers, correct?
23      A.  Yes.
24      Q.  Did you look at any data of how
25  much, if any, of its laminated zipper

Page 341

1      MR. DANIELS: Objection as to
2  form.
3      A.  Again, I only have AquaGuard
4  discovery from them. Not third parties.
5      Q.  The answer is no?
6      A.  The answer is no, I don't have
7  third-party data from them regarding
8  non-AquaGuard purchases.
9      Q.  But you did see documents in
10  the record reflecting some of those
11  customers indicating that they were
12  planning or deciding to switch over to
13  third-party manufacturers of laminated
14  zippers over from Uretek laminated
15  zippers and/or YKK laminated zippers,
16  correct?
17      A.  Well, I saw a lot in the
18  record. I saw YKK switching them from T4
19  to T8, and I showed the documents you
20  showed me, as well.
21      Q.  Can you answer my question,
22  please?
23      A.  I thought I did.
24      Q.  No, you didn't and you know you
25  didn't.

Page 343

22 (Pages 340 - 343)

1    MR. DANIELS:  Objection again.
2        Attorney Wolkoff, I am not going
3  to allow you to keep badgering the
4  witness like that.
5    Q.   You did see some documents in
6  the record reflecting a number of the
7  customers indicating that they were
8  planning or deciding to switch over to
9  third-party manufacturers of laminated
10 zippers for purchasing Uretek laminated
11 and/or YKK laminated zippers, correct?
12   A.   I saw instances of customers
13 talking about particular transactions.  I
14 don't know about a number of customers.
15 I have seen the examples you showed me.
16   Q.   Did you say anything about that
17 in your reports?
18   A.   Again, I think I said I didn't
19 talk about these e-mails in my reports.
20   Q.   Did you say anything about that
21 topic, that is, YKK customers planning or
22 actually switching from YKK laminated
23 and/or Uretek laminated zippers over to
24 zippers manufactured by third-party
25 laminators?

Page 344

1    MR. DANIELS:  Objection as to
2    form.  Objection, asked and answered.
3    A.   I don't recall talking about
4  these e-mails or other instances like
5  this in my report.
6    Q.   Did you talk at all in your
7  report about the -- strike that.
8        Did you specify in your reports
9  the market share of third-party
10 competitors for water-resistant zippers
11 for high-end outerwear during the
12 relevant time period?
13       MR. DANIELS:  Objection as to
14   form.
15   A.   I did not specify a third-party
16 market share like that in my report, no.
17   Q.   Do you have any evidence
18 specific to North Face that if they
19 weren't offered T8s, 9s and 10s they
20 would have purchased T4s or 5s in the
21 real world during the relevant time
22 period?
23   A.   Yes.
24   Q.   What evidence?
25   A.   The tremendous success of this

Page 345

1  billion dollar product and the lack of an
2  industry alternative and the actual sales
3  of T4 and T5 to them before YKK started
4  using T8.
5    Q.   Do you have any evidence
6  specific to Nike -- strike that.
7        Do you have any evidence
8  specific to North Face that if not
9  offered T8s, 9s and 10s the North Face,
10 in particular, would have purchased T4s
11 and T5s?
12       MR. DANIELS:  Objection.  Asked
13   and answered.
14   A.   I don't know if it's specific.
15 It's specific to these customers because
16 that's what we've analyzed and that's
17 what they demonstrated by their
18 purchases.  And they purchased a T8 that
19 is comparable to a T4.  There is no
20 alternative.  It's a success.  There is
21 extensive demand for these zippers.  They
22 were able to sell them for more than a
23 normal zipper and even more than a less
24 expensive water-resistant zipper.
25   Q.   You say the T8s, 9s and 10s

Page 346

1  were comparable to the T4s and T5s.  The
2  T8s, 9s and 10s had a lower price than
3  the T4s and 5s during the relevant time
4  period, correct?
5    A.   In the actual world, yes, they
6  sold the T8s, 9s and 10s for less than
7  the T4s and 5s.
8    Q.   The T8s, 9s and 10s had a
9  shorter delivery time to the Asian
10 outerwear manufacturers than the T4s or
11 5s, correct?
12       MR. DANIELS:  Objection to form.
13   A.   I don't have data on that.  I
14 have seen reference to that.  And that is
15 in the actual world of what was happening
16 in production.
17   Q.   The answer is yes in the actual
18 world?
19   A.   In the actual world all I have
20 is some documents that talk about that.
21   Q.   So the answer is yes?
22   A.   Those documents say that the
23 lead time is longer than a T8 lead time,
24 that's what those documents say.
25   Q.   The lead time for a T4 is

Page 347

23 (Pages 344 - 347)

1 longer than the lead time for a T8,
2 correct?
3    A.   In the actual world given the
4 production levels that were occurring,
5 that's what it said.
6    Q.   Did you look at any documents
7 comparing the quality of the T4s and T5s
8 to the quality of the T8s, 9s and 10s?
9    A.   I looked at sales records that
10 say they sold 40 million of them over the
11 years. So they were comparable to my
12 understanding.
13    Q.   Did you look at any records
14 comparing the quality of the T4s and T5s
15 with the quality of the T8s, 9s and 10s
16 during the relevant time period?
17    A.   I just looked at it from a
18 sales data point of view. I didn't look
19 at a technical comparison.
20    Q.   So the answer is no?
21        MR. DANIELS:  Objection as to
22    form.
23    A.   I looked at it from a sales
24 point of view. I did not look at it from
25 a technical comparison. I also assume

1 they are both infringing, for example, so
2 they are comparable.
3    Q.   Did you look at any customer
4 statements comparing the quality of the
5 T4 and T5s with the quality of the T8s,
6 9s and 10s during the relevant time
7 period?
8    A.   I believe the record had some
9 communications, customers going back and
10 forth, talking about particular instances
11 or orders that talk about that.
12    Q.   And what did they talk about,
13 sir?
14    A.   Just talking about deliveries
15 and orders and things like that,
16 comparing them.
17    Q.   Did you -- I am specifically
18 asking you, did you review any documents
19 in which customers compared the quality
20 of the T8s, 9s and 10s with the quality
21 of the T4s and T5s?
22    A.   I don't recall if quality was
23 in those e-mails. I recall documents
24 about transactions.
25    Q.   You don't talk about any

1 comparison of quality in your reports,
2 that is quality between the T4s, T5s as
3 compared to T8s, 9s and 10s or as
4 compared to competitors' water-resistant
5 laminated zippers during the relevant
6 time period; do you?
7    A.   I don't talk or analyze quality
8 in my report. I recognize they are the
9 same and can be exchanged.
10    Q.   You're saying that the T4s and
11 T5s during the relevant time period were
12 the same in quality to the T8s, 9s and
13 10s and competitive laminated zippers for
14 high-end outerwear, sir?
15        MR. DANIELS:  Objection as to
16    form.
17    A.   That is my working
18 understanding, that they were being used
19 for one purpose and they switched to
20 another. But they were comparable to the
21 customers.
22    Q.   What did you do, if anything,
23 to look at the quality of the zippers as
24 compared to each other? Did you actually
25 look at any statements or look at any

1 zippers? In fact, did you ever look at
2 -- let me ask you this.
3        Did you ever look at any T8s,
4 9s and 10s as they were manufactured
5 during the relevant time period and
6 compare them with T4s and T5s, the actual
7 zippers?
8    A.   Not as they were manufactured.
9 I think I've seen samples during this
10 case. I have seen the T4 and T5
11 manufactured. But I haven't seen -- I
12 didn't travel to Japan and see the T8s.
13    Q.   So you never looked at the T8s,
14 9s and 10s?
15    A.   I have seen samples, but I did
16 not see that manufacturing process,
17 correct.
18    Q.   Did you ever compare the
19 quality of the T8s, 9s and 10s with T4s
20 and T5s as they existed and were
21 manufactured during the relevant time
22 period?
23    A.   Not from a technical point of
24 view. I am not a technical witness. I
25 looked at it from a sales point of view

24 (Pages 348 - 351)

1 and an economic point of view that they
2 were selling 40 million of these over the
3 time period.
4    Q.   40 million of what?
5    A.   40 million of T4s and T5s over
6 the history of the relationship.
7    Q.   But the business began to shift
8 to Asia in 2006; didn't it?
9    A.   That's been alleged and talked
10 about, yes.
11    Q.   And the number of T4s and T5s
12 began to dwindle after the business
13 shifted to Asia, the garment
14 manufacturing business for high-end
15 outerwear, correct?
16        MR. DANIELS:  Objection as to
17    form.
18    A.   Well, it does, in the actual
19 world it does dwindle.  YKK sells into
20 the excluded markets and yes T4s dwindle.
21    Q.   T4s and T5s took a lot longer
22 to get to Asian manufacturers than when
23 those manufacturers were in North
24 America; isn't that correct?
25        MR. DANIELS:  Objection as to

Page 352

1    form.
2    A.   Again, I have seen documents
3 that say there is longer lead times.  So
4 I don't have any granular data about lead
5 times.
6    Q.   T4s and T5s cost a lot more
7 than water-resistant laminated zippers
8 cost for Asian manufacturers when buying
9 them from Asian laminated producers,
10 correct?
11        MR. DANIELS:  Objection as to
12    form.
13    A.   YKK was charging meaningfully
14 more for the T4 versus the T8, if that
15 answers your question.  They were
16 charging more for that, yes.
17    Q.   After the business of garment
18 manufacturing shifted to Asia, garment
19 manufacturers in Asia were able to
20 purchase laminated water-resistant
21 zippers for much cheaper prices than the
22 T4s and T5s manufactured in Connecticut,
23 correct?
24        MR. DANIELS:  Objection as to
25    form.

Page 353

1    A.   I don't know if it was after or
2 before, but YKK was charging a lower
3 price for T8.
4    Q.   I am not asking about YKK, in
5 particular.
6    A.   Okay.
7    Q.   Okay?
8    A.   Thank you.
9    Q.   After the business shifted, the
10 garment manufacturing business shifted to
11 Asia, Asian garment manufacturers were
12 able to purchase water-resistant
13 laminated zippers for a much lower price
14 from Asia laminators than with respect to
15 Uretek laminated zippers in Connecticut,
16 correct?
17        MR. DANIELS:  Objection as to
18    form.
19    A.   I've seen documents that
20 suggest there is water-resistant zippers
21 of not comparable quality, for example,
22 or infringing, that are much less.  And,
23 of course, YKK is an example of a
24 lamination in Asia, so that was less as
25 well.  They charged less for that.  I

Page 354

1 recognize that.
2    Q.   After the business of garment
3 manufacturing shifted to Asia, garment
4 manufacturers in Asia could purchase
5 laminated zippers for much lower prices
6 and with much lower delivery times than
7 with respect to T4s and T5s manufactured
8 and laminated in North America, correct?
9        MR. DANIELS:  Objection as to
10    form.
11    A.   I don't know.  You showed me
12 documents that suggest the price was
13 lower, even before, even in 2002 or '99.
14    Q.   So therefore, it's true
15 afterwards.  What I am asking you, sir,
16 is after the business of garment
17 manufacturing shifted to Asia, garment
18 manufacturers in Asia could purchase
19 water-resistant laminated zippers for
20 much lower prices and with much shorter
21 delivery times than with respect to
22 zippers laminated and manufactured in
23 North America, T4s and T5s, correct?
24        MR. DANIELS:  Objection as to
25    form.

Page 355

25 (Pages 352 - 355)

1    A.    What I am struggling with is
2 when you say after, it's as if that is
3 why it was after and the price was lower
4 before and the lead time was what it was
5 before, as well.  So I don't understand
6 the shift to Asia part of your question.
7    Q.    So garment manufacturers in
8 Asia could purchase water-resistant
9 laminated zippers for their high-end
10 outerwear from Asian laminators for much
11 lower prices and with much less delivery
12 times than with respect to T4s and T5s
13 laminated and manufactured in North
14 America, correct?
15        MR. DANIELS:  Objection as to
16    form.
17    A.    Again, there is other zippers
18 out there.  As they are not comparable to
19 the success of the T4 and T5, but I know
20 that T8 was less, for example.  I know
21 you showed me examples of others.
22    Q.    I am not asking about T8s.  Do
23 you want to answer my question, please?
24 Or I can ask it again.
25    A.    I would appreciate that.

Page 356

1 to the Uretek laminated T4s and T5s,
2 correct?
3        MR. DANIELS:  Objection as to
4    form.  He did answer your question.
5    A.    Maybe I don't understand --
6 when you say qualitative analysis, are we
7 still talking about the technical
8 comparability of them?
9    Q.    The quality of the zippers.  Do
10 you understand the word "quality"?
11    A.    Well --
12    Q.    Looking at the zippers, talking
13 to customers, talking to experts in the
14 field about the quality of those zippers,
15 did you make any determination of the or
16 compare the quality of Asian manufactured
17 competitive laminated water-resistant
18 zippers with the T4s and T5s?
19        MR. DANIELS:  Objection.  Asked
20    and answered.
21    A.    I did not as a technical
22 witness.  I did as a damage witness
23 looking at the marketplace and looking
24 at, talking with Mr. Cockrell.
25    Q.    But you looked at no data of

Page 358

1    Q.    Garment manufacturers in Asia
2 could purchase water-resistant laminated
3 zippers for their high-end outerwear from
4 Asian laminators for much lower prices
5 and much less delivery times, much
6 shorter delivery times than with respect
7 to T4s and T5s that Uretek laminated in
8 Connecticut?
9        MR. DANIELS:  Objection to form.
10    A.    Putting aside comparability.  I
11 recognize that there was other
12 water-resistant zippers that were lower
13 priced in the marketplace.
14    Q.    And you didn't make any
15 analysis from a qualitative standpoint of
16 the quality of these water-resistant
17 laminated zippers by Asian laminators as
18 compared to the T4s and T5s, correct?
19    A.    Well, the qualitative analysis
20 that I did do was recognizing that the
21 T8s were sold in that marketplace.
22    Q.    Can you answer my question,
23 sir?  You didn't make any qualitative
24 analysis of the water-resistant laminated
25 zippers by Asian laminators as compared

Page 357

1 sales by Asian laminators during the
2 relevant time period; did you, sir?
3        MR. DANIELS:  Objection as to
4    form.
5    A.    I didn't need to, because they
6 existed and T8s were sold in that
7 marketplace with them.
8    Q.    I didn't ask you whether or not
9 you needed to.  You didn't look at any
10 sales data by any Asian manufacturer of
11 laminated water-resistant zippers during
12 the relevant time period; did you, sir?
13        MR. DANIELS:  Objection to form.
14    Obviously, he looked at the YKK data.
15    A.    Putting aside YKK.  I think
16 I've already testified that I did not get
17 third-party data from them, correct.
18    Q.    I would like to place in front
19 of you what's been previously marked as
20 Defendants' Exhibit 335.
21        (Defendants' 335, document Bates
22    stamped YKK0698140, previously marked
23    for identification.)
24        MR. DANIELS:  Can we take a
25    break after this exhibit?

Page 359

26 (Pages 356 - 359)

1      MR. WOLKOFF:  Yes.
2      MR. DANIELS:  Thank you.
3    Q.   Nike is another customer who
4 you included in your figure 4 on page 13
5 with over a million meters of purported
6 high-end outerwear zippers, correct?
7    A.   Yes.
8    Q.   And having placed in front of
9 you DX 335, you're familiar with this
10 internal YKK report on September 4th,
11 2007 containing the minutes of its 14th
12 global marketing meeting, correct?
13      MR. DANIELS:  Objection. Lack
14 of authentication.
15    A.   I have seen things like this GM
16 G meeting. I don't know if I saw this
17 one. It was attached to Mr. Reed's depo.
18 Maybe this is the one. I believe it is.
19    Q.   Let me direct your attention to
20 page 698142, do you see there is a
21 paragraph numbered 3, entitled
22 "Polyurethane Film Coating Products"?
23    A.   Yes.
24    Q.   You see in the second bullet it
25 talks about, "Main target customers are

Page 360

1 the ones who are not using YKK but cheap
2 Chinese water-repellent zippers in the
3 Georgia accounts who switched or are
4 going to switch to competitors due to
5 cost reasons, for example, Nike and
6 Lands' End," correct?
7    A.   I see that.
8    Q.   And you had read that in
9 connection with doing your work in this
10 matter in preparing your supplemental
11 report, Exhibit 12, correct?
12    A.   Yes, I recall this.
13    Q.   You didn't talk about Niki or
14 Lands' End indicating that they might or
15 were switching to competitor waterproof
16 or water-resistant zipper laminators due
17 to cost reasons; did you, sir?
18    A.   I don't recall talking about
19 this e-mail in my report, correct.
20    Q.   You didn't talk about them
21 either; did you?
22    A.   I did not talk about Nike and
23 Lands' End other than the sales data I
24 analyzed which includes Nike purchasing
25 T8s at a certain price despite this

Page 361

1 competition. But other than that, I did
2 not talk about this.
3    Q.   But you didn't talk about
4 whether or not Nike was also purchasing
5 water-resistant laminated zippers from
6 competitors; did you? You said not a
7 word about it.
8    A.   I did not specifically talk
9 about all these other things going on. I
10 focused on the data available here which
11 shows that Nike and others paid more for
12 T8s in this marketplace despite that
13 competition.
14    Q.   You didn't talk at all in your
15 reports about any of these customers in
16 terms of whether or what they were buying
17 from competitors with regard to
18 water-resistant zippers for their
19 high-end outerwear; did you?
20      MR. DANIELS:  Objection as to
21 form. Objection, asked and answered.
22    A.   I don't talk about their other
23 activities. I talk about the sales data
24 available here. And the market that's
25 been demonstrated.

Page 362

1    Q.   As far as you know, the 13
2 customers listed in your figure 4
3 actually purchased more meters of
4 water-resistant laminated zippers for
5 their high-end outerwear than you
6 reported in your supplemental report, you
7 just had no data on that, correct?
8      MR. DANIELS:  Objection as to
9 form.
10    A.   I don't know what else they
11 purchased. That data is not available to
12 me, correct, one way or the other.
13    Q.   And you see on page 698146 of
14 Defendants' Exhibit 335 there is a
15 Section 8 entitled "Market Analysis."
16    A.   Yes, I see that.
17    Q.   And you see it says in the
18 second bullet "IDEAL" in all capital
19 letters "Presents real samples in three
20 weeks, quotes pricing in one day"?
21    A.   I do.
22    Q.   Do you know if that's true, at
23 the time that there was a competitor by
24 the name of IDEAL, during the relevant
25 time period, who presented samples to

Page 363

27 (Pages 360 - 363)

Page 364

1 customers in three weeks but quoted
2 pricing in a day?
3    A.   Not the Outlook in this
4 document, but I was aware that IDEAL was
5 selling zippers.
6    Q.   IDEAL was selling during the
7 relevant time period water-resistant
8 laminated zippers to high-end outerwear
9 customers, correct?  You were aware of
10 that?
11    A.   I was aware that IDEAL was
12 selling, yes, to them.
13    Q.   And you have no knowledge, no
14 basis for saying that IDEAL zippers were
15 not acceptable, noninfringing
16 alternatives?
17    A.   Well, maybe I don't understand
18 your question.  IDEAL was there,
19 infringing or not.  YKK achieved the
20 sales.
21    Q.   You do understand my question.
22 You keep avoiding the questions by --
23       MR. DANIELS:  Again, I am
24    getting very tired of it Attorney
25    Wolkoff.  You're accusing the witness

Page 365

1    of intentionally avoiding your
2    question.
3       MR. WOLKOFF:  I think the record
4    reflects that he is.
5       MR. DANIELS:  You're
6    misunderstanding the record or you're
7    not understanding your own questions.
8    I am running out of patience with the
9    attacks on the witness.
10       MR. WOLKOFF:  I am not as smart
11    as you are.  I think anyone reviewing
12    the record can see what this
13    professional witness is doing.
14    Q.   Do you have any basis for
15 saying that the IDEAL zippers, laminated
16 zippers, during the relevant time period,
17 were not acceptable non-infringing
18 alternatives?
19    A.   Again, I believe I do, because
20 I accepted what YKK was able to do with
21 them in the market.
22    Q.   Okay.  I am talking about
23 non-infringing alternatives.  Do you have
24 any basis for saying that IDEAL made
25 zippers that infringed during the

Page 366

1 relevant time period, sir, infringed the
2 Uretek '214 patent?
3    A.   I am not a technical witness.
4 I don't have a basis to say whether or
5 not that infringed or not.
6       MR. WOLKOFF:  Let's take the
7    break you wanted, Mr. Daniels.
8       THE VIDEOGRAPHER:  We are now
9    going off the record.  The time is
10    11:22 a.m.  This is the end of the
11    media labeled number 1.
12       [Off the record.]
13       THE VIDEOGRAPHER:  We are back
14    on the record.  The time is
15    a.m., and this is the beginning of
16    media labeled number 2.
17 BY MR. WOLKOFF:
18    Q.   Mr. Donohue, are you aware of
19 instances in which Uretek turned down
20 business, turned down sales of its T4s or
21 T5s because it refused to lower its
22 price?
23    A.   In general, yes, I am aware of
24 in the actual world price negotiations
25 like that.

Page 367

1    Q.   I would like to place in front
2 of you what we had marked as a Trial
3 Exhibit 353, Defendants' Exhibit 353.
4       (Defendants' Exhibit 353,
5    document Bates stamped YKK0016715,
6    previously marked for identification.)
7    Q.   You have seen this e-mail
8 before, correct?
9       MR. DANIELS:  Objection.  Lack
10    of authentication.
11    A.   Yes, I believe I have seen this
12 or something very much like it.
13    Q.   Looking at the bottom of page
14 16716, following onto 16717, do you see
15 that Mr. Shibata of YKK brought to Stuart
16 Press's attention an inquiry from Russia
17 to purchase up to 2 million meters of
18 Uretek laminated T4s, this is back on
19 January 28, 2008?
20    A.   I do see that.
21    Q.   And it was not only up to 2
22 million meters for that year, it was for
23 a yearly usage that is going forward each
24 year, correct, according to the e-mail?
25    A.   It says it is a yearly usage.

28 (Pages 364 - 367)

1 I see that.
2    Q.   And YKK asked Stuart Press of
3 Uretek if he would reduce his price so
4 that they could get this order, correct?
5    A.   I see him asking that, yes.
6    Q.   And on page 16715 Mr. Press
7 responded by saying, "Not only wasn't
8 Uretek going to reduce the price of its
9 T4 laminated zippers but they were
10 actually faced with increasing its prices
11 during the year," correct?
12    A.   Yes.
13    Q.   And so he declined to offer any
14 discount in order to get the 2 million,
15 up to 2 million meter order for T4s,
16 correct?
17    A.   Yes, in this e-mail Mr. Shibata
18 is reporting that he did not offer any
19 discount on the inquiry.  That's what
20 Mr. Shibata is saying.
21    Q.   And is Mr. Shibata said to
22 Mr. Press, "It's unfortunate you can't
23 offer any discount on this 2 million
24 meter inquiry" right?
25    A.   That's what he said.
Page 368

1    Q.   And Mr. Press was true to his
2 word.  Uretek, in fact, increased its
3 prices on the T4s and T5s beginning in
4 2008, correct?
5    A.   I would have to go back, but I
6 do recall some price increases during
7 this, the actual period where volumes
8 were not where they wanted them to be.
9    Q.   They just turned down 2 million
10 meters a year, and yet you sit there and
11 say that Uretek volumes was not where
12 Uretek wanted them to be; is that your
13 testimony, sir?
14    A.   That's my understanding from
15 talking to Mr. Press, that the volumes we
16 are talking about, in my analysis, were
17 very different than this, but yes.
18    Q.   Uretek turned down 2 million
19 meters of T4s a year because it wouldn't
20 reduce its price, correct?
21    A.   I only know what this e-mail
22 says, but again, I am not talking about 2
23 million a year, I am talking about --
24    Q.   I am asking, sir, whether
25 Uretek turned down an order for 2 million
Page 369

1 meters a year for T4s because it wouldn't
2 reduce its prices?
3        MR. DANIELS:  Objection as to
4 form.
5    A.   All I have is this e-mail.
6 That's what this e-mail is suggesting.
7    Q.   Well, you talked to Mr. Press
8 while he was still alive, right?
9    A.   I did.
10    Q.   Did you ask him about this?
11    A.   Not specifically this.  I asked
12 him about the impact of higher volumes
13 and price decreases.
14    Q.   The fact that T8s, 9s and 10s
15 could be sold by YKK to Asian garment
16 manufacturers for high-end outerwear
17 doesn't mean that YKK could sell T4s and
18 T5s to those customers; did it, sir or
19 does it?
20    A.   Well, I think it demonstrates
21 that there is a market demand for that
22 type of zipper.  So it does demonstrate
23 that there is a market demand for that
24 zipper.
25    Q.   But the fact that YKK could
Page 370

1 sell its laminated T8s, 9s and 10s to
2 customers, doesn't mean that it could
3 sell T4s and T5s to its customers,
4 particularly given higher prices and
5 longer delivery times for Asian garment
6 manufacturers, correct, for the T4s and
7 T5s?
8        MR. DANIELS:  Objection to form.
9    A.   Well, I think I've talked about
10 pricing.  The pricing in the actual
11 world, yes, they were higher.  But at the
12 same or a comparable price for a
13 comparable product that was not available
14 elsewhere, yes, that market demand does
15 demonstrate that they could achieve those
16 sales.
17    Q.   So your testimony is the fact
18 that YKK could sell, could sell YKK
19 laminated zippers to customers meant that
20 YKK could sell Uretek laminated T4s and
21 T5s during the relevant time period to
22 those customers despite the higher prices
23 and longer delivery times for those T4s
24 and T5s; that's your testimony?
25        MR. DANIELS:  Objection as to
Page 371

29 (Pages 368 - 371)

1    form.
2    A.   Well, again, despite -- it's
3 not despite. My testimony recognizes
4 that price would be a factor, and
5 recognizes that they would sell those.
6 And in the actual world the T4 was much
7 higher. But the market demand was there.
8 There was a comparable zipper and there
9 was no alternatives.
10    Q.   Do you have -- strike that.
11        Do you cite to any specific
12 customer in your reports where the
13 customer said I am willing to pay more
14 and wait longer for T4s and T5s than to
15 purchase T8s, 9s and 10s or zippers
16 manufactured by some other third-party
17 water-resistant laminator?
18        MR. DANIELS: Objection as to
19    form.
20    A.   I don't believe I have that
21 fact set in my report other than the T4
22 and T5 that did occur in the actual
23 world. There were customers that still
24 purchased them.
25    Q.   You don't identify if those

Page 372

1 customers were Asian customers in your
2 reports, do you, that purchased T4s and
3 T5s in the relevant time period?
4    A.   I do identify that. They were
5 sold by Asian-selling companies.
6    Q.   You don't identify whether the
7 T4s and T5s that were purchased during
8 the relevant time period were
9 transactions that took place between YKK
10 and Asian garment manufacturers in Asia;
11 do you, sir?
12    A.   They were -- the affiliates
13 that sold them were Asian affiliates.
14    Q.   I am not talking about
15 affiliates. You don't identify whether
16 the sales of T4s and T5s during the
17 relevant time period were made by YKK to
18 Asian manufacturers in Asia; do you, sir?
19        MR. DANIELS: Objection. Asked
20    and answered.
21    A.   I know from the sales data that
22 they were made, the sales were made by
23 YKK Asian affiliates. So I assume they
24 are selling to Asia. You're right, they
25 could be selling to other people.

