IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AU NEW HAVEN, LLC, and TRELLEBORG COATED SYSTEMS US, INC., <br><br> Plaintiffs, <br><br> v. <br><br> YKK CORPORATION ET AL., <br><br> Defendants. | Civil Action No. 1:15-cv-03411-GHW-SN <br><br> June 16, 2023 |

**PLAINTIFFS' OPPOSITION TO**
**YKK'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINIONS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................. 1

LEGAL STANDARD ........................................................................................... 1

ARGUMENT ........................................................................................................ 3

I.  Plaintiffs' Experts Correctly Apply the First Jury's Definition of "High End Outerwear" and Permissibly Rely Upon Each Other in Reaching Their Conclusions ..................................................................................................... 3

II. Cockrell's and Donohue's Opinions Neither Turn "Maximizing Profits For All Parties" Into an After-the-Fact Profit Redistribution Exercise Nor Conflict with the Court's Prior Ruling on YKK's MIL4 .................................................. 7

III. YKK's Challenge to the Entirety of Donohue's Luggage Lost Profits Analysis Is Not Only Untimely, But Also Without Merit ................................. 12

IV. Donohue's Domestic Conduct Calculations Are Admissible ........................... 14

    A.  Donohue's Domestic Conduct Opinions Are Timely .............................. 14

    B.  Donohue Does Not Opine On Liability and Does Not Recount Any Impermissible Fact Narrative .................................................................... 15

    C.  Donohue's Opinions Are Well-Grounded ................................................ 18

CONCLUSION ...................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**                                                                                 **Page(s)**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ................  2

*Arista Recs., LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409 (S.D.N.Y. 2009)...........  15

*Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465 (S.D.N.Y. Mar. 28,
    2022), *reconsideration denied*, 2023 WL 1466597 (S.D.N.Y. Feb. 2, 2023)........  6

*Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmbH*, 2018 WL
    4253181, *13 (S.D.N.Y. 2018) ...............................................  22

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ...................................  2, 3

*EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 740 (8th Cir. 2000) ............................  22

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir.
    2002) ........................................................................................  21

*FDIC v. Suna Assocs.*, Inc., 80 F.3d 681, 687 (2d Cir. 1996)....................................  2

*Floyd v. City of New York*, 861 F. Supp. 2d 274 (S.D.N.Y. 2012) ...........................  2

*Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004)........................................  21

*In re Air Disaster at Lockerbie Scot.*, 37 F.3d 804 (2d Cir. 1994) ...........................  14

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009)................  2

*In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230 (E.D.N.Y. 2007)...................  17

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
    2006 WL 2128785 (S.D.N.Y. July 28, 2006) ......................................  16

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................  2

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 WL 4684238
    (S.D.N.Y. Apr. 11, 2005) ........................................................  15

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ....................................  17

*Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404
    (S.D.N.Y. 2013) ........................................................  11

i

*Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247 (2d Cir. 2014) ............................ 16, 20

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1023 (S.D.N.Y. 1994) ............................................ 22

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ........................................ 2

*Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134 (2d Cir. 1991) ............................................ 16, 20

*Richardson v. Corr. Med. Care, Inc.*, 2023 WL 3490904 (2d Cir. May 17, 2023) .... 18

*Royal Park Invs. v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387 (S.D.N.Y. 2018).... 1

*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249 (2d Cir. 2005) ............................... 2

*Sarkees v. E. I. Dupont De Nemours & Co.*, 15 F.4th 584 (2d Cir. 2021) ................. 18

*Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996) ...................... 21

*Sullivan v. Ford Motor Co.*, 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000) ................ 17

*U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122 (S.D.N.Y. 2015) ............................................ 6

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) .................................................. 14

*United States v. Joseph*, 542 F.3d 13 (2d Cir. 2008) ................................................. 17

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293 (S.D.N.Y. 2015) ........................ 17

## **Other Authorities**

5 McCarthy on Trademarks and Unfair Competition § 27:42 (5th ed.)...................... 22

Fed. R. Evid. 403 ........................................................................................................ 7

Fed. R. Evid. 702 ........................................................................................................ 1

Fed. R. Evid. 702 Advisory Committee Note to 2000 Amendments.......................... 18

## INTRODUCTION

Defendants YKK Corporation's *et al.* ("YKK") motion to exclude the Supplemental Expert Reports of Messrs. David Cockrell ("Cockrell") and James Donohue ("Donohue") should be denied in its entirety. Cockrell and Donohue did exactly what the Court required in preparing these reports. They collectively (1) revisited their earlier opinions to account for the jury's finding at the first trial (ECF 918, "HEO Verdict") about the intended meaning of "high end outerwear" ("HEO") as used in the subject license agreement ("License Agreement," PX-1) and (2) formulated a variety of additional opinions to, "as possible, account for the full range of possible legal standards that could emerge from a decision in" *Abitron Austria GmbH v. Hectronic Int'l, Inc.*, Dkt. No. 21-1043. *See* ECF 957. YKK's motion primarily derives from YKK's refusal to accept the HEO Verdict. Although YKK may dislike the ultimate conclusions reached by Cockrell and Donohue, their methodologies accurately map onto the HEO Verdict and, in part, already have been found by both this Court and Magistrate Judge Netburn to be admissible. *See* ECF 425 at 32-36; ECF 611 at 17-19; ECF 419 at 46-50. Given this circumstance, any alleged deficiencies in the supplemental opinions go only to the weight, not the admissibility, of the evidence.[1]

## LEGAL STANDARD

Courts applying Fed. R. Evid. 702 engage in a "three-step inquiry." *Royal Park Invs. v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 394 (S.D.N.Y. 2018). This inquiry requires the court to assess "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles

---

[1] In contrast, and for example, Plaintiffs' *Daubert* motion seeking to exclude the HEO opinions of YKK's experts is based on the fact that YKK's experts undisputedly applied an incorrect methodology that was untethered to the HEO Verdict. While it is not surprising that YKK's outerwear industry expert did not include a single additional outerwear style as HEO compared to his 2017 original opinion, the impermissible methodology leading to that flawed conclusion, not the flawed conclusion standing alone, requires the granting of Plaintiffs' motion.

and methods reliably to the facts of the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).[2] "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266.

