UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AU NEW HAVEN, LLC, and TRELLEBORG COATED SYSTEMS US, INC., <br><br> Plaintiffs, <br><br> v. <br><br> YKK CORPORATION, et al., <br><br> Defendants. | Civil Action No. 15-CV-03411 (GHW) <br><br> **DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINIONS** |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...................................................................................................................................2

I.     PLAINTIFFS' EXPERTS FAIL TO APPLY THE JURY'S DEFINITION OF HEO ...................................................................................................................................2

    A.     Mr. Cockrell Gave No Effect to the "Maximizing Profits" Clause ..........................2

    B.     Plaintiffs' Experts' Interpretation of HEO Incorrectly Applies the Features-Based Portion *Ex Ante* and the Profitability Portion *Ex post* ....................3

II.    MR. DONOHUE'S LUGGAGE DAMAGES OPINIONS ARE INADMISSIBLE ...........5

III.   MR. DONOHUE'S CAUSATION OPINION IS NOT ADMISSIBLE .............................6

    A.     Mr. Donohue's Causation Opinion Is Untimely .......................................................6

    B.     Mr. Donohue Is Not Qualified To Offer His Liability Opinions .............................7

    C.     Mr. Donohue's Trade Show Analysis Is Pure Speculation and Inadmissible ...................................................................................................................9

CONCLUSION ................................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arista Recs. LLC v. Lime Grp. LLC*,
  2011 WL 1674796 (S.D.N.Y. May 2, 2011) ................................................................................8

*Arista Recs., LLC v. Usenet.com, Inc.*,
  608 F. Supp. 2d 409 (S.D.N.Y. 2009)..........................................................................................8

*Burndy Corp. v. Teledyne Indus., Inc.*,
  584 F. Supp. 656 (D. Conn. 1984), *aff'd*, 748 F.2d 767 (2d Cir. 1984)....................................10

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013)..........................................................................................8

*Int'l Code Council, Inc. v. UpCodes Inc.*,
  43 F. 4th 46 (2d Cir. 2022) ........................................................................................................10

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
  2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005)..............................................................................7

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
  67 F.3d 435 (2d Cir. 1995)...........................................................................................................8

*Portus Sing. PTE LTD v. Kenyon & Kenyon LLP*,
  449 F. Supp. 3d 402 (S.D.N.Y. 2020)..........................................................................................8

*Washington v. Kellwood Co.*,
  105 F. Supp. 3d 293 (S.D.N.Y. 2015)..........................................................................................8

## Rules

Fed. R. Evid. 401 ..............................................................................................................................9

Fed. R. Evid. 403 ..............................................................................................................................9

Fed. R. Evid. 702 .........................................................................................................................1, 9

**PRELIMINARY STATEMENT**

In 2002 the parties signed the ELA to address the competitive landscape in the laminated water-resistant zipper market. That agreement exclusively licensed a number of YKK entities under the patents then assigned to Hal Hoder and Stuart Press.[1] The ELA had exclusions, but otherwise YKK was licensed and those licensed zippers are not at issue in this action. The focus of this action has been and is Plaintiffs' assertion that YKK sold unlicensed zippers to a specific excluded market—the High End Outerwear ("HEO") market. The Court held a trial to define "HEO" as used in the ELA, and the jury did so. Dkt. 918. Thereafter, the parties were given the opportunity to supplement their expert reports to apply the jury's definition of HEO or risk exclusion under Rule 702. Plaintiffs decided not to supplement their experts' opinions to apply the jury's definition – instead claiming, baselessly, that the jury wholesale adopted the definition their experts applied years before the verdict.

But Plaintiffs' pre-verdict definition, which was provided by David Cockrell, was only a recitation of qualitative features without any attempt to address the jury's requirement that such features be looked at in the specific context of maximizing the parties' profits in the global market.[2] Nonetheless because Plaintiffs are more dedicated to preserving their original damages numbers than they are to applying the jury's definition, they maintain Mr. Cockrell's original entirely features-based allocation of garments into HEO and then assert that, serendipitously, this allocation results in an optimal re-distribution of profits over the entirety of the agreement.