Page 373

1    Q.   So the point is that the T4s
2 and T5s that were sold during the
3 relevant time period were sold by YKK to
4 manufacturers of garments that
5 transactions occurred in North America,
6 correct?
7    A.   Some of them did. But some of
8 them also occurred in Asia and they were
9 to the high-end outerwear customers.
10    Q.   What percentage occurred in
11 Asia, sir?
12    A.   Due to YKK's infringement into
13 the excluded markets, a very low amount,
14 because they were also selling T8s.
15    Q.   The sale of T4s and T5s in Asia
16 to Asian garment manufacturers during the
17 relevant time period were very low,
18 correct?
19    A.   They were very low in the
20 actual world due to the infringement,
21 yes. But they were occurring by the same
22 customers.
23    Q.   By far the majority of the
24 sales of T4s and T5s during the relevant
25 time period were made to customers in

Page 374

1 North America, correct?
2    A.   In the actual world I think
3 that's fair. Most of them were probably
4 made in North America, again, because the
5 Asian companies were limited. The T8 was
6 lower priced.
7    Q.   I would like to place in front
8 of you what's been marked as Defendants'
9 Exhibit 364.
10        (Defendants' Exhibit 364,
11    document Bates stamped YKK0258349,
12    previously marked for identification.)
13        MR. DANIELS: I am sorry, did
14    you say plaintiffs or defendants?
15        MR. WOLKOFF: Defendants'
16    Exhibit 364.
17        MR. DANIELS: I am going to
18    object due to lack of authentication.
19    Q.   You have seen DX 364 before in
20 connection with your work in this matter,
21 correct?
22    A.   I have seen this before, yes.
23    Q.   And you see beginning on page
24 258350 this is an e-mail in which Stuart
25 Press notified YKK in April of 2008 that

Page 375

30 (Pages 372 - 375)

1 YKK was increasing its prices on the T4
2 and T5 by 6 percent, correct?
3    A.   I see that there, yes.
4    Q.   And on page 258349 YKK said to
5 Mr. Press, "We are very surprised to hear
6 6 percent price increase from you.
7 Unfortunately, it is impossible for us to
8 accept a price increase now due to market
9 and competitive situation," correct?
10    A.   I see what he wrote there, yes.
11    Q.   And Mr. Press wrote back, "Too
12 bad.  We're going to increase our prices
13 anyway on the T4s and T5s," correct?
14        MR. DANIELS:  Objection.  That
15    appears nowhere in the document.
16    Misstates the record.
17    Q.   Mr. Press, you see said in
18 response, "I am happy to discuss this
19 live, but at this juncture, we have to
20 implement pricing which reflects the
21 reality of what we are dealing with on
22 the cost side"?
23        MR. DANIELS:  Objection.
24    Doesn't state the entirety of the
25    e-mail and takes a sentence out of

Page 376

1 context.
2    A.   I see what he responded.  Yes,
3 I do see that.
4    Q.   Let me place in front of you
5 what we have marked as DX 533.
6        (Defendants' Exhibit 533,
7    document Bates stamped YKK0601288,
8    previously marked for identification.)
9    Q.   This is another e-mail from
10 Uretek to YKK, this time during the
11 relevant time period, February 15th,
12 2011, about a price increase on the T4s
13 and T5s, correct?
14        MR. DANIELS:  Objection.  Lack
15    of authentication.
16    A.   I see that here, the e-mail on
17 February 15th on 1288, is that what
18 you're referring or are you on the back
19 page?
20    Q.   No, 601288.
21    A.   Okay.
22    Q.   You see that Uretek notified
23 YKK that it's new pricing will take
24 effect on all new orders, correct?
25    A.   I see that.  Again, the actual

Page 377

1 world, I understand what they were doing.
2    Q.   And YKK wrote in their e-mail
3 above, "Price increases from Uretek all
4 are big.  Some of them are huge," right,
5 sir?
6    A.   Yes.
7    Q.   You were aware of this when you
8 did your report, correct?
9    A.   I was.
10    Q.   Did you mention any price
11 increases by YKK on the T8s, 9s and 10s
12 during the time period at issue, the
13 relevant time period, as opposed to price
14 increases on Uretek on its laminated
15 zippers?
16    A.   I looked at the T8s, 9s and 10s
17 prices over the time period.  So whatever
18 the price changes were, I looked at them.
19 They may have went up, they may have went
20 down, depending on the zipper.
21    Q.   Do you recollect any
22 announcement by YKK that you refer to in
23 your reports that it was raising its
24 prices to the T8s, 9s and 10s?
25    A.   I didn't look at one-off

Page 378

1 e-mails to do that.  I looked at the
2 sales data.  The sales data reflect the
3 actual pricing for the 500 million
4 dollars of sales.
5    Q.   And do you recall what it
6 reflects?
7    A.   It reflects a, generally the
8 prices went up over time during the time.
9 But it was reflected by year in my
10 report.  It goes up and down depending on
11 the zipper.
12    Q.   Whose prices went up more, do
13 you say in your report, during the
14 relevant time period, YKK's for its T8s,
15 9s and 10s or Uretek's prices for it's
16 T4s and T5s; do you know?
17    A.   I would have to look at the
18 data, but I do recall and know that in
19 the actual world, the T4 and T5 prices
20 were higher, were generally higher than
21 the T8s, 9s and 10s.
22    Q.   In fact during the relevant
23 time period, Uretek's Stuart Press
24 recognizes that the Uretek laminated T4s
25 and T5s were no longer competitive in

Page 379

1 terms of delivery times and also,
2 perhaps, in price, correct?
3    A.   I can't speak for Mr. Press.  I
4 recall seeing one-off e-mails talking
5 about situations.  But he did not suggest
6 that to me over time.
7    Q.    Let me show you DX 509, please.
8         (Defendants' Exhibit 509,
9    document Bates stamped YKK0004623,
10    previously marked for identification.)
11        MR. DANIELS:  Objection.  Lack
12    of authentication.
13    Q.    You see that DX 509 on page
14 4623 is an e-mail from Mr. Blunt to
15 others at YKK on June 2, 2010, so during
16 the relevant time period, reporting on
17 his meeting with Stuart Press?
18    A.   I see the e-mail.
19    Q.    Do you see in the third
20 paragraph, that paragraph begins with the
21 words "High-end issue" underscored?
22    A.   I do.
23    Q.    Do you see the e-mail goes on
24 to say, "From your discussion he" --
25 referring to Stuart Press -- "recognizes

Page 380

1 e-mail in my report.
2    Q.    You knew about it, you had read
3 it, correct?
4    A.   I had read this e-mail.
5    Q.    You would agree, sir, that
6 Arc'teryx was a very important and large
7 customer for both YKK and Uretek?
8    A.   Yes.
9    Q.    Can you tell me what your
10 knowledge was of Arc'teryx' willingness
11 or unwillingness to purchase the Uretek
12 laminated T4s and T5s during the relevant
13 time period?
14        MR. DANIELS:  Objection to form.
15    A.   I haven't talked to Arc'teryx.
16 I just have their sales data showing that
17 they, I believe, did purchase some during
18 this time period and they were a large
19 purchaser of T4 and 5 before the relevant
20 time period.
21    Q.    Do you know anything about
22 Arc'teryx' willingness or unwillingness
23 to purchase Uretek laminated T4s or T5s,
24 during the relevant time period from
25 February 2009 going up through September

Page 382

1 this business has shifted to Asia and
2 Asian-produced product is not competitive
3 in lead time and perhaps price."
4         Do you see that?
5    A.   I see the quote from Mr. Blunt
6 reporting what he says Mr. Press says,
7 yes.
8    Q.    Did you ask Mr. Press
9 specifically about this e-mail when you
10 talked with him?
11    A.   Again, I don't recall if I
12 talked to him about this e-mail.  I
13 talked about this concept about the
14 ability to make the sales.
15    Q.    Did you talk with Mr. Press
16 about this e-mail when you spoke to him,
17 whether or not it was accurate?
18    A.   I did not directly talk to him
19 about this e-mail, but I talked to him
20 about these issues such as price and lead
21 time.
22    Q.    You didn't say anything about
23 this e-mail in your report; did you?
24    A.   I don't know.  I would need to
25 look back.  I don't recall citing this

Page 381

1 2019?
2        MR. DANIELS:  Objection as to
3    form.
4    A.   I only know that they did
5 purchase some and that, therefore -- in
6 the actual world, but they were offered
7 both, the T4 and T5s at a much higher
8 price.
9    Q.    And so they bought T8s, 9s and
10 10s, right?
11    A.   They did.  YKK offered the T8s,
12 9s and 10s at a much lower price and so
13 Arc'teryx bought them into the excluded
14 markets.
15    Q.    What do you know about
16 Arc'teryx shifting its business from
17 Canada to Asia, its manufacturing garment
18 business?
19    A.   I understood that they, among
20 others, were shifting manufacturing to
21 Asia throughout this relationship period.
22    Q.    Did you understand that
23 Arc'teryx shifted most of its
24 manufacturing of high-end outerwear to
25 Asia from 2009 on, that is during the

Page 383

32 (Pages 380 - 383)

1 relevant time period?
2    A.   I knew that it was shifting.  I
3 don't have any specifics about that,
4 other than where they were purchasing
5 AquaGuard.
6    Q.   I would like to show the
7 witness Defendants' Exhibit 460.
8        (Defendants' 460, document Bates
9    stamped YKK0196058, previously marked
10    for identification.)
11    Q.   You reviewed this in connection
12 with your work in this matter, correct?
13        MR. DANIELS:  Objection.  Lack
14    of authentication.
15        MR. WOLKOFF:  You keep saying
16    that, but the witness said that he
17    considered these e-mails in connection
18    with his work.  Therefore, I am
19    allowed to show them to him.
20        MR. DANIELS:  I am not
21    instructing him not to answer the
22    question.  I am just preserving
23    objections for the record.  YKK seems
24    to have an issue with authentication
25    of its own documents in this trial.

Page 384

1 do you?
2    A.   No, I don't recall citing this
3 document.
4    Q.   You see this is an e-mail from
5 Kenji Miyamoto at YKK.  And it's dated
6 during the relevant time period June 4th,
7 2009, and the subject is Uretek.
8    A.   Yes.
9    Q.   You know who Mr. Miyamoto is or
10 was during the relevant time period?
11    A.   No, I just assume from the
12 e-mail that he's at the selling affiliate
13 in Canada.
14    Q.   You don't know anymore than
15 that about him?
16    A.   I do not.
17    Q.   Mr. Miyamoto wrote in his
18 e-mail, "This is the comments YKK Canada
19 has received from Arc'teryx on Uretek's
20 T4 chains."
21        And then he lists two issues,
22 do you see that?
23    A.   I do.
24    Q.   And the first one is a pricing
25 issue and the second is a quality issue,

Page 386

1        MR. WOLKOFF:  We do and it's not
2    incorrectly.
3        MR. DANIELS:  We just want to
4    make sure we are preserving the same
5    objections that YKK states.
6        MR. WOLKOFF:  I just want to
7    state on the record that it's an
8    improper objection.  But that's okay.
9    You can keep making it.
10        MR. DANIELS:  I respectfully
11    disagree.  That's okay.  He's not been
12    instructed not to answer the question,
13    so.
14    A.   I see this e-mail and I don't
15 know if I've seen this before.
16    Q.   You say that you looked at it.
17 You say that in your report, your
18 supplemental report; do you remember
19 that?
20    A.   Of course, I received all of
21 the exhibits and I searched on them for
22 things.  But I just don't remember, I
23 don't remember this as a trial exhibit.
24    Q.   Well, you didn't say anything
25 about this Exhibit 460 in your reports;

Page 385

1 correct?
2    A.   That's what the e-mail says.
3    Q.   And in the first paragraph
4 under pricing issue Mr. Miyamoto said
5 that Arc'teryx was looking for discounts,
6 correct?
7    A.   Correct.
8    Q.   And with regard to the quality
9 issue, it said that Arc'teryx thought
10 that the T8 was a better product than the
11 T4, correct?
12    A.   That's what this gentleman is
13 saying.
14    Q.   Did you do any analysis or
15 review or investigation to determine if
16 those issues were true, that is Arc'teryx
17 had a pricing issue and a quality issue
18 with the Uretek laminated T4s and T5s?
19    A.   I did, as with all customers, I
20 looked at the pricing issue and addressed
21 that in my reports.  And I recognized
22 that if you're selling it for much higher
23 against the T8, the market demand is at
24 the T8 price level, so that would be the
25 price issue.  For the quality issue,

Page 387

33 (Pages 384 - 387)

1 Arc'teryx bought millions of T4s and T5s.
2    Q.   But not after it shifted its
3 business to Asia, correct?  Arc'teryx
4 practically stopped its purchases of T4s
5 and T5s after it shifted its business
6 from North America to Asia, correct?
7    A.   They didn't stop, but they did,
8 they bought much less, absolutely.  They
9 started buying T8s instead of T4s, for
10 example, in the excluded markets.
11    Q.   You didn't say anything in your
12 reports about Arc'teryx having a pricing
13 issue and a quality issue with T4s and
14 T5s, the Uretek laminated zippers; did
15 you?
16       MR. DANIELS:  Objection as to
17 form.
18    A.   I didn't address it at that
19 specific level.  And as I said, I don't
20 cite this document in my report.
21    Q.   Do you know whether or not YKK
22 Canada offered Arc'teryx discounts on the
23 T4s and T5s in order to try to keep the
24 business and prevent Arc'teryx from
25 switching over to T8s, 9s and 10s or

Page 388

1 recall reviewing this one.
2    Q.   Did you actually review all of
3 the trial exhibits that you received?
4    A.   I did not review every trial
5 exhibit.  I did searches on them for
6 information.  But I did not necessarily
7 review every trial exhibit.
8    Q.   Didn't you say in your report
9 that you considered all of the trial
10 exhibits in connection with your work in
11 your reports?
12    A.   I did.  I said I considered
13 them.  And I received them.  And I
14 searched on them.  I am just saying I
15 don't recall this particular e-mail.
16    Q.   But actually now you're saying
17 you didn't read all of the trial
18 exhibits, correct?
19       MR. DANIELS:  Objection to form.
20    A.   I didn't say I did.  I said I
21 researched on them and tried to find
22 information relevant.
23    Q.   You said in your report you
24 considered all of them.  Did you consider
25 all of them without reading them?

Page 390

1 other laminated zippers for their
2 high-end outerwear?
3    A.   I don't know.  I have the sales
4 records that show the ultimate prices.  I
5 don't know if they were discounted.
6    Q.   Let me show you Defendants'
7 Exhibit 462.
8       (Defendants' Exhibit 462,
9       document Bates stamped YKK0407549,
10       previously marked for identification.)
11    Q.   You see this is an e-mail
12 string during the relevant time period,
13 so June 2009, involving Kenji Miyamoto
14 from YKK Canada discussing Arc'teryx?
15       MR. DANIELS:  Objection.  Lack
16 of authentication.
17    A.   I see what it is, yes.
18    Q.   And you saw this before in
19 connection with your work in this matter,
20 correct?
21    A.   I don't recognize this.
22    Q.   You said in your report that
23 you had reviewed it, you don't remember?
24    A.   It was in the set of trial
25 exhibits that I received.  But I don't

Page 389

1    A.   I do searches on things and I
2 include what I receive and what
3 information is available to me.
4    Q.   Did you consider the trial
5 exhibits that you said you considered in
6 your report without reading them; is that
7 your testimony?
8    A.   That's not my testimony.
9    Q.   On page 407550, in the middle
10 of the page, Mr. Miyamoto discussed YKK's
11 wanting to offer Arc'teryx a special
12 price with large discount, given the fact
13 that Asia was 35 percent cheaper,
14 correct?
15    A.   Are you on the line under
16 "Greg," is that where you are?
17    Q.   Yes.
18    A.   I see what it says here.
19    Q.   You see that?
20    A.   I do.
21    Q.   It says, "If we offer with T4
22 special price, we have to give large
23 discounts on both chains and cut zippers.
24 Price differences in chains are 20
25 percent, cut zippers is 35 percent.  Asia

Page 391

1 is cheaper" right?
2    A.  Yes, that's what it says.
3    Q.   And then on page 7551,
4 Mr. Miyamoto said towards the bottom of
5 the page, he set out his "Guess of what
6 will happen, he said "Arc'teryx will move
7 into switching the T8s starting from
8 Asia, no matter what (price, quality,
9 minimum lot logistics in Asia)."
10       Do you see that?
11    A.  I see what he says.
12    Q.   Did you say anything in your
13 reports about Arc'teryx wanting to switch
14 out of buying T4s as laminated by Uretek
15 because of quality, minimum lots or
16 logistics in Asia?
17    A.  I did not specifically say
18 something like that.
19    Q.   Do you know what a minimum lot
20 refers to?
21    A.  Basically, the minimum that you
22 have to purchase.
23    Q.   And what was the story with
24 regard to Uretek with regard to the
25 minimum amounts that you had to purchase

Page 392

1 details.
2    Q.   Well, you recall the dead stock
3 issue but you don't know what dead stock
4 means?
5    A.  As I said, I recall dead stock
6 coming up but I don't recall the details.
7    Q.   Who did it come up with?
8    A.  I think Mr. Press because we
9 talked about any issues that were raised
10 in the actual world about what they would
11 do to solve them.
12    Q.   Your analysis is a but-for
13 analysis rather than what occurred in the
14 actual world, correct?
15    A.  It's a but-for analysis.  It
16 considers things that are going on in the
17 actual world, as I said this morning.
18    Q.   But principally it's a but-for
19 analysis, correct?
20    A.  It's but-for compared to actual
21 to get damages, yes.
22    Q.   Well, do you know how much
23 Arc'teryx or other customers were
24 spending on this issue of dead stock in
25 connection with their purchases of T4s

Page 394

1 from them as compared to from others; do
2 you know?
3    A.  I don't know in the actual
4 scenario what that minimum lot was.
5    Q.   Do you know what the phrase
6 "dead stock" means in this context?
7    A.  I have heard it before.  I
8 can't remember as I sit here.  I don't
9 want to guess.
10    Q.   Well, do you see that it's
11 mentioned on the very first page of
12 Defendants' Exhibit 462, Page 407549 at
13 the top in the second paragraph, third
14 line.  It says, "What to do with all dead
15 stock with T4?"
16    A.  I see that.
17    Q.   Did you know that Arc'teryx was
18 complaining that it had to buy more from
19 Uretek than it wanted and, therefore, was
20 spending money with regard to so-called
21 dead stock that it didn't need or want?
22       MR. DANIELS:  Objection as to
23    form.
24    A.  I don't -- as I said, I recall
25 the dead stock issue but I don't know the

Page 393

1 and T5s, the Uretek laminated zippers?
2       MR. DANIELS:  Objection.
3    Q.   Any idea?
4       MR. DANIELS:  Objection as to
5    form.
6    A.  No, I don't have that
7 information from them.
8    Q.   Do you know whether or not YKK
9 had any kind of minimum requirement of
10 purchases in connection with the T8s, 9s
11 and 10s, the way that Uretek did?
12    A.  I don't know.
13    Q.   Do you know whether or not
14 customers had issue with dead stock in
15 their purchases of T8s, 9s and 10s from
16 YKK?
17    A.  I don't know one way or the
18 other.
19    Q.   Do you know whether or not
20 other competitors in the manufacturing
21 and lamination of water-resistant
22 zippers, had any kind of minimum
23 requirements that lead to dead stock on
24 the part of purchasers or customers?
25    A.  I don't know their policies on

Page 395

35 (Pages 392 - 395)

1 that.
2    Q.   Do you know whether or not the
3 different affiliates of YKK were in
4 competition with each other?
5    A.   I haven't talked to them about
6 that.  I don't know -- I am kind of
7 recalling a document or two where they
8 were both, I noticed they were both
9 selling sometimes to the same people.
10    Q.   Do you know why YKK Canada
11 would be offering discounts to Arc'teryx
12 if they continued to purchase T4s and T5s
13 and didn't switch to purchasing T8s, 9s
14 and 10s from YKK affiliates in Asia?
15    A.   I don't think I understand your
16 question.
17    Q.   Do you know why YKK Canada was
18 offering discounts to Arc'teryx to
19 continue to purchase T4s as opposed to
20 Arc'teryx switching and buying T8s or 9s
21 or 10s from YKK affiliates in Asia?
22    A.   I haven't interviewed anyone
23 from Canada.  I assume they are trying to
24 make sales.
25    Q.   Do you know whether or not YKK

Page 396

1 Canada was paid on the basis of selling
2 T4s and T5s as opposed to T8s, 9s and
3 10s; do you have any idea about that?
4    A.   I would only have a working
5 assumption that they are paid on their
6 sales.  They are generating sales.
7    Q.   Do you know whether or not YKK
8 Canada was paid for selling T8s, 9s and
9 10s that were sold by YKK affiliates in
10 Asia?
11    A.   As far as I know in the sales
12 record, that transaction wouldn't go
13 through Canada, it would go through the
14 Asian affiliates, so it wouldn't be
15 reflected in their records, from what I
16 can tell.
17    Q.   Do you know whether or not YKK
18 Canada had an incentive to sell T4s or
19 T5s as opposed to allowing or having
20 customers switch to purchasing T8s, 9s
21 and 10s from YKK affiliates in Asia?
22    A.   I don't know about their
23 incentives.  I just know what they were
24 selling from the sales data.
25    Q.   Do you know whether YKK Canada

Page 397

1 ever sold any T8s, 9s and 10s during the
2 relevant time period; is that anything
3 that you looked at?
4    A.   I looked at sales by
5 affiliates.  I would need to go and look.
6 That's possible.  I need to go and check.
7    Q.   Is there anything in your
8 reports about whether YKK Canada ever
9 sold any T8s, 9s and 10s during the
10 relevant time period?
11    A.   In the narrative I don't recall
12 talking about that.  In the exhibit I did
13 some analysis by affiliate and that might
14 show that if they did.
15    Q.   Can you think of anything that
16 was said in your reports about that,
17 sitting here?
18       MR. DANIELS:  Objection.  Asked
19    an answered.
20    A.   As I say in the narrative of my
21 report, I don't recall talking about that
22 issue.  But in exhibits I do break it out
23 by affiliates.  To the extent T8 was sold
24 by some other entity, Canada or any
25 other, it would show up under that

Page 398

1 affiliate.
2    Q.   Do you know YKK USA was
3 incentivized to sell T4s and T5s to its
4 customers as opposed to sales of T8s, 9s
5 and 10s by YKK affiliates; do you have
6 any knowledge about that?
7       MR. DANIELS:  Objection.  Asked
8    and answered.
9    A.   I don't know about their
10 incentives and what they were being told
11 to do or bonus, that information wasn't
12 provided.
13    Q.   Do you know whether or not any
14 of the YKK North American affiliates were
15 attempting to convince customers to stick
16 with the T4s and T5s rather than purchase
17 T8s, 9s and 10s from YKK Asian
18 affiliates?
19    A.   I don't have testimony about
20 that.  I just know in the sales data what
21 happened.
22    Q.   You just know about what sales
23 were made?
24    A.   What sales actually happened,
25 that they shifted from T4s and 5s to 8s

Page 399

36 (Pages 396 - 399)

1 and 9s.
2    Q.   Let me place in front of you
3 what we had marked as DX 458.
4        (Defendants' 458, document Bates
5        stamped YKK0152695, previously marked
6        for identification.)
7        MR. DANIELS:  Attorney Wolkoff,
8    just while we are on the record on
9    this, if there are any documents that
10    relate to any incentives that you
11    suggest may exist -- I don't recall
12    them being produced in discovery --
13    but if there were financial incentives
14    established by YKK for all these
15    affiliates, we need to confirm if
16    those documents exist because they
17    should have been produced.
18        So I am making that request on
19    the record that YKK search and confirm
20    that if such documents exist regarding
21    the T4 and T5s, if those exit and are
22    not produced then obviously we will
23    have to take that up in the court.
24    Q.   Placing in front of you
25 Defendants' Exhibit 458.  You have seen

1 this e-mail dated during the relevant
2 time period, May 26th, 2009 with the
3 subject of Arc'teryx.
4        You have seen this in
5 connection with your work in this matter,
6 correct?
7        MR. DANIELS:  Objection.  Lack
8    of authentication.
9    A.   I am not positive.  It looks
10 like a topic that I recall.  But I don't
11 remember if I saw this particular one.
12    Q.   Well, let me direct your
13 attention to page 152696.  Do you see
14 Greg Groff reports on a meeting that he
15 was having here with a representative
16 from Arc'teryx who he refers to as Mike
17 B.
18    A.   I see that.  Mike C.
19    Q.   Well --
20    A.   I am sorry, maybe I am missing
21 the page.
22    Q.   In the second paragraph that
23 says "Later on when I was meeting with
24 Mike B," do you see that?
25    A.   The second paragraph, second

1 page?
2    Q.   Yes.
3    A.   Got it, Mike B and then Mike C
4 at the top.  Thank you.
5    Q.   Do you see there is reference
6 at the top on page 152696 of DX 458 to
7 "Now the really big issue."
8        It says "Mike C and Allen
9 advised that Arc'teryx is taking a very
10 serious look at switching all of their
11 Asian production to T8s.  The testing
12 they have done have led them to believe
13 that T8 is a better product than the T4."
14        Do you see that?
15    A.   I see that.  It's written down.
16    Q.   Did you say anything in your
17 report about customers switching to T8s,
18 9s and 10s from T4s and 5s because they
19 believed the quality was better?
20    A.   I don't talk about the quality
21 issue in my report.  I look at the actual
22 sales data, as I said this morning.
23    Q.   But you knew about this Exhibit
24 458 when you were preparing your
25 supplemental report, correct?

1    A.   I knew it existed and I think I
2 have seen the context of this e-mail and
3 maybe another e-mail or something like
4 that.  But I knew about this, and I
5 understood that this was raised.
6    Q.   And the e-mail goes on to say,
7 "Later on when I was meeting with Mike B
8 I asked him about it.  He went into a
9 20-minute rant about the different
10 products with the final result that he
11 thinks the T8 is better, and although he
12 would rather use North American-made
13 products their clothing is suffering from
14 using inferior zippers."
15        Do you see that?
16    A.   I see what's written here.
17    Q.   Okay.  And you had seen that
18 when you were doing your work and
19 preparing your supplemental report in
20 this matter, correct?
21    A.   I've seen this issue raised and
22 I have also seen Arc'teryx continue to
23 buy T4 and T5.
24    Q.   But you didn't mention anything
25 about this; did you?

1    A.   I did not mention this e-mail.
2    Q.   Didn't Arc'teryx while it may
3  have continued to buy small amounts of
4  T4s and 5s switch by far the majority of
5  its purchases after this to T8s, 9s and
6  10s?
7    A.   Yes.  YKK offered them a lower
8  price T8 and sold into excluded market,
9  and they switched.
10    Q.   This e-mail is talking about
11  the T4s being inferior in quality to the
12  T8; do you see that?
13    A.   I see what is written in the
14  e-mail.
15    Q.   So you see that, right?
16    A.   I do see that.  And I know they
17  bought millions of T4 and 5.
18    Q.   But you didn't discuss -- they
19  didn't buy millions of T4s and T5s --
20    A.   Over the life of their
21  relationship?
22    Q.   Let me finish the question.
23    A.   Thank you.
24    Q.   After they shifted their
25  garment manufacturing predominantly to

Page 404

1  Asia, Arc'teryx reduced substantially its
2  purchases of T4s and T5s, correct?
3    A.   Yes.  Because T8 was too
4  priced.
5    Q.   And according to this,
6  Arc'teryx believed that the T4 had sewn
7  into its products made their clothing
8  suffer from using inferior zippers,
9  correct?
10    A.   That's what this e-mail says.
11    Q.   You didn't discuss this issue
12  in your report; did you?
13    A.   I did not discuss this e-mail
14  in my report.
15    Q.   Did you try to examine or
16  investigate whether other garment
17  manufacturers also had quality issues
18  with the T4s and T5s compared to other
19  alternatives?
20    A.   I considered the record and I
21  talked to Mr. Press about anything that
22  was going on in the actual world that
23  existed.
24    Q.   Okay.  Did you try to examine
25  or investigate by talking to customers or

Page 405

1  potential customers, that is garment
2  manufacturers, whether they had quality
3  issues with the T4s and T5s as compared
4  to other alternatives?
5    A.   I didn't talk to garment
6  manufacturers, so no.
7    Q.   Did you ask for any records
8  about quality issues that garment
9  manufacturers were having with the T4s
10  and T5s during the relevant time period,
11  so you could look at the issue?
12    A.   I asked for all the records
13  available in the case and did searches on
14  the database.  So, yes, I asked for all
15  the records in the case.
16    Q.   But you weren't given any
17  records with regard to quality issues,
18  were you, sir, by the plaintiffs --
19       MR. DANIELS:  Objection as to
20    form.
21    Q.   -- quality issues with the T4s
22  and T5s?
23       MR. DANIELS:  Objection as to
24    form.
25    A.   I was given e-mails such as

Page 406

1  this.  So I remember one-offs of people
2  talking about it.  But again, I also
3  recognize that YKK presented both of them
4  as options.  And AquaGuard didn't suggest
5  one was inferior to the other, and also,
6  of course, purchased 40 million meters
7  over the life of the relationship.
8    Q.   These documents I have been
9  showing you came from defendants.  Did
10  the plaintiffs provide you with any data
11  or information about quality issues that
12  customers were having in the real world
13  with the T4s and T5s during the relevant
14  time period?
15       MR. DANIELS:  Objection as to
16    form.
17    A.   I would have to go back and
18  look at which Bates stamps I am referring
19  to, but I do recall talking to Mr. Press
20  about actual issues that came up in the
21  actual world.
22    Q.   Did you take any notes about
23  those conversations?
24    A.   As I said this morning, no.
25    Q.   Did you write anything in your

Page 407

38 (Pages 404 - 407)

1 reports about quality, the quality of T4s
2 and T5s?
3    A.   I did not talk about the
4 quality, the technical issues, between
5 the two.
6    Q.   Let me show you what's been
7 marked as Defendants' Trial Exhibit 575.
8       (Defendants' Exhibit 575,
9    document Bates stamped YKK0267341,
10    previously marked for identification.)
11    Q.   Do you see that down below
12 there is an e-mail on this page 267341?
13       MR. DANIELS:  Objection, lack of
14 authentication.
15    Q.   From --
16       MR. WOLKOFF:  I was in the
17 middle of the question.
18       THE VIDEOGRAPHER:  Counsel, I
19 apologize, can we please go off the
20 record for one second, I lost one of
21 my recorders.
22       MR. WOLKOFF:  Yes.
23       THE VIDEOGRAPHER:  Now going off
24 the record.  The time is 12:24 p.m.
25       [Off the record.]

Page 408

1       THE VIDEOGRAPHER:  We are going
2    back on the record.  The time is
3    p.m.
4 BY MR. WOLKOFF:
5    Q.   I place in front of you,
6 Mr. Donohue, Defendants' Exhibit 575.  Do
7 you see the first e-mail is from a Lee
8 Smith of YKK USA to Michael Blunt, during
9 the relevant time period May 31, 2012,
10 the subject is Uretek?
11    A.   I see that.
12    Q.   And Mr. Smith said that he
13 needed to discuss with Mr. Blunt some
14 issues; do you see that?
15    A.   I do.
16    Q.   And the very first issue that
17 he listed was "Quality issues are
18 rampant," correct?
19    A.   That's what the e-mail says.
20    Q.   And the subject of e-mail is
21 "Uretek," right?
22    A.   Correct.
23    Q.   Again, you didn't put anything
24 about quality issues with the T4s and
25 T5s, whether rampant or not rampant, you

Page 409

1 just didn't discuss anything about it in
2 your report; did you?
3    A.   I didn't talk about this
4 e-mail.  Again, I recognized in my report
5 that they were a 40 million meter
6 supplier.  But I did not directly talk
7 about quality issues, technical issues,
8 like that, no.
9    Q.   You didn't directly talk about
10 -- the word "quality" doesn't appear in
11 your report at all; does it?
12    A.   Not to my knowledge.  That's
13 what I am referring to.  I don't directly
14 talk about it this way.  I looked at them
15 as a supplier.
16    Q.   Do you know whether or not
17 customers would have purchased T4s or T5s
18 if they weren't offered T8s, 9s and 10s
19 in light of purported quality issues with
20 the T4s and T5s, is that an issue that
21 you analyzed at all in your report?
22    A.   Well, it's an issue that I
23 analyzed in the but-for analysis, that
24 they could achieve the sales which I did
25 analyze.

Page 410

1    Q.   But not in terms of quality,
2 you didn't analyze any purchaser
3 decisions in terms of quality of the T4s
4 and T5s compared to competitors; did you?
5    A.   Well, Uretek's demonstrated
6 ability to supply 40 million meters over
7 time is compared to competitors, yes.
8       So indirectly you're looking at
9 what their ability is to make these sales
10 and they demonstrated they could be a
11 supplier.  They continued to be a
12 supplier.
13    Q.   You keep referring to millions
14 of sales outside of the relevant time
15 period.  I am just asking you about the
16 relevant time period.
17       Did you discuss in your report
18 anywhere the possibility of customers not
19 purchasing T4s or T5s, even if offered
20 T8s, 9s and 10s due to pricing, delivery
21 time or quality issues, is that discussed
22 anywhere in the narrative?
23       MR. DANIELS:  Objection as to
24    form.
25    A.   Well, the narrative talks about

Page 411

1 the ability to make the sale, the ability
2 to capture the sale and why.
3    Q.   Do you talk anywhere in your
4 narrative about customers deciding not to
5 purchase T4s or T5s, that possibility,
6 even if they weren't offered T8s, 9s and
7 10s because of pricing issues, delivery
8 issues and quality issues, do you discuss
9 that in the narrative of your report?
10        MR. DANIELS: Objection. Asked
11    and answered.
12    A.   In the but-for section of my
13 first report, as well as in my second
14 report, I talk about why Uretek would
15 capture the sales at that level. I did
16 not address particular e-mails or quality
17 issue e-mails like this. But I do
18 address this issue about their ability to
19 make it.
20    Q.   In your supplemental report
21 that is after the jury's verdict, you
22 didn't discuss pricing issues that
23 customers were having with the T4s and
24 T5s, did you, in the narrative?
25    A.   Well, the but-for section is

Page 412

1    Q.   In your supplemental report,
2 which is after the jury's verdict, you
3 don't discuss explicitly in the narrative
4 of your report pricing issues that
5 customers may have been having or did
6 have with the T4s and T5s during the
7 relevant time period; did you?
8        MR. DANIELS: Objection to form.
9    Objection, asked and answered.
10    A.   Aside from modeling what price
11 they would capture them at, I did not
12 talk about these pricing e-mails and
13 things like that. No, I didn't go into
14 that granular detail. I did so at a
15 macro level with those charts in my
16 discussions of those charts.
17    Q.   Those charts aren't your
18 narrative; are they, sir?
19        MR. DANIELS: Objection as to
20    form.
21    A.   Well, they are in the written
22 part of my report. But again, the charts
23 are also discussed in words. So I can
24 point to paragraphs around the charts.
25    Q.   In your supplemental report,

Page 414

1 still in my second report, so indirectly
2 I do, because it's recognizing can you
3 make those sales.
4    Q.   In your supplemental report,
5 after the jury's verdict, you didn't
6 discuss pricing issues that customers
7 were having or may have been having with
8 the T4s and T5s during the relevant time
9 period; do you?
10    A.   Well, my chart where I analyze
11 the profits of the 500 million dollars
12 talks about using a T8 price to recognize
13 any pricing issues.
14    Q.   In your supplemental report,
15 that is after the jury's verdict, you
16 didn't discuss in the narrative of the
17 report pricing issues that customers may
18 have been having with the T4 or T5s
19 during the time period of the relevant
20 time period?
21        MR. DANIELS: Objection. Asked
22    and answered.
23    A.   In the narrative of the report
24 I discuss what they would have been sold
25 for, which captures this issue.