In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). Indeed, exclusion "of expert testimony is the exception rather than the rule." *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012). That rule tracks "the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'" *FDIC v. Suna Assocs.*, Inc., 80 F.3d 681, 687 (2d Cir. 1996) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993)); *see also Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005) ("Rule 702 embodies a liberal standard of admissibility for expert opinions.").

If an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999); *see also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) ("[D]isputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.").[3]

---

[2] Internal quotations and citations are omitted and emphasis is added throughout this brief unless otherwise indicated.

[3] As noted in Plaintiffs' June 2, 2023, initial *Daubert* memorandum, given the now bifurcated nature of these proceedings, this Court, however, cannot permit the second jury to re-decide the issue of which of two substantively different methodologies should apply to determining which outerwear is HEO, as allowing the second jury to decide that issue already decided in the first trial would violate Plaintiffs' Seventh Amendment jury trial right. *See also* ECF 831 at 13 & 15 n. 6.

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## ARGUMENT

**I.    Plaintiffs' Experts Correctly Apply the First Jury's Definition of "High End Outerwear" and Permissibly Rely Upon Each Other in Reaching Their Conclusions.**

Contrary to YKK's contention, Plaintiffs' experts correctly applied the first jury's definition of "high end outerwear" in rendering their opinions. YKK incorrectly argues, without any support, that the now determined definition of HEO requires consideration of those factors proposed by YKK in YKK's first trial closing argument slide. But the first jury simply did not adopt those factors. Thus, nothing in the jury verdict requires the consideration of the factors that "garment manufacturers" allegedly account for, namely, "relative price, delivery time, quality, availability, and capacity of the zippers in making their purchasing decisions."[4] Mot.[5] at 12. This faulty premise is nothing more than a transparent attempt to re-litigate YKK's rejected interpretation of HEO, which formed no part of the first jury's HEO Verdict. Doing so would violate Plaintiffs' Seventh Amendment rights. Plain and simple, YKK lost at the first trial and cannot re-try this issue under the guise of exclusion of Plaintiffs' expert witnesses. Because Cockrell did not apply the "wrong legal standard," YKK's motion must be denied.

---

[4] YKK contends that Cockrell in his deposition "admitted the absence of any consideration of the factors that might bear on 'maximizing profits for all parties in the global market.'" Mot. at 12. However, none of the factors identified by YKK were part of the first jury's HEO Verdict. Indeed, YKK has not identified any testimony from Cockrell's deposition that undermines the methodology for his conclusions offered in Cockrell's supplemental report. To the contrary, Cockrell applied the jury's HEO Verdict in forming his supplemental opinions. *See, e.g.,* Cockrell's Supplemental Expert Report (Mot. Exh. A) ¶ 10 ("I now have affirmatively considered the relationship between the outerwear-based factors referenced in the First Verdict and this financial information as part of my analyses").

[5] "Mot." refers to YKK's Motion to Exclude Plaintiffs' Expert Opinions, which at the time of this opposition had only been served but not yet filed. ECF No. 981.

As discussed in Plaintiffs' June 2, 2023, *Daubert* papers (which are incorporated herein by reference), the first jury in the HEO Verdict determined that whether outerwear is HEO requires consideration of a non-exclusive list of characteristics of the finished outerwear goods (fabric, weight, water resistance, breathability, seam tolerance, function, and price) "as they relate to maximizing profits for all parties in the global market." The first jury thereby instructed that these qualitative factors not be applied so strictly that little or no outerwear constituted HEO, thereby depriving Plaintiffs of their HEO excluded market lamination profits (partnering with YKK or some other zipper manufacturer) and limiting Plaintiffs' revenue to a mere $0.03/meter royalty. Conversely, the jury instructed that the factors also not be applied so lax as to render virtually all outerwear HEO, thereby depriving YKK of its water-resistant zipper profits in the permitted mid-range and low-end outerwear markets. Contrary to YKK's repeated false claim that Cockrell ignored the HEO Verdict in this regard (*e.g.*, Mot. at 13), Cockrell expressly did apply this methodology.[6]

In short, YKK's description of what Cockrell and Donohue did to more closely conform their opinions to the HEO Verdict is self-servingly inaccurate. Mot. at 7 & 14. Contrary to YKK's assertion, Cockrell reassessed the record in light of the HEO Verdict. Although he reached the same conclusions as to the individual styles of outerwear (much like with YKK's industry expert), Cockrell reached those conclusions through a *de novo* application of his expertise to the definition

---

[6] As noted above, YKK conflates Cockrell's **conclusions** with Cockrell's **methodology**. *See* Mot. at 11-12 ("adding that requirement changed nothing about his analysis, because he did not change his conclusions at all"); *id.* at 12 ("Because Mr. Cockrell concludes that 'high end outerwear' covers the same products whether that term is defined only by a garment's features or by its features 'as they relate to maximizing profits for all parties in the global market,' he gives that clause no effect"). Oddly, by making this argument, YKK seems to concede that its own industry expert must be precluded under either party's arguments because the opinions of YKK's industry expert as to what garments were not HEO did not change. Even as to YKK's reference to Cockrell not expressly including in his 2017 report any discussion of the financial impact caused by any particular application of the outerwear characteristics listed in the HEO Verdict (Mot. at 4), Cockrell undisputedly did consider various information which directly or indirectly was related to these profits in issuing his 2017 report. *See* Cockrell's Supplemental Expert Report (Mot. Exh. A) ¶ 6.

of HEO as found by the first jury (unlike with YKK's industry expert). Cockrell considered all of the factors that the HEO Verdict instructed him to consider as to the individual items of outerwear in the manner in which the HEO Verdict instructed. Thus, while Cockrell may have reached similar conclusions in 2017 and 2023, the process by which he reached those conclusions was revised from his initial report. This is no different than a lower court, upon remand from a higher court, properly reaching an opinion similar to its initial opinion although based on a *de novo* assessment of the issues in light of the higher court's remand instructions. The HEO Verdict did not necessarily require a different conclusion, as YKK apparently contends (at least with respect to Plaintiffs' experts), but rather required the application of the stated outerwear-based factors in the stated manner, resulting in whatever conclusion that application yields in the expert's considered opinion.