Under Plaintiffs' view, however, it would be impossible to know whether zippers were

---

[1] It still is unclear where at least some of these licensed assets eventually were assigned. *See, e.g.,* Dkt. 958 at 12 ("When confronted with a request to document Randal Hoder's status as heir to Mr. Hoder and to implement the requested transfer, the TIPO records show, Plaintiffs stopped trying.").

[2] "Global" plainly is a geographical term, not an invitation to inject the licensed zippers into the definition of what is excluded from the ELA by having Mr. Donohue include revenue and profits numbers for the licensed zippers.

1

being sold for use in HEO until long after the zippers were sold, and after a cohort of manufactured garments was identified using Mr. Cockrell's *ad hoc* features so that a profitability analysis could then be done, under various assumptions, to determine and then re-allocate "profitability." That temporal issue shows that Plaintiffs cannot be right, and that their experts' opinions on this topic cannot be squared with the first jury's verdict, and thus have no relevance. The HEO grouping Mr. Cockrell assembled, without any assessment of maximizing profitability *before* the sale of the zippers, represents years of sales under different conditions, and Mr. Donohue's *ex post* profitability analysis was reflexively applied to that grouping of years of sales. This is not what the parties agreed to, and not the definition the jury adopted. The Court should exclude the supplemental opinions of Messrs. Cockrell and Donohue in their entirety.

## ARGUMENT

### I. PLAINTIFFS' EXPERTS FAIL TO APPLY THE JURY'S DEFINITION OF HEO

#### A. Mr. Cockrell Gave No Effect to the "Maximizing Profits" Clause

Plaintiffs concede that, in defining HEO, Mr. Cockrell did not consider whether it was actually feasible to sell Uretek-laminated T4 or T5 zippers for inclusion in the garments he identifies as HEO, or whether their relative price, delivery time, quality, availability, and the capacity of Uretek to laminate the zippers as compared to market competitors made T4 and T5 zippers a non-starter as to any of those products. Instead, Plaintiffs contend that Mr. Cockrell did not have to consider any of these factors in identifying HEO because they are not explicitly mentioned in the HEO verdict. Pls' Opp. at 3. This makes no sense. If the market would not buy T4 or T5 zippers for particular outerwear, and YKK could also not sell its own, royalty-bearing laminated zippers for inclusion in those garments with particular features, the only entity whose profits would be maximized is the competition. Plaintiffs' experts' interpretation reads the profit maximization clause out of the HEO definition altogether, by giving the clause a circular meaning.

2

Indeed, under Plaintiffs' experts' interpretation, it does not matter if Mr. Cockrell identifies 100 meters, 10,000 meters, or 1 million meters of zippers sold to various garments over a span of years because Mr. Donohue's calculations would result in "profits" for both parties, supposedly confirming that Mr. Cockrell identified the correct set of HEO. Plaintiffs attempt to address this logical flaw by arguing that the jury included the profit maximization clause to make sure the parties do not allocate too much or too little to HEO. Again, this makes no sense. Putting aside the fact that the parties would have no way to know before selling a zipper whether the sale would be in the "too much" or "too little" category, the first jury was not presented any evidence on quantities of meters sold, or any damages numbers. They simply heard that the garment manufacturing industry was moving to Asia, there was increased competition, and that significant clients, such as The North Face, were switching to competitors' water resistant zippers. *See, e.g.*, DX-56; DX-92. Consequently, the parties entered into the ELA so that YKK could sell water resistant zippers laminated by YKK in Asia (to address the lead time and price concerns of customers), rather than lose the sales to competitors. *See* YKK Mot. at 5. "Maximizing profits for all parties in the global market" refers to not losing sales to competitors, but Plaintiffs' experts' methodology assumes that competitors are not an issue at all. Mr. Cockrell's pre-verdict, features-only based definition of HEO fails to incorporate the profit maximization clause and thus his opinions (and derivatively Mr. Donohue's opinions) regarding HEO should be excluded.

      **B.    Plaintiffs' Experts' Interpretation of HEO Incorrectly Applies the Features-Based Portion *Ex Ante* and the Profitability Portion *Ex post***

Plaintiffs admit that Messrs. Donohue and Cockrell's definition of HEO uses an "after-the-fact revised profit breakdown[]" to divvy up profits between YKK and Uretek, based on Mr. Cockrell's previous HEO analysis. Recognizing that the point of a definition is to let the parties know *ex ante* what is within the excluded field, Plaintiffs unveil a new theory for how Mr.