Page 413

1 that is after the jury's verdict, you
2 don't discuss explicitly in the narrative
3 of your report delivery time issues that
4 customers may have been having or did
5 have with the T4s and T5s during the
6 relevant time period; do you?
7        MR. DANIELS: Objection to form.
8    Objection, asked and answered.
9    A.   In my supplemental report I am
10 not discussing delivery times explicitly,
11 no.
12    Q.   In your supplemental report,
13 which is, that is after the jury's
14 verdict, you don't discuss explicitly in
15 the narrative of your report quality
16 issues that customers were having or may
17 have been having with the T4s and T5s
18 during the relevant time period; did you?
19        MR. DANIELS: Objection. Asked
20    and answered.
21    A.   I am not talking about quality
22 in my report. I am talking about what
23 they can make, and I look at it that way.
24    Q.   Do you know whether or not YKK
25 brought issues that customers were having

Page 415

40 (Pages 412 - 415)

1 with the quality of T4s or T5s to the
2 attention of Stuart Press?
3    A.   I believe there was instances
4 of that, yes.  Those are some of the
5 things that we talked about.
6    Q.   You didn't discuss anywhere in
7 your report the fact that during the
8 relevant time period YKK brought issues
9 that customers were having with the
10 quality of T4s and T5s to the attention
11 of Stuart Press; did you?
12    A.   I don't believe I go into that
13 detail in my report about that issue,
14 correct.
15    Q.   Now, you say that there are
16 about 66 million meters of YKK laminated
17 zippers sold to high-end outerwear
18 customers, correct?
19    A.   Yes, 65 million.
20    Q.   And that is over about an
21 eight-year time period, correct?
22    A.   Correct.
23    Q.   In your report submitted on
24 June 7th, 2017, so that's incorporated
25 into your supplemental report, correct,

Page 416

1 sir?
2    A.   I already have that or was it
3 already marked?  Would you like it
4 marked?
5    Q.   We don't need to mark it.  It's
6 been marked in the prior deposition.
7    A.   That's fine.
8    Q.   So turning to paragraph 151 of
9 your report dated June 7th, 2017, you say
10 that "If YKK had sold T4s and T5s in the
11 amount of the 65 million meters of YKK
12 laminated zippers to customers instead of
13 T8s, 9s and 10s, then over an eight-year
14 period on an annual basis that would
15 require a maximum capacity at Uretek of
16 about 12 million meters to achieve the
17 additional sales," correct?
18    A.   Correct.
19    Q.   But the most that Uretek had
20 ever laminated was only a little bit more
21 than half of that number of meters, and
22 that was in 2005, correct?
23    A.   Correct.  The 7.4 million in
24 2005.
25    Q.   Specifically, looking at your

Page 417

1 Exhibit 21A-R3, 7.4 million T4s and T5s
2 was Uretek's high watermark in 2005 --
3 happened to be in 2005, correct?
4    A.   Yes.
5    Q.   And the 7.4 million meters was
6 by far the most water-resistant zippers
7 Uretek laminated in any given year,
8 correct?
9    A.   Yes, in the actual scenario,
10 that was their peak.
11    Q.   So if, in fact, these 65
12 million meters that you purportedly
13 identify had to be laminated by Uretek,
14 they would have had to have increased
15 their production by at least 70 percent a
16 year, correct?
17    A.   70 percent, yes.
18    Q.   Let me place in front of you DX
19 44.
20        (Defendants' Exhibit 44,
21    document Bates stamped YKK0703047,
22    previously marked for identification.)
23    Q.   Do you see it's a report with
24 regard to Uretek at YKK all the way back
25 in May of 1999?

Page 418

1        MR. DANIELS:  Objection.  Lack
2    of authentication.
3    A.   Yes.
4    Q.   And you've seen this report
5 before, correct?
6    A.   Correct.
7    Q.   Let me direct your attention to
8 page 703050, at the top there is a few
9 paragraphs under the heading "Uretek
10 Manufacturing," correct?
11    A.   Correct.
12    Q.   And the first paragraph under
13 that heading says "The Uretek factory is
14 old and cramped.  The majority of the
15 machinery is 30-years-old at least.  Some
16 machinery is newer (10 to 15-years-old).
17 The building itself is far older.  It is
18 estimated to have been built in the
19 1930s."
20        That's what the report says,
21 correct?
22    A.   That's what those lines say,
23 yes.
24    Q.   And that was in 1999.  The
25 plant didn't get any newer in February

Page 419

41 (Pages 416 - 419)

1 2009 through September 2019; did it, sir?
2      MR. DANIELS: Objection as to
3 form.
4    A.   No. The plant itself and time
5 marched on, yes.
6    Q.   You acknowledge, sir, that
7 Uretek has only -- strike that.
8      You acknowledge in your
9 supplemental report -- strike that.
10     You acknowledge that Uretek,
11 during the relevant time period, had only
12 two zipper machines, correct? Two
13 machines laminating zippers during the
14 relevant time period?
15    A.   I need to go back and look to
16 confirm because multiple machines are
17 used to do the steps in the process at
18 times. But I know they had more than
19 one. Yes, I would have to look back at
20 my report.
21    Q.   If you look at paragraph 149 --
22 so two paragraphs above the paragraph I
23 just was asking you about -- you say in
24 the third, second line running onto the
25 third line that Uretek had "two dedicated

1 zipper machines," correct?
2    A.   Yes.
3    Q.   You claim that Uretek had other
4 machines that could be converted into
5 zipper laminating machines for YKK,
6 correct?
7    A.   That was one of the possible
8 solutions, yes.
9    Q.   If those other machines had
10 been converted to zipper laminating
11 machines, then those machines couldn't be
12 used for what they were being used for,
13 that is Uretek's other commercial
14 activities, correct?
15    A.   In that example, but there was
16 capacity on those machines.
17    Q.   Yeah.
18    A.   So that assumes, of course,
19 that it was fully utilized and they
20 weren't fully utilized. And that is one
21 solution.
22    Q.   That's not what you said in
23 your report. You said, "All existing
24 lamination machines are also capable of
25 being converted into zipper machines at

1 little cost," correct?
2    A.   Correct.
3    Q.   You didn't say anything about
4 having excess capacities in those
5 machines in your reports; did you?
6      MR. DANIELS: Objection to form.
7    A.   Well, at paragraph 150 I
8 explained that increased capacity could
9 have included many things such as longer
10 run times, higher volumes, wider rolls
11 and if required adding more machines.
12    Q.   Yeah, but you didn't say
13 anything about these other machines
14 having excess capacity; did you, sir?
15    A.   "The existing machines could
16 run" --
17    Q.   It's fine.
18    A.   I will keep reading.
19     -- could run three shifts --
20     MR. DANIELS: You have to let
21 the witness answer the question.
22    A.   -- let me finish reading.
23     "Run three shifts for longer,
24 but typically have not been utilized at
25 this higher level of production."

1      So yes, they have. It's the
2 next sentence.
3    Q.   You think that that says that
4 the other machines had excess capacity,
5 sir? They weren't being used at their
6 typical capacity levels?
7    A.   Yes. I think if you say
8 something is not being used at its
9 capacity level, it has other capacity.
10    Q.   We will let the jury decide on
11 that one.
12     MR. DANIELS: Objection to the
13 sarcasm.
14    Q.   In any event, sir, if you
15 converted those other machines over to
16 zipper laminating machines, they wouldn't
17 be able to be used for what they were
18 doing, that is Uretek's other commercial
19 activities, correct?
20    A.   In isolation, if you took one
21 out of service and made it do something
22 else, yes, you would take it away from
23 something else.
24    Q.   Did you account anywhere for
25 any lost revenue that Uretek would have

1 had, if it had put one of its other
2 machines into use as a zipper laminating
3 machine for T4s and T5s during the
4 relevant time period?
5    A.   No, because it didn't need to
6 -- one, it had excess capacity. And two,
7 it didn't need to do that --
8    Q.   So the answer is no?
9    A.   -- to reach capacity. Well, it
10 didn't need to. There was no loss. I
11 didn't account for other loss because
12 there isn't other loss.
13    Q.   Did you check to determine
14 whether Uretek was bound by contract with
15 any third-parties to manufacture products
16 for them with these machines that you say
17 could be converted over into zipper
18 laminating machines?
19       MR. DANIELS: Objection. Again,
20    this whole line of questioning was
21    already covered in prior depositions.
22    It has nothing to do with the jury's
23    verdict of January 2023. You are
24    hoeing old ground.
25    A.   I am sorry, can you reread your

Page 424

1 question, please?
2    Q.   Did you make any determination
3 whether Uretek was bound by contract with
4 any third parties to manufacture products
5 for them with these machines that you say
6 could be converted over to zipper
7 laminating machines?
8    A.   In my discussions with
9 Mr. Press I understood that they, that
10 these would be available if needed for
11 capacity. So he did not suggest that
12 they were not available or committed to
13 someone else.
14    Q.   Did you ask him whether Uretek
15 had any contracts with any third parties
16 to manufacture products for them with
17 these machines?
18    A.   I didn't need to ask him if
19 Uretek had other business. I knew they
20 had other business. And I certainly
21 asked him, could you reach these capacity
22 levels with the other business and he
23 said yes.
24    Q.   I am asking you whether or not
25 you had any information about Uretek

Page 425

1 having contracts with other third parties
2 that required the use of these other
3 machines in order to produce products
4 pursuant to those contracts?
5    A.   I just had an understanding
6 from Mr. Press that they had other
7 business lines. I am sure there were
8 contracts. I am sure some were spec.
9 But I understood there were other
10 businesses that would need to be
11 accounted for in the capacity analysis.
12    Q.   Looking at figure 6 on page 17
13 of your supplemental report. You point
14 out that sales of T4s and T5s had
15 considerably scaled down beginning in
16 2009, and going up through the end of the
17 relevant time period, correct?
18    A.   Correct.
19    Q.   But it's true that Uretek
20 couldn't keep up even with that scaled
21 down demand of T4s and 5s, let alone
22 manufacture an additional 65 million
23 meters, correct?
24    A.   In the but-for world, I have
25 already concluded that they could keep up

Page 426

1 with that demand. In the actual world,
2 they had much less volume, less
3 inventory, things of that nature. So I
4 appreciate that questions were raised
5 about particular orders and things like
6 that.
7    Q.   Uretek, in the real world,
8 couldn't keep up even with the scaled
9 down demand during the relevant time
10 period for T4s and T5s let alone laminate
11 an additional 65 million meters, correct,
12 sir?
13       MR. DANIELS: Objection. Asked
14    and answered.
15    A.   I had understood that they kept
16 up with their demand and running at a
17 lower production resulted in some
18 instances that we talked about this
19 morning. But they successfully were
20 selling throughout this time period.
21    Q.   Let me place in front of you
22 Defendants' Exhibit 392, a trial exhibit.
23       (Defendants' 392, document Bates
24    stamped YKK016984, previously marked
25    for identification.)

Page 427

43 (Pages 424 - 427)

1    Q.   You read this e-mail in
2  connection with your work in this matter,
3  correct?
4    A.   Yes.
5         MR. DANIELS:  Objection.  Lack
6    of authentication.
7    Q.   According to your figure 6 on
8  page 17 of your supplemental report, how
9  many meters of T4s and T5s did Uretek
10  have to laminate in the year 2008?
11    A.   Just for Arc'teryx, 420,000
12  plus.  It's probably a little more.
13    Q.   And how many meters did they
14  have to laminate in general overall for
15  T4s and T5s in that year 2008; do you
16  know?
17    A.   In 2008, I would need to look
18  at my exhibits to tell me the total
19  number.
20    Q.   It was a lot less than 7
21  million; wasn't it?
22    A.   Yes.  They were not getting
23  orders for the excluded markets, so it
24  was much lower than 7 million.
25    Q.   And yet given the slow demand,

1    MR. DANIELS:  Objection as to
2    form.
3    A.   No.  And I don't know if this
4  e-mail suggests that they didn't keep up
5  with it.  Mr. Press told me that they
6  filled their orders.  That they were
7  certainly hamstrung by not having
8  significant volume and inventory.  But
9  they were filling their orders and yes
10  things happen in production that you need
11  to deal with.
12    Q.   But this e-mail from YKK went
13  to Stuart Press talking about Uretek
14  being so far behind that the YKK machines
15  had to be stopped because they didn't
16  have anything to work on, correct?
17    A.   That's what this --
18         THE VIDEOGRAPHER:  Counselor,
19    again, I lost power.  I think there is
20    something going on with the
21    electricity here.  I lost totally
22    power.
23         MR. WOLKOFF:  Can you answer,
24    and we will just have it on the
25    machine?

1  as Defendants' Exhibit 392 reflects, some
2  of the shipments from Uretek were so late
3  that the YKK machines were stopped due to
4  lack of material to work on; do you see
5  that?
6    A.   Yes, I see this e-mail.
7    Q.   Did you --
8    A.   This being 392.
9    Q.   Did you say about that in your
10  report, that Uretek was so far behind in
11  keeping up with even the lower demand in
12  2008, that the YKK machines had to be
13  stopped because they didn't have anything
14  to work on from Uretek?
15    A.   I didn't talk about it in that
16  granular detail.  And again, that is
17  actual with the much reduced volumes.
18  And I talked with Mr. Press about these
19  one-off instances where they needed to do
20  things to get orders together.
21    Q.   Did you discuss in your reports
22  that Uretek couldn't even keep up with
23  the lower demand for the T4s and T5s, let
24  alone laminate an additional 65 million
25  meters during the relevant time period?

1    A.   I am sorry, can you say it
2  again?
3         MR. DANIELS:  Hold on, you're
4    going to continue this deposition
5    without video?
6         MR. WOLKOFF:  I was just going
7    to let him finish the answer.  Given
8    that he doesn't remember the question,
9    we will wait for the video.
10         [Off the record.]
11
12         [Whereupon, at 12:49 p.m., a
13    luncheon recess was taken.]
14
15
16
17
18
19
20
21
22
23
24
25

1    AFTERNOON SESSION
2       1:31 p.m.
3  J A M E S   J.   D O N O H U E,
4  the Witness herein, was examined and
5  testified as follows:
6       THE VIDEOGRAPHER:  We are back
7    on the record.  The time is 1:31 p.m.,
8    and we are now going back on the
9    record.
10  EXAMINATION  (Cont'd)
11  BY MR. WOLKOFF:
12    Q.   The videographer lost power
13  when you were, Mr. Donohue, answering a
14  question I had asked and so we took a
15  short lunch break to allow him to repower
16  up.
17       So let me return to the
18  question I was asking and you were in the
19  middle of answering when he lost power.
20       So directing your attention to
21  DX 392, this particular e-mail talking
22  about Uretek being late such that the YKK
23  machines were stopped due to a lack of
24  material to work on was an e-mail from
25  YKK to Stuart Press himself at Uretek,

Page 432

1  correct?
2    A.   Yes.
3    Q.   And the subject was "Late
4  Shipment," right?
5    A.   It was.
6       MR. WOLKOFF:  I would like to
7    have marked as Exhibit 13 for
8    identification the jury verdict in
9    this matter.
10       (Donohue Exhibit 13, jury's
11    verdict and definition of the meaning
12    of "high-end outerwear" was so marked
13    for identification, as of this date.)
14    Q.   Placing in front of you what we
15  had marked as Exhibit 13 for
16  identification.  You recognize this as
17  the jury's verdict and definition of the
18  meaning of "high-end outerwear"?
19    A.   Yes, I do.
20    Q.   Now, in order to satisfy the
21  maximizing profits part of the jury's
22  definition of high-end outerwear,
23  customers would have to be willing to
24  purchase the T4 and T5s zippers for them
25  to be high-end outerwear, correct?

Page 433

1    A.   Well, the definition is about
2  the definition of high-end outerwear.  So
3  it's not about what's purchased, it's
4  just a definition of high-end outerwear.
5  Maybe I just don't understand your
6  question.
7    Q.   Well, the definition of
8  high-end outerwear not only includes the
9  characteristics or functions of the
10  garments but also says, "As they relate
11  to maximizing profits for all parties in
12  the global market," correct?
13    A.   It does say that.
14    Q.   So in order to satisfy the
15  maximizing profits part of the definition
16  of high-end outerwear, customers would
17  have had to have been willing to purchase
18  the T4s and T5 zippers in order for them
19  to be sewn or considered as sewn into
20  high-end outerwear, correct?
21    A.   I don't see that specific
22  detail in the definition.  It's just the
23  characteristics as they relate to
24  maximizing profits.
25    Q.   So in your work you have not

Page 434

1  taken into account whether in order to
2  satisfy the maximizing profits part of
3  the definition of high-end outerwear,
4  customers would have had to have been
5  willing to purchase the T4 and T5 zippers
6  in order to sell them into their
7  garments, correct?
8    A.   Well, in my work, in my damage,
9  calculation, yes, I concluded they are
10  willing to purchase them.
11    Q.   But I am not asking you what
12  you concluded, sir, and whether or not
13  they are willing to purchase them.  There
14  is a disagreement, believe it or not,
15  about that.
16       What I am asking you is in
17  order to satisfy the maximizing profits
18  part of the definition of high-end
19  outerwear, as determined by the jury
20  reflected in Donohue Exhibit 13,
21  customers would have to be willing to
22  purchase the T4 and T5 zippers for their
23  garments, correct?
24    A.   Well, customers -- there is two
25  markets here.  So customers may only

Page 435

45 (Pages 432 - 435)

1 purchase non-high-end or they may
2 purchase high-end.
3    Q.   I know, but I am talking about
4 the definition of high-end outerwear.  In
5 order to satisfy the maximizing profits
6 definition of high-end outerwear,
7 customers would have to be willing to
8 purchase the T4 or T5 zippers for them to
9 be sewn into their outerwear garments to
10 be considered as high-end outerwear;
11 correct?
12       MR. DANIELS:  Objection as to
13    form.
14    A.   I still don't think I am
15 understanding your question because it's
16 a definition, it's not --
17    Q.   Okay.
18    A.   -- it's not saying what
19 happened.  It's a definition.  So maybe I
20 am just --
21    Q.   Well, I don't understand your
22 answer.  In order to satisfy the
23 maximizing profits' part of the
24 definition of high-end outerwear, did you
25 in your work consider whether customers

Page 436

1 would be willing to purchase the T4 or T5
2 zippers as opposed to some other
3 laminated zippers for their outerwear
4 garments in order to make them high-end
5 outerwear?
6    A.   For my work, yes.  Some were
7 purchased and deemed high-end outerwear,
8 including T4 and T5s, and some other
9 zippers were not.
10    Q.   Now, you would agree that if
11 customers had been told that they cannot
12 purchase T8s, 9s and 10s for their
13 high-end outerwear that at least some of
14 them would have refused to buy T4s or T5s
15 either because of price or delivery times
16 or other factors, correct?
17    A.   Well, again, I address price in
18 my report.  I recognize that price may be
19 important to customers and so I am only
20 capturing the price that was achieved.
21    Q.   Let me ask you to answer my
22 question, please.  If customers were told
23 that they couldn't purchase T8s, 9s and
24 10s for their outerwear garments, at
25 least some of the customers for high-end

Page 437

1 outerwear have refused to purchase T4s or
2 T5s either because of price, delivery or
3 other issues, correct?
4       MR. DANIELS:  Objection as to
5    form.
6    Q.   You agree with that?
7    A.   No, no, I don't agree with
8 that.  In my analysis I found that given
9 the importance of this patented feature
10 and the billion dollar market, the $500
11 million market for outerwear and the lack
12 of alternatives, the customers would
13 purchase T4 and 5.
14    Q.   So your opinion is that the
15 customers who bought 65 million meters of
16 T8s, 9s and 10s, if they were told they
17 couldn't buy T8s, 9s and 10s would have
18 all purchased every single meter, 65
19 million meters without turning to
20 alternatives?
21    A.   Correct.  I claim all the T4
22 and 5s that were high-end outerwear.
23    Q.   Now, you recognize that even
24 though you didn't state what YKK's market
25 share was for T8s, 9s and 10s, it wasn't

Page 438

1 100 percent, correct?
2    A.   It wasn't 100.  It was high in
3 the one-off documents, but it wasn't 100
4 percent.  But it was 100 percent of the
5 500 million in outerwear, yes.
6    Q.   But it wasn't 100 percent of
7 the outerwear zipper market, was it, sir,
8 for high-end outerwear?
9       MR. DANIELS:  Objection as to
10    form.
11    A.   No, it would not be all of it.
12    Q.   And you don't state what it
13 was, do you, in your report?
14    A.   What the global, what the
15 zipper market share was?
16    Q.   You don't state what YKK's
17 market share was for T8s, 9s and 10s in
18 high-end outerwear, you don't say it
19 anywhere; do you --
20       MR. DANIELS:  Objection to the
21    form.
22    Q.   -- in your reports?
23    A.   No, I don't state a number for
24 you, that's correct.  I don't state a
25 number in my report.

Page 439

46 (Pages 436 - 439)

1    Q.   You just know it wasn't 100
2 percent, correct?
3    A.   It wasn't 100 percent with
4 respect to the others, but they certainly
5 purchased, the customer purchased all of
6 that 500 million that I am allocating in
7 the supplemental report.
8    Q.   We're not circular, sir.  I am
9 not asking you about the 500 million.
10 The customers purchased the 500 million.
11 That doesn't mean that YKK could have
12 sold everything to those customers.
13        What I am asking you, sir, is
14 you don't say anything in your report
15 about YKK's market share for T8s, 9s and
16 10s.  You just know that it wasn't 100
17 percent, there were other competitors out
18 there selling water-resistant laminated
19 zippers, correct?
20    A.   Correct.  There were others out
21 there.  When YKK was selling this 500
22 million, there were other competitors out
23 there at the time.
24    Q.   T4s and T5s couldn't be
25 considered zippers for high-end outerwear

1 in terms of maximizing profits, if
2 customers wouldn't have purchased them;
3 isn't that right, sir?
4    A.   Well, I don't understand your
5 question.  Customers did purchase them,
6 even in the actual world.
7    Q.   They didn't purchase all of
8 them.  So answer my question, please.
9 This is getting frustrating because you
10 just keep pointing back to 500 million
11 meters, which has nothing to do with my
12 questions.
13        MR. DANIELS:  Objection.
14    Q.   In order to be -- strike that.
15        In order to maximize profits,
16 T4s and T5s wouldn't be zippers for
17 high-end outerwear if customers wouldn't
18 purchase them, that would not constitute
19 maximizing profits in the jury's
20 definition of high-end outerwear,
21 correct?
22        MR. DANIELS:  Objection as to
23    form.
24    A.   Your question just assumes that
25 customers wouldn't purchase them.  So I

1 don't --
2    Q.   I am not assuming that at all,
3 sir.  What I am asking you is, if
4 customers wouldn't purchase T4s or T5s
5 then the T4s or T5s couldn't be
6 maximizing profits and thus be zippers
7 for high-end outerwear, correct?
8        MR. DANIELS:  Objection as to
9    form.
10    A.   I am sorry, I am not
11 understanding your question.  It seems
12 like a hypothetical.  If you're asking me
13 to assume that they are not in the market
14 or something -- I just don't understand
15 your question.
16    Q.   Okay.  Assume that customers,
17 for whatever reason, be it higher price,
18 longer delivery times, quality issues,
19 were told that they couldn't buy T8s, 9s
20 and 10s and, therefore, refused to
21 purchase T4s or 5s because of those
22 issues.  Those T4s and T5s would not be
23 zippers for high-end outerwear, correct,
24 because the customers refused to buy
25 them?

1    A.   If they are used in high-end
2 outerwear, they would still be high-end
3 outerwear.
4    Q.   And that's how you defined
5 high-end outerwear for use in your
6 report, correct?
7    A.   I defined it using the jury's
8 definition.
9    Q.   Well, no, you didn't, and
10 that's what I am asking you.
11        MR. DANIELS:  Objection.
12    Q.   Did you take into account --
13 strike that.
14        Did you say anything in your
15 report about an order to maximize profits
16 and satisfy that part of the definition
17 of high-end outerwear customers would
18 have to be willing to purchase the
19 zippers, the T4s and T5s?
20    A.   In my report I calculate them,
21 the customers purchasing T4s and T5s.
22    Q.   But I am not asking you whether
23 or not customers purchased T4s and T5s,
24 so let's stop going around the barn.
25        Did you say anywhere in your

47 (Pages 440 - 443)

1  report that in order to satisfy the
2  maximizing profits part of the definition
3  of high-end outerwear, customers would
4  have to have been willing to purchase T4s
5  and T5s?
6      A.  I don't recall a quote like
7  that in my report, but in my calculations
8  and in my words I explain how they would
9  purchase them in lieu of T8s, 9s and 10s.
10     Q.  Your opinion of overall damages
11 didn't change after the jury's verdict
12 from where it was from before the jury's
13 verdict, correct?
14     A.  Correct.
15     Q.  Your opinion of the number of
16 meters of high-end outerwear zippers
17 didn't change after the jury's verdict
18 from where it was before the verdict, 65
19 million, correct?
20     A.  Yes.  In my prior answer that
21 is what I was referring to.  The 65
22 million is still 65 million.  I found
23 that my analysis was consistent with the
24 jury verdict.
25     Q.  So your opinion didn't change

Page 444

1  record was read back as follows:
2      "Question:  So your opinion
3  didn't change at all from before the
4  jury's verdict or after the jury's
5  verdict, your opinions?
6      "Answer:  My 65 million doesn't
7  change.  I, obviously, explain why
8  that is the case in my supplemental
9  report."
10     A.  In the supplemental report I
11 went through why that's the case.  But
12 you are correct that mathematically the
13 65 million is the same number.
14     Q.  Your opinion of overall damages
15 didn't change from before the jury's
16 verdict and after the jury's verdict,
17 correct?
18     A.  Correct.  The 65 million and
19 what stems from that is the same.
20     Q.  In order to maximize profits
21 and, therefore be zippers for high-end
22 outerwear, laminated zippers would have
23 to be zippers that the high-end customers
24 would purchase, correct, sir, yes or no?
25     A.  They would be purchasing

Page 446

1  at all from before the jury's verdict or
2  after the jury's verdict, your opinions?
3      MR. DANIELS:  Objection.  The
4  supplemental report speaks for itself.
5      A.  My 65 million doesn't change.
6  I, obviously, explain why that is the
7  case in my supplemental report.  But my
8  65 million --
9      Q.  I am not asking you to
10 explain --
11     MR. DANIELS:  You have to let
12 the witness answer the question.  If
13 you're going to ask a question, you
14 have to let the witness answer it.
15     MR. WOLKOFF:  He's not answering
16 the question.
17     MR. DANIELS:  Because you're
18 interrupting him.
19     MR. WOLKOFF:  I am interrupting
20 him because he's not answering.
21     MR. DANIELS:  At least you're
22 admitting you're interrupting him.
23     Can you, please, read back the
24 question, Dawn.
25     [The requested portion of the

Page 445

1  zippers in this definition, yes.  They
2  would be purchasing high-end zippers.  I
3  am sorry, purchasing zippers for high-end
4  goods.
5      Q.  Let me place in front of you DX
6  639.
7      (Defendants' 639, article from a
8  publication called Gear Junkie dated
9  January 14, 2014 previously marked for
10 identification.)
11     Q.  You see that this is an article
12 from a publication called Gear Junkie
13 dated January 14th, 2014 that talks about
14 the waterproof LightRail zipper shown in
15 the Columbia jacket, sir?
16     MR. DANIELS:  Objection.  Lack
17 of authentication.
18     A.  I see this.
19     Q.  You read this in connection
20 with your work in this matter, correct?
21     A.  I believe I saw information
22 about IDEAL before, yes.  Maybe it's
23 black and white and I am not recognizing
24 it.  But I do recall pictures about
25 IDEAL.

Page 447

48 (Pages 444 - 447)

1    Q.    You didn't discuss or even
2  mention the IDEAL zipper and the fact
3  that here it was shown in the Columbia
4  outerwear in your reports; did you, sir?
5    A.    I didn't discuss this picture
6  in my report; no, I did not.
7    Q.    I am not asking about the
8  picture.
9        Did you discuss the IDEAL
10 LightRail zipper at all as an alternative
11 zipper for purchase in any of your
12 reports?
13       MR. DANIELS:  Objection as to
14    form.
15    A.    I don't recall talking
16 specifically about IDEAL.  I just talked
17 about alternatives.
18    Q.    Let me place in front of you DX
19 664, which is also Plaintiffs' Deposition
20 173 in the Arntson deposition.
21       (Defendants' 664, document Bates
22    stamped YKK0011534, previously marked
23    for identification.)
24    Q.    Do you see that this is YKK's
25 summary report of the Outdoor Retailer

Page 448

1  that there weren't any acceptable
2  alternatives, whether or not they
3  infringe, right?
4    A.    In my report, I have to go back
5  and look, I talk about how this was a
6  standard.  And I am not aware of another
7  industry standard zipper, infringing or
8  otherwise.
9    Q.    Is that something that you have
10 expertise on, sir?
11    A.    No, I can't opine on
12 infringement or not.
13    Q.    Mr. Cockrell, is he, to your
14 knowledge, an expert on what zippers
15 infringe patents or not?
16    A.    No, I believe his focus is
17 industry.
18    Q.    Did you talk to anybody else
19 other than Mr. Cockrell about whether or
20 not there were other non-infringing,
21 acceptable non-infringing alternative
22 zippers?
23    A.    I don't recall any other
24 conversations about that, no.
25    Q.    Directing your attention now

Page 450

1  Show in August 2014, sir, so during the
2  relevant time period?
3    A.    Yes, I do see that.
4    Q.    Now, the prior exhibit that we
5  just looked at, Exhibit 639, Defendants'
6  Exhibit 639 showed the IDEAL zipper in a
7  Columbia outerwear garment, correct?
8    A.    Yes, that's what it says.
9    Q.    Did you search for other
10 examples of competitive zippers being
11 sewn into outerwear garments in
12 connection with your work in this case?
13    A.    Yes, I did.
14    Q.    And where are those?
15    A.    Well, I talked with
16 Mr. Cockrell about that, and I discussed
17 in my report how there was no acceptable
18 alternatives.  So I didn't find one.
19    Q.    Again, sir, you keep going on
20 about this.  What you said in your report
21 is that you were not aware of any
22 acceptable non-infringing alternatives,
23 correct?
24    A.    Yes.
25    Q.    You didn't say in your report

Page 449

1  back to Defendants' Exhibit 664, you have
2  seen this report about the outdoor
3  retailer summer market in 2014, so during
4  the relevant time period in connection
5  with your work here, correct?
6    A.    Correct.
7    Q.    Let me direct your attention to
8  page 11553.  You see there is a page here
9  that's entitled, "Homework On New Item
10 Development"?
11    A.    I see that.
12    Q.    And then about in the middle of
13 that page, there is a discussion of the
14 competitors in the water-repellent area,
15 correct?
16    A.    Yes.
17    Q.    And it says, "Competitors have
18 been aggressively developing new
19 design/function trends YKK is not being
20 able to cover," correct?
21    A.    That's what it says.
22    Q.    You saw that in connection with
23 your work in this matter, correct?
24    A.    I did.
25    Q.    But you said nothing about it

Page 451

1 or even about competitors in your
2 reports; did you, sir?
3    A.   I didn't say anything about
4 this sentence. I've already talked about
5 my work in the market shares, and the
6 market sales and things like that.
7    Q.   You didn't say anything about
8 competitors in the industry; did you,
9 sir --
10        MR. DANIELS:  Objection as to
11   form.
12    Q.   -- in your reports?
13        MR. DANIELS:  Objection, asked
14   and answered.
15    A.   No. For example, I pointed out
16 in my supplemental report, I talk about
17 how they achieve the 500 million in sales
18 despite any competition.
19    Q.   I am not going you again about
20 the 500 million dollars in sales. You
21 keep repeating it over and over again.
22 But it's not an answer to my questions.
23        MR. DANIELS:  Objection.
24    Q.   My question is: Did you have
25 any kind of section or discussion in your

Page 452

1 narrative about competitors in the
2 water-resistant zipper industry during
3 the relevant time period?
4    A.   One example that comes to mind
5 is pointing out that YKK made those
6 sales, still 500 million, despite any
7 competition. So, yes, we are recognizing
8 there is a market. There is competitors
9 there.
10    Q.   Okay. Did you place into your
11 report any analysis of who the
12 competitors were in the industry for
13 water-resistant zippers during the time
14 period at issue?
15    A.   I did not list them and have
16 their sales data and things like that, as
17 I said earlier, no, I don't have that in
18 my report.
19    Q.   Here is yet another e-mail,
20 Defendants' Exhibit 278.
21        (Defendants' Exhibit 278,
22   document Bates stamped YKK0484616,
23   previously marked for identification.)
24        MR. DANIELS:  Objection, lack of
25   authentication.