Further, contrary to YKK's claim that Cockrell and Donohue only supplementally opined that Cockrell's original opinions were correct (Mot. at 7), Cockrell and Donohue instead properly determined whether the list of garments previously identified as high end outerwear in Cockrell's 2017 report required modification in light of the HEO Verdict. Cockrell's supplemental opinions begin with the analysis in his original expert report which already had categorized individual outerwear styles, made by YKK outerwear customers which YKK itself had categorized as "functional" in YKK's internal sales data, based on the same factors listed in the HEO Verdict. ECF No. 368-1; *see also* ECF 419 at 48-49.[7] Donohue then, **as a middle step**, calculated what profits all parties (Plaintiffs and YKK) would have made in the global outerwear market (the excluded HEO market and the permitted mid-range and low end markets) applying Cockrell's initial balancing of the outerwear factors identified in the HEO Verdict. That calculation resulted

---

[7] There, Magistrate Judge Netburn also rejected YKK's now repeated argument (Mot. at 8 n. 5) that Donohue's statistical sampling and extrapolation was inadmissible. ECF 419 at 49-50 (Donohue's extrapolation from the discovery customer data to all functional outerwear sales was neither unsound nor excludable under *Daubert*).

in Plaintiffs earning approximately 24% of the global outerwear market profits and YKK earning approximately 76% of the global outerwear market profits (as opposed to the 3%-97% split still urged by YKK).[8] Cockrell's Supplemental Expert Report (Mot. Exh. A) ¶ 9. Finally, Cockrell considered this profit maximization for all parties in concluding that his initial list analyzing individual items of outerwear did not require any modification in order to conform to the recent HEO Verdict.[9] *Id.* ¶ 10.

YKK's attempt to insulate Cockrell's and Donohue's opinions (Mot. at 4 & 11) is unfounded as experts are entitled to rely on the opinions of other experts. *See U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) ("One expert is permitted to rely on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert in the case—even if those facts, opinions, and data are otherwise inadmissible."); *Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at *20 (S.D.N.Y. Mar. 28, 2022), *reconsideration denied*, 2023 WL 1466597 (S.D.N.Y. Feb. 2, 2023).

Cockrell's and Donohue's opinions, considered together in their entirety, completely map onto the HEO Verdict. That Cockrell's supplemental conclusions are the same as his initial conclusions should not be surprising. Cockrell's original determination was always in the context of the License Agreement, and the purpose of the HEO excluded market was to create a market segmentation that would provide YKK the opportunity to sell patented zippers and make profits

---

[8] As Magistrate Netburn previously ruled, "given YKK's large profit margin on the zippers, it is not unreasonable for Donohue to conclude that YKK could have maintained sales volume while losing some of its margin to Uretek's higher lamination costs." ECF 419 at 47-48. YKK has never suggested that YKK ever did anything other than maximize its sales volume.

[9] To the extent YKK now intends to argue that the "total profits for all parties" is the determinative consideration (Mot. at 9), any such argument would impermissibly require a substantive re-writing of the HEO Verdict to instruct that the outerwear-based factors be considered as they relate to **the collective** profits of all parties in the global outerwear market. No such language appears, or is even suggested, in the HEO Verdict, which is particularly warranted as YKK had absolutely no right to make any profits in the markets excluded from the License Agreement, including the HEO excluded market.

in the non-HEO outerwear markets in exchange for a royalty, but would exclude the HEO market

so as to not cannibalize the Plaintiffs' lamination profits. The outerwear product factors Cockrell

initially used, considered with knowledge of other information that directly or indirectly related to

the parties' respective profits, were the same as those the first jury determined were part of the

definition of HEO as used in the License Agreement. Contrary to YKK's argument (Mot. at 13 &

16), Cockrell did not ignore the first jury's instructions; rather Cockrell (1) meaningfully took

account of the jury's additional financial consideration of maximizing profits for all parties

(Plaintiffs and YKK, not just YKK) in the global outerwear market by considering the financial

implications of his application of the outerwear-based factors as calculated by Donohue and (2)

determined that the methodology required by the HEO Verdict did not alter his determinations as

to which individual styles of outerwear were HEO. YKK may disagree with this conclusion, but

Cockrell's and Donohue's methodologies were reasonable. YKK's disagreement does not provide

a legitimate basis to exclude the HEO testimony of Plaintiffs' expert witnesses under either

*Daubert* or Fed. R. Evid. 403.  Thus, the Court must deny YKK's motion.


**II.     Cockrell's and Donohue's Opinions Neither Turn "Maximizing Profits For All Parties" Into an After-the-Fact Profit Redistribution Exercise Nor Conflict with the Court's Prior Ruling on YKK's MIL 4.**

Nor, as YKK argues, are Cockrell's and Donohue's opinions purely after-the-fact analyses

or analyses that somehow contradict this Court's ruling on YKK's MIL 4 issued almost three years

ago. Mot. at 7 & 14-15.

First, Cockrell's and Donohue's opinions are not purely after-the-fact analyses. If YKK

had kept the required records, the parties contemporaneously (on an annual, if not shorter, basis)

would have been able to track the volume of T4/T5 sales compared to T8/T9/T10 sales for use in

outerwear, including outerwear being made by YKK's "functional" customers, based upon the

threshold of "high end outerwear" being employed by YKK at any given time (*i.e.*, to analyze the respective profits they were making in the global outerwear market). The parties then, in live time, would have been able to raise any concerns that the other party was setting that threshold too high or too low as it related to the profits of both Plaintiffs and YKK in the global outerwear market. This reality is evidenced by the circumstances under which this dispute arose in mid-2006.