3

Cockrell's features-based analysis could have been applied "in live time." Pls' Opp. at 7-8. Specifically, Plaintiffs posit that based on YKK's sales records, "the parties contemporaneously (on an annual, if not shorter, basis)" would have been able to track the volume of Uretek-laminated and YKK-laminated zippers and "based upon the threshold of 'high end outerwear' being employed by YKK at any given time" would have been able to "raise any concerns that the other party was setting that threshold too high or too low as it related to the profits of both Plaintiffs and YKK in the global outerwear market." *Id*. This new attorney theory, however, is not part of Plaintiffs' experts' reports or opinions, and does not convert their "profitability" analysis into part of the definition of HEO because, regardless of whether one were to track the volume of zippers one week, one month or one year after they were sold, the point is that it is still *after* – the decision of whether the sale could only be a T4/T5 zipper or a different type of zipper has already been made. And, although Plaintiffs state that this process is "evidenced by the circumstances under which this dispute arose in mid-2006" (*Id*. at 8), the jury did not hear any evidence related to the commencement of the dispute because the parties agreed that the dispute was irrelevant to defining HEO as used in the ELA. *See* Dkt. 869 at 44 and 52-53.[3]

Moreover, although Plaintiffs state that Mr. Cockrell engaged in a three-step sequential process to comply with the HEO Verdict (Pls' Opp. at 5-6), Plaintiffs' explanation of "maximizing profits" shows that Mr. Cockrell's analysis collapses into one step, *i.e.,* consideration of the features he identified in 2017. Mr. Donohue's calculations reflected in the exhibits appended to Mr. Cockrell's supplemental report (Defs' Ex. A at Exhs. 1 & 2 ), which Plaintiffs emphasize was an important "middle step," was not a step at all. Mr. Donohue merely assumes Mr. Cockrell's

---

[3] Moreover, even the evidence concerning the commencement of the dispute does not suggest the parties would ever engage in the process now proposed by Plaintiffs; if anything, as discussed in Lauren Kindler's reports, assuming infringement, that evidence supports that the parties would have agreed to a reasonable royalty in 2006—precisely what Uretek was asking for at the time. (Pls' Ex. 4 at 68-73; Dkt. 364-2 at ¶¶ 118-161.)

4

2017 definition of HEO is correct and then calculates the profits flowing to each party in that hypothetical world based on numerous baseless assumptions outside Donohue's expertise as an accountant. This so-called "middle step" is not part of a methodology for defining what is or is not HEO because it does not provide any way to alter what already was included in HEO.

Finally, Plaintiffs' experts' interpretation of HEO violates the Court's ruling granting YKK motion *in limine* 4 because "the other parts of defendants' business, including the sales of zippers that were sold in undisputedly permitted markets are not at issue here." Dkt. 626 at 62:23-63:3. Plaintiffs' proposal would improperly put YKK's financials in the permitted markets front and center. Plaintiffs wrongly argue that the jury undid the Court's ruling on motion *in limine* 4 by referring to the "global market," which Plaintiffs contend must mean YKK's overall profits. But evidence of YKK's global profits was never before the jury; instead, the jury's reference to the "global market" acknowledges the geographic shift of the outerwear garment industry to Asia. Despite the Court's warning against "taking the position that the import of the jury's definition was … that so long as the overall deal is profitable for all parties" then the items that meet Mr. Cockrell's features-based conditions are HEO, Plaintiffs have done just that. *See* Dkt. 950 at 5:17-6:13; *id.* at 7:8-20.[4] Overall profitability and hypothetical profit sharing are the touchstones of Messrs. Cockrell's and Donohue's opinions regarding HEO, and those opinions should be excluded as irrelevant, highly prejudicial, and confusing.

## II. MR. DONOHUE'S LUGGAGE DAMAGES OPINIONS ARE INADMISSIBLE

Contrary to Plaintiffs' assertions (Pls' Opp. at 12), Defendants' challenges to Mr.