Page 453

1        MR. WOLKOFF:  I haven't even
2   asked my question about it yet.
3        MR. DANIELS:  You handed it to
4   him.
5        MR. WOLKOFF:  Yes, handing it,
6   handing an exhibit to a witness is not
7   asking a question about it.
8        MR. DANIELS:  I will reassert it
9   after you phrase a question then.
10    Q.   You see this is an e-mail chain
11 between Uretek and YKK attaching a
12 summary of a November 5, 2006 meeting
13 between them?
14        MR. DANIELS:  Objection. Lack
15   of authentication.
16    A.   I do see Defendants' Exhibit
17 278, yes.
18    Q.   And on page 335095?
19        MR. DANIELS:  Those are not the
20   right Bates numbers.
21    A.   It seems to be out of order.
22 It skips from 621 to 335.
23    Q.   Do you see on page 335095,
24 there is a few paragraphs under the
25 heading "Summary of Our Meeting of

Page 454

1 November 5"?
2    A.   Yes.
3    Q.   And you see there is a section
4 numbered 3, "Changes in Market
5 Operations" in which Mr. Sarumaru was
6 speaking?
7    A.   Yes.
8    Q.   And do you see, starting in the
9 third line, he told Stuart Press of
10 Uretek that "This is also true for
11 water-repellent zippers, and there is
12 also a disturbing increase of similar
13 products with cheaper pricing by other
14 companies"?
15    A.   I see that sentence.
16    Q.   Did you say anything about this
17 in your report?
18    A.   I don't talk about this
19 paragraph in my report.
20    Q.   But do you talk about the
21 subject, sir? You know that's what I am
22 asking you.
23        MR. DANIELS:  Objection. That's
24   not the question you asked. You asked
25   him if he talked about this in his

Page 455

50 (Pages 452 - 455)

1  report. And you were referring to
2  what you just read, and he answered
3  the question.
4       If you would like to ask him a
5  different question, feel free. But
6  don't accuse him of that, having to
7  guess what the question --
8       MR. WOLKOFF: That will be the
9  day when you teach me how to ask
10  questions, Mr. Daniels. That's a day
11  long in coming.
12      The this referred to the subject
13  matter, obviously. He knows it and
14  you do too.
15      MR. DANIELS: And I object.
16  He's going to take you at your words.
17      MR. WOLKOFF: Those weren't my
18  words.
19  Q.   Did you talk at all in your
20  report about this subject matter, that is
21  an increase of similar products with
22  cheaper pricing by other zipper
23  manufacturing companies -- zipper
24  laminating companies, that is?
25  A.   Not in this detail. I talked

Page 456

1  about alternatives, non-infringing
2  alternatives, and I talked about being
3  able to make these sales despite the
4  market's competition.
5  Q.   But did you say anything in
6  your report about this topic, that is as
7  Mr. Sarumaru said, as far back as 2006,
8  that there was an increase of similar
9  products with cheaper prices by
10  competitors in the water-resistant
11  laminating zipper industry?
12      MR. DANIELS: Objection. Asked
13  and answered.
14  A.   Aside from my discussion of
15  alternatives and my discussion of being
16  able to achieve the global market sales
17  despite competition, I did not go into
18  detail about that competition.
19  Q.   Whether you went into detail or
20  not, did you have anything in your
21  narrative about what Mr. Saramaru was
22  talking about with Mr. Press as far back
23  as 2006 that there had been a disturbing
24  increase of similar products with cheaper
25  pricing by other zipper laminating

Page 457

1  companies?
2       MR. DANIELS: Objection. Asked
3  and answered.
4  A.   I did not elaborate in detail
5  about the competition. There is many
6  forms and I didn't talk about it, but I
7  recognize it was there.
8  Q.   You had this exhibit before you
9  or in connection with writing your
10  supplemental report, correct?
11  A.   I did have this, yes.
12  Q.   Did you cite it in your report,
13  in the discussions in your report,
14  anyway?
15  A.   I don't believe so.
16  Q.   Did you cite in your report
17  even one of the documents that I have
18  shown you today at your deposition, even
19  one?
20      MR. DANIELS: Objection. The
21  reports speak for themselves.
22  A.   Yeah, I believe I cited the
23  Outdoor Retailer reports in my report. I
24  don't know if I cited that one. I tried
25  to get every year. I would need to go

Page 458

1  back and look.
2  Q.   All you cited about the Outdoor
3  Retailer reports is that you said
4  customers went to them, correct?
5  A.   My report says what it says,
6  but customers went to them and sometimes
7  they show what YKK was doing there.
8  Q.   Uretek representatives went to
9  each one of those trade shows as well,
10  correct?
11  A.   I do recall Mr. Press being at
12  those trade shows. Yes. I don't know if
13  he went to all of them.
14  Q.   And are there any documents
15  that suggest or state that Mr. Press went
16  to all of the trade shows?
17  A.   I don't know of a document that
18  inventories what trade shows he went to.
19  Q.   You say that at the trade
20  shows, the customers who went to the YKK
21  booth would have seen their market
22  flyers, correct?
23  A.   I identified that they were
24  likely exposed to flyers, yes.
25  Q.   So you would agree that

Page 459

51 (Pages 456 - 459)

1 Mr. Press who also went to the trade
2 shows also likely saw the YKK flyers,
3 correct?
4    A.    Again, I assume he was there on
5 some of the occasions, yes.
6    Q.    Do you know of Mr. Press
7 raising any objection to anyone at YKK or
8 anybody else, to your knowledge, about
9 what was in the YKK marketing flyers at
10 any point?
11    A.    I don't know one way or the
12 other. I know Mr. Press raised many
13 concerns. I don't know if this was one
14 of them.
15    Q.    Do you know if Mr. Press ever
16 objected to any of the marketing flyers
17 that were at the YKK trade shows that he
18 went to?
19    A.    I don't know one way or the
20 other. There were many discussions
21 between the parties.
22    Q.    You can't know one way or the
23 other. You need to know. Either yes or
24 no. There is no such thing as not
25 knowing one way or the other. That

1 applies to not remembering. But not
2 knowing doesn't have a caveat of one way
3 or the other. You either know or you
4 don't know.
5        Do you know of Mr. Press or to
6 your knowledge anybody else at Uretek
7 ever raising any objection about any of
8 the contents of the YKK marketing flyers
9 at anytime?
10    A.    To my knowledge, I don't recall
11 that as I sit here, him doing it or not
12 doing it, and I am not privy to those
13 negotiations that were going on, so I
14 don't know.
15    Q.    Did you see any documents or
16 any notes or anything else, or any
17 information, data, reflecting an
18 objection by Mr. Press or anybody else at
19 Uretek to anything in the YKK marketing
20 flyers; do you recollect seeing any of
21 that?
22    A.    I don't recall that as I sit
23 here. I know claims were brought.
24 Again, I --
25    Q.    Can you pull out 509, please?

1    A.    I'm sorry, that is something I
2 have already?
3    Q.    That is something you have
4 already.
5        Do you have it in front of you,
6 sir?
7    A.    I do not. I am looking for it.
8    Q.    Rather than taking the time,
9 let me place it in front of you.
10    A.    Thank you.
11    Q.    You see that this an e-mail
12 report by Mr. Blunt concerning Stuart
13 Press, back on June 2, 2010?
14    A.    Yes.
15    Q.    And you see in that report it
16 says, "Press attends the fall outdoor
17 show every year"?
18    A.    I see that's Mr. Blunt's
19 statement, yes.
20    Q.    And that's where you say YKK
21 had its marketing flyers, at the trade
22 shows that Mr. Press was attending?
23    A.    That is one place they have
24 them, yes.
25    Q.    I would like to place them in

1 front of you. Defendants' Exhibit 295.
2        (Defendants' Exhibit 295,
3    document Bates stamped YKK0627414
4    previously marked for identification.)
5    Q.    You see this is a report of a
6 YKK meeting with Uretek in March of 2007,
7 sir?
8    A.    Yes.
9        MR. DANIELS: Objection. Lack
10    of authentication.
11    Q.    You saw this document in
12 connection with the preparation of your
13 supplemental report in this matter,
14 correct?
15    A.    I am reviewing it to confirm.
16        (Witness reviews document.)
17    A.    Yes, I did see this.
18    Q.    And you see this is a
19 PowerPoint that YKK presented to Uretek
20 at this meeting in March of 2007,
21 correct?
22        MR. DANIELS: Objection as to
23    form.
24    A.    I see it's probably a
25 PowerPoint. I don't know who presented

1  which.
2    Q.   Well, it was Uretek and YKK,
3  according to the PowerPoint who was
4  present at the meeting, right?
5    A.   That's what this says, yes.
6    Q.   You had this document in
7  connection with doing your work in this
8  matter, correct?
9    A.   I did.
10   Q.   Did you ask anyone what this
11  document was?
12   A.   I don't know.  I know we talked
13  about some of the topics that are in here
14  with Mr. Press, but I don't know if I was
15  using this document to do it.
16   Q.   Let me direct your attention to
17  page 627430.  You see this part of the
18  PowerPoint that is dated March 2, 2007 in
19  the right-hand corner at the top?
20   A.   Yes.
21   Q.   And this section of the
22  PowerPoint is headed "Competitors,"
23  correct?
24   A.   It is.
25   Q.   And in the middle there is a

Page 464

1  picture of what is said to be a
2  water-resistant zipper, like the T4s,
3  T5s, and the T8s, 9s and 10s, correct?
4    A.   That's what it says here,
5  "water-resistant zipper."
6    Q.   And right above the
7  water-resistant zipper, it talks about
8  Chinese manufacturers, right?
9    A.   It does say that.
10   Q.   And it says among other things
11  that these Chinese manufacturers, the
12  competitors for the sale of
13  water-resistant zippers, had a lead time
14  of only seven days, correct?
15   A.   That's what this says.
16   Q.   How did Uretek laminated T4s
17  and T5s compare in connection with the
18  sales of those zippers to Asian garment
19  manufacturers with this lead time for the
20  Chinese manufacturers of seven days; do
21  you know?
22   A.   Historically I understood it to
23  be longer.
24   Q.   How much longer?
25   A.   I have seen various estimates,

Page 465

1  as I have said this morning.
2    Q.   How much longer?
3        MR. DANIELS:  Objection.  Asked
4    and answered.
5    A.   I don't know precisely how much
6  longer.  I know I see references to
7  weeks.
8    Q.   Seven days is, obviously, one
9  week for the Chinese manufacturers to
10  deliver their water-resistant zippers,
11  correct?
12   A.   Yes.
13   Q.   Remember, we looked at a
14  document that indicated that typical lead
15  time for the delivery of Uretek laminated
16  T4s and T5s was six to eight weeks?
17   A.   I do recall.  That was one of
18  the examples I was thinking of.
19   Q.   So that would be as much as
20  eight times as long to get a Uretek
21  laminated zipper than a Chinese
22  manufactured water-resistant zipper,
23  correct?
24   A.   Compared with what actually
25  happened.  Yes, at the time given the low

Page 466

1  volumes, no inventory control, yes.
2    Q.   Do you know the importance of
3  lead times in the garment fashion
4  industry?
5    A.   I understand that they can be
6  important, but I am not an industry
7  expert on that.
8    Q.   You said nothing about this
9  document in your report; did you?
10   A.   I don't believe I cited it for
11  anything.  It has a lot of basic
12  background information.
13   Q.   In fact, you said nothing about
14  Chinese competitors in your reports.  You
15  don't have the words "Chinese
16  competitors" appear anywhere; do you,
17  sir?
18       MR. DANIELS:  Objection as to
19   form.
20   A.   I don't believe so.  It just
21  says "Competitors."
22   Q.   Are you aware that Uretek never
23  had a patent in China for its lamination?
24   A.   China, correct.  I just wanted
25  to be correct, Taiwan and Hong Kong, yes,

Page 467

53 (Pages 464 - 467)

1 but China no.
2    Q.   Actually, plaintiffs never had
3 a patent in Taiwan; did they, sir?
4        MR. DANIELS:  Objection as to
5    form.
6    A.   I understood the zipper patents
7 include foreign counterparts in Canada,
8 Taiwan, Hong Kong, Japan and the European
9 Union.
10       MR. WOLKOFF:  I would like to
11    have a memorandum opinion and order by
12    Judge Woods in this matter filed on
13    March 23, 2023 marked as Donohue
14    Exhibit 14 for identification.
15       (Donohue Exhibit 14, Memorandum
16    Opinion and Order by Judge Woods was
17    so marked for identification, as of
18    this date.)
19    Q.   Have you seen this memorandum,
20 opinion and order by Judge Woods in this
21 matter prior to today?
22    A.   I have.
23    Q.   Did you read it?
24    A.   I opened it and skimmed some
25 parts of it.

Page 468

1    A.   Yes.  I think that's what he's
2 using, the name change.
3    Q.   So you now are aware that the
4 plaintiffs did not have a patent in
5 Taiwan?
6        MR. DANIELS:  Objection.
7    Mischaracterizes the order.
8    Mischaracterizes the facts.
9    A.   I am aware of the order, but
10 again as a damage expert I am assuming
11 infringement.  I am assuming standing.  I
12 am not addressing any legal issues that
13 may come with the patent.
14    Q.   With regard to China, given
15 that as you've agreed Uretek never had a
16 patent with regard to its lamination in
17 China, a customer could have purchased
18 water-resistant zippers from a Chinese
19 supplier overseas without violating any
20 Uretek patent, correct?
21       MR. DANIELS:  Objection as to
22    form.
23    A.   Well, it depends on what they
24 would do with that afterwards.  If they
25 imported it to the U.S., maybe.  But as

Page 470

1    Q.   So let me direct your attention
2 to page 12 of Judge Woods' order.
3        Do you see in the second full
4 paragraph there, he talks about whether
5 or not the plaintiffs had a patent in
6 Taiwan?
7    A.   Page 12 you said, right?
8    Q.   Yes.
9    A.   Second paragraph?
10    Q.   Yes, sir.
11    A.   Yes, I see that.
12    Q.   Do you see the Court said in
13 that second paragraph about Taiwan, "The
14 records uncovered in Taiwan show no
15 change in ownership of the Taiwanese
16 patents from Mr. Press and Howard Koder.
17 More importantly there is no indication
18 in the records that a transfer was ever
19 implemented to either Uretek or
20 Trelleborg"?
21        Do you see that?
22    A.   I do.
23    Q.   Uretek, Trelleborg, those are
24 the plaintiffs in this case, referring to
25 Uretek being AU New Haven, correct?

Page 469

1 part of a make part, correct, if there is
2 no patent in China, you would not be
3 infringing the make part of that or the
4 use.
5    Q.   And so the Chinese competition,
6 they would not be infringing on any
7 Uretek patent if the purchaser of their
8 zippers didn't import them into the
9 United States, correct?
10       MR. DANIELS:  Objection.  Calls
11    for a legal conclusion.
12    A.   Well, they have other patents
13 around the world.  So that could be
14 infringing.
15    Q.   Okay.  Where did Uretek have
16 other patents?
17    A.   Well, we just mentioned the
18 foreign counterparts included Taiwan,
19 Japan, Hong Kong and the European Union,
20 for example.
21    Q.   Well, I mentioned Taiwan in the
22 context of not having a patent there.
23       MR. DANIELS:  Objection, again
24    misstates the record.
25    Q.   You would agree a customer

Page 471

54 (Pages 468 - 471)

1 could have purchased water-resistant
2 zippers from a supplier in China, so long
3 as it didn't ship those zippers into the
4 United States or one of the locations
5 where YKK -- strike that.
6        You agree that a customer could
7 have purchased water-resistant zippers
8 from a supplier in China, so long as it
9 didn't ship those zippers into the United
10 States or one of the other countries
11 where Uretek did have a patent on its
12 lamination activities, correct?
13    A.   I obviously can't give legal
14 opinions, but I agree if there is no
15 patent coverage that you would be
16 infringing, it could be a non-infringing
17 activity.
18    Q.   Did you do anything to look at
19 how many competitors for water-resistant
20 zippers were located in China during the
21 time period at issue?
22    A.   Aside from understanding that
23 the outerwear sales and the billion
24 dollars of sales that were made were made
25 with that competition.

Page 472

1    Q.   Okay.  I am not moving to
2 strike because we've agreed to forego
3 making those motions until time of trial.
4 But I would have made many of them.
5        Did you do anything to
6 determine how many competitors for
7 water-resistant zippers were in China
8 during the period at issue, that calls
9 for a number of competitors, if any?
10    A.   I saw Chinese competitors
11 mentioned in the documents, but I have
12 not inventoried them and added them up.
13 No, I do not provide a number of
14 competitors in my report.
15    Q.   Do you know when the plaintiffs
16 had a patent for their lamination
17 activities in Japan, as of when?
18        MR. DANIELS:  Objection.  Calls
19 for a legal conclusion.
20        MR. WOLKOFF:  No, it doesn't.
21 It just calls for having read Judge
22 Woods' opinion which he said he did.
23        MR. DANIELS:  You've already
24 mischaracterized that opinion once.
25 So I am objecting.  It calls for a

Page 473

1 legal conclusion.  I am not
2 instructing the witness not to answer.
3 So I am not sure why we are engaging
4 in the colloquy.
5        MR. WOLKOFF:  I actually read
6 the portion of the order about Taiwan
7 to the witness, so I didn't
8 mischaracterize.
9        MR. DANIELS:  Well, we disagree.
10 The witness can answer the question.
11    A.   I understand that the Japanese
12 patent was filed sometime prior to 2009,
13 I believe, or around 2009.  And I think
14 it issued in 2013.
15    Q.   Can you turn to Judge Woods
16 order, Donohue Exhibit 14, back to page
17 12?
18        Do you see there the first
19 paragraph above the one about Taiwan is
20 about Japan, correct?
21    A.   Yes.
22    Q.   And Judge Woods says in the
23 next to last sentence going on to the
24 final sentence of that paragraph, that
25 "There was no transfer of the rights in

Page 474

1 the '523 patent to Uretek or Trelleborg,
2 until the purported 2016 assignment was
3 registered with the JPO," Japanese Patent
4 Office?
5    A.   I see that.
6    Q.   So are you aware that the
7 plaintiffs did not have a Japanese patent
8 for the lamination activities until the
9 latter part of 2016 --
10        MR. DANIELS:  Objection.  Calls
11 for a legal conclusion.
12    Q.   -- not 2013, as you just
13 testified to?
14        MR. DANIELS:  Objection.  Calls
15 for legal conclusions.
16    A.   Well, just to be clear, I
17 thought that '13 may have been the file
18 date.  But the '16 -- I don't recall the
19 assignment date.
20    Q.   You said the file date was
21 2009.
22    A.   The file date was pre-2009, I
23 don't remember the exact year.  And I
24 thought there --
25    Q.   So now you're saying you

Page 475

55 (Pages 472 - 475)

1 thought 2013 was also the file date, two
2 file dates, that's how you're going to
3 answer my question?
4    A.   Issue, issued.
5        MR. DANIELS:  Objection.  You
6    have to stop badgering the witness.
7    He answered the question very clearly.
8    You keep going over the same
9    questions.  Let him finish his answer
10   to your questions.
11   A.   I thought '13 was the issue
12 date.  Not the file date.  I did not --
13 the 2016 assignment, I don't know.  I
14 know that's a legal issue that's being
15 discussed.
16   Q.   Okay.  Actually, on page 9 of
17 the judge's order he states under the
18 paragraph F that the patent wasn't filed
19 for in Japan until September 2016,
20 correct?
21   A.   I see him saying that shows
22 that the September 16th was the executed
23 deed of assignment.
24   Q.   So a patent couldn't have been
25 filed for by the plaintiffs until they

1 actually had the patent assigned to them,
2 which was by September of 2016, correct?
3        MR. DANIELS:  Objection as to
4    form.  Calls for a legal conclusion.
5    A.   Yeah, I can see the dates, but
6 I've assumed that there are patents.
7 I've assumed they are infringed.  I am
8 not touching on these legal issues.
9    Q.   Your work assumed that the
10 plaintiffs did have a patent in Japan and
11 Taiwan from 2009 forward, correct?
12   A.   It assumed that they had, that
13 there was an infringement and they had
14 standing for damages for that damage
15 period, that the legal issues that were
16 needed --
17   Q.   Is the answer yes?
18   A.   Yes, I've assumed that that
19 would be the legal period.
20   Q.   If plaintiffs didn't have a
21 patent in Japan until the fall of 2016,
22 what, if anything, would that do to your
23 damages opinions; do you know?
24        MR. DANIELS:  Objection as to
25    form.

1    A.   At a high level, if the
2 infringement period is shorter, it may
3 take certain units out of the damage
4 calculation if there is no infringement
5 during that period.  Because I am
6 assuming infringement.
7    Q.   So sitting here, do you know
8 what the impact on your damages opinions
9 would have been if plaintiffs didn't have
10 a patent in Japan until the fall of 2016?
11       MR. DANIELS:  Objection as to
12   form.  Also calls for legal
13   conclusions.
14   A.   If time is the proper way to
15 address that, assuming, because I can't
16 address these legal issues, but time is
17 the proper way to address that, my report
18 and the exhibits have damages by year, so
19 you would adjust the years accordingly,
20 if that, that was the solution to this
21 legal issue.
22   Q.   Do you have a damages analysis
23 beginning in November or September of
24 2016?
25   A.   My analysis is by year.

1    Q.   So you don't have one beginning
2 in November or September of 2016?
3        MR. DANIELS:  Objection.
4        You have to let him finish his
5    answers.
6        MR. WOLKOFF:  He finished.
7        MR. DANIELS:  How do you know,
8    you interrupted him.
9        MR. WOLKOFF:  I didn't interrupt
10   him.
11   A.   I have it by year.  I currently
12 do not have a subtotal for '16 through
13 2019 or 2018; that's fair.  But I do have
14 my damages calculation by year.
15   Q.   But you didn't set forth in
16 your reports a damages opinion on the
17 basis of the plaintiffs not having a
18 patent in Japan until the fall of 2016;
19 did you?
20       MR. DANIELS:  Objection as to
21   form.
22   A.   If time is the right way to
23 solve that, I haven't created a new
24 subtotal, but I have the damages by year.
25   Q.   If the plaintiffs didn't have a

1 patent in Taiwan, what would that do to
2 your damages figures --
3         MR. DANIELS:  Objection as to
4     form.
5  Q.   -- do you know?
6         MR. DANIELS:  Objection.  Calls
7     for a legal conclusion.
8  A.   If they don't have a patent in
9 Taiwan, the U.S. damages would still be
10 based on import.  But if there is no
11 patent in Taiwan, and you're asking me to
12 assume that those are not infringing,
13 effectively, they would remove the ones
14 that are in Taiwan, made in Taiwan.
15  Q.   Can you tell me what the impact
16 would be on your damages opinion?
17  A.   I would have to look at my
18 exhibits and remove RCPU, which is made
19 in Japan, Taiwan, for example, from those
20 calculations.
21  Q.   There were other sales of T8s,
22 9s and 10s in Taiwan beyond RCPU,
23 correct?
24  A.   I believe T8s, 9s and 10s were
25 made in Japan.

Page 480

1 advertising claim.
2  Q.   Did you separate out your
3 purported damages with respect to either
4 of those claims?
5         In other words, this amount of
6 damages applies to the patent
7 infringement claim, and this amount of
8 damages applies to the Lanham Act claim?
9  A.   I separated them by the act of
10 selling into the excluded markets, which
11 I understand could be a wrongful act
12 under potentially the patent claim in the
13 United States or potentially the Lanham
14 Act claim.
15  Q.   That's not what I am asking.
16         MR. DANIELS:  Again, objection,
17     he answered your question.  If you
18     would like to change your question and
19     ask him a different question, you're
20     free to.  You have to stop
21     mischaracterizing his answers as
22     non-responsive to your questions.
23  Q.   Did you separate out your
24 damages opinions with respect to the
25 Lanham Act and patent infringement.

Page 482

1  Q.   But the question is whether
2 they were sold, isn't it, sir, not where
3 they were manufactured?
4  A.   There were some T8s, 9s and 10s
5 sold in Taiwan.  I would have to look at
6 that as well.
7  Q.   Do you know sitting here today
8 what the impact would be on your damages
9 opinion if the plaintiffs did not have a
10 patent in Taiwan?
11         MR. DANIELS:  Objection as to
12     form and objection that it calls for
13     legal conclusions.
14  A.   Depending on the wrongful act
15 or claim, we would have to adjust that
16 time period, and I haven't provided a
17 subtotal at this time.
18  Q.   Are you aware of how many
19 remaining different claims there are in
20 the plaintiffs' operative complaint in
21 this case?
22  A.   I believe I am.
23  Q.   How many are there?
24  A.   I believe there is a U.S.
25 patent claim and a Lanham Act, a false

Page 481

1         MR. DANIELS:  Objection.
2     Thought you were done.
3         MR. WOLKOFF:  Let me start
4     again.
5  Q.   Did you separate out your
6 opinions on damages and allocate them to
7 the two different claims here, saying
8 this is the amount of damages in my
9 opinion under the Lanham Act claim, and
10 this is the amount of damages in my
11 opinion under the patent infringement
12 claim?
13  A.   I broke them out by act.  I was
14 requested to break them out by act.
15  Q.   Did you break out your damages
16 opinions by claim in this matter, this
17 much according to or with respect to
18 patent infringement and this much with
19 respect to the Lanham Act?
20  A.   By breaking them out by act, I
21 understand that they would fall either in
22 the patent claim for the lost profits in
23 the United States or under the false ad
24 claims.
25  Q.   Did you say in your report

Page 483

57 (Pages 480 - 483)

1  anywhere these are the damages that I
2  opined for patent infringement and these
3  are the damages that I opined under the
4  Lanham Act?
5      A.  I don't phrase it that way.  I
6  phrased it as these are the lost profit
7  damages due to the lost profit activity
8  and these are the disgorgement damages
9  which I understand then relate to those
10  claims because different acts relate to
11  the wrongful act of selling into excluded
12  markets.
13      Q.  Do you know how many different
14  named defendants there are in this case,
15  different corporations?
16      A.  I don't have a count for you,
17  but I appreciate there are selling
18  affiliates all over the world.  A dozen
19  plus.
20      Q.  You call them affiliates.  Did
21  you look up the relationship among any of
22  these defendants?
23      A.  Only what's shown in the record
24  that they are sales affiliates for YKK.
25      Q.  They are separate corporations,

Page 484

1  and damages by entity.
2      Q.  How much, in your opinion, were
3  the damages caused under the Lanham Act
4  by YKK Zipper Indonesia; is that in your
5  report?
6      MR. DANIELS:  Objection as to
7  form.  Objection, it calls for a legal
8  conclusion.
9      A.  I would need to look at my
10  exhibits to my report where I believe I
11  lay out the sales by entity.  So there is
12  a line for Indonesian and it would have
13  revenues and gross profits for
14  disgorgement and then there would be a
15  lost profits, too, where I break it out
16  by entity.
17      Q.  Did you state in your opinions
18  as opposed to having to go look in
19  tables, how much your damages opinion is
20  with regard to any one of these separate
21  YKK entities?
22      MR. DANIELS:  Objection as to
23  form.
24      A.  No.  I believe my report, the
25  narrative, as we've been saying,

Page 486

1  aren't they, sir, the defendants?  Each
2  one is a separate corporation?
3      A.  I do understand that, yes.
4  That's why they are listed here.
5      MR. WOLKOFF:  Let me have the
6  amended complaint, please, marked as
7  Donohue Exhibit 15, please, for
8  identification.
9      (Donohue Exhibit 15, amended
10  complaint was so marked for
11  identification, as of this date.)
12      MR. DANIELS:  What is that?
13      Q.  Do you see that there are 21
14  separate corporations who are defendants
15  in this case?
16      A.  I can count them for you, but I
17  recognize there are a list of defendants
18  here, yes.
19      Q.  You didn't opine as to a
20  damages number with respect to YKK
21  Corporation versus YKK Hong Kong versus
22  YKK fastening product sales and so on,
23  that is as to each separate defendant
24  corporation; did you, sir?
25      A.  My report breaks down the sales

Page 485

1  aggregates that for all of the YKK
2  entities together.  And then the exhibits
3  to my report break it out by entity.
4      Q.  Can I read in the narrative in
5  your report any statement to the effect
6  of these are the damages under the Lanham
7  Act as regards YKK France, SARL, these
8  are for YKK Vietnam Co., and so on and so
9  forth, is that anywhere in your report in
10  the narrative?
11      A.  You would have to look at the
12  exhibits to get the disgorgement number
13  and the profit number.
14      Q.  And that's true for the Lanham
15  Act and it's also true for the patent
16  infringement claims, right?
17      A.  Correct.  That detail is in the
18  exhibits.  Not in the narrative itself.
19      Q.  Let's take a look at Exhibit
20  R34 in your supplemental report, please.
21      A.  Exhibit 34, right?
22      Q.  Yes.  Exhibit 34 and Exhibit
23  34A you compare revenues and profits
24  between what the parties earned based on
25  YKK selling T8s, 9s and 10s versus what

Page 487

58 (Pages 484 - 487)

1 the parties would have been earned if YKK
2 had been able to sell T4s and T5s to
3 their customers instead, correct?
4    A.   Yes, there is a lot here.  But
5 that's essentially what this is doing,
6 it's comparing what actually happened
7 them selling T8s, 9s and 10s for the
8 high-end outerwear compared to what
9 should have happened, them selling T4s
10 and 5s for the high-end outerwear.
11    Q.   Looking at the line item for
12 high-end outerwear, you got the
13 determination of what was high-end
14 outerwear from Cockrell, right?
15    A.   He was one of the steps, yes.
16 He was the last step that narrowed it to
17 that.
18    Q.   And now in Exhibits 34 and 34A,
19 you're reallocating the parties' profits
20 based on Cockrell's determination of
21 high-end outerwear, correct?
22    A.   In part, yes.  That is the 65
23 million in part comes from Mr. Cockrell.
24    Q.   And this is your profit
25 analysis under the jury's verdict,

Page 488

1    MR. DANIELS:  Objection.
2    Q.   Whether you got it from him
3 orally or in writing, I am not asking you
4 that, but you got it from him, right?
5    A.   He was part of that 65 million.
6 And he was part of it before, and he was
7 part of it after the jury verdict.  And I
8 discussed with him that his verdict --
9 his opinion was consistent with the jury
10 verdict.
11    Q.   Your analysis of profits came
12 after Cockrell had already determined
13 what was high-end outerwear, correct?
14    A.   Well, my first report came
15 before the jury verdict, yes.  Maybe I
16 misunderstood.
17    Q.   Yeah.  Exhibits 34 and 34A are
18 your reallocation of profits among the
19 parties, correct?
20    A.   They are my -- in my
21 supplemental report, to look at the
22 profits between the parties, yes.
23    Q.   Okay.  And your analysis of
24 profits came after Mr. Cockrell already
25 determined and told you what, in his

Page 490

1 correct?
2    A.   This is.  This is a
3 demonstration of that, what it looks like
4 now, sitting here today.
5    Q.   And you got the line item for
6 high-end outerwear from Mr. Cockrell,
7 right?
8    MR. DANIELS:  Objection.  Asked
9    and answered.
10    A.   Well, he's part of that
11 process, yes.
12    Q.   And you got that line item from
13 Mr. Cockrell before you made your
14 profitability analysis, correct?
15    A.   I got that, that same number
16 happened to be the same, but I talked
17 with Mr. Cockrell about his analysis and
18 confirmed that it was consistent with the
19 jury verdict.
20    Q.   You got Mr. Cockrell's line
21 item for high-end outerwear before you
22 made your profitability analysis?
23    MR. DANIELS:  Objection.
24    Q.   Here in Exhibits 34 and 34A,
25 correct?