YKK's argument that it was erroneous for Cockrell to rely on Donohue's after-the-fact revised profit breakdowns when applying the HEO Verdict ignores various realities. Initially, the HEO Verdict was delivered in 2023 and the relevant damages period is 2009-2019; therefore, all parties are analyzing historical circumstances in their efforts to prove to the jury what should have occurred. Further, and as discussed above, Cockrell's analysis (unlike the analysis of YKK's industry expert) involved a review of the outerwear style-by-style to comply with the first jury's instruction to consider the characteristics of the individual outerwear. The financials attached to Cockrell's supplemental report, and considered by Cockrell, provide confirmatory evidence that the manner in which Cockrell considered and applied those outerwear factors not only reasonably maximized the profits of all parties in the global outerwear market, but also would reasonably have been **expected** to do so *ex ante* by the parties. In other words, the jury's list of factors was not applied so strictly that almost nothing was HEO, depriving Plaintiffs of all HEO market zipper lamination profits; nor was it applied so loosely that almost everything was HEO, depriving YKK of all non-HEO laminated zipper sales profits. A comparison of Cockrell's approach to the approach of YKK's industry expert, Paul Arntson ("Arntson"), confirms that Cockrell's opinion more closely reflects what the parties (who were experts in their field and likely as able as anyone to project profitability) intended as the negotiated profit allocation. If YKK did not sell its T8/T9/T10 zippers, as YKK admits, "with no limitation" (PX-77 attached hereto as <u>Exhibit 1</u>) but

rather had acted in good faith to abide by its License Agreement limitations, data would have existed year-to-year from which the parties generally could have determined *ex ante* what the respective anticipated profits would have been under various thresholds of "high end outerwear." But YKK did not do so, and Cockrell's opinion is appropriate under the circumstances within his field of expertise. To the extent reasonable minds could perhaps differ, that goes to the weight of Cockrell's opinions, not the admissibility.

<u>Second</u>, Cockrell's and Donohue's analyses do not contradict this Court's ruling on YKK's MIL 4 entered almost three years ago. The Court's ruling on YKK's MIL 4 regarding YKK's profits in the markets permitted by the License Agreement was made long before the Court had the benefit of the HEO Verdict. *Cf.* ECF 945 n. 3 (advising that the Court will subject expert reports to *Daubert* scrutiny based on the HEO Verdict "which was information that was not available in the Court's previous consideration of expert reports").

As explained during the February 10, 2023, conference (2/10/23 Tr. at 6-8; *see also* ECF 928), by defining the excluded HEO market, the first jury necessarily also defined the permitted non-HEO market. The HEO Verdict specifically references, emphasis added, "maximizing profits for all parties in the **global** market" and not simply in the HEO market. The Court also appeared to recognize this fact when it granted Plaintiffs leave to include trial exhibits previously removed from Plaintiffs' trial exhibit list in light of the Court's earlier ruling on YKK's MIL 4. *See* ECF 945 n. 4; 2/10/23 Tr. at 4 (the Court noting the relationship between Plaintiffs' interpretation of the HEO Verdict and the Court's prior ruling on YKK's MIL 4); ECF 928 at n. 1 & Par. 4.[10]

---

[10] In this regard, YKK misleading cites only the Court's inquiries of Plaintiffs' counsel and omits citation to counsel's **subsequent** explanatory responses thereto as well as the Court's **subsequent** comment thereon. Mot. at 14, omitting citation to 2/10/23 Tr. at 6:14-7:7 & 7:21-8:5; *see also* 2/10/23 Tr. at 14:23-15:11 (Plaintiffs' counsel explaining that the newly entered HEO Verdict directly supports Plaintiffs' prior opposition to YKK's MIL 4) and *id.* at 16:4 (the Court describing Plaintiffs' explanation as "helpful").

Third, Donohue's opinions that YKK's sales of T8/T9/T10 zippers into the excluded markets caused a 1-for-1 loss of sales of T4/T5 zippers already has survived YKK's *Daubert* challenge (ECF 419 at 46-50, as described above) and YKK's summary judgment challenges (ECF 425 at 32-36 & ECF 611 at 17-19).[11] YKK's argument that somehow the License Agreement would be rendered unnecessary under Plaintiffs' interpretation of the HEO Verdict (Mot. at 15 & n. 7) derives from YKK inventing a straw-man argument—one **not** made by Plaintiffs in this litigation—that all customers, not just HEO customers, would have bought T4/T5 zippers. To the contrary, and as this Court is acutely aware from the first trial, the intent of the parties when the License Agreement was entered was that YKK was being licensed certain patent rights so that YKK could make a "lower cost" water resistant zipper to sell to customers such as those in the "low-end garment market." PX-66 at YKK-335337-338 (attached hereto as Exhibit 2). The License Agreement, and the associated royalties to be paid, related to the parties' desire to capture those non-excluded markets, which the parties believed in 2002 would not otherwise be captured unless YKK were allowed to manufacture and sell such a lower cost water resistant zipper.[12] Consistent with that undisputed intent of the parties, Donohue's and Cockrell's HEO opinions do not claim all T8/T9/T10 outerwear sales, but rather properly divide the global outerwear market

---

[11] See ECF 425 at 34 ("[Donohue's] report provides what a reasonable jury could find to be a stable foundation for a reasonable estimate of damages. Defendants insist on theoretical perfection, but on that basis their motion cannot prevail."); *id.* at 36 ("Plaintiffs have offered evidence that YKK's sale of goods into the excluded markets caused them damage."); *id.* at 38 ("Defendants' second argument that Plaintiffs cannot prove a recoverable loss is similarly unavailing for the reasons discussed above."); ECF 611 at 19 ("[The evidence presented by Plaintiffs] presents a cogent reason why YKK's profits on sales in the excluded market might have been at Uretek's expense: every sale of a YKK zipper was a diverted sale.").

[12] It cannot be over-emphasized that YKK had absolutely no rights whatsoever under the License Agreement to manufacture or sell patented zippers in the excluded markets and only enjoyed any profits YKK could recognize in those markets if YKK sold Plaintiff-laminated zippers (and for only so long as Plaintiffs' voluntarily continued to partner with YKK). In fact, YKK's current position, not Plaintiffs' position, renders the HEO excluded market language in the License Agreement meaningless if HEO is defined only as those customers who want to purchase T4/T5 zippers and, by definition, excludes those customers who decide to purchase the T8/T9/T10 zippers at the lower competing prices set by YKK itself. Paraphrasing YKK's own words (Mot. at 15 n. 7), the very existence of the License Agreement HEO exclusionary language disproves YKK's interpretation of the HEO Verdict.

between HEO (outerwear of high quality sold by YKK's "functional" customers who value function and performance as instructed by the HEO Verdict) and non-HEO outerwear.