---

[4] Plaintiffs contend that YKK takes the Court's warning out of context because the Court subsequently asked the parties to explain how their experts' opinions map onto the HEO verdict, and thanked Plaintiffs for their "helpful" explanation. *Id.* at 13:19-16:3. Notably, a few days later, the Court issued a scheduling order warning the parties that if they elected not to submit new expert reports accounting for the HEO verdict, they "should expect that the Court will evaluate the admissibility of their proposed expert testimony as previously presented to the Court." Dkt. 945, n. 3.

5

Donohue's luggage opinions are timely because they relate to his new supplemental opinions. Mr. Donohue purports to calculate profits Plaintiffs allegedly lost because luggage manufacturers changed their purchasing decisions and bought predominately RCPU zippers instead of Uretek-laminated zippers after they read the challenged statement on a flyer that only mentioned T4, T5, T8 and T10—but not RCPU—zippers. There is no logical causal nexus between YKK's sales of RCPU zippers and a flyer for Aquaguard zippers. Thus, Mr. Donohue's opinion regarding damages related to "luggage" should be precluded. In their opposition, Plaintiffs conclusorily assert that "RCPU zippers were well-known as members of YKK's patented water resistant zipper family." (Pls' Opp. at 12). Although Plaintiffs cite to PX-13, that is an internal YKK presentation and does not support Plaintiffs' assertions. At any rate, as noted in the next section, Plaintiffs fail to show that the challenged statement influenced a single purchasing decision—a point that is as true for the luggage market as it is for the HEO market.

## III.   MR. DONOHUE'S CAUSATION OPINION IS NOT ADMISSIBLE

### A.   Mr. Donohue's Causation Opinion Is Untimely

It is undisputed that Plaintiffs must prove causation to support any damages asserted for their Lanham Act claim. *See* Dkt. 611 at 17. Initially Plaintiffs expected to establish causation through "expert testimony from [Mr. Cockrell] who was set to testify that companies would not have purchased the accused zippers from YKK if they had known that YKK allegedly was infringing upon Uretek's patents. . . . But the Court excluded that testimony, finding this opinion rooted in hypothetical speculation, abstract beliefs, and attorney argument." Dkt. 611 at 17-18 (citations and punctuation omitted). In its July 30, 2020 Order, the Court noted that without Mr. Cockrell's causation opinion, Plaintiffs were "[c]lutching at straws to keep their claim alive," through a "chain of inferences" and that even the "most generous reading of Plaintiffs' theory of causation" would be "tricky" to prove at trial. *Id.*

6

Faced with this daunting task, Plaintiffs seized the opportunity of supplemental expert reports to have Mr. Donohue step in and, for the first time, try to fill the causation gap. Based on nothing but his *ipse dixit*, Mr. Donohue, a CPA, opines that flyers with the challenged statement were displayed at all Outdoor Retailer trade shows from 2009 through 2019 and that all of "the YKK customers who attended the Outdoor Retailer trade shows in the United States [] were therefore *likely* exposed to YKK's false advertisements." Ex. B at ¶ 48. Mr. Donohue then opines, outside his field of accountancy, that all of YKK's sales to these customers that were allegedly in the excluded fields (including luggage, even though the RCPU zippers were not even mentioned on the challenged flyer), were diverted from YKK's T4/T5 zippers to YKK's RCPU, T8, T9, or T10 zippers, and provides damages numbers based on that theory. Thus, necessarily baked into Mr. Donohue's damages opinion is the completely speculative assumption that all the customers for whom he calculates damages read the challenged statement and actually decided not to purchase T4/T5 zippers *because of* that statement. Indeed, without this causal link, Mr. Donohue's new damages opinion is irrelevant—having no bearing on any claim in this case—and would be highly prejudicial and confusing to the jury.

Plaintiffs' argument that Mr. Donohue's untimely causation opinion is in response to the Court's instruction that supplemental reports "account for the full range of possible legal standards that could emerge from a decision in" *Abitron* (Dkt. 958) is without merit. The requirement to prove causation existed before the *Abitron* decision and will exist after. The only circumstance that has changed is the fact that Mr. Cockrell is not permitted to opine on causation. Mr. Donohue's highly speculative causation theory is untimely and should not go to the jury. *See Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 2005 WL 4684238, *8 (S.D.N.Y. Apr. 11, 2005).