Page 489

1 opinion, was high-end outerwear, correct?
2    MR. DANIELS:  Objection.  Asked
3    and answered.
4    A.   Well, it was done after the
5 fact, of course, because it was done now,
6 after these sales had occurred.  So, yes,
7 it happened later.
8    Q.   Cockrell didn't analyze
9 profitability before determining, for
10 example, that Berghaus's outerwear
11 garment called the Mirage Shell was
12 high-end outerwear; did he?
13    MR. DANIELS:  Objection as to
14    form.
15    A.   You would have to ask
16 Mr. Cockrell exactly what he did before.
17 But I also understood that Mr. Cockrell,
18 like I, was aware of the dynamic of this
19 definition which is 3 cents for a royalty
20 were permitted for lamination profits,
21 and he was aware of that, as was I,
22 before.  So I think he was aware of that
23 and considered it before, as did I.
24    Q.   I am asking you whether after
25 the jury's verdict you understand that

Page 491

59 (Pages 488 - 491)

1  Cockrell kept his same opinion of what
2  was high-end outerwear as before the
3  jury's verdict, 65 million meters,
4  correct?
5      MR. DANIELS:  Objection as to
6    form.
7    A.  Ultimately, his opinion was the
8  same with my calculations.  I should add
9  we're using 65 million as a shorthand,
10  but you appreciate that Mr. Cockrell
11  looks at the features and I work with him
12  to incorporate the sales data.
13    Q.  Mr. Cockrell's opinion of what
14  was high-end outerwear and what was not
15  high-end outerwear remained the same
16  after the jury's verdict, correct?
17      MR. DANIELS:  Objection as to
18    form.
19    A.  Correct.  He reviewed his
20  opinion in light of that, but, yes, the
21  finding of which item is high-end
22  outerwear remained the same.
23    Q.  Do you know whether
24  Mr. Cockrell analyzed profitability
25  before determining, for example, that

Page 492

1      MR. DANIELS:  You are clearly,
2    clearly interrupting the witness's
3    answer.
4    Q.  Did you have anything else to
5  answer?
6      MR. DANIELS:  You are clearly
7    interrupting the witness's answer.
8      THE WITNESS:  I don't have
9    anything further.
10    A.  How long have we been going
11  since lunch?
12    Q.  An hour and five minutes.
13    A.  Can we take a break?  I think
14  we need a break.  Would you like to
15  finish your question, though?
16    Q.  I would.
17    A.  Absolutely.
18    Q.  Do you know whether or not, in
19  particular, Mr. Cockrell made an analysis
20  of maximizing profitability before
21  determining that specifically the
22  Berghaus Mirage Shell was a high-end
23  outerwear shell?
24    A.  Again, for details about what
25  he did, you would have to ask

Page 494

1  Berghaus's outerwear garment called the
2  Mirage Shell was high-end outerwear?
3    A.  I believe I mentioned, you have
4  to ask him what he did, but I know he was
5  aware of the profitability between the
6  parties given the 3 cents and the
7  lamination profits.
8    Q.  I am not asking about
9  profitability --
10      MR. DANIELS:  You have to let
11    him finish his answer.
12      MR. WOLKOFF:  He did finish.
13      MR. DANIELS:  He finished
14    because you interrupted him again.
15      MR. WOLKOFF:  You stop yelling
16    at me.
17      MR. DANIELS:  Stop interrupting
18    the witness because you don't like his
19    answer.
20      MR. WOLKOFF:  Stop raising your
21    voice at me.
22      MR. DANIELS:  Then stop
23    interrupting the witness.
24      MR. WOLKOFF:  I am not
25    interrupting.

Page 493

1  Mr. Cockrell.  But I also appreciate that
2  with the analysis as a whole, not
3  narrowed to any one good or item you're
4  selecting, he did appreciate that the way
5  the license worked would provide 3 cents
6  or lamination profits, depending on this
7  definition.  So he was aware of the
8  profit portion of this process at the
9  time.
10    Q.  Okay.  That's not what I am
11  asking you.  Do you know whether or not
12  Mr. Cockrell made any analysis with
13  regard to maximizing profitability with
14  respect to any of the specific types of
15  garments that he determined were high-end
16  outerwear?
17      MR. DANIELS:  Objection as to
18    form.  Objection, asked and answered.
19    A.  Again, you will have to ask him
20  that question.  I don't look at it as
21  looking at specific units.
22      When his analysis was done he
23  appreciated that there was this three
24  verus lamination profit dynamic.  I don't
25  want to say he didn't consider any

Page 495

60 (Pages 492 - 495)

1 profitability, because I believe he did
2 when he was doing this.
3        MR. WOLKOFF:  All right.  We can
4 take your break.
5        THE WITNESS:  Thank you.
6        THE VIDEOGRAPHER:  We are now
7 going off the record.  The time is
8 2:40 p.m., this is the end of media
9 label number four.  We are off the
10 record counselors.
11        [Off the record.]
12        THE VIDEOGRAPHER:  We are back
13 on the record.  The time is 2:52 p.m.
14 This is the beginning of media label
15 number 5.
16 BY MR. WOLKOFF:
17    Q.   Directing your attention to
18 Exhibits 34 and 34A that we were looking
19 at before the break, you see you have a
20 line item for high-end outerwear in your
21 profitability analysis, correct?
22    A.   I do.
23    Q.   So you did this profitability
24 analysis as reflected in Exhibits 34 and
25 34A after Mr. Cockrell had already

Page 496

1 see there is a profitability analysis?
2    A.   Yes.
3    Q.   And these are the analyses you
4 did, they are your Exhibits 34 and 34A,
5 correct, to your supplemental report?
6    A.   Correct.
7    Q.   Now looking at Exhibit 34A to
8 your supplemental report, on the left
9 side of this analysis there is the
10 actual, that is that YKK sold
11 $207,683,564 of high-end T8s, 9s and 10
12 and sold $1,952,704 of T4s and T5s,
13 correct?
14    A.   Well, they sold 12 million in
15 T4s.  Their revenue was 12 million.  And,
16 yes, the --
17    Q.   Maybe I am misreading it, but
18 under plaintiffs high-end outerwear
19 revenues on the left-hand side of this
20 analysis you show plaintiffs' sales of
21 T4s and T5s at $1,952,704 -- strike that.
22 I see.
23        You show that YKK sold and
24 derived revenues of $207,683,564 from
25 selling T8s, 9s and 10s during the

Page 498

1 provided you with what he believed was
2 high-end outerwear, correct?
3    A.   I did it with what he provided
4 before and then working with him to
5 confirm that it was consistent with the
6 award, I used it again.  So it turned out
7 to be the same number, so yes.
8    Q.   Now, I want to show you
9 Cockrell's supplemental report.  Let's
10 have it marked as Exhibit 16 for
11 identification, please.
12        (Donohue Exhibit 16, David
13    Cockrell's supplemental report was so
14    marked for identification, as of this
15    date.)
16    Q.   Have you seen this supplemental
17 report of David Cockrell submitted on
18 March 28, 2023 before?
19    A.   I have.
20    Q.   When is the first time you saw
21 it?
22    A.   I saw this right around March
23 28th, the end of March.
24    Q.   Let me direct your attention to
25 Mr. Cockrell's Exhibits 1 and 2.  Do you

Page 497

1 relevant period from February 2009 to
2 September 2019, correct?
3    A.   Correct.
4    Q.   And you show that plaintiffs
5 earned royalty payments of 1,952,704 from
6 those sales of T8s, 9s and 10s during the
7 same relevant time period, right?
8    A.   Correct.
9    Q.   And then on the right-hand side
10 you have your but-for analysis, if YKK
11 had sold T4s and T5s laminated by Uretek,
12 correct?
13    A.   Correct.
14    Q.   And you show that if YKK had
15 sold T4s and T5s instead of YKK laminated
16 T8s, 9s and 10s, it would have earned the
17 same amount of revenues, $207,683,564,
18 correct?
19    A.   Yes.
20    Q.   You also show Uretek's revenues
21 increasing if T4s and T5s had been sold,
22 rather than T8s, 9s and 10s, from the
23 royalties of $1,952,704 to $61,879,867,
24 correct?
25    A.   Correct.

Page 499

61 (Pages 496 - 499)

1    Q.   YKK would have been the one
2  paying that $61,879,867 out of its
3  pocket, correct?
4    A.   Correct.  Well, out of its
5  pocket, out of the sales, the margins
6  that it made.
7    Q.   So the total revenues from the
8  sale of these water-resistant zippers if
9  YKK had sold T4s and T5s instead of 8s,
10  9s and 10s would have been $269,563,431,
11  correct?
12    A.   Yes, because it's overlapping
13  revenues between the two, right?
14    Q.   As opposed to the $209,636,268
15  total revenues in the real world from
16  YKK's sales of T8s, 9s and 10s, correct?
17    A.   Correct.  Because the 207 is
18  third-party sales and the 61 is revenue
19  that YKK would be paying.
20    Q.   The additional 60 plus thousand
21  dollars of revenue would have come from
22  customers paying more for T4 and T5s than
23  for T8s, 9s and 10s, correct?
24    A.   No, it's not additional.  It's
25  207.  The third party revenues are 207.

Page 500

1  paying 3 cents as opposed to lamination.
2    Q.   So it's the customers who would
3  be paying that additional 60 million
4  dollars, correct?
5    A.   No.  In this example it's not
6  the customers.  It would be coming out of
7  YKK's profits.  YKK could choose to try
8  to pass some of it on, maybe they could
9  given the importance of the
10  water-resistant patents.  But in this
11  example it assumes that YKK would sell at
12  the same price.
13    Q.   If it was coming out of YKK's
14  pocket, then YKK's revenues would have
15  been reduced by 61 million?
16    A.   No.
17    Q.   Okay.  When did you give your
18  profitability analyses, Exhibits 1 and 2
19  to the Cockrell report that we've marked
20  as Exhibit 16 in relationship to his
21  work; do you know?
22    A.   It would be in late March.
23    Q.   Did you send it to him by
24  e-mail?  How did you communicate that to
25  him?

Page 502

1  As to what YKK would sell to the market
2  for.  And yes the parties revenues would
3  be more because the Plaintiff would be
4  charging YKK for its lamination services,
5  but the revenue for the water-resistant
6  market sales that they did make would
7  still be 207 in this example.
8    Q.   But you have the total amount
9  of revenues as $269,563,431.  You added
10  together the 207,683,564 with the
11  61,879,867, correct?
12    A.   I do.  I add those two numbers
13  up.
14    Q.   So you're saying the total
15  revenues had YKK sold T4s and T5s instead
16  of T8s, 9s and 10s, would have been
17  during the relevant period $269,563,431,
18  correct?
19    A.   Yeah, because they are both
20  making revenues.
21    Q.   And the total revenue in the
22  real world went YKK sold T8s, 9s and 10s
23  was 60 million dollars less than that,
24  right?
25    A.   Yes, because they are only

Page 501

1    A.   Well, first we had calls.  We
2  talked about it.  I talked with him about
3  the analysis.
4    Q.   The question is, sir, when did
5  you send your Exhibits 34 and 34A to
6  Mr. Cockrell that he appended to his
7  report that we marked as Exhibit 16 as
8  his Exhibits 1 and 2?  Was it by e-mail
9  or some other means?
10    A.   It would be by e-mail, and for
11  clarification to counsel.  I did not
12  e-mail Mr. Cockrell directly.
13    Q.   Did you direct that those
14  analyses be provided to Mr. Cockrell?
15    A.   Yes.
16    Q.   In your e-mail?
17    A.   No, those were the discussions
18  I was talking about.  I don't know if I
19  said send these to Cockrell in an e-mail.
20  I don't remember.  But we talked to
21  Mr. Cockrell, and as a result of those
22  conversations I eventually sent him this
23  analysis via counsel.
24    Q.   Now, the total revenues that
25  you show in Exhibit 34A of $269,563,431,

Page 503

62 (Pages 500 - 503)

1 in the event that YKK had sold T4s and 5s
2 instead of T8s, 9s and 10s, you have
3 allocated 61,879,867 of those revenue
4 dollars to plaintiffs, correct?
5    A.   It's not an allocation.  It's
6 basically the lamination fee that they
7 would charge YKK.
8    Q.   But you still have YKK earning
9 the same amount of revenues that it would
10 have had it earned revenues from selling
11 T8s, 9s and 10s, correct?
12    A.   Yes, because that lamination
13 fee is a cost to YKK.  Not necessarily a
14 revenue.
15    Q.   But you added the two together?
16    A.   I do.
17    Q.   In your high-end outerwear
18 column, correct?
19    A.   I do to look at the parties
20 overall relationship.
21    Q.   So you have YKK, as we've
22 already said, earning the same amount of
23 revenues if it were selling T4s and T5s,
24 that it would have earned selling T8s, 9s
25 and 10s, correct?

1    A.   Correct.  In this example I
2 assume the price is the same.  Again, if
3 they can pass some of that off which is
4 possible given the importance of the
5 patents, as I say in my supplemental
6 report, but in this example, I assume
7 they charge the same price and meet that
8 demand that already existed.
9    Q.   And so you're assuming that YKK
10 would be able to charge the same price
11 for the Uretek laminated T4s and T5s in
12 your but-for world that YKK actually
13 charged for its T8s, 9s and 10s in the
14 real world, correct?
15    A.   Correct.  I am assuming the
16 same price, the same volume and price.
17    Q.   But Uretek's price for the T4s
18 and 5s was consistently higher than YKK's
19 price for its laminated zippers, the T8s,
20 9s and 10s, correct?
21       MR. DANIELS:  Objection as to
22    form.
23    A.   In the actual world, yes.  YKK
24 charged more for four or five relative to
25 8s, 9s and 10s.

1    Q.   Now, you allocate the profits
2 between YKK and Uretek as reflected in
3 paragraph 37 of your supplemental report,
4 correct?
5    A.   Yes.
6    Q.   It was YKK who manufactured the
7 zippers that it then laminated to become
8 T8s, 9s and 10s, correct?
9    A.   Correct.  They manufactured the
10 chain Uretek for them to do the
11 lamination.
12    Q.   But with regard to T8s, 9s and
13 10s that YKK sold, it was YKK that
14 manufactured the zippers, correct?
15    A.   Correct.
16    Q.   It was YKK that laminated the
17 T8s, 9s and 10s, correct?
18    A.   That's correct.
19    Q.   It was YKK that marketed and
20 sold the T8s, 9s and 10s, correct?
21    A.   Correct.
22    Q.   It was YKK who identified
23 customers to whom the T8s, 9s and 10s
24 could be sold?
25    A.   Correct.

1    Q.   It was YKK who employed and
2 paid the people who did all of that,
3 correct?
4    A.   Yes.  I presume they were
5 paying them.
6    Q.   In allocating the profits from
7 the sale of high-end outerwear zippers,
8 you allocated more of the profits to
9 Uretek than to YKK, right?
10    A.   That's only when limiting it to
11 the high-end outerwear meters.
12    Q.   Yes, that's what I am talking
13 about the high-end outerwear meters at
14 issue in this case, you allocated the
15 profits of the sale of the high-end
16 outerwear zippers 54 percent to Uretek
17 and only 46 percent to YKK, right?
18    A.   That is how this calculation
19 turns out.  I have other caveats that I
20 mention in my report, but, yes, that's
21 how this calculation works, that's the
22 math.
23    Q.   Directing your attention to
24 your figure 4 on page 13, you say that
25 the total likely outerwear meters for all

1 customers was 148,826,403, correct?
2    A.   Correct.
3    Q.   But you had data for only
4 36,615,392 actual meters, correct?
5    A.   I am sorry, can you read that
6 again?
7    Q.   So you had data for only
8 36,615,392 meters, correct?
9    A.   I had third-party customer
10 discovery data for customers that
11 represented 36.6 million, yes.  I,
12 obviously, had sales records for all of
13 the data, but just so we're clear, I had
14 third-party discovery information for
15 customers that represented 36.6 million
16 in sales.
17    Q.   I am looking at your figure 4,
18 where you set out the laminated likely
19 outerwear sales meters by customer for
20 the relevant time period, February 2009
21 through September of 2019, correct?
22    A.   Yes.
23    Q.   And the data that you had from
24 the third-party customers for likely
25 outerwear meters was 148,826,403 meters,

Page 508

1 correct?
2    A.   The data from YKK, correct.
3    Q.   You only had data from the
4 customers for 36,615,392 meters, correct?
5    A.   Correct.  Those sample
6 outerwear customers only represented 36.6
7 million of the 148.8 million.
8    Q.   So you had actual data from
9 customers for less than a quarter of the
10 total meters, correct?
11    A.   Yes, that's the, that's the
12 representative sample for those
13 customers.
14    Q.   And that data came from 13
15 customers that you referred to
16 alternatively as sample outerwear
17 customers or discovery customers,
18 correct?
19    A.   Correct.
20    Q.   The 13 customers produced that
21 data in response to subpoenas that the
22 plaintiffs served upon them, correct?
23    A.   Correct.
24    Q.   But the 13 customers didn't
25 produce copies of their actual books and

Page 509

1 records maintained in the ordinary
2 course, they just produced summaries;
3 didn't they?
4        MR. DANIELS:  Objection as to
5    form.
6    A.   They produced summaries from
7 their book and records, but this is a
8 narrow set of information just for these
9 particular purchases.
10    Q.   They just produced summaries,
11 correct?
12        MR. DANIELS:  Objection as to
13    form.
14    Q.   Not their underlying books and
15 records?
16        MR. DANIELS:  Objection as to
17    form.
18    A.   When you say underlying books
19 and records.  They didn't produce GLs or
20 -- they had to go get this information
21 from their systems.  So, yes, they used
22 their systems to pull this information
23 and provide it just for AquaGuard.
24    Q.   They just provided summaries of
25 what was in their underlying books and

Page 510

1 records, the 13 discovery customers just
2 provided summaries, correct?
3        MR. DANIELS:  Objection as to
4    form.  Objection, asked and answered.
5    A.   I don't know how to categorize
6 summaries.  They had lines and lines of
7 detail about where these products went
8 and then they produced actual catalogs
9 about the jackets and things like that.
10        MR. WOLKOFF:  Well, let's have
11    marked as Exhibit 17 for
12    identification an exemplar of what one
13    of these 13 customers, Patagonia,
14    produced.
15        MR. DANIELS:  Objection as to
16    form and the characterization.
17        (Donohue Exhibit 17, example of
18    the summaries from the 113 discovery
19    clients, was so marked for
20    identification, as of this date.)
21    Q.   Exhibit 17 is an example of the
22 summaries that you looked at from the 13
23 discovery customers, this one is from
24 Patagonia, correct?
25    A.   Yes, I recall seeing this.

Page 511

64 (Pages 508 - 511)

1    Q.   Do you know who prepared this
2 summary?
3        MR. DANIELS:  Objection as to
4 form.
5    Q.   Was it Patagonia, was it you or
6 someone else?
7    A.   I would have to go back and
8 look at the subpoena and the data that we
9 got from Patagonia, I am not certain.
10   Q.   This is not something, Exhibit
11 17, that you prepared, is it?
12   A.   I don't -- I prepared
13 additional summaries of all of the
14 information to prepare my analysis.  I
15 don't think this is one of them.  But
16 again, I don't know as I sit here.
17   Q.   But as far as you can recollect
18 Exhibit 17 isn't something that you
19 prepared.  It was produced by Patagonia
20 pursuant to the subpoenas, isn't that
21 true?
22   A.   That is my understanding.  When
23 you say summary, I guess I am hesitating
24 because it's a big listing here.  I don't
25 recall a summary aggregating something.

Page 512

1 But I do recall these lists.
2    Q.   These aren't a complete list of
3 Patagonia's underlying books and records,
4 someone made selections from them,
5 correct, summarized them?
6        MR. DANIELS:  Objection as to
7 form.
8    A.   Well, I understood that they
9 identified the products that used
10 AquaGuard.  So it would always be a part
11 of the records.  Not all of the records.
12   Q.   Where are all the records?  Did
13 the Patagonia folks produce all their
14 underlying records from which Exhibit 17
15 was derived?
16       MR. DANIELS:  Objection as to
17 form.
18   A.   Patagonia produced records of
19 the use of the zippers.  I don't believe
20 they produced source documents and GL and
21 things like that or inventory reports and
22 invoices, no.  I think they replied to
23 the subpoena by telling us where they
24 used the zippers.
25   Q.   And the same is true for the

Page 513

1 other 12 customers in addition to
2 Patagonia, they all produce selections
3 from their underlying books and records
4 maintained in the ordinary course, not
5 their books and records themselves,
6 correct?
7    A.   Well, I don't understand.  I
8 don't think you would produce books and
9 records to do this.  You would have to
10 identify for us where you used those
11 zippers.
12   Q.   Okay.
13   A.   That is my understanding of
14 what they did.
15   Q.   Did the other 12 discovery
16 customers produce their underlying books
17 and records from which their similar
18 summaries, similar to Exhibit 17, were
19 produced?
20       MR. DANIELS:  Objection as to
21 form.
22   A.   I don't recall the discovery
23 customers producing invoices and
24 underlying manufacturing records.  I
25 understand that they provide where they

Page 514

1 used it.  They did their work to do that.
2    Q.   So it was the 13 discovery
3 customers that did the work to compile
4 the information that you then used, that
5 they compiled from their original source
6 records, right?
7    A.   Well, those customers had
8 access to their records.  Not me.  So,
9 yes, they had to go to their records.
10 Identify where they use these zippers.
11 And they produced it in varying forms.
12   Q.   Is there anything that we can
13 look at in terms of the 13 discovery
14 customers' underlying records to check
15 the accuracy of what they selected that
16 appear in Exhibit 17, and other similar
17 compilations by the other 12 discovery
18 customers?
19       MR. DANIELS:  Objection as to
20 form.
21   A.   I don't know.  I suppose you
22 can look at public data to see if you can
23 do that.  But again, you would have to
24 get access to Patagonia's private
25 records, and so via subpoena this is what

Page 515

65 (Pages 512 - 515)

1 was available. And they provided their
2 summaries, their detail, at a product
3 level, of where they were using the
4 zippers.
5    Q.  Do you know whether or not the
6 plaintiffs demanded that these 13
7 discovery customers produce their actual
8 underlying records, so that someone could
9 check the accuracy of these summaries as
10 reflected in the exemplar that we marked
11 for Patagonia as Exhibit 17?
12         MR. DANIELS:  Objection as to
13    form.
14    A.  I don't recall that in the
15 subpoena. It would be unusual to me.
16 Again, you would weren't auditing
17 Patagonia. You were asking them for
18 where do you use these zippers.
19    Q.  But sitting here, do you know
20 of any way that the defendants can check
21 the accuracy of these selections that
22 were made by the 13 discovery customers
23 from their underlying books and records
24 as reflected in the exemplar that has
25 been marked for Patagonia as Exhibit 17?

Page 516

1         MR. DANIELS:  Objection as to
2    form.
3    A.  I assume they also could have
4 reached out to their customers, if they
5 had concerns.
6    Q.  Can you answer my question,
7 please? Do you know of any way that the
8 defendants in this case could check the
9 accuracy of these selections or summaries
10 made by the 13 discovery customers of
11 what's in their underlying books and
12 records as reflected in Exhibit 17?
13         MR. DANIELS:  Objection. Asked
14    and answered.
15    A.  I think I already said you
16 could look at the jackets, if you could
17 publicly find them. But also YKK could
18 have approached Patagonia, in your
19 question, I guess, and asked them for
20 more information.
21    Q.  But the plaintiffs didn't give
22 the defendants the underlying records
23 that went into compiling these summaries
24 as reflected in Exhibit 17 for Patagonia
25 and the others?

Page 517

1         MR. DANIELS:  Objection as to
2    form.
3    A.  Well, the plaintiffs didn't
4 have that information. They requested
5 this data from Patagonia and received it.
6 If YKK -- I suppose to answer your
7 question -- could have approached them as
8 well and gotten more information.
9    Q.  But the plaintiffs didn't
10 provide the underlying records that went
11 into the discovery customers' compiling
12 these summaries such as Exhibit 17 for
13 Patagonia?
14         MR. DANIELS:  Objection as to
15    form.
16    A.  The plaintiffs provided
17 whatever Patagonia produced.
18    Q.  Which didn't include the
19 underlying books and records, that's all
20 I am asking you, sir?
21         MR. DANIELS:  Objection as to
22    form.
23    A.  And I've already said that it
24 did not include invoices, manufacturing
25 records, things of that nature. It

Page 518

1 relied on the third-party customers to
2 provide this information.
3    Q.  Now, you had this summary data
4 for only 13 of YKK customers who you call
5 the discovery customers, correct?
6    A.  Correct.
7    Q.  How many customers, individual
8 or different customers, did YKK have for
9 its water-resistant zippers during the
10 time period February 2009 through
11 September of 2019?
12         MR. DANIELS:  Again, I am going
13    to object. I just feel compelled to
14    object that this is all stuff that was
15    already previously covered. It is
16    well beyond any of the permissible
17    discovery allowed by the Court at this
18    point. These are just glaring
19    examples of overreaching the Court's
20    order of permitted discovery.
21         MR. WOLKOFF:  I am looking at
22    his figure 4 in his supplemental
23    report submitted after the jury
24    verdict on March 28th, 2023 and asking
25    him about the source materials that

Page 519

66 (Pages 516 - 519)

1  went into creating that figure. It
2  absolutely is new material, new
3  questioning. And your statement is
4  absolutely and utterly without basis.
5  I am sorry. I would ask you to please
6  stop interrupting with long baseless
7  objections that interrupt the
8  examination.
9      MR. DANIELS: They are not
10 baseless. They are not long. I am
11 entitled to object.
12 Q. How many customers did YKK have
13 for its water-resistant zippers during
14 the time period February 2009 through
15 September of 2019 in addition to the 13
16 discovery customers whose data you
17 summarized in figure 4 of your
18 supplemental report, dated March 28th,
19 2023?
20 A. The detailed sales data had
21 various customer names, but just looking
22 at it in a customer name area, like
23 different customers and customers could
24 be the same customer, just multiple
25 lines, but it's probably 3, maybe 4000

Page 520

1  lines of different customers over this
2  time period that exist, in terms of
3  customer count.
4  Q. And you had the summary data
5  for only 13 of them from the customers,
6  correct?
7  A. On a customer count basis,
8  only, yes. Meters are much more
9  important, but, yes, on a customer count,
10 there is another several thousand rows in
11 that database.
12 Q. And so what percentage of
13 customer data did you have in arriving at
14 your analyses?
15 A. I had customers that
16 represented 36 million of the 148.
17 Q. That's meters. That's less
18 than 25 percent, right, of the meters?
19 A. It is what it is. But, yes,
20 that's the meter number. And, of course,
21 if you do a customer account, it's a very
22 small percentage. 13 of --
23 Q. What is it?
24 A. Less than a percent, like a
25 10th of a percent.

Page 521

1  Q. So you had data from customers,
2  from less than 1 percent of YKK's
3  customers during the relevant time
4  period --
5  A. No, I disagree.
6  Q. -- that form the basis of your
7  opinions, correct?
8  A. No.
9  Q. Okay. You had data from 13 --
10 strike that.
11     You had customer data from 13
12 discovery customers for the relevant
13 period, correct?
14 A. Correct.
15 Q. And YKK has, as you said,
16 between 3000 and 5000 customers during
17 the relevant time period, that's how many
18 they had?
19 A. I don't think I said 5000. The
20 customer database has many lines of
21 customers, some overlap, but there are
22 thousands of lines in that database.
23 Q. So in terms of percentage of
24 customers whose data you looked at, what
25 was the percentage?

Page 522

1  A. In pure customer count, it's a
2  very small percentage, it's 13 of some
3  4000. A meaningless number, but that's
4  what that would be.
5  Q. You think it's meaningless.
6  What percentage did you have?
7  A. I had almost 25 percent of the
8  data.
9  Q. The 25 percent is a percentage
10 of meters, correct?
11 A. Yes.
12 Q. In terms of a percentage of
13 customers, what did you have?
14     MR. DANIELS: Objection. Asked
15 and answered.
16 Q. Tell me an actual percentage,
17 please.
18 A. I don't have it for you.
19 Whatever 13 is out of a few thousand is.
20 It's a very small percentage.
21 Q. It's less than 1/10th of one
22 percent, is that right?
23 A. I think I said about a 10th of
24 a percent or something like that. It's a
25 small number if you do it by customer.

Page 523

67 (Pages 520 - 523)

1    Q.   The record will reflect you did
2  not say that until I had to follow-up 10
3  times with you.
4         MR. DANIELS:  Objection.
5    Harassing the witness again.
6    Q.   How many zippers in terms of
7  meters did Mr. Cockrell actually review
8  to determine high-end outerwear and not
9  high-end outerwear; do you know?
10        MR. DANIELS:  Objection as to
11   form.
12   A.   I don't know if I have it, if I
13 know that as I sit here.  It was several
14 thousand items.  And those items would
15 have different various levels of meters
16 in them.
17   Q.   Do you recollect testifying at
18 your first deposition that Mr. Cockrell
19 had actually looked at only around 14.8
20 million meters of outerwear garments in
21 making his assessment of what was
22 high-end outerwear and what was not?
23   A.   That's what I was trying to
24 remember, what he did.  That's what it
25 represents.

Page 524

1    Q.   Okay.  You said that meters
2  were the most important, correct?
3    A.   Relative to 13 out of 4000,
4  yes.
5    Q.   So what percentage of meters of
6  these outerwear garments did Cockrell
7  actually look at in making his assessment
8  of high-end outerwear versus not high-end
9  outerwear?
10   A.   Well, that would be two things.
11 One, he looked at these customers that
12 represent 36 million meters or more
13 importantly 21 million at the high-end
14 outerwear meters.  And he also looked at
15 customers as well.  So he just looked at
16 customers there, I don't have a count for
17 that.
18   Q.   He didn't look at the actual
19 garments of other customers other than
20 the 13 discovery customers; did he?
21   A.   I think there he just looked at
22 websites and also knew what those
23 customers sell.
24   Q.   Mr. Cockrell did not examine
25 the garments of any customers other than

Page 525

1  the 13 discovery customers, correct, in
2  making his assessments of high-end
3  outerwear versus non-high-end outerwear?
4         MR. DANIELS:  Objection to form.
5    Objection, asked and answered.
6    A.   Directly, that is fair.  But,
7  obviously, Mr. Cockrell has seen many,
8  many jackets and he knew what his
9  customers were selling.  I don't want to
10 limit what he did.  You can ask
11 Mr. Cockrell.
12   Q.   I am asking you, sir.
13 Mr. Cockrell didn't actually examine for
14 purposes of his work in this case and the
15 information that he passed on to you, the
16 outerwear of any customers beyond the 13
17 discovery customers, correct?
18        MR. DANIELS:  Objection as to
19   form.  Objection, Mr. Cockrell's
20   reports all speak for themselves.
21   A.   His sample analysis was based
22 on his third-party discovery, and there
23 were no other sample jackets beyond that.
24 Correct.  That's the 13 he looked at.
25   Q.   And he looked at only around 10

Page 526

1  percent of the meters of likely outerwear
2  that you calculated, correct, in making
3  his assessment of what was high-end
4  outerwear and what was not?
5    A.   Well, that was the sample, the
6  sample size and what he looked at there
7  but those customers represent 36.6
8  million or 21 total.
9    Q.   You know, sir, can you answer
10 my question?
11   A.   I am doing my best.
12   Q.   I don't want to harass you as
13 your counsel here would say.  I have my
14 own opinions of what you are doing.  But
15 they are not really relevant.
16        Mr. Cockrell actually examined
17 only about 10 percent of the total amount
18 of meters in your determination of likely
19 outerwear in making his assessment of
20 high-end outerwear versus not high-end
21 outerwear, correct?
22        MR. DANIELS:  Objection.  Asked
23   and answered.
24   A.   Again, I would have to go back
25 to look at that.  But I recognize that

Page 527

68 (Pages 524 - 527)

1 the sample was a smaller amount of meters
2 than the meters sold by those customers.
3    Q.    You apply Cockrell's
4 determination of high-end outerwear to
5 thousands of customers and 148 million
6 approximately of meters of zippers,
7 correct?  Much more than he examined.
8    A.    Well, no.  I only apply -- 148
9 is the permitted outerwear market.  I
10 only apply his analysis to T8s, 9s and
11 10s functional customers which is not the
12 148.
13    Q.    Okay.  You applied
14 Mr. Cockrell's determination of what was
15 high-end outerwear and what was not to
16 all of the thousands of customers that
17 YKK had during this time period, correct?
18    A.    No, I only applied it to the
19 customers who purchased T8s, 9s and 10s
20 and were functional.
21    Q.    How many meters of zippers did
22 you apply Mr. Cockrell's analysis to?
23    A.    112, 113 million, roughly.
24    Q.    And how many meters did he
25 actually look at on garments?