YKK's additional arguments about alleged non-infringing alternatives also are entirely without basis. Magistrate Judge Netburn already has ruled that Cockrell can testify "that there are no zippers which the outerwear industry has recognized as a legal, functioning alternative." ECF 419 at 44.[13] Donohue further only has calculated damages based on YKK's actual sales made in the face of whatever infringing or non-infringing alternatives existed. *Cf. Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 429-430 (S.D.N.Y. 2013). YKK's own damages expert admitted that YKK made those tens of millions of meters and hundreds of millions in sales revenue notwithstanding whatever infringing or non-infringing competition may have existed. Kindler Tr. 512:22-513:9 & 514:6-515:15 (attached hereto as Exhibit 3). And this Court already has found sufficient evidence of Lanham Act damages in denying YKK's prior motions for summary judgment. ECF 425 at 35-36; ECF 611 at 19 ("Plaintiffs appear to have evidence on which the jury could reasonably find that YKK's advertisements that it had the exclusive right to manufacture, use, sell and import zippers incorporating the water repellant technology cause Uretek to lose sales").

Further, the record confirms that the issue of alleged alternatives, in fact, is nothing but yet another red herring. As set forth in Plaintiffs' June 2, 2023, *Daubert* papers, YKK has not produced a single example of a competing water-resistant zipper being used in high end outerwear, and YKK itself confirmed that as of January 2008 (the year immediately preceding the beginning of the damages period) that "There is very little Competitors PU Zippers found including North Face.

---

[13] In light of, *inter alia*, the above-cited ruling, YKK's suggestion that Plaintiffs somehow are precluded from testifying about the lack of non-infringing alternatives is the subject of a pending motion. *See* ECF 637, 638, 668, & 678. YKK omits informing the Court of this pending motion.

YKK has obtained PU Coil Zipper World Wide!! Estimate 15 Million Meters / Year!!!" *See* PX-404 (attached hereto as Exhibit 4). Not surprisingly, YKK never informed its own industry expert of this fact. *See* Arntson Dep. Tr. 457:14-462:6 (attached hereto as Exhibit 5).

Thus, Cockrell and Donohue have properly applied the HEO Verdict, and YKK's arguments claiming otherwise must be rejected.

### III.    YKK's Challenge to the Entirety of Donohue's Luggage Lost Profits Analysis Is Not Only Untimely, But Also Without Merit.

YKK belatedly moves to exclude Donohue's opinions on damages related to the luggage market and challenge "the entirety of his lost profits analysis for 'luggage' as unreliable ...." Mot. at 19. At the outset, the challenge to anything outside the scope of the supplemental report was never permitted by this Court. YKK could have brought that claim years ago but did not. Such motion, therefore, must be denied on Fed. R. Civ. P. 16 grounds as unpermitted and untimely. The fact that a subset of water resistant zipper sales into the luggage excluded market necessarily is included in Mr. Donohue's *Abitron* analysis does not alter this conclusion.

In any event, and as discussed above, both this Court and Magistrate Judge Netburn already have found that Donohue's damages opinions are admissible, all without any distinction among the particular excluded markets at issue. *See* ECF 425 at 32-36; ECF 419 at 46-50; ECF 611 at 17-19. Further, the false advertising statement broadly addresses all zippers covered by the subject patents without any listing of particular zipper codes. The RCPU zippers were well-known as members of YKK's patented water resistant zipper family (*see, e.g.,* PX-13 attached hereto as Exhibit 6), Masayuki Sarumaru ("Sarumaru") testified at deposition that the advertisements are used when YKK was trying to sell its water resistant zippers to customers (Sarumaru Dep. Tr. at

430:11-16, attached hereto as Exhibit 7[14]), and many luggage manufacturers attended the United States trade show at which YKK regularly maintained a vendor booth and distributed the flyers (Arntson Dep. Tr. at 437:22-450:1, 452:20-453:25, & 458:2-460:1, attached hereto as Exhibit 5[15]).

And Magistrate Judge Netburn already rejected YKK's attempt (Mot. at 18-19 & n. 8) to divorce itself from its own internal coding of the products that constitute "luggage." *See* ECF 419 at 50-51. There, Magistrate Judge Netburn unequivocally stated:

> Defendants offer no reason to believe that their own internal data tags were inaccurate or were used in a fashion that differed from the definitions used in the licensing agreement. At some point experts, like all people, must make some epistemological assumptions, and it is not *per se* unreliable to use YKK's internal sales data coding. If Defendants have evidence or argument that this sales data is unreliable, then that goes to the weight, not the admissibility.

And since that ruling, Sarumaru (who signed the License Agreement on behalf of YKK) has confirmed under oath, further supporting Donohue's opinions, that:

> luggage is a term that covers everything. It has a very broad meaning, and right now luggage, the interpreter interprets that as travel bags, but that could also include business bags, business cases, sports bags, backpacks. Those are all called luggage. It's a term that is generally used. So luggage is -- in one word, luggage covers everything.

1/26/23 HEO Trial Tr. at 517:23-518:3.

At some point this Court must end YKK's attempts to relitigate decided issues any time YKK is permitted to file even the narrowest of motions. Plaintiffs suggest that now, the eve of trial and years after all prior summary judgment and *Daubert* deadlines have passed, is that time.

---

[14] Sarumaru's deposition at which this testimony was given occurred in August 2018. Both the question to Sarumaru and Sarumaru's answer about the flyers' use was phrased in the then present, not the past, tense confirming the continued use of those flyers at that time. *Id.* (Q: "And based on your experience at YKK how **are** these types of documents used by YKK?"; A: "It **is** when a product **is** introduced or presented to customers."); *see also* PX-79U attached hereto as Exhibit 17 (circulating the subject flyer in September 2015).

[15] The trial exhibits marked as deposition exhibits in these passages of Arntson's deposition testimony--in order of reference: PX-79A, 79B, 79C, 79D, 79E, 79F, 79G, 79H, 79T, 79U, 403, 490 (Dep. Exh. 383), 406, 409, 407, & 405 (Dep. Exh. 384)--are attached hereto as Exhibits 8-23, respectively. Contrary to YKK's suggestion (unsupported by any declarations of YKK's own representatives) that the flyers in YKK's trade show booth are not these flyers (Mot. at 3 n. 1), Arntson's above-cited deposition testimony confirmed they were the same.