**B.     Mr. Donohue Is Not Qualified To Offer His Liability Opinions**

Plaintiffs concede that if Mr. Donohue were to simply recite hearsay facts he found by

7

searching the internet, without providing any expert analysis of those facts, that would be improper. *See* Pls' Opp. at 15; *Arista Recs., LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009). Therefore, Mr. Donohue's factual narrative could only be admissible if Mr. Donohue were qualified to analyze those facts and provide an expert opinion explaining how the subset of customers he identifies represent those who were planning to purchase T4/T5 zippers but, because of the challenged statement, purchased RCPU, T8, T9 or T10 zippers instead. As a CPA, Mr. Donohue is not qualified to offer opinions about customers' purchasing behavior,[5] including what they would read or review when making purchasing decisions, who would make those decisions (and whether that person, in particular, attended trade shows in the U.S.), and how those decisions were made within each company that operates on a worldwide basis. *See, e.g.*, *Morse/Diesel, Inc. v. Trinity Indus., Inc.,* 67 F.3d 435, 444 (2d Cir. 1995); *Portus Sing. PTE LTD v. Kenyon & Kenyon LLP*, 449 F. Supp. 3d 402, 420 (S.D.N.Y. 2020); *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, *9-10 (S.D.N.Y. May 2, 2011).[6] Yet, by providing damages opinions for a particular subset of companies that he identifies, Mr. Donohue necessarily relies on a causation analysis to identify that subset; otherwise his damages numbers are irrelevant and unfairly prejudicial.

Mr. Donohue's factual narrative is improper and inadmissible because it could only be presented for two possible purposes—both equally inappropriate: (1) either Mr. Donohue is offering a causation opinion based on his analysis of hearsay facts and intends to opine that the

---

[5] Plaintiffs' cited cases are inapposite on the relevant point of Mr. Donohue's expertise to give *industry* opinions. *See, e.g.*, *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 308-11 (S.D.N.Y. 2015) (finding CPA expert's "experience in accounting and business valuation does not translate into marketing expertise" and excluding his opinion on same as "wholly outside of the scope of his expertise").

[6] Plaintiffs misstate YKK's argument to require disqualification of damages experts who do not possess expertise in the specific industry. *See* Pls' Opp. at 17. Mr. Donohue's opinions are inappropriate because they are not limited to measuring damages, but rather seek to stich in a *liability* opinion that requires *industry* expertise that he plainly (and admittedly) lacks. *See, e.g.*, *Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013); *see also*, Ex. D. at 284:4-11; *id.* at 310:12-18.

8

challenged statement actually caused a particular subset of customers to change their purchasing decisions (an opinion he is unqualified to give), or (2) Mr. Donohue is simply repeating hearsay facts found off the internet[7] with no expert analysis so that the jury can then use those facts for their own causation analysis. Plaintiffs' position appears to be that Mr. Donohue is doing the latter. *See* Pls' Opp. at 16, n. 18 ("[N]owhere does Donohue, for example, attempt to express an opinion as to how the false advertising affected any decision-making by YKK's customers … [t]he jury will decide factual questions such as these…"). Plaintiffs, however, cannot use their experts as a vehicle to fill evidentiary gaps and put otherwise inadmissible hearsay before the jury.

        **C.**        **Mr. Donohue's Trade Show Analysis Is Pure Speculation and Inadmissible**

Given the unreliability under Rule 702, the irrelevance under Rule 401, and the high risk of unfair prejudice and jury confusion under Rule 403, Mr. Donohue's speculative trade show opinions, well beyond his accounting expertise, should be excluded. First, Plaintiffs reliance on the Court's July 2020 summary judgment opinion is misplaced. This opinion was issued three years ago—long before Plaintiffs invented their new causation theory and used Mr. Donohue as a vehicle to try to get their trade show hearsay evidence before the jury. The Court's 2020 Opinion did not prospectively bless Mr. Donohue's 2023 methodology, which relies upon information gleaned from the internet that was not presented to the Court (or even in the record) at the time.