Page 528

1    A.    Again, I am trying to remember
2 that 4.8 million number.  I know it was
3 several thousand jackets.  I forget the
4 volume, but it was a very sizable sample.
5    Q.    What percentage of your 112
6 meters did Mr. Cockrell actually examine,
7 just give me a percentage, please?
8    A.    Again, I need to see the 4.8.
9 I remember that calculation, I just don't
10 recall as I sit here.
11    Q.    So sitting here, you don't
12 remember?
13    A.    Sitting here, I don't remember.
14 I recognize it was, the 36 is the sales
15 data.  And that the sample size was
16 smaller.
17    Q.    But you accepted his
18 determination and applied it to your 112
19 million meters, correct?
20    A.    Correct, I did use his --
21    Q.    For how many customers?
22    A.    I used his analysis for the 113
23 million meters and as I said before, the
24 customer line item count is 3 to 4000.
25    Q.    The jury determined that

Page 529

1 maximizing profits is part of determining
2 what is and what is not high-end
3 outerwear, correct?
4    A.    The jury included that sentence
5 in the definition, yes.
6    Q.    Mr. Cockrell is the one who
7 made the determination for plaintiffs in
8 this case of what is high-end outerwear
9 and what isn't high-end outerwear,
10 correct?
11    A.    He was part of it.  Because his
12 analysis was doing it on part, on the
13 T8s, 9s and 10s, the functional higher
14 prices and things like that.  He was part
15 of it.
16    Q.    He was the one who made the
17 determination of what is high-end
18 outerwear in this case, correct?
19    A.    He is the one that made that
20 ultimate step, but it started with those
21 other steps.
22    Q.    I am talking about the
23 determination of what is high-end
24 outerwear and what is not.  Mr. Cockrell
25 made that last step in your analysis,

Page 530

1 correct?
2    A.    He made that last step in my
3 analysis, correct.
4    Q.    And Mr. Cockrell didn't perform
5 any profitability analysis, you did, sir,
6 correct?
7       MR. DANIELS:  Objection as to
8    form.
9    A.    I certainly did the
10 calculations in the supplemental report,
11 but as I mentioned before, I understood
12 Mr. Cockrell was aware of this dynamic of
13 the 3 cents versus the lamination
14 profits.
15    Q.    Mr. Cockrell didn't perform any
16 profitability analysis in determining
17 what was high-end and what wasn't, you
18 were the one who performed a
19 profitability analysis, correct?
20       MR. DANIELS:  Objection as to
21    form.  Objection, asked and answered.
22    A.    As I said before, I am the one
23 who provided those calculations to
24 Mr. Cockrell.  Also, I know Mr. Cockrell
25 was aware of the 3 cents versus

Page 531

69 (Pages 528 - 531)

1 lamination profit dynamic before that
2 would result in a meaningful segmentation
3 of the market.
4    Q.   Well, you said you didn't
5 provide your profitability charts to
6 Mr. Cockrell until the very end of March,
7 correct?
8        MR. DANIELS:  Objection as to
9    form.
10    A.   Correct, that's when I provided
11 the charts.
12    Q.   And the only profitability
13 analysis in Mr. Cockrell's supplemental
14 report that he appended as Exhibits 1 and
15 2 are your profitability analysis,
16 correct, sir?
17    A.   That appears to be the only
18 thing that he appended to his report,
19 correct.
20    Q.   Do you know of any -- strike
21 that.
22        With respect to luggage, sir,
23 you're aware that the exclusive license
24 agreement or ELA excluded luggage but
25 also made an exception for sports and

1 cosmetic bag markets?
2    A.   I am aware.
3    Q.   So under the ELA you're aware
4 that the parties agreed that YKK could
5 sell its YKK laminated zippers into the
6 sports and cosmetic bag markets, correct?
7    A.   Yes, that was excluded from the
8 exclusion, correct.
9    Q.   Can you look at Exhibit 12A-R3
10 in your supplemental report, please.
11    A.   Do you have a page you want me
12 to go to?
13    Q.   I don't think it's numbered.  I
14 think it's your Exhibit 12A-R3.
15    A.   Okay.
16    Q.   Do you have that?
17    A.   I do.
18    Q.   This exhibit reflects you're
19 identifying the "Luggage" that had YKK
20 laminated zippers based on your review of
21 YKK's records, correct?
22    A.   Yes.  It's actually identifying
23 the codes that I use to include as
24 luggage among other things, military.
25    Q.   So let's turn to the second

1 page of your Exhibit 12A-R3, to your
2 supplemental report, and let me direct
3 your attention to Finland.  Now by
4 Finland, you mean YKK Finland, correct?
5 That particular corporation.
6    A.   Yes.
7    Q.   And for Finland you had a usage
8 code 1A, a usage code 1E and a usage code
9 1F, right?
10    A.   Yes.  It might be an I, but I
11 understand what you mean.
12    Q.   And under YKK usage name, IA or
13 1A was luggage general.  IE or 1E was
14 ladies bag and IF or 1F was small cases,
15 right?
16    A.   Yes.
17    Q.   And that's the -- those are the
18 three YKK usage names, correct?
19    A.   Correct.
20    Q.   And then there is a column that
21 you called Normalized Usage, correct?
22    A.   Correct.
23    Q.   And now what YKK called luggage
24 general you're calling luggage bags,
25 correct?

1    A.   Correct.
2    Q.   And what YKK called ladies
3 bags, you're calling luggage bags,
4 correct?
5    A.   Correct.
6    Q.   And what YKK called small
7 cases, you're calling luggage bags,
8 correct?
9    A.   Correct.
10    Q.   And then in the fourth column,
11 that's the column that you used to total
12 up your luggage data, correct?
13    A.   Correct.
14    Q.   And now you're calling luggage
15 bags just luggage, correct?
16    A.   Correct.
17    Q.   And you're calling luggage bags
18 just luggage, correct?
19    A.   Correct.
20    Q.   And you're calling luggage bags
21 just luggage.  So all three of the
22 entries that YKK had for luggage general,
23 ladies bags, small cases you're now
24 calling luggage for purposes of your
25 luggage analysis, correct?

1    A.   Yes.  In the data, if it was
2 called IE ladies bag or small cases it's
3 included in luggage.
4    Q.   So you treated what YKK called
5 ladies bags as luggage for purposes of
6 your damages opinion, correct?
7    A.   I did.
8    Q.   You're not an expert on whether
9 ladies bag are luggage; are you, sir?
10    A.   No, I am relying on their
11 codes.
12    Q.   Well, their codes indicated
13 that this was ladies bags, correct, not
14 luggage?
15    A.   It's in the luggage section.
16    Q.   But it called the items ladies
17 bags, correct, not luggage?
18    A.   It did in the usage name, but
19 IA and IE and IF are luggage.
20    Q.   It called the item ladies bags,
21 correct?
22    A.   It did within the luggage
23 category.
24    Q.   And the other category it
25 called small cases, correct?

Page 536

1    A.   Within the luggage category,
2 yes.
3    Q.   And you treated all three as
4 luggage for purposes of your damages
5 analysis, correct?
6    A.   Because it's in the luggage
7 category.
8    Q.   And you treated them all as
9 luggage, correct?
10    A.   Because it's in the luggage
11 category, yes.
12    Q.   Did you look at any of the
13 ladies bags or small cases to determine
14 if, in fact, they could be properly
15 called luggage?
16    A.   I did not have discovery about
17 how those bags were used by consumers.
18    Q.   Do you know whether or not
19 anybody on behalf of the plaintiffs
20 looked at the ladies bags and the small
21 cases to determine if, in fact, they were
22 luggage as you treated them?
23    A.   I am not aware of any discovery
24 from customers.  I just know this was a
25 luggage category.

Page 537

1    Q.   And you treated bags as luggage
2 for a number of other YKK affiliates
3 besides this one Finland, correct?
4    A.   Correct.  If it was a luggage
5 core category I still included it.
6    Q.   But you know that there is an
7 exception under the ELA for bags.  If
8 they are sports bags or cosmetic bags,
9 correct?
10    A.   Yes, I know that it's a sports
11 bag or a cosmetic bag exception.
12    Q.   Did you determine if any of
13 these ladies bags or other bags were
14 sports bags or cosmetic bags before you
15 included them in your damages analysis as
16 just luggage?
17    A.   I did not.  It was included as
18 luggage.  It doesn't say cosmetic bags.
19 So I did not exclude it.
20    Q.   Did YKK have any records that
21 said cosmetic bags, sir?
22    A.   Not that I can locate.
23    Q.   So you just included them all
24 as luggage, right?
25    A.   No, I included only things they

Page 538

1 called luggage as luggage.
2    Q.   Well, they didn't call this
3 luggage and I don't mean to go around the
4 barn but if you want to do it.  They
5 called them ladies bag, that's what they
6 called them?
7    A.   It was in a core category of
8 luggage.
9    Q.   But it was specified as being a
10 ladies bag, right?
11    A.   It was.
12    Q.   You would agree that some
13 ladies bags could be sports bags to
14 cosmetic bags and, therefore, shouldn't
15 have been part of your damages analysis,
16 correct?
17    A.   It's possible.  I don't know.
18 The agreement says cosmetics bags.  This
19 says ladies bags.
20    Q.   But YKK didn't have a separate
21 line item in its records for cosmetic
22 bags; did it?
23    A.   I did not find one.  They
24 weren't tracking this apparently.
25    Q.   So you just treated all of the

Page 539

71 (Pages 536 - 539)

1 references to ladies bags as luggage?
2    A.   As I said, they called it
3 luggage.  So do I.
4    Q.   They didn't call it luggage.
5 They called it ladies bags.
6        MR. DANIELS:  Objection.  You've
7    asked this question 10 times.  He's
8    testified over and over what the
9    record states.  They speak for
10   themselves.  You can't keep arguing
11   with the witness.  These have been
12   asked and answered repeatedly.
13       MR. WOLKOFF:  You're just
14   supposed to say objection to form in
15   the Southern District of New York.
16       MR. DANIELS:  You're supposed to
17   ask each question once.
18       MR. WOLKOFF:  And you have not
19   done that.
20       MR. DANIELS:  And you haven't
21   done that either.
22       MR. WOLKOFF:  You are supposed
23   to say objection to form.  Asked and
24   answered.
25       MR. DANIELS:  Objection to form.

1    Q.   Okay.  And you did that not
2 only for your determination of luggage
3 for YKK Finland but also for the YKK
4 Dallian Zipper Company, correct?
5    A.   Correct.
6    Q.   Where is YKK Dallian Zipper
7 Company located; do you know?
8    A.   I believe China.
9    Q.   You also did the same thing for
10 YKK Mexico, YKK Malaysia, YKK Russia,
11 correct?
12   A.   Russia.  And yes, I believe I
13 was consistent.  If I included it as a
14 ladies bag, I included it for each
15 affiliate.
16   Q.   How much in the way of the
17 exceptions, cosmetic bags or sports bags,
18 did you determine that YKK sold its
19 zippers, waterproof zippers or
20 water-resistant zippers for?
21   A.   I am sorry, I don't understand
22 your question.
23   Q.   How many meters of
24 water-resistant zippers did you find that
25 YKK sold in connection with cosmetic bags

1 Asked and answered.
2        MR. WOLKOFF:  You have
3    consistently violated the rules,
4    Mr. Daniels, at this deposition.
5    A.   I'll say it again this is a
6 code --
7    Q.   The code that YKK used said
8 ladies bag, correct?
9    A.   The subcode did.  But the code,
10 the I is luggage.
11   Q.   Right.  They may have included
12 the ladies bags in a subcode of luggage
13 but the code they use said ladies bags,
14 correct?
15       MR. DANIELS:  Objection.  Asked
16   and answered.
17   A.   The subcode is ladies bag, yes.
18   Q.   And what did you do to
19 determine if those ladies bags were
20 cosmetic bags or sports bags?
21   A.   It said it was a ladies bag.
22 It didn't say it was a cosmetic bag.  So
23 I did not exclude it.
24   Q.   You included it?
25   A.   I included it.

1 or sports bags?
2    A.   Well, first of all, there was
3 not a cosmetic category, so I could not
4 identify how much of the other, if any,
5 of the other categories was cosmetic
6 bags.
7        For sports bags, there was a
8 sports luggage code -- which I would need
9 to go back and the record and see -- but
10 there was a sports luggage code that was
11 excluded so I excluded that.  And there
12 was also a sports code, which was rather
13 sizable.
14   Q.   How much in the way of cosmetic
15 bags did you exclude in terms of your
16 determination of luggage for purposes of
17 your --
18       MR. DANIELS:  Objection.  I am
19   sorry, I thought you were done.
20   Q.   -- for purposes of your damages
21 analysis?
22       MR. DANIELS:  Objection.  Asked
23   and answered.
24   A.   As I said there was no cosmetic
25 code.

1   Q.   So how many meters did you
2 exclude?
3   A.   If there was no code, I did not
4 include or exclude them.  But there's no
5 code, so no number to add up.
6   Q.   So you didn't exclude zero
7 meters for cosmetic bags, correct?
8   A.   The cosmetic -- there is no
9 cosmetic bag code.  I didn't take it out
10 or put it in.
11   Q.   Did you ask to look at these
12 ladies bags that you were treating as
13 luggage in order to determine whether or
14 not they were luggage before you included
15 them in your damages?
16      MR. DANIELS:  Objection to form.
17   A.   I asked for whatever discovery
18 from the customers would be available and
19 the high-end was what was available.
20 There was no luggage discovery.
21   Q.   Okay.  Did you ask to look at
22 any of the ladies bags in which the
23 zippers were sewn to determine if they
24 were properly included by you as luggage?
25   A.   I did not have access to the

Page 544

1 customer's use of the luggage meters.  I
2 only had access to YKK's records.
3   Q.   So the answer is no?
4   A.   I did not ask.  I did not have
5 access to them.
6   Q.   Did you ask for access to them?
7   A.   I asked for access to
8 customers, and that resulted in the HEO
9 analysis.
10   Q.   Did you ask for access to
11 records about what these ladies bags
12 actually were before you included them in
13 luggage?
14   A.   I don't recall asking that
15 question.
16   Q.   In your original expert report,
17 paragraph 62B -- by the way, did every
18 YKK affiliate have a category for sports
19 bags, sir, or is it just one or two?
20      MR. DANIELS:  Objection as to
21   form.
22   A.   I don't recall.  I remember a
23 sports category and then a sports luggage
24 category.  I would have to go back and
25 look.  I recall the sports category being

Page 545

1 rather meaningful.  I just don't know if
2 it was -- not all the affiliates had the
3 exact same coding.
4   Q.   Is there any information in
5 your reports that indicate which YKK
6 entities had a coding for sports bags
7 separated from luggage?
8   A.   12A that we were just on would
9 identify that.
10   Q.   Can you tell me looking at that
11 which of the affiliates had a sports bag
12 category?
13      MR. DANIELS:  Object.  I want to
14   state for the record that natives, all
15   experts exchanged -- including Ms.
16   Kingler -- the natives.
17      So are you referring only to the
18   written one or are including the
19   native that Mr. Donohue also provided?
20      MR. WOLKOFF:  I am referring to
21   the document I put in front of him.
22   Okay.
23   A.   So Exhibit 12A, if you walk
24 through the column, it says "Normalized
25 Usage," the affiliates are on the left,

Page 546

1 you can see that there are some sporting
2 goods.
3   Q.   I am not talking about
4 supporting goods.
5      Which YKK affiliates had a
6 specific code for sports bags, if any?
7   A.   That code was called sports
8 luggage.  It was not called sports bags.
9   Q.   Did any of the YKK entities
10 have a code for sports bags?
11   A.   I don't believe so.  I believe
12 the code I saw was called sports luggage.
13   Q.   And even then, only a few of
14 the YKK corporations had a code for that,
15 correct?
16   A.   Correct.  I don't have a count
17 as I sit here, but I recall that not all
18 of them had it.  For example, Russia had
19 it, sports luggage.
20   Q.   YKK also internally treated
21 backpacks separately from luggage in its
22 reports, correct?
23   A.   Well, it depends on what
24 reports.  Sometimes they talked about the
25 luggage category.  Sometimes they talked

Page 547

73 (Pages 544 - 547)

1  about luggage and backpacks.
2      Q.   Well, I was beginning to ask
3  you, let me go back to your original
4  report, paragraph 62B.  There you cite in
5  your footnote 89, the Bates stamp number
6  YKK0050675.
7      A.   Yes, I see that.
8      Q.   And that's the same as DX 141.
9  I'll show it to you.
10         (Defendants' Exhibit 141,
11         document Bates stamped YKK0050675,
12         previously marked for identification.)
13     Q.   You cited that in the footnote,
14  even though you only put the Bates range,
15  correct?
16     A.   Yes.
17     Q.   So this is a document that you
18  cited yourself in your original report,
19  correct?
20     A.   Yes, at times they talk about
21  both and at times they talk about it as a
22  category.
23     Q.   So this is an e-mail from YKK
24  to Stuart Press and also a Caroline
25  Monamoin also with Uretek that we marked

1  referring in the first e-mail on page
2  60562 to backpack/luggage, correct?
3      A.   I see that, yes.
4      Q.   And here is another one, DX
5  171.
6          (Defendants' Exhibit 171,
7          document Bates stamped YKK0060562
8          previously marked for identification.)
9      Q.   Again YKK referred to the
10  backpack/luggage industry, using two
11  different words, backpack and luggage,
12  correct?
13     A.   Yes.
14     Q.   You treated all backpacks
15  interchangeably for luggage as purposes
16  of calculating your damages, correct?
17     A.   If YKK coded them as luggage,
18  then I did.
19     Q.   Do you know whether or not all
20  of the backpacks that YKK zippers went
21  into that you treated as luggage were, in
22  fact, luggage?
23     A.   I only know that YKK called
24  them luggage in their contemporaneous
25  records.

1  as Exhibit 141; do you see that?
2      A.   Yes.
3      Q.   And as far back as 2003, the
4  date of this e-mail, YKK talked about
5  luggage and backpack manufacturers,
6  correct?
7      A.   Yeah.
8      Q.   Separating the two?
9      A.   Luggage/backpack in the
10  subject, for example.
11     Q.   It doesn't say in that
12  paragraph luggage/backpack.  In the body
13  of the e-mail it says "luggage and
14  backpack manufacturers," correct,
15  separately?
16     A.   In the body it says for their
17  luggage/backpack in the first sentence.
18  But later on I think it says luggage and
19  backpack, right?
20     Q.   Here is another one.
21  Plaintiffs' Exhibit 363.
22         (Plaintiffs' Exhibit 363,
23         document Bates stamped YKK0060562
24         previously marked for identification.)
25     Q.   You see this is a YKK e-mail

1      Q.   YKK didn't have a separate line
2  item in their books and records for
3  backpacks, correct?
4      A.   They had a lot of codes, I
5  don't believe I have seen that one.
6      Q.   YKK didn't have a separate code
7  in its records for backpacks, did it?
8      A.   I don't believe so.  They have
9  a lot of codes.  I don't remember seeing
10  a backpack code.
11     Q.   In the internal records we
12  looked at, it used two different words,
13  it used backpack and luggage, correct?
14     A.   In those e-mails it did.  But
15  in their coding, they used luggage and
16  various forms of luggage.
17     Q.   But in their coding for
18  luggage, they had all kinds of things
19  included that one might not think of as
20  luggage, correct?
21         MR. DANIELS:  Objection to form.
22     A.   They had luggage in multiple
23  things.  I am not defining luggage in the
24  ELA.  They had luggage in multiple
25  things.

1    Q.   But you didn't break out or try
2 to break out backpacks from the luggage,
3 you just included it all in your damages
4 analysis?
5    A.   If YKK called it luggage, I
6 included it, except for the sports
7 luggage.
8    Q.   YKK didn't call it anything.
9 It just didn't code it separately as
10 backpacks.  It had it in a luggage
11 category on its books and records,
12 correct?
13    A.   It called it luggage on its
14 books and records, yes.  Assuming they
15 did that.
16    Q.   They called golf bags, coded
17 them at least as luggage, correct?
18    A.   I don't know if it did that,
19 because there is also sporting goods
20 categories.
21    Q.   Do you see, for example, in
22 your first page for Dallian about
23 two-thirds of the way down the page, it
24 coded jeans as luggage, right -- let me
25 strike that.

Page 552

1 items of luggage or sports bags or
2 cosmetic bags or backpacks in connection
3 with your assessment of damages based on
4 luggage?
5    A.   No, I believe his was limited
6 or focused on high-end outerwear.
7    Q.   Did you look at any items of
8 luggage or sports bags or cosmetic bags
9 or backpacks in connection with your
10 assessment of damages based on luggage?
11         MR. DANIELS:  Objection as to
12    form.
13    A.   No, there was no discovery from
14 luggage customers.  I relied on YKK's
15 records.
16    Q.   Plaintiffs didn't take any
17 discovery of any of the customers
18 manufacturing cosmetic bags or backpacks
19 or sports bags, sir, and, therefore, they
20 didn't provide you with any, correct?
21    A.   The plaintiffs took discovery
22 of HEO customers, of high-end customers.
23 I don't have any discovery from luggage
24 customers.
25    Q.   You assume in your but-for

Page 554

1    A.   No.
2    Q.   Would you agree, sir, that at
3 least some backpacks are not
4 appropriately called luggage in the real
5 world?
6         MR. DANIELS:  Objection as to
7    form.
8    A.   I don't know, we are talking
9 about luggage in an ELA.  So I used YKK's
10 codes to do that.
11    Q.   Would you agree, sir, that in
12 the real world, there are backpacks that
13 are not appropriately considered luggage?
14         MR. DANIELS:  Objection as to
15    form.
16    A.   Again, luggage could be taken
17 on an airplane.  It could be what you
18 carry things in.  I am using YKK's codes
19 to do what I did.
20    Q.   And you included any backpacks
21 as luggage for purposes of your damages
22 analysis, correct?
23    A.   If YKK coded them as luggage,
24 they are included.
25    Q.   Did Mr. Cockrell examine any

Page 553

1 opinions of damages for luggage that YKK
2 would have been able to sell all of the
3 items you determined to be luggage with
4 T4s and T5s instead of T8s, 9s and 10s,
5 correct?
6    A.   No.
7    Q.   You have no basis for
8 concluding that customers would have
9 purchased the items you included as
10 luggage, if instead of having YKK
11 laminated zippers they had Uretek
12 laminated zippers, correct?
13    A.   I do.  I do have evidence of
14 that.  I know that the zipper was very
15 important to these customers, and there
16 is demonstrated demand.  There is no
17 alternatives.  It was profitable.
18    Q.   You keep saying, again, there
19 were no alternatives.  But you actually
20 didn't say that there were no
21 alternatives as we have been through it
22 several times, but you keep saying the
23 same erroneous thing.  You didn't say
24 that there were no alternatives in your
25 report; did you, sir?

Page 555

75 (Pages 552 - 555)

1    A.   I focused on the demand that
2  did exist.  And that demand existed, as I
3  say in my report, despite any
4  competition.
5    Q.   Did you say that there were no
6  alternatives in your report, sir?
7    A.   I say that there was no
8  infringing alternatives and I mention,
9  again, in my supplemental that they made
10 these sales despite any competition, in
11 whatever form or flavor that is.
12   Q.   Did you say that there were no
13 alternatives to the T8s, 9s and 10s or
14 T4s and T5s in your report, sir?
15       MR. DANIELS:  Objection as to
16   form.
17   A.   I said there was no
18 non-infringing alternatives.  I also
19 mentioned it was an industry standard.
20 And I mentioned it was sold despite that
21 competition.
22   Q.   Did you say that there were no
23 alternatives to the T8s, 9s and 10s or
24 T4s and T5s in your reports, sir, did you
25 say that specific thing?

Page 556

1    A.   I would have to go back and
2  look and see if that is somewhere in
3  there.  I say several things in my demand
4  section about how this is their own
5  provider.
6    Q.   Do you remember saying that,
7  sir?
8    A.   I have to go back and look.
9    Q.   Go ahead.  I think we have been
10 through this already, yet you keep saying
11 that you said that there were no
12 alternatives when you didn't say it.
13       MR. DANIELS:  I object that --
14   Q.   Look at paragraphs 20, 23 and
15 25, again, please?
16       MR. DANIELS:  I object.  We have
17   been through it already.  Asked and
18   answered.
19   A.   Of the supplemental?
20   Q.   Yes.
21   A.   Okay.
22   Q.   Now, that you've looked at your
23 report, did you say there are no
24 alternatives to the T4, T5s, T8s, 9s and
25 10s in the marketplace in your report?

Page 557

1        MR. DANIELS:  Objection as to
2    form.
3    A.   Well, I was looking at my first
4  report.  Let me just look at that and
5  confirm.
6        (Witness reviews document.)
7    A.   In my first report, page 67,
8  paragraph 137, I do say that YKK's only
9  source of a water-resistant zipper for
10 the excluded market was the plaintiffs.
11   Q.   That's not what I asked you.
12   A.   But, no, that's the part of my
13 report where I address it.
14   Q.   So the answer is no?
15   A.   I don't say it that specific
16 way.  I lay out alternatives in a
17 different way and demand.
18   Q.   You didn't check or compare the
19 prices of Uretek laminated zippers for
20 luggage versus the prices of YKK
21 laminated zippers for luggage during the
22 relevant time period; did you, sir?
23   A.   I was aware of some documents
24 that said that.  I did consider the
25 discounted luggage price in my report.

Page 558

1  But I don't talk about other zipper
2  prices in my report.
3    Q.   You don't talk about the prices
4  of Uretek laminated zippers for luggage
5  versus the prices of YKK laminated
6  zippers or the price of other
7  competitors' zippers for luggage in your
8  report; do you, sir?
9        MR. DANIELS:  Objection as to
10   form.
11   A.   Well, I certainly talk about
12 the YKK prices for T8s, 9s and 10s and
13 T4s and T5s and I know in the actual they
14 are more.  We talked about that.  I
15 definitely do that.
16   Q.   I am asking you about the
17 actual prices.  Did you compare in your
18 report the prices that were charged for
19 T4 or T5s zippers used in luggage versus
20 T8s, 9s and 10s or RCPU zippers used in
21 luggage at all, sir?
22   A.   Yes, because my sales data
23 included that for YKK sales, which
24 included those.
25   Q.   Did you compare, make any

Page 559

76 (Pages 556 - 559)

1 comparison in your reports between the
2 Uretek laminated zippers for luggage
3 versus third-party competitors prices for
4 their water-resistant zippers used in
5 luggage?
6        MR. DANIELS:  Objection to form.
7    A.   I did not, I did not have data
8 about third parties, as we talked about
9 this morning, I did not compare that.
10    Q.   Did you conclude in your
11 reports any comparison of the delivery
12 times for Uretek laminated zippers for
13 luggage versus competitors' delivery
14 times of their zippers for luggage?
15    A.   I did not have delivery time
16 data.  I looked at some documents as we
17 looked at this morning that cite
18 one-offs, but I did not have delivery
19 time data.
20    Q.   So the answer is no?
21    A.   The answer is no.
22    Q.   You're aware that YKK and
23 Uretek had a number of discussions during
24 the period at issue about resolving their
25 issues concerning T4s and T5s versus T8s,

Page 560

1 9s and 10s?
2    A.   I am.
3    Q.   And they talked about increase
4 the royalty rate from 3 cents per meter
5 to something higher than that, correct,
6 during those discussions?
7    A.   They talked about a lot of
8 things.  I recall something similar to
9 that, but it had other conditions.
10    Q.   Do you recall that Uretek and
11 YKK discussed from time to time
12 increasing the royalty rate on the sale
13 of the T8s, 9s and 10s zippers?
14    A.   Generally, I recall during the
15 time trying to resolve all of this there
16 were negotiations going back and forth.
17    Q.   On increasing the royalty rate,
18 sir?
19    A.   That was one of the many
20 components discussed.
21    Q.   What were the other components?
22    A.   Over time I recall other
23 commitments, you know, volume commitments
24 and things like that.
25    Q.   What, specifically, do you

Page 561

1 recall besides the parties discussing
2 royalty rates?
3    A.   I recall volume commitments as
4 being another one of the concerns from
5 Uretek -- from YKK to Uretek.
6    Q.   You said there were many
7 components, what else do you recall
8 besides that one and the royalty rates
9 being discussed between the parties?
10    A.   I recall that these
11 negotiations were going on for several
12 years.
13    Q.   I am asking you about the
14 components, not the time period.  What
15 other components do you remember being
16 discussed between the parties, you said
17 there were many of them?
18    A.   Well, there was -- I guess I
19 was counting that they were going back
20 and forth.  There were many things being
21 exchanged with different terms.
22    Q.   What were they, sir?
23    A.   They were, basically, going
24 back and forth about how to resolve this,
25 which included different -- I kind of

Page 562

1 remember also a percentage HEO at some
2 point that might be assumed, different
3 volume commitments and the different
4 royalties.
5    Q.   You already mentioned the
6 volume commitments and the royalties.
7 Mentioning them again doesn't make for
8 multiple components.  But you do remember
9 that increasing the royalty payments were
10 a topic discussed between the parties as
11 a means of resolving their differences?
12        MR. DANIELS:  Objection as to
13    the form of the question.
14    A.   I do, in settling this
15 litigation, I do remember that.
16    Q.   Let me show you Exhibit DX 586.
17        (Defendants' Exhibit 586,
18    document Bates stamped YKK0713410,
19    previously marked for identification.)
20    Q.   You see that these are minutes
21 or at least a memo reflecting a meeting
22 between YKK and Uretek during the
23 relevant time period, July 12th, 2012?
24        MR. DANIELS:  Objection.  Lack
25    of authentication.

Page 563

77 (Pages 560 - 563)

1    A.   I see that here.
2    Q.   You saw this in connection with
3  your work on your supplemental report,
4  correct?
5    A.   I received all of the exhibits,
6  but I don't remember seeing this.
7    Q.   Well, you said that you had
8  considered all of them.  We have been
9  through this before.  This was one of
10  them.  Did you consider this exhibit,
11  Exhibit 586?
12    A.   I searched on things to find
13  things.  I just don't recall reading
14  this.  I have seen things like this.  But
15  I don't recall seeing this one.
16    Q.   Well, why did you say you
17  considered all of the exhibits, if you
18  didn't even read some?  Why did you say
19  that?
20        MR. DANIELS:  Objection.  Asked
21    and answered numerous times today.
22    A.   Because in preparation for
23  trial, multiple times, I have received
24  them.  And I have been searching on them
25  and searching on things and so I include

Page 564

1  them.
2    Q.   You remember searching and
3  searching on Exhibit 586?
4    A.   No.  Searching against all of
5  the population.
6    Q.   So you said in your report that
7  you had considered all of the exhibits
8  which would include Defendants' Exhibit
9  586, but that's not true.  You don't even
10  recall reading Defendants' Exhibit 586,
11  let alone considering it?
12        MR. DANIELS:  Objection as to
13    form.  Objection, asked and answered
14    numerous times today.
15    A.   I searched for information.  I
16  wanted to make sure we understood what
17  population we had, and so I included it.
18  But you're right, I don't remember this
19  particular form.  I remember the types of
20  topics being discussed, because I have
21  seen documents concerning the settlement
22  of this litigation that talk about things
23  like this.
24    Q.   Do you remember seeing
25  Defendants' Exhibit 586 before and

Page 565

1  considering it?
2    A.   I don't remember seeing
3  specifically 586 before.
4    Q.   Okay.  So in the middle, there
5  is a statement next to initial P; do you
6  see that?
7    A.   Uh-huh.
8    Q.   You have to answer.
9    A.   I am sorry, yes.  And what
10  number I should ask you, thank you.  You
11  say the initial P, there is numbers of
12  initial Ps.
13    Q.   Yes.  And do you see up above
14  in the second paragraph that P is defined
15  as Press's statement, Stuart Press's
16  statement?
17    A.   I see that.
18    Q.   So about two-thirds of the way
19  down there is a statement attributed to
20  Stuart Press that "Uretek will propose a
21  new definition."
22        Do you see that?
23    A.   I see that.
24    Q.   So in this memo, the following
25  statement is attributed to Stuart Press

Page 566

1  during the relevant time period July
2  12th, 2012, "Uretek will propose a new
3  definition and a means to compensate
4  Uretek through a higher royalty for
5  high-end outerwear made in the past and
6  what will be made in the future."
7    A.   I see that's what it says.
8    Q.   So the parties were discussing
9  resolving their differences by paying an
10  increased royalty rate, correct?
11    A.   That was one of the things
12  discussed --
13    Q.   Okay.
14    A.   -- during this time.
15    Q.   Let me show you Defendants'
16  Exhibit 611.
17        (Defendants' Exhibit 611,
18      document Bates stamped YKK0004615,
19      previously marked for identification.)
20    Q.   You see, that this is an e-mail
21  to YKK by Stuart Press during the
22  relevant time period October 1, 2013?
23    A.   Okay.
24    Q.   And you see that on the second
25  page 4616 that Mr. Press talked about

Page 567

1  resolving the parties' differences with a
2  higher royalty; for example, 15 cents a
3  meter on outerwear luggage and backpacks
4  from 2014 going forward, correct?
5      A.  I see that.  That's one of the
6  components in here.  There are others,
7  but that is one of them.
8      Q.  Let me show you Defendants'
9  Exhibit 660.
10     (Defendants' Exhibit 660,
11     document Bates stamped YKK0714527
12     previously marked for identification.)
13     Q.  You see this is a memo of YKK
14 meeting with Stuart Press, again, during
15 the relevant time period July 28th, 2014?
16     MR. DANIELS:  Objection.  Lack
17 of authentication.
18     A.  Yes.
19     Q.  If you can turn to page 714528,
20 this is again an exhibit that you
21 considered in connection with your report
22 in this matter, correct?
23     A.  Yeah, I have seen this before.
24     Q.  And on page 714528 there is a
25 reference to Uretek offering Stuart Press

Page 568

1  this case for high-end outerwear, luggage
2  or military items, correct?
3      A.  No.  Lost profits is the
4  appropriate remedy in my opinion, not a
5  royalty.
6      Q.  Okay.  That's not what I asked
7  you.  You didn't make any attempt to
8  determine a reasonable royalty rate in
9  this case for high-end outerwear, luggage
10 or the military items in dispute; did
11 you?
12     A.  No, I did not prepare one, I
13 did not prepare a royalty analysis.
14     MR. WOLKOFF:  Okay.  I want to
15 have marked as the next exhibit the
16 statement by YKK that remains at issue
17 in this case.  Let's have it marked as
18 Exhibit 18 for identification, please.
19     (Donohue Exhibit 18, statement
20     by YKK was so marked for
21     identification, as of this date.)
22     MR. DANIELS:  I am going to
23 object to form on the description.
24     MR. WOLKOFF:  I am sorry, there
25 wasn't any question.