IV.    **Donohue's Domestic Conduct Calculations Are Admissible.**

YKK makes sweeping, but unsupported, challenges to Part III of Donohue's supplemental expert report, in which Donohue does nothing more than provide, as ordered by this Court, various additional damages calculations that may be relevant to one or more of "the possible legal standards that could emerge from a decision in [*Abitron*]."[16] ECF 957. For the following reasons, the Court must deny YKK's motion.

A.    **Donohue's Domestic Conduct Opinions Are Timely.**

Under the guise of a timeliness objection, YKK oddly complains that Donohue did not "discuss the legal standards that could emerge from *Abitron*." Mot. at 25. As Magistrate Judge Netburn previously has noted, experts cannot opine at to what the law is, but only can give opinions that "would assist the jury in fulfilling its duty of reaching factual conclusions and applying those conclusions to the court's legal instructions."  ECF 419 at 10 (citing *In re Air Disaster at Lockerbie Scot.*, 37 F.3d 804, 826-27 (2d Cir. 1994)); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (the use of expert testimony is not permitted if it will usurp the role of the trial judge in instructing the jury as to the applicable law).

To that end, Donohue simply calculated the only two additional categories of lost profits and disgorgement damages that Plaintiffs could envision accounting, along with Donohue's already issued opinions, for the full range of possible legal standards that could emerge from *Abitron*, namely (1) calculations related to YKK outerwear customers with United States headquarters or offices and (2) calculations related to YKK outerwear customers attending trade

---

[16] Donohue already had calculated Plaintiffs' $11.5 million lost profits damages limited to infringing zippers imported into the United States (PX-263C attached hereto as Exhibit 24) and did not repeat same in his supplemental report. Apparently trying to create some false impression before the Court, YKK repeatedly compares this figure to the supplemental $75.6 million calculation related to the disgorgement of YKK's profits under an alternate measure of damages that might emerge from *Abitron*. Mot. at 2 & 25. The two calculations are unrelated.

shows in the United States where YKK was a participating vendor and at which the false advertising likely was distributed to those customers. Whether any of these calculations, all of these calculations, some combination of these calculations, or none of these calculations ultimately will apply only can be determined once the United States Supreme Court issues its ruling in *Abitron.* Accordingly, Donohue's supplemental opinions are timely.[17]

### B.    Donohue Does Not Opine On Liability and Does Not Recount Any Impermissible Fact Narrative.

YKK's attempt to recast the factual information Donohue properly collected within his researching abilities as an improper opinion on liability must be rejected. At the outset, Plaintiffs note that none of this factual information was provided by Plaintiffs and that Donohue derived the subject factual information through his own independent research. *Cf. Arista Recs., LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009) (an expert "who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge").

<u>First</u>, Donohue previously identified YKK's outerwear customers with United States Headquarters and/or Corporate Offices. That list already was identified on Plaintiffs' trial exhibit list prior to the bifurcation (*see* PX-244 attached hereto as <u>Exhibit 25</u>) and was further revised in Donohue's supplemental report (PX-457 attached hereto as <u>Exhibit 26</u>). There is nothing impermissible about Donohue reporting the results of a search for the headquarters and/or corporate offices of YKK's customers using the customer and other websites.

---

[17] Importantly, however, YKK's arguments in this regard require, as Plaintiffs argued in their June 2, 2023, *Daubert* papers, the preclusion of the newly disclosed opinion of YKK's damages expert that the form of Lanham Act damages awarded should be a reasonable royalty, not lost profits. *See* Mot. at 24, citing *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 WL 4684238, *8 (S.D.N.Y. Apr. 11, 2005) ("[U]ntimely produced evidentiary materials, including expert submissions, are subject to near automatic exclusion.").

Second, there is nothing impermissible about Donohue analyzing YKK's own trade show reports and conducting research on historic trade show websites (all cited as sources in his supplemental report) to identify which YKK outerwear and luggage customers attended trade shows in the United States at which YKK participated as a vendor and likely distributed the offending advertisements. Donohue identifying the subset of excluded market customers which may form the proper basis of any new legal standard announced in *Abitron*, in pertinent part, is no different than Donohue analyzing YKK's internal sales data to determine which YKK customers likely used T8/T9/T10 zippers in HEO and/or which YKK customers likely used T8/T9/T10/RCPU/DT zippers in luggage. Donohue is neither an outerwear nor a luggage expert, but this type of forensic accounting is clearly within his field of expertise and already has been found to be proper and admissible.[18]  ECF 419 at 48-51.

The propriety of such research and analyses by one of Donohue's expertise is well-supported by the case law. *See, e.g., Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,* No. 04 Civ. 7369, 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006) (allowing testimony from economic expert with "significant experience in conducting financial and economic analyses relating to products in the marketplace," even though he didn't have "specific training in the field

---

[18] In contrast, and contrary to YKK's unsupported argument (Mot. at 21), nowhere does Donohue, for example, attempt to express an opinion as to how the false advertising affected any decision-making by YKK's customers, whether based on input from Cockrell or otherwise. The jury will decide factual questions such as these, including considering any burden-shifting presumptions of confusion and injury that will apply should the jury find that YKK's false advertising was literally false or willful. *See, e.g., Merck Eprova AG v. Gnosis S.p.A.,* 760 F.3d 247, 256 (2d Cir. 2014) ("We have held in the past that where a defendant's advertising of products is literally false, a Lanham Act plaintiff need not provide evidence of actual consumer confusion by resort to witness testimony, consumer surveys, or other such evidence in order to establish entitlement to damages under the Lanham Act.") (internal quotation marks omitted); *id.* at 262 ("In a false advertising case such as this one, where the parties are direct competitors in a two-player market, and where literal falsity and willful, deliberate deception have been proved, the presumptions of injury and consumer confusion may be used for the purposes of awarding both injunctive relief and monetary damages to a successful plaintiff."); *Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.,* 926 F.2d 134, 140 (2d Cir. 1991) ("Once it is shown that a defendant deliberately engaged in a deceptive commercial practice, we agree that a powerful inference may be drawn that the defendant has succeeded in confusing the public. Therefore, upon a proper showing of such deliberate conduct, the burden shifts to the defendant to demonstrate the absence of consumer confusion.").

of optometry or experience related to the eye care profession"); *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."); *Sullivan v. Ford Motor Co.*, No. 97 Civ. 593, 2000 WL 343777, at *5 (S.D.N.Y. Mar. 31, 2000) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.").