Second, Plaintiffs' argument about a burden-shifting presumption for consumer confusion is a red herring. Mr. Donohue's inappropriate "trade show analysis" is Plaintiffs' attempt to prove causation–it has nothing to do with consumer confusion, which arises under the falsity element of their Lanham Act claim. In addition, Plaintiffs' argument that the Court already ruled that the

---

[7] For example, Mr. Donohue searched the internet to find YKK customers' headquarters and/or corporate offices, and who attended Outdoor Retailer shows (*e.g.* Ex. B, ¶¶ 41-44). Plaintiffs blatantly mischaracterize this effort as "forensic accounting" (Pls' Opp. at 16); however, no special accounting skills or degrees are required to conduct this type of internet search.

challenged statement is material is wrong.  YKK, not Plaintiffs, moved for summary judgment, and the Court did not secretly grant summary judgment in Plaintiffs' favor on materiality.  Indeed, the only language in the Court's opinion as to materiality is limited to "[c]onstruing the evidence in the light most favorable to Plaintiffs."  Dkt. 425 at 35.  That does not mean Mr. Donohue automatically is allowed to opine on that fact issue given his lack of relevant expertise.[8]

With respect to Plaintiffs' Third and Fourth arguments, these are factual arguments that are belied by the record, and thus cannot provide a reliable basis for Mr. Donohue to offer a causation opinion (even if he were a qualified industry expert).[9]  Fifth, Plaintiffs refer to the Court's March 2019 summary judgment opinion finding that there are disputed material facts concerning whether the challenged statement is commercial speech, but fail to explain how this holding provides Mr. Donohue with a reliable, non-speculative methodology to opine on causation.  Sixth, and finally, Plaintiffs cite a string of cases that stand for the unremarkable proposition that where there is proof of diversion of some sales, but not all sales, then the damages should reflect the amount of sales that were actually diverted.  But these cases only confirm that Mr. Donohue's opinion misses the mark because he fails to utilize a methodology that would identify only those customers whose sales were actually diverted away from T4/T5 zippers because of the challenged statement.

## CONCLUSION

The Court should exclude the opinions and testimony of Messrs. Cockrell and Donohue.

---

[8] Plaintiffs also attempt to conflate *materiality* with *causation*.  Materiality requires Plaintiffs to prove that the challenged statement is of the type that would cause customers to change their purchasing decisions.  *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F. 4th 46, 63 (2d Cir. 2022).  Causation, on the other hand, requires proof that when changing their purchasing decisions, the customers would have purchased *Plaintiffs' product*, rather than a competitors' product, adopt a different design, or decide to drop the product altogether.  *See Burndy Corp. v. Teledyne Indus., Inc.*, 584 F. Supp. 656, 664 (D. Conn. 1984), *aff'd*, 748 F.2d 767 (2d Cir. 1984).

[9] There are countless examples of Plaintiffs' overreaching and mischaracterizing the record, but not enough space to detail them all.  *See e.g.*, Pls' Opp. at 20-21 (citing "photographic evidence" that flyers with the Remaining Statement were used during the relevant period, while failing to mention that their own expert who cited them admitted that the images were too blurry to tell what the flyers said.  Ex. D. at 602:10-603:22; *see also* YKK Mot. at 3, n. 1.

Dated: June 23, 2023

Respectfully submitted,

By: /s/ *Steven Cherny*
Steven Cherny
Harvey J. Wolkoff
Deborah K. Brown
Brian Biddinger
Owen Roberts
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.: (212) 849-8700
stevencherny@quinnemanuel.com
harveywolkoff@quinnemanuel.com
deborahbrown@quinnemanuel.com
brianbiddinger@quinnemanuel.com
owenroberts@quinnemanuel.com

Immanuel R. Foster
Elizabeth M. Kelly
QUINN EMANUEL URQUHART
& SULLIVAN LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
Tel.: (617) 712-7142
immanuelfoster@quinnemanuel.com
elizabethkelly@quinnemanuel.com

Russell A. Korn
Michael A. Bertelson

KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE Suite 2800
Atlanta, Georgia 30309-4528
Tel.: (404) 815-6500
rkorn@kilpatricktownsend.com
mbertelson@kilpatricktownsend.com


Kate Cassidy
LTL ATTORNEYS LLP
152 West 57th Street, 19th Floor
New York, New York 10019
Telephone: (332) 244-7015
kate.cassidy@ltlattorneys.com

*Attorneys for Defendants*