Page 570

1  -- strike that.
2          And on page 714528, there is a
3  reference to YKK offering to Stuart Press
4  of Uretek a new royalty rate of 9 cents a
5  meter, correct?
6      A.  Yeah, I see that bullet, about
7  two-thirds down.
8      Q.  So there were various occasions
9  on which the parties discussed the
10 resolution of their issues by increasing
11 the royalty rate from 3 cents to
12 something a bit higher, correct?
13     A.  Yes, that is certainly one of
14 the things they discussed.
15     Q.  Did you make any attempt to
16 determine a reasonable royalty rate in
17 this case for high-end outerwear or
18 luggage or military items?
19     A.  No, I have not performed a
20 Georgia Pacific analysis.  As I mentioned
21 in the prior deposition, a lot of the
22 components are here but I did not perform
23 a Georgia Pacific analysis.
24     Q.  So you didn't make any attempt
25 to determine a reasonable royalty rate in

Page 569

1      MR. DANIELS:  I am objecting to
2  the description.
3      MR. WOLKOFF:  You're objecting
4  to me marking something?
5      MR. DANIELS:  No.  You described
6  this.  I am objecting to your
7  description into the record.
8      MR. WOLKOFF:  What's the
9  objection?
10     MR. DANIELS:  I put it on the
11 record.  You told me not to make
12 speaking objections a little while
13 ago.
14     MR. WOLKOFF:  I asked you not to
15 make speaking objections, but that
16 doesn't mean I can't ask you the basis
17 for an objection when it's not
18 apparent to me.
19     MR. DANIELS:  There may be other
20 statements that are relevant in this
21 case now.
22     Q.  Looking at Exhibit 18 for
23 identification, do you see this as the
24 statement that is still at issue in this
25 case according to the court order, "YKK

Page 571

1 has the exclusive right to manufacture,
2 use, sell and import zippers
3 incorporating this water-repellent
4 technology"?
5    A.   Yes, I am aware of this
6 statement from the Court's filing.
7    Q.   And this is the statement that
8 forms the basis, as you're aware of
9 plaintiffs' Lanham Act claim, correct, in
10 this case?
11    A.   Yes.  I'm let the plaintiffs
12 speak for its total basis, but I
13 understand this was the statement that
14 was found in the summary judgment motion
15 to be false.
16    Q.   Let me place in front of you
17 what's already been marked apparently in
18 three different places, Plaintiffs'
19 Exhibit 116, Blunt Exhibit 46 and
20 Sarumaru Deposition Exhibit 65.
21        (Plaintiffs' Exhibit 116, a
22    one-page printout describing the
23    AquaGuard water-repellent zippers from
24    YKK's website for identification.)
25    Q.   Do you recognize this as a page

Page 572

1 describing the AquaGuard water-repellent
2 zippers from YKK's website?
3    A.   I do.
4    Q.   And you would agree, sir, that
5 this selection from the YKK website
6 doesn't have the statement at issue that
7 we've marked as Exhibit 18, correct?
8    A.   I am checking it, but not to my
9 knowledge.
10    Q.   You're not aware of the
11 statement at issue ever appearing on
12 YKK's website, at any time, correct?
13    A.   I am not aware of that, as I
14 sit here.
15    Q.   There is nothing in your report
16 that says it did; is there?
17    A.   Correct.
18    Q.   In terms of marketing flyers,
19 if we look at your supplemental report,
20 and let me direct your attention
21 specifically to Exhibit 44 -- I meant
22 paragraph 44.
23        In terms of marketing flyers,
24 if we look at your supplemental report
25 let me direct your attention,

Page 573

1 specifically, to paragraph 44.
2    A.   I am there.
3    Q.   You point out that YKK issued
4 reports indicating it attended the 2003
5 summer outdoor retail show and the 2003
6 winter market trade show, correct?
7    A.   Correct.
8    Q.   And then in the next paragraph
9 of your supplemental report, paragraph
10 45, you say that "YKK distributed
11 marketing materials, its flyer, at these
12 trade shows," correct?
13    A.   I do.
14    Q.   You then cite or say in
15 paragraph 45 that "There was a flyer that
16 was allegedly distributed by YKK at a
17 trade show in 2008," correct?
18    A.   Correct.
19    Q.   And then you go on to say that
20 "Similar or identical flyers were used as
21 early as 2003," correct?
22    A.   Yes.
23    Q.   But you haven't calculated
24 damages here as early as 2003.  You
25 calculated Uretek's purported damages

Page 574

1 from February of 2009 to September 30,
2 2019, correct?
3    A.   Correct, that was the available
4 period for damages.
5    Q.   You don't provide a single
6 example of YKK marketing flyers with the
7 language at issue that's reflected in
8 Donohue Deposition Exhibit 18, dated from
9 February 2009 on, that is during the
10 relevant time period at issue; do you,
11 sir?
12        MR. DANIELS:  Objection as to
13    form.
14    A.   I cite other flyers, that was
15 just the first one.  I believe there are
16 some flyers from the 2008 and '09 time
17 period.  And maybe in 2015.  So I do cite
18 those examples.
19    Q.   I am asking about flyers that
20 themselves were dated, that were prepared
21 during the time period of February 2009
22 through September 2019, the relevant time
23 period.
24        Do you recall citing to any
25 flyers that were dated during that time

Page 575

80 (Pages 572 - 575)

1 period?
2         MR. DANIELS: Objection as to
3   form.
4     A.   When you say dated, like a
5 copyright date or something? When I say,
6 when I use the years before, they are in
7 e-mails or a report that's from the time
8 period. So I don't know when that flyer
9 was created. Correct. I just know that
10 flyer was in use in 2008 and '09 and '15,
11 for example.
12     Q.   Do you cite to any YKK
13 marketing flyers that were prepared or
14 created during the relevant time period
15 February 2009 through September 2019, to
16 your knowledge?
17         MR. DANIELS: Objection as to
18   form.
19     A.   Aside from the copyright dates
20 on them, if there was one, I don't know
21 when these flyers were created. I just
22 know when they are being used.
23     Q.   All right. So let's take a
24 look at when they are being used. We
25 will look at your report.

Page 576

1         You cite these various flyers
2 in footnote 61 of your supplemental
3 report, correct?
4     A.   Yes.
5     Q.   So let's go through them. The
6 first one you cite is a flyer appended to
7 PX 79E, correct?
8     A.   Yeah. I mean I cite an e-mail
9 or a report. But the flyer I am citing
10 is the PX 79E.
11     Q.   So let me place that,
12 Plaintiffs' Exhibit 79E in front of you.
13         (Plaintiffs' Exhibit 79E,
14     document Bates stamped YKK0010318,
15     previously marked for identification.)
16     Q.   Now, this flyer marked as
17 Plaintiffs' Exhibit 79E doesn't have a
18 date on it, correct?
19     A.   It does not. The flyer itself
20 doesn't. The other document I cite, I
21 think it provides the date of its use.
22 But not when this flyer was created.
23     Q.   You don't have any evidence
24 that this flyer marked as Plaintiffs'
25 Exhibit 79E was ever circulated or used

Page 577

1 by YKK during the relevant time period;
2 do you, sir?
3     A.   No, that's not correct. I have
4 Mr. Saramaru's testimony suggesting that
5 flyers such as these were used to promote
6 product, the flyers' purpose is promoting
7 a product.
8     Q.   I am asking you, specifically,
9 sir, about this flyer, Plaintiffs'
10 Exhibit 79E that contains the statement
11 at issue on page 10319.
12         Do you have any evidence that
13 this flyer was used by YKK or circulated
14 by YKK during the relevant time period,
15 February 2009 through September of 2019?
16     A.   Well, as I was saying I
17 understand what they were for, they were
18 for selling to customers. Mr. Saramaru's
19 testified that flyers like these are used
20 for selling to customers.
21     Q.   Do you have any evidence --
22     A.   I am not done, respectfully.
23 And I thought I mentioned the report in
24 that footnote where I've seen the flyers
25 referenced in the outerwear reports that

Page 578

1 are indicating that they are being used.
2 But, yes, this, 79E, I just know flyers
3 like this were being used.
4         MR. WOLKOFF: I move to strike.
5     Q.   Do you have any evidence --
6         MR. DANIELS: I object to the
7         motion to strike.
8     Q.   Do you have any evidence that
9 Plaintiffs' Exhibit 79E was used or
10 distributed by YKK during the relevant
11 time period, that is from February of
12 2009 through September of 2019 --
13         MR. DANIELS: Objection. --
14     Q.   -- this flyer?
15         MR. DANIELS: Objection. Asked
16     and answered.
17     A.   I explained that I have
18 evidence of the use of these flyers,
19 types of flyers. You're asking this
20 piece of paper, I don't know. It looks
21 like the same flyer in the pictures. And
22 it looks like the same flyer in a
23 deposition.
24     Q.   Do you know whether this flyer,
25 Plaintiffs' Exhibit 79E, was used or

Page 579

81 (Pages 576 - 579)

1 circulated by YKK during the relevant
2 time period February 2009 through 2019?
3          MR. DANIELS: Objection. Asked
4    and answered.
5    A.    Same answer. Mr. Sarumaru
6 testified that they are used for that
7 purpose.  That they are a flyer used for
8 selling.  I have seen pictures of them at
9 these shows.  I have seen e-mails of them
10 using these flyers.  So that's the
11 evidence that I have.
12   Q.   Do you have any evidence that,
13 specifically, Plaintiffs' Exhibit 79E was
14 used by YKK during the relevant time
15 period?
16          MR. DANIELS: Objection. Asked
17    and answered.
18    A.   Not beyond what I just said.
19   Q.   Do you have any evidence
20 specific to Plaintiffs' Exhibit 79E that
21 it was used by YKK during the relevant
22 time period from February 2009 through
23 September of 2019?
24          MR. DANIELS: Objection, asked
25    and answered.  This is sixth or fifth

Page 580

1    time.  Whatever it is, we can get the
2    count, he's answered the question.
3    You may not like the answer.  But
4    we're at the point where it's
5    harassment asking the same question
6    five or six times, whatever we are up
7    to again.
8    A.   I can go through it again.  But
9 that's the evidence that I have of its
10 use.  That's it.  I have Mr. Sarumaru's
11 testimony.  I have it's a marketing
12 flyer.  I have that it's used at these
13 outdoor shows.  There are pictures.  I
14 have it attached to some e-mails.  That's
15 what I've seen in the record.
16   Q.   Do you know of anything
17 reflecting that Plaintiffs' Exhibit 79E
18 was given to any particular customer
19 during the relevant time period,
20 specifically, Plaintiffs' Exhibit 79E?
21   A.   Not beyond what I already said.
22 These are used for that purpose.  I don't
23 have an e-mail to a particular customer.
24   Q.   I am not asking you whether or
25 not something is used for a purpose.  I

Page 581

1 am asking you -- it's very simple -- I
2 don't know why you can't answer the
3 question.  It's true I asked you the
4 question a number of times.  I am asking
5 you specifically about Plaintiffs'
6 Exhibit 79E.  If you don't answer the
7 question, we are going to move to compel.
8          Do you have any knowledge that
9 Plaintiffs' Exhibit 79E was used by YKK
10 during the relevant time period, February
11 2009 through September 2019, this
12 specific flyer --
13          MR. DANIELS: Objection. Asked
14    and answered.
15   Q.   -- marked as Exhibit 79E?
16          MR. DANIELS: And if we have to
17    get the Court on the phone to stop
18    this harassment, then we will.  Asked
19    and answered.
20    A.   That time you asked me any
21 knowledge.  The only information I have
22 is about this:  That it's for this
23 purpose.  Mr. Sarumaru testified it's
24 being used for that purpose.  I have seen
25 it at trade shows.  I have seen it in

Page 582

1 their outdoor reports.  I have seen it
2 e-mailed.  But obviously, I wasn't at the
3 trade show.  When you say any knowledge,
4 if that bar is me being there; no, I
5 wasn't there.
6    Q.   I am asking about a specific
7 time period.  I am not asking whether it
8 was ever used, which is all that you're
9 responding to.
10          I am asking for whether you
11 know if Plaintiffs' Exhibit 79E was used
12 by YKK during the time period February
13 2009 through September of 2019, that time
14 period.
15          MR. DANIELS: Objection.
16   Q.   And this specific Exhibit.
17          MR. DANIELS: Objection. Asked
18    and answered.
19    A.   And I can't add anything more
20 to my prior answers.  And I believe some
21 of that --
22   Q.   I am going to move to compel?
23    A.   -- time frame includes 2009 and
24 later years.
25          MR. WOLKOFF: We will move to

Page 583

82 (Pages 580 - 583)

1    compel.
2      Q.  Do you know that the metadata
3  on Plaintiffs' Exhibit 79E reflects that
4  it has a date of 2007, sir?
5      A.  I don't know.
6      Q.  Do you have any basis to
7  contest that the metadata on Plaintiffs'
8  Exhibit 79E reflects that it has a date
9  of 2007?
10         MR. DANIELS:  Objection as to
11  form.
12      A.  No, I don't.
13      Q.  The relevant time period at
14  issue here doesn't extend back to 2007,
15  it begins February 2009; doesn't it, sir?
16         MR. DANIELS:  Objection to form.
17  Calls for a legal conclusion, as well.
18      A.  The relevant damage period is
19  2009 forward, correct.
20      Q.  Let me hand you Plaintiffs'
21  Exhibit 79F.
22         (Plaintiffs' Exhibit 79F
23      document Bates stamped YKK0631221,
24      previously marked for identification.)
25      Q.  Do you see that this is an

Page 584

1  e-mail from Mr. Shibata to others at YKK
2  dated before the relevant time period,
3  October 16th, 2007?
4      A.  Yes, I see that.
5      Q.  And do you see there is a flyer
6  appended to it, Bates stamped 358274?
7      A.  I do.
8      Q.  Now, this is the second flyer
9  that you cite in your exhibit, 61, PX
10  79F, correct?
11      A.  Correct.
12      Q.  And you see that it was
13  appended to an e-mail back in October of
14  2007, so before the relevant time period,
15  correct?
16         MR. DANIELS:  Objection as to
17  form.
18      A.  It was in 2007, yes.
19      Q.  Okay.
20         MR. WOLKOFF:  Let's take a break
21  for a few minutes, please.
22         THE VIDEOGRAPHER:  We are now
23  going off the record.  The time is
24  4:31 p.m., and this is the end of the
25  media labeled number 5.  We are off

Page 585

1    the record, counselors.
2      [Off the record.]
3         THE VIDEOGRAPHER:  We are back
4  on the record.  The time is 4:43 p.m.
5  This is beginning of media labeled
6  number 6.
7  BY MR. WOLKOFF:
8      Q.  When we broke, I was looking at
9  your footnote 61 in your supplemental
10  report, Mr. Donohue, in which you list
11  the various marketing flyers that
12  plaintiffs base the Lanham Act claim on.
13      Do you recollect that, sir?
14      A.  I do.
15         MR. WOLKOFF:  I would like to
16  have marked as the next exhibit, a
17  document Bates stamped YKK0084466
18  through YKK0084472.
19         THE REPORTER:  Exhibit 19.
20         (Donohue Exhibit 19, document
21      Bates stamped YKK0084466 through
22      YKK0084472 was so marked for
23      identification, as of this date.)
24      Q.  Placing in front of you what we
25  had marked as Exhibit 19 for

Page 586

1  identification.
2      Do you see this is the document
3  Bates stamped YKK008466-472 that you
4  refer to in your footnote 61, as
5  associated with both flyers I showed you
6  before the break, PX 79E and PX 79F?
7      A.  Yes.
8      Q.  And the date is 2007, so it's
9  before the relevant time period, correct?
10      A.  Yes.
11      Q.  The relevant time period didn't
12  begin until two years later, correct?
13         MR. DANIELS:  Objection.  By
14      your definition at the beginning of
15      the deposition, otherwise it calls for
16      a legal conclusion.  You defined the
17      relevant time period in the beginning
18      of the deposition.
19         MR. WOLKOFF:  I am using the
20      relevant time period that this witness
21      used in his reports.  I am not
22      defining anything.
23         MR. DANIELS:  We need to be
24      clear on this, because I've assumed
25      the entire time you used relevant time

Page 587

83 (Pages 584 - 587)

1    period as you defined that term at the
2    beginning of the deposition.
3        MR. WOLKOFF:  I am using the
4    relevant period as this witness used
5    in his reports.
6        MR. DANIELS:  Objection.  Calls
7    for a legal conclusion.  And I am
8    going to reserve my objection to go
9    back to the entire record every time
10   you used relevant time period.
11       MR. WOLKOFF:  You can reserve
12   anything you want.  I am using the
13   time period that this witness used,
14   and that's how we defined it with him
15   at the beginning of the deposition.
16   Q.    So this is associated with the
17   two flyers, 79E and 79F, 2007, and not
18   from the time period 2009 forward?
19   A.   It's before 2009, yes.
20   Q.    I am showing you the next flyer
21   that you refer to, so Plaintiffs' Exhibit
22   79T.
23       (Plaintiffs' Exhibit 79T,
24       document Bates stamped YKK0587587
25       previously marked for identification.)

Page 588

1        MR. DANIELS:  Objection to form.
2    Q.   It's the same one in your
3    figure 8 on page 24 of your supplemental
4    report, 2008?
5    A.   It's the same flyer, but that
6    is a different footnote, but, yes, that
7    looks like a very similar flyer.
8    Q.   Okay.  And you see that
9    Mr. Scolnick at the University of
10   Michigan, EDU, education, is copied on
11   this e-mail from YKK with the flyer
12   attached to it, correct?
13   A.   I do.
14   Q.   And then on page 587589 there
15   is an e-mail to YKK on November 10th,
16   2010, from the same Spencer Scolnick,
17   whose e-mail address is at the University
18   of Michigan, correct?
19   A.   Yes.
20   Q.   And Mr. Scolnick is talking
21   about a project at his college, do you
22   see that, he says at the bottom "Our
23   project," yes?
24   A.   Yes.
25   Q.   And he talks about the project.

Page 590

1    Q.    This is an e-mail between the
2    University of Michigan, or at least a
3    student there, and YKK.
4        This one is November 11th,
5    2010, correct?
6    A.   Correct.
7    Q.    And you see that the flyer at
8    issue is appended to 79T with the
9    statement at issue, correct?
10   A.   I see that back there, yes.
11   Q.    In fact, the flyer is attached
12   to an e-mail string starting on page
13   587590, an e-mail from Alexandra Gray,
14   G-R-A-Y, at YKK to Wendy Chambley,
15   C-H-A-M-B-L-E-Y at YKK with a copy to a
16   Mr. Scolnick, S-C-O-L-N-I-C-K at the
17   University of Michigan, correct?
18   A.   Yes.
19   Q.    You saw this e-mail string in
20   the flyer that you cited in your report,
21   correct?
22   A.   I did.
23   Q.    And this flyer is the same one
24   that you cited as being prepared in 2008,
25   correct?

Page 589

1    He says "We were going to use the zipper
2    on a ski glove.  It would enable users to
3    access their fingers without actually
4    taking the glove off."
5        You see that, correct?
6    A.   Yes.
7    Q.    You cited this e-mail in your
8    report in the footnote?
9    A.   I did.
10   Q.    This flyer was sent to a
11   student, not a garment manufacturer,
12   correct?
13   A.   In this e-mail, yes.
14   Q.    And his project that he had
15   asked information about involved a ski
16   glove?
17   A.   Apparently.
18   Q.    And ski gloves are not at issue
19   here.  They are not high-end outerwear.
20   They are not luggage.  Correct?
21   A.   Well, I guess it could be a
22   high-end outerwear of a type.  But it's a
23   ski glove.
24   Q.    You didn't include ski gloves
25   as high-end outerwear, you explicitly

Page 591

84 (Pages 588 - 591)

1 excluded them; didn't you, sir?
2    A.   I would have to go back and
3 look at the codes again.  I included
4 high-end outerwear, things of a
5 functional nature.
6    Q.   You don't remember, sir, that
7 you excluded gloves from your analysis of
8 high-end outerwear?
9    A.   I need to look back.  I don't
10 recall focusing on ski gloves at any
11 time.
12    Q.   You don't recall including ski
13 gloves as high-end outerwear, do you,
14 sir, which is what Mr. Scolnick at the
15 University of Michigan is asking about?
16    A.   I just don't remember that code
17 as I sit here.  I need to look at my
18 exhibit and look at the code here.
19    Q.   Are you aware that the student
20 Spencer Scolnick -- and you would agree
21 that a student with a project involving
22 zippers on ski gloves is not a garment
23 manufacturer; do you agree with that?
24    A.   I would agree with that.
25    Q.   So this flyer was sent to a

Page 592

1 student that is not a garment
2 manufacturer, correct?
3    A.   Correct.
4    Q.   And you cited that in your
5 footnote, but you didn't mention that;
6 did you?
7    A.   I did not mention that.  I am
8 mentioning the flyers, examples of the
9 flyers that they were using in the
10 day-to-day business.
11    Q.   Using to send to a student that
12 wasn't a garment manufacturer?
13    A.   That's what they did this time.
14    Q.   Do you know what Spencer
15 Scolnick at the University of Michigan
16 actually ordered from YKK, if anything?
17    A.   No idea.
18    Q.   Did you know that he ordered
19 T5s zippers for his ski gloves?
20    A.   I did not know that.
21    Q.   In fact, YKK could sell ski
22 gloves with T5s in them to Mr. Scolnick;
23 couldn't they?
24       MR. DANIELS:  Objection as to
25    form.

Page 593

1    A.   Of course, they could sell T5s
2 laminated to anyone.
3    Q.   Including Mr. Scolnick, right?
4    A.   Correct.
5    Q.   The next one you cite is 79U.
6 Let me show you that one.
7       (Plaintiffs' Exhibit 79U,
8       document Bates stamped YKK0330626,
9       previously marked for identification.)
10    Q.   This is another one of the
11 so-called flyers, together with the
12 transmittal e-mail that you cite in the
13 footnote 61, in connection with the
14 Lanham Act calculation of damages,
15 correct?
16    A.   This is one of the flyers I
17 cite, yes.
18    Q.   And the flyer is attached to an
19 e-mail string between YKK and a company
20 called California Innovations, correct?
21    A.   Correct.
22    Q.   And California Innovations is a
23 manufacturer of softsided coolers and
24 lunch packs, not a garment manufacturer;
25 were you aware of that, sir?

Page 594

1    A.   I was not aware of what they
2 specifically create.
3    Q.   Did you do any research to
4 determine whether or not innovations was
5 even an outerwear garment manufacturer,
6 sir?
7    A.   No.
8    Q.   Did you know that California
9 Innovations in any event ordered an
10 AquaSeal zipper not an AquaGuard zipper
11 in the end?
12    A.   I did not.
13    Q.   You didn't check up on that
14 either; did you?
15    A.   I did not.  It was just an
16 example of a flyer.
17    Q.   Do you see the attachment
18 refers to AquaSeal, in Exhibit 79U, on
19 the first page, 330626, a zipper not even
20 in issue in here?
21       MR. DANIELS:  Objection to form.
22    A.   It attaches two attachments,
23 the AquaGuard flyer and the AquaSeal
24 flyer.
25    Q.   Do you know that California

Page 595

85 (Pages 592 - 595)

1 Innovations chose the AquaSeal zipper to
2 purchase?
3    A.   I did not know.
4    Q.   In any event, the AquaSeal
5 zipper is not at issue here; is it?
6    A.   No, it's not.
7    Q.   And California Innovations
8 isn't a high-end garment manufacturer; is
9 it, sir?
10    A.   I don't know.  You've told me
11 that they don't.  But I haven't
12 researched them.
13    Q.   Before you cited it in your
14 footnote as an example of YKK circulating
15 a flyer during the relevant time period
16 to a high-end garment manufacturer; don't
17 you think you should have looked at that?
18        MR. DANIELS:  Objection as to
19    form.  Mischaracterizes the testimony.
20    A.   No.  It's an example of YKK
21 using the flyers.
22    Q.   But using it with someone
23 that's not a high-end outerwear garment
24 manufacturer, right?  That's not what you
25 intended to cite it for?

Page 596

1    A.   I intended to cite it as an
2 example of them using the flyer to market
3 the customers.
4    Q.   You didn't mean to have people
5 infer that they were using the flyer
6 during the relevant time period to market
7 to high-end outerwear garment
8 manufacturers then; did you?
9    A.   I don't understand your
10 question, by citing to it or just my
11 report in general?
12    Q.   By citing to it.  You weren't
13 implying that by citing to Exhibit 79T,
14 this flyer sent to California
15 Innovations, that innovations was a
16 high-end outerwear garment manufacturer;
17 were you?
18    A.   I don't believe I was.  I don't
19 say that in my supplemental report.
20    Q.   No, you don't.  Let me place in
21 front of you Exhibit 79A.
22        (Plaintiffs' Exhibit 79A,
23    document Bates stamped YKK0493633
24    previously marked for identification.)
25        MR. DANIELS:  Do you have a

Page 597

1    copy?
2    Q.   This is the last of the flyers
3 that you cite, right?
4    A.   Yes.
5    Q.   And what is the date on this
6 one?
7    A.   2003 is the e-mail.
8    Q.   So how many years is that
9 before the relevant time period?
10        MR. DANIELS:  Objection as to
11    form.
12    A.   Six years before 2009.
13    Q.   Do you cite in your report any
14 use of transmittal by YKK of a marketing
15 flyer with the statement at issue,
16 reflected in Exhibit 18, to any high-end
17 outerwear garment manufacturer or luggage
18 manufacturer or military manufacturer,
19 from February 2009 through September
20 2019, that you're aware of?
21    A.   Could you read that back,
22 please?
23    Q.   Do you cite in your report any
24 use or transmittal by YKK of a marketing
25 flyer, with the statement at issue

Page 598

1 reflected in Exhibit 18, to any high-end
2 outerwear garment manufacturer or luggage
3 manufacturer or military manufacturer,
4 used between February 2009 through
5 September 2019 that you're aware of?
6        MR. DANIELS:  Objection to the
7    form.
8    A.   I thought I cited something
9 from at least 2009, showing that they
10 were using the flyer.
11    Q.   Can you identify that, sir?
12    A.   I thought it was in that
13 footnote.  I don't think we looked at
14 everything in this footnote.
15        MR. WOLKOFF:  Well, let's have
16    marked another item from the footnote,
17    so that we do look at everything
18    YKK0011470 to 11480.
19        Take a look at that one.
20    MR. DANIELS:  Is that 20?
21    THE REPORTER:  20, yes.
22        (Donohue Exhibit 20, document
23    Bates stamped YKK0011470 to 11484, was
24    so marked for identification, as of
25    this date.)

Page 599

86 (Pages 596 - 599)

1    Q.   Now, you say this is associated
2 with the flyer PX 79G, PX 79H, PX 79T and
3 PX 79U, correct?
4    A.   No, I don't, I don't say that.
5    Q.   You say YKK 0011470-484 and 482
6 and then you cite two other --
7    A.   Thank you, that's why I was
8 confused.
9    Q.   -- attachments associated with
10 the flyer of 79G, 79H, 79T, and 79U,
11 correct?
12        MR. DANIELS:  My exhibit stops
13    at 480.
14        MR. WOLKOFF:  Okay.
15    Q.   Correct, sir?
16    A.   I say that in the footnote and
17 I just don't think we have the last one,
18 11485-487.
19    Q.   I will give you that one in a
20 moment.
21    A.   Okay.
22    Q.   But looking at this one that we
23 marked as Exhibit 20, the date is before
24 the February 2009 through September 2019
25 time period, correct?

Page 600

1 issue in that picture?
2    A.   I can see the red letters, but
3 in this version, I can't see it.
4    Q.   Can you see the statement at
5 issue in this flyer, the picture of which
6 is Exhibit 21?
7    A.   If you blew it up, you may be
8 able to.  Standing in front of it at the
9 show we could.
10    Q.   We can't tell from Exhibit 21
11 whether a flyer with the statement at
12 issue, which was reflected in Exhibit 18
13 was used in 2009 at this show or not, we
14 can't read what that flyer is saying,
15 correct?
16    A.   I can't read it verbatim, but
17 it looks a lot like that flyer.
18    Q.   Read the words that you can
19 read.
20    A.   I can read "AquaGuard," and
21 after that it gets pretty blurry.
22        MR. WOLKOFF:  Let's have marked
23    as Exhibit 22 for identification Bates
24    stamp YKK0011509 through 11519.
25        (Donohue Exhibit 22, document

Page 602

1    A.   Correct.
2        MR. DANIELS:  I am objecting
3    this is not a complete copy of the
4    document that's cited in the footnote
5    and doesn't have the pages that was
6    even cited in the footnote included.
7        MR. WOLKOFF:  I would like to
8    have this marked as Exhibit 21 for
9    identification YKK0011485 through 487.
10        (Donohue Exhibit 21, document
11    Bates stamped YKK0011485 through 487
12    was so marked for identification, as
13    of this date.)
14    A.   Okay.  This isn't the
15 continuation of that, but it's missing a
16 few pages.  There is another one from
17 2009.
18    Q.   This is a report on a summer
19 outdoor show in July of 2009, correct?
20    A.   Correct.
21    Q.   It has no flyer attached to it;
22 does it, sir?
23    A.   It doesn't.  It shows the flyer
24 in the picture.
25    Q.   Can you see the statement at

Page 601

1    Bates stamped YKK0011509 through
2    11519, was so marked for
3    identification, as of this date.)
4    Q.   This is a report on an outdoor
5 summer market show in 2009, correct?
6    A.   Correct.
7    Q.   The flyer at issue -- strike
8 that.
9        And a flyer appears on page
10 11511?
11    A.   Correct.
12    Q.   Can you read anything in that
13 flyer?
14    A.   I can read "AquaGuard
15 water-resistant zippers," and I can see
16 the color card.
17    Q.   Can you read anything about
18 that has the statement at issue which is
19 reflected in Exhibit 18 in that flyer as
20 part of Exhibit 22?
21    A.   No, I just see the red
22 language, but I can't read it.
23    Q.   So we have now looked at all of
24 the citations in your report to YKK
25 flyers, correct?