YKK's position, on the other hand, "would, in essence, disqualify all CPAs from conducting a damage assessment unless they first acquire 'expertise' in the specific industry in which they purport to opine on damages." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 308-09 (S.D.N.Y. 2015). But "[t]he liberal construction of Rule 702 is exemplified by an experienced forensic accountant's ability to testify to the valuation of businesses without regard to the particular industry focus of those enterprises." *Id.* at 309. Ultimately, "[q]uibble[s] with an expert's academic training" go to the "testimony's weight ... not its admissibility," and are an appropriate subject for cross-examination. *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008); *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (expert's lack of experience performing or interpreting air quality studies was "properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility").

Finally, nowhere does Donohue impermissibly repeat an opinion of Cockrell as apparently claimed by YKK. Mot. at 21. Magistrate Judge Netburn already has concluded that Donohue properly can rely on Cockrell's opinions regarding HEO and the alleged existence of

17

non-infringing alternatives (ECF 419 at 47-50), and YKK does not identify any other particular

opinion of Cockrell that appears anywhere in Donohue's report.[19]

### C.    Donohue's Opinions Are Well-Grounded.

In arguing that Donohue's trade show analysis should be precluded, YKK ignores the prior

rulings of this Court, established case law, the factual record, and common sense. If YKK wishes

to attack the credibility of Donohue's conclusions during cross-examination or highlight any

alleged shortcomings of his opinions to the jury, it is free to do so at trial, but for the following

reasons, none of YKK's argument warrant preclusion of Donohue's testimony. *See, e.g., Sarkees*

*v. E. I. Dupont De Nemours & Co.*, 15 F.4th 584, 593 (2d Cir. 2021) ("Of course, [an expert's]

evidence will be subject to cross-examination and challenge by opposing evidence, and ultimately

the weight and persuasive force of [the expert's] evidence will be for the jury."); *Richardson v.*

*Corr. Med. Care, Inc.*, 2023 WL 3490904, at *3 (2d Cir. May 17, 2023) ("[T]he credibility, weight,

and persuasive force of [an expert's] evidence is an issue for the jury to decide."); *see also* Fed. R.

Evid. 702 Advisory Committee Note to 2000 Amendments ("[T]he rejection of expert testimony

is the exception rather than the rule … and the trial court's role as gatekeeper is not intended to

serve as a replacement for the adversary system.").

<u>First</u>, as discussed above, this Court already has found sufficient evidence of Lanham Act

damages in denying YKK's prior motions for summary judgment. ECF 425 at 35-36; ECF 611 at

19 ("Plaintiffs appear to have evidence on which the jury could reasonably find that YKK's

advertisements that it had the exclusive right to manufacture, use, sell and import zippers

---

[19] To the extent YKK somehow is referring to the nature of the outdoor trade shows, any input from Cockrell would have been factual, not opinion, in nature, which information also subsequently was confirmed by YKK's own industry expert at his May 2023 deposition. Arntson Dep. Tr. at 403:20-405:21, 454:1-456:23 (referenced PX-49 attached hereto as <u>Exhibit 27</u>), & 458:2-460:1 (attached hereto as <u>Exhibit 5</u>).

incorporating the water repellant technology cause Uretek to lose sales").[20] The information related to YKK's participation in, and its customers' attendance at, the trade shows only provide **more** information to support that ruling. Thus, if a sufficient dispute of fact already existed to deny YKK's Lanham Act causation summary judgment motions, then one certainly continues to exist to require the denial of YKK's analogous *Daubert* motion.

And the new deposition testimony of YKK's own industry expert Arntson only further confirms that the jury permissibly could consider Donohue's damages opinions.  Arntson testified, for example:

1.  (a) Arntson worked at The North Face ("TNF") about the time the License Agreement was signed, (b) YKK told TNF that YKK was working on the restrictions which might apply to YKK's ability to sell the T8 zipper, (c) TNF would want to know which restrictions did exist for "compliance" and "liability" reasons, (d) YKK never told TNF about the final restrictions, (e) TNF thought YKK had the right to sell TNF the T8/T9/T10 zippers when TNF purchased same, and (f) Arntson could not recall a single instance when TNF made the decision to include a component in its outerwear that TNF knew would infringe a valid United States patent of another company. *See* Arntson Dep. Tr. 463:22-464:6; 466:3-468:18, 469:19-470:21, 414:7-416:22 (referenced PX-488/Dep. Exh. 321 attached hereto as Exhibit 28), 418:4-418:11 (attached hereto as Exhibit 5).

2.  The YKK flyers containing the false advertising were ones Arntson personally recognized as having seen before and as being present in YKK's booth at the United States outdoor trade shows. *Id.* at 437:22-450:1 & 452:20-453:25[21].

3.  Reputable brand companies in the outerwear industry typically are sensitive to the intellectual property rights of their suppliers. *Id.* at 475:6-477:15.

4.  In his own brand of apparel, Arntson would not use a zipper that he did not have the legal right to use. *Id.* at 471:18-473:23.

---

[20] To the extent necessary, all of Plaintiffs' prior summary judgment submissions are incorporated herein by reference in their entirety.

[21] The trial exhibits marked as deposition exhibits in these passages of Arntson's deposition testimony--in order of reference: PX-79A, 79B, 79C, 79D, 79E, 79F, 79G, 79H, 79T, 79U, 403, 490 (Dep. Exh. 383), 406, 409, 407, & 405 (Dep. Exh. 384)--are attached hereto as Exhibits 8-23, respectively.