Page 603

87 (Pages 600 - 603)

1     A.   I believe so.  Maybe, did we
2   look at 62, footnote 62H, but with the
3   exception of that I believe those are the
4   flyers that I cited.
5     Q.   Where is 62H cited in 61?
6     A.   You said in my report.  It's a
7   different footnote.  62 is a different
8   footnote.
9     Q.   Are you talking about PX 79H?
10    A.   Yes, that would be another
11  flyer, I believe.
12    Q.   Okay.  So let's have that flyer
13  marked again, it's 79H, so let me just
14  show it to you.
15        (Plaintiffs' Exhibit 79H,
16        document Bates stamped YKK0001644,
17        previously marked for identification.)
18    A.   Thank you.
19    Q.   Do you know whether this is a
20  flyer actually from 2003, several years
21  before -- actually, strike that.
22        Do you know whether or not
23  Exhibit 79H has a metadata showing that
24  this flyer is prior to February 2009?
25    A.   I know that it references

Page 604

1   flyers.  I was asking you about this
2   flyer.
3         79H, you cite it in your
4   supplemental report.  Do you know whether
5   or not Plaintiffs' Exhibit 79H was used
6   by YKK, during any portion of the time
7   February 2009 through September 2019;
8   either you know or you don't?
9     A.   I am not a fact witness.  I
10  wasn't there.  All I know is what I've
11  already told you.  I wasn't there.  So I
12  think that's what you're implying.
13    Q.   You cite this as an example of
14  a flyer that was used from February 2009
15  through September of 2019.  And I am
16  testing your knowledge of whether or not
17  you really know that, sir.
18        Do you know whether Plaintiffs'
19  Exhibit 79H was used during a time period
20  February 2009 through September 2019?
21    A.   All I know is what they said
22  about it and how they used these flyers.
23  I don't know --
24    Q.   Do you know of any statement by
25  YKK, specifically, about Plaintiffs'

Page 606

1   what's available from 2008 autumn.  That
2   is the only date information that I know.
3     Q.   So you don't know whether or
4   not this flyer was used from February
5   2009 through September 2019?
6         MR. DANIELS:  Objection as to
7     form.
8     A.   I only know what I mentioned
9   before about their use of flyers.
10    Q.   Do you know whether this
11  specific flyer was used during that time,
12  79H?
13    A.   I only know what we went
14  through about YKK's use of these flyers.
15    Q.   I am not asking you again about
16  these flyers.  I am going to move to
17  compel.
18        I am going you about 79H.  Do
19  you know whether or not 79H was used by
20  YKK, from February 2009 forward?
21    A.   I only know what I said before,
22  which is what they said about how they
23  used these flyers.  That's all I know.
24  Obviously, I wasn't there.
25    Q.   I wasn't asking you about these

Page 605

1   Exhibit 79H?
2         MR. DANIELS:  Objection.  Asked
3     and answered.
4     A.   Mr. Sarumaru just talked about
5   flyers in general.
6     Q.   So no?
7     A.   He was just talking about
8   flyers like these.  That's all I know.
9     Q.   When you said "like these," he
10  didn't have 79H in front of him, did he,
11  the way you just pointed to?
12    A.   He had a flyer like this
13  marketing flyer.
14        MR. DANIELS:  Objection as to
15    form.
16    Q.   Do you know anything that YKK
17  ever said about, in specific terms, that
18  is specifically about Plaintiffs' Exhibit
19  79H?
20        MR. DANIELS:  Objection.  Asked
21    and answered.
22    A.   I don't have anything beyond
23  what Mr. Saramaru said and what I cited
24  earlier today.
25    Q.   Do you know whether Plaintiffs'

Page 607

88 (Pages 604 - 607)

1 Exhibit 79H was used by YKK during the
2 period or a portion of the period of
3 February 2009 through September of 2019?
4     A.   Not as a fact witness.  I just
5 know that they use them to sell -- the
6 purpose of them is to sell.  They used
7 these flyers while selling.  They showed
8 the pictures at the outdoor reports.
9     Q.   Do you know whether or not any
10 of the flyers that you cite in your
11 supplemental report were actually used by
12 YKK with high-end outerwear garment
13 manufacturers, during the time period of
14 February 2009 through September of 2019?
15     A.   I only know what I already
16 said, which is I see them in pictures
17 being used at outdoor shows, including in
18 2008 or '09.  There is testimony
19 suggesting that they are used to sell the
20 customers.  That's all I know.  I don't
21 have any direct knowledge of being at the
22 show or anything like that.
23     Q.   Did anybody at YKK say that any
24 of these flyers were used to sell to
25 customers from February 2009 through

Page 608

1 issue when making its zipper purchasing
2 decisions?
3     A.   I haven't talked to the
4 customers.  There is no survey about
5 them.  I don't know.
6     Q.   You did get data from the 13
7 so-called discovery customers, correct?
8     A.   I did.
9     Q.   And the plaintiffs subpoenaed
10 them, correct?
11     A.   They did.
12     Q.   Did you or to your knowledge
13 anybody else ever ask those 13 discovery
14 customers if they ever even saw the
15 statement at issue as reflected in
16 Exhibit 18, let alone were confused by
17 it?
18     A.   I am not aware of that.
19     Q.   Can you point to any document
20 that reflects a customer relying on the
21 statement at issue in deciding whether to
22 purchase a YKK water-resistant zipper?
23     A.   When you say any document, I
24 recognize that these are used for
25 marketing, and they are used to market

Page 610

1 September of 2019?
2     A.   Not that directly.  But
3 Mr. Sarumaru testified in 2017, and he
4 acknowledged that they used these flyers.
5     Q.   He didn't say that they used
6 these flyers from February 2009 to
7 September 2019; did he, sir?
8     A.   He didn't say something that
9 specific, no.  He just said they used
10 these flyers.
11     Q.   Do you know of any surveys that
12 were done by plaintiffs or to your
13 knowledge yourself or anybody else of any
14 YKK customer, to determine if they were
15 misled or confused by the statement at
16 issue, as reflected in Exhibit 18?
17     A.   I am not aware of that.
18     Q.   Do you know of any customer who
19 was misled or confused by the statement
20 at issue?
21     A.   I am not aware of that as we
22 sit here, if they were or were not
23 confused.  I don't know.
24     Q.   Do you know of any actual
25 customer who relied on the statement at

Page 609

1 the customers and they kept using them.
2 So I assume they thought they were
3 working.  But again, I am not providing
4 opinions about this statement.
5     Q.   Can you point to any document
6 that reflects a customer relying on the
7 statement at issue reflected in Exhibit
8 18, in deciding whether to purchase a YKK
9 laminated water-resistant zipper?
10     A.   When you say any, I just know
11 they were used for marketing for that
12 purpose.  That was the point.  But I
13 don't have any customer interviews or
14 knowledge of the customer, no.
15     Q.   You're not opining here that
16 the statement at issue reflected in
17 Exhibit 18 caused any of the purported
18 damages that you opine about in your
19 report; are you?
20     A.   I am not opining on the impact
21 of the statement itself.  I am opining on
22 the impact of the excluded market sales
23 due to the wrongful act, whatever they
24 may be.
25     Q.   Let me ask you please to answer

Page 611

89 (Pages 608 - 611)

1 my question without going on and trying
2 to advocate on the part of the
3 plaintiffs --
4         MR. DANIELS:  Objection.
5     Q.   -- which you have been doing
6 throughout the case which is
7 inappropriate.
8         MR. DANIELS:  That's a false
9     allegation.  Continuing to harass the
10    witness to the end of the day.
11    Q.   Let me ask you here.  Are you
12 offering any opinion that the statement
13 at issue reflected in Exhibit 18 caused
14 any of the purported damages under the
15 Lanham Act?
16    A.   I am not providing opinions
17 about the impact of that statement.
18    Q.   So you're not supplying any
19 opinions about causation, correct?
20    A.   That is not correct.  I am
21 providing opinions about causation with
22 respect to once there is an excluded
23 market sale, I go through what that does.
24 But with respect to the statement I am
25 not providing opinions consistent with my

Page 612

1 first report about that statement.
2     Q.   I am asking you whether or not
3 you're opining that the statement at
4 issue reflected in Donohue Exhibit 18
5 caused any of the purported damages under
6 the Lanham Act that you talk about in
7 your reports?
8         MR. DANIELS:  Objection.  Asked
9     and answered.
10    A.   I am not providing opinions
11 about the impact of the statement.  I am
12 providing opinions about, once that
13 statement is wrong or it causes an
14 excluded market sale, the damages due to
15 that.  But I am not providing opinions
16 about the statement itself.
17    Q.   That's what I am asking you.
18 Are you providing any opinions that the
19 statement at issue reflected in Exhibit
20 18 caused anyone to make a purchasing
21 decision with regard to a YKK laminated
22 zipper or not?
23    A.   As I believe it's clear in my
24 reports, but I am not providing an
25 opinion about that statement itself.

Page 613

1     Q.   I am not asking about the
2 statement itself.  I am asking you about
3 whether or not the statement caused any
4 confusion or damage on the part of any
5 customer in connection with their
6 purchasing decisions.  Are you providing
7 any opinion with regard to that?
8     A.   I am not providing an opinion
9 about what the statement caused the
10 customer to do.  I am providing an
11 opinion about damages due to the excluded
12 market sales.  I understand the plaintiff
13 is providing testimony and evidence about
14 the statement itself.
15    Q.   Who are they providing their
16 testimony or evidence with?
17    A.   Their case, there's legal
18 issues like presumption and things like
19 that, I am not providing opinions on
20 that.
21    Q.   Do you express any opinion on
22 what the customers for the YKK laminated
23 zippers would have done or not done if
24 instead of the statement at issue
25 reflected in Exhibit 18, customers were

Page 614

1 told that YKK shares the right with
2 Uretek to manufacture, use, sell and
3 import zippers incorporating the
4 water-repellent technology?
5     A.   I think this is consistent with
6 our prior exchange.  I am not providing
7 opinions about the impact of the
8 statement itself.
9     Q.   In terms of United States
10 sales, looking at your supplemental
11 report, paragraph 42, you say that if a
12 YKK customer had a U.S.-based
13 headquarters or even was affiliated with
14 a different customer with a U.S.-based
15 headquarters, you treated, even sales
16 made abroad, as a U.S. sale, correct?
17        MR. DANIELS:  Objection as to
18    form.
19    A.   Correct.  If they had a
20 headquarters, I would include all of
21 their sales in this conduct analysis.
22    Q.   This is new, you didn't do that
23 in your prior report, correct?
24    A.   This is new.
25    Q.   Why did you do it now?

Page 615

1    A.    Because I was asked to provide
2  additional U.S. domestic conduct activity
3  in anticipation of some legal events that
4  may occur.
5    Q.    Because the judge may exclude
6  evidence of non-USA sales as a sanction.
7  Isn't that what you were asked to do to
8  then include or make sales, U.S. sales
9  that you hadn't made U.S. sales before?
10    A.    No, I don't think I understand
11  your question.  This was in response to
12  the judge's Arbitron decision,
13  recommendation, which was to include
14  additional information about U.S.
15  conduct.  So I provided additional U.S.
16  characteristics for these sales.
17    Q.    Let's take as one example of
18  what you did, Helly Hansen.  Helly Hansen
19  is a garment manufacturer that is a
20  Norwegian company, correct?
21    A.    I believe that's where their
22  ultimate headquarters is.
23    Q.    You say that Helly Hansen has
24  some relationship with a company located
25  in the United States, correct?

Page 616

1  separate corporations; aren't they?
2    A.    They are.
3    Q.    Do they share the same
4  decision-makers with regard to the
5  purchase of water-resistant zippers; do
6  you know?
7    A.    I don't know.
8    Q.    So if someone from the
9  U.S.-based affiliate, not Helly Hansen
10  but the Norwegian company itself,
11  attended one of these trade shows, you
12  treated all of the high-end outerwear and
13  luggage sales to Helly Hansen in Norway
14  as U.S.-based even if the sales were made
15  abroad, correct?
16    A.    Correct.  I included all of
17  Helly Hansen's sales in that calculation.
18    Q.    Directing your attention to
19  paragraph 43 of your supplemental report.
20  As you indicate here, the trade shows
21  that you refer to have thousands of
22  customers attend them each year, correct?
23    A.    Yes.
24    Q.    You say that the Helly Hansen
25  affiliated corporation had one or more

Page 618

1    A.    Yes.  I understand it maintains
2  an office in Washington.
3    Q.    Actually, what you say in
4  paragraph 41 is not that Helly Hansen has
5  any office in Washington, you say it has
6  a United States-based subsidiary,
7  correct?
8    A.    Yes.
9    Q.    And so a subsidiary corporation
10  of Helly Hansen is the one with the
11  United States-based headquarters, not
12  Helly Hansen itself, correct?
13    A.    That's where Helly Hansen's
14  U.S. office is.
15    Q.    Well, that's where the office
16  of its subsidiary is, not Helly Hansen's
17  office, correct?
18    A.    The ultimate parent entity,
19  correct, is in Norway.
20    Q.    What's the name of the
21  subsidiary?
22    A.    Helly Hansen U.S. Inc.
23    Q.    Do you know the relationship
24  between Helly Hansen U.S., Inc. and Helly
25  Hansen, the Norwegian company?  They are

Page 617

1  employees that visited one or more trade
2  shows, correct?
3    A.    Correct.
4    Q.    You don't know whether or not
5  the Helly Hansen affiliated company had
6  one or more employees actually visit the
7  YKK booth among the thousands of
8  exhibiters at those trade shows; do you,
9  sir?
10    A.    There was very limited records
11  about that.  I did include some booth
12  exhibits, and some meetings if they had
13  them.  If they occurred, and I found
14  evidence, I included them in my exhibits.
15    Q.    But you also included as
16  U.S.-based sales, instances where an
17  affiliated company of a foreign company
18  just simply attended a trade show.  You
19  had no evidence that they went to the YKK
20  booth, correct?
21    A.    Well, they were water-resistant
22  customer purchasers and they had been
23  buying from YKK.
24    Q.    Do you know if they went to it
25  YKK booth, that they actually went to it

Page 619

1 as opposed to the thousands of other
2 booths?
3      MR. DANIELS:  Objection to form.
4   A.   Not beyond the understanding
5 that they were a YKK customer and buying
6 zippers.
7   Q.   Was Helly Hansen, its U.S.
8 affiliate, a purchaser, to your
9 knowledge, of water-resistant zippers; do
10 you know even know that?
11   A.   I don't know that as I sit
12 here.  I would have to go and look at the
13 records for that detail.
14   Q.   You don't know if Helly
15 Hansen's affiliate based in the United
16 States went to the YKK booth or not
17 during any of these trade shows; do you?
18   A.   I would have to go back and
19 look to see it they recorded Helly Hansen
20 at that level.  They sometimes did.
21   Q.   Do you have any evidence that
22 during the time from February 2009 to
23 December 2019, employees of the Helly
24 Hansen affiliate went to the YKK booth at
25 one of these trade shows and read the

1      A.   I wouldn't say no other
2 evidence.  Again, I mentioned the purpose
3 of the flyers is marketing the customers,
4 and these are water-resistant customers.
5 And Mr. Sarumaru acknowledged that they
6 used these flyers to market, so I have
7 that.  But you're right, I don't have --
8 I wasn't at the show.  I don't have a
9 picture of the booth with the picture on
10 it in 2015 or something like that.
11   Q.   So if an employee of the Helly
12 Hansen affiliate went to a trade show --
13 strike that.
14      So an employee of the Helly
15 Hansen, a U.S.-based affiliate would have
16 to go to the trade show, go to YKK's
17 booth, see the flyer, assuming one even
18 existed with the statement at issue from
19 2009 on, read the statement at issue
20 within the flyer, and communicated the
21 statement to the Helly Hansen employee
22 decision-makers abroad, in order for
23 those decision-makers abroad to even know
24 about the statement, let alone be
25 confused by it, what I am referring is

1 statement at issue?
2   A.   Only the inference from them
3 being a customer and them being at the
4 trade shows, and Mr. Sarumaru's testimony
5 that they were using these flyers to
6 market the customer and they were a
7 customer.
8   Q.   Do you have any evidence that
9 there was even a flyer with the statement
10 at issue at YKK's booth in 2010, 2011,
11 2012, going forward to February 2019?
12   A.   I only had a few pictures that
13 suggested there was a flyer at the booth.
14   Q.   The pictures you had were from
15 2009, correct?
16   A.   Correct.  And I was going to
17 finish and explain that they were from
18 2009.  I don't believe I have a picture
19 from the later years.
20   Q.   And you have no other evidence
21 of flyers being distributed from 2010 on
22 by YKK --
23      MR. DANIELS:  Objection.  Asked
24   and answered.
25   Q.   -- correct?

1 the statement reflected in Exhibit 18,
2 correct, under your analysis?
3      MR. DANIELS:  Objection as to
4   form.
5   A.   I guess.  I don't know who they
6 communicated the flyers to.  I think I've
7 mentioned that to you.  They would have
8 to see it, if it was used for marketing.
9 They were buying these goods, and YKK is
10 using these flyers to sell the goods.  So
11 I assume someone is seeing these flyers
12 to make that decision.
13   Q.   So an employee of the Helly
14 Hansen affiliate in the United States,
15 would have had to go to the trade show,
16 go to YKK's booth, seen the flyer, if one
17 even existed, with the statement at issue
18 during the time period of February 2009
19 forward, read the statement at issue
20 within the flyer, communicated the
21 statement at issue to the Helly Hansen
22 decision-makers abroad.  And the Helly
23 Hansen decision-makers abroad would have
24 to have been confused by the statement,
25 according to your analysis, correct?

Veritext Legal Solutions
800-336-4000

1   A.   Legally, I can't tell you who,
2 at what level, needs to be confused.  I
3 don't know how that plays into whatever
4 the decision might look like.
5   Q.   You don't know whether or not
6 these sales that you included as
7 U.S.-based sales, were made by Helly
8 Hansen decision-makers abroad who had
9 never seen the statement; do you?
10   A.   I only know -- I don't know and
11 I can't speak to within Helly Hansen at
12 what level they were confused and what is
13 required.
14   Q.   Can you even speak to Helly
15 Hansen decision-makers abroad even seeing
16 this statement at issue?
17   A.   Again, I don't, I only have
18 evidence that we went through earlier
19 today.  I don't have evidence within
20 Helly Hansen about who saw the flyer.
21   Q.   Do you have evidence of any of
22 these foreign entities whose sales you
23 included as U.S.-based sales seeing the
24 statement at issue that's reflected in
25 Exhibit 18?

Page 624

1 with the United States company, correct?
2   A.   I included -- so to make sure I
3 understand your question, I included all
4 the sales for Helly Hansen.
5   Q.   But you also did the same thing
6 as you did for Helly Hansen with these
7 other customers in connection with, now
8 including sales that were made outside of
9 the United States as U.S. sales, correct?
10   A.   Yes, because I already did the
11 import analysis.  This was a different
12 analysis to look at whether or not they
13 had a headquarters here.
14   Q.   Not just a headquarters, but if
15 they had an office, if they had a
16 subsidiary, if they had an affiliate.  So
17 you included all of the sales to the
18 foreign corporations that were foreign
19 sales as U.S. sales in that event,
20 correct?
21   A.   I did, as I explain in my
22 report.
23   Q.   And you don't know whether the
24 decision-makers at the foreign
25 corporations ever saw the statement at

Page 626

1   A.   The evidence I have I presented
2 in my supplemental report, showing that
3 the flyers used, to market to these
4 customers, they are customers, they were
5 at the shows, the flyer was used at the
6 booth.
7   Q.   Actually, you include
8 subsidiaries and affiliates.  You include
9 sales made to the foreign entities, just
10 on the basis that they had some office in
11 the United States or some affiliate in
12 the United States, correct?
13   A.   In that calculation, I was
14 asked to include the headquarters as one
15 potential domestic conduct, yes.
16   Q.   Who asked you to do that?
17   A.   I've worked with counsel to
18 understand the Arbitron decision and what
19 might be necessary and that was one way
20 to look at U.S. conduct.
21   Q.   So you included as U.S.-based
22 sales, sales that were actually made to
23 foreign corporations and that were made
24 abroad if the foreign corporation had an
25 office or an affiliate or some connection

Page 625

1 issue, ever attended a trade show,
2 correct?
3       MR. DANIELS:  Objection.  Asked
4   and answered.
5   A.   I don't have granular
6 information about within Helly Hansen who
7 attended the trade show, no.
8   Q.   And the same is true of all the
9 corporations whose foreign transactions
10 were included as U.S. sales, correct --
11   A.   Correct.
12   Q.   -- not just Helly Hansen?
13   A.   I just know Helly Hansen and
14 the other examples attended, I don't have
15 detail beyond that.
16   Q.   And you actually don't have any
17 information that the foreign
18 corporations, who engaged in foreign
19 transactions with regard to
20 water-resistant zippers, themselves
21 attended any trade shows from February
22 2009 through September 2019, yet you
23 included those foreign transactions as
24 U.S.-based sales, correct?
25   A.   In that calculation I included

Page 627

93 (Pages 624 - 627)

1 all of the company's sales, if they had a
2 U.S. presence.
3    Q.   So the answer is yes?
4    A.   Yes, I included all of the
5 sales.
6        MR. WOLKOFF:  Let's take a break
7 for a moment.  Mr. Daniels objected to
8 a document being incomplete, and I
9 would like to have the complete
10 document marked.
11        THE VIDEOGRAPHER:  We are now
12 going off the record.  The time is
13 5:33 p.m., this is the end of media
14 label number 6.
15        [Off the record.]
16        THE VIDEOGRAPHER:  We are back
17 on the record.  The time is 5:34 p.m.
18 BY MR. WOLKOFF:
19    Q.   Let me place in front of you DX
20 971.
21        (Defendants' Exhibit 971,
22    document Bates stamped YKK0235140,
23    previously marked for identification.)
24    Q.   You see this is an e-mail
25 string involving this same Michigan

Page 628

1    document Bates stamped YKK0331053,
2    previously marked for identification.)
3    Q.   Do you see this is an e-mail
4 string with a customer California
5 Innovations that we looked at earlier,
6 that you talked about in footnote 61 in
7 your supplemental report?
8    A.   Yes.
9    Q.   Do you see on the first page of
10 Exhibit 972, Terry McCullough, YKK asked
11 the Innovations representative if he had
12 any feedback on the AquaSeal zipper
13 samples?
14    A.   I see that.
15    Q.   AquaSeal zippers are not at
16 issue in this case; are they?
17    A.   They are not.
18        MR. WOLKOFF:  Off the record for
19 a minute while we get that document
20 that Mr. Daniels objected to as
21 incomplete.
22        THE VIDEOGRAPHER:  We are now
23 going off the record.  The time is
24 5:36 p.m.
25        [Off the record.]

Page 630

1 University student that we looked at
2 before in his correspondence with YKK
3 about wanting zippers for ski gloves,
4 correct?
5    A.   Yes.
6    Q.   Let me direct your attention to
7 page 235144.  You see in the middle of
8 that page, Mr. Scolnick sent an e-mail to
9 YKK ordering the T5, correct?
10    A.   Yes, I see them asking if you
11 have the T5.
12    Q.   So this wouldn't violate any
13 exclusive license agreement, would it, or
14 the Lanham Act or anything else, YKK was
15 entitled to sell T5s to customers,
16 correct?
17        MR. DANIELS:  Objection.  Calls
18 for a legal conclusion.
19    A.   Having them laminated by
20 Uretek, correct.
21    Q.   And T5s are laminated by
22 Uretek, right?
23    A.   Yes.
24    Q.   Let me show you DX 972.
25        (Defendants' Exhibit 972,

Page 629

1        THE VIDEOGRAPHER:  We are back
2 on the record.  The time is 5:39 p.m.
3 BY MR. WOLKOFF:
4    Q.   I am going to place in front of
5 you a document Bates stamped YKK11481
6 through 11484.
7        You see these are the rest of
8 the pages of what we marked as Exhibit 20
9 as cited in your Exhibit 61 with respect
10 to marketing flyers?
11    A.   Yes.
12    Q.   And it's still the case, even
13 with adding these pages to make the
14 document complete, as you cited in
15 footnote 61 of your supplemental report,
16 that this refers to a flyer that's prior
17 to February 2009 through September 2019,
18 correct?
19    A.   The report is still from 2008.
20 The picture shows the flyer.  But it's
21 still from 2008.
22    Q.   Which is before the time period
23 you looked at, correct?
24    A.   It's before the 2009 time
25 period, yes.

Page 631

94 (Pages 628 - 631)

1      MR. WOLKOFF: I don't have
2  anything further at this time. Thank
3  you.
4      MR. DANIELS: Okay. I have no
5  questions of the witness.
6      THE VIDEOGRAPHER: We are now
7  going off the record. The time is
8  5:41 p.m.
9      This is the end of this
10  videotaped deposition that is made up
11  of seven medias and they will be kept
12  by Veritext Texas. We are off the
13  record.
14      [Off the record.]
15
16      (Whereupon, at 5:41 p.m., the
17  deposition was concluded.)
18
19
20
21
22
23
24
25

*Page 632*

1  -------------- I N D E X --------------
2  WITNESS      EXAMINATION BY      PAGE
3  JAMES J DONOHUE   Mr. Wolkoff     263
4
5  -------- INFORMATION REQUESTS --------
6  REQUESTS:  400
7
8
9  -------------- EXHIBITS --------------
10  DONOHUE                FOR ID.
11  EXH 12, supplemental expert report     263
12   submitted on March 28th, 2023
13  EXH 13, jury's verdict and            433
14  definition of the meaning of
15  "high-end outerwear"
16  EXH 14, Memorandum Opinion and Order     468
17  By Judge Woods
18  EXH 15, amended complaint            485
19  EXH 16, Mr Cockrell's supplemental report 497
20  EXH 17, example of the summaries from the 511
21  discovery clients
22  EXH 18, statement by YKK            570
23  EXH 19, document Bates stamp YKK0084466  586
24  through YKK0084472
25

*Page 634*

1      ACKNOWLEDGMENT OF DEPONENT
2
3      I have read the foregoing
4  transcript of my deposition and except
5  for any corrections or changes noted on
6  the errata sheet, I hereby subscribe to
7  the transcript as an accurate record of
8  the statements made by me.
9
10
11  _____
12      JAMES J. DONOHUE
13
14
15  SUBSCRIBED AND SWORN before
16  and to me this ____ day
17  of _____, 2023.
18
19
20      _____
21          NOTARY PUBLIC
22  My Commission Expires:
23
24
25

*Page 633*

1      INDEX OF (Cont'd)
2  -------------- EXHIBITS --------------
3  DONOHUE                FOR ID.
4  EXH 20, document Bates stamped        600
5  YKK0011470 to 11484
6  EXH 21, document Bates stamped        601
7  YKK0011485 through 487
8  EXH 22, document Bates stamped        603
9  YKK0011509 through 11519
10
11  DEFENDANTS'              FOR ID
12  EXH 645, document Bates stamped
13  YKK0703208 was previously marked 310
14  EXH 56, document Bates stamped      324
15  YKK0044515 previously marked
16  EXH 86, document Bates stamped      330
17  YKK0679784, previously marked
18  EXH 335, document Bates stamped     359
19  YKK0698140, previously marked
20  EXH 353, document Bates stamped     367
21  YKK0016715, previously marked
22  EXH 364, document Bates stamped     375
23  YKK0258349, previously marked
24  EXH 533, document Bates stamped     377
25  YKK0601288, previously marked

*Page 635*

95 (Pages 632 - 635)

```
1        INDEX OF (Cont'd)
2  -------------- EXHIBITS ---------------
3  DEFENDANTS'              FOR ID
4  EXH 509, document Bates stamped    380
5   YKK0004623, previously marked
6  EXH 460, document Bates stamped    384
7   YKK0196058, previously marked
8  EXH 462, document Bates stamped    389
9   YKK0407549, previously marked
10 EXH 458, document Bates stamped    400
11  YKK0152695, previously marked
12 EXH 575, document Bates stamped    408
13  YKK0267341, previously marked
14 EXH 44, document Bates stamped     418
15  YKK0703047, previously marked
16 EXH 392, document Bates stamped    427
17  YKK016984, previously marked
18 EXH 639, article from a publication 447
19 called Gear Junkie dated January
20 14, 2014 previously marked
21 EXH 664, document Bates stamped    448
22  YKK0011534, previously marked
23 EXH 278, document Bates stamped    453
24  YKK0484616, previously marked
25
                              Page 636
```

```
1        INDEX OF (Cont'd)
2  -------------- EXHIBITS ---------------
3  PLAINTIFFS'             FOR ID
4  EXH 363, document Bates stamped
5   YKK0060562 previously marked      549
6  EXH 79E, document Bates stamped    577
7   YKK0010318, previously marked
8  EXH 79F, document Bates stamped    584
9   YKK0631221, previously marked
10 EXH 79T, document Bates stamped    588
11  YKK0587587 previously marked
12 EXH 79U, document Bates stamped    594
13  YKK0330626, previously marked
14 EXH 79A, document Bates stamped    597
15  YKK0493633 previously marked
16 EXH 79H, document Bates stamped    604
17  YKK0001644, previously marked
18
19     (EXHIBIT SHARE)
20
21
22
23
24
25
                              Page 638
```

```
1        INDEX OF (Cont'd)
2  -------------- EXHIBITS ---------------
3  DEFENDANTS'              FOR ID
4  EXH 295, document Bates stamped
5   YKK0627414 previously marked
6  EXH 141, document Bates stamped    548
7   YKK0050675, previously marked
8  EXH 171, document Bates stamped    550
9   YKK0060562 previously marked
10 EXH 586, document Bates stamped    563
11  YKK0713410, previously marked
12 EXH 611, document Bates stamped    567
13  YKK0004615, previously marked
14 EXH 660, document Bates stamped    568
15  YKK0714527 previously marked
16 EXH 971, document Bates stamped    629
17  YKK0235140, previously marked
18 EXH 972, document Bates stamped    630
19  YKK0331053, previously marked
20
21
22
23 (Index continued on the following page.)
24
25
                              Page 637
```

```
1        CERTIFICATION
2
3    I, DAWN MATERA, a Notary Public for
4  and within the State of New York, do
5  hereby certify:
6    That the witness whose testimony as
7  herein set forth, was duly sworn by me;
8  and that the within transcript is a true
9  record of the testimony given by said
10 witness.
11   I further certify that I am not
12 related to any of the parties to this
13 action by blood or marriage, and that I
14 am in no way interested in the outcome of
15 this matter.
16   IN WITNESS WHEREOF, I have hereunto
17 set my hand this 23rd day of May, 2023.
18
19
20    DAWN MATERA
21
22    *   *   *
23
24
25
                              Page 639
```

Veritext Legal Solutions
800-336-4000

```
 1        ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS
 2
    Au New Haven LLC v YKK Corporation et al.
 3  DATE OF DEPOSITION: May 18, 2023
    NAME OF WITNESS:  JAMES J. DONOHUE
 4
    PAGE/LINE(S)/   CHANGE      REASON
 5  ____/____/_____/_____
    ____/____/_____/_____
 6  ____/____/_____/_____
    ____/____/_____/_____
 7  ____/____/_____/_____
    ____/____/_____/_____
 8  ____/____/_____/_____
    ____/____/_____/_____
 9  ____/____/_____/_____
    ____/____/_____/_____
10  ____/____/_____/_____
    ____/____/_____/_____
11  ____/____/_____/_____
    ____/____/_____/_____
12  ____/____/_____/_____
    ____/____/_____/_____
13  ____/____/_____/_____
    ____/____/_____/_____
14  ____/____/_____/_____
    ____/____/_____/_____
15  ____/____/_____/_____
    ____/____/_____/_____
16  ____/____/_____/_____
    ____/____/_____/_____
17
          _____
18         JAMES J. DONOHUE
19  SUBSCRIBED AND SWORN TO
    BEFORE ME THIS_____DAY
20  OF _____, 2023.
21  _____
       NOTARY PUBLIC
22
    MY COMMISSION EXPIRES_____
23
24
25
                                    Page 640
```