Second, as noted above, burden-shifting presumptions of confusion and injury will apply should the jury find that YKK's false advertising was literally false or willful. *See, e.g., Merck Eprova AG*, 760 F.3d at 256 & 262; *Res. Devs., Inc.*, 926 F.2d at 140.  Thus, YKK will need to prove that its customers were not confused and did not base their decisions on the mistaken belief that YKK had the right to sell them patented zippers for use in the excluded markets. Related, this Court already has ruled that YKK's statements, if false, are material. ECF 425 at 35-36 ("As a statement concerning YKK's very right to sell the zippers, the statements involved 'an inherent or material quality of the product.'"). Although YKK self-servingly tries to split the factual hairs as thinly as possible to create the false impression of some monumental task of proving Plaintiffs' claim (Mot. at 22), the second jury (as did the first jury) will not leave their common sense at the door of the courthouse—YKK publicly offered patented zippers to excluded market customers with the intentionally false commercial assurance that YKK had the exclusive right to manufacture and sell those zippers, a circumstance to which reputable outerwear manufacturers (such as those making and selling HEO) were sensitive as such advertising expressly references patented intellectual property.[22]

Third, as noted above and as confirmed by Arntson, YKK's own trade show reports provide photographic evidence that these flyers were used in the damages period. *See, e.g.*, PX-407 & PX-409 (attached hereto as Exhibits 22 & 21). Sarumaru's deposition testimony further indicates that the advertisements were used at least through late 2018 when YKK was trying to sell its water resistant zippers to customers (Sarumaru Dep. Tr. at 430:11-16), and PX-79U (attached hereto as

---

[22] YKK's arguments in this regard also constitute an untimely motion for summary judgment as YKK is not challenging Donohue's calculations but rather, in effect, is claiming that insufficient evidence exists for the jury to find causation, thus allegedly preventing the jury from considering Donohue's damages calculations. As such, these arguments must be rejected. YKK has not been given permission to file any such summary judgment motion, nor has YKK complied with the rules regarding same.

Exhibit 17) is documentary evidence of the subject flyer still being in use by YKK through September 2015. Conversely, if YKK fails to present a live witness at trial to deny the continued use of these flyers, including at United States trade shows, the jury can consider that glaring omission in its deliberations as well.[23]

Fourth, the subject false advertising (shown, for example, in PX-79T attached hereto as Exhibit 16) intentionally is presented by YKK under a section called "Notice," with all the text being in bright red (the same color as United States stop signs) for the very purpose and effect of bringing the customers' attention to that language.

Fifth, this Court already expressly has found a dispute of fact as to whether these advertisements constituted commercial speech. ECF 425 at 35. As previously briefed, in order for a statement to be actionable under the Lanham Act, that statement must be commercial advertising or promotion, which is (1) commercial speech , (2) made for the purpose of influencing customers' purchasing decisions, and (3) disseminated sufficiently to the relevant purchasing public. *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004). And "promotion" may take a variety of forms of publicity used in the relevant industry, such as displays at trade shows and sales presentations to buyers. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002) (citing *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996) (finding sales presentation to a significant percentage of industry customers constitutes advertising under the Lanham Act)).

---

[23] YKK argues in a footnote (Mot. at 23 n. 9) that Donohue somehow should have addressed Stuart Press's attendance at these same trade shows. Neither Press nor Plaintiffs, however, were customers of YKK at that time, with Press's focus obviously being on the use of the patented zippers by the finished goods customers exhibiting at these shows. Further, it is undisputed that Mr. Press was complaining about YKK's excluded market activities since no later than early 2006 and that the parties were trying to resolve their differences until the time this action was instituted in early 2015. That this new argument is relegated only to a footnote by YKK is telling.

<u>Sixth</u>, the Lanham Act does not require that Plaintiffs prove every purchase of YKK's accused zippers was caused by the false statements. *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmbH*, 2018 WL 4253181, *13 (S.D.N.Y. 2018) ("plaintiff must prove a diversion of some sales from plaintiff to defendant, essentially establishing a nexus between a competitor's false advertising and a diversion of sales, but need not individually prove every single buyer who was diverted to the false advertising competitor"); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1023 (S.D.N.Y. 1994) ("a plaintiff must show that he or she suffered some damage as a result of the defendant's misrepresentations"); *see generally* 5 McCarthy on Trademarks and Unfair Competition § 27:42 (5th ed.) ("[P]laintiff must prove that at least some customers have been actually deceived, and that plaintiff has been injured in some way as a result of actual consumer reliance on the false advertising"). And "no support [exists for any contention that a plaintiff is] required to prove this causal link with direct rather than circumstantial evidence." *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 740 (8th Cir. 2000).

Overall, none of YKK's assertions warrant the exclusion of Donohue's testimony.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully submit that the Court must deny in its entirety YKK's motion to exclude the supplemental opinions and testimony of Plaintiffs' experts.

Respectfully submitted,

By: /s/ *Brian P. Daniels* _____

    Brian P. Daniels (pro hac vice)
    Michael T. Cretella (pro hac vice)
    BRENNER, SALTZMAN & WALLMAN LLP
    271 Whitney Avenue
    New Haven, Connecticut 06511
    Tel.: (203) 772-2600
    Fax: (203) 562-2098
    Email: bpdaniels@bswlaw.com
    Email: mcretella@bswlaw.com

    Norman H. Zivin (NZ-6053)
    nzivin@wolfgreenfield.com
    Tonia A. Sayour
    tsayour@wolfgreenfield.com
    WOLF, GREENFIELD & SACKS, P.C.
    605 Third Avenue
    New York, NY 10158
    212.849.3341 Phone
    617.646.8646 Fax

    Michael A. Albert
    malbert@wolfgreenfield.com
    Emma L. Frank
    efrank@wolfgreenfield.com
    WOLF, GREENFIELD & SACKS, P.C.
    600 Atlantic Avenue
    Boston, MA 02210
    617.646.8000 Phone
    617.646.8646 Fax

    *Attorneys for Plaintiffs AU New Haven,*
    *LLC and Trelleborg Coated Systems US, Inc.*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 16, 2023, a copy of the foregoing was served electronically on all parties of record.

*/s/Brian P. Daniels*
Brian P. Daniels (pro hac vice)

11u7990.doc

24